No. 19,397.

JENNIE D. FEICHTER, *Appellant*, v. ERNEST E. FEICHTER, *Appellee*.

### SYLLABUS BY THE COURT.

TRIAL—*Absence of Judge During Arguments—Prejudicial Error*. It is the duty of the judge of the district court to preside during the trial of cases; and where, over the objections of one of the parties, he calls the clerk to preside at the argument of a case and leaves the court room, a very slight showing of prejudice is sufficient to authorize a reversal of the judgment with direction to grant a new trial.

Appeal from Decatur district court; WILLIAM S. LANGMADE, judge. Opinion filed February 12, 1916. Reversed. Opinion denying a rehearing (*post*, p. 168), filed March 11, 1916. Reversal sustained.

*H. O. Caster*, of Oberlin, for the appellant.
*J. P. Noble*, of Oberlin, for the appellee.

The opinion of the court was delivered by

PORTER, J.: This is an ordinary suit to foreclose a mortgage on real estate. The plaintiff is the wife of the defendant, but when the suit was filed they had separated. The husband answered, admitting the execution of the note and mortgage and alleging that they were given without any consideration. As a second defense the answer alleged that the parties were husband and wife and that the note and mortgage were given for and in contemplation of securing a divorce without any defense thereto, and are therefore void as against public policy. The cause was tried to a jury and a verdict returned in favor of the defendant. A motion for a new trial was overruled and plaintiff appeals.

Feichter v. Feichter.

Since the trial the court house burned and the stenographer's notes were lost. Plaintiff has been unable to procure a transcript of the evidence. There are no errors assigned in plaintiff's abstract; but in the brief complaint is made that the trial court committed an abuse of discretion which prevented plaintiff having a fair trial. The abstract contains this statement:

"Just prior to the argument to the jury the court called upon the clerk of the district court to preside and keep time at the arguments, saying that he had himself some other matters to attend to. Whereupon, the appellant objected to the court's leaving the room and objected to anyone else presiding except the judge himself, saying that considerable irrelevant matter had leaked in during the trial of the case and that he feared that the argument would not be confined to the testimony. The court jokingly replied that he did not think that if he remained he would be able to keep attorneys for either side within the testimony, and left the court room and remained absent during the arguments."

It is further stated in the abstract that during the argument the jury were told by counsel for the defendant that the plaintiff was of bad moral character, and that this statement was made notwithstanding that depositions offered by the defendant for the sole purpose of attacking the personal and moral character of the plaintiff had been rejected by the court as incompetent and irrelevant. Some of the facts contained in plaintiff's abstract as to what occurred are denied by the defendant in a counter-abstract, in which it is asserted that the judge remained in the court room during the argument to the jury of counsel for plaintiff.

We think the record discloses prejudicial error. A party has a right to complain of the action of a judge in calling the clerk to preside at a trial and leaving the court room. This ought to be the rule in any lawsuit; and it certainly applies to a case that has been warmly contested and where prejudice is likely to result from statements outside the record made during arguments. Apparently enough had already transpired to satisfy the judge that he would have difficulty in confining the arguments of counsel to the real issues in the case. The plaintiff objected to the action of the judge in turning the business of the court over to the clerk, and it ought not to require very much of a showing of prejudice to authorize a new trial. There are several things in conection with this case that satisfy us that plaintiff was denied a fair trial.

In a criminal case (*The State v. Beuerman,* 59 Kan. 586, 53 Pac. 874) it was said in the opinion:

"The absence of the judge during the progress of a trial can not be sanctioned. The argument of a cause is an important part of the trial, and it is essential that it should be conducted in the presence and hearing of the judge who must ultimately approve the proceedings and render judgment. The hearing and conduct of the argument is almost, if not quite, as important as the hearing and reception of testimony; and the judge should be present to see that counsel in their arguments do not go beyond the bounds of legitimate discussion and to determine any objections that may be raised. In fact, there can be no court without a judge, and he can not even temporarily relinquish control of the court or the conduct of the trial. It is necessary that he should hear all that transpires in the trial in order that he may intelligently review the proceedings upon the motion for a new trial." (p. 591.)

The judgment is reversed and a new trial ordered.

### OPINION DENYING A REHEARING.

The opinion of the court was delivered by

PORTER, J.: In an application for rehearing it is insisted that the decision reversing the judgment was predicated upon a misunderstanding of the facts. It is said that each side was given one hour for argument, that the judge was present during about one-half of the opening argument of the defendant, who had the burden of proof, and that the judge then called a member of the bar to preside and left the court room, that he returned before the plaintiff finished speaking and presided all the time during defendant's closing argument. Our attention is also called to the fact that the courthouse was not burned, and that the stenographer's notes were lost in a fire that occurred at some other place.

Whether, as plaintiff contended, it was the clerk who was called to preside during the absence of the trial judge or some one else, as defendant contends, makes no difference. The decision was rested upon the wholesome doctrine declared in *The State v. Beuerman,* 59 Kan. 586, 53 Pac. 874, cited in the opinion, that the absence of the trial judge during the argument of a cause can not be sustained. Historically, it is important to know that the courthouse was not burned.

Rehearing denied.

No. 19,521.

JAMES P. HOLLAND, *Appellant*, V. JAMES HOLLAND AND
FRANCIS A. HOLLAND, *Appellees*.

SYLLABUS BY THE COURT.

1. PARENT AND CHILD—*Contract—Future Support—Partial Performance
—Breach—Ouster—Equities.* Plaintiff, among other things, alleged
that about 1888 his parents agreed with him and his brother that in re-
turn for their support the parents would give their land to the sons, by
will or otherwise; that afterwards it was agreed that each of the sons
was to have one-half the land; that the plaintiff took possession of his
half and lived thereon as his homestead for seventeen years, supporting
the parents until the surviving father left the place; that such sup-
port was worth much more than the use of the land; that the father
and brother had conspired to oust him therefrom and to sell the land,
had converted personal property belonging to him, and were threaten-
ing to sell other property in which the plaintiff had a joint ownership.
*Held,* error to compel him to elect to try only one of such matters, as
all should have been settled in the one action.

2. SAME—*Specific Performance Refused.* Having found that the plaintiff
had breached the contract by failure to support his father and by
putting him in fear of bodily harm by threats of violence and personal
injury, thereby causing him to leave, the trial court rightfully held
him not entitled to specific performance.

3. SAME—*Value of Father's Support—Use of Land.* But in view of
the long-continued support furnished by the son and the allegations
as to its value, it is held that he has a right to enjoin ouster and the
sale of the land to another until reimbursed or secured for the value
of such support over the use he has had of the land.

Appeal from Dickinson district court; ROSWELL L. KING,
judge. Opinion filed February 12, 1916. Modified.

*Lee Monroe,* of Topeka, and *W. S. Roark,* of Junction City,
for the appellant.

*James V. Humphrey,* of Junction City, and *C. S. Crawford,*
of Abilene, for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiff, James P. Holland, sued his father
and brother to protect his possession and interest and perfect
his title to certain land claimed by him in pursuance of an
oral agreement with his parents by which they were to be

supported by the sons and leave the land to them by will or otherwise, also to recover for certain personal property alleged to have been converted by the father and brother and to enjoin them from disposing of certain personal property claimed by the plaintiff. The jury found, among other things, that about 1888 the parents made an oral agreement with their sons, James and Francis, to make a will giving to each one-half of their land; that in part consideration for this agreement the sons were to support the parents during their lifetime, and were also to pay off a mortgage on the land; that afterwards an agreement was made to divide the land, James to have one-half and Francis the other, and possession was taken by the two sons and the mortgage was paid by them from their funds; that pursuant to the first agreement a will was made, giving to each 'a half interest in the land subject to certain bequests to be paid by the sons, to which they consented; that James supported and cared for his parents up to October, 1910; that the father left his home by reason of the persuasion and undue influence of Francis.

The plaintiff having been compelled to elect and having proceeded upon the first cause of action only, the court announced that it would dismiss the action as premature, apparently on the ground that the will could not take effect during the testator's lifetime and hence the plaintiff was not entitled to a decree. While expressing some dissatisfaction with one finding, it was stated that the court had decided neither to make another nor to set that one aside. Afterwards, however, the findings that the father had not left because of James' failure to care for him properly or mistreatment, but had left on account of the influence of Francis, were set aside and findings made by the court that James committed a breach of the oral agreement by neglecting and failing to properly care for his father, by putting him in fear of bodily harm by threats of violence and personal injury, thereby causing him to leave his home, and that the mortgage was paid from the proceeds of certain live stock owned by the father and sold by the sons. The conclusions of law were to the effect that an action for a specific performance could not be maintained during the life of the father and that the son was not entitled thereto because he had not performed the oral agreement upon his part but

had committed a breach thereof, and it was therefore adjudged that the first cause of action be dismissed for want of equity; that the plaintiff was not entitled to the injunction prayed for to restrain the disposal of the land nor to any other equitable relief, "for the reason that he has forfeited all right to any interest in or to the same by his failure to perform the oral agreement in question and by his breach of the conditions of the same."

Some question is made whether these findings were made by the court or by the judge in vacation and some contention that the appeal is not timely, but from the entire showing it must be held that the findings were first made a part of the journal entry by the court at the succeeding term, and that the appeal was taken in time.

The plaintiff claims that his expenditures in the support of his parents amounted to $12,000 more than the use of the land, and that the father, having been tolled away by the brother, is conspiring with him to sell the land and oust the plaintiff therefrom, and has even brought a forcible detainer suit in pursuance of such purpose; that the plaintiff has occupied the land as a homestead for seventeen years, that he has at all times been willing to support his father and in his petition tenders such support and a good and sufficient bond to secure the same. It is urged with much force that the plaintiff has acquired an interest in the land which equity should protect even though he may have been at fault in not keeping on good terms with his father.

Numerous cases are cited holding in substance that after a long-continued execution on the part of the child such a contract may be breached by the parent; but the feature which distinguishes this from any cited case is the express finding that the plaintiff himself breached the contract by practically driving his father away. Taking this finding as true, as we are compelled to do under the rules, the trial court was justified in holding that the plaintiff is not in condition to ask a court of equity to enforce the contract. But after much consideration this court has reached the conclusion that as the contract appears to have been made by both parents with both of the sons, who were to render the support in return for land, that the entire support of the parents for many years

seems to have been furnished by the plaintiff, he having entered upon the land by the consent of the parents under the contract and raised his family there and regarded it as a homestead for more than fifteen years—if the support furnished was as alleged of many times more value than the use of the land—it is not fair or equitable to hold that the father can put the plaintiff and his family off the land and dispose thereof without any regard to the rights therein of the son who offers to secure his father's continued support.

The principle of allowing for partial consideration paid, or part performance had before the breach or misconduct of the grantee, has been recognized in a number of decisions involving contracts somewhat similar to the one before us. In *Penfield v. Penfield,* 41 Conn. 474, the son supported the father a few months and then a quarrel arose and thereafter the son failed to care properly for him. In compelling a reconveyance the court said:

"The inconsiderable sums which the respondent has paid for taxes on the property and interest on the mortgage, since the conveyance to him, are fully balanced by his use of the property." (p. 480.)

*Pitts, Adm'r, v. Pitts,* 21 Ind. 309, was an action by a daughter against her father's estate on a note given in consideration of her living with and keeping house for him. An instruction to the effect that if she, without sufficient cause or without his consent, left his service before his death she could recover the reasonable value of her services, was approved. In *Vancleave v. Clark,* 118 Ind. 61, 20 N. E. 527, 3 L. R. A. 519, a man contracted with another for the support of his infant daughter in his own family as one of his children. After thus supporting her for some time he placed her in a county asylum among common paupers, on account of her having become insane. It was held that the recovery for the breach of the contract would be the difference in value between the care contracted for and the care received. It was said:

"In this case the appellant had fully complied with the contract for nearly two years. Under this state of the case it is not competent for the appellee to sue for and recover the entire consideration paid by him by reason of the failure of the appellant to comply with the contract for the period of nine months." (p. 66.)

Holland v. Holland.

In *Patton v. Nixon*, 33 Ore. 159, 52 Pac. 1048, a woman made a conveyance of her property to her daughter in consideration of her future support, and after receiving such support for a time it ceased, and it was held that while she had a remedy at law to recover by way of damages, equity would dispose of the matter by making her maintenance a charge upon the property. The supreme court of Minnesota in *Bruer v. Bruer*, 109 Minn. 260, 123 N. W. 813, in a case of conveyance by a parent to his son for support and maintenance during the remainder of his life, held that upon breach of the agreement by the son the plaintiff could have the conveyance set aside or the amount due under the agreement made a lien upon the land or such other relief as the equities made justifiable. It was said in the opinion (p. 265) that by the modern trend of authority these transactions are placed in a class by themselves and enforced without regard to form and phraseology. In *Norris v. Lilly*, 147 Cal. 754, 82 Pac. 425, a suit for cancellation for breach of contract to support after performance had continued for six years, while the question arose upon the correctness of the judgment upon the pleadings, it was said in the opinion:

"In the very case here pleaded, if the defendants, after the payment or this money, and after years of personal service, had refused to proceed further with the contract, plaintiff unquestionably would have been entitled to rescind, but in rescinding, the court of equity would take cognizance of the value of the services rendered and the moneys paid, the value of the occupation of the land by the promisors, and reach its conclusion under the evidence as to the terms upon which a cancellation of the deed should be decreed." (p. 756.)

In *Johnson v. Paulson*, 103 Minn. 158, 114 N. W. 739, in a case of breach after partial compliance, it was held that the court was justified in ordering judgment that the land should be returned to the grantors, "with the right of possession upon payment to the grantees of an amount sufficient to reimburse them for the expense incurred in making improvements on the premises." (Syl.) This is a well-considered case, and numerous authorities are cited. (See, also, *Bogie v. Bogie and another*, 41 Wis. 209; Note 43 L. R. A., n. s., 916; 6 R. C. L., § 319.)

While, under the findings made by the court, the plaintiff is not in a position to ask the specific performance of the contract, still he should be permitted to retain possession of the land

until reimbursed or secured for the partial payment he has made thereon by the long years of support furnished his parents, if it can be shown to have been materially more valuable than the entire use he has had of the land.

When the case was here before (*Holland v. Holland,* 89 Kan. 730, 132 Pac. 989), it was said that sufficient grounds were stated in the petition for the relief sought in the second and third counts, and as pleadings remain the same the suggestion still applies.

It was error to compel an election and restrict the plaintiff to a trial of the first cause of action. The entire controversy should have been settled.

The judgment is modified and the cause remanded for further proceedings in accordance herewith.

---

No. 19,583.

PRESTON PARIS, *Appellee,* v. L. A. GOLDEN and E. G. GOLDEN, *Appellants,* and FRANCIS M. CLAUDEL, *Appellee.*

OPINION DENYING A REHEARING.

Appeal from Smith district court; RICHARD M. PICKLER, judge. Opinion denying a rehearing filed February 12, 1916. (For original opinion of reversal see 96 Kan. 668, 153 Pac. 528.)

*F. W. Mahin,* and *I. M. Mahin,* both of Smith Center, for the appellants.

*L. C. Uhl,* and *L. C. Uhl, jr.,* both of Smith Center, for the appellees.

The opinion of the court was delivered by

MASON, J.: A petition for a rehearing, containing a forcible presentation of the argument for the appellee, has been fully considered, but the court adheres to the view already expressed. A contention is pressed that a correct interpretation has not been placed upon the language of the petition in the action for specific performance, with regard to the kind of

title the plaintiff was willing to accept. The sentence in question reads:

"The plaintiff further alleges that on the said 1st day of March, A. D. 1906, he was ready, able and willing and has ever since been and still is able, ready and willing to perform all of the terms and conditions of said contract of sale upon his part and pay the full purchase price of said lands and accept a warranty deed conveying the title to the said lands and tenements of which the said defendant was seized on the 1st day of March, 1906, or such title as the defendant has in said above described premises at the time of the commencement of this action."

The contention is made that this means that the plaintiff was willing either (1) to accept a warranty deed conveying the title the defendant had on March 1, 1906; or (2) to accept [without qualification as to the character of deed to be given] such title as the defendant had when the action was begun. Such a reading may be consistent with the rules of grammar, but we do not think the language quoted, considered as a whole, is fairly to be given that construction. To us the obvious meaning seems to be that the plaintiff was willing to accept a warranty deed to such title as the defendant had, either on March 1, 1906, or when the action was begun. It indicated that in case the defendant should prove unable to make a perfect title the plaintiff elected to accept such as he had, notwithstanding any defects, rather than avail himself of his alternative right to treat the contract as broken, and ask damages for its breach, allowing the defendant to retain the land. It did not imply that the plaintiff voluntarily relieved the defendant from any of his legal obligations under his agreement.

Upon grounds set out in the original opinion we regard the case as not falling within the rule against splitting a cause of action, applied in *Naugle v. Naugle,* 89 Kan. 622, 132 Pac. 164. The present action is in effect upon a breach of warranty. If the defendant had paid his personal debt to Paris, or if for any reason it had not been enforced against the land, the plaintiff would have had no claim against him.

The petition for a rehearing is denied.

No. 19,693.

J. J. HAAS, *Appellee*, v. CLEMENT L. WILSON et al., *Appellants.*

SYLLABUS BY THE COURT.

1. PUBLIC LAND—*Patent to Heirs of Deceased.* The rule announced in *Byerly v. Eadie*, 95 Kan. 400, 148 Pac. 757, is adhered to.

2. LAND IN WILD STATE—*No Title by Adverse Possession.* Title to real property can not be acquired by adverse possession where the land is in a wild state, vacant, unoccupied, and no apparent acts of ownership have been performed thereon.

Appeal from Greeley district court; ALBERT S. FOULKS, judge. Opinion filed February 12, 1916. Reversed.

*Clement L. Wilson,* of Tribune, and *Mayo Thomas,* of Elkhart, for the appellants.

*W. C. Dickey,* of Leoti, and *W. M. Glenn,* of Tribune, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: This is an action to quiet title to real property. The plaintiff recovered judgment. The defendants appeal.

John W. Gray filed on government land in Greeley county but died before making final proof. He left as his heirs Robert J. Gray, Narcissus A. Kelly, Callie T. Gray, Lilla E. Samish and George W. Gray. Narcissus A. Kelly made final proof and a patent was isued by the government to the heirs of John W. Gray. P. J. Donahue was appointed administrator of the estate of John W. Gray, and under an order of the probate court conveyed the land to J. C. V. Kelly, the husband of Narcissus A. Kelly. Afterwards, Kelly and his wife conveyed the land by warranty deed to Clarence L. White, who in turn conveyed it to the plaintiff in April, 1889. Robert J. Gray died in 1912, intestate, leaving as his only heir his grandson Rex Williams. In August, 1912, Rex Williams conveyed by quitclaim all his right, title and interest in the land to Clement L. Wilson. In 1911 Callie T. Gray, Lilla E. Samish, George W. Gray and Narcissus A. Kelly by quitclaim deed conveyed all their right,

Haas v. Wilson.

title and interest in the land to the defendant Virginia Lee Byerly.

The land was continuously vacant, unoccupied and in a wild state from 1889 until 1912, when defendants Clement L. Wilson and Virginia Lee Byerly went on the land and plowed around it. John W. Gray was buried on the land and his body remained there until 1912, when it was removed therefrom by the defendants. The plaintiff has paid the taxes on the land from the time of acquiring his deed in 1889 to the present time. The defendants do not now claim title to the whole of the land. They claim four-fifths of it and ask that it be divided.

1. *Byerly v. Eadie,* 95 Kan. 400, 148 Pae. 757, disposes of the administrator's deed, and its validity as against the grantees of the patentees is not now urged. The deed from Narcissus A. Kelly and her husband to Clarence L. White conveyed to him the title acquired by her under the patent from the government. The deed from White to the plaintiff conveyed that title to him. The plaintiff and the defendants then became tenants in common of the land in controversy.

2. The principal question for our consideration is, Did the plaintiff acquire title to this land by adverse possession, the land being vacant and in a wild state, and no apparent acts of ownership having been exercised thereon? This question has been disposed of by numerous decisions of this court. In *Dickinson v. Bales,* 59 Kan. 224, 52 Pac. 447, it was said:

"To constitute adverse possession of land, it is not absolutely necessary that there should be inclosure, buildings, or cultivation, but the acts done must be such as to give unequivocal notice of the claim to the land, adverse to the claims of all others, and must be of such a character and so openly done that the real owner will be presumed to know that a possession adverse to his title has been taken." (Syl. ¶ 1.)

(See, also, *Taylor v. Miles,* 5 Kan. 498, 514; *Myers v. Coonradt,* 28 Kan. 211, 215; *Board of Regents v. Linscott,* 30 Kan. 240, 264, 1 Pac. 81; *Case v. Frazier,* 30 Kan. 343, 2 Pac. 519; *Walker v. Boh,* 32 Kan. 354, 357, 4 Pac. 272; *Harris v. Curran,* 32 Kan. 580, 4 Pac. 1044; *Craven v. Bradley,* 51 Kan. 336, 339, 32 Pac. 1112; *Claflin v. Case,* 53 Kan. 560, 36 Pac. 1062.)

The plaintiff's possession, if he can be said to have been in possession, was neither open nor notorious. It did not have those elements that ripen into title by fifteen years' continuous

duration. No one was in such possession of the land as would enable him to acquire title by adverse possession. It was vacant, unimproved, unoccupied, and it is not shown that any one performed any acts of ownership on the land after it was patented until defendants Wilson and Byerly plowed around it.

The judgment is reversed. The action is remanded with direction to proceed in accordance with the views herein expressed.

---

No. 19,694.

THE WETMORE STATE BANK, *Appellee*, V. R. J. COURTER and AMANDA E. COURTER, *Appellees*, and N. RASMUS et al., *Appellants*.

SYLLABUS BY THE COURT.

1. OPENING JUDGMENT—*When New Summons Unnecessary.* On the filing of a petition to open a judgment it is not necessary to issue a new summons to a defendant who had permitted the judgment to be taken against him by default.

2. SAME—*General Appearance Waives Summons.* Rule followed that summons is not necessary when a voluntary general appearance is entered.

3. APPEARANCE—*What Constitutes a General Appearance.* A general appearance is entered by a defendant, (*a*) when he files a motion to make plaintiff's petition more definite and certain; (*b*) when he joins in a stipulation that plaintiff may have further time to amend his petition; (*c*) when files a general denial; (*d*) when he files an answer to the cross-petition of his codefendant.

4. AMENDMENT TO PLEADINGS—*Judicial Discretion.* Rule followed that the allowance or refusal to allow amendments to pleadings is within the sound discretion of the trial court.

5. MORTGAGE FORECLOSURE—*Venue Where Land is Situated.* A foreclosure action is properly brought in the county where the land is situated, and the grantee of the mortgaged land who had assumed and agreed to pay the mortgage is a proper party defendant in such action.

6. SAME—*Evidence—Contents of Deed—When Record May be Impeached.* When upon due demand a defendant, grantee of a tract of land, is unable or unwilling to produce the deed conveying the title to him, secondary evidence of its contents is admissible although the record of the register of deeds shows a purported copy of the deed, it being the contention of the demandant that the register's record is an inaccurate copy of the original deed.

Bank v. Courter.

7. VERDICT—*May be Received by Attorney by Agreement.* Rule announced in *The State v. Keehn,* 85 Kan. 765, 118 Pac. 851, that by agreement of the litigants and with the approval of the trial judge in open court, the verdict of the jury may be received by a designated attorney in the absence of the trial judge, followed and applied.

Appeal from Kearny district court; GEORGE J. DOWNER, judge. Opinion filed February 12, 1916. Affirmed.

*Guy L. Hursh,* and *E. R. Sloan,* both of Holton, for the appellants.

*R. F. Hayden,* and *George P. Hayden,* both of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: In June, 1911, R. J. Courter had a real-estate transaction with N. Rasmus whereby Courter conveyed to Rasmus a quarter section of Kearny county land subject to a mortgage for $1000, which Rasmus assumed and agreed to pay, in exchange for a house and lot in the city of Wetmore subject to a mortgage for $800, which Courter assumed and agreed to pay. The mortgage on the Kearny county land, which had been executed by Courter and wife, was held by The Wetmore State Bank. This mortgage was permitted by Courter and Rasmus to mature without payment, and the bank brought suit in the Kearny county district court to foreclose its mortgage and for a personal judgment against Courter and to bar Rasmus of his junior and inferior interest in the property.

Personal service of summons was obtained through the sheriff of Nemaha county upon all the defendants, they being residents of that county. Courter answered, not denying his liability to the bank, but pleading his conveyance to Rasmus, and that for a valuable consideration Rasmus had agreed to pay the mortgage, and prayed for a personal judgment against his codefendant, and that if a personal judgment were obtained by plaintiff against Courter and Rasmus the property of the latter be first subjected to the satisfaction of the plaintiff's judgment.

Aside from this answer no appearance was made by either defendant at the trial, and the plaintiff, upon evidence, sub-

mitted his cause and obtained judgment according to his prayer.

Some months later Courter filed a petition to vacate the judgment, showing sickness and other good excuse for his and his attorney's nonappearance at the trial. The plaintiff bank answered, confessing the allegations of the petition to vacate, and consented to open the judgment. The defendant Rasmus had no notice of this petition. The court found the allegations of the petition to be true, and on June 19, 1913, set aside the judgment.

The plaintiff then amended its petition, repeating all of its original allegations, but enlarging as to Rasmus, and pleading the conveyance by Courter to Rasmus by the deed of 1911, whereby Rasmus assumed and agreed to pay the mortgage, and praying for a personal judgment against both defendants.

Following this a new summons was issued and served on the defendant Rasmus and his wife, requiring them to answer on or before October 15, 1913.

On October 13, 1913, Rasmus and wife filed a motion asking that plaintiff be required to make its petition more definite and certain; on November 14, 1913, Rasmus and wife joined in a stipulation, filed November 26, 1913, that plaintiff might have twenty days in which to further amend its petition; and on December 13, 1913, the defendants Rasmus and wife filed their answer in which they denied generally, and denied that the deed from Courter to Rasmus contained any provision binding Rasmus to assume and pay the mortgage. On the same day Rasmus and wife filed an answer to the same effect against Courter's cross-petition. Thereafter, when court convened in February, 1914, Rasmus and wife asked and obtained leave to file a motion to vacate the order of June 19, 1913, setting aside the original judgment, because they had no notice and were not served with summons in that proceeding. This motion recited that they appeared "specially for the purpose of this motion." The motion was overruled. Then Rasmus and wife asked leave to amend their answer to include an additional defense, to wit, the matters leading up to the first judgment, and alleging the same to be a final adjudication and still in full force and effect. This leave to amend was denied. A motion to the same effect and praying dismissal was likewise filed and overruled.

The cause was then tried, and the jury in answer to a special question found that the deed of the Kearny county land from Courter to Rasmus contained a recital that Rasmus assumed and agreed to pay the mortgage. From this judgment Rasmus and wife appeal, assigning several errors which will be noticed as we proceed.

1. We do not perceive any error in overruling appellants' motion to set aside the order vacating the original judgment. True, no summons was issued, but the only party who could complain was the bank which had prevailed in the original judgment. Summons is unnecessary when voluntary appearances are made. (*Bury v. Conklin,* 23 Kan. 460.) And as the cause proceeded after the original judgment was vacated, these appellants made repeated general appearances before their special appearance was presented. (*Abercrombie v. Abercrombie,* 64 Kan. 29, 67 Pac. 539.)

2. Neither does any error appear in the court's denial of appellants' motion for leave to amend their petition. Aside from the general rule that the allowance or denial of amendments is ordinarily within the sound discretion of the trial court (*Bank v. Badders,* 96 Kan. 533, 536, 152 Pac. 651), the amendment sought to be made was a mere recital of the earlier steps of the litigation.

3. The motion that appellants should be permitted to go hence alleged that the original judgment was still in full force and effect contradicted the record and was properly denied. We see no point to appellants' contention that the action, one in foreclosure and its incidents, was wrongly brought in Kearny county, nor in the contention that the court had no jurisdiction. (Civ. Code, § 48.) When Rasmus assumed and agreed to pay the mortgage, he contracted to place himself on exactly the same footing as the original obligor, his codefendant Courter, and in Kearny county where the land was situated, not in Nemaha county where all the litigants resided, was the proper forum. Is there fair ground for a distinction as to the venue in a foreclosure case where the land lies in one county and all the litigants reside in another? Or shall it be said that in such a situation the lawsuit must be divided and the foreclosure end of it tried where the land lies and that the breaches of covenant incidental thereto must necessarily be tried in the county where the parties reside? We think not.

But even if Rasmus could have avoided a personal judgment by staying out of the Kearny county district court, he did not stay out. (*N. M. R. R. Co. v. Akers*, 4 Kan. 453, syl. ¶ 4.) His appearance was general; he appeared and filed a motion that plaintiff be required to make its petition more definite and certain; he joined in a stipulation giving plaintiff more time to amend its petition; he filed a general denial to plaintiff's petition; he filed an answer to his codefendant's cross-petition. These were all general appearances, and all entered and filed before any of his special pleas and exceptions to the jurisdiction.

4. Exception is taken to the admission of testimony that Courter's deed to Rasmus contained a recital that Rasmus, the grantee, assumed and agreed to pay the mortgage. Formal demand had been made on Rasmus to produce the deed. It was not forthcoming. It was then competent to admit secondary evidence. True, it would have been the proper and perhaps the better practice first to have introduced the record of the register of deeds, as the statute makes it primary evidence with the same effect as the original deed. But even then the original deed must prevail over the register's record if there is a conflict. Moreover, the obvious purpose of the statute is merely to avoid the necessity of explaining the absence or nonproduction of the original deed where its contents are not in dispute, and can not relate to an issue arising on the accuracy of the register's record. Here the crux of the case depended on whether the register's record was an accurate copy of the original deed. The original deed was in the control of Rasmus. He could not or would not produce it. Therefore Courter's secondary evidence was admissible, and indeed the admission of such testimony was the only way to avoid a palpable miscarriage of justice. It might also be observed that the register's record was later introduced, so the matter descends to a question of the order of presentation of evidence, which ordinarily is hardly so important as to jeopardize the judgment. We do not understand it to be the contention of counsel that secondary evidence of the contents of the original deed could not have been introduced under any circumstances merely because the register's record purported to be a true copy of the original. (Civ. Code, § 369.)

5. One more question is presented. The case was in the hands of the jury on the evening of February 3, and the district judge had to leave in order to open court in Finney county next morning. It was agreed by the parties that a local attorney, A. R. Hetzer, Esquire, of the Kearny county bar, might receive the verdict; that he might permit the jury to separate in case they did not reach a verdict by midnight, and that he might reconvene them for further deliberation. Mr. Hetzer permitted the jury to separate about 11:30 p. m., and reconvened them at 9 a. m. the following day, and the jury returned a verdict about 11:30 a. m. on February 4. At that time the district judge was holding court in Finney county, having convened court there that forenoon about 9 o'clock a. m.

Appellants make no excuse for this repudiation of their agreement, and cite *Cox v. The State, ex rel.,* 30 Kan. 202, 2 Pac. 155, and *In re Millington, Petitioner, etc.,* 24 Kan. 214. But it was clearly pointed out by this court in *The State v. Keehn,* 85 Kan. 765, 118 Pac. 851, that by consent of the parties and with the approval of the trial judge in open court, the verdict of a jury may be received by a designated attorney in the absence of the judge. This whole subject was there treated comprehensively, and the views therein set forth will be followed here. Until the legislature shall otherwise decree, the tendency to lay aside antiquated artificialities when no prejudice is done to substantial rights is likely to continue. The fair agreement under which this verdict was received did not affect the appellants' subtantial rights; and since justice seems to have been the result of this lawsuit and no prejudicial error appears in the case, the judgment is affirmed.

Freeman v. Scherer.

No. 19,698.

A. J. FREEMAN, *Appellant*, v. C. A. SCHERER et al., *Appellees*.

SYLLABUS BY THE COURT.

1. INJUNCTION—*Drainage Ditch—Highway—Surface Water—Insufficient Evidence.* A ditch was dug in a highway by a landowner and the public officers to drain water from the highway as well as from the adjoining land, and an embankment or dike was made on the side of the ditch which served to prevent the water from passing upon the land on that side of the highway. After the enactment of chapter 175 of the Laws of 1911, which related to drainage, the ditch was deepened and the dike enlarged by the owners of the adjoining lands, the better to serve the ·purpose for which they were originally made. Another landowner brought an action to prevent the maintenance of the dike, alleging that it interfered with the flow of surface water from his land. It appeared that the maintenance of the ditch had not resulted in injury to his land since the dike was rebuilt and that there was no reasonable probability that it would do so. *Held*, that·the mere apprehension or possibility of injury did not warrant the granting of an injunction, nor is a party entitled to that remedy unless he satisfactorily shows that the injury is likely to occur and that his remedy at law is inadequate.

2. SAME—*Equitable Considerations.* One who seeks equity must do equity, and if an applicant for an injunction has encouraged, invited or contributed to the injury and loss sought to be enjoined, or acted wrongfully and illegally in respect to it, he is not entitled to the relief.

Appeal from Dickinson district court; ROSWELL L. KING, judge. Opinion filed February 12, 1916. Affirmed.

*Thomas Dever*, of Junction City, for the appellant.

*G. W. Hurd, Arthur Hurd, Bruce C. Hurd,* and *C. E. Rugh*, all of Abilene, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: A. J. Freeman brought suit against the defendants asking for a mandatory injunction directing the defendants to remove a dike built by them in April, 1911, after chapter 175 of the Laws of 1911 took effect, which dike Freeman alleged was so placed as to interfere with the natural course of drainage down the valley from his land. The lands involved in the suit all lie between two streams—one on the

west called Crute Branch, and one on the east called Chapman creek—and on both sides of a road running east and west on the line between sections 1 and 12. Freeman's land consists of the southeast quarter of section 1 north of the road, and the east one-half of the northeast quarter of section 12 (containing 80 acres) south of the road; and Chapman creek meanders in a southerly direction down through his land and across the road where there is a bridge. Defendant Scherer's land is the west one-half of the northeast quarter of section 12 and lies just west of plaintiff's south 80 acres; while the land of Sarah E. Marts is the quarter section lying just west of the Scherer land. All of the land of the defendants lies south of the road. The land of the plaintiff which lies north of the road and on the west of Chapman creek slopes in a general southerly direction, and the natural course of surface water is down across the road and over the lands of the defendants. The road mentioned was established in 1893, and to carry off the water that accumulated on the road as well as on the adjoining land the public authorities and an adjoining owner of land made a ditch along the road which was designed to improve the road and to carry the water to Chapman creek. The dirt taken from this ditch was thrown mostly on the south side of the ditch and formed a sort of embankment. At a later time the ditch was enlarged and the dike raised to some extent. The dike is about one-half mile long and extends along the south edge of the road on the north line of the land of the defendants.

The answers of defendants Scherer and Theodore Marts alleged among other things that there had been a ditch along the roadside which had properly taken care of the drainage for many years, and until it was filled up in 1910 by Freeman, and that any damage he may have suffered to his land was due to this act. In response to this claim Freeman alleged that the ditch was unauthorized and that he had a right to close it. Marts alleged and insisted that the rights of Freeman with regard to this dike had been litigated and determined in a former suit, tried in 1912, and that the only injury sustained by him resulted from his fault. The case to which reference was made was between plaintiff and one of the defendants herein, and many of the facts and contentions in the present case were

under consideration in that one. (*Marts v. Freeman,* 91 Kan. 106, 136 Pac. 943.)

The trial herein was before the court without a jury, and there was evidence which tended to show that the road mentioned was established in 1893; that in wet periods the surface water flowed from the north upon the road as well as upon the lands of the defendants on the south side of the road. To prevent injury to the road, and also to the land south of it, the public authorities and landowners jointly dug a ditch on the south side of the road from a slough, which was near the center of the valley, eastward about a half a mile to Chapman creek. It also appeared that plaintiff had recognized that the ditch was for the purpose of drainage and to carry water not only from the road, but also from the lands north of the road, by digging lateral ditches from his land to the ditch, and he had further applied to the township officers to put in a tile or drain across the road to carry the water from his farm to the ditch. In 1910 the plaintiff filled up the ditch and thereby caused injury to the land of Marts for which the latter asked a recovery of damages. In that action plaintiff denied liability, and insisted that the ditch was not dug for the benefit of the public; that the embankment or dike south of the ditch unlawfully obstructed the natural flow of the water and that it had operated to injure him. He asked to enjoin Marts from maintaining the ditch and embankment. That action resulted in a judgment in favor of Marts for damages and the injunction for which Freeman had asked was denied. Upon an appeal the judgment of the district court was affirmed. (*Marts v. Freeman,* supra.) It was there held that the fact "that the improvements were urged by and resulted in benefits to a landowner did not impair the right of the constituted authorities, acting in good faith, to make it for the use and benefit of the public." (Syl. ¶ 3.) And it was further held that "The fact that a watercourse so created is an artificial one affords no justification for obstructing it where it exists by lawful authority, although the obstruction causes the water to flow where it did before the ditch was opened." (Syl. ¶ 4.)

It appears that in the spring of 1911 the ditch was deepened and the dike raised, and that this was done after the enactment of chapter 175 of the Laws of 1911, which authorizes the

owners of land in certain cases to construct drains. It does not appear from the evidence, however, that the plaintiff has since that time suffered any injury from the maintenance of the dike and the ditch.

When the plaintiff made his opening statement the defendants moved for judgment in their favor on the pleadings and the opening statement, but the court reserved its rulings on these motions; and after the plaintiff had introduced his testimony, the court on the demurrer of defendants, as well as on the motion for judgment on the opening statement, rendered judgment in favor of the defendants. The plaintiff insists that there was some evidence which tended to support the material allegations of his petition, and that under the rules applicable where the evidence is challenged by a demurrer the ruling of the court was erroneous. This was an equity case triable without a jury, in which the issues of fact as well as of law were for the determination of the court. It differs little from a case which is finally submitted to the court upon the testimony of the plaintiff alone. However, taking the plaintiff's testimony, uncontradicted as it was, and drawing all the inferences in favor of plaintiff where the testimony was open to more than one inference, the court, we think, was justified in holding that the plaintiff could not recover. A public highway existed upon which the ditch was made. That ditch had been constructed under public supervision and had served as an artificial channel to carry the water to the creek. It had been recognized and used by the plaintiff as a means of draining his adjoining lands, and the embankment or dike appears to have been an incident of the making of the ditch and really a part of it.

It is urged by plaintiff that as the ditch and dike were rebuilt after the act of 1911 relating to drainage was in force, the rebuilding of the same constituted a violation of the provisions of that act as much as if the ditch and dike had been orignally constructed at that time. The act, among other things, prohibits the lower proprietor of land from constructing a dam or levee that will obstruct the flow of surface water onto his land to the damage of an upper proprietor. The ditch in question, as we have seen, had been in use for a great many years and had become an established artificial channel that carried off the surface water. The work done upon it in 1911 did not change

its course nor divert it from the purposes for which it was originally dug. It is true, the dike was enlarged and that more earth was used in making part of it than was taken from the ditch. It was done, however, with the manifest purpose of confining the water in the ditch and carrying it to Chapman creek. But it is contended that the ditch was not in fact open when the law of 1911 was enacted and therefore it should be treated as an original improvement. It appears that plaintiff filled up the ditch and purposely obstructed the flow of water, some time in 1910, not long before the enactment of the law of 1911. Although it was determined in *Marts v. Freeman*, 91 Kan. 106, 136 Pac. 943, that the plaintiff was not justified in closing the ditch, he admits that he did so, and hence he voluntarily took the risk of the injury that might result to him from holding back the water that might have flowed through the ditch to the creek. If the reconstructed ditch, however, is to be treated as a new construction within the meaning of the act of 1911, the court was nevertheless warranted in denying the injunction. While plaintiff's land was overflowed during the exceptional floods of 1903 and 1908, when all the lowlands in that region were under water, it appears that no injury or loss has been suffered by him since the reconstruction of the dike or the enactment of the law of 1911. The fact that the land was overflowed during the exceptional floods does not warrant the inference that such floods will become common nor require the issuance of an injunction. Experience has demonstrated that injury from floods is not likely to recur and that the provisions already made for drainage are ordinarily sufficient. Injunction is not used to prevent a prospective injury unless it appears that there is a reasonable probability of injury and that the law will not afford an adequate remedy. "Mere apprehension or a possibility of wrong and injury by a defendant is ordinarily not enough to warrant the granting of an injunction." (*Hurd v. Railway Co.*, 73 Kan. 83, syl. ¶ 3, 84 Pac. 553; 22 Cyc. 769.) In *Whitehair v. Brown*, 80 Kan. 297, 102 Pac. 783, an action was brought to obtain an injunction to prevent the building of a dam which it was alleged would obstruct the flow of waters, and the court said:

"To establish their right to an injunction it was necessary for the plaintiffs to satisfy the court that there were reasonable grounds to fear

Freeman v. Scherer.

the recurrence of the new injury with such frequency as seriously to affect the value of their lands, or that other considerations rendered their remedy at law inadequate." (p. 300.)

(See, also, *Haage v. Kansas City S. Ry. Co.*, 104 Fed. 391; 2 Farnham, Water & Water Rights, § 582*a*, and cases there cited.)

If damage should result to plaintiff from the maintenance of the dike it would appear that an action for damages would afford him an adequate remedy in which each of the parties would have an opportunity to have his rights determined by a jury. The ditch and dike appears to have served the purpose reasonably well until it was obstructed by the plaintiff himself. The only injury that can come to him from the maintenance of the dike is that it might hold the surface water upon his land. He practically invited this result when he filled up the ditch and prevented the flow of water into the creek. One who asks for an injunction is governed by the usual equitable rules, and one of them is that "He who seeks equity must do equity." If he has acted wrongfully and illegally in the matter he is hardly entitled to ask for equitable relief by injunction. He did act illegally and wrongfully when he closed the ditch and obstructed the passage of water through it. In a sense he invited and permitted the injury which he anticipates may result to him from the ditch and dike. "A party can not invite and encourage a wrong, and then ask a court of equity to protect him by an injunction from the consequences of that wrong." (*Stewart v. Comm'rs of Wyandotte Co.*, 45 Kan. 708, syl. ¶ 2, 26 Pac. 683; *Downs v. Comm'rs of Wyandotte Co.*, 48 Kan. 640, 29 Pac. 1077; 22 Cyc. 776.)

Some objections are made to the rulings of the court excluding testimony, but in view of the facts related in behalf of the plaintiff in the opening statement of the case and the testimony of the plaintiff himself, none of the objections appears to be material.

The judgment is affirmed.

No. 19,701.

THE MERRIAM MORTGAGE COMPANY, *Appellee*, v. THE SAINT PAUL FIRE & MARINE INSURANCE COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. JUDGMENT—*No Appeal after Voluntary Payment.* One who voluntarily pays a judgment rendered against him by a district court can not question the justice or validity of the judgment by subsequent appeal to this court.

2. INSURANCE—*Mortgage Clause—Right to Subrogation Lost.* The rule that the burdens and the benefits of a contract, remedy, or course of conduct must be accepted together or renounced together applied in considering an application by an insurance company for subrogation under a mortgage clause attached to one of its policies, made after all liability on the policy had been denied and the mortgagee had been compelled to establish his right by litigating the matter to final judgment.

3. INSURANCE—*On Oklahoma Property—Written in This State—Attorney's Fee.* Under sections 4262 and 4263 of the General Statutes of 1909, the court, in rendering judgment against a fire insurance company on a policy of insurance written in this state, is authorized to allow the plaintiff a reasonable sum as an attorney fee although the policy relates to property situated in the state of Oklahoma.

4. INSURANCE—*Appeal—Attorney's Fee.* The statute referred to does not authorize this court to allow the plaintiff an attorney fee on appeal by an insurance company from a judgment rendered against it.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed February 12, 1916. Affirmed.

*E. L. Foulke, C. A. Matson,* and *J. D. Wall,* all of Wichita, for the appellant.

*Eugene S. Quinton,* of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a fire insurance policy. The plaintiff recovered judgment for the amount of the policy and for an attorney fee. A supplemental application by the defendant for subrogation was denied. The defendant appeals.

The policy was issued to the owner of the property involved.

Loss was made payable for the assured's account to the plaintiff as mortgagee under a mortgage clause attached to the policy, which reads in part as follows:

"It is agreed that whenever this company shall pay the mortgagee any sum for loss under this policy and shall claim that as to the grantors in the mortgage, or owners, no liability therefor existed, it shall at once be legally subrogated to all the rights of the mortgagee under all the securities held as collateral to the debt secured by the mortgage, to the extent of such payments. Or at its option may pay to the mortgagee the whole principal due or to become due upon the note or bond, and mortgage securing the same, and shall thereupon receive a full assignment and transfer of the mortgage, without recourse, and all other securities held as collateral to the debt; but no such subrogation shall impair the right of the mortgagee to first recover the full amount of their claim."

The case was submitted on a demurrer to the petition and a stipulation covering certain facts. Judgment was rendered on February 21, 1914, which the defendant paid on April 8, 1914. The appeal was taken on August 19, 1914. The defendant assigns as error the rendition of judgment in favor of the plaintiff and makes an extended argument against the plaintiff's right to recover. Having voluntarily paid the judgment, the defendant can not now question its justice or validity. (*Seaverns v. The State,* 76 Kan. 920, 93 Pac. 163; *The State v. Massa,* 90 Kan. 129, 132 Pac. 1182.) In the Seaverns case previous decisions of this court discussing and applying the principle involved were collated and classified.

An attorney fee was allowed under sections 4262 and 4263 of the General Statutes of 1909, which read as follows:

"This act shall apply to all policies of insurance hereafter written in this state, and also to the renewals which shall hereafter be made of all policies written in this state, and the contracts made by such policies and renewals shall be construed to be contracts made under the laws of this state.

"The court in rendering judgment against any insurance company on any such policy of insurance shall allow the plaintiff a reasonable sum as an attorney's fee, to be recovered as a part of the costs."

The policy related to property situated in the state of Oklahoma, but was written in this state. Sections 4262 and 4263 of the General Statutes of 1909 are sections 3 and 4 of chapter 142 of the Laws of 1897. The act of 1897 was amendatory of chapter 102 of the Laws of 1893, entitled, "An act defining the liability of fire insurance companies in certain cases." Sec-

tion 1 of this act provided that the amount of insurance written in a policy covering real property in this state should be taken as the true value of the property if totally destroyed and the true amount of the loss. Section 2 made the act apply to all policies of insurance written upon real property in this state. Section 3 provided for attorney fees. The act of 1897 continued the original valued policy provision, added a new subject, amended section 2 to apply not merely to policies written on real property in this state but to all fire insurance policies written in this state, and continued the provision relating to attorney fees. The result is, the policy under consideration is governed by the statute, and it is not material that the laws of Oklahoma do not provide for the allowance of attorney fees in actions on insurance policies.

The application for subrogation was made under the first part of the mortgage clause quoted above. The court authorized an assignment of the securities held by the plaintiff on full payment within a stated time of the balance due on the plaintiff's note and mortgage, under the latter part of the mortgage clause. The defendant declined to comply with the court's order and stands on its right to *pro tanto* subrogation. Instead of recognizing the obligation of the contract to pay the loss to the mortgagee, liability to the mortgagor being denied, the defendant repudiated that obligation, and with the obligation repudiated the reciprocal contract right to *pro tanto* subrogation. Having compelled the plaintiff to resort to litigation and to establish liability under the policy by final judgment, the defendant can not now reverse its attitude and demand that the amount of the judgment be taken out of the plaintiff's security. The controlling principle is that of election. The burdens and the benefits of a contract, remedy, or course of conduct must be accepted together or must be renounced together. Decisions applying the principle are collated in the opinion in the case of *Ullrich v. Bigger,* 81 Kan. 756, 106 Pac. 1073.

An application is made for the allowance of an additional attorney fee to the plaintiff on account of the defendant's appeal. This court does not render judgment on the policy of insurance.

The judgment of the district court is affirmed.

No. 19,711.

GERTRUDE NICHOLAS, revived in the name of PATRICK H. CONEY, as Administrator, etc., *Appellee*, v. THE TOPEKA RAILWAY COMPANY, *Appellant*.

### OPINION DENYING REHEARING.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion denying a rehearing filed February 12, 1916. (For original opinion of reversal see 96 Kan. 699, 153 Pac. 506.)

*L. S. Ferry, T. F. Doran,* and *J. S. Dean,* all of Topeka, for the appellant.

*Joseph G. Waters,* and *John C. Waters,* both of Topeka, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff files a petition for rehearing. The opinion (*Nicholas v. Street Railway Co.,* 96 Kan. 699, 153 Pac. 506) cites notes in 52 L. R. A. 448 and 15 L. R. A., n. s., 840, and says:

"A logical deduction from the cases there collated is that where the defect in the street is caused by the city as an active agency, and over which the railway company has no control and with which it has no right to interfere, the company is not liable for injuries caused by that defect." (p. 702.)

Each case cited in these notes on the liability of a street railway company for defects in track or street not caused by the company has been examined. The notes correctly state the law as declared in each case there cited. In each case, where the defective condition was produced by the city, the railway company was not held liable. These cases are *Snell v. Rochester Railway Co.,* 71 N. Y. Supr. Ct. Rep. 476, *Citizens Pass. Ry. Co. v. Ketcham,* 122 Pa. St. 228, 15 Atl. 733, and *Campbell v. Railway Co.,* 139 Pa. St. 522, 21 Atl. 92. Other cases holding the railroad not liable although the defect was not caused by the city are *Egan v. Forty-second St., M. & St. N. A. R. Co.,* 4 N. Y. Supp. 530, *Silberstein v. Houston, etc.,*

13—97 KAN.

*R. R. Co.*, 117 N. Y. 293, 22 N. E. 951, and *Eddy v. Ottawa City Passenger Railway Co.*, 31 Q. B. U. C. 569. In most of the cases cited in the notes the defective conditions in the streets were produced by natural causes, use, or wear. The cities do not appear to have in any way produced the defective conditions, and in most of the cases the street railway companies were under contract or franchise obligation to repair the streets.

In the petition for rehearing the plaintiff says:

"Please bear in mind that this court is bound to say that the original construction of this track, never having been altered or changed, was at the start a negligent and improper construction and in direct violation of its franchise as given by the county board, as required by the laws on our statute books, against the entire decisions of this court and against its duty to the public, for whose use the streets are primarily made, and none of which duties or liabilities can be ignored or immuned by any ordinance or contract of franchise the city of Oakland could make with it."

The evidence showed that the track at Sardou avenue, other than the crosswalk, was in the same condition as when first constructed. This construction was according to the franchise given by the county commissioners, was according to law as it then existed, was not against the decisions of this court, nor against its duty to the public.

The plaintiff contends that a street railway company must always keep its tracks in a safe condition. There is no doubt about the correctness of this rule. The difficulty in this case is not that the defendant did not keep its tracks in a safe condition, but that the city produced an unsafe condition and the defendant could not under the law interfere with that condition. It appears in evidence that at other places in the city of Oakland where crosswalks were built by the city over the track of the defendant company, the walks were built level with the top of the rails.

The judgment of this court is adhered to and the petition for rehearing is denied.

Young v. Buck.

No. 19,794.

RENA BUCK YOUNG, *Appellant*, v. L. D. BUCK et al. (ELIZABETH BUCK et al., *Appellees*).

OPINION DENYING A REHEARING.

SYLLABUS BY THE COURT.

1. FRAUDULENT CONVEYANCE—*Creditor's Bill—Limitation of Actions.* Although during the pendency of an action for the recovery of money the defendant makes a conveyance of real estate, which is at once recorded, the circumstances being such as to charge the plaintiff immediately with notice of its execution and of its fraudulent character, the statute of limitation (requiring actions for relief on the ground of fraud to be brought within two years from the discovery of the fraud) does not begin to run against an action to subject the land conveyed to the payment of the plaintiff's claim until judgment has been rendered in the original action, provided it is prosecuted with reasonable diligence.

2. SAME—*Attachment—Choice of Remedies.* The fact that plaintiff has not resorted to attachment does not affect his rights with respect to subjecting to the payment of his judgment land fraudulently conveyed by his debtor.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion. denying a rehearing filed February 12, 1916. (For original opinion of reversal see *ante*, p. 39, 154 Pac. 213.)

*F. J. Oyler*, of Iola, for the appellant.
*Baxter D. McClain*, of Iola, for the appellees.

The opinion of the court was delivered by

MASON, J.: (1) In the original opinion in this case it was said that an action in the nature of a creditor's bill can not be brought until the claim on which it is based is reduced to judgment, but that suit on the original demand—that is, the effort to put it in judgment—must be begun within a reasonable time after the discovery of the fraud, not exceeding two years. It was assumed, without further discussion, that the period of limitation (with respect to actions for relief on the ground of fraud) did not run during the pendency of an action the purpose of which was to procure the necessary judgment. A text was cited which declares upon the

authority of many cases, including some from Kansas, that a plaintiff can not *indefinitely* suspend the running of the statute by delaying to take a step necessary to the completion of his right of action. The implication that the operation of the statute might be suspended for a limited time was regarded as too clear to require statement. In a petition for a rehearing the defendant urges that this court had never previously decided that the delay occasioned by the necessity of reducing the plaintiff's demand to judgment could authorize an action to set aside a deed on the ground of fraud to be brought more than two years after its discovery, and that such decision in effect nullifies the statute creating that limitation (Civ. Code, § 17, subdiv. 3). It is true that in this state no express decision had previously been made on the exact point referred to, but the rule applied was deemed to follow from what had been said on the general subject. In holding that where one action can not be begun until judgment has been obtained in another the statute of limitations does not run during the pendency of the first action if it is brought and prosecuted with due diligence, we but follow the established practice in other jurisdictions, as well as the intimations of prior decisions of this court. (12 Cyc. 43; 25 Cyc. 1200; *Montgomery Iron Works et als. v. Capital City Insurance Co.,* 137 Ala. 134, 34 South. 210; *Finch v. Kent,* 24 Mont. 268, 61 Pac. 653; *Ainsworth v. Roubal,* 74 Neb. 723, 105 N. W. 248; *Blackwell et al. v. Hatch,* 13 Okla. 169, 73 Pac. 933; *Williams v. Commercial Nat. Bank,* 49 Ore. 492, 90 Pac. 1012; *Watt v. Morrow et al.,* 19 S. Dak. 317, 103 N. W. 45. See, also, *Taylor v. Lander,* 61 Kan. 588, 60 Pac. 320.)

In *Railway Co. v. Grain Co.,* 68 Kan. 585, 75 Pac. 1051, it was said that the enumeration by the legislature of specific exceptions to a statute of limitations by implication excludes all others. Such is the general rule, as shown by the note to the case cited in 1 Ann. Cas. 643. What was there decided, however, was that the fraudulent concealment of facts giving rise to a cause of action on contract does not suspend the operation of the statute, a matter of disagreement in other jurisdictions. (25 Cyc. 1214.) The general language of the opinion has been said not to admit of universal application.

(*Coal Co. v. Miller,* 88 Kan. 763, 129 Pac. 1170.) But the question here presented does not involve any implied exception to the statute of limitations. It is often said that a cause of action for relief on the ground of fraud accrues when the fraud is discovered, or when in the exercise of reasonable diligence it should have been discovered. Such a statement is substantially, but not absolutely, accurate. It is sufficiently exact to answer the purpose of the cases in which it has been employed. The statute, however, does not say that an action for relief on the ground of fraud is barred in two years from the time the fraud is discovered. It says that it is barred in two years from the time it shall have accrued. (Civ. Code, § 17, subdiv. 3.) It does not say that all actions for relief on the ground of fraud shall be deemed to accrue upon the discovery of the fraud, but that no such action shall be deemed to accrue until the fraud is discovered. Its exact language is: "the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." Under these provisions the action accrues when the fraud is discovered, provided it is already complete in every other respect. But an action by a creditor to set aside a fraudulent conveyance of his debtor does not accrue in any event until his claim is reduced to a judgment. (*Bank v. Chatten,* 59 Kan. 303, 52 Pac. 893; 12 Cyc. 9.) If when the judgment is obtained the fraud has been discovered, actually or constructively, his cause of action then accrues. If not, it accrues at such later time as the fraud is discovered. It can not accrue until he has a right to bring his action (25 Cyc. 1065-1067), and until that time the statute of limitations can not begin to run.

(2) The argument is also advanced that the pendency of the original action should not have suspended the running of the statute against the action to set aside as fraudulent the conveyance of the defendant's property, because the plaintiff had a right to attach the land without waiting for judgment to be rendered. She was not required to invoke the remedy by attachment. (*Rose v. Dunklee,* 12 Colo. App. 403, 56 Pac. 342.) A contrary holding in *Gillespie v. Cooper,* 36 Neb. 775, 55 N. W. 302, was overruled in *Ainsworth v. Roubal,* 74 Neb. 723, 105 N. W. 248. She was not bound

to anticipate the deeding away of the defendant's land, and after the deed had been executed an attachment against the grantor would not have been in itself a complete remedy. Nor could the existence of an attachment, before judgment, be made a basis of a creditor's bill. (*Tennent v. Battey,* 18 Kan: 324.)

The petition for a rehearing is denied.

---

### No. 19,871.

SAMUEL E. ADAMS, *Appellant,* v. E. K. ROBERSON et al., and THE STATE OF KANSAS, Intervenor, *Appellees.*

#### SYLLABUS BY THE COURT.

1. ISLAND SCHOOL LANDS—*Adjudication of Claims—Procedure—Burden of Proof.* The provision of the statute of 1913 relating to the adjudication of claims to island school land, that a cause brought thereunder shall stand for trial with the settler as plaintiff and the protestant as defendant, and shall be fully tried and determined as other civil cases, implies that the burden of proof rests upon the settler.

2. SAME—*When Open to Settlement as School Lands.* Under the statute as it existed prior to 1915 the only tracts lying within the original banks of navigable rivers that were open to settlement as school land were such as had at one time constituted islands.

3. SAME—*Accretions—Rights of Riparian Owner.* A riparian owner is not prevented from acquiring title by accretion by the fact that the addition to his land is influenced by artificial causes, in which he has had no part.

4. SAME—*Accretions—Artificial Obstructions.* The evidence examined and held not to show conclusively that artificial obstructions in the river caused a sudden and perceptible shifting of the bed of the stream.

5. SCHOOL LANDS—*Judgment against Settler—Ejectment Proper.* Where a proceeding under the statute of 1913, regarding island school land, results in a determination against the settler, the judgment may include an order for his ejection from the premises.

Appeal from Barton district court; DANIEL A. BANTA, judge. Opinion filed February 12, 1916. Affirmed.

*F. Dumont Smith,* of Hutchinson, *Stephen H. Allen, Otis S. Allen,* and *George S. Allen,* all of Topeka, for the appellant.

*William Osmond,* and *Elrick C. Cole,* both of Great Bend, for appellees E. K. Roberson and W. B. Cornell.

The opinion of the court was delivered by

MASON, J.: Samuel E. Adams settled upon a tract of land lying between the original banks of the Arkansas river, and filed a petition asking to be allowed to purchase it as island school land.  E. K. Roberson and W. B. Cornell filed protests, each claiming a portion of the tract as an accretion to patented land of which he was the owner, lying south of the river.  The state, intervening by the county attorney, also claimed the title.  The papers were certified to the district court in accordance with the statute (Laws 1913, ch. 295, § 3).  A trial resulted in a verdict and judgment for Roberson and Cornell, and Adams appeals.  The city of Great Bend was also a defendant, but as it has made no appearance here, and no error is urged with specific reference to it, no discussion of its relation to the case is thought necessary.

(1)  The appellant complains because the burden of proof was placed upon him.  He argues that as the title to the bed of the stream was originally in the state it was incumbent upon Roberson and Cornell, in order to give themselves any standing, to show affirmatively that the tracts which they claimed were accretions.  This might be true as between these parties and the state, but no one except Adams is complaining.  The statute above cited declares that in the situation here presented the "said cause shall regularly stand for trial with the settler as plaintiff and the protestant as defendant, and the state as intervenor, and the issues of fact and of law, and all claims of the respective parties to such lands, shall be fully tried and determined as other civil cases."  It was clearly the purpose of the legislature, in designating the settler as the plaintiff, to cast upon him, as the instigator of the proceedings, the burden of proving facts necessary to his recovery—among others, that the land claimed was of such character as to be open to settlement.  This was decided in *Winters v. Myers*, 92 Kan. 414, 140· Pac. 1033.

(2)  The plaintiff criticises the instructions as ignoring the fact that the state owns the bed of the river, and in this connection cites the present act making all abandoned beds of navigable streams school lands, and providing for their sale whether they were ever islands or not (Laws 1915, ch. 322).  The case

was tried in 1914, and as the law then stood settlement could be made only on lands that had constituted actual islands within twenty years prior to 1913. (Laws 1913, ch. 295, §§ 1, 9; *Means v. Kennedy,* ante, p. 29, 154 Pac. 245.) Moreover, the jury were specifically told that the title to the bed of the river was in the state.

(3) The theory presented by the plaintiff at the trial was that an island had formed in the river bed and grown until it had covered the site in question. The defendant undertook to combat this mainly by showing that there never had been an island at the point of settlement. This was the principal issue to which the evidence on each side was directed, and the conflict was direct and irreconcilable. The court instructed, in substance, that the land belonged to the defendants if it had been gradually added to riparian tracts owned by them, by accretion or reliction; and those processes were clearly defined, no objections being made to the definitions. In 1884 several spans at the south end of a bridge across the river above the land in controversy were filled in with earth, and a dam was run out from the bank a short distance upstream, for the protection of the road so formed. The made land was shown to be largely due to this work. The plaintiff asked an instruction that he was entitled to a verdict if the tract in dispute was formed by the diversion of the stream caused by the fill and dam. This request seems intended to present the contention that a riparian owner can acquire no title to land formed in the bed of a stream if its formation is brought about by artificial causes, although he may have had no part in them. That view has sometimes been taken, but the weight of authority is to the contrary. (1 R. C. L. 233; 1 A. & E. Encycl. of L. 468; I Enc. L. & P. 805; 29 Cyc. 351; 1 Kinney on Irrigation and Water Rights, 2d ed., § 538, p. 928.) We accept the majority doctrine, which we do not understand to be now controverted by the plaintiff; for while a formal objection to the instruction referred to is made in the specification of errors, it has not been pressed in the argument.

(4) The plaintiff does contend, however, that there was no evidence to sustain a finding that the defendants had acquired title by accretion or reliction, for the reason that it conclusively appeared from the evidence of both parties that the immediate effect of the fill and dam was to divert the channel of

the river, so that what had previously been the bed of the stream adjoining the tracts now owned by the defendants became at once tillable land, the ownership of which was in the state, its emergence being due to the process of avulsion. It is true that most of the evidence is consistent with that theory, and much of it has at least an apparent tendency to support it. A number of the witnesses say that the immediate effect of the fill and dam was to change the channel of the river and carry it over to the north bank. The context, however, seems to indicate that in some cases the word "channel" was used as the equivalent of "current," and that changes in the channel were spoken of without any intention of referring to an actual change in the river bed. No instruction was given specifically with regard to avulsion, and none was asked. But the jury were told that for the defendants to have acquired title by accretion or reliction the change must have been gradual and imperceptible. We think the evidence justified a submission to the jury of the question whether title was so acquired, and a finding thereon in favor of the defendants. The witnesses differed greatly not only in recollection but in expression. One of them, whose residence dated back to 1878, said that since that date there had been no channel, in the ordinary stage of the river, east of the bridge (the bridge runs north and south) ; that the channel ran along about the center; that the first year there was no channel at all—no water except during a freshet. Another said that the tract washed in and filled up to the bank first; that "when this approach to the bridge was built it stopped the flow of the water materially; that is, it didn't flow so fast, and the water naturally would settle along the south bank of the river and fill it up"; that the land "was formed by the settling of muddy water after it passed the approach to the bridge. The water naturally flows slower east of that approach, and the sediment of the river would naturally settle there"; that "it settled along the south bank of the river; from the south bank out"; that "when there was any water in the river it was there" [referring to the south side of the river east of the bridge] ; that there was no channel on the south side separate from the main river [implying that there was as a part of the main river]. Another testified that the water went clear to the old [south] bank; that the land was "filled up against the bank out into

the river"; that the dam "threw all the current of the water to the north side." Another said that "the river gradually filled in on the south side and floated away from them" [the defendants' lands]. A witness for the plaintiff testified that the dam drove the stream towards the north, and afterwards the south channel became filled up. When asked whether the Adams tract grew up in the bed of the river or from the south bank he answered that it grew from the south side. The plaintiff's present theory does not square with evidence given in his behalf, that after the dam was built there was a stream forty feet wide between the south bank and the alleged island on which settlement was made, and that the island grew to the south bank.

(5) The judgment not only denied the plaintiff's claim, but also declared the defendants to be the owners of the lands in question, and ordered the plaintiff to be ejected therefrom. The plaintiff contends that in any event the defendants were entitled to no affirmative relief, and in particular that the order of ejectment was unauthorized, because the statute makes no provision for it. As the case was submitted to the jury the verdict is fairly to be regarded as including a finding that the land was formed by accretion to the south bank, and therefore belongs to the defendants. The language of the act of 1913 already quoted—that "the issues of fact and of law, and all claims of the respective parties to such lands, shall be fully tried and determined as in other civil cases"—indicates a purpose to have all controversies between the parties with respect to the land threshed out and disposed of in the proceeding there provided for. The statute in a sense protects a settler in entering and occupying a portion of a tract which may in fact be the lawful property of another occupant—it creates a procedure by which the rights of all parties after such settlement may be speedily litigated. The settlement is really the first step in a proceeding to determine the character of the land, and for that reason is given qualified protection. An adjudication that the land is not open to settlement determines that the plaintiff has no right of possession, and it would be out of harmony with the spirit of the law to allow him to retain it until another judgment should be obtained against him in some other form of action.

The judgment is affirmed.

No. 19,872.

THE WYANDOTTE COAL & MINING COMPANY, *Appellee,* V. THE
WYANDOTTE PAVING & CONSTRUCTION COMPANY et al.
(THE SOUTHERN SURETY COMPANY, *Appellant*).

No. 20,162.

THE WYANDOTTE COAL & LIME COMPANY, *Appellee,* V. THE
WYANDOTTE PAVING & CONSTRUCTION COMPANY et al.
(THE SOUTHERN SURETY COMPANY, *Appellant*).

SYLLABUS BY THE COURT.

1. PAVING CONTRACTS—*Application of Payments by Debtor and Credi-
tor—Surety May Not Control.* Third persons, such as guarantors,
sureties, indorsers, and the like, secondarily liable on one of several
debts, can not control the application which either the debtor or the
creditor makes of a payment, and neither the debtor nor the creditor
need apply the payment in the manner most beneficial to such persons.

2. SURETY COMPANY—*Actions for Paving Materials—Amount of Judg-
ments—Evidence Supports Findings.* A surety company guaranteed
payment for materials used by a construction company in paving cer-
tain streets, another construction company, with the same officers and
the same general manager, had a contract for paving certain other
streets, and each company purchased its materials from plaintiff.
*Held,* that the evidence is sufficient to support a finding that certain
checks signed by the first construction company and delivered to plain-
tiff by the manager of both companies, with direction to credit the
same to the account of the second company, were properly applied as
directed, and that under the circumstances in evidence the surety com-
pany can not complain.

Case No. 19,872.   Appeal from Wyandotte district court, di-
vision No. 3; HUGH J. SMITH, judge.   Consolidated with—

Case No. 20,162.   Appeal from Wyandotte district court,
division No. 1; EDWARD L. FISCHER, judge.   Opinion filed
February 12, 1916.   Affirmed.

*Arthur J. Stanley, Guy E. Stanley,* both of Kansas City,
*Thomas E. Wagstaff,* of Independence, *Joseph P. Fronton,
John J. Cosgrove,* both of Kansas City, Mo., and *John P. Mc-
Cammon,* of St. Louis, Mo., for the appellant.

*J. E. McFadden,* and *O. Q. Claflin,* both of Kansas City, for
the appellee.

The opinion of the court was delivered by

PORTER, J.: These actions, though tried in different divisions of the district court, have been consolidated here because they involve the same questions of law and substantially the same facts. The Wyandotte Coal & Lime Company brought both actions against the Wyandotte Paving & Construction Company to recover for materials furnished in paving certain streets in Kansas City, Kan. The construction company made no defense. The Southern Surety Company furnished the bond required by statute guaranteeing the payment for materials and was joined as defendant. Each case was tried without a jury, and judgment was rendered against the surety company which appeals.

Separate suits were brought because the materials were furnished under different contracts. In the first suit plaintiff claimed a balance due of $630.23. The surety company claimed to be entitled to a credit of $900, represented by a canceled check which it offered in evidence. In the second case plaintiff sued to recover a balance of $2198.14, and the only question involved in that case is whether the surety company is entitled to a credit of $600, which it claims was paid on the account.

The Wyandotte Paving & Construction Company and the Rackliffe-Gibson Construction Company each entered into contracts with the city of Kansas City for the improvement of streets. Mr. Rackliffe was president of both companies, and Gracia Knowles was secretary-treasurer of the Rackliffe-Gibson company and also secretary of the Wyandotte Paving & Construction Company. Mr. Fenton was the superintendent of both companies and had charge of the work of improving the streets under the various contracts between the city and each company. It also appears that the principal office of both construction companies was in the same suite of rooms in St. Joseph, Mo.

The question of law in the first case turns upon the proper application of a check for $900 which the surety company claims was paid by the Wyandotte Paving & Construction Company, and wrongfully credited by plaintiff to the account of the Rackliffe-Gibson Construction Company. Mr. Mer-

stetter, the general manager of the plaintiff company, after testifying to the value of the material furnished in that case, the credits given and the amounts remaining due, further testified that the Rackliffe-Gibson Construction Company was indebted to the plaintiff for material furnished in carrying out certain contracts not involved in these actions; that on January 23, 1914, he received from that company a check for $1000 with directions to apply it to the account of the Rackliffe-Gibson company; that he applied the payment as directed and deposited the check in the bank; that some days later the check was dishonored for want of funds, and he communicated by telephone with the offices of the Rackliffe-Gibson company at St. Joseph and was assured that they would attend to the matter promptly. Also, that he talked about it to Mr. Fenton, and a few days later, February 2, Fenton met him in the street and said: "Here are two checks to take up the check for $1000"; that one of the checks was for $100 and the other for $900, both payable to the Wyandotte Coal & Lime Company; that they went immediately to the bank, where he indorsed the two checks, and the dishonored check was surrendered to Fenton; that he made no change on the books, but allowed the original credit of $1000 to the Rackliffe-Gibson company to stand as it was given the day the $1000 check was received.

It appears that the Southern Surety Company, which was surety on the bond of the Wyandotte Paving and Construction Company in the Georgia avenue and Yecker avenue contracts, had arranged with the Commercial National Bank that no checks drawn by the Wyandotte Paving & Construction Company would be cashed without the countersignature of the surety company. Both the $900 and $100 checks, which were produced at the trial, were countersigned by the surety company and bore the words "Georgia Avenue Account" and "Yecker Avenue Account," respectively. It is the contention of the surety company that these memoranda and the countersignature of the surety company were notice to the plaintiff that the checks were to be applied as payments upon the particular contracts therein referred to. Mr. Merstetter testified, however, that he did not see any countersignature on either check; that he was not aware at that time the Southern Surety Company was surety for the Wyandotte Paving & Construc-

tion Company on either the Georgia or Yecker avenue contracts; that he did not see the memoranda and that his attention was not directed to them. His testimony was that he had no knowledge of any arrangement between the bank and the Southern Surety Company with respect to the manner in which the checks should be signed.

The circumstances under which these two checks were received are corroborative of the testimony of Mr. Merstetter to the effect that his attention was not challenged to the manner in which they were indorsed nor the memoranda upon them. They were handed to him on the street, and with the statement of the manager of the Rackliffe company that they were given to take up the check that had been dishonored. He and Fenton went at once to the bank for that purpose; all that was necessary for him to do was to place the indorsement of his company on the checks and to see that the dishonored check was taken care of. It was the natural thing for him to regard the incident as closed and to allow the account on the books to remain as though the first check had been paid when it first reached the bank. Moreover, it appears that when the check for $900 was given the amount due on the Yecker avenue contract was only about $600. All these circumstances were doubtless given weight by the trial court in finding generally in favor of the plaintiff.

Both paving companies were indebted to the plaintiff for material. Both were represented by the same superintendent and manager. That the two checks were signed by the Wyandotte Paving & Construction Company, even if he had noticed the fact, was not, we think, sufficient as a matter of law to put Merstetter upon inquiry, in view of all the circumstances, and particularly in view of the fact that both companies were managed and conducted by the same officers. The manager of the company which had given the dishonored check informed him that the two checks were for the specific purpose of taking up the one that had been dishonored. We think that the general judgment in plaintiff's favor must be sustained.

In the other case the surety company claims that the account sued upon should have been credited with the amount of two checks, one for $100 and one for $500. The check for $100 is one of the two checks which plaintiff claims was given for the

purpose of taking up the $1000 dishonored check. That has been disposed of in the other case and need not be again considered. The check for $500 was one which plaintiff credited to the account of the Rackliffe-Gibson company, and in addition to being drawn in the same way in which the other two checks were drawn, it bore in one corner the word "cement." Mr. Merstetter testified that he credited that check according to specific directions received in a letter, which was introduced in evidence and which reads:

"As per your wire of today we have sent a check payable to your order for $500. Kindly apply this on your old account and we will send you another check very shortly.          RACKLIFFE-GIBSON CONSTRUCTION CO.,
                                        By GRACIA KNOWLES, Secy. and Treas."

As contended by plaintiff, there was no street or contract for paving to which the word "cement" could apply, nor was there a separate account kept by plaintiff for cement furnished. It further appears from the testimony of Mr. Merstetter that he never noticed the memorandum "cement" on the check, and merely followed the directions contained in the letter and credited it to the account of the Rackliffe-Gibson company.

There is another point suggested which we think applies with equal force to both claims of the surety company, which is, that there is no privity of contract between the plaintiff and the surety company. The latter was not the owner of the fund out of which the payments were made. The right of appropriation of payments belongs exclusively to the debtor and creditor, and a third party can not be heard to complain of a different appropriation from that agreed upon by the debtor and creditor. The surety company had an arrangement with the bank that it should have the privilege of countersigning checks given by the Wyandotte Paving & Construction Company. But we are at a loss to understand how the plaintiff, who was a stranger to that transaction, could be bound by it. It was aware that the two paving companies were managed by the same officers, and when it was offered a check by the manager of both companies and told to apply the check to the satisfaction of a debt owing to it from one of them, it was not obliged, although the check was signed by the other company, to inquire by what authority the company making the payment used the check of the other.

Since, under all the circumstances shown by the evidence in these cases, the Wyandotte Paving & Construction Company made no direction to apply the checks in controversy to its own indebtedness, and on the contrary permitted its own officers to apply them to the payment of the debts of the other company, the surety has no right to complain. In the language of Judge Story:

"This right of appropriation is one strictly existing between the original parties; and no third person has any authority to insist upon an appropriation of such money in his own favor, where neither the debtor nor the creditor has made or required any such appropriation." (*Gordon v. Hobart*, 2 Story, 243, 264, 10 Fed. Cas. 787, 794.)

"Third persons, such as guarantors, sureties, indorsers, and the like, secondarily liable on one of the debts, can not control the application of a payment by either the debtor or the creditor, and neither the debtor or the creditor need apply the payment in the manner most beneficial to such persons." (30 Cyc. 1251, and cases cited in the notes.)

This is the rule applied in case of an ordinary accomodation surety; and certainly an insurance company engaged in the business of writing surety bonds for a compensation has no right to insist upon a more favorable one.

The judgments are affirmed.

---

No. 19,876.

O. P. BROOKS, *Appellant*, v. WALTER K. CAMPBELL and ELMER BEELER, *Appellees*.

SYLLABUS BY THE COURT.

1. *Partnership—Dissolution—Action for Accounting—Limitation of Action*. When a partnership business is closed out, a cause of action for an accounting and settlement arises between the partners, under an implied contract mutually and equally to share the profits and bear the burdens of the partnership.

2. SAME. A partnership business was closed out in April, 1908. An action for an accounting and settlement and for moneys due to one partner from the other partners was not begun until September, 1913. *Held*, that such action was barred by the statute of limitations. (Civ. Code, § 17, subdiv. 2.)

3. PARTNERSHIP—*Action for Accounting—Statute of Limitations Not Tolled by Action of One Partner*. A partnership of three members establish a business at Ardmore, Okla. The business was a failure,

and was closed out by the plaintiff as manager with the consent of the other partners. Two years and three months later plaintiff collected a claim against a railway company for loss of goods shipped by him to the other partners upon closing out the partnership business. Plaintiff voluntarily placed the sum collected to the credit of the defunct partnership. *Held,* that such voluntary payment did not interrupt the running of the statute of limitations in plaintiff's own favor.

Appeal from Montgomery district court; THOMAS J. FLAN-NELLY, judge. Opinion filed February 12, 1916. Affirmed.

*J. E. Brooks,* and *C. O. Buckles,* both of Sedan, for the appellant.

*Thomas E. Wagstaff,* and *S. P. Miles,* both of Independence, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: In October, 1907, the plaintiff and defendants formed a partnership for the purpose of conducting a plumbing and gas-fitting business in the city of Ardmore, Okla. By agreement of the partners, the plaintiff went to Ardmore to take charge of the business at a salary of $85 per month. His salary and all other expenses were to be paid out of the proceeds if the business, and the profits, if any, were to be shared equally. The business was a losing venture. The receipts for six months were $3000.10; the disbursements $3683.62; and certain other expenditures were borne by the plaintiff personally. The plaintiff closed out the business in April, 1908, and shipped the remaining goods on hand to the defendants, who had an independent partnership in other business elsewhere.

This action was brought on September 19, 1913, and the later amended petition set out the foregoing facts, and pleaded the state of the accounts between plaintiff and defendants, showing a balance due him, and alleging the existence of "some unsettled accounts." His petition continues: .

"That certain goods shipped to the defendant at the time said business was closed were lost and said firm had a claim against the Mo. Pac. Railway Company for the loss of said goods which claim the defendant Walter Campbell of said [independent] firm of Campbell and Beeler instructed this plaintiff to collect. That he proceeded to collect the claim but did not succeed therein until the first day of August, 1910,

14—97 KAN.

when said company paid $100.00 in settlement of such claim, which was placed to the credit of the firm of Brooks, Beeler & Campbell on the 1st day of August, 1910.

"That since the first day of August, 1910, each of said defendants have been absent from the state of Kansas at times for more than a total of 60 days."

The plaintiff prayed for a commission to examine the books and accounts of the firm, for a determination of the partners' several interests and for a judgment for the amount claimed to be due from his copartners.

The district court sustained a demurrer to the amended petition, and the case is here for review.

1. Was this action barred by the statute of limitations?

There is an implied obligation between general partners that on the termination of the partnership they will account to each other and settle and pay any balances due among themselves. To bring about such accounting and settlement a cause of action will lie. (*Norman v. Conn,* 20 Kan. 159; *Turner v. Otis,* 30 Kan. 1, 1 Pac, 19; *Clarke v. Mills,* 36 Kan. 393, 13 Pac. 569; 30 Cyc. 681, 713; 1 M. A. L., p. 762.) In the petition it was alleged that the partnership business was closed in April, 1908. This action was not begun until September 19, 1913, some five years and five months thereafter.

Unless the partnership business was unsettled, and we will consider that later, the plaintiff's cause of action for an accounting arose April, 1908, and was barred in April, 1911. If, as alleged, his partners owed the plaintiff a balance of money, it too was barred in April, 1911. (Civ. Code, § 17, subdiv. 2.)

If there were unsettled accounts, the statute would not begin to run until they were disposed of. (Bushnell, Limitations and Adverse Possession, §§ 57, 66, 67, 207, 208; 2 Wood on Limitations, 3d ed., § 211 and note.)

Here, so far as shown by the petition, the only item unsettled, that is, unpaid, was the claim against the railway company for a shipment of goods lost in transit. The plaintiff says that "Walter Campbell of the firm of Campbell & Beeler instructed the plaintiff to collect" that item. It should go without saying that the firm of Campbell & Beeler, an independent firm, had no interest in the affairs of the partnership under consideration, which was the firm of Brooks, Beeler & Campbell. But

laying aside that point as a technicality, let it be considered that Campbell, a partner of the Ardmore firm of Brooks, Beeler & Campbell, instructed the plaintiff, Brooks, to collect the claim against the Missouri Pacific railway. He did not authorize, nor can it be fairly said from the pleadings that he directed that the amount which might be collected from the railway company should be "placed to the credit" of the defunct firm of Brooks, Beeler & Campbell. It seems hardly fair to permit this voluntary payment by Brooks in 1910 to the defunct firm to interrupt the running of the statute of limitations in his own favor. (*Hancock v. Cook,* 35 Mass. 30.) It would be stretching language unduly to characterize the railway company as a "customer" of the defunct firm.

We have examined the authorities cited by appellant. The first was the case of *Green v. Williams,* 21 Kan. 64, which was largely one of agency, and it was properly held that the statute did not run because there was no demand and refusal to pay and because the agent lived in another state.

The other case cited by appellant (*Benoist et al. v. Markey, Tutor, et al.,* 25 La. Ann. 59) is much more to the point. There the firm of Benoist, Shaw, Murphy & Newman had formed a partnership in 1859. Its business was ruined by the civil war, and there was nothing done towards a settlement of the partnership business until 1866, when suit was begun and a receiver appointed upon the application of the parties. Litigation of several years' duration ensued. This was a plain case where the statute should not be held to begin to run until a settlement of the partnership affairs had been effected and until the partners could have an opportunity to commence proceedings under the judgment settling the respective rights of the liquidating partners.

Other cases holding that the statute does not under all circumstances begin to run on the dissolution of the partnership are *Holloway v. Turner,* 61 Md. 217, *Jordan v. Miller and als.,* 75 Va. 442, and *Riddle v. Whitehill,* 135 U. S. 621. They relate to partnerships being wound up in due course, realizing assets, satisfying debts, etc. Obviously no statute of limitations would run in such cases.

There is, however, apparently no end of authority for holding that the cause of action for accounting and settlement be-

tween partners arises on the dissolution of the partnership, or in such a case as pleaded by appellant, when "with the consent of the defendants (his partners) he closed out the business when it was found to be unprofitable and plaintiff shipped to the defendants the stock of goods remaining on hand when said business was discontinued." Some of these authorities which we have examined in detail are: *Adams v. Taylor*, 14 Ark. 62; *Wilhelm v. Caylor, Ex'r of Riael*, 32 Md. 151; *Codman v. Rogers*, 27 Mass. 112; *Atwater v. Fowler*, 1 Edw. Ch. (N. Y.) 417; *Murray v. Coster*, 20 Johns. (N. Y.) 576; *Appleby v. Brown*, 24 N. Y. 143; *Coleman v. Second Avenue R. R. Co.*, 38 N. Y. 201; *Dwinelle v. Edey*, 102 N. Y. 423, 7 N. E. 422; *Gray v. Green*, 125 N. Y. 203, 206, 26 N. E. 253; *Coalter v. Coalter*, 1 Rob. (Va.) 79; Angell on Limitations, § 69, and Wood on Limitations, 3d ed., § 211.

From the foregoing we must hold that the cause of action for the accounting and settlement on the implied obligation of partners arose when the partnership business was closed out in 1908, and an action thereon filed in 1913 was barred by the statute of limitations (Civ. Code, § 17, subdiv. 2), and the voluntary payment to the defunct partnership in 1910 by the plaintiff did not interrupt in his own favor the running of the statute (52 L. R. A. 707, note 3).

The demurrer was properly sustained, and the judgment is affirmed.

---

No. 19,880.

JUSTUS B. LINDERHOLM, *Appellant*, v. THE KANSAS CONFERENCE OF THE SWEDISH EVANGELICAL LUTHERAN AUGUSTANA SYNOD OF NORTH AMERICA, *Appellee*.

SYLLABUS BY THE COURT.

CHURCH MEMBER—*Excommunication—Appeal to Church Conference— Decision of Conference Final—Not Entitled to New Trial.* The plaintiff was excommunicated by the church council of Bethany Lutheran church at Lindsborg, an unincorporated religious society of which he was a member. The by-laws of the church provided for an appeal to the conference, a voluntary association of Lutheran churches. The by-laws also contained the following provision: "The decision of the conference in the matter shall in all events be final." The plaintiff appealed to the conference, which ratified the action of the council.

The plaintiff filed a motion for a new trial. The conference decided that the document could lead to no further consideration of the cause. The plaintiff sued the conference for damages for not hearing the motion for a new trial. A demurrer was sustained to his evidence. *Held,* the demurrer was properly sustained, because the plaintiff failed to show any church rule, custom or usage requiring the conference to consider a motion for a new trial; the conference was not bound by the common-law rules of civil procedure, and the by-law quoted forbids further action by the conference after it has decided an appeal.

Appeal from McPherson district court; FRANK F. PRIGG, judge. Opinion filed February 12, 1916. Affirmed.

*John F. Hanson,* of Lindsborg, for the appellant.

*G. F. Grattan,* and *John M. Grattan,* both of McPherson, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for the refusal of a church conference to hear a motion for a new trial. A demurrer was sustained to the plaintiff's evidence and he appeals.

Linderholm was a member of the congregation of Bethany Lutheran church, an unincorporated religious society at Lindsborg. The by-laws of the church contained the following provisions:

"Should the warning be without any effect as to the one called, the church council shall suspend or excommunicate according to the word of God. The person excommunicated loses then all his rights to any part in the congregation's real or personal property. . . . If the member is not satisfied with the church council's decision concerning himself, he may appeal to the conference on the condition that he, within a week, gives notice to the church council after he has received notice of the decision, and states his reason and grounds for his appeal. The decision of the conference in the matter shall in all events be final."

Charges were preferred against Linderholm and he was excommunicated. He appealed to the conference, a voluntary association of Lutheran churches. The conference sustained the action of the church, as appears by the following transcript of its proceedings:

"Conference Minutes 1904. Mr. J. B. Linderholm had appealed to the Conference from the decision of the church council of Bethany congregation at Lindsborg.

"The Conference elected a committee to take this appeal into consideration and to go through the documents and as a result thereof to lay resolutions before the Conference. As members of this committee were elected Rev. S. E. Glad, and C. A. Henry and Mr. Gust Burk.

"At the sixth session this committee rendered the following report:

"The committee, elected to consider the appeal sent to the Conference by J. B. Linderholm, reports as follows:

"(a) It appears that said Linderholm has on account of unkind judgments and threats been refused admittance to the Lord's supper, and that after continued obstinacy and unbecoming conduct during divine service has been excommunicated by the church council;

"(b) That although Linderholm has in writing bound himself to desist from strife he nevertheless has continued as before in publications, in word and action;

"(c) That in his appeal he admits his irresponsibility for 'coarseness and peculiarities' with which he has confronted those who time and again have attempted to bring about a reconciliation with him.

"(d) The committee moves, that the action of the church council be ratified. THE COMMITTEE.

"The report was accepted by the Conference."

The plaintiff, through his attorney, John F. Hanson, filed a motion for a new trial, which the conference disposed of in the following manner:

"Decided that whereas, the conference already decided this matter or case these writings can not be given or lead to any further consideration on the part of the conference."

This action of the conference is the foundation of the plaintiff's claim for damages, the specific allegation of the petition being, "that plaintiff by the refusal of said conference to sit and hear said motion for new trial as aforesaid has been damaged in the sum of $5000."

The record of the proceedings in the district court contains no statement by the court respecting the defect or defects in the plaintiff's proof, and failure to establish any material allegation of the petition is fatal to recovery. Conceding, but not deciding, that damages might have been awarded for a departure from orderly church procedure, there is no proof that the conference was guilty of such conduct.

There was evidence that the Lindsborg church sprung from the Swedish Lutheran church in Sweden, that "there is a tendency to follow that and get precedents from that when it can reasonably be adopted," but that trial procedure depends in this country on custom and usage, and it is customary to

proceed in some reasonable way. What the usages and customs of the Lutheran church in this country or in any other country may formerly have been, or may now be, respecting new trials by conferences after decisions of appeals from church councils, was not shown.

The plaintiff offered in evidence a provision of the church law of Sweden which states that "in other matters of practice the cause shall proceed on appeal the same as in the secular courts." The offer was rejected, but the evidence will be treated as if it had been admitted. The secular courts referred to are the courts of Sweden. There was no proof or offer of proof that new trials are a part of the procedure in those courts, and it is impossible to declare or to infer that the provision offered in evidence related in any way to the subject of new trial. Beyond this, the testimony went no further than that there is a "tendency" to follow Swedish precedents. How far this tendency prevails and how far it has been superseded by modern American customs does not appear, and so far as the proof discloses, a new trial after a conference decision on appeal may be quite contrary to such customs.

The attorney for the plaintiff, testifying not as an expert in church law and custom but simply as "a lawyer," expressed the opinion that a new trial, under the circumstances of this case, would be a reasonable procedure in this country in the Lutheran church where no specific procedure is provided. This testimony failed to touch the subject of the existence or nonexistence of a church law, church usage or church custom requiring a Lutheran conference to consider a motion for a new trial after determining an appeal to it from the action of a church council in excommunicating a member of a congregation.

There was just one piece of evidence introduced by the plaintiff which bore directly on the subject under consideration, and that was the decision of the conference itself, the highest church tribunal to which the plaintiff could appeal, that the motion for a new trial could not lead to any further consideration of the cause. In written briefs by the plaintiff himself and by his attorney, both of which descend to scurrility, this decision is characterized as arbitrary, inexcusable, despotic, and revolutionary. There is not a particle of evidence relating

to the attitude of the conference or of its members toward the motion for a new trial other than the written decision itself. That is a document which this court can interpret, and on its face it discloses nothing but an opinion that a motion for a new trial did not lie after the conference had decided the appeal. There is not the slightest hint in the evidence that this was not the conscientious opinion of a church tribunal having knowledge of its duties and its powers under church law and precedent, and having final authority in the matter. There is abundant authority that this decision conclusively binds the civil courts, but leaving the decision out of consideration, there is no evidence offered or introduced from which a civil court or jury could say that a motion for a new trial was a recognized or proper remedy available to the plaintiff after the conference had decided the appeal.

It is said that in the absence of rules adopted by a religious association governing the procedure of its tribunals in cases of excommunication, the rules of the common law prevail. It seems that the practice of granting new trials had not been settled in England so that we can now know definitely what it was in the fourth year of James the First, when the common law of England was imported into this country. (14 Encyc. Pl. & Pr. 717.) Whatever the practice, it related to jury trials and obtained in courts of general jurisdiction only. It was not permissible, as it is not now permissible, in tribunals possessing special or limited authority. Beyond this, however, the broad, general doctrine apparently approved by a few courts, that common-law civil procedure invades church procedure in such a way as to control the action of church tribunals in matters not governed by specific church rules duly adopted, has no lodgement in this state. In so far as a church society has not prescribed rules of procedure for its tribunals, those tribunals may adopt their own procedure, and they are not obliged to guide themselves in the disposition of causes by Blackstone and Chitty and Stephens. Church tribunals possess the same authority in this respect that state tribunals possess, subject to the limitation that they can not violate positive law, or act in bad faith, or act so unconscionably or oppressively as to indicate bad faith. Persons becoming members of unincorporated religious societies do so subject to these conditions.

It so happens that the Lindsborg church has an adopted rule governing the subject under discussion, whatever the general laws or customs of Lutheran church government may be. It provides for an appeal from the church council to the conference, and then specially provides that the decision of the conference shall in all events be final. The case ends absolutely, so far as the person on trial is concerned, when the conference renders its decision. There are no further proceedings of any kind in the same or in any other tribunal. Litigiousness is not indulged in the tribunals of this church to the extent that it may be indulged in the civil courts.

There are other reasons why the plaintiff's case utterly failed, but they need not be enumerated. The foundation of the supposed cause of action, the right to a new trial by the conference, did not exist.

The plaintiff in his brief *pro se* undertakes to give the court the real inside facts about his troubles at Lindsborg, and so gives his version of the whole story, beginning about the year 1901. What he regards as the true motive for the insanity proceedings against him is revealed. The scene in which the plaintiff retired from the conference (he probably means council) is of tense dramatic interest:

"My patience was at an end. I sprang up, and with an expression sometimes used by Luther when extremely vexed I left the room."

The briefs contain much other matter quite as remote from the single subject presented by this appeal. It is to be hoped that upon reflection the plaintiff and his attorney will perceive that this court is bound by the record made in the district court.

Complaint is made that the district court did not require the answer to be made more definite and certain. Since the court did not reach them, it makes no difference what affirmative defenses the answer contained.

The judgment of the district court is affirmed.

No. 19,882.

JOHN F. HANSON, *Appellant*, v. THE MISSOURI PACIFIC RAIL-
WAY COMPANY, *Appellee*.

### SYLLABUS BY THE COURT.

*Motion for Continuance—Absent Evidence—No Diligence Shown.* Where
a plaintiff moves for a continuance on the ground that on account of
his poverty he has not been able to look up the evidence and find
witnesses to prove his case, a denial of the motion is justified by
evidence that he had brought a previous action on the same cause,
which he had dismissed when it was brought to trial, suing again just
before the expiration of a year.

Appeal from McPherson district court; FRANK F. PRIGG,
judge. Opinion filed February 12, 1916. Affirmed.

*John F. Hanson,* of Lindsborg, for the appellant.

*Frank O. Johnson,* of McPherson, *W. P. Waggener,* and
*Walter E. Brown,* both of Atchison, for the appellee.

The opinion of the court was delivered by

MASON, J.: John F. Hanson sued the Missouri Pacific Rail-
way Company before a justice of the peace, on account of
property alleged to have been destroyed in the spring of 1910,
by fire caused by its negligence. No appearance was made by
the defendant and judgment was rendered for the plaintiff.
An appeal to the district court was taken on August 5, 1913.
On December 2, 1913, the plaintiff moved for a continuance
over the term on the ground, supported by his affidavit, that
by reason of his poverty he had been "unable to look up all the
evidence in the case and find suitable witnesses to prove the
issues," or to pay the expenses of witnesses, or to take deposi-
tions. On the same day the defendant's attorney orally stated
some facts with regard to the history of the case, and the court
overruled the motion. Five days later the defendant's at-
torney, with the consent of the court, filed an affidavit purport-
ing to cover the same ground as his oral statement. Hanson
filed a counter-affidavit. On December 10, 1913, the day on
which the case had been set for trial, it was called, and as the

Webster v. Broeker.

plaintiff did not appear, it was dismissed for want of prosecution. The plaintiff appeals.

The substance of the statement made in behalf of the defendant is this: About April, 1912, the plaintiff sued the defendant upon the same cause of action before a justice of the peace. The case was continued twice, the second continuance being at the request of the plaintiff to give him time to obtain his evidence. At the trial the plaintiff introduced some hearsay evidence, but perceiving that the justice was going to rule against him, dismissed the case without prejudice. The present action was brought a few days short of a year after the dismissal.

Complaint is made because the defendant's attorney was permitted to file his affidavit after the motion for a continuance had been denied. It was proper to consider the attorney's oral statement at the hearing of the motion, and to allow it later to to be reduced to writing, verified and filed. The evidence warranted the conclusion that reasonable diligence had not been shown in preparing for trial. The refusal of a continuance was clearly within the discretion of the trial court, and the dismissal was the necessary result of the plaintiff's failure to prosecute.

The judgment is affirmed.

---

No. 19,884.

J. C. WEBSTER, *Appellee*, v. HERMAN BROEKER, *Appellant*.

SYLLABUS BY THE COURT.

JURISDICTION—*Justice of the Peace—Amount in Controversy*. In an action before a justice the bill of particulars stated a cause of action for the recovery of $300; the prayer asked judgment for that sum with interest from the day the action was begun; judgment was rendered for $300. *Held*, that the prayer was no part of the statement of the cause of action, that the amount sued for was $300, and that the justice court and the district court on appeal had jurisdiction.

Appeal from Douglas district court; CHARLES A. SMART, judge. Opinion filed February 12, 1916. Affirmed.

*R. E. Melvin,* and *Thomas Harley,* both of Lawrence, for the appellant.

*Fred A. Clarke,* of Lawrence, for the appellee.

The opinion of the court was delivered by

PORTER, J.: In this case the only question is, whether the justice court and the district court, where the case was appealed, had jurisdiction, and this depends upon what sum the plaintiff sued for in the justice court. The bill of particulars alleged that defendant owed plaintiff $300 for failure to perform a written agreement; that demand had been made for that sum and defendant had refused to pay the same. In the prayer for relief the plaintiff prayed judgment for $300 "together with interest thereon at the rate of six per cent per annum from the 8th day of October, 1913, and for costs of suit." The action was begun in a justice court on the 8th day of October, 1913, and the summons was personally served on the defendant the same day. On December 28, 1913, the court rendered judgment in plaintiff's favor for $300 with interest from the date of the judgment and for costs. The defendant appealed to the district court and filed a motion to dismiss on the ground that the bill of particulars demanded judgment for more than $300 and that neither the justice court nor the district court had jurisdiction of the cause. There is a statement in the abstract that the same application was made and denied in the justice court. This is challenged in the counter-abstract. The district court overruled the motion to dismiss, and on the trial of the case judgment was rendered against the defendant for $300 and costs.

It is stated in the bill of particulars that the defendant is owing the plaintiff the sum of $300, and unless the prayer for relief is considered a controlling part of the statement of the cause of action it is clear that the plaintiff claimed no more. The mandate in the code of civil procedure which requires that "its provisions, and all proceedings under it, shall be liberally construed, with a view to promote its object, and assist the parties in obtaining justice" (§ 2), applies to actions before justices where formal pleadings are not necessary. (*Wooster v. McKinley,* 1 Kan. 317.)

Webster v. Broeker.

It would be quite technical to hold that when the action was commenced the plaintiff claimed there was more than $300 due. In *Smith v. Kimball*, 36 Kan. 474, 13 Pac. 801, it was said:

"However strongly a pleader may be bound, and however much he may be estopped by the averments of facts in the body of his pleadings, it is doubtful whether he is bound or estopped by his prayer for relief. He is supposed to know the facts upon which he predicates his action, and to state them as he understands them, but the relief to which he is entitled on the facts related is a question for the court, and over which he has no control." (p. 492.)

A *per curiam* opinion in *Smith v. Smith*, 67 Kan. 841, 73 Pac. 56, contains the following inaccurate statement:

"It is well settled in this state that the prayer of the petition forms no part of it, and that relief may be granted in accordance with the facts stated in the petition rather than pursuant to its prayer."

The prayer for relief is a part of the petition or bill of particulars, and a necessary part. In enumerating what the petition must contain, the language of section 92 of the code is, "Third, a demand of the relief to which the party supposes himself entitled." While the prayer is a necessary part of the petition, it is not a part of the statement of the cause of action. A pleader may suppose himself entitled to other and different relief than the facts stating his cause of action warrant, and may ask for such relief, but in determining the question of the jurisdiction of the court it is the cause of action stated, and not the relief prayed for, which controls.

The statement in the opinion in *Smith v. Smith*, supra, that "It is well settled in this state that the prayer of the petition forms no part of it," was not necessary to the decision in that case, was *obiter*, and should be overruled. The case at bar is controlled by the decision in *Parker v. Dobson*, 78 Kan. 62, 96 Pac. 472, the second paragraph of the syllabus of which reads:

"If in an action before a justice of the peace upon a promissory note the amount claimed in the bill of particulars do not exceed $300, the justice, or the district court upon appeal, may adjudicate the controversy, although the interest accruing before final judgment increase the amount due to more than $300; but whatever the balance found due may be the judgment can not exceed $300." (Syl. ¶ 2.)

The plaintiff elected to accept judgment for the amount within the jurisdiction of the court. The action was to recover no more than $300, and therefore the judgment is affirmed.

No. 19,887.

Ross B. Broadhead and Lee Rhoades, *Appellees*, v. The Atchison, Topeka & Santa Fe Railway Company, *Appellant*.

### SYLLABUS BY THE COURT.

1. Shipping Cattle—*Unloading in Transit—Quarantined Yards—Construction of Telegram—Evidence.* In an action for damages to a shipment of cattle caused by a delay in starting after they were loaded, and by unloading in transit in yards which had been ordered quarantined by the Bureau of Animal Industry, so that such cattle had to be kept there several days and disinfected, evidence was offered for the purpose of showing that the following telegram:

"A. T. & S. F. yards Waynoka infected scabies account Elwood cattle. Quarantine until disinfected. Bureau Supervision.
    Signed: Allan."

required only the quarantining of certain portions of such yards in which infected cattle had been recently handled, which evidence was rejected. *Held*, that such ruling was proper.

2. Same—*Written Notice of Damages Claimed—When Unnecessary.* The shipping contract provided that written notice of a claim for damages should be given to some officer of the company or to the nearest station agent before the stock should be removed from the destination or place of delivery and before it had been slaughtered or intermingled with other stock. The cattle were kept at the quarantined yards seven days and there dipped by the servants of the defendant under the supervision of the Bureau of Animal Industry. No claim was made for damages caused after the shipment left the yards. *Held*, under such circumstances written notice was not required as to damages then apparent, but in order to recover for damages so caused but thereafter developing, notice was required unless waived.

3. Same — *Negligence — Requested Instructions Refused — Error.* The allegations, proof and instructions involved two grounds of damage, delay at Argentine and the treatment received at Waynoka. The defendant requested that the jury be required to state, if they found the defendant negligent, in what respect or respects they considered it negligent, which request was refused. *Held*, error.

Appeal from Douglas district court; Charles A. Smart, judge. Opinion filed February 12, 1916. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley,* all of Topeka, for the appellant.

*M. A. Gorrill,* and *Henry H. Asher,* both of Lawrence, for the appellees.

The opinion of the court was delivered by

WEST, J.:   November 4, 1913, the plaintiffs delivered to the defendant at Kansas City two carloads of cattle to be transported to Woodward, Okla., and paid the freight thereon.   The shipment was permitted to stand on the sidetracks at Argentine about four hours after the cattle were loaded, and when reaching Waynoka, Okla., there was not sufficient time remaining to reach the point of destination without violating the federal twenty-eight-hour act, and the cattle were unloaded in the yards there.   It developed that these yards had, by an officer of the Bureau of Animal Industry, been ordered quarantined, and the cattle were held therein until the 13th of November, and in the meantime were disinfected under the order of the Bureau of Animal Industry and as a result thereof were damaged.   To recover for this damage the plaintiffs brought this action, alleging negligence in the delay at Argentine and in unloading into infected yards at Waynoka; that the defendant knew and was fully advised that these yards had been on the 5th day of November, 1913, quarantined by an inspector in charge of the Bureau of Animal Industry on account of being infected with scabies.

The cattle were unloaded at Waynoka at 12:50 p. m., November 6.   The yards at Waynoka comprise forty-two pens, most of them thirty by fifty-four feet; three loading chutes and one unloading platform.   October 31, a shipment of cattle from Abernathy, Tex., was unloaded in the Waynoka yards through the north chute into pen No. 42 at the northeast corner of the yards.   On November 3 some cattle from Kenna, N. Mex., were unloaded and placed in pens Nos. 5 and 6 on the west side of the yards and near the central portion thereof.   These were reloaded through the south and center loading chutes.   On November 5 the station agent received a telegram from inspector Allan of the Bureau of Animal Industry at Fort Worth, reading as follows:

"A. T. & S. F. yards Waynoka infected scabies account Elwood cattle. Quarantine until disinfected.   Bureau Supervision.   Signed: ALLAN."

November 3, a notice was served upon the railway company, Kansas City, Mo., to—

"Clean and disinfect car 52461 A. T. & S. F.; scabby cattle from Abernathy, Texas.   Until chutes and pens through which these cattle

were handled are cleaned and disinfected all cattle handled through them will be classed as cattle exposed to scabies. Walter A. Smith, Veterinary Inspector, B. A. I. Unloaded Waynoka, October 31, 1912."

From all of which it appears that when the plaintiffs' cattle arrived at Waynoka on November 6 the defendant had notice that the Abernathy cattle were infected and that all cattle handled through the pens and chutes which they had passed through would, until cleaned and disinfected, be classed as cattle exposed to scabies, and had received the order of November 5, that the yards were infected on account of the Elwood cattle—that is, the cattle from Abernathy—and to quarantine until disinfected. The information that the shipment from Kenna, N. Mex., unloaded on November 3, had been found to be infected was received by the agent after the plaintiffs' cattle had been unloaded.

The delay at Argentine, while of itself not necessarily of great significance, becomes an important element in the case if it thereby became necessary to unload at Waynoka in order to keep from violating the twenty-eight-hour law. The question of negligence in unloading into infected yards must rest upon the knowledge possessed by the company at the time of such unloading. It is strenuously urged that only two small portions of the yards had been occupied by infected cattle, and that the order from inspector Allan to quarantine the yards meant and made necessary the quarantine of only such portions thereof as were actually infected. No question is made about the duty of the railway company to obey the orders of the Bureau of Animal Industry, and the plain, unambiguous telegram was sufficient to require the defendant to refrain from unloading the plaintiffs' cattle in any portion of such yards. Hence it was not error for the trial court to reject evidence as to how such telegram was or should have been construed; neither was it error to speak of the yards in the charge as those that had been infected with a disease common among cattle. The foreman of the stockyards testified that the order was "to quarantine the stockyards and close the yards for unloading purposes until yards had been disinfected and quarantine raised by B. A. I. inspector. During the time Broadhead shipment occupied my yards, the yards were subject to the supervision of the B. A. I. doctor. Dr. Warner

supervised the disinfecting of the yards and spraying of the Broadhead cattle." It is not the infection, but the dipping of the cattle and the rough treatment incident thereto, that the plaintiffs complain of, and whatever distinctions are sought to be made between a quarantine of the yards and a quarantine of certain chutes and pens only, the cattle were by the defendant unloaded into yards which it had been ordered to quarantine and where they had to be disinfected, and were damaged thereby.

It is urged that written notice of plaintiffs' claim was not given as required by the eighth clause of the shipping contract, and that such notice should have been given after unloading at destination when the cattle were discovered at the owner's ranch. The testimony shows that the cattle were unloaded at Waynoka on the 6th and remained there until the 13th, during which time they were dipped by the defendant's employees under the supervision of the Bureau of Animal Industry, and no claim is made for any damage except such as was caused by the delay at Argentine and the treatment at Waynoka. The clause of the contract under consideration, so far as applicable, reads as follows:

"In order that any loss or damage to be claimed by the shipper may be fully and fairly investigated and the fact and nature of such claim or loss preserved beyond dispute and by the best evidence, it is agreed that as a *condition precedent* to his right to recover any damages for any loss or injury to his said stock during the transportation thereof, or at any place or places where the same may be loaded or unloaded for any purpose on the company's road, . . . the shipper or his agent in charge of the stock will give *notice in writing* of his claim therefor to some officer of said company, or to the nearest station agent, or if delivered to consignee at a point beyond the company's road, to the nearest station agent of the last carrier making such delivery, before such stock shall have been removed from the place or destination above mentioned, or from the place of delivery of the same to the consignee, and before such stock shall have been slaughtered or intermingled with other stock, and will not move such stock from said station or stock-yards until the expiration of three hours after the giving of such notice."

While neither the shipper nor the carrier could tell when the cattle left Waynoka, or even when they reached the owner's ranch, what might develop as the result of the treatment while being disinfected at the Waynoka yards, still each had equal

knowledge and means of knowledge when the cattle left Waynoka, so that a written notice that the shippers would claim damages for injuries already apparent could not have been of any benefit or advantage to the defendant company. Under such circumstances, the rule is well settled that written notice is not required. (*Railway Co. v. Frogley,* 75 Kan. 440, 89 Pac. 903; *Darling v. Railway Co.,* 76 Kan. 893, 902, 93 Pac. 612, 94 Pac. 202; *Railway Co. v. Wright,* 78 Kan. 94, 95 Pac. 1132; *Cockrill v. Railway Co.,* 90 Kan. 650, 136 Pac. 322.) But as to damages subsequently developing as the result of such dipping, notice was required unless waived, so that the carrier could be advised that a claim would be made for such damages as well as for those already apparent. (*Giles v. Railway Co.,* 92 Kan. 322, 140 Pac. 875.) The suggestion that the notice should have been deferred until the cattle were discovered at the ranch of the owner does not accord with the language of the clause in the shipping contract under consideration.

The defendant requested the court to submit to the jury eight special questions. The four submitted were answered to the effect that the cattle were held in the yards under the orders of the Bureau of Animal Industry and sprayed and disinfected under government supervision; that the yards at Waynoka were under quarantine after two o'clock, November 6, 1913, which quarantine took effect November 3, 1913. Questions 5 and 6 were whether the defendant was notified on November 6 that portions of the yards held infected cattle, and if so, when such notice was served. It is argued that it was desired by these two questions to show, if possible, that the notice that the Kenna shipment was infected was not received until after the plaintiffs' cattle were unloaded. While not very material, and while it is conceded that the evidence on this point is somewhat convincing in favor of the defendant, it would have been proper to submit these interrogations, although their refusal can not be held to be materially prejudicial. Question 8 asked the jury to state in what manner the eighth clause of the shipping contract was complied with. This question was so utterly improper in form and substance that the court could not do otherwise than refuse its submission. Question 7 was:

"If you find the defendant negligent, then state in what respect or respects you consider the defendant negligent."

Broadhead v. Railway Co..

The plaintiffs had alleged two acts of negligence, the delay at Argentine and the unloading at Waynoka, and the court had with considerable care instructed as to each, charging that:

"They claim that these two items of negligence form the basis of the damages they sustained. . . . Drawing your attention now to the first allegation of negligence, the delay at Argentine, if there was a delay. There is no evidence that the delay at Argentine injured these cattle in and of itself, but it becomes important in connection with another branch of this case. . . . Now, if this delay in Argentine made it necessary for them to unload the cattle at Waynoka in order to comply with this rule, then it becomes important. In other words, if they had not delayed the shipment in Kansas City, might they have arrived at their destination within the twenty-eight hours? So the delay in Kansas City becomes important in that regard . . . and so, gentlemen, it becomes quite important for you to inquire, did the delay in Kansas City make it necessary to unload the cattle at Waynoka? Because, it being admitted that they did unload the stock into the Waynoka yards, they were bound to furnish yards there reasonably safe for the cattle."

Having given these instructions, and the jury having been thus plainly charged concerning the two claims of negligence on which the plaintiffs relied, it was not only proper but a matter of right that question 7 should have been submitted. To this effect have been the decisions for more than a generation. (*C. B. U. P. Rld. Co. v. Hotham*, 22 Kan. 41; *Johnson v. Husband*, 22 Kan. 277; *City of Wyandotte v. Gibson, Adm'x*, 25 Kan. 236; *Foster v. Turner*, 31 Kan. 58, 1 Pac. 145; *W. & W. Rld. Co. v. Fechheimer*, 36 Kan. 45, 12 Pac. 362, and cases cited; *A. T. & S. F. Rld. Co. v. Ayers*, 56 Kan. 176, 42 Pac. 722; *Barker v. Railway Co.*, 89 Kan. 573, 132 Pac. 156; *Cole v. Railway Co.*, 92 Kan. 132, 139 Pac. 1177; *Jones v. Interurban Railway Co.*, 92 Kan. 809, 813, 141 Pac. 999; *Adams v. Railway Co.*, 93 Kan. 475, 481, 144 Pac. 999.)

The judgment is reversed and the cause remanded for further proceedings in accordance herewith.

WEST, J. (dissenting): In my judgment the instruction given by the trial court concerning notice was in accord with the declarations of this court in *Railway Co. v. Frogley*, 75 Kan. 440, 443, 89 Pac. 903; *Darling v. Railway Co.*, 76 Kan. 893, 901, 93 Pac. 612, 94 Pac. 202; *Railway Co. v. Wright*, 78 Kan. 94, 96, 95 Pac. 1132, and *Cockrill v. Railway Co.*, 90 Kan. 650, 653, 136 Pac. 322, and correctly stated the law.

No. 19,889.

GEORGE HASELTINE, revived in the name of PAUL N. GLEISS-
NER, *Appellant,* v. FRED NUSS et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. VACATION OF STREET—*Land Reverts to Abutting Lot Owners.* The
   statutory rule followed, that on the vacation of a street the land so
   vacated reverts to the "owners of lots adjacent or abutting thereto,
   according to the frontage of said lots or land."
2. EJECTMENT—*Basis of Recovery—Plaintiff's Own Title.* The rule fol-
   lowed that a plaintiff in an action in ejectment must rely on the
   strength of his own title, and not on the weakness of his adversary's
   title.

Appeal from Dickinson district court; ROSWELL L. KING,
judge. Opinion filed February 12, 1916. Affirmed.

*H. L. Humphrey,* of Abilene, for the appellant.

*Frank A. Green,* of Herington, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action in ejectment brought by
the appellant to recover possession of a tract of land thirty
feet wide and one hundred and eighteen feet long, being the
half of a platted but vacated street adjacent to a town lot in
the city of Herington, Dickinson county, Kansas. The plain-
tiff claims this tract under a sheriff's deed issued in 1913. The
defendants are in possession and claim under a tax deed to the
adjacent and abutting lot issued in 1901.

The original town of Herington was platted some time prior
to October 8, 1884, but was not then an incorporated city. One
M. D. Herington then owned the lot adjacent to the tract of
land in controversy. The board of county commissioners va-
cated the street on October 8, 1884. Half of the vacated street
adjacent to defendants' lot and abutting thereto is the tract of
land involved in this lawsuit. In 1885 Herington conveyed the
entire block (except two lots not here pertinent) in which de-
fendants' lot is located to the Topeka, Salina & Western Rail-
road. The defendants and their grantors have been in posses-
sion of the adjacent and abutting lot and of the tract in

controversy for several years, and a hotel was erected by the defendants' grantors on the disputed tract about eight years before this action was begun. The fifteen years' prescriptive title has not yet matured. Defendants' title, aside from their rights by possession and improvements, and possibly by estoppel, is founded on a tax deed issued in July, 1901. This tax deed shows some possible infirmities, and the chain of title thereunder culminating in defendants is not very clearly deraigned.

In 1891, George Haseltine, the appellant, recovered a judgment against M. D. Herington, and by successive executions and by a proceeding of controverted regularity, in 1906, to revive the judgment, Haseltine kept his judgment alive until August, 1912, when the tract of land in dispute, the half of the street vacated in 1884, adjacent to and abutting the lot claimed by defendants and upon which their hotel was situated, was levied upon and sold as the property of M. D. Herington to satisfy Haseltine's judgment. Haseltine bid in the property. The sale was confirmed and a sheriff's deed issued to Haseltine in March, 1913.

A jury was waived, the cause was tried, the evidence introduced, and the plaintiff's petition praying for possession of the property denied. Plaintiff appeals.

The principal question concerns the effect to be given to section 5 of chapter 190 of the Laws of 1877 (Comp. Laws, 1885, § 6545), which provides:

"The alleys, streets or other public reservations so vacated shall revert to the owner or owners of lots adjacent or abutting thereto, according to the frontage of said lots or land."

Does not the plain and unequivocal language if this statute settle this controversy? The half of the street adjacent to and abutting the defendants' lot became by virtue of the vacation of the street and by operation of the statute a part of defendants' lot. Mr. Justice Brewer, in *A. T. & S. F. Rld. Co. v. Patch,* 28 Kan. 470, said that in such a situation the vacated street, or the proper part of it, became, "as it were, a part of the lot,—something in the nature of an accretion to it." (p. 473.) Of course that distinguished jurist did not mean that it was exactly like land made imperceptibly by slow deposit and receding waters, but that the legal effect was the same, and that the vacated property inured, at least as against all claim-

ants except the public, to the benefit of the abutting landowner. The same question was considered in *City of Belleville v. Hallowell*, 41 Kan. 192, 21 Pac. 105, and in *Challiss v. Depot and Rld. Co.*, 45 Kan. 398, 25 Pac. 228. In the latter case the Patch case was discussed, the court saying:

"The court did not at that time determine whether upon the vacation of the street it reverted to the original proprietor or passed to the adjacent lot-owners. The latter view has since been adopted by this court. (*City of Belleville v. Hallowell*, 41 Kan. 192, 21 Pac. 105.)" (p. 404.)

These decisions seem to have settled the law in this state. In a note in 26 L. R. A. 661, it is said:

"The status of the vacated portion of a street can not be regarded as an open question in Kansas, it being held in *Challis v. Atchison Union Depot & R. Co.*, 45 Kan. 398, 25 Pac. 228, under the provision of the General Statutes of 1889, that the portion of the street in front of the condemned lot passed as an accretion or as appurtenant thereto, to the owner of the property."

From the foregoing it appears that the tract of land in dispute is to be considered part and parcel of the lot claimed, occupied and improved by defendants. No shadow of title to this lot remained in M. D. Herington at the time of the sheriff's deed to Haseltine in 1913. The sheriff did not sell any land belonging to Herington, and Haseltine acquired no claim to defendants' lot and its statutory accretion thereunder. This being true, it is of no consequence that there may be infirmities in defendants' title. It will answer their purposes (*Mooney v. Olsen*, 21 Kan. 691) until it is attacked by some one holding a better title, for it is elementary law that a plaintiff must depend upon the strength of his own title, not on the weakness of his adversary's (*The State of Kansas v. Stringfellow*, 2 Kan. 263; *Mitchell v. Lines*, 36 Kan. 378, 13 Pac. 593).

This renders unnecessary a consideration of other questions presented. It was not error to admit evidence to show that Herington had conveyed away his title to the lot and consequently to the abutting vacated street in 1885. Such evidence possibly might not avail the defendants if they were the moving parties; but in scrutinizing the title under which Haseltine claimed, it was competent to show that he as the moving party had no title under which to proceed against the defendants.

The death of appellant is suggested. The motion to revive and substitute Paul N. Gleissner is allowed. The motion of appellees to introduce evidence not considered below, apparently in reliance on section 580 of the civil code, need not be considered. But see *Hess v. Conway*, 93 Kan. 246, 144 Pac. 205.

The judgment is affirmed.

---

No. 19,892.

WILLIAM H. EMERY, *Appellant*, v. THE FARMERS STATE BANK et al., *Appellees*.

SYLLABUS BY THE COURT.

1. PROMISSORY NOTE — *Principal and Surety — Character of Judgment against Surety—Laches.* Under section 464 of the civil code, one who has signed an instrument as surety is entitled to show in an action brought thereon that he signed as surety only, and have a judgment certifying that to be his relation to the other parties to the instrument, and that the judgment so entered shall be satisfied from the property of the principal debtor, so far as it can be done, before seizing the property of the surety to satisfy the balance of the judgment, but the application to have his relation to the parties determined and the judgment accordingly entered should be made before the final judgment is entered.

2. SAME—*Application to Have Judgment Modified—Application Denied —Res Judicata.* A judgment rendered without a determination whether any of those jointly and severally bound upon an obligation is a surety, may be opened up and modified so as to show who is principal and who is surety, upon any of the grounds provided in the code for opening up and modifying judgments, and where the question has been submitted and determined by the court and no appeal is taken from its decision, a party is not entitled to have it reconsidered and redetermined in another action.

3. JUDGMENT LIEN—*Attaches Only to Debtor's Interest in Land.* A judgment lien does not attach to any interest greater than the judgment debtor possessed in the land when the judgment was entered, and if the judgment debtor has transferred his entire equitable estate in land to a third person before the rendition of the judgment and nothing remains in him except the naked legal title, the judgment does not become a lien upon such land.

Appeal from Washington district court; JOHN C. HOGIN, judge. Opinion filed February 12, 1916. Affirmed.

*A. J. Freeborn,* of Washington, *John Heasty,* and *W. H. Barnes,* both of Fairbury, Neb., for the appellant.

*J. W. Rector,* and *Edgar Bennett,* both of Washington, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action by William H. Emery to enjoin the Farmers State Bank from selling property of his which had been levied upon to satisfy a judgment rendered in favor of the bank against Emery and Edgar Bennett. The judgment was based on a promissory note for $1000 signed by Emery and Bennett. Personal service was obtained upon both Emery and Bennett when the action upon the note was begun, but neither of them made any defense, and on June 2, 1914, judgment was rendered against both of them by default. On June 16, 1914, an execution was issued upon the judgment at the instance of the bank, and thereupon Emery filed a motion in the case asking for a modification of the judgment on the ground that he was only a surety on the note, and that the bank had acted fraudulently in taking judgment against both signers as principals. The motion came on for hearing August 13, 1914, and upon the showing made the motion was denied. No appeal was taken from the decision on the motion and it has never been modified or reversed. Shortly afterwards the bank procured the issuance of an alias execution, which was levied upon real estate of Emery, and on September 8, 1914, he brought this injunction action to prevent the sale of the land. On the trial the plaintiff offered his testimony, but the court, on a demurrer, held that no ground having been shown by him for injunction, the temporary order was dissolved, and from this judgment he appeals.

Emery alleged and offered testimony to show that while he signed the note as though he were a principal, he was in fact only a surety and that this fact was known to the bank before judgment was taken against him. He also stated that the bank had released property of Bennett from the lien of the judgment, although he was insolvent and had no other property subject to be taken in satisfaction of the judgment. It appears that a separation occurred between Bennett and his wife, who is a daughter of Emery, and that in March preceding the ren-

dition of the judgment upon the note he contracted with his wife to convey to her two lots free and clear of incumbrance. Emery knew of this settlement and contract about the time they were made, which was months before the judgment on the note was rendered. After the judgment, and in order to make a clear conveyance to his wife, Bennett procured the bank to release the lien of the judgment on the lots by giving it a bond signed by his father and himself, binding them to pay any part of the judgment which the bank might lose by reason of the release of the lien upon the lots.

The ruling of the court refusing the injunction must be sustained. Plaintiff relies on section 464 of the civil code, which in effect provides that in cases where two or more persons execute an instrument and are jointly and severally bound, a party may show that he signed the instrument as surety and procure the entry of a judgment certifying who is principal and who is surety, and that an execution thereafter issued on such a judgment shall be levied upon the property of the principal debtor, and if his property is not sufficient to satisfy the judgment, a levy may then be made on the property of the surety to satisfy the balance of the judgment. Plaintiff had the opportunity to make the showing when the judgment was rendered against him, and although he was personally served with summons and knew that judgment was to be taken upon the note, he made no showing nor any appearance in the case. No reason is shown why the plaintiff did not appear and have his relation to the note and the terms of the judgment determined at that time. Summons was served upon him so that he might present any defense or secure any rights he might have in the premises. Every issue in the case and all the terms of the judgment, including the relation of the defendants to the note and to the plaintiff, should have been submitted to the court at that time, and the defendants served are as much bound by the judgment then rendered as if they had answered and made a defense in the action. When a final judgment is rendered it is ordinarily the end of the litigation as far as the plaintiff is concerned, but, of course, questions may arise between the defendants as to their relations to the obligation and their relative liability. (*Kupfer v. Sponhorst*, 1 Kan. 75.) The plaintiff calls attention to a case in Nebraska to the effect

that if a judgment is rendered against two parties one of whom is a principal and the other a surety, without having the relations of the parties to the obligation determined, the surety may come in after judgment and show his suretyship and have his relations to the creditor as well as his joint debtors determined. It would seem that the judgment in such a case might be opened up, modified and set aside according to the rules prescribed by the code, and in no other way, and it is not claimed that the plaintiff has brought himself within any of these provisions. If it were assumed that the judgment did not operate as a merger of the relation of principal and surety and that a party might come in after judgment and show that he is only a surety, it can hardly be contended, and the Nebraska case does not hold, that he can have more than one determination of the question. As we have seen, the plaintiff did apply to have the judgment modified and his suretyship established, setting up substantially the same grounds as were alleged in this action. His motion was denied and the decision still stands. Under no theory can it be held that he is entitled to have the question tried again and again, and especially when the decision invoked by him stands unreversed and unmodified.

One ground upon which the application for injunction is based is that the bank had released its lien on the lots of Bennett to the prejudice of the plaintiff. This ground can not be sustained, as it appears that Bennett had transferred the full equitable title he held in the lots to his wife, the daughter of the plaintiff, a considerable time before the judgment was rendered. This left in Bennett no more than a naked legal title, and this he had bound himself to convey. A judgment can not attach to a mere naked legal estate nor to any greater interest than the judgment debtor has in the land. The judgment creditor is not regarded or treated as a *bona fide* purchaser, nor does he acquire any interest in the property itself, but only a lien or preference over subsequently acquired interests in the property. (*Harrison & Willis v. Andrews,* 18 Kan. 535; *Holden v. Garrett,* 23 Kan. 98; *McCalla v. Knight,* 77 Kan. 770, 94 Pac. 126; *Brown v. Pierce,* 74 U. S. 205, 19 L. Ed. 134.)

It follows that the bank had no lien to surrender and that plaintiff therefore lost nothing because the so-called release of the lien was executed.

The judgment of the district court will be affirmed.

_____

No. 19,896.

THE STOCKTON ELEVATOR & SHIPPING ASSOCIATION, *Appellee,* v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. QUESTION OF PRACTICE—*Not Decided.* A question of practice held not necessary to be decided.

2. SHIPPING CONTRACT—*Interstate Commerce.* A shipment of goods consigned to a point in another state constitutes interstate commerce, notwithstanding an actual delivery is made before a state line is crossed.

3. SHIPPING GRAIN—*Expense in Furnishing Grain Doors—Reimbursement.* In an action against a carrier for the expense incurred by a shipper in furnishing grain doors to box cars, the plaintiff can not prevail by showing merely the total cost of all the doors he had furnished, including an unascertained number of items for which no charge could be made because they accrued in interstate shipments, after the interstate commerce commission had forbidden the reimbursement of such expenses unless provided in the tariff, and before any tariff provision had been made in that regard.

Appeal from Rooks district court; CHARLES W. SMITH, judge. Opinion filed February 12, 1916. Reversed.

*W. P. Waggener, Walter E. Brown,* both of Atchison, and *O. O. Osborn,* of Stockton, for the appellant.

*S. N. Hawkes,* of Topeka, for the appellee.

The opinion of the court was delivered by

MASON, J.: The Stockton Elevator & Shipping Association sued the Missouri Pacific Railway Company before a justice of the peace on account of material it had furnished for the repair of cars in which it had shipped grain between August 5, 1908, and November 25, 1908. The case was taken on appeal to the district court, where a judgment for $231.60 was rendered against the defendant, which appeals.

(1) The record shows that at one stage of the proceedings

the plaintiff amended its bill of particulars so that a recovery was asked for more than $300. The defendant moved to dismiss the cause because the increase of the amount in controversy carried it beyond the jurisdiction of the court in an appeal from a justice of the peace. The motion was denied, and that ruling is complained of, on the authority of a series of cases, culminating in *Thompson v. Stone*. post, p. 237, 64 Pac. 969. Affidavits have been presented here for the purpose of showing that prior to the judgment an oral statement was made by the plaintiff's attorney to the effect that the right to recover more than $175 and interest was waived. The proceedings of the trial court can not be brought upon the record in this manner. (*Mason v. Harlow*, 92 Kan. 1042, 142 Pac. 243.) It is at least doubtful, however, if the assignment of error referred to is available. The judgment was rendered February 17, 1914; a motion for a new trial was overruled May 5, 1914; and the appeal was taken October 27, 1914, more than six months after the judgment, although less than six months after the overruling of the motion for a new trial. The ruling on the motion to dismiss is not reviewable unless it is such a trial error as to be the basis of a motion for a new trial, and it is said not to fall in that class. (29 Cyc. 760; 4 Enc. L. & P. 333, 334; *Galey v. Mason*, 174 Ind. 158, 91 N. E. 561.) The question suggested need not be determined by reason of the view taken of another feature of the case.

(2) The plaintiff's claim was based largely upon the furnishing of lumber for grain doors. It was conceded that the material had been furnished, and that the total cost was correctly stated by the plaintiff; but it was not shown what part of the expense was incurred for shipments within the state, or in interstate commerce after November 16, 1908. This is important, because by ruling 78 of the interstate commerce commission, made June 1, 1908, interstate carriers are forbidden to reimburse shippers for such expenses unless expressly provided in their tariffs (Interstate Commerce Commission, Conference Rulings Bulletin No. 6, p. 21), and it was shown that no such tariff provision had been made prior to the date named. The evidence in behalf of the plaintiff was that most of the cars for which the doors were furnished were consigned from Stockton, Kan., to Kansas City, Mo., although the majority of them were actually unloaded at Kansas City, Kan. Shipments

Thompson v. Stone.

of goods consigned to a point in another state constitute interstate commerce, notwithstanding an actual delivery is made before a state line is crossed. (*Horse & Mule Co. v. Railway Co.*, 95 Kan. 681, 149 Pac. 436; *Enright v. Railway Co.*, 96 Kan. 546, 152 Pac. 629.) In the case last cited it was contended that because cattle shipped from a Kansas station were unloaded at the Kansas City stockyards on this side of the state line the transaction was intrastate, but the court said: "A shipment of live stock from a point in this state, consigned to a commission firm in Kansas City, Mo., is interstate commerce." (Syl. ¶ 2.)

(3) It was incumbent upon the plaintiff to show how much material was furnished under such circumstances as to warrant a charge against the company. It could not prevail by showing the total amount of material furnished, including an unascertained number of items for which no charge could be made. "In an action for the recovery of money, it devolves upon the plaintiff, before he is entitled to judgment, to prove by satisfactory and competent evidence what, if any, sum is due him from the defendant." (*Wolfley v. Shuemaker*, 4 Kan. App. 38, syl., 45 Pac. 792; *Morgan v. Valley Bank*, 4 Kan. App. 668, 46 Pac. 61.)

The judgment is therefore reversed, and the cause remanded for a new trial.

---

No. 12,165.

*B. F. THOMPSON, *Appellant*, v. EDGAR STONE et al., *Appellees*.

HEADNOTE BY THE REPORTER.

1. JURISDICTION—*Justice of Peace—Amount Involved—Appeal.* Where in an action before a justice of the peace the defendant sets up a counterclaim and set-off exceeding $300, and does not withhold setting off any portion of the same, the justice has no jurisdiction to hear and determine such counterclaim and set-off or any portion thereof.

2. SAME. Where an action is appealed from a justice of the peace to the district court, the district court has only such jurisdiction in the case as the justice of the peace had.

Appeal from Kingman district court; G. W. MCKAY, judge. Opinion filed May 11, 1901. Reversed.

*NOTE.—This case was not reported in full when the opinion was filed (see 63 Kan. 881), and is reported here because it is cited in the case of *Shipping Association v. Railway Co.*, ante, p. 235.

*George L. Hay*, of Kingman, for the appellant.
*John E. Lydecker*, of Kingman, for the appellees.

*Per Curiam:* The plaintiff in error commenced this action before a justice of the peace in Kingman county, Kansas, to recover a judgment against the defendants in error on a promissory note. Upon the trial the court rendered judgment in favor of plaintiff in error for $166 and interest. The defendants in error appealed. At the convening of the district court the defendant in error, Stone, asked leave to file an answer and cross-petition, which was granted. The answer and cross-petition thus filed set up a demand against the plaintiff in error in the sum of $553, for which he prayed judgment. The plaintiff in error objected to the jurisdiction of the court to try the issues thus raised, which objection was overruled. He then filed a demurrer to the answer and cross-petition on the ground that the court had no jurisdiction of the amount in the answer and cross-petition, which demurrer was overruled by the court and the plaintiff in error excepted. The defendant in error did not offer to withhold any portion of his demand. A trial was had and judgment rendered for defendant in error on his cross-petition. The plaintiff in error brings the case here, alleging that the district court had no jurisdiction of the amount involved in the cross-petition or to try the issues involved therein. We think this contention must be sustained. The district court had only such appellate jurisdiction as that possessed by the justice of the peace. The jurisdiction of a justice of the peace in a civil action is $300; when an action is appealed from a justice of the peace court to the district court, the district court has only such jurisdiction as the justice of the peace had.

We have already held that where the defendant sets up a claim and set-off, exceeding the jurisdiction of the justice of the peace court, and does not withhold any portion of the same, the district court has no jurisdiction to hear or determine such set-off or any portion thereof. (See *Wagstaff v. Challis*, 31 Kan. 212, 1 Pac. 631.)

The district court erred in entertaining jurisdiction of the cross-petition and in rendering judgment thereon for the defendant in error.

The judgment of the court below will be reversed.

No. 19,901.

JOHN BUTLER, *Appellee*, v. THE CITY OF KANSAS CITY, KAN.,
*Appellant*.

SYLLABUS BY THE COURT.

1. CITY PESTHOUSE—*Maintenance a Governmental Duty.* Where a mu-
nicipal corporation maintains a pesthouse for the treatment and iso-
lation of persons who have been exposed to or affected with smallpox,
it performs a governmental duty.

2. CITY PESTHOUSE—*Negligence in Keeping—City Not Liable for Dam-
ages.* The rule that the governmental agencies of the state are not
liable in an action of tort for either misfeasance or nonfeasance is
applied to an action against a city to recover damages for personal
injuries resulting from the defective condition of the floor of a pest-
house where plaintiff, who was affected with smallpox, was confined by
the city authorities.

Appeal from Wyandotte district court, division No. 2;
FRANK D. HUTCHINGS, judge. Opinion filed February 12,
1916. Reversed.

*R. J. Higgins, W. H. McCamish,* and *Lee Judy,* all of Kansas
City, for the appellant.

No appearance was made for the appellee.

The opinion of the court was delivered by

PORTER, J.: John Butler sued the city of Kansas City to re-
cover damages for personal injuries alleged to have been
caused by the city's negligence. The city maintains a pest-
house where persons affected with smallpox are taken for iso-
lation and treatment. The petition alleged that Butler became
sick with smallpox and was taken by employees of the city and
confined in one of the rooms or wards of the pesthouse, where
each morning he was obliged to start a fire, and that blood-
poisoning resulted from a splinter of the flooring which en-
tered his bare foot as he walked from the bed to the stove.
The petition alleged that the city was negligent in maintaining
the floor of the room in a defective and dangerous condition.
A demurrer to the petition was overruled. The city elected to
stand upon the demurrer and has appealed.

The contention of the city is, that in maintaining a pest-house it was performing a governmental duty under the police power of the state, and therefore can not be held liable for negligence causing injuries to persons who were in the pest-house for treatment and isolation while affected with small-pox.

On the same principle a similar immunity from liability has been held to exist in a case where a county is sued by an inmate of a jail for injuries resulting from negligence in the manner in which the jail was maintained. (*Pfefferle v. Comm'rs of Lyon Co.*, 39 Kan. 432, 18 Pac. 506.) The decision in that case was placed upon the ground that in respect to persons committed to its custody, the county was engaged in the performance of a governmental duty for the benefit of the state and possessed the same immunity as the state.

In *Thomas v. Ellis County*, 91 Kan. 443, 138 Pac. 409, it was said:

"Counties are mere auxiliary agencies of the state government, and, like the state, are immune from liability on account of damages occasioned by the manner in which they exercise·or fail to exercise their govermental powers." (Syl. ¶ 1.)

(See, also, *The State v. Lawrence*, 79 Kan. 234, 250, 100 Pac. 485.)

The same doctrine was applied in a case of malicious prosecution. (*City of Caldwell v. Prunelle*, 57 Kan. 511, 46 Pac. 949.) It was there held that in enforcing a police regulation the officers of the city were exercising a public and governmental function. In the opinion it was said:

"For the manner in which they exercise their powers and duties in this respect the city is not liable." (p. 513.)

The case of *Edson v. Olathe*, 81 Kan. 328, 105 Pac. 521 (rehearing denied, 82 Kan. 4, 107 Pac. 539), recognized the distinction between the governmental and proprietary functions of municipal corporations generally, and as affecting property and contract rights. (See authorities cited in opinion.) Another case more nearly in point as to the facts, and in which the controlling question was the distinction between the liability of a city for an act done by it in its public capacity as a part of the political subdivisions of the state and its liability for an act done to its private advantage in relation to which the

state at large has no interest, is *La Clef v. City of Concordia,* 41 Kan. 323, 21 Pac. 272. There the plaintiff brought an action to recover damages to his health by the negligent condition of a jail in which he was confined for the violation of a city ordinance. It was held that the city in maintaining the jail stands in the same attitude as counties and is not liable for injuries resulting from the enforcement of public laws affecting the state at large.

It is a general rule that the govermental agencies of the state are not liable in an action of tort for either nonfeasance or misfeasance. (*Fowle v. The Common Council of Alexandria,* 28 U. S. 398, 7 L. Ed. 719; *Maxmilian v. Mayor,* 62 N. Y. 160, 164, 165, 20 Am. Rep. 468.) Judge Dillon states the law as follows:

"The power or even duty on the part of a municipal corporation to make *provision for the public health and for the care of the sick and destitute,* appertains to it in its govermental or public, and not in its corporate, or as it is sometimes called, private capacity. And therefore where a city, under its charter, and the general law of the state enacted to prevent the spread of contagious diseases, *establishes a hospital,* it is not responsible to persons injured by reason of the misconduct of its agents and employees therein." (4 Dillon, Municipal Corporations, 5th Ed., § 1661.)

Among the cases cited in the notes which are directly in point, see, *Evans v. City of Kankakee,* 231 Ill. 223, 83 N. E. 223; *Sherbourne v. Yuba County,* 21 Cal. 113; *Summers v. The Board of Commissioners of Daviess County,* 103 Ind. 262, 2 N. E. 725; *City of Richmond v. Long's Adm'rs,* 17 Gratt. (Va.) 375; *Murtaugh v. The City of St. Louis,* 44 Mo. 479.

In *Barbour v. Ellsworth,* 67 Maine, 294, a well person was taken to a hospital for smallpox, where he contracted the disease. Alleging that he had not been suitably or sufficiently cared for, he sued the city for damages, and it was held there was no liability. In *Lynch v. North Yakima,* 37 Wash. 657, 80 Pac. 79, it was held that the city was not liable for the act of a policeman who took a person exposed to smallpox into a building occupied by the fire department, thereby exposing the employees to contagion.

The duty of a municipal corporation to conserve the public health is govermental, and it is not liable for injuries inflicted

16—97 Kan.

while performing such duty. (6 McQuillin, Municipal Corporations, § 2669.)

The petition failed to state a cause of action against the city, and the judgment is reversed with directions to sustain the demurrer.

---

No. 19,904.

THE CITY OF IOLA, *Appellee*, v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. RAILROADS—*Crossing Highway—Restoration of Highway.* Under its common-law duty a railway company which constructs its road across a highway is bound to restore the highway, by some reasonably safe and convenient means, to its former condition.

2. RAILROADS — *Crossing Public Street — Duty to Make and Maintain Crossings—Bridges.* Under the statute which requires a railway company that builds its road over a street or highway to restore it "to its former state, or to such a state as to have not necessarily impaired its usefulness" (Gen. Stat. 1909, § 1763, subdiv. 4), a railway company which constructs a railroad over a street of a city is bound not only to make a suitable crossing, but to maintain the same as long as it continues to occupy the street, and to that end it may be required to build and maintain a bridge at the crossing of a highway if such a structure is rendered necessary by the construction of the railroad.

3. RAILROADS — *Along Public Street — Duties in Relation to Crossings, Bridges and Watercourses.* When a railway company is given permission to build its road along a street of a city upon the condition that the company will construct and maintain suitable crossings at all points of intersection with other streets, it is the duty of the company which builds along that street and over others to make crossings appropriate to the situation at the points of intersection; and where the company in the course of constructing its road diverts a small creek from its natural channel into an artificial one along the side of its track and across a street, using the earth obtained in digging the channel to make an embankment or grade for its road, and the railroad and channel so made render the construction of a bridge over a street across which the railroad is built necessary for the safety and convenience of those using the street, it is incumbent upon the railway company to construct and maintain such bridge or other structure, and when reasonably necessary, to rebuild and replace it with a new one.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed February 12, 1916. Affirmed.

W. P. Waggener, A. E. Crane, both of Atchison, and Altes H. Campbell, of Iola, for the appellant.

H. A. Ewing, S. A. Gard, and G. R. Gard, all of Iola, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: In this action the city of Iola asks a peremptory writ of mandamus to compel the Missouri Pacific Railway Company to build a bridge at the intersection of Walnut and Benton streets in that city.

The railroad was built through Iola in 1881, and preliminary to its construction the city enacted an ordinance granting to the company the right to build its road along Benton street, which runs east and west. The grant was made on the condition "that said railroad company constructs and maintains suitable crossings on said street and all points of intersection thereof by other streets and highways within the limits of said city." In constructing its railroad on Benton street the company diverted a small stream called Coon creek from its regular course. It had run across Benton street near the intersection of Benton and North streets, and ran in a southwesterly direction about a block and then made a bend, turning north and crossing Benton street again two blocks distant at its intersection with Walnut street. The company constructed its road near the middle of Benton street, and from a point at North street to one about a half a block beyond Walnut street, a distance of about two and a half blocks, it dug a new channel for Coon creek north of its tracks, and closed up the old channel. The earth taken from the bed made for the new channel was used by the railway company in making the embankment or grade on which the track was laid. The track was 3.57 feet higher than the original grade of Benton street, and the new channel as made by the railway company for the creek is 6.34 feet lower than the rails of its track. The railroad and the new channel so made practically rendered Benton street useless for ordinary travel for a distance of two and a half blocks, extending from North street to a half a block beyond Walnut street. At the intersection of Benton and Walnut streets the channel made by the railway company is about forty feet wide, and the height and character of the grade and the depth of

the channel practically destroyed the crossing and made Walnut street impassable at this place. To overcome this difficulty and make the crossing passable the railway company about the time its road was built erected a wooden bridge over the channel, which has been maintained by the railway company ever since that time. That bridge has become so weakened by decay and use that it is no longer safe for public travel. The city is now improving Walnut street, and has by ordinance required the railway company to build a cement bridge over the excavation or channel made by the railway company in the construction of its road and make a suitable crossing there, and the company having failed to comply with the requirement, this proceeding was brought to compel the building of the bridge and the making of a suitable crossing at this place.

It is conceded to have been the duty of the railway company to restore Walnut street and make a suitable crossing there at the time the railroad was built and the excavation made across the street. It is also conceded that to make a suitable crossing it was the duty of the company at that time to build the bridge at the intersection of Walnut and Benton streets; but it is insisted that this fulfilled its obligations and that it is not required to maintain the bridge after a crossing was so made. Independent of statute and under the common law it is the duty of a railway company which constructs a road across a highway to restore the highway by some reasonably safe and convenient means to its former condition. (*State, ex rel. City of St. Paul, v. Minnesota T. Ry. Co.,* 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656.) We had a statute in 1881, and it is still in force, which provides that a railway company which builds a railroad across a street or a highway or along or upon any stream of water shall restore the street, highway or stream "to its former state, or to such a state as to have not necessarily impaired its usefulness." (Gen. Stat. 1909, § 1763, subdiv. 4.) Under this statute the privilege of crossing a highway carries with it the duty of a railway company not only to restore the highway, but it is a continuing duty to maintain it in its former or a suitable condition for travel so as to meet the requirements of the situation at that place. In *The State v. Mo. Pac. Rly. Co.,* 33 Kan. 176, 5 Pac. 772, it was said:

"A railroad company has no right to render the streets of a city unsafe or dangerous; and in all cases where a railroad company is permitted to

City of Iola v. Railway Co.

use a street for railroad purposes, it should be compelled to restore the street as far as practicable to that same condition of safety and usefulness as the street would occupy if it were not used for railroad purposes at all, and the railroad company should be compelled to maintain this condition of safety and usefulness as long as it continues to use and occupy the street." (p. 187.)

In performing the duty of restoration the company may be required, if it be reasonably necessary to a suitable crossing, to construct and maintain a bridge and its approaches. (*The State v. Irrigation Co.*, 63 Kan. 394, 65 Pac. 681; *City of Emporia v. Railway Co.*, 88 Kan. 611, 129 Pac. 161; *The City of Newton et al. v. The Chicago, Rock Island & Pacific Rly. Co.*, 66 Iowa, 422, 23 N. W. 905; *See v. Railroad Co.*, 123 Iowa, 443, 99 N. W. 906; *State, ex rel. City of St. Paul, v. Minnesota T. Ry. Co.*, 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656; *State, ex rel., v. St. Paul, M. & M. Rly. Co.*, 98 Minn. 380, 108 N. W. 261.)

The duty of making and maintaining a crossing covers whatever structures are necessary and reasonable, including the necessary approaches, although a part may be outside of the right of way of the railroad. (*Farley v. The C. R. I. & P. R. Co.*, 42 Iowa, 234; *L. & N. R. R. Co. v. Commonwealth*, 149 Ky. 459, 149 S. W. 898; *Moberly v. The K. C., St. J. & C. B. Rly. Co.*, 17 Mo. App. 518; *Moberly v. The K C., St. J. & C. B. Rly. Co.*, 98 Mo. 183, 11 S. W. 569; *Railroad v. State*, 128 Tenn. 172, 159 S. W. 601; *Roxbury v. Railroad Company*, 60 Vt. 121, 14 Atl. 92; 3 Elliott on Railroads, §§ 1097, 1107.)

Apart from the common-law and statutory duties of the company respecting the restoration of the street, there was the contract obligation provided in the ordinance granting the company the right to occupy the streets, which was accepted by the company, to the effect that it would construct suitable crossings at the intersections of streets, and it included the added and continuing duty of maintaining such crossings. The defendant interpreted this obligation to mean that it was required to build a bridge where its road crossed Walnut street, and under the authorities it is its duty to maintain a suitable bridge at this crossing as long as it uses and occupies the street, and when reasonably necessary to rebuild or replace it with a new one. (*The State, ex rel., v. Railway Co.*, 95 Kan. 22, 147 Pac. 801, 57 L. R. A., n. s., 751.) The turning of the waters of

Coon creek into the channel made by the company in making its grade in Benton street, which appears to have been done with the consent of the city, did not relieve it from the duty of making and maintaining suitable crossings at the intersections of the streets, and the bridge in question is a part of the crossing at the intersection of Walnut street. (*Board of County Comm'rs v. Duluth, R. W. & S. R. Co.*, 67 Minn. 213, 69 N. W. 898.)

Objection is made to one of the findings of the trial court, but we discover nothing in it which prejudicially affects the result reached.

The judgment of the district court is affirmed.

---

No. 19,906.

JAMES WELLIVER, *Appellee*, v. M. R. CLARK, *Appellant*.

SYLLABUS OF THE COURT.

1. ASSAULT—*Damages—Instructions.* Rule followed that when the instructions taken as a whole are not misleading to the jury and are fair to a party, he can not justly complain of an inaccurate expression now and then found in such instructions.

2. SAME—*Evidence.* Evidence examined and no basis found for holding the verdict excessive.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed February 12, 1916. Affirmed.

*S. B. Amidon, Jean Madalene, S. A. Buckland,* and *C. R. Sowers,* all of Wichita, for the appellant.

*E. E. Enoch, George W. Adams,* and *John W. Adams,* all of Wichita, for the appellee.

The opinion of the court was delivered by

WEST, J.: The parties had a controversy over an article of household furniture, a table, which the defendant was attempting to take away from plaintiff's sister, and the defendant struck the plaintiff twice with a claw hammer, once in the face and once on the head. This action for damages followed, resulting in a judgment for one thousand dollars.

The defendant appeals and contends that the verdict and judgment are contrary to the law and against the evidence for various reasons, amounting substantially to the complaint that the court erred in its instructions and in its rulings on evidence, and finally and chiefly that the verdict was excessive.

The instructions were long, and, taken as a whole, very fair to the defendant, and he is not justified in picking out an inaccurate expression here and there for criticism.

The complaints covering the admission of evidence we find to be without substantial basis.

In presenting his views of the excessive character of the verdict, defendant's counsel in their brief say that they believe this court should render judgment for seventy-six dollars compensatory damages, and that the plaintiff be required to remit the remainder less costs. This would seem to eliminate all other questions.

There was evidence tending to show much spirit and force on the part of the defendant in his use of the hammer, with a result much more severe and lasting than that which the defendant finds from considering other testimony in the case. From conflicting evidence the jury determined the amount of damages and this was approved by the trial court, and we find in the record no sufficient basis for disturbing it.

The judgment is affirmed.

---

No. 19,909.

MARY J. JACOBS, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

1. AUTOMOBILE—*Crossing Railroad Tracks—Failure to "Look and Listen"—Contributory Negligence.* It is such negligence as will prevent a recovery for injuries sustained for a driver of an automobile to attempt to cross a railroad track at a grade crossing without looking or listening for the approach of a train, although an electric warning bell is maintained at the crossing and the bell is not ringing.

2. SAME—*Enginemen Not Guilty of Wantonness.* Enginemen in charge of a locomotive attached to a passenger train, who cut off the steam and apply the air one quarter of a mile before reaching a street crossing in a small city, and who suppose that an electric warning bell stationed

at the crossing is ringing, are not guilty of wantonness, although they fail to ring the engine bell or sound the whistle for the crossing, and although they go through the city at the rate of forty-five miles per hour.

Appeal from Sedgwick district court, division No. 2; THORN-TON W. SARGENT, judge. Opinion filed February 12, 1916. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley,* all of Topeka, for the appellant.

*John W. Adams,* and *George W. Adams,* both of Wichita, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: In this action the plaintiff seeks to recover for the death of her husband caused by the negligence of the defendant. The defense was contributory negligence on the part of the deceased. The plaintiff recovered judgment. The defendant appeals.

John J. Jacobs, the husband of the plaintiff, met his death by driving his automobile on the defendant's tracks in front of a swiftly moving passenger train. This occurred on Saturday afternoon at the crossing of the principal street in Valley Center. The defendant maintained an electric bell at this crossing. The jury made special findings of fact as follows:

"2. For how long a distance east of the railroad track at the crossing in question could one traveling on the highway continuously have in sight a train stationed a quarter of a mile northward of the crossing? Ans. Twenty-eight feet.

"6. Was the electric bell at the crossing in question ringing when the said train approached said crossing? Ans. No.

"7. Were the engineer and fireman each at his post of duty and in his particular place on the engine as the train in question approached and passed over the crossing in question? Ans. Yes.

"8. How far was the engine from the crossing in question when the fireman first discovered that the automobile would probably not be stopped in time to avoid a collision with the engine? Ans. One hundred fifty feet.

"9. How far was the automobile from the crossing when the fireman first discovered that said automobile would probably not be stopped before it got on the crossing in the way of the engine? Ans. Fifteen feet.

"10. After the fireman on the engine discovered, if he did discover, that

Jacobs v. Railway Co.

the automobile would probably go upon the crossing in the way of the engine, what could have been done by him or the engineer that was not done to prevent the collision in question? Ans. Nothing.

"11. How far was the automobile in question from the crossing when the fireman first saw it approaching the crossing? Ans. Fifty feet.

"12. What particular place on the pilot or engine first came in contact with the automobile? Ans. Side of pilot back three feet from the point.

"13. How far from the crossing did the engineer make his service application of air as the train approached Valley Center, if same was made at all? Ans. One-quarter mile.

"14. What, if anything, would have prevented said Jacobs from seeing or hearing the approaching train in time to. have avoided the collision if he had taken the pains to look and listen for same when he was about twenty-five feet from the crossing? Ans. Nothing.

"15. If you find that the engineer cut off steam before he came to the crossing, state how far from said crossing he made such cut off? Ans. One-quarter mile.

"16. If you find that the negligence of those in charge of the engine caused the injury and death in question, state in what such negligence consisted? Ans. Excessive speed.

"17. What was the usual rate of speed at which this mail train in question usually passed over the crossing in question at Valley Center prior to the date of the collision in question? Ans. Thirty-five miles.

"18. Was the said Jacobs guilty of negligence on his own part which contributed to his injury and death at the time and place in question? Ans. No.

"19. Did the engineer and fireman as they approached the crossing in question, suppose that the electric bell at the crossing would ring automatically as the engine approached the said crossing? Ans. Yes.

"21. Give speed of train at time of collision in question. Ans. Forty-five miles.

"24. At what rate of speed was the automobile running when twenty feet from the crossing? Ans. Ten miles.

"25. Name the different signals given of the approach to the crossing in question by the train in question. Ans. None."

1. The fourteenth finding establishes that the deceased did not look nor listen for the approach of a train before driving on the track. (*Beech v. Railway Co.*, 85 Kan. 90, 116 Pac. 213; *Cleveland, etc., R. Co. v. Coffman*, 30 Ind. App. 462, 64 N. E. 233; *Tobias v. Railroad Co.*, 103 Mich. 330, 61 N. W. 514.)

The vital question in this case is, Did the failure of the electric bell to ring relieve the deceased of the obligation to look and listen before attempting to cross the track?

The plaintiff seeks to have the rule in *McClain v. Railway*

*Co.*, 89 Kan. 24, 130 Pac. 646, applied in this case. There this court said:

"Ordinarily if a traveler proceeds across a railroad track without taking the precaution to ascertain if there is a train in dangerous proximity he does so at his peril. The application of this rule is modified to some extent by the circumstance that gates have been erected and watchmen employed at crossings. In such case a traveler is not required to exercise the same vigilance when he approaches a track as he would at crossings not so guarded." (p. 30.)

Human intelligence guarded the crossing and operated the gate in that case. In the present case an electrical, mechanical device was intended to give warning of approaching trains. Sometimes this bell would not ring when trains were passing, and at other times it rang when no train was in sight. An electric bell, which at most can be nothing but a warning of an approaching train to those who listen, can not be classed with a gate thrown across a street to prevent passing over railroad tracks; neither can it be classed with a flagman who stands in the street and stops those who desire to cross when there is danger. It is more nearly analogous to the locomotive bell and whistle. Failure to ring the engine bell or sound the whistle does not relieve a traveler from the duty to look and listen before attempting to cross a railroad track. If the plaintiff's contention in this respect is correct, a railroad increases its responsibility and liability by putting in electric bells at highway and street crossings. The object in putting in electric bells is to promote public safety, not to increase railroad liability. Silence of such a bell is not an invitation to cross railroad tracks without taking the ordinary precautions.

In *McSweeney v. Erie Railroad Co.*, 93 App. Div. 496, 87 N. Y. Sup. p. 836, an action for damages for injuries sustained at a crossing where there was an electric bell, the court said:

"The exercise of due care required the deceased, under the circumstances, to look and listen for an approaching train, and the mere fact that the stationary signal bell was not ringing did not relieve him of the imputation of negligence if he failed to exercise this degree of care." (p. 499.)

In that case judgment for the railroad was rendered at the close of the plaintiff's evidence. To the same effect is *Cleveland, etc., R. Co. v. Heine,* 28 Ind. App. 163, 62 N. E. 455. *Cleveland, etc., R. Co. v. Coffman,* 30 Ind. App. 462, 64 N. E.

233, supports this position, although a new trial was ordered. But a new trial was requested by the defendant, not judgment on the findings. The plaintiff cites *Tobias v. Railroad Co.*, 103 Mich. 330, 61 N. W. 514, to support his contention that it was the province of the jury to determine whether or not the deceased was guilty of contributory negligence in attempting to cross the railroad track without looking or listening when the electric bell was not ringing. The supreme court of Michigan there said that the question of contributory negligence should have been given to the jury, and reversed a judgment for the defendant because it was not given. A dissenting opinion in that case argues that the court should have directed a verdict for the defendant. *Wabash R. Co. v. McNown*, 53 Ind. App. 116, 99 N. E. 126, supports the majority opinion in the Tobias case, *supra*. We think the better rule is that the failure of an electric bell to ring does not relieve one about to cross a railroad track of the imperative duty to look and listen before crossing. If he fails to do so, he is guilty of such contributory negligence as will prevent his recovery for any injuries sustained, and there is nothing to submit to the jury.

It has been held that it is the positive duty of the driver of an automobile to stop, look and listen before crossing railroad tracks. (*A. C. L. R. R. Co. v. Weir*, 63 Fla. 69, 58 South. 641, 41 L. R. A., n. s., 307; *Craig, Appellant, v. Penna. R. R. Co.*, 243 Pa. St. 455, 90 Atl. 135; *Earle, Appellant, v. Phila. & R. Ry. Co.*, 248 Pa. St. 193, 93 Atl. 1001; *Brommer v. Pennsylvania R. Co.*, 179 Fed. 577, 29 L. R. A., n. s., 924; *New York Cent. & H. R. R. Co. v. Maidment*, 168 Fed. 21, 21 L. R. A, n. s., 794; *Bason v. Ala. G. S. R. R. Co.*, 179 Ala. 299, 60 South. 922; 2 R. C. L. 1206.) On the other hand, it has been held that the driver of an automobile is not under all circumstances as a matter of law required to stop before crossing a railroad track. (*Dickinson v. Erie Railroad Co.*, 81 N. J. Law. 464, 81 Atl. 104, 37 L. R. A., n. s., 150; *Pendroy v. Great Northern Ry. Co.*, 17 N. Dak. 433, 117 N. W. 531; *Hull v. Seattle, Renton & Southern R. Co.*, 60 Wash. 162, 110 Pac. 804; 2 R. C. L. 1206.) This state follows the rule last stated. (*Denton v. Railway Co.*, 90 Kan. 51, 56, 133 Pac. 558.)

(See, also, *A. T. & S. F. Rld. Co. v. Hague*, 54 Kan. 284, 38 Pac. 257; *C. R. I. & P. Rly. Co. v. Williams*, 56 Kan. 333, 43

Pac. 246; *C. R. I. & P. Rly. Co. v. Hinds,* 56 Kan. 758, 762, 44 Pac. 993; *Railroad Co. v. Powers,* 58 Kan. 544, 550, 50 Pac. 452; *Railroad Co. v. Holland,* 60 Kan. 209, 216, 56 Pac. 6; *Railroad Co. v. Willey,* 60 Kan. 819, 822, 58 Pac. 472; *Johnson v. Railroad Co.,* 80 Kan. 456, 461, 103 Pac. 90.)

More than a dozen times this court has said that a traveler must look and listen for approaching trains before attempting to cross railroad tracks, and that if he fails to do so and is injured in consequence thereof, damages can not be recovered for such injury.   (*L. & G. Rld. Co. v. Rice,* 10 Kan. 426; *U. P. Rly. Co. v. Adams,* 33 Kan. 427, 6 Pac. 529; *Clark v. Mo. Pac. Rly. Co.,* 35 Kan. 350, 355, 11 Pac. 134; *A. T. & S. F. Rld. Co. v. Townsend,* 39 Kan. 115, 119, 17 Pac. 804; *A. T. & S. F. Rld. Co. v. Priest,* 50 Kan. 16, 22, 31 Pac. 674; *Roach v. St. J. & I. Rld. Co.,* 55 Kan. 654, 658, 41 Pac. 964; *Railroad Co. v. Willey,* 60 Kan. 819, 58 Pac. 472; *Burns v. Railway Co.,* 66 Kan. 188, 191, 71 Pac. 244; *Railway Co. v. Ryan,* 69 Kan. 538, 540, 77 Pac. 267; *Hoopes v. Railway Co.,* 72 Kan. 422, 83 Pac. 987; *Railroad Co. v. Entsminger,* 76 Kan. 746, 749, 92 Pac. 1095; *Railway Co. v. Wheeler,* 80 Kan. 187, 191, 101 Pac. 1001; *Beech v. Railway Co.,* 85 Kan. 90, 116 Pac. 213; *Adams v. Railway Co.,* 93 Kan. 475, 144 Pac. 999; *Butts v. Railway Co.,* 94 Kan. 328, 146 Pac. 1142.)   The driver of an automobile is under the same or a more imperative duty to look and listen before crossing railroad tracks.   (*Gage v. Railway Co.,* 91 Kan. 253, 137 Pac. 938; *Northern Pac. Ry. Co. v. Tripp,* 220 Fed. 286; *Horandt v. Central Railroad Co.,* 78 N. J. Law, 190, 73 Atl. 93; *Elder v. The P., C., C. & St. L. Ry. Co.,* 186 Ill. App. 199; *Glick v. Cumb. & W. Elec. Ry. Co.,* 124 Md. 308, 92 Atl. 778; *Fort Wayne, etc., Traction Co. v. Schoeff,* 56 Ind. App. 540, 105 N. E. 924; *Allison v. Chicago, Milwaukee & S. P. R. Co.,* 83 Wash. 591, 145 Pac. 608.)   The rule requiring one about to cross a railroad track to look and listen applies in a city as well as in the country.   (*Burns v. Railway Co.,* 66 Kan. 188, 191, 71 Pac. 244; *Railway Co. v. Ryan,* 69 Kan. 538, 540, 77 Pac. 267; *Northern Pac. Ry. Co. v. Tripp,* supra; *Horandt v. Central Railroad Co.,* supra; *Elder v. The P., C., C. & St. L. Ry. Co.,* supra; *Allison v. Chicago, Milwaukee & S. P. R. Co.,* 83 Wash. 591, 145 Pac. 608.)

The deceased was guilty of contributory negligence such as

will prevent the plaintiff's recovery in this action, unless those in charge of the engine were guilty of wantonness.

2. The plaintiff contends that the deceased lost his life through the wanton conduct of those in charge of the engine. This contention is based on the failure of the enginemen to ring the bell and sound the whistle and on the high rate of speed at which the train was run through Valley Center. Against this the jury found that the service application of air was applied and the steam cut off one quarter of a mile before reaching the crossing, and that the enginemen supposed the electric bell at the crossing was ringing.

Although contributory negligence on the part of the deceased will excuse the defendant for its negligence, yet wantonness on the part of the defendant will avoid the deceased's contributory negligence and render the defendant liable. (*K. C. Rly. Co. v. Fitzsimmons,* 22 Kan. 686; *U. P. Rly. Co. v. Adams,* 33 Kan. 427, 429, 6 Pac. 529; *K. C. Ft. S. & G. Rld. Co. v. Kelly,* 36 Kan. 655, 14 Pac. 172; *U. P. Rly. Co. v. Dunden,* 37 Kan. 1, 14 Pac. 501; *K. P. Rly. Co. v. Whipple,* 39 Kan. 531, 540, 18 Pac. 730; *Tennis v. Rapid Transit Rly. Co.,* 45 Kan. 503, 25 Pac. 876; *A. T. & S. F. Rld. Co. v. Todd,* 54 Kan. 551, 559, 38 Pac. 804; *Railway Co. v. Cooper,* 57 Kan. 185, 190, 45 Pac. 587; *Cummings v. Railroad Co.,* 68 Kan. 218, 220, 74 Pac. 1104; *Tempfer v. Street Railway Co.,* 89 Kan. 374, 379, 131 Pac. 592.) Negligence is not presumed. It must be proved. (*Mo. P. Rly. Co. v. Haley, Adm'r, etc.,* 25 Kan. 35; *Jackson v. K. C. L. & S. K. Rld. Co.,* 31 Kan. 761, 3 Pac. 501; *Railroad Co. v. Tindall,* 57 Kan. 719, 48 Pac. 12; *Byland v. Powder Co.,* 93 Kan. 288, 294, 144 Pac. 282; *Willis v. Skinner,* 94 Kan. 621, 634, 147 Pac. 60; *U. P. Rly. Co. v. Mahaffy,* 4 Kan. App. 88, 46 Pac. 187.) Wantonness, like negligence, is not presumed but must be proved. (*Railway Co. v. Lacy,* 78 Kan. 622, 626, 97 Pac. 1025.) This court has often said that whether negligence in a particular case is shown is ordinarily a question for the jury, but when the facts are undisputed or are definitely found by the jury and only one conclusion can be drawn therefrom, it becomes a question of law for the court. (*Kansas Pac. Ry. Co. v. Butts,* 7 Kan. 308; *Wade v. Electric Co.,* 94 Kan. 462, 469, 147 Pac. 63, and numerous cases intervening.) The same rule applies when wantonness is the issue.

(*Campbell v. K. C. Ft. S. & M. Rld. Co.*, 55 Kan. 536, 543, 40 Pac. 997; *Railway Co. v. Cooper*, 57 Kan. 185, 191, 45 Pac. 587; *Railway Co. v. Lacy*, supra; *Gilbert v. Railway Co.*, 91 Kan. 711, 139 Pac. 380.) This court has reversed judgments in several cases because there was not sufficient evidence to justify the finding of the jury that the injury was caused by wantonness. (*C. B. U. P. Rld. Co. v. Henigh, Adm'r*, 23 Kan. 347, 359; *K. P. Rly. Co. v. Whipple*, 39 Kan. 531, 18 Pac. 730; *K. C. Ft. S. & G. Rld. Co. v. Kier*, 41 Kan. 671, 21 Pac. 770; *Railway Co. v. Cooper*, 57 Kan. 185, 191, 45 Pac. 587; *Railway Co. v. Lacy*, 78 Kan. 622, 97 Pac. 1025; *Gilbert v. Railway Co.*, supra; *McCullough v. Railway Co.*, 94 Kan. 349, 146 Pac. 1005.) This court has sustained a judgment where the trial court denied relief to the plaintiff for the reason that the evidence was not sufficient to establish wantonness. (*Campbell v. K. C. Ft. S. & M. Rld. Co.*, supra.)

In *Railway Co. v. Lacy*, supra, this court said:

"To constitute wilful negligence there must be a design, purpose or intent to do wrong or to cause the injury." (p. 629.)

"Reckless disregard of security, wantonness or other equivalent of bad faith and the wilful or malicious disposition to injure all involve something else than negligence." (*Railway Co. v. Walters*, 78 Kan. 39, 41, 96 Pac. 346.)

"The conduct of the employees in charge of an engine in failing to take measures for the protection of a person upon the track can be characterized as 'wanton,' in the sense in which that word is used in this connection, only when they actually know of his presence, or when the situation is substantially the same as though they had such knowledge—when such knowledge may fairly be imputed to them. It is not enough for that purpose that the exercise of ordinary diligence would have advised them of the fact, for their omission of duty in that regard amounts only to negligence. Nor is it enough that they know some one might be in the place of danger; the probability must be so great—its obviousness to the employees so insistent—that they must be deemed to realize the likelihood that a catastrophe is imminent and yet to omit reasonable effort to prevent it because indifferent to the consequences." (*Railway Co. v. Baker*, 79 Kan. 183, 187, 98 Pac. 804.)

In *U. P. Rly. Co. v. Mitchell*, 56 Kan. 324, 43 Pac. 244, this court approved an instruction which defined reckless conduct as an indifference to the rights of others, an indifference whether wrong is done or not; and which told the jury that the defendant could be held liable only for injuries inflicted

which were wilful, wanton, or malicious, or which were so grossly negligent as to amount to wantonness. Many of our courts hold that wantonness precluding a defense of contributory negligence can not be predicated on the omission of a duty before the discovery of a person in a position of peril on a railroad track. (Note, 21 L. R. A., n. s., 427, 442.)

Why did the enginemen make the service application of air? Why did they cut off the steam when a quarter of a mile away from the crossing? What effect shall be given to their supposition that the electric bell was ringing? The only answer to these questions is that they did consider the possibility of persons attempting to cross the railroad track, and had regard for their safety.

Taking into consideration the facts found by the jury in this case—the failure of the enginemen to ring the bell and sound the whistle, the rate of speed at which they were accustomed to go through Valley Center, the rate at which they went through on the day of the accident, the application of the air, the cutting off of steam, the supposition that the electric bell was ringing, and the conditions existing at the crossing— we are compelled to say as a matter of law that the enginemen were not guilty of wantonness. *Gilbert v. Railway Co.,* 91 Kan. 711, 139 Pac. 380, supports this conclusion.

The judgment is reversed with direction to the trial court to enter judgment for the defendant.

---

No. 19,912.

CORA GARRETT AND JAMES GARRETT, *Appellees,* v. H. M. BEERS, *Appellant.*

SYLLABUS BY THE COURT.

1. CHANGE OF WATERCOURSE—*Damages—Proper Party Plaintiff.* Where a plaintiff has acquired a town lot and has entered into possession under a contract of purchase, he is the owner of it so far as concerns his right to maintain an action for damages to the property.

2. EXTRAORDINARY FLOODS—*Damages—"Act of God."* An "act of God" as known in the law is an irresistible superhuman cause, such as no reasonable human foresight, prudence, diligence and care can anticipate and prevent.

3. SAME—*Heavy and Protracted Rains—Not within Definition of "Act of God."* A flood caused by a heavy and protracted rain no greater than had fallen "many a time before" within the duration of a man's experience is not such "an act of God" as will excuse one who changes the natural course of a stream into a new channel which is inadequate to carry off its waters without damage to neighboring property.

4. TITLE—*In Name of Wife—Husband Liable for Changing Watercourse.* Although the title to property may be vested in a wife, her husband may subject himself to liability as its owner by acts of dominion and control over it.

5. SAME—*Acts Rendering Husband Liable for Changing Watercourse.* Where a husband's business firm contributed a large sum of money towards the purchase of a tract of land and the husband joined in platting it as a city addition, paid the taxes from year to year, changed the course of a stream which flowed through it, advertised lots in the addition, sold such lots and received payments therefor and gave receipts in his own name, he may be liable as owner for the negligent manner of changing the stream and its consequences although the title to the property was taken and held in the name of his wife.

6. CHANGING WATERCOURSE—*Liability for Damages.* Where for his own purposes the owner of land changes the course of a stream, he must use due care to provide the stream with a new channel of sufficient capacity to carry off not only the ordinary flow of water but also such high waters as may reasonably be anticipated from heavy and protracted rains and which the old channel was capable of carrying away without damage to neighboring property.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge. Opinion filed February 12, 1916. Affirmed.

*T. F. Railsback,* of Kansas City, and *Glenn R. Donaldson,* of Kansas City, Mo., for the appellant.

*David F. Carson, Claude L. Peterson,* and *William Drennan,* all of Kansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The appellees brought this action in the district court of Wyandotte county against the appellant, in which they alleged their ownership of a certain lot in a suburb of Kansas City; that the defendant for long prior to May, 1910, had owned certain lands known as Spring Valley Addition adjacent thereto on the west; that prior to May, 1910, there was a run-

ning stream which flowed through the defendant's lands and along the west side of the plaintiffs' lot; that the defendant carelessly and negligently filled up the channel of the stream so that it flowed directly east to plaintiffs' lot and away from its natural channel, and that in May, 1910, the waters of the stream flowed over the plaintiffs' lot and damaged their building, fences, household goods and clothing to the extent of $400, and permanently depreciated their property in the sum of $600. They asked judgment for $1000.

Defendant's answer was a general denial. The jury made special findings of fact, and awarded damages to plaintiffs in the sum of $475. The court overruled defendant's motion for a new trial upon condition that the plaintiffs would remit $200 on the verdict. This the plaintiffs did; and judgment was rendered against defendant accordingly.

The defendant appeals and assigns error: (1) in overruling defendant's demurrer to the evidence; (2) in refusing certain instructions; (3) in overruling defendant's motion for judgment; and (4) in refusing judgment on the special findings.

1. It is urged that the demurrer should have been sustained because the plaintiffs were not the owners of the property. There can be no cavil about their ownership of the household goods and clothing. Touching their ownership of the realty, it was shown that the plaintiffs had bought the land and entered into possession under a contract of purchase in 1907, although they did not receive a warranty deed to the realty until October, 1910, some months after the damages alleged. Ordinarily one who buys real estate and enters into possession under a contract of purchase is the owner of it against all comers, excepting possibly the vendor holding the legal title, and may maintain an action as owner for damages to the property. (Civ. Code, § 25; *St. L. L. & D. Rld. Co. v. Wilder*, 17 Kan. 239, syl. ¶ 6; *Mooney v. Olsen*, 21 Kan. 691; *Burke v. Johnson*, 37 Kan. 337, 15 Pac. 204; *Goodrich v. Comm'rs of Atchison Co.*, 47 Kan. 355, 361, 27 Pac. 1006; *Christy v. Richolson*, 48 Kan. 177, 29 Pac. 398; *Mulvane v. Lumber Co.*, 56 Kan. 675, 44 Pac. 613; *Steele v. Dye*, 81 Kan. 286, 290, 105 Pac. 700; *Banchor v. Proctor*, 88 Kan. 510, 129 Pac. 526; 25 Cyc. 1549; 6 Words and Phrases, p. 5134.)

17—97 KAN.

Defendant also contends that the waters which flooded plaintiffs' property constituted "an act of God." An "act of God" as known in the law is an irresistible superhuman cause such as no ordinary or reasonable human foresight, prudence, diligence and care could have anticipated and prevented. (1 Cyc. 758.) It is usually applied to convulsions of nature, like earthquakes, unprecedented floods, violent winds, tempests and droughts. (1 Bouvier's Law Dict., Rawle's Revision, p. 79.) There was testimony that the May flood in 1910 which caused the damage was not unprecedented; that "many a time" such heavy rains had fallen before. Clearly this was a question for the jury. The court's instructions fully covered the point and the demurrer was properly overruled.

2. It is next urged that defendant was entitled to a peremptory instruction that the jury should return a verdict in his favor, on the ground that he was not the owner of the property upon which the new channel was dug and which carried the flood waters on to plaintiffs' lot and destroyed their property. While the fee was held by the defendant's wife, much of the evidence tended to show that his business firm advanced a large sum of money for its purchase, that he had caused the change to be made in the channel of the stream, that he participated in platting the land, that he paid the taxes, advertised the platted lots for sale, sold lots, received payments and gave receipts in payment for lots, directed workmen in filling the old channel and in making the new channel. The defendant's ownership could not have been settled by a peremptory instruction to the jury under this state of the evidence.

3. Nor can it be doubted that plaintiffs sufficiently alleged and that their evidence tended to prove actionable negligence. If the new channel had been adequate to carry the flood waters, plaintiffs would not have been damaged. As the old channel flowed, their property, real and personal, would have been above, or chiefly above, the point where the waters left defendant's land. There was some evidence that the flood waters which did the damage came from another direction and not from defendant's land. That was only a question for the jury.

4. But it is said that the jury found specially that the waters which did the damage were flood waters. But as the

flood waters were wont to flow before defendant changed the channel, they could do no damage to plaintiffs. When he changed the channel he should have taken into account the capacity needed to carry off the probable volume of waters in a freshet. This, according to some of the testimony, he did not do. Nor can it be fairly said that the water was all surface water. Some of the evidence showed that the old channel, colloquially known as the "Sea Serpent," was a living stream with natural springs in its course, and that men brought their horses there for water. (*Rait v. Furrow,* 74 Kan. 101, 85 Pac. 934; *Manufacturing Co. v. Bridge Co.,* 81 Kan. 616, 106 Pac. 1034; *Roland v. Railway Co.,* 82 Kan. 546, 108 Pac. 808.)

Objection is made that the evidence did not warrant the jury's special finding that the defendant was the "joint owner" of the property. No hypercritical interpretation should be given to this language. Obviously the jury sought for a practical term to characterize the defendant's ownership or interest in the property, taking into account the fact that the fee was vested in his wife and that under the evidence and the court's instructions the defendant also had such interest in and dominion over the property as to rise to the dignity of ownership.

Reviewing this case in full, it appears that it presents no legal difficulties whatsoever. It was a case which turned largely upon facts which had to be sifted from conflicting testimony; and since the result is practically free from such errors as would warrant the interference of an appellate court, the judgment must be affirmed.

No. 19,916.

JOSEPHUS MINOR, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Fire—Sparks from Locomotive—Evidence*. In an action to recover damages from a railway company for negligently causing the burning of a barn in the operation of its railroad, the testimony tended to show that it was not an impossibility for igniting sparks and cinders to be carried by a high wind a distance of 800 feet from a locomotive and there set fire to dry and inflammable material, and it is held that the evidence submitted herein was sufficient to support the verdict of the jury that the property was set on fire and destroyed through the negligence of the defendant.

2. SAME—*Trial—No Error in Admission of Evidence*. The admission of testimony which is not competent for one purpose but is admissible on another phase of the case is not ground for reversal where the court expressly limits the application of the testimony to the issue upon which it is competent.

3. SAME—*Findings Supported by Evidence*. Special findings of the jury which are challenged are held to be supported by the evidence in the case.

Appeal from Ford district court; GORDON L. FINLEY, judge. Opinion filed February 12, 1916. Affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott, Harlow Hurley,* all of Topeka, and *William Osmond,* of Great Bend, for the appellant.

*E. L. Foulke, C. A. Matson, J. D. Wall, H. E. Snyder,* all of Wichita, and *Carl Van Riper,* of Dodge City, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: Josephus Minor asked for and obtained a judgment against the Atchison, Topeka & Santa Fe Railway Company for damages for the burning and destruction of a barn and other property alleged to have been set on fire by the defendant in the operation of its railroad.

The barn, which was eight hundred feet distant from the railroad, was filled with dry hay. The fire occurred during a very dry period, and on the day of the burning the wind was blowing at the rate of thirty-one miles an hour and directly

Minor v. Railway Co.

from the railroad towards the barn. Fire was seen in the barn shortly after a train passed, and the jury found that it broke out about thirty minutes after the train passed. No fire was set nor was anything burned between the railroad and the barn, and there is a contention that the distance between the passing train and the barn was so great that it was impossible for igniting sparks to be carried from a locomotive to the barn. Attention is called to the opinion of certain authors who argue that sparks emitted from a locomotive will ordinarily carry fire no farther than fifty feet, and under the most favorable conditions to the setting of a fire, not more than one hundred and fifty feet. Witnesses in the case, however, testified that igniting sparks and cinders from passing trains may, under certain conditions, be carried and start a fire as great a distance as it was from the track to the barn. It is well known that the size of the sparks or cinders thrown from a locomotive, the atmospheric conditions existing at the time, and the velocity of the wind materially affect the fire-carrying quality of sparks and cinders. Under the testimony it can not be said to be an impossibility for igniting sparks and cinders to be carried the distance mentioned. The plaintiff must, therefore, be regarded as having made a *prima facie* case showing that the fire was the result of the defendant's negligence. (*Tuttle v. Railway Co.*, 86 Kan. 28, 119 Pac. 370.) There was testimony in the case to the effect that about the time in question live sparks and cinders were carried more than five hundred feet. Another witness stated that after the barn was burned, and shortly after the train passed, fire was set on the plaintiff's premises a distance of six hundred feet from the track; while another witness stated that he observed sparks from a passing train falling near the site of the barn when the wind was blowing about twenty miles an hour. One witness said that the locomtive of the train which passed just before the fire was started was throwing out black smoke as if the fireman had just been putting coal in the firebox. The testimony tended to show that there was no other source from which the fire might have originated. Some testimony tended to show a defect in the locomotive which passed about the time of the fire. Under our decisions it must be held that a *prima facie* case against the defendant was made and that no error was

committed in overruling the defendant's demurrer to the plaintiff's evidence. (*Railway Co. v. Geiser*, 68 Kan. 281, 75 Pac. 68; *Lillard v. Railway Co.*, 79 Kan. 25, 98 Pac. 213; *Tuttle v. Railway Co.*, supra; *White v. Railway Co.*, 91 Kan. 526, 138 Pac. 589.)

There is a claim of error in the ruling admitting testimony as to fires set out at other times by the defendant. Some of this testimony is within the rule permitting the admission of testimony of that character in *Tuttle v. Railway Co.*, 86 Kan. 28, 119 Pac. 370, and *Barker v. Railway Co.*, 89 Kan. 573, 132 Pac. 156. A more complete answer to the claim of error is that the court instructed the jury that all testimony of that character was admitted and could be considered only for the purpose of showing that live sparks from locomotives could be carried as far as the barn was from the track. So limited, the reception of the testimony could not be error, as it was undoubtedly admissible for that purpose. The testimony as to the distance that burning shingles were carried at the time of the fire was admissible for the same purpose as well as to show the velocity of the wind.

Objection is made because of the refusal of the court to admit testimony of a statement made by one Miller, who was called as a witness in behalf of the defendant, said to be inconsistent with the testimony given by him on the trial. He testified that he reached Minor's place before the fire burned out, and that it was about 11 o'clock eastern time. On further examination he testified that he might have made the statement that it was about 11 o'clock western time. The offer to show that he made that statement was refused. Assuming that it was competent for the defendant to contradict its own witness in this particular or use the offered testimony for any purpose, it must be held under all the evidence in the case that the exclusion of the offered testimony was not material error.

Error is next assigned on the refusal to set aside the special finding to the effect that the engineer did not handle the train properly in that he undertook to make up eight minutes of time in running from Howell to Dodge City, a distance of nine miles. The negligence upon which the verdict and judgment are based is not excessive speed of the train, but it was the

Minor v. Railway Co.

using of a defective engine. The train was scheduled to run this distance in twenty minutes, but it appears to have made the run in twelve minutes. It appears that the rate of speed of the train was forty-five miles an hour, and running at that rate in the open country can hardly be declared to be excessive or negligent. It was running faster, it is true, than the prescribed schedule, but ordinarily it is not negligence to run a train faster than the scheduled rate when it is deemed to be necessary, and it can not be regarded as a culpable want of care unless some peculiar circumstances require a diminished rate of speed. It may be that the pushing of the locomotive up to the high pressure of steam and the increased speed may have contributed somewhat to the throwing of sparks which were carried by the wind to the barn, but as we have seen, the recovery is not based on that negligence, and if the finding were stricken from the record there would still be sufficient support for the verdict.

It is next charged that there was no support for the finding that about thirty minutes elapsed after the train passed before the fire broke out. There was some confusion in the testimony in regard to the time of the occurrences there, due, in part at least, to the fact that the line of division between central time and mountain time is near the plaintiff's premises, and hence not all the witnesses used the same standard when speaking of time. There is testimony that the fire started in the hay inside of the barn within a few minutes after the train passed, and that it burned some time before it broke through the roof of the barn. The jury in their finding probably referred to the time the fire broke through the roof of the barn, and we see no error in upholding the finding.

Although the testimony is slight it appears to be sufficient to warrant the jury in finding that the engine was defective in that the plates were out of place, and it also appears to be sufficient to uphold the verdict and the judgment that have been rendered.

After giving consideration to all of the assignments of error and the arguments thereon we are of opinion that the judgment of the trial court should be upheld.

The judgment is affirmed.

No. 19,920.

J. C. COLLINS, *Appellant*, V. JOHN MORRIS, *Appellee.*

SYLLABUS BY THE COURT.

1. MOTION FOR NEW TRIAL—*Its Purpose.* The purpose of a motion for a new trial is to inform the trial court what errors are relied upon in order that the court may, by granting a new trial, correct any error shown to exist.

2. APPEAL—*Matters for Review.* "Only such matters as were considered by the trial court are open to review in the supreme court." (*Brock v. Corbin*, 94 Kan. 542, syl. ¶ 4, 146 Pac. 1150.)

3. APPEAL—*Matters Not Raised in Motion for New Trial—Not Reviewable.* Following *Washburn v. Bank*, 86 Kan. 468, 121 Pac. 515, it is held where no complaint of the admission of evidence over plaintiff's objection was made in the motion for a new trial, the question can not be raised in this court.

4. TREES—*Owner May Use His Land for Any Purpose Desired.* "It is not for the wrongdoer who causes an injury to decide whether an owner should have used his land for a particular purpose nor the use to which it can most profitably be employed." (*Barker v. Railway Co.*, 94 Kan. 61, 66, 145 Pac. 829.)

5. TRESPASS—*Destruction of Trees—Measure of Damages—Evidence.* In an action under section 9692 of the General Statutes of 1909 by a landowner to recover treble damages for the destruction of trees where plaintiff has elected to recover the distinct value of the trees, which the evidence shows can be determined independent of the land, and has offered no evidence of the value of the land before and after the trees were destroyed, it is error to admit over plaintiff's objections proof that the land would sell for as much or more for farming purposes without the trees as with them.

6. TRESPASS—*Destruction of Trees—Evidence Does Not Sustain Verdict.* While it is not the province of this court to weigh the evidence, it may determine that there is or is not sufficient evidence to support the verdict; and in this case the court determines the verdict is contrary to the evidence and therefore the judgment is reversed.

7. OBITER DICTUM—Certain expressions in the opinion in the case of *Railway Co. v. Lycan*, 57 Kan. 635, 47 Pac. 526, are held to be *obiter* and are disapproved.

Appeal from Miami district court; JABEZ O. RANKIN, judge. Opinion filed February 12, 1916. Reversed.

*E. J. Sheldon,* and *S. J. Shively,* both of Paola,. for the appellant.

*Alpheus Lane,* and *M. A. Lane,* both of Paola, for the appellee.

The opinion of the court was delivered by

PORTER, J.: This is an action to recover treble damages for the malicious destruction of trees. Plaintiff and defendant own adjoining farms, and the trees destroyed were six shade trees which plaintiff alleges were growing on his land near the partition fence. There was a verdict and judgment in favor of defendant, from which the plaintiff appeals.

The specifications of error in plaintiff's brief are, *first,* the admission of incompetent and immaterial testimony over his objections; *second,* the rejection of competent testimony offered by the plaintiff; *third,* overruling the motion for a new trial; *fourth,* rendering a verdict for defendant; *fifth,* ordering a judgment for defendant. The case was submitted to a jury on evidence and instructions, and no judgment was ordered, so the fifth assignment need not be considered.

At the outset we are confronted with the objection which defendant makes to any consideration of the first and second specifications, which relate to the admission of evidence, because they are raised for the first time in this court. As the principal questions argued in plaintiff's brief relate to the rulings of the court admitting certain testimony offered by the defendant, it will be necessary to consider the grounds of the motion for a new trial. The grounds are stated as follows:

"Now comes the plaintiff and moves the court for a new trial of the issues at law and fact in the above entitled case for the reason that the verdict is contrary to the evidence. And for the further reason that the verdict is contrary to law as given under the influence of passion and prejudice, and not a fair consideration of the evidence, and for the further reason that the plaintiff did not have a fair trial."

Nowhere is there any reference to rulings of the court on the admission of testimony. A new trial was asked, *first,* because the verdict is contrary to the evidence; *second,* because it is contrary to law as "given under the influence of passion and prejudice, and not a fair consideration of the evidence"; and *third,* because the plaintiff did not have a fair trial.

The amended code provides that a new trial may be granted on the application of the party aggrieved when it appears that his rights are "substantially affected":

"*First*, because of abuse of discretion of the court, misconduct of the jury or party, or accident or surprise which ordinary prudence could not have guarded against, or for any other cause whereby the party was not afforded a reasonable opportunity to present his evidence and be heard on the merits of the case.

"*Second*, erroneous rulings or instructions of the court.

"*Third*, that the verdict, report or decision was given under the influence of passion or prejudice.

"*Fourth*, that the verdict, report or decision is in whole or in part contrary to the evidence.

"*Fifth*, for newly discovered evidence material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial.

"*Sixth*, that the verdict, report or decision was procured by the corruption of the party obtaining it." (Civ. Code, § 305.)

The third reason stated in the motion—"that the plaintiff did not have a fair trial"—is not a statutory ground unless it be made to appear that he was prevented from having a fair trial by one of the six grounds set forth in the statute.

There is nothing in the motion challenging the attention of the trial court to the principal claim now raised in this court, that incompetent or immaterial testimony in favor of defendant was admitted over the plaintiff's objections. The purpose of a motion for a new trial is to inform the trial court what errors are relied upon, in order that the court may, by granting a new trial, correct any error shown to exist. It would not be fair to the other litigant, nor fair to the trial court, nor to this court, if a defeated litigant were permitted to secure the reversal of a judgment on grounds not presented to the court below. If there be reversible error in a verdict or judgment the interests of justice and of both parties as well as of the public are best served by the granting of a new trial at once rather than after the delay and costs incident to an appeal. It is precisely for the same reasons that the amended code (§ 307) requires that where the exclusion of evidence is relied upon, the excluded evidence must be produced before the trial court so the trial judge may pass upon it and determine whether a new trial should be granted. (*Thompson v. Thompson*, 94 Kan. 168, 171, 146 Pac. 344; *Broady v. Fire Association*, 94 Kan. 245, 146 Pac. 343.)

Collins v. Morris.

"Only such matters as were considered by the trial court are open to review in the supreme court." (*Brock v. Corbin*, 94 Kan. 542, syl. ¶ 4, 146 Pac. 1150.)

In a recent case (*Washbon v. Bank*, 86 Kan. 468, 121 Pac. 515) it was ruled as follows:

"Certain evidence was admitted over the objection of plaintiffs. No complaint of the ruling was made in the motion for a new trial. *Held*, that the question can not be raised in this court." (Syl. ¶ 1.)

The errors of which the plaintiff now complains respecting the admission of testimony would have been sufficiently set forth if in his motion for a new trial he had merely alleged "erroneous rulings" in the language of the second ground provided in the statute.

"In a motion for a new trial it is sufficient to set forth the grounds in the language of the statute, and where such a motion recites "erroneous rulings" as one of its grounds, appellant can have a review of any ruling made on the trial respecting the admission of evidence." (*Coal Co. v. Nicholson*, 93 Kan. 638, syl. ¶ 2, 145 Pac. 571.)

The failure to raise the question below is unfortunate, for the court is satisfied there was prejudicial error in the admission of certain testimony respecting the measure of damages. This, however, furnishes some reason for what might under ordinary curcumstances be regarded as a rather technical consideration of the other errors assigned. We find nothing to indicate that the verdict was given under the influence of passion or prejudice. The court, over the objections of plaintiff, permitted the defendant to prove by a number of witnesses that the destruction of the shade trees caused no damage or injury to the real estate. These witnesses were permitted to testify that in their opinion the land was just as valuable for farming purposes without as with the shade trees, and one or two of defendant's witnesses thought the destruction of the trees benefited the land and made it even more valuable than before. The court having admitted the incompetent evidence, it was the duty of the jury to consider it; and the fact that they found for the defendant indicates that they did so because of this evidence, rather than that they were influenced by prejudice or passion.

There remains only the first ground stated in the motion—that the verdict is contrary to the evidence. The plaintiff's

testimony showed that the shade trees were valuable. A few of them were oak, and others elm. The plaintiff testified that he had planted them when he first acquired title to the land in the late "seventies" and early "eighties." Some of the witnesses for defendant admitted that the trees had a value of at least $5 each, and the testimony of the plaintiff tended to show that some of them were worth as much as $20 each. It can be said, therefore, that there was no dispute in the evidence that the trees possessed a value as shade trees. The testimony of the defendant himself shows that he destroyed the trees purposely and maliciously. It is true, on the trial defendant made some effort to show that a few of the trees destroyed stood on the line between the two farms, that the fence was not the true line, and therefore he owned a portion of these particular trees and had the right to burn them; but this was clearly an afterthought, and if his contention respecting the line were true, and if it were conceded that because he owned a portion of one or two of the trees he could destroy them, it furnishes no defense to his act in burning the others. Besides, his own testimony is an admission that he burned the trees purposely and maliciously because he became angry at the plaintiff for claiming that he was farming land that did not belong to him. On cross-examination he testified as follows:

"Q. You set fire to the tree? A. Yes, I did.

"Q. What did you do that for? You intended to burn the tree? A. Mr. Collins write for me—he wanted to rent my—he said I farmed twenty feet of the public highway; that is where the trouble came there."

While it is not the province of this court to weigh the evidence, it may determine that there is or is not sufficient evidence to support the verdict. (*Glenn v. Railroad Co.*, 94 Kan. 83, 145 Pac. 865.) In this case the verdict can not, in our opinion, be sustained by the fact that there was evidence from which the jury might have found that some of the trees destroyed were on the division line and therefore the defendant owned an interest in some of them. Because of his own admissions, the verdict should have been set aside. As a new trial must be ordered, it is proper to say that the objections to evidence showing the value of plaintiff's land immediately before and after the trees were destroyed should have been sustained. The plaintiff seeks to recover as damages treble the

value of the trees as appurtenant to the land under the provi-sions of the statute.   (Gen. Stat. 1909, § 9692.)

In *Railway Co. v. Lycan,* 57 Kan. 635, 47 Pac. 526, it was held that where trees are destroyed, and they had a distinct value susceptible of distinct measurement, the value of the trees or things destroyed is the best measure and the most sat-isfactory method of determining the value of the loss.   This doctrine was reaffirmed in *Barker v. Railway Co.,* 94 Kan. 61, 145 Pac. 829, where it was said in the opinion :

"It is not for the wrongdoer who causes an injury to decide whether an owner should have used his land for a particular purpose nor the use to which it can most profitably be employed.   He is liable to pay for the loss of the property appurtenant to real estate which is actually destroyed and which has a value independent of the land, such as buildings and trees, and the evidence indicates that there was no difficulty in determin-ing the value of the trees destroyed and the loss sustained."   (p. 66.)

In the opinion in the Lycan case, *supra,* Mr. Justice Allen, speaking for the court, after recognizing that the best measure of the damage is the value of the thing destroyed as an appur-tenant to, or part of the realty, used this language : "If for any reason the injury to the realty should be in fact less than the value of the thing destroyed, the plaintiff's recovery would be limited to the actual diminution in value of the realty." Which, he adds, "might be shown, either on cross-examination of the plaintiff's witnesses or as a matter of defense."   (*Rail-way Co. v. Lycan,* 57 Kan. 635, 642, 47 Pac. 526.)

The language just quoted from the opinion was not neces-sary to the decision of that case.   It was *obiter.*   Applied to a certain class of cases where the plaintiff sues to recover the damages to the land itself, it may and doubtless would apply ; but where, as in this case, the plaintiff has elected, as he un-doubtedly may, to recover for the value of the specific thing destroyed and has offered no proof tending to show that he seeks to recover damages to the realty alone ; and, on the other hand, has offered evidence to show the distinct value of the thing destroyed, it would be absurd to say that the wrongdoer, who has committed a willful act in destroying shade trees or trees in an orchard, may escape all liability for his wrongdoing by proof that the land would sell for as much or more for farm-ing purposes without the trees as with them.   Is it conceivable that because there are residence lots in some places upon which

there are more shade trees growing than ninety-nine persons in a hundred would care to have if they owned the premises, that fact, if conceded, would justify another in committing a trespass and cutting down some of the trees? A farmer leaves a magnificent elm or oak standing in a field. Its shade and roots injure a quarter of an acre or more of the soil for farming purposes. By uprooting the tree the owner may add to the strictly commercial value of the field for purposes of raising corn or wheat. But when the field becomes a meadow or pasture the tree has a practical value; it furnishes shade for cattle, and aside from its utility it may have to the owner of the soil a value difficult to estimate in dollars and cents. It may be a tree which "perhaps has been brought to its present state by years of patient care and which may be a source of comfort and gratification to an entire community" and especially to its owner. (*Paola v. Wentz,* 79 Kan. 148, 153, 98 Pac. 775.) In the case just cited the court affirmed a judgment in favor of an abutting owner enjoining a city from destroying shade trees. In the opinion it was said:

"The interest of an abutting owner in a shade tree growing in the street is as sacred as any other property right. Sentiment and utility combine to give it value." (p. 153.)

(To the same effect see *Remington v. Walthall,* 82 Kan. 234, 108 Pac. 112.)

The correct rules for the measurement of damages to trees as trees is recognized in *Barker v. Railway Co.,* 94 Kan. 61, 145 Pac. 829, holding that where fruit trees which have a distinct value as part of the land are destroyed by the negligent act of another, and their value and the damages can be definitely measured and the court applies that rule, the defendant can not complain that the court failed to apply the rule as to the difference in the value of the land before and after the destruction. In that case, too, the court expressly held that the owner of the trees may recover their value as damages without regard to whether the land could have been used more profitably without them.

"The owner is entitled to plant an orchard on his land whether or not it is the most profitable use to which it can be applied, and if the fruit trees are destroyed he is entitled to claim damages from the wrongdoer for being deprived of such use and of the value of the trees." (*Barker v. Railway Co.,* supra, syl. ¶ 2.)

Hail Association v. Surety Co.

The before and after value of the land upon which a trespass has been committed is sometimes a proper measure of the damages sustained. In other cases, where the thing destroyed is fruit or shade trees, the plaintiff in an action under the statute has the right to elect to sue for three times their value as trees, and the wrongdoer can not defeat his right to recover by showing that the land was of the same or greater value after the destruction of the trees.

We conclude that the evidence as to the value of the land before and after the destruction of the trees should not have been admitted. The judgment, however, can not be reversed on that ground, because it is raised for the first time in this court.

For the reason that the judgment is manifestly contrary to the evidence it will be reversed and a new trial ordered.

---

No. 19,924.

THE KANSAS STATE MUTUAL HAIL ASSOCIATION, *Appellant*, v. THE TITLE GUARANTY & SURETY COMPANY, *Appellee*, and THE AMERICAN SURETY COMPANY.

SYLLABUS BY THE COURT.

1. INDEMNITY BOND—*Alleged Untruth in Application Therefor—Question for Jury.* In an application to a surety company for a bond insuring the good conduct of an employee a negative answer was returned to the question whether he was indebted to his employer. The sum of fifty dollars had been advanced to him to enable him to meet the expenses of his employment, to be returned out of his earnings. *Held,* that it was not error to submit to the jury whether this transaction should have been mentioned in answer to the question, and whether the failure to mention it proceeded from bad faith.

2. PLEADINGS—*Inconsistent Defenses—No Prejudicial Error.* Where a defendant, instead of pleading, as he might have done, that one or the other of two conditions existed, either of which served his purpose, pleads one of them in one count of his answer and the other in another, the plaintiff is not ordinarily prejudiced by the denial of a motion to require him to elect between them, although both allegations could not be true.

3. INDEMNITY BOND—*Issue to be Tried—Instruction.* In an action upon a bond undertaking to indemnify an employer against losses through the embezzlement of an employee, it is not error to instruct that one of the issues is whether he was guilty of that offense.

4. SAME—*Burden of Proof—Instruction.* A general instruction that the plaintiff has the burden of proving a right to recover is not objectionable, although some issues are involved as to which the burden is on the defendant.

5. INSURANCE AGENT—*Failure to Remit Premiums—No cause of Action Proven.* Where an insurance agent, who is authorized to retain twenty per cent of all premiums collected, remits eighty per cent of each collection made, without specific direction as to the application thereof, the fact that the company applies a part of the amount remitted to an indebtedness of the agent for money advanced, can not result in fixing liability upon a bonding company which has undertaken to indemnify the insurance company against loss occasioned by the embezzlement of its agent.

Appeal from McPherson district court; FRANK F. PRIGG, judge. Opinion filed February 12, 1916. Affirmed.

*Alex S. Hendry,* of McPherson, for the appellant.

*G. F. Grattan,* and *J. M. Grattan,* both of McPherson, for appellee The Title Guaranty & Surety Company.

The opinion of the court was delivered by

MASON, J.: A mutual hail insurance company employed a soliciting agent, who gave a bond signed by a surety company, to protect his employer against all pecuniary loss directly sustained by larceny or embezzlement on his part. The insurance company sued the bonding company, alleging that the agent had collected in its behalf $288.18 more than he had remitted, and asking judgment for that amount. A trial resulted in a verdict against the plaintiff, and a judgment was rendered accordingly, from which it appeals.

(1) The written application of the insurance company for the bond included these questions and answers, among others: "Is he [the agent] now in debt to you? No. If so, state amount and nature of such indebtedness. No." At the time the company had advanced to the agent fifty dollars to enable him to pay his way until returns from the business should begin to come in, he to repay it out of his share of the proceeds; and this amount was charged against him on the books of the company. The defendant maintained that the answer to the first question quoted was untrue and that it was thereby relieved from liability. The court instructed the jury in effect

that if the answer was false and had been made in bad faith the bond could not be enforced, owing to certain of its provisions not necessary now to be stated. The plaintiff complains of the instruction on the ground that under the circumstances shown the fifty dollars advanced to the agent did not constitute a debt, and that there was no evidence of any bad faith in the answer that was made. We think the evidence justified allowing the jury to determine whether or not the fifty-dollar transaction was of such a character that it should have been mentioned in answer to the question, and whether or not under all the circumstances the failure to mention it proceeded from a want of good faith. Upon the whole record, as will appear from what is hereinafter said, it seems very unlikely that the verdict was affected by this matter.

(2) Among other defenses the defendant presented the claim that in making a statement to it of the amount of the agent's alleged shortage it had wilfully suppressed the fact that the amount charged against him included the sum of $440, advanced to him by the plaintiff. In a separate defense the same allegation is repeated, except that the money is said to have been advanced by the plaintiff's secretary. The plaintiff contends that the defenses were inconsistent, and complains of the refusal of the court to require the defendant to elect between them, and of the admission of evidence with regard to the advancing of money by the secretary. There is a conflict of authority as to how far inconsistent defenses may be united in an answer. (*Fetzer v. Williams,* 80 Kan. 554, 103 Pac. 77.) Whatever inconsistency there may be in the two defenses referred to is not objectionable. The defendant, instead of pleading in one count that the money was advanced by either the company or its secretary, presented one theory in one count and the other in another. The effect was much the same. The facts lay peculiarly within the knowledge of the plaintiff, and it was in no way prejudiced by the denial of its motion to require the defendant to elect.

(3) The court in its charge referred to the question whether the agent was guilty of embezzlement as one of the issues. Complaint is made of this on the ground that it tended to confuse the jury and create the impression that the agent was on trial. The bond undertook to indemnify the plaintiff only

against losses occasioned by larceny or embezzlement. The
issue referred to was therefore in the case, and it does not
appear to have been so presented as to be the occasion of any
prejudice.

(4) The jury were told that the burden of proof was on
the plaintiff to prove its right to recover by a preponderance
of the evidence. This is objected to apparently on the ground
that as to some of the specific issues the burden was on the de-
fendant. The instruction given was true as a general state-
ment. If a more specific direction had been asked a different
question would be presented. Criticism is made of the verifica-
tion of the answer. It seems sufficient, but no reason is sug-
gested why any verification was necessary.

(5) The evidence showed that the insurance company from
time to time advanced to its agent different sums, amounting
in all to $440, which were charged against him on the books.
His arrangement with the company was that he should cover
a definite territory, soliciting business, writing insurance and
collecting premiums. He was authorized to retain twenty per
cent from each premium collected, from which he was to pay
all his expenses, including the charges of subagents, the resi-
due to be his compensation for his services. As the agent
made reports of business done he was charged with the pre-
miums collected (less his twenty per cent deduction) and as
he made remittances they were credited to him on the
general balance, being applied to his indebtedness arising
from the advancements made to him, as well as to the charges
for premiums collected. The plaintiff claimed this practice
to have been authorized by the agent, under his agreement
with the company, but the jury specifically found to the con-
trary. The plaintiff also contended that the agent had assigned
his share of the premiums collected, to secure the payment
of the money advanced him, and this issue was submitted to
the jury in such a way that their general verdict must be
deemed to include a finding against the contention. The remit-
tances of the agent amounted to more than eighty per cent of
the premiums collected, and he was made to appear in default
in that respect only by applying to his indebtedness, growing
out of the sums advanced to him, a part of the amounts he

remitted.   The plaintiff invokes the rule that the creditor may determine what application shall be made of payments by a debtor who omits to give any directions in that regard. That principle does not apply here, because the surety company had not guaranteed the payment of the agent's debts. It merely had undertaken to indemnify his employer against loss by his larceny or embezzlement.   The bond specifically provided that the surety should not be liable "for any loans or advances made by the employer to the employee for any purpose."   We approve the view of the trial court that so long as the agent remitted to the company eighty per cent of each premium collected, no liability arose under the bond. His failure to repay the advances made, out of his share of the premiums, was a mere breach of contract.   The bonding company guaranteed only his observance of the criminal law, not the civil.

The effect given to a mistake made by a witness, while testifying to the contents of a record he was then examining, has led to an apparent controversy concerning the fact in that regard.   The matter had no important bearing on the decision of the case.   Whatever misunderstanding existed was obviously due to inadvertance, and has been cleared up.

The judgment is affirmed.

---

No. 19,925.

THE AMERICAN SURETY COMPANY OF NEW YORK, *Appellee,* v. THE MARYLAND CASUALTY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. CORPORATION—*Sued in Wrong Name—Answer—Trial—Judgment— Misnomer Waived.*  Where process is served against a defendant corporation in the wrong name and it answers in that name, a judgment taken against it is as valid as if rendered against it in the right name. The failure to plead the misnomer waives it.

2. SAME—*Misnomer—No Plea in Abatement—Misnomer Waived.*   The New Century Zinc and Lead Mining Company, a corporation organized under the laws of Delaware, was sued by an employee to recover damages for personal injuries.   The petition and summons described the defendant as "The New Century Mining Company" and the petition alleged that it was a Kansas corporation.   The summons was

served upon the president of the company; an answer was filed in the name of "The New Century Mining Company" as defendant, and the cause was tried and judgment rendered against defendant. On appeal to the supreme court the judgment was affirmed. In no manner was the misnomer brought to the attention of the district or the supreme court. *Held,* that failure to file a plea in abatement waived the misnomer, and that after the judgment it is too late for the defendant, or for a casualty insurance company in privity with it, to question the fact that the company was sued, or the validity of the judgment.

3. INDEMNITY BOND—*Against Injuries to Employees—Judgment for Employee—Liability on Indemnity Bond.* A casualty company issued a policy indemnifying a corporation from liability for injuries to its employees and agreeing to defend all suits brought against it. It defended such an action where the corporation was sued by the wrong name and judgment was taken against the defendant. *Held,* after the affirmance of the judgment on appeal it is too late for the casualty company to question the validity of the judgment, or its own liability to a surety company which signed the supersedeas bond and took an assignment of the policy as security for money advanced to satisfy the judgment.

Appeal from Cherokee district court; EDWARD E. SAPP, judge. Opinion filed February 12, 1916. Affirmed.

*A. M. Keene,* of Fort Scott, for the appellant.

*William F. Sapp,* and *A. S. Wilson,* both of Galena, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Ed Reynolds sued the New Century Zinc and Lead Mining Company, a corporation organized under the laws of Delaware, to recover damages for personal injuries. In his petition he described the company as "The New Century Mining Company," and alleged that it was a Kansas corporation. The summons contained the same misnomer, but was served personally upon the president of the company. The Maryland Casualty Company had issued a policy to the New Century Zinc and Lead Mining Company indemnifying it from loss by liability for injuries to its employees, and agreeing to defend at its own cost all suits brought by employees against the company. The summons and papers in the Reynolds case were sent to the attorneys for the casualty company at the request of the latter company, and they filed an answer for "The

New Century Mining Company" and defended the action in the district court, where Reynolds obtained a judgment. The true name of the mining company was not disclosed by any pleading filed in its behalf, but an appeal was taken to the supreme court by the attorneys for the casualty company, the title of the cause remaining the same. The supersedeas bond, however, was signed in the true name of the defendant company as principal, and also by the American Surety Company as surety. The New Century Zinc and Lead Mining Company advanced the premium for the supersedeas bond and the premium for its renewal a year later, but the casualty company reimbursed it for these payments. The judgment in Reynolds' favor was affirmed in this court at the July term, 1913. (*Reynolds v. Mining Co.*, 90 Kan. 208, 133 Pac. 844.) When the mandate was sent down the New Century Zinc and Lead Mining Company satisfied the judgment and costs. It obtained the money to do this by a loan made by the American Surety Company, which had signed the supersedeas bond. In order to secure the loan or advancement of the money, it assigned to the surety company its interest in the policy of insurance issued by the American Casualty Company. That company denied any liability to the surety company on the policy, and the surety company brought this action to recover the amount of the judgment and costs in the Reynolds case. A jury returned a verdict in favor of the surety company and judgment was rendered in its favor, from which the casualty company has appealed.

We are unable to discover any reason why the judgment should not be affirmed or any way by which the casualty company can escape liability on its policy of indemnity. The judgment in the Reynolds case was enforceable against the New Century Zinc and Lead Mining Company notwithstanding the company was sued in the wrong name. The summons was served upon its president, an answer was filed and the action contested on its merits as though there had been no misnomer. If the company objected to being sued in the wrong name it should have filed a plea in abatement or called the court's attention to the mistake in some way. Failing to do so or to disclose its true name, it waived the misnomer. (*School District v. Griner*, 8 Kan. 224; *Clark v. Clark*, 19 Kan.

522; *Wilton Town Co. v. Humphrey*, 15 Kan. 372.) The court would have authorized an amendment correcting the mistake if its attention had been challenged to it. (*Weaver v. Young*, 37 Kan. 70, 14 Pac. 458; *Service v. Bank*, 62 Kan. 857, 860, 62 Pac. 670.) But to have the mistake corrected was not what either the mining company or the casualty company desired. From the statement of counsel for defendant at the trial of the present case, it appears that the casualty company thought some advantage could be gained by defending the Reynolds action in the name under which he sued the mining company and by concealing the misnomer. It is well-established law that where process is served upon a defendant in a wrong name and he answers in the named sued upon, a judgment against him is as binding as if rendered against him in his right name. If he fail to plead the misnomer he waives it. (37 Cent. Dig. cc. 2607-2610, § 177, and cases cited.)

Although when the Reynolds judgment was affirmed the American Surety Company became liable on the supersedeas bond, its liability was that of a surety, and the mining company, the judgment debtor, was primarily liable. Officers of the surety company and of the mining company testified to the fact that the money to pay the judgment was obtained by a loan from the surety company, and that the policy was assigned and transferred as security for the loan. It made no difference whether any note was given or any charge or account made.

There was no ground upon which to sustain the demurrer to the evidence. It is difficult to see how the trial court could have erred in charging the jury that the New Century Zinc and Lead Mining Company was the same thing as the New Century Mining Company. For all purposes of this action they are the same, or, putting it another way, the mining company's legal name is as stated in its charter, but it is sometimes known by the name in which it was sued and the judgment in Reynolds' favor rendered; because the fact remains that the suit was defended through the courts just as though the company had been sued in its charter name.

The instructions were quite favorable to the defendant. Some of the special questions submitted by the defendant might well have been refused, but the jury seem to have

answered them properly. Their affirmative answer to the question whether Reynolds ever brought an action against the New Century Zinc and Lead Mining Company was correct. He sued that company under the ·wrong name; the company waived the misnomer and defended the action. After the judgment it is too late for that company, or for the casualty company which was in privity with it, to question the fact that the company was sued. The same may be said respecting the special question whether defendant ever issued an indemnity policy to a corporation by the name of the New Century Mining Company. The jury answered Yes; and under the court's instructions and the law as we have stated it, for every purpose connected with this case, the answer, though not literally correct, is substantially so. The question should not have been submitted, for no one claimed that the policy was issued to a company of that name, so it makes no difference how it was answered. The defendant's liability on the policy could not be affected by any of the answers returned by the jury.

The judgment is affirmed.

------

No. 19,927.

DOLLIE L. UDEY, *Appellant,* v. THE CITY OF WINFIELD, *Appellee.*

SYLLABUS BY THE COURT.

1. PERSONAL INJURIES—*Clerical Employees—Workmen's Compensation Act.* Clerical employees in the office of the city clerk are not employees of the city in conducting a light and water plant, as contemplated by section 6 of the workmen's compensation act. · (Laws 1911, ch. 218.)

2. SAME—*Assumption of Risk—No Recovery.* The evidence of the plaintiff showed that the character of the work of removing the pipe which fell on the deceased and the dangers incident thereto were apparent to him, and in attempting to perform such work in the way he did he was sufficiently at fault to bar a recovery. *Held,* the demurrer to such evidence was rightfully sustained.

Appeal from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed February 12, 1916. Affirmed.

*A. M. Jackson,* and *A. L. Noble,* both of Winfield, for the appellant.

*James A. McDermott,* of Winfield, for the appellee.

The opinion of the court was delivered by

WEST, J.: The widow of Alberta Udey brought this action for the benefit of herself and her children to recover damages for the death of her husband, alleging in substance that the defendant city owned, conducted and operated for profit an electric-light plant and waterworks system; that it had more than fifteen workmen continuously in its employment in that line of business and had not elected to come within the provisions of the workmen's compensation act (Laws 1911, ch. 218); that the deceased was in the employment of the defendant, and one Welfelt was the superintendent and chief engineer of the plaintiff; that on the 21st day of March, 1912, and for many years theretofore there was a cast-iron pipe about thirty feet long at the old plant which had been used as a conduit from the filter to the clear-water basin, and was suspended about two and one-half feet from the ground by being fastened at one end to the filter and at the other end to the clear-water basin; that the deceased was ordered by Welfelt to disconnect about ten feet of this pipe for use at the electric-light and water plant; that in order to disconnect such portion it was necessary to unbolt the rivets or screws in the joints of the pipes, which Udey attempted to do under such order; that in trying to disconnect the pipe and after a part had been disconnected such pipe was left, for want of due care, by the defendant, suspended in midair about two and one-half feet with only a fastening at one end and without any other prop or support; that it had been exposed and had become weak and corroded; "that the defendant was guilty of negligence, carelessness and want of due care in unbolting the rivets of said pipe without any props and supports, or any arrangements therefor, and by reason thereof it broke and fell upon Udey without any fault upon his part, and while in performance of duty, and so bruised and wounded him as to cause his death."

The answer admitted that the city had not elected to come within the provisions of the workmen's compensation act; de-

nied generally the allegations of the petition except as specifically admitted; alleged contributory negligence; that the deceased was foreman of the old water plant and had for many years known the condition of each and every part thereof; that if a portion of the pipe was left suspended it was the result of the work of Udey without the knowledge, direction or consent of Welfelt or any other servant of the city. The court sustained a demurrer to the plaintiff's evidence, from which ruling he appeals.

Section 46 of chapter 218 of the Laws of 1911 provides that it shall not be a defense to any employer who shall not have elected to come within such provisions that the employee either expressly or impliedly assumed the risk of the hazard complained of, or that he was guilty of contributory negligence, but such negligence shall be considered in assessing the amount of recovery.

It is contended that the defendant was within the terms of the act by reason of having fifteen persons in the employ of its electric-light and waterworks plant, and that therefore the ordinary defenses of assumption of risk and contributory negligence do not apply. Assuming, without deciding, that a municipal corporation like the defendant, if employing the requisite number of persons in such plant, should be deemed to be an employer within the meaning of the act in question, it must be held that the testimony failed to show that fifteen persons were thus employed. The number could not be completed without including mere clerical employees in the office of the city clerk. The testimony showed that the plant was located at the old fairgrounds, where there was a stone building, also equipment for operating the plant; that a bookkeeper and a stenographer at the city clerk's office performed the clerical duties, which included entries with reference to the light, water and street departments.

Section 6 provides that the act shall apply only to the employment in the course of the employer's trade or business on, in or about a railway, factory, mine or quarry, electric, building or engineering work, laundry, natural-gas plant, and all employments wherein a process requiring the use of any dangerous explosive or inflammable materials is carried on, which is conducted for the purpose of business, trade or gain;

each of which employments is hereby determined to be especially dangerous, in which from the nature, conditions or means of prosecution of the work therein, extraordinary risk to the life and limb of the workmen engaged therein are inherent, necessary or substantially unavoidable. The title of the act is:

"An Act to provide compensation for workmen injured in certain hazardous industries."

It is not within the letter or spirit of this statute that clerical employees like the clerk and stenographer in the city clerk's office should be included within the list of those engaged in the hazardous enterprise of operating an electric-light and waterworks system.

Considerable argument has been directed to the proprietary character of the work involved, but as the city makes no claim of exemption on the ground of exercising governmental functions, that matter need not be considered.

This leaves one question: whether or not, considering the case as an ordinary common-law action for damages, it can be said that the court erred in sustaining the demurrer to the evidence. In other words, Did the evidence of plaintiff show or tend to show actionable negligence on the part of the city? The deceased was foreman of the water lines, had been foreman a long time, had had the running of the old plant, and was well informed as to the situation and condition. It was attempted to be shown by a subsequent statement of the superintendent that the latter had stepped away to find some timber or boards to place under the pipe to hold it up, and when he returned he found that Udey was dead, but this was excluded as not part of the *res gestæ*. From the evidence, we have only this situation: The pipe was suspended above the surface of the ground, and underneath was an excavation or ditch two and a half to three and a half feet deep; Udey undertook to remove a portion thereof without placing any supports thereunder; that he had an S wrench for the purpose of removing the taps from the bolts which held the sections of the pipe together; that a natural way to remove those on the under side would be to work in the ditch underneath, although by reaching over and around, the nuts could be loosened without getting

underneath the pipe; that Udey was found in the ditch crushed to death by a portion of the pipe which had fallen upon him; that it had broken off where it joined the flanges and the broken or largest end had fallen upon him, a part of the bolts from the flanges at the place where the pipe had broken having been removed; the wrench was in his jacket over his chest, not in his pocket, but sticking where it had been crushed in his clothing where the pipe was lying on him. No board or other material was seen near the place by which the pipe could have been supported. The foreman testified, among other things, that—

"At the time Udey was killed they were undertaking to take out a piece of the pipe to take to the present water works and install it there as a part of its equipment; that he desired to take something like seven feet of this pipe, and that it was to be taken between two joints, and that Udey was to commence on the eight inch pipe; that in order to do this it would be necessary to unbolt at the joints; that Udey was taken there by him for the purpose of unbolting these joints; that there was nobody there except Udey and himself, and that he was not present when the pipe fell."

He testified that it would have been possible for any one working there to put a board under the end of the pipe, as the piece they were working on had to be unbolted near the filter tub. A witness, H. B. Dix, testified that the bolts had all been removed from the flanges at the basin at the east end and that a part of the bolts had been removed from the flanges at the place where it broke and fell on the deceased. T. B. Myers, who had been superintendent of the old water plant, testified, among other things, that while theoretically it might not be necessary to get under the pipe, from a practical point of view he thought it would; that if he had been working there he would have thought the practical thing would have been to get under the pipe to loosen the under bolts, and that he thought it would be necessary; that it was necessary to shore up the pipe and keep it from falling into the ditch; that it was his judgment that it was best to shore this pipe up in the first instance in order to loosen or release the bolts; that Udey had some practical knowledge and might know what was necessary to be done in and about the work which he had been engaged in.

True, Udey was attempting to remove the pipe under the order or direction of the foreman Welfelt. But there is noth-

ing whatever to indicate that Udey did not have as full and complete a knowledge and comprehension of the nature of the work and the dangers incident thereto as Welfelt had. On the contrary, it appears that he was quite familiar with the situation, the dangers of which were apparent. It is clear that Udey did proceed to unbolt the pipe without its being supported so as to prevent its falling when it should come apart. But in order for the plaintiff to recover, some actionable negligence on the part of the city must appear—negligence which does not unavoidably involve contributory negligence or assumption of risk on the part of the deceased. In what way the body came to be in the ditch, whether by accident or design, we do not know, and verdicts can not rest on conjecture. (*By-land v. Powder Co.*, 93 Kan. 288, 144 Pac. 251, and cases there cited.) The rule that it is the duty of the master to provide a safe place to work does not apply to a place made dangerous by the very work being done. (*West v. Packing Co.*, 86 Kan. 890, 122 Pac. 1024.) And in attempting to remove the pipe without support the work necessarily became more and more dangerous as it progressed—a fact which must have been apparent to the deceased.

But aside from all this, if we assume or infer from the evidence that the death was caused by a fall of the pipe resulting from Udey's being put to work in a place unsafe because the pipe was not supported, and that in thus putting him to work the city through its superintendent was guilty of negligence, it is still inescapable that the danger was apparent to him as well as to the superintendent, that he was equally at fault, or sufficiently at fault, in proceeding without complaint and without taking measures to protect himself, to bar a recovery. (*Metz v. Railway Co.*, 90 Kan. 463, 135 Pac. 578; 2 M. A. L. p. 396.)

The judgment is therefore affirmed.

No. 19,933.

THOMAS A. FRAZIER, *Appellee*, v. THE MISSOURI PACIFIC
RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Personal Injuries — Damages — Compromise and Settlement.* The plaintiff was injured by the defendant's negligence. While yet under the influence of anæsthetics, he settled his claim for damages. Afterward he wrote a letter to the defendant's superintendent ratifying the settlement and asking for a position on the road. The evidence showed that this letter was written at the suggestion and in the presence of a special agent of the defendant and was delivered to him; that he gave the letter to the superintendent, who referred it to the claim agent that made the settlement, and endeavored to find a position for the plaintiff, but when this action was commenced had not succeeded. This evidence was not sufficient to warrant the court in submitting to the jury the question of fraud in procuring the letter to be written.

2. SAME. A letter containing this language, "I would like some kind of position with your company, as I settled fairly with the Company and without any trouble," voluntarily written after recovery from injuries sustained and with full knowledge of all circumstances, is a ratification of the settlement therein mentioned.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed February 12, 1916. Reversed.

*W. P. Waggener, A. E. Crane*, both of Atchison, and *O. H. Bentley*, of Wichita, for the appellant.

*S. B. Amidon, Jean Madalene*, and *S. A. Buckland*, all of Wichita, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff recovered a judgment for $8000 for the loss of two fingers and an injury to a third one on his left hand, caused by the defendant's negligence. The defendant appeals.

The plaintiff was injured while attempting to board one of the defendant's passenger trains. On the next day, about twelve hours after the injury and while the plaintiff was under the influence of anæsthetics administered to him during

the amputation of his fingers, the defendant's claim agent went to the hospital to see the plaintiff and informed him that when he desired to settle the claim against the company to call him, the claim agent. The afternoon of that day the claim agent was called and settlement was made by which the defendant paid the plaintiff $450 and agreed to pay his doctor bills and hospital charges. The plaintiff was then still under the influence of anæsthetics and knew nothing of this settlement. About two weeks thereafter he was discharged from the hospital and was informed of the settlement by his wife. Two months after being discharged from the hospital the plaintiff wrote A. H. Webb, the defendant's superintendent at Wichita, as follows:

"I am the man that was hurt in Wichita Yard at Station. And I was advised to write you in regards to position. As I only have one hand at present it is impossible for me to hold the place as order Clerk, at Wichita Wholesale Groc Co and I would like some kind of position with your company, as I settled fairly with the Company and without any trouble. I have several Friends on the Mo. Pac. Ry. for Reference."

1. The defendant argues that this letter ratified and confirmed the settlement. The plaintiff contends that he was induced to write this letter by fraud on the part of the defendant. The evidence on this question shows that the plaintiff wrote the letter at the suggestion and in the presence of Bruce Cornet, who stated to the plaintiff that he was the special agent of the defendant, and said in substance that if the plaintiff would write to Superintendent Webb he could probably place the plaintiff in a position in the service of the company. The letter was delivered to Bruce Cornet, and by him given to Webb. Webb referred the letter to the claim agent that made the settlement for the defendant, and tried to find a position for the plaintiff. No position was found for him. This action was begun two months later. There was no evidence that any promise of a position of any kind was made to the plaintiff to induce him to write the letter; neither was there any evidence to show that any suggestion was made as to what the letter should contain.

Was there evidence sufficient to warrant the court in submitting to the jury the question of fraud in inducing the plaintiff to write the letter? What circumstance shows fraud?

None that we can see.   The suggestion might have been fraud-
ulently made, but there is no evidence of any kind to show that
it was so made.   "Good faith is presumed, and need not be
proved."   (*Weybrich & Co. v. Harris,* 31 Kan. 92, syl. ¶ 3, 1
Pac. 271.)   Fraud is never presumed.   It must be established
by evidence.   (*Long Bros. v. West & Co.,* 31 Kan. 298, 1 Pac.
545; *Baughman, Sheriff, v. Penn,* 33 Kan. 504, 6 Pac. 890;
*Bliss v. Couch,* 46 Kan. 400, 403, 26 Pac. 706; *Gleason v. Wil-*
*son,* 48 Kan. 500, 29 Pac. 698; *Hasie v. Connor,* 53 Kan. 713,
720, 37 Pac. 128; *Richolson v. Freeman,* 56 Kan. 463, 466, 43
Pac. 772; *Gilmore v. Swisher,* 59 Kan. 172, 52 Kan. 426.)   We
are not unmindful of the fact that fraud is rarely susceptible
of positive proof, but that does not dispense with the necessity
of producing evidence to show that fraud existed.   It is not
enough to produce evidence to show that fraud might have
been practiced.   Evidence must be introduced to show that
fraud was practiced.   That evidence need not be direct; it may
be circumstantial, but it must be sufficient to convince a rea-
sonable man that fraud existed.   (6 Encyc. of Ev. 50, 51.)

"A charge of fraud can not be sustained by mere insinuation and
suspicion, strained inference, doubtful or suspicious circumstances, or
mere conjecture; and evidence which produces a vague misgiving is not
enough.   Where the evidence is capable of an interpretation which makes
it equally as consistent with defendant's innocence as with his guilt, that
meaning must be ascribed to it which accords with his innocence."   (20 .
Cyc. 121.)

Applying these rules, we must conclude that there was not
evidence sufficient to warrant the court in submitting to the
jury the question of fraud in inducing the plaintiff to write
the letter to Webb.

2.   What was the effect of the letter?   The plaintiff said,
"I would like some kind of position with your company, as I
settled fairly with the Company and without any trouble."   A
shorter statement is, "I setted with the company."   The de-
fendant contends that this constitutes a ratification of the re-
lease signed by the plaintiff.   The court in effect instructed
the jury that the letter ratified the settlement unless the letter
was procured to be written by fraud.

"A ratification is defined to be the confirmation of a previous act done
either by the party himself or by another; it is the confirmation of a
voidable act.   23 Am. Eng. Encycl. L. 889.   And a confirmation neces-

sarily supposes a knowledge of the thing ratified. *Blen v. Bear River, &c., Mining Co.,* 20 Cal. 613; *San Diego Railroad Co. v. Pacific Beach Co.,* 112 Cal. 53. It follows, then, that in order to constitute a ratification there must be an acceptance of the results of the act with an intent to ratify and with full knowledge of all the material circumstances. *Ansonia v. Cooper,* 64 Conn. 544." (*Russell v. Erie Railroad Co.,* 70 N. J. Law, 808, 816, 59 Atl. 150, 67 L. R. A. 433, 437.)

The letter is before us. Its language is clear and plain. Parol evidence is generally inadmissible for the purpose of showing that the words used were not intended to have the legal effect ordinarily following their use. (*Gowans v. Pierce,* 57 Kan. 180, 45 Pac. 586.)

"The construction of written instruments is a question of law for the court, and ordinarily it is error to submit such a question to the jury." (*Shear Co. v. Thompson,* 80 Kan. 467, syl. ¶ 1, 102 Pac. 848.)

(See, also, *Warner v. Thompson,* 35 Kan. 27, 10 Pac. 110; *Bell v. Keepers,* 37 Kan. 64, 14 Pac. 542; *Cosper v. Nesbit,* 45 Kan. 457, 25 Pac. 866; *Ellis v. Woodruff,* 88 Kan. 734, 738, 129 Pac. 1193; 9 Cyc. 591.)

"But where the construction of a written contract depends upon extrinsic facts as to which there is a dispute, its construction is a mixed question of law and fact, and is for the jury under proper instructions from the court." (9 Cyc. 591.)

The construction of this letter does not depend on any extrinsic fact about which there is a dispute. The plaintiff made the settlement. At the time he made it he was under the influence of anæsthetics. That fact does not modify the meaning to be attached to the language used in the letter written when not under the influence of anæsthetics. What did the plaintiff mean when he said, "I would like some kind of position with your company, as I settled fairly with the Company and without any trouble?" There is only one answer. That answer is, "I settled with the company." If he settled with the company this action is at an end. By using that language the plaintiff in effect said, "Any claim I may have had against the company has been settled." He then recognized that he had settled with the defendant, acknowledged that settlement as such, and confirmed and ratified it.

The judgment is reversed. It is directed that judgment be entered for the defendant.

No. 19,935.

THE OGALLAH ELEVATOR COMPANY, *Appellant,* v. FRED
HARRISON, *Appellee.*

SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Servant Engaged in Outside Business—Master no Claim to Earnings.* The rule that a servant must account to his master for earnings received from outside employment ordinarily relates to employment in the same kind of business in which his master is engaged and does not relate to the servant's earnings in another kind of business in which his master is not interested and which is not inimical or prejudicial to his master's business.

2. SAME. The plaintiff employed the defendant to manage its business of buying and selling grain and coal and to keep open during business hours its offices and warehouses and to keep its books and accounts. The defendant with the knowledge and acquiescence of plaintiff undertook for another employer the business of selling flour, a business which the plaintiff had considered and decided not to engage in. No complaint was made that the defendant neglected plaintiff's business on account of the other employment. *Held,* that the defendant's earnings in the sale of flour are his own property and the plaintiff has no legal claim thereto.

3. MANAGER OF CORPORATION—*Not a Guarantor of Credits Extended.* Ordinarily a manager of a business is not a guarantor of its credits extended nor an insurer against mistakes, and in the absence of negligence, he is not personally liable for an uncollectible debt.

4. SAME—*Use of Company's Scales—No Cause of Action Proven.* Where an elevator company lays claim to moneys earned and collected by its manager for the use of its scales, and the jury finds that the amount collected was somewhere between $12 and $30, and that the manager paid out between $10 and $25 for help in operating the scales, and that the manager retained no part of the earnings to his own use, the plaintiff fails to establish its cause of action.

5. TRIAL—*Incompetent Evidence—When Not Prejudicial.* Prejudicial error can not be based upon the admission of incompetent testimony when it is not shown to have improperly affected the result.

Appeal from Trego district court; JACOB C. RUPPENTHAL, judge. Opinion filed February 12, 1916. Affirmed.

*Herman Long,* of Wa Keeney, for the appellant.

*E. A. Rea,* of Hays, *Lee Monroe, James A. McClure,* **and** *C. M. Monroe,* all of Topeka, for the appellee.

19—97 KAN.

The opinion of the court was delivered by

DAWSON, J.: The Ogallah Elevator Company brought this action against Fred Harrison, who served as its manager from November, 1909, until March, 1912, to recover $40.90 which he had paid to one Jeff Belveal without authority, and to collect from Harrison $180 which he had earned and received for the sale of flour for a rival elevator company while in the plaintiff's employment, and also to collect from defendant $40 which he had collected from various persons for the use of plaintiff's scales.

The defendant answered by pleading the statute of limitations and an audit and settlement as to the Belveal item; that the money received for the use of plaintiff's scales had been paid out with plaintiff's consent for work and labor; and that the sale of flour for the rival elevator did not interfere with his duty to plaintiff and that plaintiff lost nothing thereby, and that he had done this work with the knowledge and consent of plaintiff and its officers.

Plaintiff replied that any settlement touching the Belveal item and for the use of the scales had been procured by defendant's fraud and concealment, and made without authority and without its knowledge or ratification; and that if any officer consented to or acquiesced in defendant's employment to sell the rival elevator's flour, it was without authority from plaintiff.

The special findings and general verdict were in favor of defendant. The plaintiff assigns many errors in the admission and exclusion of evidence, in the instructions, and in the general result. Such of these as may have been of sufficient consequence to affect the final result will be noted.

1. Much of appellant's brief is devoted to its claim to the $180 earned by the defendant in the sale of flour for a rival elevator. The plaintiff was engaged in dealing in grain and coal. It was not engaged or concerned in the business of dealing in flour. It had considered the advisability of doing so, but on account of lack of funds it decided not to undertake it. The defendant's employment required him to attend to its business and keep its funds and accounts, and its offices and warehouses were to be opened for business from seven o'clock

a. m. until six o'clock p. m., or later if business demanded it. It was clearly shown that the plaintiff knew, through the only way a corporation can know—by notice to its president and directors—that the defendant was handling this flour, and it took no action to stop it as inimical to its business. If the plaintiff had any grievance on this account its action would be for breach of contract or in tort. It certainly has no legal claim to defendant's earnings. The case is not to be considered as if the plaintiff itself were dealing in flour and had employed the defendant for that purpose. The president of the plaintiff company testified:

"I remember the occasion of his (defendant's) accepting employment from the Wheatland Elevator Company; before he accepted that employment there had been talk about handling flour by the directors of the Ogallah Elevator Company at a meeting that they held; it had been discussed at different times while I was on the board, and the company was financially embarrassed, and was n't able to build a building, so that they could handle this stuff, and they did n't feel as though they would like to go in debt in order to handle it; we supposed naturally that the sale of flour would draw trade for our other business; we were buying wheat, some corn, and handling coal. . . . I can recollect it, it had been talked through the board, and we all understood it, and the stockholders all knew it, and I said as far as I am personally concerned, that you can handle that flour, providing that it don't interfere with our other business; I don't know how soon he commenced handling the flour after that; I did learn of it after he commenced; I understood all the time he was handling it that he was getting pay from the Wheatland Elevator Company and I understood that he was keeping that pay for himself; I never made any objection to this because it was talked among the board, and a number of the board, and while they did n't all of them, did n't sanction it, they did n't say for him not to handle it. They all knew it and they never objected; that is, to the board; it was n't brought up before the board as I remember; the reason for this was talked over among themselves that he was n't getting hardly enough wages to justify him in staying there, and he had a position offered him for more wages, and we, I think part of the board, perhaps all of it, I could n't say, agreed to let him—agreed that if he handled that, he could use—collect the money for his own affairs. I got that started wrong. The intention was to help out his salary, and he was talking of leaving, and I says: 'We can't afford to let Fred go; we have had him here ever since the elevator started, and he knows more about the business, and he came here green and inexperienced, and he did n't know anything about bookkeeping, and had to learn everything, and after we had learned him, or he had learned himself rather, that I thought best that we keep him right on the job, and by helping his salary out on the

side by handling this flour, why, he was willing to stay with us a little while longer. This was talked over in a general way. I don't say it was talked over at the board, but in a general way, and the outsiders and the stockholders all knew of this thing, because I talked with different ones both stockholders and directors."

Whether this situation of affairs is viewed as an acquiescence on the part of the plaintiff as found by the jury (10 Cyc. 1065; 16 Cyc. 714), or as showing the nature of plaintiff's claim to defendant's earnings in the sale of the flour, the result was correct (*Wheeler & Tappan Co. v. Dahms*, 50 Ill. App. 531; *Hillsboro National Bank v. Hyde*, 7 N. Dak. 400, 75 N. W. 781; *Clarke v. Kelsey*, 41 Neb. 766, 60 N. W. 138; 26 Cyc. 1020; 5 Labatt's Master and Servant, 2d ed., § 2037).

The gist of the cases just cited is to the effect that the employer can not claim as his own the earnings of his servant from an independent employment on an unrelated business. The appellant recognizes this rule, but has been led astray in its application. Its idea appears to have been that since the dealing in flour could have been associated conveniently with the plaintiff's grain and coal business, it was entitled to the earnings on the flour business. Moreover, plaintiff's long acquiescence in defendant's outside employment estops it to claim his outside earnings.

2. Turning next to the item of $40.90 which was alleged to have been paid to Belveal without authority: While not directly pleaded by defendant that it was paid out by mistake, the plaintiff was apprised of that fact. Plaintiff's counsel said as much in his opening statement to the jury. The evidence showed that the plaintiff owed Belveal for wheat and Belveal owed the plaintiff for coal, and in settling accounts the defendant, as agent for the plaintiff, paid Belveal $40.90 too much. It was clearly shown to have been an innocent mistake, and when discovered it was charged against Belveal's account. No fair interpretation of defendant's contract of employment bound him as a guarantor of the credits extended by the plaintiff. Technically, counsel for appellant is right in his contention that defendant should have pleaded that he paid out this money by mistake. But when plaintiff knew this fact as shown by the opening statement of its counsel, and it was clearly established and uncontroverted by the evidence,

shall we now, on account of defendant's failure to plead the mistake, reverse this case and send it back to the trial court, which would in furtherance of justice permit him to amend his answer in that particular? Since there is no dispute as to the fact, and plaintiff does not even suggest that it was misled and does affirmatively show that it was fully apprised of the facts, the revised code forbids a reversal on such a ground. (Civ. Code, §§ 141, 581; *Root v. Packing Co.*, 94 Kan. 339, 345, 147 Pac. 69; *Hamilton v. Railway Co.*, 95 Kan. 353, 359, 360, 148 Pac. 648.)

3. Appellant has some slight ground for its complaint touching the rulings of the court on the admission of evidence relating to the moneys collected by the defendant for the use of the scales. The authorities cited which show that the plaintiff was not entitled to defendant's earnings in the sale of flour, an independent business from that in which the plaintiff was engaged, are just as precise and definite to the effect that defendant's earnings within the scope of the employer's business belong to his employer. Moreover, the keeping of an accurate account of the moneys which in any way pertained to plaintiff's business was one of the matters clearly covered by defendant's employment, and this duty and obligation ought not to be lightly excused by informal assent on the part of individual officers or directors. But the facts, based upon competent testimony, are shown by the findings of the jury:

"7. Did the defendant during his employment by the plaintiff do certain weighing for compensation on plaintiff's scales without accounting to said association for such compensation? Answer: Yes.

"8. If you answer No. 7 'yes,' how much money did he receive for such weighing? Answer: Amount not shown to be less than twelve or more than thirty dollars.

"9. How much money did Fred Harrison pay out on account of help in the matter of weighing hay? Answer: Amount not shown to be less than ten or more than twenty-five dollars.

"10. Did Fred Harrison retain for his own use any of the money taken by him on account of weighing hay? If so, how much? Answer: No."

These findings fail to show that the defendant owed the plaintiff anything on this item. He did fail to keep an account. He did not appropriate the scale earnings to his own use. So said the jury. How then can it be material whether the evidence which was introduced was competent or incompetent to show whether the plaintiff had authorized by positive

sanction or by acquiescence the appropriation of the scales' earnings to defendant's personal use?

We have carefully considered the other questions presented, but do not deem it necessary to comment on them. We note the appellant's criticisms of the trial court's many adverse rulings to its objections to the evidence. Most of the evidence objected to covered the action of the board of directors ordering a dismissal of this suit, and the attitude of individual officers and directors towards the appropriation of the scales' moneys by the defendant. As we view the case, the evidence was probably incompetent, but we fail to trace prejudicial error to its admission.

In the voluminous abstracts and copious briefs, which show clearly the diligence and zeal with which counsel for both litigants have presented this cause, these controlling facts appear: (a) the plaintiff has no legal claim on defendant's earnings on the sale of the Wheatland Company's flour; (b) the defendant was not personally liable for the money paid to Belveal by mistake; and (c) while defendant was bound by his contract of employment to keep an accurate account of the scales' earnings and failed to do so, he did have authority to pay out these moneys and did pay them out for services in plaintiff's behalf, and the jury found that none of the scales' moneys was appropriated to the defendant's private use. Thus the issuable and controlling facts have all been settled by the jury adversely to plaintiff's contention; and since no prejudicial error can be detected, the judgment must be affirmed.

---

No. 19,937.

THE CAPITAL CITY VITRIFIED BRICK & PAVING COMPANY, *Appellant*, v. THE CONCORDIA LUMBER COMPANY, *Appellee*.

SYLLABUS BY THE COURT.

APPEAL—*Record—Transcript of Evidence—Duty to Furnish—Review.* To obtain a review of rulings upon the admission of evidence, or of questions which depend upon the evidence, a transcript of the stenographer's notes of the testimony and the proceedings at the trial should be procured and filed in the way prescribed in section 574 of the civil code; and where a complete transcript has not been made and filed, and there is no agreement of counsel that the record presented contains all the evidence on any particular issue or matter, no

questions arising on the evidence can be considered, and as the only questions assigned for error in this appeal require the consideration of the evidence which has not been transcribed, the appeal must be dismissed.

Appeal from Cloud district court; JOHN C. HOGIN, judge. Opinion filed February 12, 1916. Dismissed.

*Edwin L. O'Neil,* of Topeka, *Homer E. Kennett,* and *Olin W. Hunter,* both of Concordia, for the appellant.

*Park B. Pulsifer,* and *Charles L. Hunt,* both of Concordia, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: The Capital City Vitrified Brick & Paving Company brought this action against The Concordia Lumber Company to recover the sum of $362.50, the contract price for a shipment of 40,000 building and 1500 pressed brick ordered by the defendant company and shipped, according to directions, to Hollis, Kan., where they were intended to be used. The defendant refused to accept and use the brick, upon the ground that those furnished as building brick were unfit for use and not the kind of brick that it had purchased, and the 1500 pressed brick were so mixed with the other brick that it was impracticable to separate and use them. A counterclaim of twenty dollars was presented in the answer by defendant to pay the loss resulting from plaintiff's breach of contract. The trial resulted in a judgment for defendant, and upon this appeal the plaintiff insists that error was committed in admitting testimony, in refusing to submit certain interrogatories that were requested, and in the giving and refusing of instructions.

To review these rulings a consideration of the evidence and the proceedings of the trial court is essential. It appears that only a part of the oral evidence has been transcribed, and the defendant insists that he is unable to test plaintiff's abstract by the transcript or make a counter-abstract that will correctly present the errors assigned. It is conceded that the transcript is not complete, and the defendant asserts that vital and considerable parts of the evidence and proceedings have been omitted. It does not appear that there was any obstacle

in the way of the plaintiff's obtaining a complete transcript. Whether the rulings in admitting testimony, in the submission of special questions, or in instructing the jury, were material can only be determined from an examination of the evidence. The record does not contain a stipulation that all matters material for the disposition of the errors assigned are included in the record, nor is there any agreement of counsel that the evidence is complete on any particular issue.

In *Typewriter Co. v. Andreson,* 85 Kan. 867, 118 Pac. 879, it was said:

"The code prescribes how a record of evidence and proceedings may be preserved for use on appeal, and it is the duty of an appellant who asks a consideration of the evidence or proceedings to make them a part of the record before filing his abstract. (*Baker v. Readicker,* 84 Kan. 489, 115 Pac. 112.) Without a certified transcript or an agreement of parties as to what evidence was offered and received the court can not consider its sufficiency or other questions arising on it." (p. 868.)

In *Readicker v. Denning,* 86 Kan. 79, 119 Pac. 533, it was held that a record of the evidence is made by filing the stenographer's transcript and the burden of doing this devolves upon the appellant, and that to obtain a review of questions depending upon the evidence, the appellant must "procure and cause to be filed an official transcript of all the evidence introduced, except as the necessity therefor may be avoided by agreement of counsel, or by a statement in the transcript that it contains all the evidence on a particular matter." (p. 80.) The same rule was applied in *Davidson v. Timmons,* 88 Kan. 553, 129 Pac. 133, where it was said:

"In the absence of a transcript this court can not settle conflicting claims as to the proceedings in the trial court nor determine whether rulings referred to in the findings of that court on such proceedings may not have been controlled by evidence, admissions or waivers not preserved in the record." (p. 557.)

In the recent case of *McGuire v. Davis,* 95 Kan. 486, 148 Pac. 755, the question was again considered and it was said:

"The appellant was privileged to omit from her abstract any evidence regarded by her as not pertinent to the questions presented. But it was incumbent upon her to have all the oral testimony preserved in a transcript, in order to provide an authentic source to which the appellee might go for whatever additional evidence he wished to bring before the court in a counter-abstract." (p. 491.)

Bank v. Haid.

It may be said that if it were agreed that the testimony in the record included all that is pertinent to any question presented in the appeal, the decision must have been that the finding of the jury determined that the brick furnished were not of the particular kind that were purchased. If those furnished were not the kind contracted for, defendant was not obliged to accept them even if they were of greater value than those purchased.

It appears that none of the other objections is material, but the state of the record is such that we are not warranted in entering upon their consideration. Nothing being open to review here, the appeal is dismissed.

No. 19,938.

THE MANHATTAN STATE BANK, *Appellant*, V. F. H. HAID and ELIZABETH HAID, *Appellees*.

SYLLABUS BY THE COURT.

1. WILL—*Interpretation—Power Vested in Executors—Equitable Conversion of Real Estate into Personalty.* The provisions of a will interpreted, and held that it did not confer on the executors naked power to sell real estate and distribute the proceeds to heirs who took title by descent, but that on the death of the testatrix an equitable conversion of the real estate into personalty took place and title passed to the executors to enable them to carry out certain trusts created by the will.

2. SAME—*Partition Agreement—Executor's Deed to Wife of Executor Valid—Creditor's Bill.* In order to carry out a partition agreement among heirs the executors of the will referred to executed to the wife of one of them an executor's deed purporting to convey a tract of land apportioned to the grantee's husband by the partition agreement. It was believed a deed from the two executors would not be valid if one of them were named as grantee. The husband delivered the deed to his wife with the firm belief that it placed title to the land in her. The deed was duly recorded, and neither the husband nor wife was then indebted to any one. Some years later the husband became financially involved and one of his creditors now seeks to appropriate the land to the payment of a debt. *Held*, the husband is estopped to deny that the executor's deed had the effect which it was designed to produce, and is estopped to claim the land under any title which he possessed at the time the deed was delivered, and that the creditor's right to the land is no better than that of the debtor.

Appeal from Douglas district court; CHARLES A. SMART, judge. Opinion filed February 12, 1916. Affirmed.

*W. B. Brownell,* of Lawrence, and *C. B. Daughters,* of Manhattan, for the appellant.

*J. K. Codding, C. H. Codding,* both of Leavenworth, *A. C. Wilson,* and *Thomas Harley,* both of Lawrence, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one by a creditor to determine the true ownership of land which it was claimed belonged to the debtor, in order that the land might be sold to advantage to satisfy the creditor's claim. The defendant, the debtor's wife, who asserted title, prevailed, and the plaintiff appeals.

The district court made findings of fact, the correctness of which is not disputed. The findings state that Barbara Haid, the owner of the land, died testate. The will was duly probated, and F. H. Haid and Edward Haid, sons of the testatrix named as executors in the will, duly qualified as such. The will provided that the real and personal property belonging to the testatrix at the time of her death should be sold and converted into money. Certain obligations were to be satisfied and certain sums were to be invested and the income paid to grandchildren until they became of age. Subject to these provisions, the proceeds derived from the sale of the property were to be divided among the five children of the testatrix in certain proportions. One child, however, was to receive the income only of her share, for her life, when her share was to become the property of her children. The executors were made trustees to invest funds to the best advantage and otherwise carry out the trusts created. The children of the testatrix, being adults, agreed upon a division of the property, some taking land and some taking money. The agreement was not in writing but was fully performed. By the agreement the land in controversy was apportioned to F. H. Haid. In order to carry out the agreement an executors' deed was made. It was supposed that an executors' deed naming one of the executors as grantee would not be valid. F. H. Haid's wife, Elizabeth Haid, was made the grantee in the deed, which was approved

by the probate court.  F. H. Haid delivered the deed to his wife, and did so with the firm belief that it placed title to the land in her.  The land was occupied at the time by F. H. and Elizabeth Haid as their homestead, and neither one of them was then indebted to anybody.  The deed was dated June 26, 1905, was recorded on June 29, 1905, and title to the land has ever since remained where it then was.  In the year 1910 F. H. Haid became indebted to the plaintiff, and if the land belongs to him it is subject to sale under an attachment levied in October, 1912.

The plaintiff contends that the will gave the executors no title to any part of the estate of the testatrix, that they were given naked power to sell and distribute the proceeds to the heirs, who were also devisees, that F. H. Haid took title by descent from his mother and became owner in severalty by the partition agreement, that the executors' deed had no office to perform so far as a transfer of title was concerned, that it conveyed nothing to Elizabeth Haid, and consequently that the land is the property of F. H. Haid.

There is abundant authority that an equitable conversion of the real estate took place to enable the executors to carry out the trusts created by the will.  Express words giving title to executors are not essential to equitable conversion when such is the necessary effect and intention of the will.  It was impossible to carry out this will unless the entire estate passed as personalty.  The persons who were to receive shares of the estate under the will were not those who would inherit if there were no will.  There were five heirs, but one of them was deprived of her share of the estate by the will and was given merely an income for life.  The will spoke from the date of the death of the testatrix, the conversion took place at that time, rights were fixed at that time, and the real estate did not descend as such to Barbara Haid's heirs.  It was permissible for the beneficiaries of the will to agree upon a division of the estate satisfactory to themselves and to agree to accept property in kind to avoid a sale.  The parol partition, however, had no effect on the devolution of title at the time of the death of the testatrix.  After the partition F. H. Haid held the title to no more land by descent from his mother than before the partition.  The entire estate was in contemplation

of the law personalty, the legal title to which was vested in the executors to accomplish the purposes of the will.

The plaintiff says it has been decided by this court that where executors are merely authorized to sell and divide the proceeds among heirs there is no conversion, citing, *Bank v. Murray,* 86 Kan. 766, 121 Pac. 1117; *Ward v. Benner,* 89 Kan. 369, 131 Pac. 609; *Smith v. Hensen,* 89 Kan. 792, 132 Pac. 997, and *McLeod v. Palmer,* 96 Kan. 159, 150 Pac. 535. The effect of these decisions is correctly stated. They do not govern the present controversy, however, because the will of Barbara Haid did not invest her executors with naked authority to sell and to divide proceeds among her heirs.

Conversion of the land into personalty is not insisted upon as forbidding its seizure by attachment in 1912 if it then belonged to F. H. Haid. Conversion is important, however, in considering the title of Elizabeth Haid. When the parol partition was made F. H. Haid did not hold by descent from his mother and did not have a legal title of any kind, but the legal title was vested in the executors as if the land were personalty. In order to carry out the partition agreement an executors' deed was deemed essential. It was believed that a deed from two executors would not be valid if one of them were the grantee. The deed was made to Elizabeth Haid, was delivered to her by F. H. Haid and was delivered with the firm belief that it placed title in her. The plaintiff says the court did not find that F. H. Haid "intended" to place title in his wife. The court did find the facts concerning the conduct and the belief of adult, rational persons, and these are reliable indexes of intention. It would be quite remarkable if F. H. Haid did not intend to do what he firmly believed he was doing. Whether the deed be considered as a conveyance of land or as an assignment by the executors of F. H. Haid's share of the estate considered as personalty, he executed and delivered the deed to Elizabeth Haid in order to invest her with title to the share of the estate alloted to him by the partition agreement. Whether the instrument were valid or invalid as a conveyance or as an assignment, whether it carried any title to Elizabeth Haid or not, F. H. Haid is estopped to deny that the deed had the effect which it was designed to produce, and is estopped to claim under a title which he possessed at the time the deed

was delivered. This would be true even if equitable conversion had not taken place. Of course the plaintiff can appropriate the land only in virtue of F. H. Haid's right to it. Cases relating to estoppel of one who executes a deed as executor or administrator to set up an existing title in himself are collated in a case note in 21 L. R. A., n. s., at page 60. A later case reported in the same series (32 L. R. A., n. s., 854) is that of *Bliss v. Tidrick,* 25 S. Dak. 533, 127 N. W. 852.

The plaintiff says there was no consideration for the deed. The absence of a consideration to the executors merely goes to the validity of the instrument considered as an executors' deed, which is not material. As between F. H. Haid and his wife no consideration was necessary. Not being indebted to anybody and there being no fraud in the transaction, F. H. Haid could place the title to his share of his mother's estate wherever he desired. The presumption is the land was a gift from husband to wife. (*Olson v. Peterson,* 88 Kan. 350, 128 Pac. 191; *Clester v. Clester,* 90 Kan. 638, 136 Pac. 236; *Page v. Pierce,* 92 Kan. 149, 153, 139 Pac. 1173.)

In making application for a loan F. H. Haid stated the land belonged to him and that he had inherited it. The representation was not binding upon Elizabeth Haid. Elizabeth Haid permitted her husband to manage the farm, collect rents, pay taxes, etc. The finding is that she did this with the knowledge and with the consent which a wife and mother usually has and gives concerning business matters of her husband when he is managing her property. Conduct of this character is not sufficient to defeat a title once acquired, and whatever the conduct of Haid and his wife may have been subsequent to the delivery of the deed, the findings conclusively show that title then vested in her.

The judgment of the district court is affirmed.

No. 19,940.

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JEFFERSON, *Appellant,* v. THE DELAWARE RIVER DRAINAGE DISTRICT OF JEFFERSON COUNTY, *Appellee.*

#### SYLLABUS BY THE COURT.

DRAINAGE DISTRICT—*Public Corporation—Ditches Crossing Highway— Expense of Bridges—District Not Liable.* A drainage district organized under chapter 215 of the Laws of 1905 is a public corporation created by the legislature to perform public functions. Neither by common law nor by statute is any duty imposed upon the drainage district to build or maintain bridges where its ditches cross a public highway, and therefore the board of county commissioners can not maintain an action against the district to recover the expense of constructing such bridges.

Appeal from Jefferson district court; OSCAR RAINES, judge. Opinion filed February 12, 1916. Affirmed.

*H. T. Phinney,* county attorney, *W. P. Waggener, James M. Challiss,* and *A. E. Crane,* all of Atchison, for the appellant.

*S. D. Bishop,* of Lawrence, for the appellee.

The opinion of the court was delivered by

PORTER, J.: In 1905 the Delaware river drainage district was duly organized in Jefferson county under the provisions of chapter 215 of the Laws of 1905 (Gen. Stat. 1909, § 3000 *et seq*). Thereafter the corporation proceeded to establish a system for the drainage of lands included in the district, and it became necessary to cut ditches across certain public highways. At three of these places the county board some years later was obliged to erect bridges, and afterward brought this action to recover from the drainage district the cost and expense thereof, aggregating over $12,000. The court sustained a demurrer to the petition and rendered judgment in defendant's favor for costs. The plaintiff appeals.

The only question for determination is whether the county can recover from the drainage district. The plaintiff relies largely upon the principle which controlled the decision in *The State v. Irrigation Co.,* 63 Kan. 394, 65 Pac. 681. That

was a case where a private corporation constructed an irrigation canal for its own purposes. At a place where the canal crossed a public highway it became necessary to construct a bridge. The statute under which the irrigation company constructed the ditch expressly made it the duty of the proprietors of any such irrigation canal to build all necessary bridges and viaducts for the use of the public in crossing. (Laws 1891, ch. 133, art. 4, § 31, Gen. Stat. 1901, § 3677.) It was therefore held to be the duty of the corporation to erect the bridge. And it was held, also, that this duty rested upon the irrigation company independent of the statute, upon the same principle which compels a railway company, where its railroad intersects a public highway, to restore the highway to its former condition of usefulness, and, if necessary to accomplish that end, to erect and maintain bridges. It is well established that this liability is imposed upon a private corporation by common law. (*The State v. Irrigation Co.,* supra, and cases cited in the opinion.) But that principle has no application to a case where the construction of ditches or embankments by a public corporation makes it necessary to improve a highway. The drainage district, like the county, is a quasi public corporation, an arm of the state, created by the legislature to perform a function of government. It derives its authority to exist from the same source as does the county. Both were created by and exist at the pleasure of the legislature. (*In re Dalton,* 61 Kan. 257, 59 Pac. 336; *The State v. Lawrence,* 79 Kan. 234, 100 Pac. 485.)

"That body [the legislature] defines the limits of their powers, and prescribes what they must and what they must not do." (*The State, ex rel., v. Commissioners of Shawnee Co.,* 28 Kan. 431, 434.)

In draining the swamps and lowlands of the district, the drainage board performs a public service and promotes the public health and welfare. Section 35 of chapter 215 of the Laws of 1905 (Gen. Stat. 1909, § 3034) declares the purpose of the act to be "to encourage the improvement of natural watercourses, to protect lands from damage and injury by overflow, and to promote the public health, convenience, and welfare."

The drainage district was incorporated as "a body politic and corporate," to which was granted the "exclusive control

of the beds, channels, banks and of all lands the title to which is vested in the state of Kansas lying between the banks at high-water mark of all natural watercourses within such district." (§ 7, Gen. Stat. 1909, § 3006.)

The fact that the construction of the drains and ditches was intended to and does improve and render more valuable the lands of private individuals, who alone are charged with the cost of the improvement, makes the corporation none the less a quasi public one. Nor does that fact in any sense relieve the county from its duty to maintain and keep the public highways in fit condition for travel. In the act authorizing the creation of the drainage district the legislature made no provision for the payment by the district of the expense of erecting these bridges. No authority is given the district to levy a tax or assessment upon the lands benefited by the drainage system to pay for bridges, at least for those erected after the cost and expense of the system of drainage had been once ascertained and assessed.

The judgment sustaining the demurrer will be affirmed.

---

No. 19,941.

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF WYANDOTTE, *Appellee,* v. W. W. HASKELL et al., *Appellants.*

SYLLABUS BY THE COURT.

TAXATION—*Special Assessments—Sewers—Limitation of Actions.* A special assessment to construct a sewer was levied on land which it is claimed could not be drained or benefited by such sewer. *Held,* that having let the thirty-day period elapse for instituting an action to set aside or in any way contest or enjoin the levy, such defense is now barred.

Appeal from Wyandotte district court, division No. 1; ED-WARD L. FISCHER, judge. Opinion filed February 12, 1916. Affirmed.

*E. S. McAnany, M. L. Alden,* and *T. M. VanCleave,* all of Kansas City, for the appellants; *Samuel Maher,* of Kansas City, of counsel.

*Richard J. Higgins,* of Kansas City, for the appellee.

The opinion of the court was delivered by

WEST, J.: This was an action to foreclose a tax lien for special sewer assessments. The land was adjudged subject to the lien, and the owners appeal.

It was found that the special assessments were ascertained and levied in 1903, and that no suit or action was instituted to set aside or in any way contest or enjoin the levy until the answer in this action was filed, more than eight years after such ascertainment and levy. The statute covering this case provides that—

"No suit nor action of any kind shall be maintained in any court to set aside or in any way contest or enjoin the levy . . . after the expiration of thirty days from the time the amount due . . . is ascertained." (Gen. Stat. 1909, § 994.)

Authorities are cited to show that no right existed to assess the land in question because it could not be drained or benefited by the sewer, but under the rule now well established in this state it is too late to raise that question. (*Rockwell v. Junction City*, 92 Kan. 513, 141 Pac. 299; *Rockwell v. Junction City*, 93 Kan. 1, 142 Pac. 268; *Railway Co. v. City of Chanute*, 95 Kan. 161, 147 Pac. 836; *Arment v. Dodge City*, ante, p. 94, 154 Pac. 219.)

The judgment is affirmed.

---

No. 19,942.

EMILY J. WELLS, *Appellant*, V. MATILDA HANSEN et al., *Appellees*.

### SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Principal and Agent—Agent Repairing Sidewalk—Liability for Agent's Negligence—Pleadings*. A cause of action against an agent for the renting of real property is stated in a petition which alleges that the agent contracted at the time of renting the property to repair a walk thereon; that afterward, being requested by the tenant to repair the walk, the agent employed a man to do the work whom he knew to be careless, negligent, and incompetent; that after some repairs had been made the agent informed the plaintiff, wife of the tenant, that the walk had been inspected and repaired and was all right and safe for her use, although after being repaired the walk was

in a dangerous and unsafe condition; and that the dangerous condition of the walk caused her to fall and break her arm.

2. SAME—*Agent's Misfeasance—Cause of Action Stated.* In such a case a cause of action is stated against the workman; where the petition alleges that the workman employed to make the repairs, after making some repairs, informed the plaintiff, the tenant's wife, that the walk had been inspected and repaired and was all right and safe for her use; alleges that the walk after being repaired was in a dangerous and unsafe condition; and that the plaintiff was injured by reason of the defect in the walk.

3. PLEADINGS—*Amended Petition—Venue.* A petition which fails to state a cause of action may be amended so as to make it state a cause of action, although some of the defendants may not be residents of the county in which the petition is filed and may be attacking the jurisdiction of the court because of such nonresidence.

Appeal from Wyandotte district court, division No. 3; HUGH J. SMITH, judge. Opinion filed February 12, 1916. Reversed.

*Thomas A. Pollock, David F. Carson,* and *James T. Cochran,* all of Kansas City, for the appellant.

*William T. Jamison, J. G. Hutchison, M. J. Ostergard,* all of Kansas City, Mo., and *Thomas J. White,* of Kansas City, for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: In this action the sufficiency of the petition and the jurisdiction of the court are attacked. During the times mentioned in the pleadings, defendants J. R. Richey and Thomas Kent were residents of Wyandotte county and defendants Matilda Hansen and Nels Hansen were residents of Johnson county.

December 21, 1912, the plaintiff filed her petition in the Wyandotte county district court and caused summons to be served on the Hansens in Johnson county on December 23, 1912. January 17, 1913, defendants Hansen appeared specially and moved the court to set aside the service of summons on them on the ground that they were served in Johnson county; that defendants J. R. Richey and Thomas Kent had no interest in the subject matter of the action; that judgment could not be rendered against them, and that they had been made parties to give to the court color of jurisdiction so that

summons might appear to be properly made on defendants Hansen. This motion was denied February 15, 1913. February 19, 1913, defendants Hansen filed a plea in abatement, setting out the same grounds as in the motion. May 10, 1913, this plea, on the motion of the plaintiff, was stricken from the files. March 15, 1913, the plaintiff filed an amended petition. May 14, 1913, defendants Hansen filed their answer to the plaintiff's petition, attacking the jurisdiction of the court and alleging the same matters set out in their motion. May 16, 1913, the plaintiff filed her demurrer to the answer of defendants Hansen. This demurrer was overruled April 4, 1914. The plaintiff filed no further pleading to this answer. March 15, 1914, defendants Richey and Kent filed separate demurrers to the amended petition. These demurrers were sustained July 25, 1914. December 18, 1914, judgment on the demurrers was rendered in favor of defendants Richey and Kent, and the action was dismissed as to defendants Hansen. The plaintiff appeals from the judgment in favor of defendants Richey and Kent and from the judgment dismissing the action as to defendants Hansen.

The amended petition in substance alleges that defendants Hansen were the owners of certain real property in Wyandotte county; that defendant Richey was their agent for the real property and had authority to make repairs, including repairs of walks, and received as compensation for his services a percentage of the rents collected by him; that the plaintiff's husband leased the property from defendants Richey and Hansen for a residence for himself and family and so occupied it; that defendant Richey, at the time of leasing the property, and as a part of the contract, agreed to repair a walk thereon; that after entering on the property the plaintiff and her husband requested defendants Richey and Hansen to inspect and repair the walk; that defendants Richey and Hansen undertook to repair the walk and employed defendant Kent to do the work; that Kent was not a competent person to repair the walk; that he was careless and negligent in repairing and inspecting the walk; that defendants Richey and Hansen knew that Kent was a careless, negligent and incompetent workman; that defendant Kent undertook to make the repairs, but left the walk in a dangerous and unsafe condition;

that the defendants said to and informed the plaintiff that the walk had been inspected and repaired and was all right and safe for the plaintiff's use; that the defendants knew, or by the exercise of care could and should have known, that the walk had not been placed in a safe condition; that afterward the plaintiff, by reason of the defective condition of the walk, fell and broke her arm; and that she was damaged in the sum of $3000.

Three questions are presented for consideration: first, did the amended petition state a cause of action against defendant Richey? second, did it state a cause of action against defendant Kent? and third, did the court have jurisdiction of defendants Hansen?

1. The petition charges specific misconduct on the part of defendant Richey, in employing a workman whom he knew to be careless, negligent and incompetent to make the repairs; and in informing the plaintiff, after the work was done, that the walk had been inspected and repaired and was all right and safe for her use, although, after being repaired, the walk was in a dangerous and unsafe condition. Does the fact that Richey was the agent of defendants Hansen excuse him from liability for injuries sustained by reason of the defective repairs? In *Dowell v. Railway Co.*, 83 Kan. 562, 112 Pac. 136, this court said:

"The contention is that no cause of action was stated against Johnson. . . . It is argued that Johnson, being the agent and servant of the railway company, is not liable for mere acts of nonfeasance, and this appears to be based on the theory that agents are responsible only to their principals, and while they may be held for misfeasance, they are not liable to third parties for mere omission of duty. This contention overlooks the theory that a servant owes duties to third persons as well as to his master. A servant or employee of a corporation can not well escape liability for the nonperformance of a duty which he owes to an injured third party. The distinctions between liabilities of agents and servants for acts of nonfeasance and misfeasance, as well as their liability for the omission of their duties to persons other than their principals and masters, are fully discussed and the authorities cited in case notes appended to *Mayer v. Thompson-Hutchison Building Co.*, 28 L. R. A. 433, *Ward v. Pullman Co.*, 25 L. R. A., n. s., 343, and *Hagerty v. Montana Ore Pur. Co. et al.*, 25 L. R. A., n. s., 356." (p. 565.)

The authorities hold that an agent is liable for his mis-

feasance. (2 C. J. 826.) In *Schlosser v. Great Northern R. Co.*, 20 N. Dak. 406, 127 N. W. 502, the court said:

"Where an agent is guilty of misfeasance, that is, where he has actually entered upon the performance of his duties to his principal, and in doing so fails to respect the rights of others, by doing some wrong, as where he fails or neglects to use reasonable care and diligence in the performance of his duties, he will be personally responsible to a third person who is injured by reason of his misfeasance. An agent's liability in such cases is not based upon the ground of his agency, but on the ground that he is a wrongdoer, and as such, is responsible for any injury he may cause." (p. 411.)

## What is meant by "misfeasance"?

" ' "Misfeasance" is the improper doing of an act which a person might lawfully do.' It is a failure to use, in the performance of a duty owing to an individual, that degree of care, skill, and diligence which the circumstances of the case reasonably demanded. *State, to Use of Cardin, v. McClellan*, 113 Tenn. 616, 85 S. W. 267, 268, 3 Ann. Cas. 992." (3 Words & Phrases, 2d Series, p. 409.)

"A 'misfeasance' is the failure to do something imposed upon the person by law as a reasonable member of society, or the failure to use reasonable care and diligence in the performance of a duty imposed by contract which results in an injury to a third person. *Irvin v. Callaway*, 55 S. E. 1039, 1040, 127 Ga. 246 (citing *Southern Ry. Co. v. Grizzle*, 124 Ga. 737, 53 S. E. 244, 110 Am. St. Rep. 191)." (3 Words & Phrases, 2d Series, p. 409.)

"Misfeasance is the performance of an act in an improper manner, whereby some one receives an injury. *Williams v. Dean*, 111 N. W. 931, 933, 134 Iowa, 216, 11 L. R. A., n. s., 410." (3 Words & Phrases, 409.)

" 'Misfeasance' is the improper doing of an act, as distinguished from 'nonfeasance,' which is the total omission to do an act. . . . It has been held that misfeasance may involve to some extent the idea of not doing, as where an agent, while engaged in the performance of his undertaking, does not do something which it is his duty to do under the circumstances, as, for instance, when he does not exercise that care which a due regard for the right of the other party requires. Such negligence as would be actionable in any relation of life is 'misfeasance' by not doing. *Southern Ry. Co. v. Rowe*, 59 S. E. 462, 466, 2 Ga. App. 557." (3 Words & Phrases, 2d Series, pp. 409, 410.)

"An agent is liable to third persons when he is negligent in the performance of his duties, whether such act is termed misfeasance or nonfeasance." (*Lough v. John Davis & Co.*, 30 Wash. 204, 70 Pac. 491, 94 Am. St. Rep. 848, headnote, ¶ 3.)

"An agent having charge of a building, with authority to make repairs and employ servants, is personally liable for injuries to a passenger, due

to the negligent operation or repair of the elevator." (*Orcutt v. Century Bldg. Co.*, 201 Mo. 424, 99 S. W. 1062; 8 L. R. A., n. s., 929, headnote, ¶ 6.)

"A servant or agent is liable for a negligent omission or nonfeasance causing injury to a third person where he would be liable if acting as principal." (*Mayer v. Thompson-Hutchison Building Co.*, 104 Ala. 611, 16 South. 620, 28 L. R. A. 433, headnote, ¶ 2.)

"A car inspector who, after inspection and approval, sends out a car which he knows, or by the exercise of ordinary care could have known, was defective, is liable in damages to a brakeman who, because of the defect, is injured in attempting to use it in the ordinary manner, in the absence of contributory negligence on his part." (*Ward v. Pullman Car Corporation, &c.*, 131 Ky. 142, 114 S. W. 754, 25 L. R. A., n. s., 343, headnote, ¶ 1.)

"A servant is personally liable to third persons when his wrongful act in the course of his employment is the direct and proximate cause of their injury, whether such wrongful act be one of nonfeasance or misfeasance." (*Ellis v. Railway*, 72 S. Car. 465, 52 S. E. 228, 2 L. R. A., n. s., 378, headnote, ¶ 1.)

"An agent who has complete control and management of real property of a nonresident is personally liable for injuries sustained by a third person in consequence of the dangerous condition of the premises at the time when they were leased by him to a tenant." (*Baird et al. v. Shipman*, 132 Ill. 16, 23 N. E. 384, 7 L. R. A. 128, headnote.)

"Where an agent undertook to build a trap-door, but did the work so negligently as to cause the injury complained of, action would lie by the injured party not only against the principal but the agent also." (*Harriman et al. v. Stowe*, 57 Mo. 93, syl. ¶ 4.)

"Where an agent has complete control of a tenement house, and constructs a new walk in the court, leaving a large hole in the walk, and plaintiff, a new tenant, without previous knowledge of the existence of the hole, stepped into it after dark and was severely injured, it is misfeasance of the agent rendering him liable, and not a mere nonfeasance." (*Carson v. Quinn*, 127 Mo. App. 525, 105 S. W. 1088, headnote, ¶ 2.)

(See, also, *Bannigan v. Woodbury*, 158 Mich. 206, 122 N. W. 531, 133 Am. St. Rep. 371.)

"An agent having complete control and management of his principal's business, with the power to do what is reasonably necessary to protect third persons against injuries from omissions or commissions in the conduct of the same, is under obligation to so use that which he controls as not to injure another, and will be liable in damages to any third person for a failure to discharge such duty." (*Stiewel v. Borman*, 63 Ark. 30, syl. ¶ 4, 37 S. W. 404.)

"Agent is guilty of misfeasance in negligently directing water to be admitted to water-pipes in a room in a house owned by his principal, but

which is under his general management, without first examining the condition of such pipes, by reason of which injury results, and he is liable to the tenant of the shop below for damage therefrom; and the fact that the room in which the pipes are is let to a tenant at that time does not release him from liability." (*Bell v. Josselyn*, 69 Mass. 309, 63 Am. Dec. 741, headnote.)

"For a misfeasance done by an agent, in the line of his agency, both the principal and agent are liable." (*Martin v. Benoist*, 20 Mo. App. 262, syl. ¶ 3.)

Under the allegations of the amended petition defendant Richey's active misconduct renders him liable to the plaintiff. The amended petition states a cause of action against him.

2. The allegations of the amended petition against defendant Kent are that he was employed to repair the walk; that he made some repairs; that he informed the plaintiff that the walk had been inspected and repaired and was all right and safe for her use; and that after being repaired the walk at the place where the plaintiff was injured was in a dangerous and unsafe condition. This constituted misconduct on the part of defendant Kent, for which, if proven, he is liable in damages to the plaintiff. The petition states a cause of action against defendant Kent.

3. Did the court have jurisdiction of defendants Hansen? The conclusion reached concerning the sufficiency of the petition as to defendants Richey and Kent makes this question easy to answer. But one cause of action is stated in the petition. If the allegations of the petition are true, each of the defendants is liable to the plaintiff. All were properly joined as defendants. (Civ. Code, § 35; *Dowell v. Railway Co.*, 83 Kan. 562, 112 Pac. 136.) Summons was properly served on defendants Hansen in Johnson county. (Civ. Code, § 61.) But if, as stated by defendants Hansen in their motion, their plea in abatement and their answer, no cause of action exists as to defendants Richey and Kent, and they were made parties simply to give color of jurisdiction to the district court of Wyandotte county in this action, another question presents itself. That question was not argued, is not presented in the briefs, is not now before this court and will not be further discussed.

Defendants Hansen never attacked the amended petition. Their motion, plea in abatement, and answer, were directed

against the original petition. This does not change their situation. The plaintiff, by permission of court, had the right to amend her petition so as to make it state a cause of action against any one or more of the defendants if it did not state a cause of action as first filed. Until defendants Hansen were discharged they were bound to take notice of all the pleadings filed in the action.

The judgment is reversed with directions to overrule the demurrers of defendants Richey and Kent and set aside the order of dismissal as to defendants Hansen, and proceed with the cause as herein indicated.

No. 19,943.

L. M. HICKS, *Plaintiff*, v. W. E. DAVIS, as State Auditor, etc., *Defendant*.

### SYLLABUS BY THE COURT.

1. LEGISLATURE—*Acts Unassailable When Within Limits of the Constitution.* Rule followed that within the limits of the constitution the legislature is supreme in its own sphere, and its discretion can not be challenged or reviewed by the executive or judicial departments of the state government.

2. SAME—*Grain Inspector—Appropriation for Expenses—Valid.* When the legislature by a regular statutory enactment makes an appropriation to pay a person a sum of money under a claim for traveling expenses while in the state's service, the legal, equitable and moral aspects of the claim concern the legislature alone, and can not be reviewed by the auditor of state.

3. SAME — *Appropriations — Grain Inspection — Power of Legislature.* The petitioner worked in the state grain department, at Kansas City, for three years and four months, at a salary of $60 per month. During the period of his employment there was no statutory provision for his traveling expenses. The legislature of 1913 appropriated a sum of money to be paid out of the "grain inspection fee fund" to reimburse the petitioner for traveling expenses while he was employed by the state. *Held,* that the legislature had full and exclusive control of the subject, and the law pertaining thereto leaves no duty imposed on the auditor of state except the ministerial one of executing the expressed will of the legislature.

4. SAME—*Duty of Auditor upon Presentation of Voucher.* When a lawful appropriation has been made by the legislature and the person entitled thereto presents a voucher therefor in due form, and when

upon the auditor's refusal to honor the voucher the claimant seeks redress in court, he can not be deprived of relief because of the termination of the fiscal year and the closing of the year's accounts before his action is finally adjudicated.

5. STATUTE—*Amendment—How Made.* An act of the legislature which attempts expressly to amend or repeal a prior act must conform to the procedure prescribed by the constitution. (Const., art. 2, § 16.)

6. SAME—*Attempted Amendment to Statute Invalid.* In the body of a section of a statute enacted by the legislature of 1913 was an item appropriating a sum of money to the petitioner. The legislature of 1915 sought to abrogate that item by an act purporting to repeal the act of 1913 "in so far as it relates to item 106 of section 1 of said chapter." *Held,* that the later act wholly disregarded section 16 of article 2 of the constitution and is consequently void.

Original proceeding in mandamus. Opinion filed February 12, 1916. Writ allowed.

*W. A. Snook,* of Kansas City, for the plaintiff.

*S. M. Brewster,* attorney-general, and *John L. Hunt,* assistant attorney-general, for the defendant.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff asks for a writ of mandamus to compel the auditor of state to draw a warrant in his favor against the "state grain inspection fee fund" in the custody of the state treasurer, pursuant to an appropriation item in "an act making appropriation to pay sundry claims against the state," which took effect on March 19, 1913. (Laws 1913, ch. 61.) The item reads:

"Item 106. To L. M. Hicks, for money expended for traveling expenses while in employ of State Grain Inspection Department from February, 1909 to June 11, 1912, $384.60, to be paid out of the state grain inspection fee fund."

The petition and answer alike show that the plaintiff was employed as a helper in the state grain inspection department at Kansas City from February, 1909, until June, 1912. His salary in 1909 and 1910 and until the enactment of chapter 199 of the Laws of 1911 was fixed by the statute at $60 per month. (Gen. Stat. 1909, § 3337.) There was no statute authorizing any allowance for expenses. Chapter 199 of the Laws of 1911, amending section 3337 of the General Statutes of 1909, pro-

vided that the chief inspector, subject to the approval of the grain-grading commission, might fix the salaries of his subordinates in any sum not in excess of the salaries prescribed by the older act. The lawful salary of the petitioner therefore continued to be $60 per month until he left the state's service in 1912. The later act did not contemplate or provide for traveling expenses for such employees as the petitioner.

The auditor of state contends that the state owed the petitioner nothing for expenses, either legally or morally, at the time the legislature made the appropriation under which the plaintiff now claims. The auditor also calls attention to chapter 14 of the Laws of 1915, which purports to repeal the item under which the petitioner claims.

The auditor asserts that the "traveling expenses" for which the legislature provided in the appropriation item were only incurred by the petitioner between his home and his place of employment, both in Kansas City.

1. It is elementary law that the government of Kansas is conferred upon three coördinate departments—the legislative, the executive and the judicial. Each is supreme within its own sphere, subject only to our constitutional limitations. Neither can trench upon the field of the other. The legislature makes the laws. The executive, of whom the auditor of state is one of the most important officers, must execute and administer the laws. The function of the judiciary is to interpret, explain and to apply the laws to controversies concerning rights, wrongs, duties and obligations arising under the laws.

How far may an executive officer like the auditor of state look beneath the surface of a legislative enactment? His counsel cite some decisions to the effect that where there is no legal, equitable or moral claim upon the state's bounty, an appropriation making a mere gift of money is void. The chief limitations upon the power of our legislature to dispose of public funds or other state property are these: (a) Free governments are founded by the people for their equal protection and benefit, and special privileges granted by the legislature may likewise be revoked by it. (Bill of Rights, § 2.) (b) Hereditary emoluments must not be granted. (Bill of Rights, § 19.) (c) Restrictions on change of salaries of con-

Hicks v. Davis.

stitutional officers, members of the legislature and the judiciary. (Const., art. 1, § 15; art. 2, § 3; art. 3, § 13.) (*d*) The preservation and use of the school funds. (Const., art. 6, §§ 3-8.) (*e*) Limiting and regulating the state's indebtedness. (Const., art. 11, §§ 5-7.) (*f*) "No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer term than two years." (Const., art. 2, § 24; art. 11, § 3.) (*g*) State funds can not be devoted to internal improvements. (Const., art. 11, § 8.)

Within these limitations, the control and disbursement of the revenues of the state are subject to the will of the legislature, unfettered by interference by the executive or the judiciary. And in scrutinizing this statute, we must proceed on the assumption that it is valid unless it contravenes some express inhibition of the constitution or one necessarily implied from some express affirmative provision of that instrument. (*Prouty v. Stover, Lieut. Governor*, 11 Kan. 235; *The State v. Weiss*, 84 Kan. 165, 168, 113 Pac. 388; *Winters v. Myers*, 92 Kan. 414, 420, 421, 428, 140 Pac. 1033.)

2. Conceding that the legislature can not make a grant of funds to a private citizen where there is no legal, equitable or moral claim thereto (*Winters v. Myers*, supra; *Loan Association v. Topeka*, 87 U. S. 655, 664), who is to determine such question? In the old days, when special laws were frequently enacted notwithstanding the constitutional provision that "in all cases where a general law can be made applicable, no special law shall be enacted" (Const., art. 2, original § 17), it was said by the first chief justice of the state:

"EWING, C. J.: . . . The legislature must necessarily determine whether their purpose can or can not be expediently accomplished by a general law. Their discretion and sense of duty are the chief, if not the only, securities of the public for an intelligent compliance with that provision of the constitution. Whether we could, in any conceivable case presenting a flagrant abuse of that discretion, hold a private law invalid as contrary to that provision of the constitution, we need not here decide, but we would certainly not hold such a law invalid merely because it would, in our opinion, have been possible to frame a general law under which the same purpose could have been accomplished." (*State of Kansas, ex rel. Johnson, v. Hitchcock*, 1 Kan. 178, 185.)

In *Beach v. Leahy, Treasurer*, 11 Kan. 23, Mr. Justice

Brewer, in discussing the challenged validity of a special law, said:

"It may be conceded that this is a special law. . . . It is evident, also, that the result could be accomplished by a general law. . . . Why this distinction was made we do not know, and there is nothing in the record to enlighten us thereon. We may imagine many reasons, but it is useless to speculate. It is enough . . . that there may have been good and sufficient reasons." (pp. 26, 27.)

To the same effect were *Hughes v. Milligan,* 42 Kan. 396, 399, 22 Pac. 313, and *The State, ex rel., v. Lewelling,* 51 Kan. 562, 565, 33 Pac. 425.

Although the validity of special legislation may now be judicially reviewed under the amendment of 1906 (Const., art. 2, § 17; *Anderson v. Cloud County,* 77 Kan. 721, 95 Pac. 583), yet the general principle stated in the foregoing cases as to other matters within legislative control, and not thus hampered by a judicial review, is as potent and logical now as ever. The courts can not impeach the legislative discretion, neither can an executive officer. Paraphrasing the language of Justice Brewer, we must say it is enough that the petitioner presented to the legislature a bill for traveling expenses while in the service of the state, that presumably the legislative committee and the legislature considered the claim, found it reasonable and proper, and supported by some moral claim to the state's justice, and regularly and lawfully ordained that it be paid.

If we might take judicial cognizance of the enormous area of Kansas City, the metropolis of this state, with its far-flung suburbs, its hundreds of miles of railroad switch tracks, sidetracks, and warehouse and elevator tracks, its public and private elevators towering to the sky, some of them at long distances from others, it would probably be no more difficult a task to convince us than it was to convince the legislature that it was not only proper but wise and economical for the petitioner in pursuing his business of grain inspection to use any reasonable and available means of transportation to reach the various places where his services were required. Apparently the legislature so determined, and its determination can not be gainsaid.

It must be obvious that if the theory of the auditor is correct, it would be bound to apply to all cases where public of-

ficers and their subordinates had incurred expenses not previously authorized by the legislature. Of course no officer, great or small, may lawfully obligate the state to pay any sum whatsoever unless there is a statute therefor, and the legislature in its discretion might refuse to compensate the state's servants for any and all such expenses. But suppose the auditor of state, or the secretary of state or any one of the state's official boards and commissions were dragged into a lawsuit, the expenses of which could not be borne by their limited contingent funds. Would it be said that, since the legislature had made no provision in advance for the payment of such expenses, and the officers and commissioners had accepted their official positions with their attendant advantages and disadvantages at a definitely fixed compensation, they could not afterwards be reimbursed by the legislature? The case at bar is of little consequence, but the principle involved touches the fundamental sovereignty of the state.

Moreover, the legislature was not even technically giving away the state's general funds when it appropriated this particular item. It decreed that it should be paid out of the grain inspection fee fund—a fund exacted from the owners of grain solely for the proper expenses of inspection, and not justifiably exacted from them for any other purpose.

3. And this presents possibly another question. The auditor suggests that there is no money in the grain inspection fee fund to pay this claim. We assume that this is because the books for the fiscal year ending June 30, 1915, have been closed, and that any balances then existing in that fund have reverted to the general revenue funds of the state. But the books were open when the petitioner filed this action. That crystallized the status of the fund as of that date, and if there were moneys in the grain inspection fee fund at that time, the closing of the books will not bar the petitioner. There is no magic in bookkeeping. Books which have been closed in derogation of a lawful outstanding claim which had been provided for by the legislature must be reopened and the claim paid and the proper entries made to recite the pertinent facts.

4. Many objections are made by counsel for the petitioner to chapter 14 of the Laws of 1915, but it is needless to follow his somewhat abstruse and complicated philosophy. The con-

stitution plainly instructs the legislature as to its procedure when it deliberately sets out to amend or repeal a specific statute or a section of a statute. Of course, when the legislature is legislating directly on any subject, it may close its eyes, and frequently does, to all earlier legislation, and a later act, as the last expression of the legislative will, will supersede and repeal by implication all inconsistent earlier legislation. But when the legislature has a direct and special purpose in view, as it had when it attempted to revoke and expunge item 106 in the act of 1913, it was bound to amend the section in which it was incorporated. This it could only do by rewriting the section to suit its determination. In congress, and perhaps in some of the states, the method of repeal attempted here would be valid. It is not so in Kansas. Article 2 of section 16 of the constitution of Kansas provides:

"No law shall be revived or amended unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed."

The section of the act carrying the item appropriated to the petitioner (Laws 1913, ch. 61, § 1) contains many matters which the legislature of 1915 had no intention to meddle with. Therefore the only way to eliminate the item appropriated for petitioner was to rewrite the section. So says the constitution, and consequently the act of 1915 is plainly, palpably and utterly void.

The writ is allowed.

---

No. 19,947.

AMELIA RODGERS, *Appellant,* v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY et al., *Appellees.*

SYLLABUS BY THE COURT.

RAILROADS—*Personal Injuries—Cause of Accident Unknown—No Damages Without Proof of Negligence.* The plaintiff alleged that her husband was a passenger on one of defendant's trains and that upon arrival at his destination he undertook to walk alongside the train, and while walking past a water tank he slipped upon ice which had been negligently allowed to accumulate there, fell under the wheels of the train and was killed. His lifeless body was found on one side of the track and his severed legs between the rails of the track. He had expressed a purpose to come to the place where he was killed, on one

of defendant's trains. No one saw him upon the train, nor leaving it; nor was there any evidence that he had purchased a ticket for passage upon the train. No proof was produced as to how he happened to be killed, outside of the circumstances of the location of his body and the conditions existing there. *Held*, that the evidence in the case, only a part of which has been stated, was not sufficient to show that the defendant failed to perform any duty which it owed to him and that his death was the proximate result of defendant's negligence.

Appeal from Riley district court; SAM KIMBLE, judge. Opinion filed February 12, 1916. Affirmed.

*W. S. Roark*, of Junction City, for the appellant.

*Paul E. Walker*, and *Luther Burns*, both of Topeka, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.:  Amelia Rodgers brought this action against the Chicago, Rock Island & Pacific Railway Company to recover the sum of $10,000 as damages for the death of her husband, John W. Rodgers, on or about the 22d day of December, 1911, which it was alleged was caused by the negligence of the company.

In her petition she alleged that Rodgers was a passenger on an eastbound train of the defendant, which arrived at Manhattan on the morning of December 22, 1911, and that a water tank near the west end of the station platform was permitted to be in a leaky and defective condition, with the result that ice accumulated in the trough of the tank at the side of the railroad, and that Rodgers, who alighted from the train before daylight and when the station platform was not properly lighted, passed along the side of the train, slipped on this dangerous accumulation of ice, fell under the train and was killed. The answer of the defendant was a denial of the averments of the petition and a charge of contributory negligence. A trial was had with a jury, and after plaintiff had introduced her evidence a demurrer to the same was sustained and judgment given for the defendant.

From the testimony of plaintiff it appeared that Rodgers was an able-bodied man of good habits, about fifty years old and a resident of Manhattan. The day before the casualty he

was at Clifton, a station about fifty-two miles west of Manhattan on defendant's railroad. The evening before his death he expressed a purpose to return to Manhattan on a coming train, and early the next morning his dead body was discovered at Manhattan between the west end of the station platform and the water tank of the company. The body was north of the rails, and his legs, which were severed below the knees, were lying between the rails of the track, about four or five feet from the drip trough of the water tank, which was thickly coated with ice. The body lay on his traveling bag and did not appear to have been dragged.

There are two railroads on which Rodgers might have traveled from Clifton to Manhattan, but the shorter and more direct route and the one he had expressed a purpose to take is defendant's railroad. There is no proof that he purchased a ticket at defendant's station, and no witness saw him enter the train at Clifton. Two of defendant's trains were scheduled to pass east between Clifton and Manhattan that night, one due at Manhattan at 1 a. m. and the other at 5:25 a. m., but there is nothing to show that Rodgers was seen upon either of them, nor was he seen to leave any of defendant's trains.

The station is near Fourth street, which runs north and south, and steps leading to the station from that street, as well as from one on the north, are provided. West of the station there are some steps leading from the street on the north side, but most of the people entered and left over the steps near the east end of the station on Fourth street. The station platform extends 217 feet west of the station, and the trough of the water tank is located between 9 and 10 feet west of the platform, and 50 feet beyond the platform is Fifth street. Persons on eastbound trains sometimes alighted west of the tank, and occasionally some of them walked between the track and the tank to the west end of the platform, although there is a large sign placed opposite the water tank with the warning: "No Thoroughfare. Walking on or across tracks is strictly prohibited." The body of Rodgers was found five feet from the platform, or about half way between it and the trough of the water tank, but beyond the location of his body and an expressed purpose to return home on that night nothing indicating the cause of his death was shown. We think the evidence produced failed

Rodgers v. Railway Co.

to make a *prima facie* showing that the death of Rodgers resulted from the negligence of the defendant. Negligence can not be rested upon mere presumption, nor can a finding of negligence ever be made without evidence. No one is required to pay damages until it has been shown that he is in fault. In the absence of evidence the presumption ·is that the defendant is free from negligence. (*Mo. P. Rly. Co. v. Haley, Adm'r, &c.*, 25 Kan. 35; *Railroad Co. v. Tindall*, 57 Kan. 719, 48 Pac. 12; *Byland v. Powder Co.*, 93 Kan. 288, 144 Pac. 251.)

In this case it was not enough to prove that Rodgers was found lifeless upon the track of the defendant's railroad, nor even that there is a strong possibility that a train of the defendant ran over and killed him. It devolved on the plaintiff to show by competent evidence that he was killed by the action of the defendant; that the company did something which should not have been done; or omitted to do something in the discharge of its duty towards him which, under the circumstances, should have been done; and further, that his injury and death resulted from such failure of the defendant. These findings can not be made unless there is either direct or circumstantial evidence to prove the essential facts of negligence on the part of the defendant and that such negligence caused the deplorable death of Rodgers. Neither fact can be based upon mere possibilities or surmises, nor even upon circumstances which are merely consistent with such fact where they are open to different inferences. (*Carruthers v. C. R. I. & P. Rly. Co.*, 55 Kan. 600, 40 Pac. 915; *Duncan v. Railway Co.*, 82 Kan. 230, 108 Pac. 101.)

Now, it has not been proven that Rodgers was a passenger on defendant's train on the night of his death. He contemplated taking the train, but, as we have seen, no witness saw him board it, upon it, or leaving it. The plaintiff's theory or inference is that he was a passenger; that he alighted from the train when he reached Manhattan, and as he walked alongside the train he slipped on the icy trough of the tank, fell under the train and was killed. A possibility suggested by the defendant is that he came to Manhattan on the Union Pacific Railroad, which has a longer line from Clifton to Manhattan, and in going to his home went upon the track of the

21—97 KAN.

defendant and was struck by one of defendant's trains at the place where his body was found. This supposition, however, like others suggested in the case, is not founded on sufficient evidence. If we assume, as the trial court appears to have done, that he was in fact a passenger on one of defendant's trains, the evidence is still lacking as to how his death occurred and whether the defendant neglected any duty which it owed to him. It might be supposed, as plaintiff has done, that he alighted from the train at the station, and as he walked west along the side of the train, while it was in motion, he lost his footing on the ice and was thrown under the train. Other surmises may be made as suggested in the argument. He may have undertaken to drop from the train before it had stopped at the station, in an attempt to shorten his journey home, and have fallen under the wheels. Whether he was traveling east towards the platform, or whether he alighted on the platform and was traveling west, can not be determined from any evidence in the case. If it be assumed that he did not attempt to leave the train until it stopped and that he alighted on the platform, another theory is suggested, that after the train had passed he started west and across the track on his way home and was struck by a second train of the defendant. This, too, is conjectural. Another suggestion made by the defendant is that, as he sometimes had fainting spells, he may have fallen on the track and was dead when a train ran over him. There may be more probability in some of the suggested theories than in others, but all of them are mere conjectures without a sufficient basis to warrant the inference that the defendant was guilty of negligence which occasioned the fatal accident.

The case falls fairly within a number of former decisions in which it was held that there was not sufficient proof of culpable negligence or liability. In *Railway Co. v. Young*, 57 Kan. 168, 45 Pac. 580, a child who was playing near a track had his hand cut off by a moving train. In an action by his parents it was contended that the railway company had failed to have a proper lookout, or to take necessary precautions for the safety of the boy and other children who were playing near the track. No one saw the accident in that instance. Upon the

assumption that the railroad company should have had a lookout on the moving cars, it was said:

"It is not enough that the company may have failed to take necessary precautions in moving the train, but before there can be a recovery it must show that the boy was hurt in consequence of such failure. How he was hurt and whether due care would have avoided the casualty rest upon conjecture rather than upon established facts, and we conclude that the testimony is insufficient to support the verdict, and that a new trial should have been granted." (p. 171.)

In *Hart v. Railroad Co.*, 80 Kan. 699, 102 Pac. 1101, a passenger in good health and accustomed to traveling on railroads appears to have fallen from the train, as his mangled and lifeless body was found on the side of the track the day after he was seen on the train, near a station on defendant's railroad. It was a vestibuled train, and the custom was to keep the doors closed between stations. The plaintiff insisted that as deceased was in possession of his faculties, it could not be inferred that he committed suicide or failed to take proper care of himself, and that the only way to account for his death was the negligence of the railway company. It was said that the passenger may have been too warm and opened a vestibule in order to get fresh air, but it was added that this was speculation, and the finding of negligence without testimony as to how the door was opened and how the accident occurred could not be sustained.

Some of the features of the case of *Brown v. Railroad Co.*, 81 Kan. 701, 106 Pac. 1001, are similar to those of the present one. A person who had been riding on a passenger train was found dead about three hundred feet from a station of the railroad company. His dead body was found on the side of the track and his dissevered legs between the rails. It was a vestibuled train and it was supposed that he or some one else had opened the vestibule before the train arrived at the station. Although, indulging the presumption that the deceased was in the possession of his usual faculties, and in the exercise of due care for his own safety, it was decided that in the absence of evidence as to who had opened the vestibule or how the deceased happened to fall under the train, a finding that his death occurred through the fault of the railroad company was not justified.

It is insisted that the watering of locomotives through a water tank is not the best method, but that it can better be done through a crane, thereby avoiding accumulations of water or ice near the track. It may be that the presence of ice at that place was a lack of due care as to some persons, but since it is not shown that the ice near the track was the proximate cause of the accident, which may have resulted from other causes, it is unneccessary to consider whether the use of a tank instead of a crane was negligence. The plaintiff alleged that the accident and death were the proximate results of the defendant's negligence. It devolved upon her to produce evidence accounting for the accident and death of Rodgers; also that there was a breach of the company's duty towards him, and that his death was due to its fault. Unless substantial proof of these elements is produced, the plaintiff can not recover. If it be assumed that Rodgers was a passenger on defendant's train, it must still be presumed that he alighted with care and did not undertake to leave the train before it had stopped, and fell between the wheels when trying to alight. And then it must be presumed that he undertook to walk towards or away from the station over the icy place near the track while that train or another one was passing the station, and without any want of care on his part. That would be building one presumption upon another—a process which does not afford a basis for an inference of negligence. (*Duncan v. Railway Co.*, 82 Kan. 230, 108 Pac. 101; *Duncan v. Railway Co.*, 86 Kan. 112, 119 Pac. 356; *Byland v. Powder Co.*, 93 Kan. 288, 144 Pac. 251.) We may give full force to the presumption of care on the part of Rodgers, but this presumption furnishes no basis for inferring negligence on the part of the defendant. Until proof to the contrary is introduced, the defendant is entitled to the presumption that it was exercising care and performing its duty toward the deceased. (*Looney v. Metropolitan Railroad Co.*, 200 U. S. 480, 26 Sup. Ct. Rep. 303, 50 L. Ed. 564.) Inference of negligence may be based on circumstances, but the circumstances must be drawn from premises that are reasonably certain and point clearly to the negligence asserted. In this respect the testimony of the plaintiff fails. As was said in *Railroad Co. v. Aderhold*, 58 Kan. 293, 49 Pac. 83:

"The accident may be accounted for in several ways, and other and

more plausible theories of the collision may be suggested; but liability can not be fixed on a bare guess, nor can a verdict rest on mere conjecture." (p. 298.)

Being satisfied that the evidence does not establish *prima facie* that the defendant was guilty of negligence and that the casualty was the result of its negligence, the judgment of the trial court is affirmed.

No. 20,083.

JOHN V. ABRAHAMS et al., as Trustees, etc., *Appellants*, v. SCHOOL DISTRICT NO. 33, *Appellees*.

SYLLABUS BY THE COURT.

1. BOND ELECTION—*School District—Australian Ballot Law*. The Australian ballot law does not apply to school-district elections held to determine whether or not bonds shall be issued to build a schoolhouse.

2. SAME—*Intention of Voter—How Determined*. The intention of voters casting certain ballots at a school-district bond election ascertained and declared from the words and marks on the ballots.

3. SAME—*Enjoining Tax—Taxpayer May Prosecute Action*. Whether or not a taxpayer of a school district may contest an election erroneously declared to have resulted favorably to the issuing of bonds, he may invoke the remedy afforded by section 265 of the civil code to prevent the bonds from being issued.

4. SCHOOL ELECTION—*Changing Schoolhouse Site—Proposition Carried*. A finding by the trial court that a proposition to change the site of the schoolhouse duly carried at a school-district election held to determine the matter, approved.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed February 12, 1916. Affirmed in part and reversed in part.

*A. M. Harvey*, and *J. E. Addington*, both of Topeka, for the appellants.

*Robert Stone*, and *George T. McDermott*, both of Topeka, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to enjoin the issuing of school-district bonds to build a schoolhouse and to enjoin

changing the site of the schoolhouse. The plaintiffs were defeated and appeal.

It is said the proposition to issue bonds did not carry at the bond election. The canvassing board rejected three ballots in the following form:

If the first ballot be counted for and the other two be counted against the bonds the proposition did not carry. The defendants claim the Australian ballot law applies to the conduct of school-district bond elections, and they interpret the ballots according to that law. The statutes involved contain provisions indicating that the Australian ballot law governs, and that it does not govern. The general practice, of which the legislature certainly is cognizant, has been to ignore the law. It was ignored in the present instance. Without entering upon an extended discussion of the subject, it is sufficient to say that the court is of the opinion the Australian ballot law does not apply to school-district bond elections. If this were not so the ballots used in the bond election were not in the form prescribed by the Australian ballot law, and other material features of that law were disregarded in holding the

election. The question then is, What was the intention of the voters casting the ballots which the canvassing board rejected? The first ballot was cast for the bonds. The word "No" written on the second ballot is a word of opposition used with reference to the proposition to vote bonds, and the ballot should be counted against the bonds. The third ballot was also cast against the bonds. The result is the proposition to vote bonds failed to carry.

It is said that the plaintiffs had a remedy by way of contest of the election. If so, the remedy was not exclusive of that afforded the plaintiffs as taxpayers by section 265 of the civil code.

The judgment of the district court with reference to issuing bonds is reversed, and the cause is remanded with direction to enter judgment for the plaintiffs.

It is said the proposition to change the site of the schoolhouse did not carry at the election held to determine the matter. The solution of this question depends upon the application of well-understood principles of law to oral testimony, which was conflicting in some particulars and which the trial court was better able to estimate. Taking the testimony as it is found in the record, however, this court concludes that the proposition carried.

The judgment of the district court with reference to changing the schoolhouse site is affirmed.

---

No. 20,102.

LUTHER C. BAILEY, *Plaintiff*, v. THE CITY OF TOPEKA et al., *Defendants*.

SYLLABUS BY THE COURT.

1. PUBLIC PARK—*Concessions for Lunch Stands and Bathing Facilities— Not Unlawful.* The action of a city in granting to individuals, for pay, exclusive rights within a public park to operate refreshment and lunch stands, and to rent boats and bathing suits and towels and dressing rooms, does not constitute a use of the park for other than public purposes, nor is it in conflict with provisions of the deed of gift by which the city acquired the property, to the effect that it should be used for the benefit of the public, and should be inalienable by deed, gift, lease, or other method.

2. SAME—*City Authorized to "Regulate" Parks.* Sufficient power for the purpose indicated is conferred by statutes authorizing the city authorities to "regulate" parks.

Original proceeding in quo warranto. Opinion filed February 12, 1916. Judgment for the defendant.

*A. M. Harvey,* and *J. E. Addington,* both of Topeka, for the plaintiff.

*George P. Hayden,* and *A. C. Bartell,* both of Topeka, for the defendants.

The opinion of the court was delivered by

MASON, J.: The city of Topeka accepted a tract of land given to it for the purpose, and on the condition, that it should be used as a public park, "for the benefit of the health, comfort, and recreation of the citizens of Topeka and their friends, and such other orderly persons as may resort thereto." The deed of gift contained a provision that "said real estate shall be inalienable by said city of Topeka, either by way of deed, conveyance, lease, or in any other manner, and shall be forever held and used for the purposes aforesaid." Luther C. Bailey, who owns land facing on that referred to, brings an original action in this court in the nature of quo warranto, asking that the city and its officers be ousted from the power which they are undertaking to exercise, of using the park for other than public purposes, and in such a manner as to violate the terms of its dedication. The case is submitted upon the pleadings.

Prior to answering the city filed a motion to dismiss, on the grounds, (1) that the court had no jurisdiction to hear the case, (2) that the allegations of the petition did not show an illegal exercise of power, and (3) that the plaintiff had no peculiar or specific interest different from the citizens of Topeka as a whole. The motion was overruled, the first ground being regarded as not well taken, and the others as involving the sufficiency of the petition, and proper to be raised rather by a demurrer than by a motion to dismiss. Whether the plaintiff has or claims any such peculiar interest in the use to which the park is put as to enable him to maintain an action to restrain the city from wrongful conduct in its management

may well be doubted.  An abutting owner may sometimes sue
to prevent a diversion of public property from the uses for
which it was acquired.  (*Comm'rs of Franklin Co. v. Lathrop,*
9 Kan. 453; Note, 1 L. R. A. 725.)   But whether the plaintiff
is within that rule need not be determined, by reason of the
conclusion reached on the other branch of the case.

(1)  The action of the city of which complaint is made con-
sists of the granting to individuals, for pay, of exclusive rights
within the park to operate refreshment and lunch stands, and
to rent boats and provide suits, towels and rooms for bathers,
at fixed prices.   A free dressing pavilion is provided for
bathers using their own suits and towels.   Apparently there
is nothing to prevent any one from using his own boat on the
pond, should he so desire.   We see nothing in the conduct re-
ferred to that is inconsistent with the public character of the
park, or that conflicts with the terms of the gift.   The ex-
clusive character of the privilege conferred is not the basis of
any legitimate objection.   For as no one has a right to engage
in the activities referred to except by permission of the city,
no one is wronged by the monopoly created.   The concessions
granted do not amount to the leasing of any part of the park.
(*The State, ex rel. Attorney General, v. Schweickardt,* 109
Mo. 496, 19 S. W. 47.)   Nor do they involve the loss of control
over it by the public officers.   Clearly it is not inconsistent with
the conditions imposed by the donor of the property that
visitors to the park should be afforded facilities for obtaining
refreshments, for boating and for bathing.   No reason exists
why they should not pay a fair price for what they eat or
drink, or for the boating or bathing equipment they use.   The ·
city might through its employees furnish these conveniences
directly, collecting reasonable charges therefor.   The fact that
a profit resulted would not render the transaction objectionable.
The incidental revenue would not characterize the transaction
as commercial rather than governmental.   Substantially the
same result is accomplished by authorizing certain individuals
to attend to the business of supplying the wants of the public
with respect to the matters referred to, retaining so much of
the proceeds as will fairly compensate them for their services
and investment, and turning the residue over to the city.   The
following text, and the cases supporting it, are in point at

least to the extent of indicating that the facilities undertaken to be supplied are appropriate to the conduct of a public park:

"Under a power to control and regulate parks the municipal authorities may provide for the pleasure, amusement, comfort, and refreshment of persons frequenting them, which in their discretion they may do by granting privileges to private persons to furnish food or refreshments, or means of innocent entertainment, with the right to erect necessary structures incident thereto which will not interfere with the rights of the public, and may give a license to use a building in a park for the purpose of a restaurant, which rights and privileges may be made exclusive, the municipality in all cases retaining the right of regulation and control over the manner of conducting the business." (28 Cyc. 938.)

The suggestion is made that, if the present course of the city officers is held to be legitimate, there is nothing to prevent them at their pleasure from turning the park into a mere amusement resort, abounding in alluring catchpenny devices and dominated by a spirit of commercialism. This does not follow. That the power of regulation and management might be so abused as to warrant the interference of a court may be conceded. But we find in what has already been done no close approach to the danger line.

(2) It is argued that special statutory authority would be required to enable the city to pursue the course of which complaint is made. A member of the city commission is designated as the "commissioner of parks and public property." (Gen. Stat. 1909, § 1235, amended by Laws of 1913, ch. 84, § 2.) The commission is empowered to "regulate" parks. (Gen. Stat. 1909, § 1280.) "A park may be devoted to any use which tends to promote popular enjoyment and recreation." (3 Dillon's Municipal Corporations, 5th ed., § 1096, p. 1749.) The furnishing of the conveniences referred to is a proper incident to the management of the park, and the method followed is so naturally adapted to the desired end that it must be regarded as a matter of administrative detail, not necessary to be specifically authorized by the legislature.

Judgment is rendered for the defendants.

No. 20,117.

L. C. ROSS and E. C. WALDO, Copartners, etc., *Appellees*, v. S. J. HOLMAN, *Appellant.*

### SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Legality of Consideration—Put in Issue by Answer.* The legality of the consideration for a note sued on is put in issue by an answer which alleges that there was no legal consideration for the note, and sets out the illegal transaction out of which the indebtedness arose for which the note was given.

2. SAME—*Illegal Consideration—"Dealing in Futures"—Fact for Jury.* In an action on a promissory note, where the defense is that the consideration for the note was an indebtedness incurred in transactions prohibited by law, and there is evidence tending to support that defense, it is error to refuse to give an instruction submitting that question to the jury.

3. SAME. In such an action, where the evidence is conflicting, it is not error to refuse to render judgment for the defendant on the pleadings and the evidence.

Appeal from Ellis district court; JACOB C. RUPPENTHAL, judge. Opinion filed February 12, 1916. Reversed.

*J. P. Shutts,* of Hays, *Ira E. Lloyd,* and *N. F. Nourse,* both of Ellsworth, for the appellant.

*John L. Hunt,* of Topeka, for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: This is an action on a promissory note. The defense is that the note was given for debts incurred in certain transactions prohibited by law. The plaintiffs recovered judgment. The defendant appeals.

1. One of the questions necessary to determine in order to reach a correct conclusion on the principal proposition is, Did the answer put in issue the legality of the consideration for the note? The answer contains a general denial and alleges:

"Defendant admits that he executed the note sued on herein, but says there was no legal consideration for the giving of said note, and alleges the facts in regard thereto to be: That during the times hereinafter stated said plaintiffs, acting as the agent of the Standard Grain and Milling Company of Kansas City, Missouri, claimed to have made con-

tracts for and on behalf of defendant, through the said Standard Grain and Milling Company, with divers persons, whose names are unknown to defendant, for the purchase and sale of grain and other commodities, upon market reports and quotations at divers times during the years 1902, 1903, and 1904, and that said grain and other commodities by the terms of said contracts were all to be delivered at some future time. Defendant alleges that if such contracts were ever made, that it was understood by all the parties thereto, including said plaintiffs Ross and Waldo, and the said Standard Grain and Milling Company, that it was not intended by any of the parties thereto, that any grain or other commodity should be delivered under said contracts, and that neither the buyer or seller was in the possession or control of any grain or other commodity so contracted to be sold, but that it was mutually intended and understood by all the parties to each of said transactions, that the difference between the market prices agreed to be paid and the regular market price at the time fixed by the contracts for the delivery of the commodity agreed to be sold should be paid by one party to the other; that each of said contracts should be settled and closed in no other manner, and that no grain nor other commodity should be in fact delivered by either party in settlement of any such contracts; that it was not a bargain for the sale of property but only a wager on the future market price of such commodity; that on all of such contracts said plaintiffs and the Standard Grain & Milling Co. received a commission; defendant says that all of said contracts were illegal and void, and that the said plaintiffs and the said Standard Grain and Milling Company knew all the facts and circumstances surrounding each of such transactions, knew that each and all of such contracts were contrary to the form of the statute in such [cases] made and provided."

Each of these allegations was specifically denied by the plaintiffs. Both the answer and reply were verified. Transactions of the kind described in the answer are prohibited by law. (Gen. Stat. 1909, § 5167.) The legality of the consideration for the note was put in issue by the answer.

2. The defendant contends that the court erred in the instructions given and in refusing to give instructions requested by him. The court gave this instruction:

"The defendant's transactions with the Standard Grain & Milling Company were legal and valid unless you find from the evidence that they were purchases or sales of grain or other commodities upon telegraphic or telephone market reports and quotations and that it was not the intention of the defendant in pursuance of such purchases or sales to receive or deliver such grain or other commodities, and that the person selling or agreeing to sell was not in the possession and control of such grain or other commodity."

The defendant requested the court to instruct the jury that—

"If the plaintiffs knew of such illegal intent, and brought or assisted

in bringing the parties to such illegal contracts together for the purpose of entering into the illegal agreements, they are *particeps criminis,* and can not recover for any loss incurred or money advanced by them in forwarding the transaction."

The court refused to give the requested instruction on the ground that the matters embraced therein were not in issue. In this we think the court was mistaken.

There was evidence tending to show that the note was, in greater part, given to reimburse the plaintiffs for money paid by them to the Standard Grain & Milling Company on account of losses sustained by the defendant in the purchase and sale of grain on telegraphic market reports and quotations, it not being the intention of any one to deliver or receive the grain purchased or sold; that the plaintiffs actively assisted the defendant in making these purchases and sales of grain and acted as agent, broker or intermediary between the defendant and the Standard Grain & Milling Company; that in these transactions the plaintiffs were the guarantors of the defendant to the Standard Grain & Milling Company; and that in the final settlement of the whole matter between the plaintiffs the Standard Grain & Milling Company and the defendant, either the note sued on, or others of which that one is a renewal, was given to the plaintiffs, who discharged the indebtedness to the Standard Grain & Milling Company. These matters, if true, were defenses under the answer and should have been submitted to the jury for determination. (*Hutchins v. Stanley,* 88 Kan. 739, 129 Pac. 1180; *Carey v. Myers,* 92 Kan. 493, 141 Pac. 602; *Investment Co. v. McFarlin,* 93 Kan. 526, 144 Pac. 842; *Grain Co. v. Elevator Co.,* 94 Kan. 360, 146 Pac. 1139.) The instruction requested, as above set out, was not embraced in the instructions given. It should have been given.

3. The defendant further contends that he was entitled to judgment on the pleadings and evidence. The pleadings put the consideration for the note in issue. The evidence on this question was conflicting. That made it necessary to submit the evidence to the jury for consideration under proper instructions.

The judgment is reversed and a new trial is ordered.

No. 20,118.

THE STATE OF KANSAS, ex rel. AGNES BJORN, *Appellant*, v.
ROBERT CREAGER, *Appellee.*

SYLLABUS BY THE COURT.

1. ACTION FOR BASTARDY—*Motive of Prosecutrix—Proper Defense.* It
is a proper defense in an action for bastardy that the motive which
actuated the prosecutrix in making the charge was to obtain a large
sum of money from the parents of the defendant, who was not guilty.

2. SAME—*Evidence—Association of Prosecutrix with Other Men.* In
an action for bastardy evidence may properly be received that near
the probable date of conception the relatrix associated with a young
man other than the defendant under circumstances which offered as
much opportunity and as much likelihood of improper conduct with
him as with the defendant.

3. SAME—*Instructions—Presumption as to Defendant's Innocence.* The
law presumes morality and uprightness of conduct until the contrary
is established, and it is not error to instruct the jury trying an action
for bastardy, in which the defendant denies the charge, that the de-
fendant is presumed to be innocent until it has been proved to the
satisfaction of the jury by a preponderance of the evidence that he is
the father of the relatrix's child.

4. NEW TRIAL—*Newly Discovered Evidence—Grounds Insufficient.* The
proceedings examined and held that the motion for a new trial on
the ground of newly discovered evidence was properly overruled be-
cause of lack of proof of reasonable diligence in discovering the evi-
dence and because the evidence was merely cumulative.

5. TRIAL—*No Error in Record.* Nineteen other assignments of error
examined and held to present no sufficient ground for reversal.

Appeal from McPherson district court; FRANK F. PRIGG,
judge. Opinion filed February 12, 1916. Affirmed.

*S. M. Brewster,* attorney-general, and *Gust Nyquist,* county
attorney, for the appellant.

*P. J. Galle,* of McPherson, for the appellee.

*John F. Hanson,* of Lindsborg, for the relatrix.

The opinion of the court was delivered by

BURCH, J.: The action was one of bastardy. The defendant was acquitted and the state appeals.

The relatrix lives at Lindsborg. The defendant lives at Mc-Pherson. On November 11, 1914, the relatrix wrote a letter to the defendant, stating, among other things, that she was in trouble, that the defendant was to blame, and calling to his attention a time when the defendant was at Lindsborg the week after Easter Sunday. Legal proceedings were threatened unless the defendant came to Lindsborg on the first train. About November 16 or 17, the personal attorney for the relatrix, John F. Hanson, saw the defendant's father, J. W. Creager, stated that marriage was out of the question, and presented a plan for quietly disposing of the relatrix, and her child when born, which plan, however, involved the payment of money. Soon after this interview the attorney besieged the residence of the defendant's parents when J. W. Creager was not at home, calling at nine o'clock and at twelve o'clock on Tuesday, on Wednesday, and on Thursday, but Mrs. Creager would not engage in conversation with the attorney. On December 9 the complaint was filed. After a hearing the defendant gave bond for his appearance at the next term of the district court.

On January 30, 1915, the relatrix was delivered of a fully developed child. The trial in the district court took place on March 11, 1915. At the trial the relatrix fixed the time when intercourse occurred at about April 15, 1914, following Messiah week at Lindsborg, which lasted from April 4 to Easter Sunday, April 12. If April 15 were the true date, the period of gestation was eight days longer than the standard time of two hundred and eighty days. The circumstances under which the intercourse occurred were that the defendant and two other boys from McPherson met the relatrix and two other girls at a bakery in Lindsborg about eight-thirty in the evening and went to a park. After a time the defendant and the relatrix separated from the others and went to the porch of Bethany library, where they remained about an hour. The relatrix was nineteen years old at the time of the trial and had known the defendant for some four years. She had seen the defend-

ant the week before Easter, but had not been in his company before that for a long time. At the preliminary hearing she said she had not been in his company for three or four years. At the trial in the district court she would not fix the time further than to indicate that it was quite a long time. After the occurrence on April 15, she did not see the defendant until the following August. She found she was sick on May 16, and she consulted a doctor the first part of June. Nothing was said to the defendant about her sickness when the relatrix saw him in August. She said she discovered her true condition in November, although she knew something was wrong when she commenced to vomit and her menses stopped in May.

On Easter Sunday, in the evening, a young man met the relatrix by a store, without previous engagement, and walked home with her. At the preliminary hearing she testified they were about an hour in getting home. At the trial she reduced the time to about fifteen minutes. This young man was at her birthday party on the 16th of May, and she was with him seven or eight times between April and the latter part of October. His home is in Nebraska. The relatrix had no regular company, but was with other young men occasionally.

One of the two girls who, with the relatrix, were members of the party at the park in Lindsborg was out of the state at the time of the trial. The other was a witness, but was unable to fix the date when the young people were together. She could not say whether the time was April or May. The three boys were witnesses. Each one fixed the date late in May. They went to Lindsborg in an automobile with two other boys, one of whom was out of the state at the time of the trial. The other was a witness, and fixed the date late in May. Some of the boys fixed the time quite definitely by the fact that they were studying for final examinations just before the close of school. One of them thought the date was the 18th of May. Another fixed the time by the fact that he had no overcoat for the trip, the overcoat being at the cleaner's, and his overcoat was at the cleaner's from May 13 to May 19. The boys testified that after meeting the girls and before they went to the park they took a package of bread from the bakery to a church on north Main street. The relatrix testified that in

the course of the conversation with the defendant he referred to an excursion train on the Union Pacific, which he had intended to take to Salina, but did not. There was testimony that such a train was run on April 15. The defendant's father, J. W. Creager, who was the Union Pacific fireman, recalled no such train on that date. There was expert testimony relating to the period of gestation.

The foregoing presents a sketch of the material features of the evidence. The assignments of error will be considered in the order and in the form presented by the personal attorney of the relatrix.

"*First.* In overruling Plaintiff's motion for new trial on the ground of newly discovered evidence, presented on hearing of said motion. (The leading error.)"

This evidence tended to show that the Luther League held meetings at a church. The only meetings held after Messiah week were on April 23, May 6, and May 19. Relatrix filed an affidavit that coffee bread was taken to the church on the evening she was with the defendant, and she had no company home from church on the evening of May 19. Other evidence was that no bread or coffee bread was served with the refreshments at the Luther League meeting of May 19. They had ice cream that night. Coffee bread was served at the meeting on April 23, which was purchased at the bakery where the boys met the girls. The attorney for the relatrix is very anxious now to have the date of the meeting with the defendant changed to April 23.

New trials are granted because of newly discovered evidence only when the evidence could not with reasonable diligence have been discovered and produced at the trial. (Civ. Code, § 305.) The bread incident came out as a detail of the conduct of the three boys and three girls the night they went to the park. The relatrix omitted to testify that they delivered bread to a Luther League meeting at the church before going to the park. The fact was first mentioned by one of the witnesses called on her behalf, but she knew where she went and what was done on the night she met the defendant with the others at the bakery. Her attorney knew the defendant was not confessing the charge against him and ought to have

known that every minute circumstance, time, place, movement and conduct of the meeting between the relatrix and the defendant would be scrutinized with the utmost sharpness. If a Luther League meeting at the church to which the party of young people carried refreshments on the way to the park be important now for the purpose of fixing the date of the visit to the park and to the library porch, it was important at the trial and should have been given attention in preparing for the trial, especially since the date of the Luther League meeting did not fit in with the testimony of the prosecutrix that she was with the defendant on the night of April 15. At the hearing of the motion for a new trial no testimony whatever was offered showing or tending to show that all the evidence relating to the bread incident could not have been discovered and produced at the trial. On the other hand, testimony of the relatrix herself concerning facts within her knowledge is offered as if the facts were newly discovered. Her attorney now says in his brief that there was no time at the trial to investigate the bread incident. He should have testified in the district court. Conceding the statement to be true, he should have applied to the district court for time. This court has knowledge that McPherson and Lindsborg are connected by telephone wires which the diligent may use. When passing upon the motion for a new trial the district court was cognizant of the course the proceedings had taken, and in the absence of any showing of an excuse for nonaction at the proper time this court has no ground for holding that the district court abused its discretion or committed error.

The date of the meeting at the bakery and what followed were important facts and disputed facts. Every witness who gave testimony on these subjects went into details. The bread incident came out in this collateral way. The relatrix can not now make an issue of it, and the testimony offered at the hearing of the motion for a new trial is merely cumulative to the testimony which was produced concerning the main issue. It is said that the new evidence would impeach the testimony of some of the witnesses favorable to the defendant. The court has decided several times that a new trial will not be granted for that purpose.

The State, *ex rel.*, v. Creager.

*"Second.* In overruling Plaintiff's several objections to the introduction of any evidence by the Defendant relative to transactions with Defendant's parents pertaining to an attempt to compromise this cause out of court by one Hanson, and also to evidence that he was attorney for Relatrix, which objections appear in the testimony of J. W. Creager, Mrs. Judith Creager, John F. Hanson, and in the Opening Statement of Defendant's Counsel, and in refusing to strike out such matters admitted. (A leading error.)"

One of the defenses to the action was that the motive actuating the prosecutrix was to get $1500 from the parents of a boy who was not guilty. The defense was a proper one; it was proper to state it in opening the case for the defendant, and it was proper to introduce evidence in support of it. The weight of the evidence introduced was a matter for the jury to consider.

*"Third.* In this, that the instructions are insufficient generally in not including one instruction explaining the pertinence, materiality, etc., of these matters pertaining to compromise referred to in error TWO, if that matter was at all admissible in this cause."

The instructions were sufficient for the guidance of the jury in the determination of the one issue before it—whether or not the defendant was the father of the relatrix's child. If the state desired special instructions upon particular matters, requests for such instructions should have been presented, which was not done.

*"Fourth.* In overruling Plaintiff's objections to evidence offered by Defendant on cross-examination of Relatrix in reference to company kept with other young men when there was no evidence at any stage of the proceedings indicating improper relations with such men. (A leading error.)"

The evidence was that near the probable date of conception the relatrix associated with a young man other than the defendant under circumstances which offered as much opportunity and as much likelihood of improper conduct with him as with the defendant. Such evidence is competent.

*"Fifth.* In failing to give any instruction on the subject of the Relatrix keeping company with other young men if any of such evidence was admissible at all."

This assignment of error is met by the response to the third.

"*Sixth.* In admitting on cross-examination of Reed by Defendant over Plaintiff's objection self-sustaining declarations of Defendant as to his denying the alleged relation with Relatrix when she was not present and the matter was not *res gestæ,* and refusing to strike out same. (Certain error.)"

The attorney for the relatrix pressed the witness for statements of the defendant, made on the way home from Lindsborg the night he was with the relatrix and made at other times, admitting or indicating that he had had improper relations with her. The witness testified that there had been talk on the subject of the defendant's relations with the prosecutrix, but that the defendant's statements would lead to an opposite conclusion. The attorney for the relatrix having thus taken down the bars, it was proper for the defendant to walk in and, on cross-examination, ask for the statements.

"*Seventh.* In admitting over Plaintiff's objection letter written by Relatrix to Defendant dated Nov. 11th, 1914, for any purpose and any part thereof, but particularly that part referring to her father and uncle wanting to take this matter into court."

The objection was to the letter as a whole and not to any specific portions of it. The entire letter was competent evidence for the defendant, and it made no difference when it was introduced.

"*Eighth.* In sustaining Defendant's objection to Relatrix's explaining what she meant in letter by the statement 'the week after Easter Sunday,' if such letter was admissible."

The letter spoke for itself. Besides, the relatrix said there was a mistake in it, and she told over and over again how she fixed the time when she was with the defendant.

"*Ninth.* In sustaining Defendant's objection to Relatrix's answering question as to the possibility of the time of meeting being later than April 15th, 1914, on the ground that it was leading."

The question was leading and suggestive. The form of the question was immediately changed and the witness, apparently taking the cue, said she was "not quite certain." Besides this, she had expressed her uncertainty in other portions of her testimony.

The State, *ex rel.*, v. Creager.

"*Tenth.* In sustaining Defendant's objection to Relatrix's stating who the father of her child was as a result of a particular intercourse on the ground that the question called for a conclusion of the witness."

Utterly frivolous in view of the repeated statements of the relatrix that she never had intercourse with the defendant except on the one occasion, and her testimony that the defendant was the father of her child.

"*Eleventh.* In overruling Plaintiff's objection to Defendant's asking Relatrix if she did not testify in a certain way in the Justice Court, objecting on the ground that it was incompetent, irrelevant, and immaterial, and particularly because not the best evidence, the testimony being transcribed and filed."

Perfectly legitimate cross-examination under elementary rules.

"*Twelfth.* In sustaining Defendant's objections to Relatrix's explaining why a Miss Esther Forsberg was not at the trial as a witness."

Miss Forsberg's nonattendance as a witness was sufficiently explained.

"*Thirteenth.* In overruling Plaintiff's objection to Witness Saylor on cross-examination being required to guess at the time of this occurrence after he had said that he did not know. (Gross error.)"

Utterly frivolous.

"*Fourteenth.* In sustaining Defendant's objection to question asked Reed by Plaintiff pertaining to studying on the ground of its being leading."

The question was leading and was one by which the attorney undertook to badger his own witness.

"*Fifteenth.* In overruling Plaintiff's objection to testimony of Bryan Darrow as to the contents of a day-book in a dry cleaning shop on the ground that it was not the best evidence."

The witness was telling how he had refreshed his memory, and said, "I looked it up on their books." That was the answer objected to, and the objection was properly overruled. Afterwards the witness gave the dates shown by the books referred to without objection. The attorney for the relatrix now asks for a new trial so he can introduce the books themselves, and the books show the precise dates given by the witness.

"*Sixteenth.* In that the instructions given, generally outside of matters already referred to, are not sufficient for the purposes of this case, and do not state the law correctly."

See *Third*, above. The law presumes morality and uprightness until the contrary is made to appear, and in a case of this character guilt must be made to appear to the satisfaction of the jury by a preponderance of the evidence.

"*Seventeenth.* In not granting Plaintiff a new trial on account of misconduct of the jury, and because one juror had failed to disclose his prejudice and disqualification on his examination as to his qualification as a juror, as appears by the affidavit of M. C. Donal. (A very material error!)"

The examination of the juror whose conduct is questioned is not given in the abstract. For all the abstract shows he may have been accepted without examination. The affidavit does not disclose misconduct, or any prejudice against the relatrix, or the proper prosecution of bastardy cases, or any legal disqualification to sit as a juror.

"*Eighteenth.* In not granting a new trial because of surprise and particularly because of not getting Esther Forsberg as a witness."

What testimony the witness would have given if she had been present, or would give if her presence can be secured at another trial, is not confided to the court, and the rule which should have been applied in the case in which Mary was a witness governs.

"*Nineteenth.* In not granting a new trial on the grounds that the verdict was given under passion and prejudice, and because it was contrary to the veidence."

The only prejudice and passion revealed in this case appear in the brief of the attorney for the relatrix. The warning given him in respect to his demeanor toward members of this court (*The State v. Linderholm*, 95 Kan. 669, 671, 147 Pac. 427) is now extended, and villification of the judges of other courts in briefs which he files here will not be tolerated again. The verdict is sustained by sufficient evidence.

"*Twentieth.* In refusing a new trial on each and every ground set up in the motion for new trial and not hereinbefore specifically pointed out."

The court considers none but errors specifically assigned. It can not undertake to check the records to see if counsel has omitted anything.

The State, *ex rel.*, v. Cumiskey.

"*Twenty-first.* In overruling challenge to the qualification of juror Clark, plaintiff exhausting all his challenges. (Give this error careful attention!)"

This subject is covered by a long line of decisions, some of which are referred to in the case of *The State v. Hoerr*, 88 Kan. 573, 129 Pac. 153.

"*Twenty-second.* In all rulings adverse to Plaintiff."

Padding.

"*Twenty-third.* In giving any judgment in favor of Defendant and adverse to Plaintiff, and in not giving judgment in favor of the Plaintiff."

Not an assignment of error at all. (*Lumber Co. v. Smith,* 84 Kan. 190, 114 Pac. 372.)

The judgment of the district court is affirmed.

---

No. 20,124.

THE STATE OF KANSAS, ex rel. S. M. BREWSTER, as Attorney-general, etc., *Plaintiff*, v. FRANK CUMISKEY, as State Inspector of Oils, et al., *Defendants*.

SYLLABUS BY THE COURT.

OIL INSPECTION — *Oil Inspection Fee Invalid — Inspection Fees Paid under Protest to be Returned.* The fee of ten cents per barrel chargeable for the inspection of kerosene, gasoline, benzine, and other petroleum products, under section 8 of chapter 200 of the Laws of 1913, is clearly and grossly in excess of the amount reasonably necessary to effectuate the lawful purposes of the act. At the time of its enactment, and ever since that time, the law was, and has been, depended on by the executive and legislative departments of the state government as a revenue measure to bring to the state treasury large sums of money in known excess of the cost of administering the law as an inspection law. The legislature of 1915, although cognizant of the facts and although of the opinion that three cents per barrel was an adequate inspection fee, failed to change the law. The fee is charged and collected for revenue purposes and not merely to defray the cost of inspection. Therefore, that portion of section 8 fixing the fee at ten cents per barrel as an inspection fee is void. Section 1 of article 11 of the constitution requiring a uniform and equal rate of assessment and taxation forbids collection of the fee as a property tax, and no other provision of law authorizes collection of the fee.

Original proceeding in mandamus. Opinion filed February 12, 1916. Writ denied.

*S. M. Brewster,* attorney-general, *S. N. Hawkes,* and *John L. Hunt,* assistants attorney-general, for the plaintiff.

*C. A. Braley,* of Kansas City, Mo., and *Fred S. Jackson,* of Topeka, for the Chanute Refining Company *et al.*

*Ossian Cameron,* of Chicago, Ill., for the Great Western Oil Refining Company.

*Albert L. Wilson,* and *Mark T. Wilson,* both of Kansas City, Mo., for the Uncle Sam Oil Company.

*Robert W. Stewart,* of Chicago, Ill., *R. R. Vermilion, Earle W. Evans,* and *Joseph G. Carey,* all of Wichita, for the Standard Oil Company of Indiana.

*J. N. Haymaker, A. V. Roberts,* and *W. D. Jochems,* all of Wichita, for the Wichita Refining Company.

The opinion of the court was delivered by

BURCH, J.: The action is one to test the validity of the oil inspection law. It takes the form of mandamus by the state to compel the state oil inspector to turn into the treasury certain oil inspection fees, which were paid to him under protest. Oil refining companies interested in the fees were made parties and made returns to the writ. Some testimony has been taken, and the cause is presented for decision on the writ, the returns, and the evidence, including some official documents of which the court takes judicial notice. The claim is that the law operates as a revenue measure and not as an inspection law for the protection of the people of the state, and that it violates the constitution of the United States and the constitution of the state of Kansas.

The law in question is chapter 200 of the Laws of 1913, which superseded sections 3938 to 3960, inclusive, of the General Statutes of 1909 (Laws 1899, ch. 170, as amended by Laws 1909, ch. 180), all of which were repealed. Kerosene, gasoline, benzine, and other petroleum products, whether manufactured in this state or not, must be inspected before being offered for sale or used for consumption for illuminating, heating, or power purposes in this state. Inspection is made by a

The State, *ex rel.*, v. Cumiskey.

state inspector, and a sufficient number of deputies to do the work, not exceeding six. The state inspector receives a salary of $2000 per year and his traveling expenses. Each deputy receives a salary of $1200 per year and his traveling expenses. Salaries and expenses are paid by warrants drawn on the state treasury. Inspection is secured by means of a system of penalties. It is a criminal offense for any one to sell or attempt to sell the oils required to be inspected without first having them inspected. Any agent, dealer, or vendor of oils who shall draw off such oils from a car tank or other vessel into a receiving reservoir before inspection and before receiving a certificate or car-tank seal authorizing the oil to be drawn off is guilty of a criminal offense. Every person, company or corporation in the state selling or dealing in oils required to be inspected is obliged to report in full and in detail to the auditor of state all receipts and invoices of oil on or before the tenth of every month. Neglect to do this is a criminal offense. The charge for inspection is ten cents per barrel of fifty gallons, which is paid to the inspector. The inspector forwards his collections to the state inspector, who pays them to the state treasurer, who places them in the general revenue fund. The state inspector is required to make an annual report on or before the twenty-fifth of December of each year of the inspections made by him and his deputies during the preceding year.

The act of 1913 superseded a law providing that inspection should be accomplished by a state inspector and a sufficient number of local inspectors to do the work. A schedule of inspection fees was prescribed, and local inspectors were authorized to keep one-half of their collections up to $50 per month as compensation for their services. The net profits to the general revenue fund of the treasury under that law were as follows:

| 1909 | $26,820.77 |
|------|-----------|
| 1910 | 31,337.16 |
| 1911 | 34,067.29 |
| 1912 | 38,189.95 |

Under the new law the net returns to the state, as reported by the state inspector, have been as follows:

| 1913 | $61,357.12 |
|------|-----------|
| 1914 | 76,665.68 |
| 1915 | 110,798.37 |

The following were the appropriations for the oil-inspection department made by the legislature of 1913:

|  | 1914. | 1915. |
|---|---|---|
| "State oil inspector | $2000 | $2000 |
| Clerk hire | 900 | 900 |
| Salaries of six deputy oil inspectors | 7200 | 7200 |
| Traveling and individual expenses including rent of office room for deputies and other expenses necessary for the transaction of the business of the office | 4000 | 4000 |
| Total | $14,100 | $14,100" |

(Laws 1913, ch. 26, § 1.)

The legislature of 1915 appropriated the same sums for the same purposes for the years 1916 and 1917.

The law of 1913 did not take effect until April first of that year. The state inspector's report for 1913 covers the year beginning with December, 1912. The recapitulation of that report follows:

| "Barrels of oil inspected | 419,945 |
|---|---|
| Barrels of gaso. inspected | 414,265 |
| Total | 834,210 |
| Amount of fees collected | $80,240.13 |
| Fees deducted for shipments to Mo | 2,299.90 |
| Total amount of expenses | 18,248.19 |
| Total amount net to State | 61,357.12" |

Recapitulations of the inspector's reports for the years 1914 and 1915 follow:

| (1914) "Barrels of oil inspected | 443,253 |
|---|---|
| Barrels of gaso. inspected | 456,650 |
| Total | 899,903 |
| Total amount of fees collected | $89,990.42 |
| Fees deducted for shipments to Mo | 4,748.60 |
| Total amount of expenses | 13,324.74 |
| Total amount net to state | 76,665.68" |

| (1915) "Total amount of fees collected | $123,308.29 |
|---|---|
| Fees deducted for shipments to Mo | 7,635.12 |
| Total amount of expenses | 12,509.92 |
| Total amount net to state | 110,798.37 |
| Barrels of oil inspected | 601,599 |
| Barrels of gas. inspected | 631,481 |
| | 1,233,080 (plus)" |

For a long time oil was inspected by inspectors appointed by local authorities, mayors and councils of cities and township trustees. In 1889 the office of state oil inspector was created.

In 1909 the scheme for inspection by local inspectors under the supervision of the state inspector was adopted. Before 1909 oil inspection was very profitable to the state. The net profits for the year 1906 were $18,011.95. For 1907 the net profits were $19,990.78. For 1908 the net profits were $20,-210.61. The law of 1909 not only afforded a large revenue to the state in excess of the cost of inspection, but it provided positions for the politically faithful who could be depended on "to look after things" in their respective localities. Year after year the state inspector's reports pointed with pride to a substantial increase in net revenues to the state over preceding years. The law of 1913 corrected the political evils, left the service as adequate and as efficient as it had been, but clung to the profit to the treasury. The state inspector's report to the governor at the close of the year 1913 reads, in part, as follows:

"Prior to April 1, 1913, at which time the present inspection law became effective, the oil inspection department comprised 124 local inspectors, located throughout the state at the various refineries and tank stations. Under the present law, the number of inspectors was reduced April 1st to six, without impairment of the efficiency of the service of the department to the public, and with material financial saving to the state as is hereinafter set out. Six inspectors are now performing the same service as did 124 under the old system and the department has been freed from criticism on the score that its revenues were being dissipated to reward political favorites.

"The six deputy inspectors are located at the various refineries throughout the state, where all oil and gasoline is properly inspected and the inspection certificates issued therefor before it is unloaded from tank cars into receiving tanks, or before it is barreled for shipment. Each of these deputy inspectors is fully provided with all necessary instruments, blanks and records for the proper and expeditious conduct of his duties."

The same matter was inserted in the report made to the governor in 1914, just before the legislature of 1915 assembled. This report also contains the following:

"At this time there are twelve refineries actively in operation in the state. After the first of the year there will be thirteen in operation, twelve of which are operated as independent companies, not connected with the Standard Oil Company, and all of whom are refining and selling oil within the state. The reports on file in the office of this department and in the office of the auditor of state show that during the year ending November 30th, 1914, this department has inspected a total of 443,-

253 barrels of oil and 456,650 barrels of gasoline making a gross total of 899,903 barrels inspected by the department during the year. By referring to former reports of the department, you will note that this is an increase of 65,693 barrels of oil and gasoline inspected over the previous year.

"No reports of kerosene explosions filed in this office and no reports of inferior gasoline."

The law requires the state auditor to make a biennial report, which he does shortly before the biennial sessions of the legislature. Sections 8873 and 8874 of the General Statutes of 1909 provide as follows:

"In such biennial reports the receipts and expenditures for each of the two fiscal years covered thereby shall be so stated as to correctly show the financial condition of the treasury for each of such years separately. He may also suggest plans for the improvement and management of the public revenues, when he deems it proper to do so.

"It shall be the duty of the auditor to include in his official report a detailed estimate of the expenditures to be defrayed from the treasury for the two next ensuing fiscal years, respectively, specifying therein each object of expenditure, and distinguishing between such as are provided for by permanent or temporary appropriations, and such as are required to be provided by law, and showing the means from which such expenditures are to be defrayed."

In his estimate of probable income to the general revenue fund from fees for the years 1916 and 1917, the state auditor, in his report submitted on December 15, 1914, included the sum of $80,000 for each year from oil inspection fees. In his estimate of appropriations to be made for the same years the auditor recommended only the usual appropriation of $14,100 per annum and proposed a saving of $4200 per year of this sum, as appears by the following suggestion:

"A saving of $4200 a year can be effected without any impairment in efficiency by abolishing the office of state oil inspector, doing away with one of his deputies, and cutting the contingent fund for oil inspection from $4000 to $3000 a year. The office work now being done by the oil inspector and one deputy could be done by the stenographer. This stenographer and the other five deputies could be attached to the state auditor's department.

"As it is now, five deputies and the stenographer do practically all the work. The oil inspector and the office deputy are simply 'middlemen.' They transmit the report of the five deputy inspectors, prepared and checked by the stenographer, to the auditor's office. For this service to the state the oil inspector receives $2000 and the deputy $1200 a year, with traveling expenses. Their work could just as well be done from the office of the state auditor."

The legislature of 1915 made no reduction in the inspection force and made the usual appropriation, but, recognizing the indefensible disparity between the amount of inspection fees received and the cost of inspection, reduced the fee from ten cents per barrel to three cents per barrel. The governor vetoed the bill on two grounds, that the reduction was unreasonable and that it would impair the usefulness of the oil inspection department. The usefulness of the oil inspection department did not depend in any particular on the fees charged for inspection. The number of men employed, the compensation they received and the appropriation for their salaries and expenses remained exactly the same. The reasonableness of an inspection fee is governed by settled principles of law and depends solely upon the relation of cost of inspection to collections for inspection, allowing a fair margin for variation. At three cents per barrel the margin above cost of inspection for the year 1914 would have been more than the total cost of inspection, and the margin for the year 1915 would have been nearly twice the total cost of inspection.

As the production and use of refined petroleum products increase inspection returns increase, and, as the state inspector's reports and the evidence show, increase at a much greater rate than the cost of inspection. Before 1913 oil inspection had become a reliable source of revenue. The act of 1913 gave the treasury more money than ever before above the cost of inspection. Its revenue-producing qualities were fully demonstrated before the legislature of 1915 assembled. The proof shows that the oil refining companies memorialized the two houses of the legislature of 1915 on the subject of the operation of the inspection law. With this and abundant other information before it the legislature formally declared that three cents per barrel was a sufficient inspection fee by passing house bill No. 551. This bill, as originally introduced, provided for a fee of five cents per barrel. It was amended in the house to read three cents per barrel, and was passed by both houses in its amended form. The experience of the year 1915 confirms the legislative declaration, but the law was not changed and fees continue to be charged and collected which bear no rational relation whatever to cost of inspection.

In September, 1914, the refining companies commenced to

pay under protest. This action was commenced in May, 1915. In December, 1915, the state inspector filed an affidavit, to be used as evidence in the case, containing the following:

"Affiant believes, after a careful consideration of all the information in his possession, and from the experience of the administration of his department, that the efficient administration of the work of the department for such full inspection of petroleum and its products, including gasoline and kerosene, will necessitate an appropriation by the state of Kansas of not less than $100,000.00 annually, and that the total revenue from the fees of such inspection, at the rate allowed and provided by law, will not materially exceed the necessary expenses of the administration of said law."

The refining companies cross-examined him. On cross-examination he reduced his estimate, without contention, $30,000. His estimate of $70,000 included the employment of a force of thirty deputies at a salary of $2000 per annum each. In his affidavit he had this to say of the six men actually in the service receiving $1200 per year.

"Affiant further states that all of said deputy inspectors are competent and efficient men, and well skilled in the work of inspecting oils and the products of petroleum required by law to be inspected."

On cross-examination he testified as follows:

"Q. Have you been forced to accept any inspectors under this law that you would not employ under the other law? A. Oh, no."

In 1914, after substantially two years' experience under the act of 1913, the state inspector reported that the efficiency of the service had not been impaired by reducing the number of deputy inspectors to six men, who were accepting $1200 per year as compensation for their services. The auditor was of the opinion that the chief inspector and one deputy might be dispensed with, and that the contingent fund might be reduced $1000 without impairing the efficiency of the service. In 1914 the department inspected nearly 900,000 barrels of oil. In 1915 it inspected more than 1,200,000 barrels of oil. This was done at a cost of less than the annual appropriation of $14,100 per year for the purpose. The court is inclined to think that if so many were necessary, twenty-four new men, competent to do the work, could be secured at the same price as those who are now serving, and that the state inspector's original estimate could safely be reduced $24,000 more, bringing the amount necessary to conduct the department in a proper and

efficient manner down to $46,000 per year. But whether the amount were $46,000 per year or $70,000 per year, the receipts for the year 1915, in which the necessity for an increased appropriation first arose, were $115,673.17, after deducting fees collected for inspecting oil shipped outside the state. If the present inspecting force and the present contingent fund were doubled, the net profit to the state on oil inspection would be enormously greater than the cost of inspection. All the evidence, however, as to what some other inspection law might accomplish and cost is beside the issue. The court has before it a definite inspection law, which the legislature chose to enact, and the results of its operation. If the legislature has adopted a limited and inefficient scheme which costs but little it can not charge and put into its treasury as clear profit on that scheme vast sums of money which might be expended on some other scheme if it were adopted.

Some deputy inspectors include in their affidavits statements that the fees received for inspecting foreign oil brought into the state does not defray the cost of inspection. Objection is made to the consideration of these opinions. Without the objection they would convey no information to the court, unaccompanied as they are by a presentation of the facts, if any there be, upon which they were based. The fact, if it be a fact, that the state is taxing its domestic oil industry to pay the cost of inspecting foreign oil is too important to be established by rule of thumb and might of itself imperil the law. The same impotence characterizes testimony given by the state inspector that the cost of inspecting the product of several small refineries, which he said "do a little once in a while," is greater than the fees received. If facts were produced the court would be able to draw its own conclusions. In no event, however, has the cost of inspecting foreign oil and the products of small refineries been as much as $14,100 per year. Conceding that a considerable part of the annual appropriation has been consumed in such inspection, the collection of the great sums charged for inspecting other oil can not be justified. While certain inescapable inequalities in the operation of inspection laws are to be expected and must be endured, a law can not be an inspection law as to some who are within its provisions and a special property tax law as to others who are also within its provisions.

The object of the law is to promote the safety of persons and property and to protect the people of the state from imposition and fraud. Authority to enact the law is derived from the police power of the state, reserved to it from the grant of powers to the federal government. As an incident of the police power the state may reimburse itself for the cost of inspection by charging the necessary expense upon the business or commodity creating the necessity for inspection. When, however, adequate remuneration has been secured the police power is exhausted. Of course, the books need not precisely balance. It is not possible to determine in advance exactly what sums may be realized from the administration of an inspection law, and there is no objection that some revenue above the cost of inspection may result. Such revenue, however, must be purely incidental to the practical operation of the law, and whenever revenue and not recompense becomes the palpable and unmistakable object the law fails as an inspection law.

The court finds as a fact that the fee of ten cents per barrel chargeable for the inspection of kerosene, gasoline, benzine, and other petroleum products under section 8 of chapter 200 of the Laws of 1913 is clearly and grossly in excess of the amount reasonably necessary to effectuate the lawful purposes of the act; that at the time of its enactment, and ever since that time, the law was, and has been, depended on by the executive and legislative departments of the state government as a revenue measure to bring to the state treasury large sums of money in known excess of the cost of administering the law as an inspection law; that the legislature of 1915, although cognizant of the facts and although of the opinion that three cents per barrel was an adequate inspection fee, failed to change the law; and that the fee is charged and collected for revenue purposes and not merely to defray the cost of inspection. The conclusion of law is that the portion of section 8 fixing the fee at ten cents per barrel as an inspection fee is void; that section 1 of article 11 of the constitution, requiring a uniform and equal rate of assessment and taxation, forbids collection of the fee as a property tax; and that no other provision of law authorizes collection of the fee.

While the legislature probably would not pass an inspection act without providing for the collection of an inspection fee,

the action of the legislature of 1915 clearly demonstrates that the present law would be continued in force without the provision for an inspection fee of ten cents. Consequently no occasion exists for declining to execute any provision of the law except the one held to be void and those subsidiary provisions which depend upon it.

The law is challenged as in contravention of certain provisions of the constitution of the United States. It is not necessary to discuss the very interesting questions thus raised. Certain features of the law are challenged as useless, inefficacious and absurd. The court prefers to leave the determination of these questions to the next legislature.

The inspection fees paid by various defendants under protest should be returned to them. The provisions of the law were such as to coerce inspection, and as a consequence the payment of inspection fees. The statute did not provide for the payment of a reasonable inspection fee, and no officer of the state had authority to accept less than the statutory fee if tendered. There being no valid law for the collection of any sum as an inspection fee, the state has no right to retain the funds indicated.

The peremptory writ is denied, and the custodian of the sums referred to as paid under protest is directed to return them to the proper parties.

---

No. 20,230.

THE STATE OF KANSAS, *Appellee*, v. E. B. WIMER, *Appellant.*

SYLLABUS BY THE COURT.

1. MURDER IN FIRST DEGREE—*Sufficiently Charged in Information.* A charge that the defendant unlawfully, willfully, feloniously, purposely and of deliberate and premeditated malice killed the person named by shooting him with a gun, commonly called a revolver, which was then and there loaded with powder and leaden bullets, construed to mean that the killing was done with deliberation and premeditation.

2. SAME—*Evidence Warranted Verdict.* The claim that the evidence did not warrant a verdict of guilty of murder in the first degree considered and held to be without substantial foundation.

3. SAME—*Instruction—Reasonable Doubt.* A charge that the jury could not acquit unless each one of them entertained a reasonable doubt of

23—97 KAN.

the defendant's guilt, while unnecessary and not to be commended, was not materially prejudicial.

4. SAME—*Evidence—Not Prejudicial.* The testimony showed that two young men associated together and visited at the homes of each frequently. The error in permitting a witness over objection to testify to the conclusion that they were good friends was harmless.

5. SAME. In describing a place with reference to an obstruction of the defendant's view it was not material error to permit a witness to answer in part that a person naturally could see as big an object as the one described.

6. SAME—*Rejected Evidence—Not Prejudicial.* Rejected evidence of a witness that defendant had attempted to sell his farm prior to the shooting was not of sufficient importance to require reversal, the defendant being permitted to go into the matter fully when upon the stand.

7. SAME—*Evidence—Former Conduct of Deceased Rejected—No Error.* An offer to prove that the deceased assaulted and beat a certain boy and was discharged from his employment on account of his quarrelsome nature and disposition five years before the killing and four years before any trouble was shown to have existed between him and the defendant was properly refused, the admission of testimony thus remote in addition to recent evidence of numerous witnesses being within the discretion of the trial court.

8. SAME—*Continuance—Evidence—Refusal Not Material Error.* Numerous witnesses testified as to the character and reputation of the defendant and the deceased for peaceableness or quarrelsomeness so that the jury had fair and ample information as to these matters. *Held,* that a refusal to grant a continuance on account of the sickness of another witness who had been subpoenaed to testify mainly in relation to these questions was not material error.

Appeal from Linn district court; CHARLES E. HULETT, judge. Opinion filed February 12, 1916. Affirmed.

*J. I. Sheppard, James G. Sheppard,* and *W. P. Dillard,* all of Fort Scott, for the appellant.

*S. M. Brewster,* attorney-general, *Harry W. Fisher,* county attorney, and *John A. Hall,* of Pleasanton, for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant was convicted of murder in the first degree, and appeals upon the grounds urged in his brief, that the information did not charge nor the evidence prove such offense, that the court erred in the instructions, in the ad-

mission and rejection of testimony and in denying a continuance. These will be considered in their order.

The charging part of the information, of which the defendant complains, is that—

"One E. B. Wimer did then and there unlawfully, willfully, feloniously, purposely, and of deliberate and premeditated malice, kill one V. M. Harold, by shooting the said V. M. Harold with a gun, commonly called a revolver, held in the hands of the said E. B. Wimer which said revolver was then and there loaded with powder and leaden bullets. And the said E. B. Wimer did, then and there as aforesaid, discharge the said revolver into the body of the said V. M. Harold, who was then and there a human being, and the said E. B. Wimer did as aforesaid then and there cause the death of the said V. M. Harold."

It is contended that this is not a charge of a willful, deliberate and premeditated killing within the meaning of the statute defining murder in the first degree. *Smith v. The State of Kansas,* 1 Kan. 365; *The State v. Brown,* 21 Kan. 38; *The State v. Stackhouse,* 24 Kan. 445, and *The State v. Johnson,* 92 Kan. 441, 140 Pac. 839, are cited.

In the Smith case it was said:

"To be murder in the first degree, the killing must have been willful, deliberate and premeditated, and such deliberate and premeditated *will* or *intent* to kill, being an essential ingredient in the crime, must be alleged in the indictment, else the prisoner is convicted of a crime for which he has not been indicted." (p. 388.)

In the Brown case the indictment did not charge that the killing was done deliberately or premeditatedly. The court said that stripped of everything except that which might be supposed to charge deliberation and premeditation it charged that the shooting was done with deliberate and premeditated malice, but not that the defendant at the time had a deliberate and premeditated intention or any intention of killing; that from anything appearing in that part of the indictment the shooting might have been committed with the intention merely of wounding the deceased. In the information before us, however, the killing itself is alleged to have been done feloniously, purposely and with deliberate and premeditated malice. With all the thoroughly approved forms easily found, it is difficult to see why an information presenting any perplexing questions as to sufficiency need be used. But, however inartistic, if the required substance be found in the charge it must be up-

held, for the defendant could suffer no material or prejudicial injury because of mere informality. In the Stackhouse case it was said that the assault, the killing, the intent to kill and the deliberate and premeditated intent constitute all the elements of the crime. (p. 450.) In the Johnson case definitions of deliberation and premeditation are given, and it is said that the former has reference to having thought over the matter beforehand, and that the latter pertains more to the matter of committing the act or the fact that its commission was determined upon in cold blood. The vital question is the meaning which must be attached to the expression "deliberate and premeditated malice." Malice aforethought has been held to be nothing more than an unlawful or wicked intention. (*The State v. White*, 14 Kan. 538; *The State v. Fooks*, 29 Kan. 425.) Malice has been said to signify ill will, hatred or revenge toward a particular individual; as denoting that condition of one's mind which is manifested by his intentional doing of a wrongful act without just cause or excuse; any wicked or mischievous intention of the mind. (*The State v. Witt*, 34 Kan. 488, 8 Pac. 769.) Malice aforethought, a wicked intention to kill, previously and deliberately formed. (*The State v. McGaffin*, 36 Kan. 315, 13 Pac. 560.) Hence, when one harbors such a state of mind and spirit of malevolence as indicated by the foregoing definitions, and with such deliberate and premeditated state of mind kills another, it is impossible to escape the conclusion that such killing is done deliberately and premeditatedly. It must be held, therefore, that in substance and effect the information sufficiently charged murder in the first degree.

In order to dispose of the contention that the evidence was insufficient to support the verdict it will be necessary to give a brief story of the events leading up to the tragedy and a succinct statement of the material facts concerning the homicide itself as shown by the evidence. In 1910 the defendant, a widower with five children, married the mother of the deceased, Hannah Wimer, a widow with eight children. After the marriage all of the children of the wife and two of the children of the husband lived with the wedded couple on the farm of the husband. The relations between the husband and wife became unpleasant, and a separation took place in Feb-

ruary, 1913, when the wife moved away and never afterwards lived with the defendant. About the time of the separation Virgil Harold, a son of Hannah Wimer, then about twenty-four years old, and the defendant, E. B. Wimer, had a fight, resulting in the latter being badly beaten up, the fight occurring apparently over what the son claimed his stepfather had said about his mother. After this it appears beyond dispute that Virgil Harold at different times was extremely abusive, insulting and threatening to the defendant, and made repeated statements to the effect that he intended to kill him or again do him bodily harm. It is equally clear that the defendant, more than twice the age of the deceased, regarded himself in danger, and for more than a year carried a pistol in order to protect himself if necessary, and that on various occasions when insulted and browbeaten by young Harold refrained from entering into any controversy or altercation with him. Some time after the separation the defendant rented his farm to a Mr. Chamberlain, and with his young son lived in a portion of the house. There was testimony tending to show that on account of the threats of his stepson the defendant tried to sell his farm and made certain journeys to other parts of the country. At Easter, 1914, Virgil Harold was at the place where the Chamberlains and the defendant lived, being a chum of one of the Chamberlain boys, and although he and the defendant met no trouble appears to have arisen, and no fault appears to have been found by Mr. Wimer by reason of Harold's presence. In June thereafter the defendant began helping in the construction of a house for a neighbor a mile east of him, and on July 2 thereafter Virgil Harold drove up to the place where Wimer was working, and after remaining there a while went to the Wimer place, unhitched his horse and had supper with the Chamberlains, intending to go that evening to an ice-cream supper. Sometime before this the pistol carried by the defendant got out of repair and he procured another, but did not have it upon his person on the day last referred to. He came home that evening, according to the testimony of some of the witnesses, somewhat earlier than usual. Virgil Harold's horse was in the barn, and after supper he went out to hitch up to his single buggy. Robert Chamberlain testified, among other things, that he ran out of the north door of the

dining room into the yard, through the gate in the direction of the barn, and saw Wimer standing in front of Harold with a gun in his hand about six feet from the deceased:

"I saw Wimer have a revolver in his right hand; Virgil's hands were hanging down to his sides, the way I looked at him; I heard no shots up to that time; Wimer spoke first; as near as I can give it, I heard him say, 'You ————'; I didn't hear Virgil say anything; when Wimer swore that oath he commenced shooting right away; fired three shots, two in quick succession with a short pause before the third; I saw Virge turn and commence to run as quick as he could; Virgil didn't speak another word after Wimer said, 'You ————'; he cried out but did n't speak a word; he cried out after the first two shots were fired; he turned to the left and kinda ducked under his horse's nose, away from Wimer; when the first two shots were fired there was just a short pause; Virge was turning, and just as he ducked under his horse's nose the third shot got him in the back; after Wimer fired he started walking up in the direction Virge turned, not but a step or two, probably three or four steps, and met right up with my brother; and I was right close, probably two or three steps away; I mean my brother James; he was coming from toward the barn."

He further testified that when he asked Wimer to give him the gun the latter stepped back so as to face both of the brothers and ordered them to keep back and stay off, and said that "That ———— can't come here." James Chamberlain testified that as Harold was putting the bridle on his horse Wimer walked down that way and said,

" 'You ————, what are you doing here?' Virge said, 'How's that?' Wimer said, 'You ————, what are you doing here? You get off this place.' Virge said, 'I'll come back here whenever these boys invite me to come back to see them.' Wimer said, 'You do, and ———— you, I will shoot you,' and he had on a pair of overalls that come up in front; he had his right hand in there, and when he said that he pulled his hand out and had this gun in it, and he leveled it at Virge, and when he done that I holloed at him. I said, 'Hold on there, Mr. Wimer, we're running this place now.' He kinda turned and started back up toward the house and Virge turned to me and said, 'Jim, did you see that gun?' I said, 'Yes, I seen it.' He said, 'Old man, I'll have you arrested before to-morrow night for drawing that gun on me, and I have got the money to back it.' Wimer turned around and said, 'I have got as much money as you have and I'll show you, ———— you. You hitch up that horse and get out of here as quick as you can.' Virge said, 'I'll go as soon as I get hitched up.' Wimer said, 'You ————,' and began shooting; at that time Virge lacked one tug and a breeching strap of being hitched up; before Wimer turned and started for the house Virge was standing on the north side of the horse, and when Wimer turned he went on the south

side and slipped the shafts into the shaft strap and hitched the tug, when Wimer got back to him; Wimer had gone probably twenty feet towards the house before he turned and came back; I didn't notice exactly, but he was standing from five to six feet from Virge when he went to shooting; I was standing in the front door; there was nothing to obstruct the line of my vision;  . . .  Harold didn't make any kind of motion toward Wimer at the time of or immediately before the shooting; he didn't advance toward Wimer in any way;  : .. .  there were two shots fired right together and then a very short pause before the third shot;  . . .  Harold said nothing at the time of the firing of the first two shots, just whirled and started to run."

The testimony showed that Harold was unarmed and that the fatal shot was in the back near the spine.   Other members of the Chamberlain family who were present gave substantially the same account of the shooting.

The defendant himself testified, among other things, that he heard on the day of the shooting that Virgil was down at Chamberlain's and heard some one say that he stayed there half of his time; that when he ordered him away upon that occasion he thought he was there to carry out his threat; but when he got home that evening Harold was sitting on the front porch:

"I went around the house to avoid him and to get away and stay away from him; I went upstairs and got my pistol and went out to order him away; I thought he was there to hang around until he got an opportunity to carry out his threats against me; that's why I went out to order him away and I took my pistol with me; when I went out there I said, 'Now, Virge, you know the conditions between you and me.   What are you doing here?   You ought not to be here.   I don't want you here.   I want you to go away and stay away from here.'   He swore, '———, I will come when I please and go when I please.'   He had his horse by the halter rope, and he dropped that and throwed his hand down to his hip, and said, '———, I will just leave here when I get good and ready.'   I had my revolver in the bib of my overalls and as he throwed his hand down to his hip pocket I covered him and said, 'Don't do that, Virge; don't do that.   You go away from here now; this thing has gone far enough between you and me.   You go away from here right now.'   He said, 'I am going as soon as I hitch up.''   I said 'That's all right; that's all that's necessary,' and I started on back to the house.   I went probably eight or ten steps.   He said, 'I am going to get you for this.   You ———, I am going to get you for this.'   He said several other things while I was walking; he asked Jim, in the first place, if he saw the gun, and Jim told him he did, and he said, 'I am going to have him in Mound City before to-morrow night.   He thinks I am afraid of his ——— old gun.   I am going to get him for this.   I am going to get you for this, you ———;'   I turned

around and faced back; his horse was facing almost directly to the barn; he was on the opposite side of it, the opposite side from me, and as I turned around I stepped back a step or two towards him, watching him, and he come right around in front of the horse; just as he come round in front of the horse he said, 'I will get you for this, you ———.' He came around with his left arm up and the other one back behind him (here the witness indicated); then I fired; I shot three times as fast as I could pull the trigger; I shot to keep him off of me; I believed he was going to carry out his threat to kill me; when he whirled to run I quit shooting; I watched to see that he did n't turn and commence shooting at me; I quit shooting as soon as he turned away from me; I did not know at that time that I had hit him at all."

On cross-examination he testified:

"Yes, sir, I shot him; I did n't expect anything else but to hit him; . . . when I started into the yard I saw Virge Harold was there: I went upstairs on purpose to get my gun; when I went out into the barn lot the first thing I saw Harold doing was getting ready to hitch up."

He also testified:

"I did not have any idea he was there for any other purpose but watching his chances; I talked calmly to him; I was calm enough to talk to him reasonable; I was n't in a passion; I was n't talking when I fired the first shot; I had no other thought in my mind only to keep Virge off of me and to keep him from hurting me; no, sir, I did not at the time fire those shots at Virgil Harold's body intending to kill him; I intended to stop him; I did shoot right at him."

While for a year and a half the conduct of the deceased toward the defendant and his threats made to and about him, up to the latter part of June, 1914, were inexcusable and atrocious, still the word pictures of the tragedy itself as already indicated are such that the jury were fully warranted in finding the homicide characterized by sufficient deliberation and premeditation to make it murder in the first degree.

The court instructed the jury that if any of them, after having considered all the evidence in the case and after having consulted with his fellow jurymen, should entertain a reasonable doubt of the defendant's guilt, then they could not find the defendant guilty; that in such case the defendant could not be acquitted unless each one of the jurors should entertain a reasonable doubt of his guilt. The latter expression is assigned as error. It is said to be open to the construction that unless every one of the jurors entertain a reasonable doubt the verdict must be "guilty." The instruction is substantially the same as that considered in *The State v. Rogers*, 56 Kan. 362, 43 Pac.

The State v. Wimer.

256, which was to the effect that if any one juror entertain a reasonable doubt of the defendant's guilt, a conviction can not be had, " 'but you can not acquit the defendant unless all the jurors entertain a reasonable doubt.' " (Syl. ¶ 3.)   In the opinion it was said:

"If the minds of the jurors do not so concur, there must be a disagreement.   But it is hardly necessary to instruct an American jury touching their right to disagree, for this is universally understood." (p. 371.)

The expression is at least an unnecessary one and its use is not to be commended, because, as everybody knows, the jury may either convict or acquit or disagree, and it can by no possibility enlighten them to charge that they can not acquit unless they all entertain a reasonable doubt.   However, it does not follow that the expression gave any license to believe that a conviction must be had unless all the jurors entertained a reasonable doubt, and it does not appear that any material prejudice arose from the use of this language.

A witness was permitted, over objection, to state that the deceased and one of the Chamberlain boys were good friends. This was for the purpose of showing that Harold was at the Chamberlains' place on account of this friendship rather than for the purpose of annoying the defendant, and in view of the claim of the latter was competent.   While the answer to the question really amounted to a conclusion and the objection, strictly speaking, should have been sustained, still the fact which was shown, that the two young men visited at the homes of each often, would indicate quite strongly that they were good friends, and the conclusion of the witness was not materially prejudicial.

A similar objection was made to a question propounded to Robert Chamberlain as to what amounted to an obstruction of the defendant's view of the deceased from the house.   Instead of answering that he would or would not have been in full view, his answer was:

"Well, a person naturally could see as big an object as that, though there's two or three small trees there.   No leafy trees or bushes or anything of that kind.   Several little maples with leaves all off."

This was a sufficient statement of the facts to render the objection on the ground of stating conclusions without merit.

Complaint is made that evidence of another witness of defendant's attempt to sell his farm prior to the shooting was erroneously rejected. The defendant himself was permitted to state fully what attempts he had made in this direction. The rejected evidence was not sufficiently important to require reversal on account of this ruling.

An offer to prove by a witness that in September, 1909, Virgil Harold assaulted and beat a boy named Richard Glaze and was discharged on account of his quarrelsome nature and disposition, was rejected. The evidence introduced touching the character of the deceased was quite sufficient to show his quarrelsome nature and disposition without going back before the marriage of his mother with the defendant, and no error was committed in rejecting the testimony in question.

Finally it is complained that a continuance was not granted on account of the absence of a witness who had been subpoenaed but was at home sick and unable to attend the trial. The testimony desired from him would have gone mainly to the character and reputation of the deceased and defendant for quarrelsomeness and peaceableness. In view of the large number of witnesses who actually testified touching these matters it can not be said that the trial court abused its discretion in refusing the continuance or that the defendant was substantially harmed or prejudiced by such ruling.

The judgment is affirmed.

---

No. 20,294.

THE STATE OF KANSAS, *Appellee*, v. WILLIAM H. VAN SICKLE, *Appellant*.

#### SYLLABUS BY THE COURT.

1. RAPE—*Instruction Refused—Not Error.* In a prosecution for rape, before it becomes necessary for the court to instruct the jury that if the woman charged to have been ravished is the wife of the defendant he can not be convicted, there must be evidence tending to prove that the parties were husband and wife.

2. SAME—*Evidence—Prima Facie Case.* In a prosecution for rape, to make out a *prima facie* case, it is not necessary for the state to prove that the accused and the woman were not husband and wife.

Appeal from Shawnee district court; division No. 1; ALSTON W. DANA, judge. Opinion filed February 12, 1916. Affirmed.

The State v. Van Sickle.

*W. S. Kretsinger,* and *W. N. Smelser,* both of Emporia, for the appellant.

*S. M. Brewster,* attorney-general, *W. E. Atchison,* county attorney, and *Lon C. McCarty,* of Emporia, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The defendant appeals from a judgment of conviction of rape by having carnal knowledge of Alma Stevenson, a female under the age of eighteen years. No defense other than not guilty was set up by the defendant. During the argument of counsel for the defendant he requested and the court refused to give this instruction:

"You are instructed that some evidence has been introduced in this case tending to show that the defendant and prosecuting witness are married, and are husband and wife, and the state has also introduced evidence to show that the defendant and prosecuting witness lived and cohabited together as man and wife. In this regard I instruct you that a man can not commit rape upon his own wife. The mere cohabitation of two persons of different sexes, and their behavior in other respects as husband and wife, always furnishes an inference of greater or less strength that a marriage has been solemnized between them. The conduct being susceptible of two opposite explanations, you are bound to assume it to be moral rather than immoral. The burden of proof is upon the state to establish to you, beyond a reasonable doubt, that the sexual relations existing between the defendant and prosecuting witness, if you find they did exist, were unlawful and illicit, and that the defendant was not the husband of said prosecuting witness, and if the state fails to prove this to you beyond a reasonable doubt you must acquit the defendant."

The defendant did not, during the introduction of evidence, contend that he and Alma Stevenson were husband and wife. The evidence fairly tended to show that they were not. To us it does not appear that there was any evidence that tended to show that they were.

The defendant's argument is that the burden was on the state to prove that Alma Stevenson was not his wife, and that for that reason it was the duty of the court to instruct the jury concerning this matter.

We disagree with the defendant in his statement that there was evidence tending to show that Alma Stevenson was the wife of the defendant. We are unable to find such evidence in the abstracts before us. There is not even a contention that

they were husband and wife. This being true, it was not incumbent on the court to instruct concerning the lack of marriage relation between the defendant and Alma Stevenson. Marriage of the defendant and Alma Stevenson was a matter of defense which must have appeared in the evidence in some way before the state was compelled to prove that the relation did not exist. In an information charging rape it is not necessary to state that the person ravished was not the wife of the defendant. (*The State v. White,* 44 Kan. 514, 25 Pac. 33; 33 Cyc. 1440; Note, 16 Ann. Cas. 902.) It follows that the prosecution to make out a *prima facie* case is not required to prove that the accused and the woman were not husband and wife. (*The State v. Hooks,* 69 Wis. 182, 33 N. W. 57, 2 Am. St. Rep. 728, 730; Note, Ann. Cas. 1912 B, 114.)

There are many matters of defense in criminal prosecutions that the state need not anticipate, and until they appear in evidence in some way it is not incumbent on the state to disprove them. Insanity and self-defense are good illustrations of this rule.

The judgment is affirmed.

---

No. 20,372.

THE STATE OF KANSAS, *Appellee,* v. JOHN COLLETTI, *Appellant.*

SYLLABUS BY THE COURT.

LIQUOR NUISANCE—*Conviction—No Error in Record.* The verdict, being supported by sufficient competent testimony, is not contrary to the evidence and is not contrary to the law.

Appeal from Cherokee district court; JAMES N. DUNBAR, judge. Opinion filed February 12, 1916. Affirmed.

*A. L. Majors,* and *C. B. Skidmore,* both of Columbus, for the appellant.

*S. M. Brewster,* attorney-general, and *F. W. Boss,* county attorney, for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant was convicted of maintaining a liquor nuisance and appeals, assigning as error that the verdict is contrary to the law and the evidence. Numerous witnesses

desired the jury to believe that it was a social affair by a club, but the sheriff and undersheriff told what they saw, and this was quite sufficient to support the verdict.

Being in accord with this part of the evidence, which the jury evidently believed, the verdict is also in harmony with the law.

The judgment is affirmed.

---

No. 20,373.

THE STATE OF KANSAS, *Appellee*, v. BUTCH TRIONE, *Appellant*.

### SYLLABUS BY THE COURT.

1. LIQUOR NUISANCE—*Injunction—Contempt—Evidence.* In a proceeding for contempt for violating an injunction against maintaining an intoxicating liquor nuisance, evidence that a liquor sold looked like beer, tasted like beer, and that the witness believed it was beer, and that there was malt in the liquor sold to another witness, is sufficient to justify a finding of the sale of intoxicating liquor.

2. SAME—*Witness Tasting Contents of Bottle.* It is not error to refuse to permit a witness to taste the contents of a bottle to see if they are the same as the contents of another bottle purchased from the accused by the witness.

Appeal from Cherokee district court; JAMES N. DUNBAR, judge. Opinion filed February 12, 1916. Affirmed.

*Charles Stephens,* and *A. L. Majors,* both of Columbus, for the appellant.

*S. M. Brewster,* attorney-general, and *F. W. Boss,* county attorney, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: This is an appeal from a judgment of conviction for contempt for violating a temporary injunction against keeping and maintaining an intoxicating liquor nuisance.

The liquor was sold over a board in the back room of a restaurant, on the premises covered by the injunction. Behind the board was a bench on which liquors and glasses were

kept. There were tables and chairs in the room. It was apparently a secret place, maintained for the sale of drinks.

1. The first contention is that the evidence does not show that the liquor sold was an intoxicating liquor as defined by the law of this state. A purchaser testified that the liquor looked like beer, tasted like beer, and that he believed it was beer. Another witness testified that there was malt in the liquor sold. This was sufficient to justify the court in finding it was an intoxicating liquor under the law of this state. Malt liquors are presumed to be intoxicating. (Gen. Stat. 1909, §§ 4361, 4364.)

2. Another complaint is that the court refused to permit a witness to taste the contents of a bottle then in the court room, labeled like one purchased from the accused by the witness, to see if the contents were the same as the contents of the bottle the witness had purchased. We do not think it was error to exclude this evidence.

The judgment is affirmed.

---

No. 20,374.

THE STATE OF KANSAS, *Appellee*, v. JULES BERGER, *Appellant*.

SYLLABUS BY THE COURT.

1. LIQUOR NUISANCE — *Information* — *Misdescription of Premises* — *Not Prejudicial.* An information charged the maintenance of a nuisance in a *frame* building on a location sufficiently described. The amended information recited that the nuisance was maintained in a *concrete* building, the location being exactly the same. *Held*, that the misdescription of the materials out of which the building was constructed did not prejudice the defendant's rights and the quashing of the amended information under such circumstances was forbidden by subdivision 7 of section 110 of the criminal code.

2. PLEA IN ABATEMENT—*Demurrer Properly Sustained.* A demurrer to a plea in abatement is properly sustained when the facts alleged in the plea contradict the record.

3. LIQUOR NUISANCE—*Competent and Sufficient Evidence.* Where the defense was that the place where the alleged nuisance was being maintained was only a lodge room where the members occasionally had a keg of beer on tap, the evidence of the officer serving the warrant, which showed the situation of the premises, the crowd, the liquors and paraphernalia of the place, and the presence of the defendant and his

The State v. Berger.

acts, was competent although the information may have been filed the day before the officer served the warrant.

4. SAME—*Former Decision Distinguished.* The case of *Topeka v. Chesney,* 66 Kan. 480, 71 Pac. 843, distinguished.

Appeal form Cherokee district court; JAMES N. DUNBAR, judge. Opinion filed February 12, 1916. Affirmed.

*A. L. Majors,* and *C. B. Skidmore,* both of Columbus, for the appellant.

*S. M. Brewster,* attorney-general, and *F. W. Boss,* county attorney, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The appellant was convicted of maintaining a common nuisance, and appeals.

The original information and the warrant issued thereon recited that the nuisance maintained by the defendant was located in a "one story *frame* building, situated," etc. Before trial, an amended information was filed in which the word "concrete" was substituted for the word "frame."

The defendant complains because the court overruled his motion to quash, sustained a demurrer to his plea in abatement, and overruled his motion to strike out the testimony of the sheriff, who raided the premises and seized the beer and liquor paraphernalia found in the nuisance therein maintained.

1. The statute forbids the quashing of an information for any defect or imperfection which does not tend to prejudice the substantial rights of the defendant on the merits. (Crim. Code, § 110, subdiv. 7.) It is not conceivable that the misdescription of the materials out of which the building was made could prejudice the rights of the defendant. The motion to quash was properly overruled.

2. The plea in abatement alleged that the place described in the amended information was a separate and distinct place from that named in the original information, and not the place which the county attorney had in mind when he filed the original information. This plea contradicted the record, and the demurrer was therefore properly sustained. (*Lester v. The State,* 91 Wis. 249, 64 N. W. 850; 12 Cyc. 356.)

3. The sheriff testified that he received the warrant on April, 9, 1915, and the same evening or the next evening he

went to the place described in the information, but it was a concrete and not a *frame* building, and found it enclosed with a high board fence. He found and seized some liquors, glasses, etc., and arrested the defendant, whom he found behind the counter serving beer to persons present. The sheriff was critically cross-examined on the point as to whether the location of the place was in accordance with the location described in his warrant.

But this evidence is said to be incompetent to prove that a nuisance was being conducted at the place at the time of the filing of the information, which was on the preceding day, and the case of *Topeka v. Chesney,* 66 Kan. 480, 71 Pac. 843, is relied on to support this contention. In that case the evidence related to the condition of the place five days after the date of the offense and three days after the filing of the complaint. But it is well established by our decisions that it is competent to show the officer's seizure of the liquors and liquor paraphernalia at the place charged in the information. (*The State v. O'Connor,* 3 Kan. App. 594, 43 Pac. 859; *The State v. Stockman,* 9 Kan. App. 422, 58 Pac. 1034; *The State v. Schoenthaler,* 63 Kan. 148, 65 Pac. 235; *The State v. Giroux,* 75 Kan. 695, 90 Pac. 249.) And such evidence is competent even if the officer proceeded without a warrant. (*The State v. Schmidt,* 71 Kan. 862, 80 Pac. 948.) The state justly contends that the appellant has not brought up all the evidence, and that the chief defense was that the building was the meeting place of a lodge and the beer-drinking a mere social affair. Even the scant record brought here indicates that that question was involved and that fact was sought to be developed by defendant's cross-examination of the sheriff. Moreover, it needs but an occasional keg of beer and beer drinking to transform a lodge room into a nuisance. On an issue as to whether the place was an innocent lodge room or a nuisance, the sheriff's evidence was competent, and the court's instructions (Nos. 5 and 7) emphasized the necessity that before the defendant could be convicted the jury must find from the evidence that a nuisance was being maintained at the place described in the information at the time it was filed. The general finding of the jury must control. It is not contended here that the evidence did not support the verdict.

The judgment is affirmed.

No. 20,538.

THE CITY OF PERRY, *Plaintiff*, v. W. E. DAVIS, as State Auditor, etc., *Defendant*.

SYLLABUS BY THE COURT.

CITY BONDS—*Defective Notice of City Election—Not Fatal to Validity of Bonds*. Under a statute requiring a notice of an election, to vote on a proposal to issue city bonds, to be signed by the mayor and city clerk, and published, the mere fact that the publication through inadvertence omits the signature of the mayor is not sufficient to invalidate the election or bonds issued thereunder, where an ordinance calling the election covered all the details required to be stated in the notice, and those who voted for the bonds constituted a majority of all the qualified electors of the city.

Original proceedings in mandamus. Opinion filed February 12, 1916. Writ allowed.

*George P. Hayden*, and *R. F. Hayden*, both of Topeka, for the plaintiff.

*S. M. Brewster*, attorney-general, for the defendant.

The opinion of the court was delivered by

MASON, J.: The city of Perry executed bonds for the enlargement of a municipal electric-light plant, which it presented to the state auditor for registration. The auditor refused to register them by reason of a doubt concerning their validity. To determine the question the city brings mandamus to require their registration. The facts are agreed to, and the case turns upon the sufficiency of the published notice of the holding of the election to vote upon the question of issuing the bonds, the proceedings in all other respects being entirely regular.

The statute requires such a notice to be signed by the mayor and city clerk, and to be published in a newspaper for three weeks. (Gen. Stat. 1909, § 745.) Here a notice in proper form was prepared, signed by both the officers named, and given to the printer for publication. But through inadvertence it was published with only the signature of the clerk attached, that of the mayor being omitted. In this respect

24—97 KAN.

only was there any failure to comply strictly with the requirements of the statute. The matter that was published gave to the electors of the city all the information concerning the election that would have been afforded if the law had been followed with literal exactness. The signature of the mayor could have added nothing to its force except by way of attesting its authenticity, and that was doubtless shown sufficiently for all practical purposes by the city clerk's signature. It is possible that some well-informed elector, who knew the law required both names to be printed, might have discredited the notice by reason of its not appearing to have been signed by the mayor. That remote possibility is offset by two considerations which were mentioned in *Chanute v. Davis,* 85 Kan. 188, 116 Pac. 367, as worthy of consideration in determining the consequences of a defective notice. Here an ordinance had been passed calling the election, and fixing the time and place of holding it, which covered the details required to be stated in the notice. As suggested in the case cited, the ordinance may perhaps be given the force of a public law, rendering applicable the rule that a failure to give the required notice does not invalidate an election if the time and manner of holding it are fixed by statute. Moreover, it is shown that those who voted for the bonds constituted not only a majority of those participating in the election, but a majority of all who were entitled to vote thereat. The notice was not the means by which the election was called—its purpose was merely to give additional publicity to what had already been determined and announced. And if all the electors who remained away from the polls had appeared and voted against the bonds the result of the election would not have been changed. In view of all the circumstances we think it clear that the irregularity in the form of the published notice was not so serious as to affect the validity of the bonds. This conclusion is well within the accepted rules. (See 10 A. & E. Encycl. of L. 630; Note, 18 Ann. Cas. 1141; 1 Dillon on Municipal Corporations, 5th ed., § 374; *Backus v. City,* 123 Minn. 48, 142 N. W. 1042; *Briggs v. Raleigh,* 166 N. Car. 149, 81 S. E. 1084; *State. ex rel. Mullen, v. Doherty,* 16 Wash. 382, 47 Pac. 598; *Smith v. Board County Comr's Skagit County,* 45 Fed. 725.)

The writ is allowed.

No. 20,584.

THE CITY OF OSWEGO, *Plaintiff*, v. W. E. DAVIS, as State Auditor, etc., *Defendant*.

### SYLLABUS BY THE COURT.

MUNICIPAL BONDS—*Improvement of Water Plant—Notice of Election—Irregular but Not Void—Mandamus.* Under a statute authorizing the issue of bonds for the extension and improvement of a municipal water plant, which provided that the notice of the election and the election ballot shall state the amount of bonds proposed to be issued, a city ordinance calling the election, the election notice and the election ballot stated the proposition thus:

"Shall the mayor and councilmen of the city of Oswego, Kansas, issue the bonds of said city in a sum not exceeding Thirty thousand dollars, bearing 5% per annum interest, payable semi-annually; payable within Twenty years from their date, in such manner as the mayor and councilmen may determine, for the purpose of improving the water supply plant and system of said city."

*Held*, that this slight departure from the precision of statement required by the statute touching the amount of bonds to be issued does not render the proposed issue illegal nor preclude their registration.

Original proceeding in mandamus.   Opinion filed February 23, 1916.   Writ allowed.

*Nelson Case*, of Oswego, for the plaintiff.

*S. M. Brewster*, attorney-general, for the defendant.

The opinion of the court was delivered by

DAWSON, J.: The city of Oswego invokes the original jurisdiction of this court in a petition for a writ of mandamus directing the auditor of state to register certain bonds of that city to provide payment for the extension and improvement of its municipal water plant.

It is agreed between the parties that the only question involved relates "to the legality and sufficiency of the description of the amount of the bonds to be issued under the ordinance, election proclamation and ballot recited in the plaintiff's petition."

The pertinent statute, in part, reads:

"Whenever the city council of any such city shall desire to procure authority for the issuance of bonds under the terms of this act, they

shall pass an ordinance directing the calling of an election for the submission of the question to the electors thereof. Notice for such election shall state the amount of bonds proposed to be issued, the purpose of the issue, and state the polling-place or places at which the election will be held." (Gen. Stat. 1909, § 745.)

In the ordinance adopted by the city pursuant to this statute it was provided:

"SECTION 2. That an election is hereby directed to be held at the usual place of voting in the several wards of said city, within thirty days from the taking effect of this ordinance, at which the following proposition shall be submitted to the electors of said city, to-wit: 'Shall the mayor and councilmen of the city of Oswego, Kansas, issue the bonds of said city in a sum not exceeding Thirty thousand dollars, bearing 5% per annum interest, payable semi-annually; payable within Twenty years from their date, in such manner as the mayor and councilmen may determine, for the purpose of improving the water supply plant and system of said city.' "

The notice by the mayor and the city clerk proclaiming the election followed the language of the ordinance and the proposition submitted at the election was approved by a lawful and sufficient majority of the voters.

It will be noted that the statute provides that the notice for the election shall state the amount of bonds proposed to be issued. The statute gives a form of ballot to be used and directs that the ballot shall conform substantially thereto. A literal compliance with this provision would require that the proposition be thus stated: "Proposition to issue bonds of the city of Oswego to the amount of $30,000.00 for the purpose," etc. (Gen. Stat. 1909. § 746.) The proposition presented by the notice and on the ballots was: "Shall the mayor and councilmen of the city of Oswego, Kansas, issue the bonds of said city in a sum not exceeding Thirty thousand dollars," etc.

It is conceded by the litigants that no exact precedent can be found in our own decisions.

We have examined a large number of cases which have arisen in other jurisdictions and the following support the contention of the plaintiff that the proposition was stated with sufficient accuracy: *Chicago, B. & Q. R. Co. v. Village of Wilber*, 63 Neb. 624, 88 N. W. 660; *Fishblatt v. Atlantic City*, 78 N. J. Law, 134. 73 Atl. 125; *Village of Bronxville v. Seymour*, 122 App. Div. (N. Y.) 377; *Lumberton v. Nuveen*, 144 N. Car. 303, 56 S. E.

940; *The Elyria Gas and Water Co. v. The City of Elyria et al.,* 7 Ohio C. D. 527; *Knight et al. v. Town West Union et al.,* 45 W. Va. 194, 32 S. E. 163.

Tending to support the position taken by the auditor of state that the proposition was not stated with sufficient accuracy are the following: *Hillsborough Co. et al. v. Henderson et al.,* 45 Fla. 356, 33 South. 997; *Smith v. Dublin,* 113 Ga. 833, 39 S. E. 327; *Crooke v. The Board of Commissioners of Daviess County,* 36 Ind. 320; *The Cincinnati, Wabash, and Michigan Railroad Company et al. v. Wells et al.,* 39 Ind. 539; *State, ex rel. Lexington & St. Louis R. R. Co., v. Saline County Court,* 45 Mo. 242; *Stern v. City of Fargo et al.,* 18 N. Dak. 289, 122 N. W. 403.

In some of the cases just cited the issue arose touching the definiteness of the proposition relating to the amount of bonds proposed to be issued and in some instances relating to the definiteness with which the rate of interest was specified. Nor can it be said that in every case the language of the various statutes under consideration was precisely like ours. But in the main the cases turn upon the liberality or the rigidity of the courts in construing the proceedings of the various municipalities under the statutes authorizing such bond issues.

Some help may be drawn from an examination of our own cases.

In *Turner v. Comm'rs of Woodson Co.,* 27 Kan. 314, an injunction was sought to restrain an issue of $27,000 of the bonds of Center township, Woodson county. The maximum amount which could be lawfully issued was $26,385.55. The amount voted by the electors was $27,000. The court held, in effect, that all the proceedings were valid and the bond issue was valid up to the lawful maximum, and held the issue void only as to the excess.

An analogous case to the one before us was *The State v. School District,* 34 Kan. 237, 8 Pac. 208. It concerned the validity of an issue of school bonds in which the statute provided that the bonds "shall specify on their face the date, amount, for what purpose issued, to whom, the time they run, and the rate of interest." (p. 243.) The bonds did not in terms specify for what purpose they were issued, except by a general recital that they were "issued in pursuance of an act of the

legislature of the state of Kansas, entitled 'An act to enable school districts in the state of Kansas to issue bonds,' approved February 26, 1866," (p. 240) and acts amendatory and supplemental thereto.  The court held, in effect, that this was sufficient to show that the purpose of the issue was to provide a schoolhouse for the district, either by erecting or purchasing the same.

In *School District v. Cushing*, 8 Kan. App. 728, 54 Pac. 924, an issue of bonds which was required by the statute to state on its face to whom issued was held to be sufficiently complied with by a recital that the bonds were payable "to ———— or bearer."

It is urged against the issuance of the writ that the city officials and those interested in the success of the bond election might mislead the voters as to the actual amount of bonds which the city government would issue where the sum is not positively and exactly specified in the bond proposition.  But this objection is no more true as to a bond election than to any other election.  In any free government the wise and the foolish, the vain and the venal, the radical and the conservative, may and do exercise the liberty of persuading their fellows to adopt their views; and all sorts of reasons, logical and illogical, serious, trivial and absurd, are given by electioneering advocates in their endeavors to win the support of the voters.  A bond election in Oswego is no more likely to be illegally affected by the misrepresentations, wheedling, or cajolery of the promoters of the bond issue than are elections elsewhere or on any other proposition submitted for the suffrage of the people. Moreover, it has never been held that where a positive and exact amount of bonds has been authorized by the electors that the municipality must issue that exact sum.  When once the issue has been authorized by the people, every prudent municipal government strives to keep the expenditures well below the maximum amount authorized by the electors; and the proposition submitted to the Oswego voters was simply a request for authority to issue $30,000 in bonds if that amount was necessary, and the people gave their sanction to such issue, and pursuant thereto the municipality now seeks to register and issue that amount.  It seems in accord with the liberal construction always given by this court in scrutinizing the official

action of public officers and boards to hold that in the proceedings leading up to the issue of the bonds in question the departure from the exact directions of the statute is not so serious as to prevent their registration.

It should be added, however, that in so important a matter as the issue of municipal bonds, the statutes authorizing them should be carefully studied and closely followed in all the proceedings leading up to their registration. It ought to be the pleasure and pride of municipal officers that in matters like these their work has been so thorough and precise that the registration of their municipal bonds goes through without a hitch, rather than to have them merely "scrape through" on a test case on the ground that the proceedings were not altogether so irregular as to vitiate them.

The writ is allowed.

---

No. 19,471.

J. I. KUTER, *Appellee,* v. THE STATE BANK OF HOLTON, *Appellant.*

OPINION ON APPLICATION FOR MODIFICATION
OF JUDGMENT.

Appeal from Jackson district court; OSCAR RAINES, judge. Opinion on application for modification of judgment filed February 12, 1916. Modification of judgment allowed. (For original opinion of reversal see 96 Kan. 485, 152 Pac. 662.)

*Guy L. Hursh,* and *E. R. Sloan,* both of Holton, for the appellant.

*E. D. Woodburn,* and *F. T. Woodburn,* both of Holton, for the appellee.

*Per Curiam:* On November 6, 1915, the judgment of the district court in this case was reversed with direction to render judgment in defendant's favor. (*Kuter v. Bank,* 96 Kan. 485, 152 Pac. 662.) An application for a modification of that order has been considered and the court is of the opinion that it should be allowed.

The judgment will be reversed and a new trial ordered with

direction to permit amended pleadings to be filed and such additional parties brought in as may be necessary to the end that the court may finally determine in this action the right of the plaintiff to the fund in the possession of the bank.

No. 19,692.

WILLIAM LAMPE, *Appellee*, v. THE STAR LUMBER COMPANY et al., *Appellants*.

SYLLABUS BY THE COURT.

1. LIENS — *Foreclosure — Sale — Assignment of Right of Redemption— Amount Required to Redeem.* Shortly after the holders of certain mechanic's liens had begun suit to foreclose, a quitclaim deed amounting to a mortgage on the land involved in the suit was executed to a trustee for the benefit of such lien holders. The foreclosure suit went to judgment, the land was sold and the sale confirmed, one of the lien holders being the purchaser at about one-fourth the amount of the judgments. Later the fee owner conveyed by warranty deed and at the same time assigned his right of redemption to the plaintiff, who sought to redeem on the basis of the sum for which the land sold at foreclosure. His payment being refused, he sued for an accounting of rents and profits and to redeem. *Held*, that the sum the land sold for is the proper basis for redemption.

2. DEED AND ASSIGNMENT—*Construed Together—Right to Redeem.* Such deed and assignment having been executed at the same time must be construed together, and for the purposes of this case amount merely to a transfer to the plaintiff of the fee owner's right to redeem.

3. EXECUTION SALE—*Mortgage Paid by Purchaser—Redemption from Sale—Amount Required.* The fee owner having requested the purchaser at the foreclosure sale to take up a mortgage on the land which he had executed to another—which was done and satisfaction entered of record—in order to redeem and oust, the purchaser must account for such mortgage, and the plaintiff, standing in his shoes, is under like obligation.

Appeal from Seward district court; GEORGE J. DOWNER, judge. Opinion filed March 11, 1916. Modified.

*F. S. Macy*, of Liberal, and *C. M. Williams*, of Hutchinson, for the appellants.

*William Barrett*, *L. G. Turner*, both of Pratt, and *C. V. Manatt*, of Liberal, for the appellee.

The opinion of the court was delivered by

WEST, J.: This was an action for an accounting as to rents and profits and to redeem from a foreclosure sale under certain mechanic's liens. The plaintiff recovered and the defendants appeal.

H. H. Stamper owned three lots in the city of Liberal and erected thereon a building, thereby accumulating mechanic's liens to the amount of more than $10,000, a large part of which was in favor of the defendant, the Star Lumber Company, which brought suit to foreclose its lien, making parties the other lien holders who appeared and pleaded. Judgment was rendered for the entire amount, and later the property was sold and purchased by the Star Lumber Company for $2700. The sale was confirmed and the sheriff ordered to issue a deed when the statutory period of redemption should expire. Five days after the foreclosure suit was begun Stamper executed to Charles Summers, for the benefit of the lien holders, a quitclaim deed to the property in question, taking back a certain written agreement. Afterwards Summers and wife conveyed to Lee Larabee, who held on behalf of the appellants. After the foreclosure sale was confirmed Stamper conveyed, and assigned his equity of redemption to the plaintiff, Lampe, who paid to the clerk $3200 for the purpose of redeeming the property from the sale, and the defendants refusing to accept this money he brought this action.

The court made findings of fact to the effect that there was no consideration for the quitclaim deed to Summers except the agreement already referred to; that the deed did not discharge the debts owing to the lien holders but that they remained in full force until they were reduced to judgment, and that the judgment of the Star Lumber Company still remains in full force and effect; that the debts which the quitclaim deed was given to secure were merged in the judgment and the premises were sold according to law to discharge the lien; that Stamper never paid to Charles Summers any of the amounts enumerated in the agreement; that the quitclaim deed was a mortgage. As matter of law it was concluded that the amount paid in by Lampe was sufficient to redeem the property from the sale and that he was entitled to the possession of

the property on a date named and to its rental value thereafter. A mortgage to one A. P. Amick for $500 covering two of the lots appeared to have been satisfied of record when the plaintiff purchased and he was held to be a *bona fide* purchaser and not liable for the payment of this mortgage which had been paid by the Star Lumber Company.

The defendants contend that Lampe had no right to redeem without payment of the entire judgment rendered on foreclosure, the theory being that the judgment and quitclaim deed merged and that the amount for which the property was bid in was not sufficient to effect redemption; that if the deed to Summers be deemed a mortgage then the defendants occupy the position of mortgagees in possession and should not be ousted until the entire debt is satisfied.

The decision of the trial court that the quitclaim deed was a mortgage, being abundantly upheld by the evidence, is approved.

The defendants having filed liens to secure their claims and having begun suit to foreclose, afterwards took the instrument held to be a mortgage, and then had the two securities, the liens in process of foreclosure and the mortgage. The mortgage seems to have been practically abandoned. The suit went to judgment and foreclosure under the liens, followed by the usual sale with an order for a deed when the redemption time should expire. While the amount of the liens was several times the sum for which the property sold, still it was at the defendant's instance that the property was put up for sale; and had an outsider bought it in for $2700 and later obtained a deed and then demanded possession thereunder, neither the Star Lumber Company nor any nor all of the defendants could withhold possession on the ground that he had not satisfied the entire judgment rendered in the suit. (24 Cyc. 61.) The Star Lumber Company having chosen to bid in the property for $2700 at a sale which it, with the other defendants, caused to be made, thereby came in as a bidder, as others might have done; and while the amount of its bid did not pay the entire debt, such amount with the statutory additions was sufficient to redeem the land from the sale, for it would be idle to subject the land to foreclosure sale to be followed by a deed which would give the purchaser and grantee the right of possession only upon payment of several thousand dollars in addition to the amount

for which the land sold. As a practical matter, if the property was worth anything near the amount of the liens, the defendants could, with safety, have made a larger bid and thereby protected themselves in case of an attempted redemption by a purchaser from the fee owner.

It appears that the defendants paid the Amick mortgage, and that for some reason it was satisfied both by the mortgagee and by the assignee, and that the record showed these satisfactions when the plaintiff purchased. The court held the plaintiff to be a *bona fide* purchaser and not liable for the payment of the mortgage. From the record it appears that on July 28, 1913, Stamper and wife conveyed the lots in question to the plaintiff by general warranty deed, and also on the same day Stamper executed an assignment containing the following:

"For and in consideration of the sum of one dollar and other valuable consideration paid by Wm. Lampe, I, the undersigned, do hereby sell and assign and set over to the said Lampe all my right of redemption of the following described real estate. . . . Which said real estate was sold by the sheriff . . . for the sum of $2,700.00 to the above plaintiff The Star Lumber Company, to whom a certificate was issued. That I hereby authorize the said Wm. Lampe to redeem for himself the above property from said sale the same as if I did and redeemed it myself as I have deeded to him by warranty deed all my interest in and to said property and state that all other deeds given for the same was to secure money the same as a Mtg."

The deed described as a general warranty is not set out, but the fair construction of the assignment already quoted from is that it transferred to Lampe Stamper's right to redeem. As between Stamper and the defendants who paid off the Amick mortgage no reason is apparent why the former should not account to the latter therefor. Because, owning the equity of redemption in the land he owned it subject to a mortgage executed but never paid by him, and as against the land in the hands of Stamper it was a proper claim in addition to the amount necessary to redeem from the foreclosure sale. Were the plaintiff a holder by a general warranty deed alone it is quite likely that under the recording act he would be protected as an innocent purchaser (*Lewis v. Kirk,* 28 Kan. 497; *Hargis v. Robinson,* 63 Kan. 686, 690, 66 Pac. 988), but the deed and the instrument of assignment being made at the same time must be construed together (*Insurance Co. v. Hanks,* 83 Kan. 96, 110 Pac. 99), the effect of which is to clothe him with the

rights of his vendor and assignor. Had Stamper attempted to redeem from the same and oust the Star Lumber Company from the land, equity would require him to reimburse it for its outlay in taking up the Amick mortgage, for while no reason appears for entering its satisfaction of record by the assignee, still this did not mislead Stamper, who knew that he had not paid it, and as to him such satisfaction would not estop the Lumber Company. Further, admission was made in open court that it was paid by Summers and Larabee for the benefit of the Star Lumber Company at the request of Stamper and his wife, and that it had not been repaid. Under all these circumstances Stamper could not redeem and recover possession, which seems to have been held by or for the Star Lumber Company and other lien holders, probably by virtue of the quitclaim already referred to, without accounting for the amount of this mortgage, and neither can the plaintiff who stands in his shoes.

The cause is remanded with directions to modify the judgment by adding to the amount paid in by the plaintiff to redeem the property the amount of the Amick mortgage. In other respects the judgment is affirmed.

---

No. 19,700.

ASHFORD W. GREENWOOD, *Appellee*, v. ANNIE M. GREENWOOD, *Appellant*.

OPINION DENYING A REHEARING.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion denying a rehearing filed March 11, 1916. (For former opinion of affirmance see 96 Kan. 591, 152 Pac. 657.)

*W. R. Hazen, H. W. Page, Bennett R. Wheeler,* and *John F. Switzer,* all of Topeka, for the appellant.

*Z. T. Hazen,* and *R. H. Gaw,* both of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: A petition for rehearing has been filed which has been supplmented quite copiously. Some of the matters urged may be given such attention as they deserve.

Much stress is laid on the fact that the trial court *made a finding* that the district court of Wabaunsee county determined the issue of fraud no further than that the contract should not be set aside, the finding being that the issue "was not determined in any other respect."

The fact that the trial court made the quoted finding was of no consequence whatever. The district court made the following findings, which were briefly but accurately summarized in the opinion:

"11. The issues of fact raised by the pleadings in said action in Wabaunsee county, including the question of fraud charged in the petition, were tried and determined by said district court of Wabaunsee county, Kansas. Substantially the same evidence was introduced in support of the charge of fraud in this action as was introduced in the action in Wabaunsee county.

"22*a*. . . . This alleged misrepresentation as to the value of the property was expressly pleaded by the defendant in her petition in the suit in Wabaunsee county as a ground for the rescission of the contract and such allegation was denied by the plaintiff in his answer."

The district court also made this finding:

"10. . . . Afterwards and on February 7th, 1911, the case was decided by the court in favor of the defendant in that action, plaintiff in this, and against plaintiff in that action. Copy of the journal entry of said judgment is attached to plaintiff's reply herein and is hereby referred to and made a part hereof."

With the issues, the evidence and the judgment found, any statement of the trial court as to the extent of the former adjudication was pure supererogation. The judgment spoke for itself. This court could interpret it just as well as the trial court, and the trial court could not by any finding it might make add to or limit the scope of the judgment. The issue before the Wabaunsee district court was whether or not the contract should be set aside for fraud. It would have been a most remarkable circumstance if the Wabaunsee district court had undertaken to determine this issue in any other or further respect than that the contract should not be set aside, and if it had done so the result would have been without effect as *res judicata* because beyond the issue under investigation. Without the judgment before it and without the finding of the trial court before it this court would have been obliged to assume that the Wabaunsee district court determined the issue before it no further than that the contract should not be set

aside. Consequently the fact that the trial court *made a find-ing* of that which was perfectly obvious and could not be otherwise was not deemed of sufficient importance to be given space in the statement of facts contained in the opinion.

The fact that the judgment of the Wabaunsee district court was limited to the issue before it, determined that issue to the extent that the contract should not be canceled, and determined nothing more, was of consequence. That fact furnished the foundation for the defendant's contention that the conduct investigated in the former cancellation suit was open to investigation again in this specific-performance suit. The case was argued orally. The point indicated was made on one side and answered on the other. The written briefs did the same thing. From these sources the court was able to comprehend the question presented for decision, which was not abstruse, and the court stated it in the opinion with sufficient definiteness for all purposes of the decision, as follows:

"The defendant argues *that the former adjudication extended no further than that sufficient cause for cancellation was not established,* that sometimes specific performance will not be decreed although cancellation would not be ordered on the same evidence, *and consequently* that the charge of fraud based on the same facts as before was open to investigation in this suit. *The premises may be conceded,* but the conclusion does not follow." (*Greenwood v. Greenwood,* 96 Kan. 591, 593, 152 Pac. 657.)

Then followed more than a page of matter in which the court tendered some reasons for not agreeing with the defendant's contention. The conclusion was stated in the first paragraph of the syllabus. The treatment of this subject in the opinion begins with the major premise, conceded to be true, that the *former adjudication extended no further than that sufficient cause for cancellation was not established.* All that followed related to the effect of that kind of an adjudication upon the rights of the parties in this suit. That is what the court had in mind; it had nothing different in mind, and statements by one of defendant's counsel that the opinion mistates the record, that the opinion is based upon facts not shown by the record and facts contrary to those shown by the record, that the appellant has had no consideration of the real question decided by the trial court, and that she has been prevented from having the consideration of the court upon the merits of her appeal, not

only have no foundation in fact but are contradicted by the plain language of the opinion itself.

The case of *Shoop v. Burnside,* 78 Kan. 871, 98 Pac. 202, is referred to again and again. That case was not overlooked. Quotations from both the syllabus and the opinion appear in the opinion in this case. This court understands the doctrine of *Shoop v. Burnside,* having decided the case and promulgated the opinion. The court declined and still declines to extend the doctrine of that case to permit the charge of fraudulent representations, decided to be insufficient to warrant setting aside a contract, to be re-pleaded and re-litigated in an action between the same parties for specific performance of the same contract. To the mind of the court the decision in *Shoop v. Burnside* and the decision in this case may stand side by side without impinging upon one another. If there be any conflict, the private interest which alone is involved in specific performance must yield to the public policy which lies at the foundation of *res judicata.*

The application of the doctrine of *res judicata* is sought to be avoided by a discussion of the difference between facts and issues. The petition in the cancellation suit made certain allegations of fact. The denial of those allegations of fact made an issue of fact and raised the question of the existence of fraud. That issue, including the question of fraud (Finding No. 11, quoted above), was determined against the plaintiff in that suit. What the doctrine of *res judicata* prevents is the investigation of the same issue of fact made in the same way and raising the same question of fraud in another suit between the same parties relating to the same subject matter, the form of the second action being immaterial. A suit was commenced to rescind a contract on the ground of fraud. Relief was denied. In a subsequent suit for damages resulting from the same fraud the former adjudication was pleaded in bar. The court said:

"Where a pleading states the facts as were set out in a former pleading in an action between the same real parties in interest, their representatives or privies, suing or being sued in the same quality or character—which facts were either admitted or traversed in the former action—and it appears that there was a final adjudication of the matters so in issue by a court of competent jurisdiction, then the question of the truth or falsity of the matters so in issue, as between the same parties,

their representatives or privies, is considered as forever settled by the adjudication upon them. And by the term, 'matters in issue,' we think must be included not only the object of the suit or the particular right or defense sought to be recovered or established, but all the facts material to the issue from which such object or remedy, cause of action or defense, was deduced." (*Gutheil v. Goodrich*, 160 Ind. 92, 95, 66 N. E. 446.)

In the Wabaunsee county case *one general fact* was involved, the existence of fraud at the inception of the contract. (See *Barber v. Kendall*, 158 N. Y. 401, 404, 53 N. E. 1, action to rescind after judgment for specific performance.) Whether the vendee said this or that, what of his statements, if any, were untrue or how far they were untrue, and to what extent the then plaintiff relied on them or was entitled to rely on them, were all matters going to the single fact, Was the contract the product of a motive improperly created in the present defendant's mind by fraud? Sometimes the making of statements, their falsity, reliance upon them, etc., are called elements or ingredients of fraud. Under a rule of pleading they must be set out, but when set out, collectively they state fraud, which is a fact, (Pomeroy, Specific Performance of Contracts, 2d ed., § 194), and whenever the cause of action is one for relief on the ground of fraud, and relief is denied by a judgment on the merits, the subject of fraud in the matter complained of is set at rest.

"So far as that cause is concerned, nothing remains upon which to base any litigation. So, also, a final judgment on the merits determining any issue of law or fact, after a contest over it, forever sets it at rest, and fixes it as a fact or as the law in any other litigation between the parties or their respective privies." (1 Van Fleet's Former Adjudication, § 1.)

The rule goes to the extent that the effect, and the *entire* effect, of the facts constituting fraud is adjudicated by a former judgment denying relief, and such facts can not be considered in a subsequent suit as a part of a different combination of facts. (*Clark v. Krause*, 17 D. C. 108.)

Leaving at one side the subject of *res judicata*, it would not be difficult to demonstrate that the findings of fact authorized a judgment for specific performance, but the court declines, as it did in the former opinion, to consume space with the analysis of the findings and the application of the rules of law which

would be necessary.  Whether or not the district court in its conclusions of law gave weight to the former adjudication, the facts having been found, this court is able to apply the proper rules of law to them.  With the subject of fraud eliminated little was left of the defense.

It is said that the third subdivision of the syllabus is that "inadequacy of consideration is not a defense to specific performance," that every lawyer knows mere inadequacy of consideration alone is not sufficient as a defense, and that the defendant has made no claim that it was.  The syllabus does not make the statement attributed to it, and neither the syllabus nor the opinion attribute to counsel reliance upon mere inadequacy of consideration alone as a defense.  One grievance of the defendant is that she did not get enough for her land.  Since that was a material subject of the lawsuit, and since insufficiency of consideration may go to the extent of producing inequity, it was deemed proper to say something about it.  The discussion inevitably led up to the question, What is adequate consideration? and a definition was adopted and stated in the syllabus.  That this discussion was pertinent is shown by the documents filed in connection with the application for a rehearing.  In one of them the subject of "inequity of the contract itself" is discussed, the sole point of the discussion being the profit to the plaintiff and the loss to the defendant resulting from the contract, ascertained by deducting the price paid from the value of the land. The figures presented show a value of from $7600 to $7980 while the price paid was from $760 to $1140 less.  The court can not accept counsel's judgment, if such be his judgment, that this disparity, under the circumstances, fraud being eliminated, ought to prevent specific performance.  The court is inclined to be guided by the authorities, which are abundant.  Two of them, one English and the other American, will indicate the trend.  In *Abbott v. Sworder,* 4 De Gex & Smale, 448, a contract to purchase land worth only 3500 pounds at a price of 5000 pounds was specifically enforced against the purchaser.  In *Nickerson v. Bridges,* 216 Mass. 416, 103 N. E. 939, decided in January, 1914, a contract to pay $16,000 for property which the evidence indicated was worth several thousand dollars more than that sum was specifically

enforced against the seller. Part of the opinion reads much as if the court were discussing the findings of fact in this case.

"Where the party to be charged has been overreached, or great hardship may be entailed, the court will exercise its discretion to prevent oppression and injustice, and this form of relief [specific performance] will be refused, although the bill, if the plaintiff desires, may be retained for the assessment of damages, rather than to remit him to his remedy at law. *Seton v. Slade,* 2 White & Tudor's Lead. Cas. in Eq. (4th Am. ed.) 513, 526. *American Stay Co. v. Delaney,* 211 Mass. 229. The evidence as to the market value of the land was conflicting. Undoubtedly the plaintiff sought to obtain it as cheaply as possible, and he and his brokers were better acquainted with its value than the vendors. But the judge has found that one of the defendants, who acted for herself and her sister the co-defendant, while advanced in years, was a business woman of experience, familiar with the location and the valuation made by the assessors of taxes. The bargain, moreover, was not entered into precipitately under pressure of the plaintiff's presence and urgency, nor were the defendants ignorant of their legal rights. During a period of five days, as he further finds, they could have made inquiries and obtained information and advice, as to whether the price offered ought to be accepted. It can not be said under these conditions, that the difference was so grossly inadequate as to lead to the inference of constructive fraud by the plaintiff, or of mistake in the making of the contract." (p. 421.)

The subject of what benefit the children received from the original divorce decree is reargued at length, the contention being that the decree created a trust. The opinion said, as the court had said before, that the language of the decree was very indefinite. The opinion stated the general rule with reference to definiteness in the declaration of a trust, given by a writer who has enriched American jurisprudence by a number of text books as brilliant as they are profound. The statement was taken from section 1009 of 3 Pomeroy's Equity Jurisprudence, 3d ed., where it was said:

"The declaration of trust, whether written or oral, must be reasonably certain in its material terms; and this requisite of certainty includes the subject-matter or property embraced within the trust, the beneficiaries or persons in whose behalf it is created, the nature and quantity of interests which they are to have, and the manner in which the trust is to be performed. If the language is so vague, general, or equivocal that any of these necessary elements of the trust is left in real uncertainty, then the trust must fail."

The opinion then cited a case decided by a supreme court of high repute in which the general rule was applied to a divorce

decree which, it was argued, undertook to create a trust in land for the benefit of children, but which failed to do so because of indefiniteness.    The syllabus of that case reads as follows:

"When, upon a decree of divorce in favor of the wife, for extreme cruelty and habitual drunkenness of the husband, the homestead property is awarded to the wife, and the decree declares that the property so awarded to her is to 'be held in trust for her support, and for that of the children of the parties,' no definite or certain trust is created, but an absolute and unlimited estate in the homestead property is transfered to the wife."    (*Simpson v. Simpson,* 80 Cal. 237, 22 Pac. 167.)

In the opinion it was said:

"As to the inference of a trust from the use of the words 'for her support and for that of the children,' and like words and phrases, Mr. Pomeroy says (section 1012): 'No definite rule can be laid down; each case must stand upon its own circumstances.    If the language is sufficient for the intention to be clearly inferred, the trust will be enforced; otherwise the donee will take an absolute estate, and the provisions concerning maintenance will be regarded as mere motives for the gift and recommendations addressed to his discretion.'

"The words in the divorce decree from which it is claimed that a trust may be inferred immediately follow the paragraph giving the wife the custody of seven minor children, and thereby casting upon her the duty of supporting and educating them, regardless of any aid which the court might allow her from the property of her husband.    Under these circumstances it seems not to have been inappropriate for the court to express, as a reason or motive for giving her the homestead, that it was intended for the support of herself and children, for which, by the decree, she had been made solely responsible."    (p. 241.)

There has been some undiscriminating thinking and careless writing about the subject of trusts by some of the courts of this country.    Cases may be found in which the simple use of the words "in trust for" a person or persons described have been held to create a trust for what seemed to the court to be a good thing for the person designated.    In such cases the general principles are often stated correctly, but it is not perceived that in applying the principles the court creates out of whole cloth the uses and purposes which are attributed to the trust instrument.    The decided cases being as multitudinous as they are multifarious, no review of them will be attempted.    In the case of *Tenney v. Simpson,* 37 Kan. 579, 15 Pac. 512, it was said that no particular form of expression is required to create an express trust but that the declaration of trust will be valid

if the writing or writings "clearly point out the nature and objects of the trust." (p. 588.) The divorce decree did not specify any estate or title or interest whatever in the land in controversy which the children were to possess or enjoy, did not specify any use to be made of it for their benefit, and did not specify any act or duty with reference to it which the trustee was to perform for their benefit. Essential elements of a trust were lacking, and the award of the land to the mother for her alimony and as her separate estate vested in her the entire title and estate, if Pomeroy and the supreme court of California are competent witnesses to the law, and if the rule indicated in *Tenney v. Simpson,* supra, is a trustworthy guide.

Counsel for the defendant undertakes to enlighten the court by means of a parallel. The declaration of trust in the divorce decree, and the declaration of trust in the divorce decree involved in the case of *Arnold v. Arnold,* 83 Kan. 539, 112 Pac. 163, are placed side by side. The question is asked, Which is the more definite and certain? and the challenge is made to point out what element is omitted in one which makes the trust void, which is found in the other and makes it valid. Here are the two decrees.

" 'And it is further ordered and decreed that the said plaintiff shall have, and there is hereby set apart to her as her separate estate, as and for her alimony in said action the following-described real estate [describing it], to be held by the said Annie Greenwood, in trust for Grace and Helen Greenwood until the said Helen Greenwood shall attain her majority, and at the expiration of said time or upon the death of both of said children before said time the title to said property shall vest in the said Annie Greenwood absolutely and in fee.' " (*Greenwood v. Greenwood,* 96 Kan. 591, 592, 152 Pac. 657.)

" 'That the plaintiff be and is hereby divorced from the said defendant and that she do have the complete, absolute and full control of said minor children during their minority, and that the legal title to said above-described homestead real estate be vested in the plaintiff in trust for and to the use and benefit of said children and any that may be hereafter born unto the plaintiff and defendant, or the survivors of them, until the youngest of said children of the survivor shall come to the age of maturity, to be held and used as the home of the plaintiff and the said children until said children or the youngest survivor of them shall come to his majority; and it is further ordered that said plaintiff do have all of the aforesaid personal property, including all growing crops on said farm, and that plaintiff do have the control of the contract of purchase of said land, and is authorized to perfect and complete the said purchase.' " (*Arnold v. Arnold,* 83 Kan. 539, 540, 112 Pac. 163.)

The difference between the two decrees is that in the Arnold case the use is clearly stated in express words in the part of the declaration of trust in which such limitation should appear, —"*to be held and used as the home of the plaintiff and the said children.*" This indispensable declaration is pointed out in the opinion in the Arnold case as follows:

"The language of the decree is clear and leaves no room for construction; it vests the legal title in her as trustee for the use and benefit of the children until the youngest shall come to the age of maturity, to be used as a home for her and her children until that time. The trust, the use and the limitation are clearly stated." (p. 543.)

The words of the decree in this case,—"in trust for Grace and Helen Greenwood" do nothing whatever but designate the beneficiaries, and there is just as much reason for reading into the decree the limitation expressed in the Arnold decree as any other. The district court found that the defendant leased the land in her own name and kept no account with her children as to the amount of money she received as rental, or how it was disbursed, but treated the income from the land as her own funds. She was well within her rights because the decree gave the children no property in a penny of the income from the land any more than it gave them title to the land itself, and charged the defendant with no duty to account to them for her management of the farm or her use of the proceeds derived from it. Because the decree is utterly barren of any description of the nature and purpose of the trust, it fails to meet the requirement of a declaration of trust.

It is asked why, if the court in the original opinion and in the opinion in *Greenwood v. Greenwood,* 85 Kan. 303, 116 Pac. 828, was able to define the nature and quantity of the children's interest and the manner in which the trust was to be performed, the trust is now held void for uncertainty. The court has not at any time been able to define the nature of any trust created by the divorce decree or the manner in which any trust created by that decree might be performed. In the case just cited the opinion summarized the terms of the decree and then said:

"We assume that the effect of the original decree was to *charge the income* from the land with the support and maintenance of the children, if necessary for that purpose." (p. 307.)

The word "trust" does not occur in that opinion except in stating the terms of the decree. In the original opinion in the present case the court said:

"The divorce decree charged the defendant with the duty of maintaining and educating the children. In order that the defendant might have means with which to discharge that duty the court gave her the land in controversy. It was supposed the land would be a source of income, and the purpose was that such income should be devoted so far as might be necessary to the support of the children during their minority. That was the full extent of their interest." (*Greenwood v. Greenwood,* 96 Kan. 591, 597, 152 Pac. 657.)

There is not a word here about any trust, and in the paragraph just preceding the one quoted the court had pointed out that essential elements of a trust were wanting. If the defendant had complied with her contract and had surrendered possession of the land, the children would have had no standing in court as beneficiaries of a trust to call the defendant to account as their trustee.

It is said that the present decision conflicts with the decision rendered in the case of *Greenwood v. Greenwood,* 85 Kan. 303, 116 Pac. 828. The court not only upholds that decision as *stare decisis,* but fully approves it. The decision was that the divorce court had no power to cancel or set aside the contract between the plaintiff and the defendant "so far as such contract in no respect interfered with the rights of the children" (Syl.), but that the interest of the children might be protected. The divorce court had original and continuing power to make any reasonable order for the support of the children. Having made an order upon that subject, the parties to the decree could not take away that support, and any attempt to do so or to substitute some other kind of support would have no effect *on the rights of the children.* But the divorce court, neither at the time of the original decree nor at the time when the attempt to cancel the contract was made, had any power to lay its hand on a contract between the plaintiff and the defendant further than might be necessary to protect the children. With the validity and the binding quality of the contract *as between the plaintiff and the defendant* the court had nothing whatever to do. It was concerned solely with the results of the contract on the rights and interests of the children, and had no concern whatever with the results of the contract on the rights and

Greenwood v. Greenwood.

interests of the contracting parties as between themselves. The divorce court conceived that the interests of the children extended so far as to require cancellation of the contract, and as a consequence the cancellation of the defendant's obligation to the plaintiff. This court reversed the judgment because it was not necessary, in order to protect the children, that the obligation of the plaintiff to the defendant should be destroyed. The contract embraced two subjects now of importance, conveyance of title and delivery of possession. Title was not to be conveyed until all relation of the children to the land was at an end and consequently they had no interest in that feature of the contract. Surrender of possession might cut off a source of income which might be material to their maintenance. They were interested in that subject, but they were interested no further than that possession should not be surrendered. Protection of their interest required no more than that the defendant keep the possession she had contracted to deliver. It did not require cancellation of the contract as between the plaintiff and the defendant or any impairment of the obligation of the defendant to the plaintiff which the contract created.

In the original opinion it was said that certain facts, which were summarized, were stage properties employed to give scenic effect to the defendant's presentation of her case and had nothing whatever to do with the merits of the book. One of the defendant's counsel feels aggrieved at the remark as a personal reflection upon him. Instead of meaning to reflect upon the counsel the court undertook to give the best turn it could to a serious matter with reference to which he stood on narrow ground. On the face of the brief his denunciation of the plaintiff and his denunciation of the decision of the trial court went dangerously near the limit of propriety. Printed briefs which become records of this court are not proper vehicles for invective against persons. The attorney for the plaintiff remonstrated against the intemperance of counsel's language. In a reply brief, counsel disclaimed any personal reflection upon the trial judge for making a decree resulting in "monstrous iniquity." The disclaimer is accepted, but it would have been better had it been extended to include an explanation of what was meant by characterizing the result of the decision as "abhorrent to the dullest sense of justice," and

what was meant by twice drawing the distinction between the decision rendered and the decision expected of the "just judge." The reply brief renewed the virulent personal attack on the plaintiff and stated that counsel had no apology to offer for it. The document passed beyond the bounds of legitimate argument to aspersion and revilement. Conceding something to zeal and to genuine emotion, the court passed the matter by as calcium light employed to bring into strong relief the merits of the controversy as counsel saw them. Counsel's statement that he believed the facts referred to in the original opinion to be relevant and material will be accepted, but the court disagrees with him and again states its opinion to be that they had nothing whatever to do with the merits of the case.

The foregoing covers the principal features of the application for a rehearing and for a reversal, and it is not deemed necessary to extend this opinion further.

The application for a rehearing is denied. The judgment of the district court is again affirmed, and the district court is directed to enter and carry into effect the mandate which has been forwarded to it.

WEST, J. (concurring specially) : Concurring in the result, I would add one suggestion.

Not only are we increasingly careful to refrain from impugning the motives of counsel but in the foregoing opinion an intended criticism merely of an argument, erroneously taken as a personal reflection, is correctly construed by the reference to the "Scenic" expression in the original opinion.

If a similar regard for the feelings of the court were manifested in all cases and at all times by counsel appearing here the felicity of the work and practice in this court would be augmented.

No. 19,739.

T. J. ENGLISH, *Appellant,* v. H. A. SANBORN et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. MORTGAGE—*Oral Agreement to Execute—Equitable Lien.* One who had given a chattel mortgage on certain property to secure a note, and had agreed to replace this with one executed by himself and wife, used the same property to secure a loan to complete payment for a farm and then promised his debtor to give him a mortgage on the farm executed by himself and wife—but gave him only a mortgage signed by himself and not acknowledged, the wife refusing to join, but she, with her husband enjoying the fruits of such exchange of security. The only defense pleaded to plaintiff's action to subject the land to the lien of his debt was a general denial. *Held,* that as between these parties the land is subject to such lien.

2. SAME—*Foreclosure—Unrecorded Deed—Innocent Purchaser—Question for Jury.* The husband and wife conveyed the land two days before this suit was begun but the grantees did not record their deed until some time after service had been made. The evidence as to such grantees being innocent purchasers examined and held to have been such as to entitle plaintiff to its submission to the jury under proper instructions.

Appeal from Greenwood district court; ALLISON T. AYRES, judge. Opinion filed March 11, 1916. Reversed.

*Howard J. Hodgson,* of Eureka, for the appellant.

No appearance was made for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiff sued to have a certain mortgage declared a first lien on the land involved herein and to have such land sold and his indebtedness paid out of the proceeds. A demurrer to his evidence was sustained and he appeals.

The plaintiff owned a farm in Rice county on which the defendants, Sanborn and wife, were tenants. In February, 1913, Sanborn, having contracted to purchase a farm in Greenwood county, had a settlement with the plaintiff by which it appeared that he owed him $1300, for which he was to give a note due in two years, secured by chattel mortgage on all the horses and mules then owned by Sanborn, which was to be ex-

ecuted by himself and wife. He alone executed such mortgage, retaining a duplicate to be executed by himself and wife and then to supersede the one signed by himself alone, after the removal to Greenwood county and an opportunity to ascertain and insert the location of the property to be covered by such duplicate. Upon arriving in Greenwood county Sanborn found that he needed $1600 to complete payment for and obtain possession of the land for which he had contracted. He and his wife thereupon mortgaged to a bank at Eureka the property, which had already been mortgaged by Sanborn to English, to obtain the $1600, which was used in paying the balance of the purchase price of the land. Sanborn then advised English that he was willing to give him a mortgage on the farm, and it was afterwards agreed between them that English should prepare and transmit a new note and mortgage on the farm to be executed by Sanborn and wife and returned to English, but upon the receipt of such papers Sanborn returned them signed by himself, without acknowledgment and without signature of his wife. Afterwards Sanborn stated to English's attorney, to whom the papers had been forwarded, that after his wife got less nervous and after his mother-in-law had left, the papers would be executed and acknowledged by himself and wife and delivered according to the agreement. This was not done.

August 14, 1913, English filed his petition in this action and service of summons was made on the defendants the next day. A deed conveying the Greenwood county land from Sanborn and wife, bearing date of August 12, 1913, its acknowledgment bearing the same date, to O. W. Hall and E. J. Nelson, was filed for record on the 19th day of September, 1913. It is claimed that in exchange for this Greenwood county land owned by Sanborn, Hall was to purchase a tract of land from one Sutton, about fifteen acres, and also a quarter-section, and convey to one Bradley for the land, which Hall was to have Bradley convey to Sanborn's wife. Also that before August 12, 1913, Hall had made the arrangement with Bradley to have his deed left in a bank at Fort Scott; that Hall's deed to Sutton was not acknowledged until August 15, 1913, the day after the petition in this case was filed, and that the deeds to Hall and Bradley were delivered on September 10, 1913.

It is contended by the plaintiff that as between him and the Sanborns his mortgage was a lien upon the Greenwood county land, and it is stated that the trial court in its rulings so held. Also that there was testimony which should have gone to the jury on the question whether Hall and Nelson purchased in good faith. Nelson admitted upon the stand that he had received $300 for making the deal and that he acted as agent for Sanborn; that neither he and Hall nor the Sanborns examined the title to the lands exchanged, although he claimed he was familiar with them already; that he would not say that his name was not put in the deed after its execution, and he admitted that it was afterwards that the instrument was made to state that he and Hall owned equal shares in the land described. Nelson had acted as agent for the vendor when Sanborn purchased the Greenwood county land. He denied having any notice or knowledge of the claims of English.

It is urged that even if Nelson and Hall purchased without notice of the claim of English they did not record their deed until after the pendency of this suit and therefore can not be heard to deny his rights.

The answer of the defendants, Sanborn and wife, was a general denial; that of Nelson and Hall an assertion of the title and denial of notice. The demurrer was sustained as to Nelson and Hall, also as to Sanborn and wife, the court finding that the debt was not yet due, and the action was dismissed as to them without prejudice. While as between English and the Sanborns the former did not literally furnish a part of the purchase price of the Greenwood county land, still by their conduct in using as a basis of credit the property which had already been mortgaged and agreed to be mortgaged to him they deprived him of recourse thereto to secure his debt, and certainly under the pleadings so far as Sanborn is concerned the mortgage signed by him is binding upon him. (*Foster v. Bank,* 71 Kan. 158, 80 Pac. 49; *Charpie v. Stout,* 88 Kan. 318, 128 Pac. 396; *Bisby v. Quinby,* 92 Kan. 86, 140 Pac. 635; *Markham et al. v. Wallace,* 147 Ala. 243, 41 South. 304; *King v. Williams,* 66 Ark. 333, 50 S. W. 695; *Carter v. Holman et al.,* 60 Mo. 498; *Martin v. Nixon,* 92 Mo. 26, 4 S. W. 503; *Dulaney v. Willis,* 95 Va. 606, 29 S. E. 324, 64 Am. St. Rep. 815; 27 Cyc. 976; 1 Jones on Mortgages, §§ 162-166; 8 M. A. L. 300.)

Under all the circumstances shown there are strong equitable reasons why plaintiff's lien should attach also as against Mrs. Sanborn, both she and her husband being content with a general denial of plaintiff's petition and both having enjoyed the fruits of the wrongful change of security. (See *Foster v. Bank*, 71 Kan. 158, 163, 80 Pac. 49.) This being so, the testimony as to the *bona fides* of the purchase by Nelson and Hall should have been submitted to the jury for its consideration under proper instructions, the dates of the various instruments and their delivery and acknowledgment, the shifting of title from Sanborn to his wife, the relation of Nelson to the transactions and the conduct of all the parties being such that fair-minded men might reach different conclusions.

The question of Nelson and Hall being purchasers *pendente lite* as suggested is worthy of very careful consideration when all the evidence shall have been received, but under the present state of the record it is not deemed necessary or proper for determination now.

The judgment is reversed and the cause remanded for further proceedings.

---

No. 19,740.

R. A. TIDBALL, *Appellee*, v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. TRIAL—*Misconduct of Counsel.* Misconduct of counsel and the trial court's ruling thereon considered and held not so serious as to require a reversal.

2. RAILWAY TRACKS—*Failure to "Look and Listen" Not Always Negligence.* The duty to look and listen before crossing a railway track does not relate to a situation where the railroad train is standing at the edge of a crossing and where the railway's employee gives a signal and invitation to cross.

3. RAILROAD ACCIDENT—*Damages to Wagon, Harness and Driver—Verdict Not Excessive.* While plaintiff on a public street was driving a horse and wagon over a railroad crossing, by the edge of which a number of freight cars were standing, the cars were suddenly backed into his wagon, breaking it, tearing his harness, and throwing him out and injuring him. The evidence touching plaintiff's damages examined and a verdict for $535 held not excessive.

Appeal from Wyandotte district court, division No. 2:
FRANK D. HUTCHINGS, judge.   Opinion filed March 11, 1916.
Affirmed.

*W. W. Brown, James W. Reid*, both of Parsons, and *A. L.
Berger*, of Kansas City, for the appellant.

*David F. Carson*, and *William K. Ward*, both of Kansas City,
for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The appellee was given judgment against the
appellant for personal injuries and for damages to his wagon
and harness in a collision at a railway crossing on a street in
Rosedale.

Appellee testified that as he was about to cross the defend-
ant's railway tracks at Rosedale, a switch engine and a num-
ber of cars passed the crossing and stopped and the defend-
ant's employee beckoned to him to cross and said "Come on."
He started to drive across, but before his wagon had cleared
the tracks the cars suddenly backed, smashed his wagon and
threw him out.   Three of the defendant's employees and an-
other witness, the flagman of another railway company which
also had a crossing on the same street about sixty feet distant,
testified that he was not signalled or told to cross but on the
contrary was told by one of them, "Stop," "Wait a minute,"
but the jury chose to believe the appellee and to disbelieve the
defendant's witnesses.

The errors assigned are: (1) misconduct of counsel; (2)
instructions given and refused; and (3) excessive verdict.

1. From the record it appears that the conduct of counsel
for the appellee was subject to criticism.   He insinuated be-
fore the jury that a rough draft of a map used to explain the
location of the scene of the accident was made for the purpose
of suggesting to a witness for defendant how he should testify,
that it had "been blocked out for him . . . and he just testi-
fies to what counsel has already made up for him."   He re-
peatedly accused the defendant's counsel and a witness for de-
fendant of having procured the names of other witnesses not
used at the trial, leaving it to be inferred by the jury that the
defendant was withholding the testimony of witnesses un-

favorable to defendant, and he made a spectacular demand before the jury for the production of the statements of bystanders who saw the accident. There was no evidence to show that the railway's employees or its counsel had procured such statements nor any evidence of the existence of such documents. There was a good deal of this sort of performance, all of which was improper, and the court should have firmly suppressed it. Eventually the trial judge seems to have taken a tighter grip on the discipline of his court, by saying:

"The Court: It seems to me that that thing on both sides is foolishness. These men that are on this jury are sensible men, and all this by-play I don't think will have any effect upon them and it ought not to be indulged in.

.   .   .   .   .   .   .   .   .   .   .   .   .

"The Court: There is nothing to prevent counsel asking you to produce anything that he thinks you have got, but he understands, I suppose, that you are not bound to produce anything of that kind, and if he wants to see it there is a regular way to get it. That is why I say it is no— . . . statements of this kind ought not to be indulged in. Go ahead."

This showing goes almost to the border line where a reversal would be required, but the court's remarks are in the nature of a finding that the jury would not be affected by it, and with some reluctance we will let it stand.

2. Objection is made because the court did not instruct the jury as to the stereotyped rule that the defendant must look and listen before crossing the track. The rule had no application here. What good would it do to look and listen in such a case? Looking, he would see the cars and the signal to cross. He did see them. Listening, he would have heard nothing but what he did hear—the railway employee's invitation to "come on." The court did instruct the jury that the appellee was bound to use reasonable and ordinary care and that his failure to do so or his contributory negligence would bar a recovery.

3. It is urged that the verdict is excessive. The appellee testified that the damage to his harness was $3; that he paid a blacksmith $10 to repair the wagon; that he paid $4 or $5 for drugs and bandages; that his earning capacity was $4.40 per day and he was unable to work for seven weeks. This showed damages amounting to about $233.60, and consequently the allowance for pain, suffering, and permanent in-

Morse v. Henlon.

juries was about $300. Hardly an excessive allowance, when we accept as true the jury's findings; and this, the appellant's counsel will not gainsay, we are bound to do.

The judgment is affirmed.

PORTER, J. (dissenting) : Several times in the course of the trial the court was requested to rule upon objections made to the conduct and statements of plaintiff's counsel in the presence of the jury. I think some of these objections should have been sustained and that the defendant was prejudiced by the refusal of the court to rule one way or the other. At different stages of the trial the court would have been justified, I think, in discharging the jury and continuing the case. Some of the proceedings bear little resemblance to an orderly trial in a court of record, and I think a new trial should be ordered.

MARSHALL, J., concurs in this dissent.

---

No. 19,746.

M. P. MORSE, revived in the name of SAMANTHA MORSE, as Administratrix, etc., *Appellant,* v. B. A. HENLON et al. (GEORGE WADE et al., *Appellees*).

SYLLABUS BY THE COURT.

1. WILL—*Construction—Intent of Testator.* There is no occasion for employing rules for judicial construction of a will in search of the testator's intention where such intention is expressed clearly and unequivocally in the instrument.

2. SAME. The intention of the testator so expressed is not controlled nor defeated by the fact that the scrivener divided the words used to express the making of a gift by the testator to a beneficiary into three paragraphs instead of including all in a single paragraph.

3. SAME—*Will Created Life Estate in Wife of Testator.* Provisions of the will under consideration are held to clearly show that the intention of the testator was to give his wife a life estate instead of an absolute title in fee simple to certain real estate.

Appeal from Pottawatomie district court; ROBERT C. HEIZER, judge. Opinion filed March 11, 1916. Affirmed.

*W. F. Challis,* and *E. C. Brookens,* both of Westmoreland, for the appellant.

*E. M. Brunner,* of Wamego, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: In an action to quiet the title to certain lots in Fostoria the controlling consideration was the meaning and effect of a will executed by John Wade. The provisions of the will material to this consideration are:

"Item 1st. I give and devise to my beloved Wife the house and six lots, viz: No's 13, 14, 15, 16 and No's 1 and 2 on which we now reside situated in Fostoria, Pott. Co., Kansas, and all the household goods, furniture, provisions and all the improvements that may be made thereon at the time of my decease.

"Item 2nd. I give and devise to my beloved Wife one hundred acres of land situated in the county of Morris and State of Kansas, to-wit—The East ten sixteenth ($^{10}\!/_{16}$) of the Northeast quarter (N. E. 1-4) of Section seven (7), Township seventeen (17), Range six (6) East of the Sixth Principal Meridian, containing one hundred acres (100) more or less.

"Item 3rd. I give and devise to Melvina Wade, my beloved wife, all the above named property for her to have and to hold the use of the same to her for and during her natural life.

"Item 4. I give and devise to my daughter, Mrs. Julia Drew, the one hundred acres of land mentioned in the above Will, with all the improvements that may be made for her to have and to hold the use of the same to her for and during her natural life and to become in possession of the same after the decease of my beloved Wife, and at the decease of my Daughter, Mrs. Julia Drew, the above mentioned one hundred acres of land with all the improvements made thereon, I give and devise to Mrs. Julia Drew's children, to be equally divided among them, that is the children living at the time of the decease of their mother."

About three years after the execution of the will John Wade died, leaving as his surviving heirs, his widow Melvina Wade, a daughter Julia Drew, four sons and five grandchildren. The widow duly consented in writing to the provisions of the will. In a will executed by Melvina Wade shortly before her death she undertook to devise the real estate in suit to M. P. Morse, a son of hers by a former marriage. He brought this action claiming title to the real estate and asking to have his title quieted as against the defendants, the heirs of John Wade, deceased. After the action was begun the plaintiff died and the action was revived in the name of Samantha Morse as administratrix.

The plaintiff insists that under the first item of the will Mel-

vina Wade was given an absolute estate in fee simple in the lots devised, and that the subsequent provision in which only a life estate was given to Melvina Wade was repugnant to the prior devise and therefore invalid. It is a well-recognized rule that where a will in clear and express terms gives a fee simple title to land with the full power of disposition it can not be diminished by any general or doubtful expressions in the later clauses of the instrument. The primary consideration in the interpretation of a will is the intention of the testator, and if it can be ascertained, that intention must govern if it is not contrary to a settled rule of positive law or in violation of public policy. The intention is to be gathered from all parts of the will as well as the circumstances surrounding the testator at the time of its execution. When all the provisions of the instrument in question are read and considered together the intention of the testator was manifestly to give his wife a life interest in the real estate devised. It is so obvious that a resort to rules of interpretation is hardly warranted. Because the scrivener divided that portion of the will which expressed the gift of the testator to his wife into three sentences or paragraphs, it is contended that they are not so connected as to express a common purpose and that the later expressions are repugnant to the earlier ones. While the scrivener employed three sentences or paragraphs in stating the extent and nature of the gift to the wife of the testator, he might have included all in one with the same effect. He might have written that the testator gave the lots, improvements and personal property as well as the farm in Morris county to the wife of the testator to have and to hold the same "for and during her natural life." The purpose of the testator would hardly have been more apparent in such a recital than in the form in which it was expressed. The intention of the testator was not obscured by the fact that the scrivener broke the statement of the gift to the wife into three parts. These parts were so related to each other and were so obviously united in the expression of a common purpose that they must be read and given the same meaning as if all had been embraced in a single sentence or clause of the will.

26—97 Kan.

In *Williams v. McKinney,* 34 Kan. 514, 9 Pac. 265, it was said:

"We are not to determine the legal effect of the will from any detached portion thereof, nor from any single phrase which it may contain. All parts of it should be considered and construed together, and if possible it should be construed in such a way as to arrive at the intention of the testator." (p. 518.)

In *Ernst v. Foster,* 58 Kan. 438, 49 Pac. 527, it was said:

"It is a general rule that a will should be construed so as to give effect to every part thereof, providing an effect can be given to it which appears to be consistent with the general purpose of the testator as gathered from the entire instrument." (p. 443.)

In *Bullock v. Wiltberger,* 92 Kan. 900, 142 Pac. 950, considerable stress was laid on the methods employed in punctuating and paragraphing the words of a will, and it led to the remark:

"We think, however, the general rule is that the arrangement of the terms is not regarded as controlling, although it is often considered as a circumstance by courts in attempting to determine the intent of the testator. . . . Technical rules of construction ought never to be resorted to where their application defeats the manifest intention of the testator." (p. 904.)

It is true that a part of the testator's property was not disposed of by the will, and that there is a presumption that a testator intends to dispose of his entire estate unless a contrary purpose clearly appears. (40 Cyc. 1409.) That presumption, however, is overcome in this instance by plain and unambiguous language which clearly evinces an intention that only a life estate in the property in question was intended to be given to the wife, and it follows that his purpose was to allow the estate not included in the devise to descend to his heirs in the manner provided by law.

The judgment is affirmed.

No. 19,749.

L. E. FONTRON, *Appellee*, v. O. H. BENTLEY, *Appellant*.

SYLLABUS BY THE COURT.

QUIETING TITLE—*Patent—Adverse Possession—Tax Deed—Priorities.*
A person claiming real estate under title derived from the government who has held adverse possession for more than twenty years, may quiet his title against a claimant under tax deeds more than two years old who has commenced no proceeding to obtain possession.

Appeal from Kingman district court; PRESTON B. GILLETT, judge. Opinion filed March 11, 1916. Affirmed.

*J. C. Bentley*, and *O. H. Bentley*, both of Wichita, for the appellant.

*W. G. Fairchild*, and *H. S. Lewis*, both of Hutchinson, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to quiet title against a claimant under tax deeds. The plaintiff prevailed and the defendant appeals.

The district court returned, among others, the following findings of fact:

*Fifth:* As above found, the plaintiff, L. E. Fontron, is the owner of the quarter section of land and his title rests in transfers, tracing from the patent from the United States down to him.

"*Sixth:* The plaintiff, Mr. Fontron, and his grantors have been in the possession and control, unmolested, open, notorious and adverse of the land in question for about 20 years.

"*Seventh:* That while the defendant, O. H. Bentley, procured the tax title in question, in his favor, as above found, and by his quitclaim deed from C. C. VanDeventer and wife procured the tax title held by the said C. C. VanDeventer, it is found by the court that the said O. H. Bentley did not obtain the possession to the said land in question under the said deed and that he never has been, since the issuance of the said deeds in possession of the said real estate."

The findings of fact are abundantly sustained by the evidence and are conclusive upon the rights of the parties. The tax deeds were issued in 1904 and 1906. Under the statute the holders were allowed two years within which to secure possession. After that they were without remedy, and the plaintiff,

whose possession was open, notorious and adverse, was entitled to an adjudication establishing his title and its invulnerability. The payment of taxes was imposed as a condition upon the relief granted.

In view of the findings of fact quoted some minor questions discussed in the briefs need not be considered.

The judgment of the district court is affirmed.

---

No. 19,764.

W. L. GUNN, *Appellant*, v. THE STOCK YARDS STATE BANK, *Appellee.*

SYLLABUS BY THE COURT.

1. BANKING—*Right to Apply General Deposit on Depositor's Matured Note.* The right of a bank to enforce its lien or off-set against a general deposit and to apply the deposit to the matured indebtedness of the depositor does not depend upon an express direction or authority of the depositor, where there is no understanding or agreement to the contrary between the depositor and the bank.

2. SAME. There is ordinarily no distinction between the right of a bank to apply a general deposit to a debt due the bank on an overdue note of the depositor and its right to apply such deposit to his overdraft.

3. SAME—*No Notice of Interest of Third Person in Deposits.* On the facts stated in the opinion, it can not be said as a matter of law that a bank which applied a depositor's account upon an overdue note he owed the bank was charged with notice of an interest of a third person in the fund.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed March 11, 1916. Affirmed.

*T. A. Noftzger, George Gardner,* and *G. W. Cox,* all of Wichita, for the appellant.

*J. N. Haymaker, A. V. Roberts,* and *W. D. Jochems,* all of Wichita, for the appellee.

The opinion of the court was delivered by

PORTER, J.: In September, 1913, W. L. Gunn and R. E. Bridge entered into an arrangement by which Bridge was to buy horses and mules on their joint account and Gunn was

to furnish money to pay for them. Gunn signed blank checks drawn on the National Bank of Commerce of Wichita, which he gave to Bridge, and which were to be filled out by Bridge as he had occasion to use them in the business. For more than a year previous thereto Bridge had kept an individual account with the Stock Yards State Bank of Wichita and had done considerable business through that bank. Bridge filled out nine of the checks and deposited them to his individual account in the Stock Yards bank· on various dates from September 16 to October 25. At the time the first check was deposited he owed the bank a note which was not then due. On October 9, after the note matured, the bank charged his individual account with $418.95, the amount due on the note. Gunn first learned on the 19th of October that the checks had been deposited to the credit of Bridge in the Stock Yards bank. He thereupon demanded of the bank the balance of the fund, and learned for the first time that part of it had been applied upon the note. Upon the refusal of the bank to refund the amount, he brought this action. The case was tried without a jury and the court found in favor of the bank. From this judgment the plaintiff appeals. The only question is whether the bank had the right to apply the deposit to the payment of Bridge's indebtedness.

Plaintiff argues that the bank had no right to charge the note to the account of Bridge, first, because it knew that the deposit did not belong to Bridge. The evidence to sustain this contention was quite meager and the court has found in the bank's favor and against the plaintiff upon the facts. Second, it is said the bank knew Bridge was insolvent and was obtaining this money from "some other source," and therefore it was its duty to inquire into the circumstances. The president of the bank testified that Bridge had been a heavy depositor for a year previous, depositing at one time $2645. The cashier testified that he knew the Bridge Horse and Mule Company was insolvent but that he thought Bridge himself was solvent, although he would not have loaned him any money at the time these checks were deposited because he did not think he was entitled to more credit. He understood Bridge was borrowing money to do business on, but he did not know from whom he was borrowing. We are at a loss to understand how the mere fact that he deposited checks

drawn by the plaintiff in his favor was sufficient to put the bank upon inquiry as to any interest the drawer of the checks might have in the funds. The third reason suggested is, that Bridge never directly or impliedly gave the bank authority to charge the note to his account. But the right of a bank to enforce its lien or off-set against a general deposit and to apply the deposit to the matured indebtedness of the depositor does not depend upon any express direction or authority of the depositor, where there is no understanding or agreement to the contrary between the depositor and the bank.

What is called a banker's lien is well recognized in commercial law. As applied to a deposit of money it is more accurate to speak of it as a right of offset; but when applied to securities it is appropriately called a lien.

"Ordinarily that [the lien] attaches in favor of the bank upon the securities and moneys of the customer deposited in the usual course of business, for advances which are supposed to be made upon their credit. It attaches to such securities and funds, not only against the depositor, but against the unknown equities of all others in interest, unless modified or waived by some agreement, express or implied, or by conduct inconsistent with its assertion." (*National Bank v. Insurance Co.*, 104 U. S. 54, 71, 26 L. Ed. 693.)

"When a depositor opens an account in a bank that very act, in the absence of an agreement to the contrary, authorizes the appropriation of his deposit balance to any matured claims the bank may hold against him, the same as if he then executed an agreement in writing to that effect." (*Meyers v. New York County Nat. Bank*, 36 App. Div. 482, 484, 55 N. Y. Supp. 504.)

The bank had the same right to apply the deposit of Bridge to the payment of his overdue note that it had to cash a check drawn by him in payment of his house rent or grocer's bill. And if there was nothing in the circumstances under which the deposits were made to put the bank upon inquiry as to the interest of the plaintiff so that he could have recovered from the bank the amount of a check drawn by Bridge for the latter's personal use and paid by the bank, then there is no reason why upon the facts in this case the bank should be liable to the plaintiff.

The authorities make no distinction between the right of a bank to apply a general deposit to a debt due the bank upon an overdue note of the depositor and its right to apply the deposit to his overdraft. The only difference would seem to be

in the steps necessary to make the application. As a matter of bookkeeping an overdraft is automatically reduced by the amount of a subsequent deposit, while in order to apply a balance of deposit to a note the note must have matured and must be charged to the account by the bank with or without direction from the depositor.

In *Kimmel v. Bean*, 68 Kan. 598, 75 Pac. 1118, the syllabus reads:

"A bank which receives from an agent for deposit in his own name the money of his principal, without notice of the agency, is protected in applying it to a past due debt of the depositor to the same extent as in paying it out upon his checks, whenever such application is authorized by the agent, either expressly or by legal implication; and such authority ordinarily arises from the making of a deposit without other directions, where the debt to which it is applied is an overdraft."

As already observed, there is no difference between the payment of a past due debt evidenced by a note and the payment of an overdraft. The opinion in *Kimmel v. Bean*, supra, cites numerous authorities which are quite applicable to the present case and it is unnecessary to review them. Bridge might have cashed the checks at the National Bank of Commerce and deposited the cash in the Stock Yards bank, and, as was said in *Kimmel v. Bean*, supra, "the question presented would not have been materially different." (p. 605.) To the same effect see *Hatch v. National Bank*, 147 N. Y. 184, 41 N. E. 403, where it was said:

"If, therefore, Smith had come with the money, and with it had paid his debt over the counter, the amount could not have been recovered by the plaintiff, although admitted to have been actual proceeds of the stolen certificate. I think the situation was not at all changed because the debtor came with Ferris & Kimball's check which the bank collected." (p. 192.)

The adoption of the rule contended for by the plaintiff is opposed to that principle of justice which determines as between innocent parties upon whom shall fall the loss in the circumstances shown in this case. Gunn placed the checks, duly signed, in the hands of Bridge, with implied authority to fill in and cash them. We fail to discover any circumstances sufficient to authorize the court to declare as a matter of law that the bank had such notice of the equities or rights of the plaintiff as would put it on inquiry.

In *Martin v. Bank*, 66 Kan. 655, 72 Pac. 218, it was held the bank was not liable to account to the owner of a fund deposited by an agent in his own name and which the bank paid on his check without knowledge of any want of authority on the part of the agent.

A case more directly in point is *Tough v. Bank*, 89 Kan. 583, 132 Pac. 174. In that case it was held that upon the facts stated a bank which had credited a deposit upon the depositor's note was not charged with notice of an interest of a third person in the fund. An attempt is made to distinguish that case from this because there the application was made with the depositor's approval. There is no claim in this case that Bridge told the cashier it was all right to charge the note to his account, but if the bank had the right to offset the one debt against the other, it would make no difference that it was done without the knowledge or consent of the depositor.

The judgment is affirmed.

--------

No. 19,891.

M. A. FITZGERALD, *Appellee*, v. J. E. FITZGERALD, *Appellant*, and H. P. FITZGERALD and E. E. ISENBERG, *Appellees*.

### SYLLABUS BY THE COURT.

ORAL CONTRACT—*Equitable Mortgage Superior to Attachment Lien.* One to whom the owner of land is indebted, and who orally agrees to and does lend money to the landowner with which to pay some of his debts, and who promises to and does pay other of the landowner's debts, and promises to and does become surety for the landowner for other of his debts, on the agreement of the landowner that he will deed to the other certain lands to secure him for the debts, money loaned, money paid and obligations incurred, becomes an equitable mortgagee of the lands agreed to be conveyed from the time of making such agreement; and his lien is paramount to that of a subsequent attaching creditor, although the deed is not made nor recorded until after the attachment is levied.

Appeal from Sherman district court; CHARLES W. SMITH, judge. Opinion filed March 11, 1916. Reversed.

*A. M. French*, of Concordia, for the appellant.

*L. B. Beardsley, George W. Holland*, and *Oscar Ostrum*, all of Russell, for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: In this action the contest is between an attachment creditor and an equitable mortgage lien holder. Defendant Isenberg, the attachment creditor, prevailed over defendant J. E. Fitzgerald, the equitable mortgage lien holder, who appeals.

In September, 1908, H. P. Fitzgerald, son of J. E. Fitzgerald, owned certain real estate situated in Sherman, Russell and Wallace counties. At that time he executed three notes for $625 each, and secured the same by mortgage on the real estate in Sherman county. The plaintiff, M. A. Fitzgerald, became the owner of one of these notes.

September 29, 1910, H. P. Fitzgerald owed J. E. Fitzgerald $955.07 and was largely indebted to a number of other parties. On that day J. E. Fitzgerald agreed to loan H. P. Fitzgerald $800 with which to pay some of his debts, agreed to pay certain other debts owed by H. P. Fitzgerald, and to sign notes with him for still other debts. To secure J. E. Fitzgerald, H. P. Fitzgerald orally agreed to convey to J. E. Fitzgerald the real estate as security. The deeds were not executed at that time because there was no one near who could draw a deed or before whom it could be acknowledged. H. P. Fitzgerald agreed to execute the deeds at an early date.

March 30, 1911, E. E. Isenberg commenced an action against H. P. Fitzgerald in the district court of Russell county and caused writs of attachment to issue, which were immediately levied on the real estate in Sherman, Russell and Wallace counties. No record whatever of the attachment of the Sherman county land was made in Sherman county until April, 1913. May 11, 1912, judgment was rendered in that action in favor of Isenberg and against H. P. Fitzgerald for $6050 with interest and costs. March 11, 1913, order of sale was issued, under which the real estate in Sherman county was sold to Isenberg. This sale was confirmed and a certificate of sale issued to him. April 8, 1911, after several requests by J. E. Fitzgerald, H. P. Fitzgerald executed deeds conveying the real estate in Sherman, Russell and Wallace counties to J. E. Fitzgerald. The deed to the property in controversy was recorded April 21, 1911. J. E. Fitzgerald complied with his agreement

partly before March 30, 1911, and all before December, 1911. He also paid the taxes on the land. J. E. Fitzgerald received actual notice of the attachment suit in Russell county and of the attachment of the Sherman county land in December, 1911, but had no actual notice before that time.

The action now before this court was commenced by the plaintiff, M. A. Fitzgerald, September 15, 1913, to foreclose the mortgage held by her on the Sherman county land. J. E. Fitzgerald and E. E. Isenberg were made defendants. J. E. Fitzgerald filed his answer and cross-petition against E. E. Isenberg, claiming a lien on the property second to the mortgage lien of M. A. Fitzgerald but prior to the lien of defendant Isenberg. Isenberg answered the cross-petition of J. E. Fitzgerald, alleging that his lien was second to the lien of M. A. Fitzgerald but prior to that of J. E. Fitzgerald, and asked to have his title quieted as against J. E. Fitzgerald. Judgment of foreclosure was rendered, and out of the proceeds of the sale of the property payment was ordered as follows: first, taxes; second, the plaintiff's costs; third, the amount due the plaintiff; and the balance to be paid to Isenberg. Title was quieted in favor of Isenberg against J. E. Fitzgerald. The court made conclusions of law as follows:

"1. As between H. P. Fitzgerald and J. E. Fitzgerald the latter under the agreement made between them on September 29th, 1910, held the equitable title to the land at the time of the levy of attachment writ issued in the Russell county suit, the legal title resting in H. P. Fitzgerald.

"2. E. E. Isenberg being an attaching creditor of H. P. Fitzgerald obtained only such interest in the land in suit under his attachment as H. P. Fitzgerald then had in it, and his equity was in law inferior to that of J. E. Fitzgerald, who then had the equitable title therein; and this would have been so declared had the latter intervened in the Russell county suit and set up his said interest in the land. This interest was not subject to attachment in the suit of E. E. Isenberg against H. P. Fitzgerald and subject to be applied to the satisfaction of the judgment obtained in that suit, and this would have been so declared, if properly raised and presented in that suit.

"3. The attachment levy made on the land in suit under the writ issued on the Russell county suit was regular and being so found by the court in that case, can not be contested in this collaterial suit.

"4. J. E. Fitzgerald having permitted the legal title to stand in the name of H. P. Fitzgerald on the record of deeds in this county, in legal effect, made him his representative in the Russell county suit, and being

in privity to him in the title is bound by judgment of the court in that suit.

"5. There was jurisdiction in the district court of Russell county, Kansas, to render the judgment and order it did in the suit of *E. E. Isenberg v. H. P. Fitzgerald,* and the judgment and finding there made, that the land in suit was subject to attachment and should be applied to the payment of the judgment rendered in that case against H. P. Fitzgerald is conclusive here. In legal contemplation J. E. Fitzgerald was a party to that suit, though not a party in fact. Under the facts found that judgment was a final adjudication of the claim of J. E. Fitzgerald to the land in suit here.

"6. The payment of taxes on December 18th, 1911, on the land in suit made by J. E. Fitzgerald was voluntary, and the sum so paid is not recoverable here.

"7. As between E. E. Isenberg and the defendant, J. E. Fitzgerald, the former is entitled to judgment for his costs against the latter."

J. E. Fitzgerald's complaint is of the third, fourth, fifth, sixth and part of the seventh conclusions of law. We will pass so much of the third conclusion as reads, "The attachment levy made on the land in suit under the writ issued on the Russell county suit was regular." The remainder of the third and all of the fourth and fifth turn on the question of privity between J. E. and H. P. Fitzgerald. The correctness of the sixth and seventh conclusions follow the determination of the question of privity.

In *Challiss v. City of Atchison,* 45 Kan. 22, 25 Pac. 228, this court said that the term "privity" denotes mutual or successive relationship to the same rights of property. The quotation found in *Hungate v. Hetzer,* 83 Kan. 265, 266, 111 Pac. 183, taken from *Coleman v. Davis,* (Tex. Civ. App. 1896), 36 S. W. 103, is as follows:

"A privy in estate, so as to be bound by a judgment affecting real estate to which he was not a party, is one whose title must be derived from a party bound by the judgment." (Syl.)

A grantor and grantee of real property are in privity with each other, and as between them the grantee is bound where his grantor was bound before the grantee acquired his interest in the property. After that the grantor can not do anything or suffer anything to be done that will affect the rights of his grantee. No person could have purchased this land from H. P. Fitzgerald with knowledge of the agreement between him and J. E. Fitzgerald at any time before the recording of the deed

and acquire any interest in the property paramount or adverse to J. E. Fitzgerald. By virtue of the agreement between H. P. and J. E. Fitzgerald, the latter became the holder of an equitable mortgage on this real estate, to secure the debt owing to him—money loaned, debts paid, and obligations incurred by him in obedience to that agreement. (*Foster v. Bank*, 71 Kan. 158, 80 Pac. 49; *Charpie v. Stout*, 88 Kan. 318, 128 Pac. 396; 1 Jones on Mortgages, 7th ed., §§ 163, 164; 2 Tiffany on Real Property, § 561; 27 Cyc. 983.) H. P. Fitzgerald could not avoid the effect of that agreement. Neither can any one who stands in his place. In an action between H. P. and J. E. Fitzgerald, the court would have enforced that agreement and declared the claim of J. E. Fitzgerald an equitable mortgage on the land. After the agreement was made, and as to all subsequent acts, H. P. and J. E. Fitzgerald were not privies.

Isenberg argues that J. E. Fitzgerald acquired his interest in the real estate while the attachment proceedings were pending, and is therefore charged with notice thereof, under section 86 of the code of civil procedure. The attachment proceeding was pending in Russell county. The real estate in controversy is situated in Sherman county. Section 86 of the code provides, in part:

"When the subject of the action is real property situated in two or more counties, the filing of the petition in the district court of one county shall not be held to impart notice to persons acquiring an interest in the real property situated in another county, except from the time the plaintiff in such action shall file for record with the registrar [register] of deeds of such other county, a verified statement setting forth the nature of the action, the court in which it is pending, a description of the real property sought to be affected thereby."

This statute was not complied with in any particular. Levying an attachment on the real estate in Sherman county did not impart notice of the attachment action in Russell county, although a copy of the attachment order may have been placed in a conspicuous place on the real estate. In addition to this, the rights of J. E. Fitzgerald did not date from the time of making and recording the deed, but from the time of making the oral contract with H. P. Fitzgerald.

Judgments are liens on the real estate of the judgment debtors. (Civ. Code, § 416.) Judgment lien holders are not purchasers. Their liens are upon the lands and tenements of

their debtors, and not upon lands not in fact belonging to their debtors. (*Swarts and Others v. Stees and Bryan & Hardcastle*, 2 Kan. 236, 241.) They are never considered *bona fide* purchasers, even if purchasers at all. (*Harrison & Willis v. Andrews*, 18 Kan. 535, 542; *Bodwell v. Heaton*, 40 Kan. 36, 40, 18 Pac. 901.) This court has said that an attaching creditor acquires no greater interest in attached property than that held by the attachment debtor. (*Burke v. Johnson*, 37 Kan. 337, 15 Pac. 204; *Bodwell v. Heaton*, supra; *Good v. Williams*, 81 Kan. 388, 391, 105 Pac. 433.) An order of attachment directs the sheriff to attach the lands, tenements, goods, chattels, stocks, rights, credits, moneys and effects of the defendant. (Civ. Code, § 193.) This does not command him to attach the property of any other person. A debtor to defeat his creditor may fraudulently convey his property to a third person, and the creditor can attach the property so conveyed. But in the present action it has not been shown that the property was fraudulently conveyed to J. E. Fitzgerald. The first and second conclusions of law establish the interest of J. E. Fitzgerald in the land. He can not be divested of that interest in an action between Isenberg and H. P. Fitzgerald. J. E. Fitzgerald's right to the real estate must be determined in some action in which he and Isenberg meet and contest that right. This might have been done in the attachment suit in the manner suggested in the second conclusion of law. It might have been done by Isenberg obtaining a sheriff's deed and beginning an action in ejectment against J. E. Fitzgerald. It might have been done in an action by J. E. Fitzgerald to quiet his title as against Isenberg. But until J. E. Fitzgerald's right to this property has been determined, his interest in the land remains, notwithstanding the attachment proceedings.

J. E. Fitzgerald had such an interest in this land as justified him in paying the taxes thereon for the protection of that interest, and his payment of those taxes was not the act of a volunteer. (Gen. Stat. 1909, § 9494.)

The trial court erred in its third, fourth, fifth, sixth and seventh conclusions of law. The judgment is reversed, and the district court is directed to enter judgment declaring the lien of J. E. Fitzgerald prior and superior to E. E. Isenberg, and to take further proceedings in accordance therewith.

No. 19,923.

C. F. SUBKE, *Appellee,* v. M. D. GONDER, *Appellant.*

SYLLABUS BY THE COURT.

PRINCIPAL AND AGENT — *Exchange of Land — Opinion of Agent as to Values—False Representation.* Under the facts stated in the opinion it is held that a statement of the value per acre of a ranch, made to a principal by an agent who was an intermediary to effect an exchange of land, was an expression of opinion upon which an action for false representation could not be predicated.

Appeal from Gray district court; GORDON L. FINLEY, judge; LITTLETON M. DAY, judge. Opinion filed March 11, 1916. Reversed.

*Frank L. Martin,* and *Van M. Martin,* both of Hutchinson, for the appellant.

*Lester Luther,* of Cimarron, and *H. O. Trinkle,* of Garden City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a principal against his agent for damages for false representations which induced an exchange of real estate. The plaintiff recovered and the defendant appeals.

The plaintiff was the owner of a tract of land in Gray county consisting of 1084 acres. This land was worth $14,000, and was subject to a mortgage which, with accrued interest, amounted to about $7500. The defendant effected a trade of the Gray county land for all but ten acres of the Kilworth ranch situated near the city of Lawrence. The Kilworth ranch consisted of 842 acres, well improved and well arranged and adapted for ranch purposes. It embraced sufficient bottom land to carry the stock, timber enough to support the ranch, pasture land and hay land. Between 200 and 300 acres were in cultivation and 20 acres in alfalfa. There were three sets of improvements on the ranch. There were three well-built frame dwelling houses, having respectively five, six and seven rooms, two of the houses having porches. There were one granary, 16 x 20 feet, with sheds attached, another granary

about ten feet square, a corncrib holding 1200 bushels of corn, with a grinding machine, and another small corncrib. There were sheds for hogs at three different places, one for 500 head, one for 50 head, and one for 30 head. There were sheds for 600 head of goats, and a cow shed with a place for hay, 20 x 40 feet. There were six chicken houses and a cement dipping tank. There were three barns, one 30 x 40 feet, shedded all around by cow sheds and stanchions, one 28 x 40 feet for horses, implements and hay, and one 42 x 84 feet, three stories high. The large barn was modern in every respect, containing a hay carrier, a litter carrier, a feed carrier, pitless scales, feed chutes of various kinds, box stalls, bins for various kinds of grain, an inside crib holding 1000 bushels of corn, and room for 500 tons of hay. There was a gravity system of waterworks watering sixteen different places on the ranch, irrigating a garden and supplying the large barn and the dipping tank. There were about 300 acres under hog-tight fence.

There was no cash market for the plaintiff's land or for the ranch. In negotations between the plaintiff's agent and Kilworth's agent, the plaintiff's land was priced at $30 per acre and the ranch was priced at $85 per acre. The plaintiff and the defendant went to Lawrence and inspected the ranch. The plaintiff was a farmer with twenty-two years' experience in farming in Illinois and Missouri. He had handled stock, was familiar with the kind of land which composed the ranch, and he spent four hours' time in making a fairly complete inspection of the ranch, except the timbered portion which was rough and poor land. At first Kilworth asked $45,000 and the Gray county land for the ranch. By the defendant's effort the price above the Gray county land was reduced to $40,000, and the trade was closed on that basis. Kilworth gave the plaintiff a deed for 160 acres, worth $8000, and a contract for the remainder of the ranch, which allowed the plaintiff twenty years time in which to pay the $40,000. The plaintiff gave the defendant a mortgage on the deeded part of the ranch to secure his commission, which was computed on the basis of $1.50 per acre for the plaintiff's land, and one-half the reduction which the plaintiff secured in the price of the ranch, a total of $4366. After concluding the negotiations, the plaintiff returned to his home, explained to

his family the terms of the trade, and his wife signed the necessary papers understanding what had been done. When the plaintiff was at the ranch Kilworth inquired respecting the plaintiff's ability to handle it. The plaintiff said he had a married son and a son-in-law who, with the plaintiff's family, which included unmarried sons, could occupy the three sets of improvements, and that he could command something like $4000 to be used in providing stock, teams, and implements. Before the trade was finally consummated Kilworth went to Gray county and inspected the plaintiff's land. The plaintiff secured permission to remain on his own land until March 1, following the trade, and he never returned to the ranch he had purchased. A few months after receiving his contract he traded it off for a farm in Iowa which did not belong to the man with whom he traded.

The defendant's employment was in writing. The contract was dated February 28, 1912, covered a variety of subjects, provided for a commission of $1.50 per acre in case of an exchange, and contained the following provision:

"It is understood that M. D. Gonder is a real estate broker and that in all cases of exchange the owner shall decide for himself and act upon his own judgment in making the exchange and that Gonder may receive and collect a commission from both parties to the exchange."

After the defendant had secured terms on the Kilworth ranch, and on April 24, the day he and the plaintiff started for Lawrence, a further contract was made providing that if the exchange with Kilworth were effected the plaintiff should receive for his services $1.50 per acre for the plaintiff's land and one-half the sum saved should a reduction in the price of the ranch be obtained. This contract also provided how the defendant's commission should be secured.

The petition rested the defendant's employment on the contract of February 28 and treated the contract of April 24 as providing for additional compensation. It was alleged that the plaintiff's land was worth $30 per acre while the Kilworth ranch was worth only $35 per acre, although represented to be worth $85 per acre, and that the plaintiff agreed to the exchange because of the false representations of the defendant. The prayer was for actual damages resulting from squandering the Gray county land, for punitive damages, and for re-

Subke v. Gonder.

covery of the commission paid the defendant. The false representations charged were of two classes: representations relating to the value of the Kilworth ranch and representations which prevented the plaintiff from exercising his own judgment and led him to trust the defendant implicitly and to rely entirely upon the defendant. Representations of the first class were that the Kilworth ranch was priced to the defendant at $85 per acre and that it was worth that sum; that after a pretended interview with Kilworth the defendant represented he had secured a reduction in price to $77 per acre; and that the plaintiff was getting a good deal for the ranch at that price. Representations of the second class were that if the defendant were allowed to do all the talking he could get a reduction in price; that if the plaintiff talked with the tenants on the ranch about buying it or about the value of it they would get mad and leave; that if the defendant were allowed to do all the talking he would make a good deal for the plaintiff; that the defendant was going to make the best deal possible for the plaintiff; and that the plaintiff should trust the defendant's judgment.

The general verdict, by specific recitals, allowed the plaintiff no damages except the commission which the plaintiff had paid. The following special findings of fact were returned:

"1. Did plaintiff inspect the land and express himself as being satisfied with the quality and price before he signed the papers? Answer. Yes.

"2. Did plaintiff consent for the defendant to price his land in the trade at a price in excess of its real value? Answer. Yes.

"3. Did plaintiff express the opinion that the land he traded off was not worth $10.00 per acre, after he had made the trade? Answer. No.

"4. Did Hemphill, as agent for Kilworth, price the land to Gonder at the price of $75,000.00? Answer. Yes.

"5. What was the reasonable cash value of the 160 acres of land Kilworth conveyed to Subke free of incumbrance? Answer. $8000.00.

"6. Do you find that Gonder was guilty of any fraud that requires him to forfeit his commission? Answer. Yes.

"7. If you answer the last question, 'yes,' state what such fraud was. Answer. Misrepresentation of facts concerning the value of Douglas County lands.

"8. What was the fair cash value of the Gray County land at the time of the trade? Answer. $14,000.00.

"9. Did Subke price his Gray County land in the trade at $30.00 per acre? Answer. He did.

27—97 Kan.

"10. Did Kilworth, at first upon the day when all the parties inspected the land, ask $45,000.00 for his land above the equity of Subke in his Gray County land? Answer. Yes."

The subject of damages resulting from the difference between the actual value of the Kilworth ranch and its represented value, or the difference in value between the plaintiff's land and the Kilworth ranch, is entirely eliminated by the verdict, which expressly limited recovery to the commission paid the defendant. The subject of false representations made to establish a special relation of trust and confidence between the plaintiff and the defendant and to induce the plaintiff to surrender his own judgment and place himself at the mercy of the defendant is eliminated by findings numbered 6 and 7. There is left for consideration unfaithfulness of the defendant in bringing about the trade, which unfaithfulness consisted solely in misrepresenting facts concerning the value of the Kilworth ranch.

The alleged misrepresentations relating to the value of the ranch have been stated. The jury found the ranch was priced to the defendant at $75,000, or more than $85 per acre, and that subject is eliminated. On the date of the trade Kilworth asked $45,000 for the ranch above the plaintiff's equity in the Gray county land. This price was reduced to $40,000. The plaintiff priced his land at a trading value of $30 per acre, which price he authorized the defendant to use and which he knew was more than his land was worth. On the basis of $30 per acre, the plaintiff's equity in the Gray county land was $25,020. There were 842 acres in the Kilworth ranch. Before signing the contract Kilworth expressed regret at giving up a little fenced tract of ten acres on which stood a long cabin which he and his wife occupied for outings. The plaintiff said that Kilworth might keep the cabin, and the enclosed tract on which it stood was excepted from the contract. The price for the ranch was, therefore, $77.22 per acre and because prices and values were understood to be and were in fact trading prices and values the defendant's representation that he had secured a reduction in price to $77 per acre was substantially true. The statement that the plaintiff was getting a good deal on the ranch at $77 per acre was confirmed by the verdict of the jury, which allowed no damages for financial loss occasioned by the exchange.

There remains as the sole basis of the verdict and judgment the statement that the Kilworth ranch was worth $85 per acre, the plaintiff having testified that while he and the defendant were on the train going to Lawrence to inspect the ranch the defendant said it was worth $85 per acre. Ordinarily a statement of this kind is purely a matter of opinion which is not to be accepted and relied on as a statement of fact. There is no absolute standard by which to determine the value of a ranch like the Kilworth ranch. The elements to be considered are so numerous and so varied that landowners and real-estate men, acting according to their best judgment, would likely differ greatly in their estimates of value, as indeed they did in this instance. Purchasers understand that the best foot will be put forward and that high and even extravagant values will likely be placed on property offered to them, and so are not deceived. (*Graffenstein v. Epstein & Co.,* 23 Kan. 443; *Burns v. Mahannah,* 39 Kan. 87, 17 Pac. 319; *Speed v. Hollingsworth,* 54 Kan. 436, 441, 38 Pac. 496; *Elerick v. Reid,* 54 Kan. 579, 38 Pac. 814; *Sowers v. Parker,* 59 Kan. 12, 51 Pac. 888; *Else v. Freeman,* 72 Kan. 666, 83 Pac. 409; *Circle v. Potter,* 83 Kan. 363, 369, 111 Pac. 479; *Herrald v. Paris,* 89 Kan. 131, 132, 130 Pac. 684; *Woods v. Nicholas,* 92 Kan. 258, 261, 140 Pac. 862; *Ross v. Cox,* 93 Kan. 338, 144 Pac. 227.)

Speaking generally, the relation between principal and agent is confidential. Its essence is fidelity, and whenever the principal has the right to receive the agent's opinion it must be an opinion fairly justified by the facts. In such cases a statement of opinion is regarded in the light of a statement of fact, and a charge of false representation may be predicated on a false and unwarranted statement of value the same as upon a false statement regarding topography, the character of improvements, the amount of rent received, and the like.

In the present case the contract of employment constituted the defendant a mere broker to bring the plaintiff and Kilworth together, and expressly imposed upon the plaintiff the duty to decide for himself and act upon his own judgment. Of course an agent may not contract for exemption from liability for a breach of duty, but he may insist upon a clear delimitation of his duty, and it is not against public policy to require a principal to rely upon his own investigation and judgment.

"Attention to business and prudence in making contracts are of no small importance; inquiry before is vastly better than inquiry after. A disposition, after entering into a contract which proves unfavorable, to search for some means of getting out of it, is unfortunate; it encourages misconstruction of statements, misrecollection of words, and willful falsehood. A party who finds on inquiry that he can not avoid his contract, except by proof of misrepresentations by the other party, is under fully as strong temptation to impute such misrepresentations, as a party seeking a contract is to make them." (*Graffenstein v. Epstein & Co.*, 23 Kan. 443, 446.)

When a principal has expressly undertaken to act upon his own judgment, his agent, who is an intermediary only, may well understand that he is responsible for the truth of all facts which he may state for his principal's information; but he is not apprised that he guarantees the literal acuracy of an estimate of value, which can be nothing more than an opinion, and an opinion upon a matter concerning which the best informed will likely differ widely. If an agent on the ground value property for his principal who resides at a distance and is not familiar with conditions, he understands that responsibility is rested upon him to decide the question of value and he accepts the responsibility. But the contract of employment under consideration imposed no duty upon the defendant to determine the value of the Kilworth ranch and state the result to the plaintiff as a basis upon which the plaintiff might rest his decision to trade or not to trade.

It is suggested in the brief that the contract of February 28 was superseded by the contract of April 24. The theory of the petition, however, was that the contract of April 24 was merely supplemental, and indeed it modified nothing contained in the earlier contract except the amount of compensation, and added a provision relating to the manner in which compensation should be secured. The petition undertook to present a change of the relation created by the contract by showing that the defendant subsequently prevented the plaintiff from exercising his own judgment and caused the plaintiff to relinquish his own judgment, but the jury were not impressed with the proof. There is no charge in the petition and no evidence that after the contracts were executed the plaintiff undertook to impose upon the defendant the responsibility of deciding and reporting what the market value of the Kilworth ranch

was, and the clear effect of the evidence was that the defendant's estimate of value was not given or received as an estimate of cash market value but as a comparative estimate for trading purposes. The plaintiff proceeded to Lawrence and inspected the property offered him after hearing the defendant's statement of its value. The plaintiff testified that nobody prevented him from going anywhere he desired to go or from seeing anything he wished to see. The jury found that he did inspect the land and that before the papers were signed he expressed himself as satisfied not merely with the price but with the quality, concerning which the defendant made no false statements or representations. The plaintiff voluntarily gave back to Kilworth ten acres of the ranch. The defendant's statement that the ranch was worth $85 per acre probably did not control the plaintiff's judgment. However this may be, it was a mere expression of opinion and not a statement of fact, and, under all the circumstances, did not belong in the category of those opinions upon which a charge of false representation may be based.

Since the defendant's liability must rest upon findings numbered 6 and 7, and since they are insufficient to sustain liability, the plaintiff failed to establish the cause of action stated in the petition and the judgment should have been for the defendant.

It appears that an execution has been issued on the judgment and a sale of property has been made to the plaintiff, who has not paid even the costs. This sale should be set aside.

The judgment of the district court is reversed and the cause is remanded with direction to set aside the sale referred to and render judgment for the defendant.

No. 19,939.

LEONARD C. UHL, *Appellee*, v. THE LIFE & ANNUITY
ASSOCIATION, *Appellant*.

SYLLABUS BY THE COURT.

1. FRATERNAL INSURANCE — *Amendments' to Laws — Must be Fair and
Reasonable.* Where a member of a fraternal beneficiary society
agrees to be bound by future amendments to its laws a reservation is
implied that the changes are to be fair and reasonable.

2. SAME. In order to be deemed necessary to the purposes of a fraternal
beneficiary society a change in its by-laws need not be indispensable
to that end. If it is reasonably adapted thereto the requirement is
met.

3. SAME—*Changes in By-laws—Reasonableness for Court.* Whether
changes made in the by-laws which affect the rights of a member in
such an association are fair and reasonable is ordinarily a question
of law, where the detailed facts are not in controversy.

4. SAME. The rates of a fraternal beneficiary society as fixed by a
change in the by-laws held not to be unreasonably high.

5. SAME—*Change in By-laws—Beneficiary Entitled to Paid-up Certifi-
cate.* Where the certificate held by a member of a fraternal benefi-
ciary society provides that after a certain time it shall be nonforfeit-
able, and that he shall be entitled to a paid-up certificate in propor-
tion to the number of payments he has made, a change is unreasonable
which denies him, unless he shall make further payments, any benefit
whatever from his admitted present share of a reserve fund which
has already accumulated.

Appeal from Smith district court; RICHARD M. PICKLER,
judge. Opinion filed March 11, 1916. Reversed.

*A. R. Lamb,* of Coffeyville, and *Otis S. Allen,* of Topeka, for
the appellant.

*L. C. Uhl, L. C. Uhl, jr., E. S. Rice,* and *A. W. Relihan,* all of
Smith Center, for the appellee.

The opinion of the court was delivered by

MASON, J.: Leonard C. Uhl held a certificate in the Life &
Annuity Association of Hiawatha, Kan., issued March 30,
1898. The association by a change in its by-laws made July 23,
1913, undertook to readjust rates and benefits, and notified
him in November of that year of a number of options that

were open to him under the new rules. He declined to accept any of them and brought an action for damages on account of a breach of the contract. He recovered a judgment and the association appeals.

(1) The plaintiff in his application for membership agreed that his contract should be subject to future amendments in the laws of the association. It is, however, an implied condition of such an agreement that the changes shall be reasonable. (29 Cyc. 75; Niblack, Benefit Societies and Accident Insurance, 2d ed., §25; Bacon, Benefit Societies and Life Insurance, 2d ed., § 91a; Note, 8 L. R. A., n. s., 521.)

(2) It has already been determined that the contract between the plaintiff and the defendant was such as to permit the association to make the very changes here involved, provided they were reasonable and necessary to the accomplishment of its purposes. (*Moore v. Annuity Association,* 95 Kan. 591, 148 Pac. 981. Recent cases illustrating the conflict of authority on the subject are collected in a note to *Thomas v. Knights of Maccabees,* 85 Wash. 665, 149 Pac. 7, in L. R. A. 1916 A, 762.) "Necessary" is a word the force of which depends upon the context. (*M'Culloch v. Maryland,* 17 U. S. 316, 414.) Here it is not used as the equivalent of "indispensable." If some change in the association's methods was required to enable it to continue business, and while acting in good faith it effected a readjustment by means reasonably adapted to the end sought, its action must be regarded as necessary, although some other plan might also have been available. The requirement that a change in the rules shall be reasonable fairly implies that it shall be necessary in this sense, so that the former decisions of this court may be said to have determined that under its contract with the plaintiff the defendant had authority to make the changes in its by-laws now in controversy, provided they were reasonable.

(3) Here the court submitted to the jury the question whether the changes made were reasonable, in the sense indicated, and a negative answer was returned. By the original terms of the plaintiff's certificate the sum of $2000 was to be paid at his death to the beneficiary named; he was to pay $2.80 a month for twenty years, at which time his payments were to end; he had the right, after three years, to cease payment and

receive a paid-up certificate for as many twentieths of $2000 as he had made annual payments. By the changes in the laws referred to, as interpreted by the association and applied to the plaintiff's situation, he was required to submit to an increase either in the amount of each monthly payment, or in the period for which they were to be made, as to which he was offered an election. If the original amount of monthly payment were unchanged he was required to continue such payments so long as he should remain a member. If payments were to stop, as originally contemplated, at the end of twenty years, the amount of the monthly payment was to be increased from $2.80 to $20.78. Several other options, the details of which are not now important, were offered him. Of the monthly payment of $2.80 provided by the original plan, thirty cents went to the local secretary, twenty cents into the expense fund of the association, and the remaining $2.30 into the reserve fund, which was set apart for the payment of certificates as deaths should occur.

The evidence upon the question of the reasonableness of the changes that were made was meager. It was shown that the defendant had advertised that it had the "largest per capita of any fraternal organization in the United States," a statement which had at one time been true, but was no longer so. This could be of little or no weight in determining the question. The secretary of the association, called as a witness by the plaintiff, testified that at the time of the change in the by-laws the plaintiff's share of the reserve fund (taking account of interest earned on the one hand and losses paid on the other) was about $280. No effort was made to controvert this. The defendant used the deposition of the actuary upon whose computations the changes had been based. He stated that the rates in force prior to the change were grossly inadequate to mature the certificates in twenty years. He computed the plaintiff's exact proportion of the reserve fund to be $278.65. Making allowance for this, he estimated the amount necessary to be collected each month until the end of the original twenty-year period, to justify the association in issuing a paid-up certificate, to be $20.78, the figures adopted by the association. His estimates were based upon the National Fraternal Congress table of mortality, and an assumption that the reserve

fund would yield four per cent interest. On March 19, 1913, a statute took effect authorizing fraternal beneciary societies to issue paid-up certificates, provided they maintained the reserve required by the American experience table of mortality, or by that of the National Fraternal Congress, and an assumption of interest not over four per cent. (Laws 1913, ch. 211, § 1.) Inferentially the statute forbids, for the future at least, paid-up certificates to be issued upon any more optimistic basis, and recognizes the reasonableness of the two tables referred to, and of the rate of interest adopted in the computation.

There was really nothing before the jury upon which they could determine that the changes made in the by-laws were unreasonable. The amount in the reserve fund for which the plaintiff was given credit was presumably correct, and even if it were wrong there was nothing in the evidence by which the mistake could be rectified. The mortality tables and assumption of interest adopted by the actuary were not open to objection, for they had received the approval of the legislature. His actual computation was hardly reviewable by the jury, for its details were not developed, nor is any error in the result now pointed out. Where the detailed facts are admitted or established the question whether a change in the by-laws is reasonable is seldom referable to a jury. (*Clarkson v. Supreme Lodge, K. of P.*, 99 S. Car. 134, 82 S. E. 1043.) "Whether a by-law is reasonable and consistent with the law, is a question solely for the court to determine." (Niblack, Benefit Societies and Accident Insurance, 2d ed., § 23, p. 45.) It is usual for the courts to declare that a particular change is or is not obnoxious to the rule imposing the test of reasonableness and fairness. (See, for example, *Maccabees v. Nelson*, 77 Kan. 629, 95 Pac. 1052; *Conner v. Golden Cross*, 117 Tenn. 549, 97 S. W. 306; *Wuerfler v. Trustees Grand Grove W. O. D.*, 116 Wis. 19, 92 N. W. 433. See, also, *Loan Association v. Merriman*, 67 Kan. 779, 74 Pac. 256.) Such examination as has been found practicable has failed to discover an instance of that question having been determined by a jury, and but one—a dictum—in which that has been referred to as the proper practice. (*Supreme Lodge, etc., v. Bieler,* 58 Ind. App. 550, 105 N. E. 244.) In view of the situation pre-

sented, the reasonableness of the new rates was not a question of fact to be determined by the jury, but one of law to be decided by the court.

(4) Upon the showing made it does not appear that the new by-laws were unreasonable. It is quite clear that the association had issued certificates containing provisions more favorable to the beneficiaries than it could carry out. Under the original arrangement it undertook to pay $2000 at the time of plaintiff's death, from a fund to which he could have contributed no more than $552, and his expectancy when he became a member was but a little over twenty years. Some change of rates or benefits was obviously necessary. If in 1913 the plaintiff, being then 67 years of age, had elected to continue the monthly payment for life ($2.30 going into the reserve fund), and had died at the expiration of his then expectancy of about eleven years, his additional contribution to the fund would have been but $303.60. No detailed computation is necessary to show that this proposition was not open to objection as requiring too many or too large payments. If he had elected to pay at the monthly rate of $20.78 ($20.28 going to the fund) for the remaining fifty-one months of the original twenty-year period his additional contribution would have been $1034.28, which added to the $278.65 already to his credit would make $1312.93. According to the calculations of the actuary, to which no definite objection is made, this is the amount necessary, giving it an earning capacity of four per cent, to justify the association's undertaking to pay $2000 on the death of the plaintiff. In view of the statute enacted just before the readjustment of rates, recognizing the mortality tables of the National Fraternal Congress, and authorizing the issuance of paid-up certificates only on the basis of a maximum rate of interest of four per cent, the rate of $20.78 per month can not be regarded as unreasonable. It results from these conclusions that the change made in the defendant's by-laws were valid, and the plaintiff's contentions must fail so far as they turn upon that question.

(5) It is said that "any amendment which entirely changes the scheme of insurance, and makes a radical departure from the fundamental plan, is not a reasonable exercise of the reserved power of amendment." (Niblack, Benefit Societies

and Accident Insurance, 2d ed., § 25.)   The plaintiff's original contract provided that he might cease payments at the end of any year and receive a paid-up certificate proportioned to the payments he had made.   The association doubtless had the power in case of necessity to change the rule by which the amount of the paid-up certificate should be determined, but not to deprive the plaintiff of this right wholly and unnecessarily.   The new by-laws are consistent with the preservation of the right in a modified form.   They provide that "any member who desires a paid-up certificate for *any amount,* not to exceed the face value of his certificate, shall pay into the reserve fund such sum, or sums, as may be necessary together with his then share of the reserve fund  .  .  .  to purchase such paid-up insurance."   This clearly implies that without any additional payment the member might have a paid-up certificate for whatever amount would correspond to his then share of the reserve fund.   This much of the money on hand equitably belonged to him.   It had already borne all the charges legitimately made against it on account of accruing losses, and the association had no right to look to it in order to meet other obligations it had undertaken.   But the defendant required the plaintiff to accept one of five proposals made to him, none of which enabled him, in case he should make no further payment, to receive anything whatever in compensation for the amount that had already accumulated in the reserve fund to his credit.   It is true he made no demand for an adjustment on the basis of what he had already paid in without further payment, but this circumstance could not work a forfeiture of his right in that regard.   The association by a formal official notice advised him of just what privileges would be accorded him, and required him to elect between the proposals submitted, stating that unless he indicated a choice by a date named he would be deemed to have accepted the one which contemplated a payment of $2.80 a month during his membership.

Inasmuch as the question of the issuance of a paid-up certificate for the amount corresponding to the plaintiff's share of the reserve fund seems not to have been directly referred to in the negotiation between the parties, the cause will be remanded with directions to enter judgment for the defendant,

provided it issues to the plaintiff such a certificate within thirty days after the mandate is spread of record in the district court; otherwise the cause may proceed as an action for the refusal to do so.

---

No. 19,948.

THE UNION CENTRAL LIFE INSURANCE COMPANY, *Appellant*, v. P. H. PUCKETT, as Trustee, etc., et al., *Appellees.*

SYLLABUS BY THE COURT.

MORTGAGE—*Stipulation to Pay Taxes—Nonpayment—Right of Foreclosure.* A stipulation in a mortgage provided that if payments of principal and interest of the mortgage debt were not paid when due, or if the taxes assessed against the mortgaged property were not paid when payable, the whole debt should become due and the mortgage become subject to foreclosure at the option of the mortgagee, and that in case a default was made in the payment of taxes the mortgagee might pay the same and the mortgage should stand as security for the taxes so paid. *Held,* that a default in the payment of the taxes operated to accelerate the maturity of the mortgage debt and gave the mortgagee the right to maintain foreclosure at once; and *held further,* that the right to foreclose was not waived by the payment of the defaulted taxes by the mortgagee.

Appeal from Cherokee district court; EDWARD E. SAPP, judge. Opinion filed March 11, 1916. Reversed.

*A. H. Skidmore,* and *S. L. Walker,* both of Columbus, for the appellant.

No appearance was made for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: The Union Central Life Insurance Company brought this action to foreclose a mortgage on land in Cherokee county, given to secure a note for $2000 executed by P. H. Puckett, trustee, Percival H. Puckett and Ada L. Puckett. This appeal is taken from the judgment of the trial court sustaining the defendants' demurrer to the petition.

The petition alleged the execution by the defendants of the note and mortgage on May 23, 1911. By the terms of the mortgage the defendants agreed, among other things, to pay

when due all taxes and assessments of every nature which would become liens upon the land, and it was further provided that in case such taxes and assessments were not so paid the plaintiff might pay them and be entitled to interest thereon at the rate of ten per cent per annum, and that the mortgage should stand as security for any payments so made. The mortgage also contained the condition that upon the defendants' failure to pay any of the principal or interest when due, or to comply with any of the covenants of the mortgage, the whole sum or sums secured thereby should thereupon become due and payable at the option of the plaintiff and the mortgage be subject to foreclosure. It was further alleged that the defendants, in violation of a covenant in the mortgage, had made default in the payment of the taxes assessed on the land for 1912, and that the plaintiff on August 28, 1913, elected to and did pay the taxes with the accrued penalties thereon, amounting to sixty-three dollars and two cents; and that the defendants had also made default in the payment of the taxes for the year 1913, and the plaintiff had paid the taxes assessed for that year, amounting to sixty-six dollars and four cents. Because of these defaults the plaintiff elected to declare the whole amount of the note to be due with the accrued interest thereon, and asked for a judgment for the amount due and for a foreclosure of the mortgage given to secure the payment of the note.

The trial court sustained the demurrer to the petition on the theory that as the plaintiff had elected to pay the taxes due and unpaid the premises thereby became security for their repayment, and that the plaintiff by paying the taxes itself had waived the default of the defendants and its right to foreclose the mortgage on account thereof.

Default in the making of payments of principal or interest when due or the failure to comply with any of the covenants of the mortgage, one of which was the payment of all taxes assessed against the mortgaged land, made the whole mortgage debt due and the mortgage subject to foreclosure at the option of the mortgagee. In the failure to make payment of the taxes an unquestionable default was made by the mortgagors, and the contingency agreed upon having happened, the maturity of the debt was accelerated and the mortgagee entitled to maintain

foreclosure unless the right given had been waived. (*National Bank v. Peck*, 8 Kan. 660; *Porter v. Schroll*, 93 Kan. 297, 144 Pac. 216.)

No brief has been filed in behalf of the defendants and the ground upon which the ruling of the court was based is not shown by the record, but counsel for the plaintiff state that the demurrer was sustained by the court upon the theory that the default of the mortgagors had been waived by the action of the mortgagee in paying the taxes, as the mortgage provided that if the taxes were paid by the mortgagee the mortgage should stand as security therefor. The stipulation that the default in paying the taxes would accelerate the maturity of the debt and give a right to foreclose is not alternative to or inconsistent with the provisions permitting the mortgagee to protect his security by the payment of overdue taxes. Nothing in the stipulations of the mortgage indicates that the exercise of one option by the mortgagee shall preclude the exercise of the other. The right to foreclose for nonpayment of taxes does not depend on the condition that the taxes remain due and unpaid, but it is dependent on the contingency that the mortgagors fail to pay them in accordance with their agreement. Under the stipulations, the neglect to pay the taxes gave the mortgagee the right to begin proceedings to foreclose, and also gave him the added right to pay the taxes and include the amount in the judgment of foreclosure. The exercise of the added right did not waive the right to foreclose for the default in the payment of the taxes. (*Brickell v. Batchelder*, 62 Cal. 623; *Rasmussen v. Levin*, 28 Colo. 448, 65 Pac. 94; 27 Cyc. 1533.)

Aside from that consideration the provision in the mortgage permitting the mortgagee to pay defaulted taxes and make them a lien upon the premises is substantially the right given to the mortgagee by the statute. (Gen. Stat. 1909, § 9494.) The mortgage was made with reference to the statute, and the right to make payment would have been a part of the mortgage if it had not been written into it. This right is given to the mortgagee in order to prevent a sacrifice of the security through the neglect of the mortgagors to pay the taxes. Such a payment by the mortgagee in no way cured the breach of the covenant, which operated to mature the mortgage debt and rendered the mortgage absolute. Nor did the payment of the

Proctor v. Fife.

taxes by the mortgagee waive the right given to it to foreclose upon the default of the mortgagors. As tending to sustain this view see *Stanclift v. Norton,* 11 Kan. 218; *Ellwood v. Wolcott,* 32 Kan. 526, 4 Pac. 1056; *Lewis v. Lewis,* 58 Kan. 563, 50 Pac. 454; *Kelso v. Norton,* 74 Kan. 442, 87 Pac. 184.

The judgment of the district court will be reversed and the cause remanded for further proceedings.

---

No. 19,949.

CATHERINE PROCTOR, *Appellee,* V. GEORGE C. FIFE et al., *Appellants.*

SYLLABUS BY THE COURT.

DEED — *Covenant against Taxes — Mutual Mistake — Reformation of Deed.* The action was one for damages for breach of a covenant against taxes contained in a warranty deed. The defense was that the deed should be reformed, on the ground of mutual mistake, so that the covenant would speak from the date of the contract of sale and not from the date of the deed. The defense was fully established by parol evidence, which was not disputed, the contention of the plaintiff being that the evidence was not admissible and that as a matter of law the covenant spoke from the date of the deed. *Held,* that the deed should be reformed.

Appeal from Wyandotte district court, division No. 1; ED-WARD L. FISCHER, judge. Opinion filed March 11, 1916. Reversed.

*Paul H. Ditzen,* of Kansas City, for the appellants.

*J. H. Luscombe,* of Kansas City, and *John C. Stearns,* of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for breach of a covenant of warranty against taxes. The defense was that the deed did not express the agreement of the parties and should be reformed in a way to relieve the defendant of liability. The plaintiff prevailed and the defendant appeals.

The parties entered into a written contract to exchange properties. The contract was dated May 24, 1913, and stated

that the defendant, J. O. Fife, agreed to sell, exchange and transfer described real estate free and clear of encumbrances. Abstracts certified down to date were to be furnished, and deeds were to be exchanged within fifteen days. On May 24 the taxes sued for had not accrued. Abstracts of title certified to May 24 were furnished, but the exchange of deeds was delayed on account of defects in the title to the property offered by the plaintiff and did not take place until July 5. The deed signed by the defendant warranted against encumbrances except taxes "not now due and unassessed." The taxes sued for accrued before July 5, and if this language were referable to the date of the contract, the defendant was not liable; if referable to the date of the deed, he was liable.

At the trial the defendant undertook to show the negotations between the parties, which included an agreement by the plaintiff to assume the taxes sued for, which were, in the main, paving and curbing taxes about to mature for improvements which were completed. Objections to this evidence were properly sustained because the oral negotiations merged in the written contract and the written contract merged in the deed. The defendant asked leave to amend his answer by setting up a cause of action for reformation of the deed on the ground of mistake. Leave was granted, and further trial of the cause was postponed until the amendment could be made. When the trial was resumed the plaintiff stood on the evidence already introduced, which consisted of proof of the covenant, the existence of the taxes and their nonpayment. The defendant then proved that the plaintiff agreed to take the property as it stood on May 24 and pay the taxes which were about to accrue. There was proof that after deeds were exchanged the plaintiff fully recognized his obligation to pay the taxes and asked the defendant's agent where he could borrow some money to enable him to do so. The plaintiff stood on his objection that this evidence was not admissible because in contravention of the terms of the deed, and offered no evidence in rebuttal. Although conversations with the plaintiff were proved he did not choose to dispute or qualify them, and neither the truth nor the credibility of any of the evidence introduced in support of the amended answer is now assailed. The plaintiff still rests his case upon the proposition that the evidence received was not admissible, and upon the further proposi-

tion that the contract did not effect a sale but was merely an agreement to sell in the future, so that the deed of necessity spoke from its date.

There is good authority that the covenant in the deed should be interpreted as relating to the date of the contract and not to the date of the deed, but without this the proof is clear and undisputed that the agreement, intention and understanding of the parties were that the taxes accruing after May 24 were to be paid by the grantee. The defendant so understood the deed, and the proof is that the plaintiff so understood it. They were mutually mistaken if the covenant does, as is claimed, speak from the date of the deed, and the deed ought to be reformed to express the true contract.

When the question is one of reformation on the ground of mistake, parol evidence is admissible to show the facts. Otherwise a false contract could not be corrected to speak the truth unless all the negotiations were in writing. This rule is as well established as the rule forbidding the impeachment of written instruments by parol evidence.

The judgment of the district court is reversed and the cause is remanded with direction to reform the deed as indicated and render judgment against the plaintiff for costs.

---

No. 19,951.

PAULINE MILBERGER, *Appellant*, v. ANNA VESELSKY, *Appellee.*

SYLLABUS BY THE COURT.

1. EXEMPTIONS—*Proceeds of Homestead.* Questions concerning the exemption of funds claimed to be the proceeds of a homestead held not to require decision.

2. SAME. The evidence held not sufficient to show that a purpose had been formed and adhered to to devote to the purchase of a home funds claimed to be the proceeds of a homestead.

3. SAME—*Division of Property by Husband and Wife—Property Not Exempt from Attachment for Wife's Debts.* Money received by a wife from her husband as her share in the division of their property held not to be exempt from seizure under attachment, notwithstanding an agreement that it was to be in full settlement of all her rights, including alimony, where a divorce was subsequently granted for her fault and without any allowance to her.

28—97 KAN.

Appeal from Barton district court; DANIEL A. BANTA, judge. Opinion filed March 11, 1916. Reversed.

*George W. Holland,* of Russell, *William Osmond,* and *Elrick C. Cole,* both of Great Bend, for the appellant.

*A. C. Banta, Clyde Allphin,* and *James W. Clarke,* all of Great Bend, for the appellee.

The opinion of the court was delivered by

MASON, J.: Pauline Milberger sued Anna Veselsky for alienation of her husband's affection, and obtained a judgment for $500, which is not appealed from. At the commencement of the action an attachment was issued and levied upon a note for $2000 (on which $400 had been paid), payable to the defendant, executed by her former husband, John Veselsky. A motion was made to discharge the note from the attachment on the ground that it was exempt for these two reasons: (1) the consideration of the note was a part of the proceeds of her interest in the sale of her homestead, and she had at all times intended to reinvest it in another homestead for herself and her dependent children; and (2) it was given her as alimony. On November 9, 1914, just before the trial of the main case, the motion to discharge the attachment was heard and sustained. The plaintiff appeals.

The following facts may be regarded as established beyond controversy: On March 28, 1912, John and Anna Veselsky, being then husband and wife, entered into a written agreement, which recited that they could not continue that relation, and desired to make a division of their property and to arrange as to the custody of their minor children. It made these provisions: the husband was to pay the wife $1000 at once, and $2000 within a year, the deferred payment to bear interest; if he sold the land which was occupied as a homestead (and which was all the real estate that either owned) within a year he was to pay the $2000, with interest, at the time of sale, and in the meantime that amount was to be a lien against it; with this exception the husband was to own absolutely all the property, real and personal, the latter being worth $2000; the wife was to have the custody of their two daughters, and the husband that of their four minor sons; in case of a divorce

these provisions were to be in settlement of all rights to either party, including alimony, costs and the care and custody of the children. The arrangement thus outlined was carried out. The cash payment of $1000 was made, and on April 29, 1912, John Veselsky gave to his wife his note for $2000, secured by a mortgage on the homestead, which is the note now in controversy. On March 5, 1913, John Veselsky was granted a divorce on the ground of his wife's having abandoned him to live with Alex Milberger, the plaintiff's husband. He remarried, and on March 28, 1914, sold the land referred to. The $400 was paid on the note in March, 1913. Anna Veselsky moved to the county of Saskatchewan, in the province of Saskatchewan, Canada. Alex Milberger also moved to that county.

The plaintiff asserts that the defendant and Alex Milberger formed illicit relations in this country which have ever since continued, and that they are living together as husband and wife. The defendant denies such present relationship and avers that her home and that of Alex Milberger are two miles and a half apart.

(1) With respect to the claim of exemption founded upon the homestead theory a number of serious legal questions are suggested, such as whether that privilege can be asserted by a resident of another country; whether the homestead right should be deemed to have been lost by abandonment; and whether the note on which the attachment was levied is to be regarded as the proceeds of a homestead. In this connection it is to be borne in mind that the note represents a part of the lump sum of $3000, which it was agreed should be paid to the wife on a division with her husband of all their property, consisting of personalty worth $2000, as well as the homestead. While it was made a lien on the land, the maker was at liberty to satisfy it with funds derived from any other source. He retained the homestead, and did not sell it until later. The divorce was granted on the ground of Anna Veselsky having abandoned her husband. However, it will not be necessary to decide these questions, because of the conclusion reached with regard to the facts.

(2) The evidence on which the motion was heard was all in writing, and therefore this court may determine its effect as

though it were presented here in the first instance. (*Robinson v. Melvin,* 14 Kan. 484; *Mathewson v. Campbell,* 91 Kan. 625, 138 Pac. 637.) There can be no exemption based upon the homestead theory unless the defendant formed an intention at the time the property was divided, to which she has adhered ever since, to purchase a home with her share. (*Smith v. Gore,* 23 Kan. 488.) The burden of proof is ordinarily upon one claiming an exemption. (18 Cyc. 1493.) While that rule is not universal there are obvious reasons why it should apply in such a case as the present, where the existence of the exemption is dependent in part upon the operations of the claimant's mind (*State ex rel. v. Hull,* 99 Mo. App. 703, 74 S. W. 888), and where the privilege is one not directly given by statute (*Huskins, Bryson & Co. v. Hanlon et al.,* 72 Iowa, 37, 33 N. W. 352). In a first affidavit for the discharge of the attachment the defendant swore that at the time she had received the thousand dollars and the note now in question it was, and had ever since been, her intention to use both for the purchase of a home. In one subsequently made she said she had spent all that she had received, including the $400 paid on the note, largely for clothing, provisions, board, household and traveling expenses, but that she still intended to buy a home with the proceeds of the attached note. The statement of her intention is not corroborated in any way. There is no showing of any steps taken in that direction, or of any specific plans formed, or of any outward expression whatever of the purpose alleged. On the other hand, it is admitted that over $1400 (all that was available) of the fund which the defendant says she intended to use in the purchase of a home has been expended for other purposes. The question whether the defendant has been living in Canada with her paramour is material to the issue, as it bears upon the likelihood of her having formed and retained a purpose to use the proceeds of the note in buying a home. The evidence on the subject is in direct conflict. The denial of the defendant is supported by that of her mother, two brothers and Alex Milberger. It is contradicted by three witnesses who are not shown to be interested, two of whom swore that the defendant is the mother of a child born about the middle of September, 1914. A conclusion as to which set of witnesses is to be believed is aided by two letters between

the defendant and Alex Milberger, the authenticity of which is not challenged, written in March and April, 1912, which clearly establish the illicit relations then existing between them. We are constrained to believe that the defendant's statement in this matter is untrue, and also that the assertion of a consistent purpose from the first to hold the proceeds of the note as a fund for the purchase of a home is a mere pretense—a device to secure its release from the attachment.

(3) The trial court held that the note was not exempt as alimony, and this ruling is approved. Alimony, being an allowance to the wife in pursuance of the husband's obligation of support, is exempt from seizure to satisfy any of her debts except those contracted after the decree, but this exemption does not extend to a payment ordered as her share in a division of community property. (1 R. C. L. 869, 870.) The note involved was not alimony. Nor was it given in lieu of alimony. It was executed by the husband to the wife in pursuance of an agreement for the division of their property, which contained a provision that all rights of either party, including possible alimony, were settled by it. The divorce was granted for the fault of the wife, and no obligation for her continued support was cast upon her husband. When the property was divided, doubtless the wife's share was fixed with reference to the fact that she was to have the custody of two of the children, but no specific part of it was shown to have been appropriated to that use.

The judgment is reversed and the cause remanded with directions to overrule the motion to discharge the attachment.

No. 19,952.

ELLA SCOTT, *Appellant*, v. JENNIE M. RODGERS et al., *Appellees*, and JESS PARR et al., *Appellants*.

SYLLABUS BY THE COURT.

HOMESTEAD—*Conveyance—No Fraud on Creditors.* A widow 67 years old, owning practically no property except a residence which she occupied as a homestead, conveyed it a short time before her death to two of her married daughters in consideration of their services in taking care of her during her last sickness. She was not aware that she was indebted to any one except her physician, and she arranged for the payment of that claim. After her death other adult children filed claims against her estate for personal services rendered in her lifetime and their claims were allowed. In an action brought by these creditors to set aside the deed, *held*, the conveyance was made without intent to defraud creditors, and *further*, that regardless of the intent the grantor could convey her homestead to any person she pleased, with or without consideration, and creditors could not complain.

Appeal from Franklin district court; CHARLES A. SMART, judge. Opinion filed March 11, 1916. Affirmed.

*W. B. Pleasant,* of Ottawa, for the appellants.

*A. B. Crum,* of Lyndon, for the appellees.

The opinion of the court was delivered by

PORTER, J.: In a suit to set aside a conveyance of real estate and for partition two defendants recovered judgment for costs. The other parties appeal. All of them except the administrator are the children of Annie Parr, deceased. Mrs. Parr was a widow and lived alone. Her four daughters were married and had homes of their own. One of the defendants is a son who made no appearance in the action.

The real estate consists of a house in Ottawa, valued at $750, which Mrs. Parr owned and occupied as her home. She died intestate October 18, 1914. For a year before her death she was quite sick and required attention. Two of her daughters, Mrs. Rodgers and Mrs. Alumbaugh, left their families, came to Ottawa, and took care of her almost constantly from May until her death in October. On September 12 she executed a warranty deed conveying the property to these two

daughters. Although weak and suffering from her sickness, she was perfectly rational at the time she made the convey- ance. She informed Doctor Pennington, her family physician, that she desired to make the deed in order to repay her daugh- ters in part for their services to her, and stated that she was not indebted to any one except what she owed the doctor for his services, and that her daughters to whom she wanted to con- vey the property had agreed to pay the doctor what would be owing to him. She asked him to have a lawyer come to the house to prepare the deed. The grantees were not present at this conversation. The deed was executed in the presence of Doctor Pennington and the notary and when neither of the grantees was present, the consideration being "one dollar and other considerations." Some days thereafter Mrs. Parr di- rected the doctor to have the deed recorded, which he did. After her death, and before the commencement of this action, when the execution of the deed was discovered, the plaintiff, Mrs. Scott, made proof of death and secured the appointment of an administrator of the estate. Subsequently Mrs. Scott and her sister, Mrs Whiteneck, filed claims in the probate court for services alleged to have been rendered by them at other times in caring for the deceased. Their claims have since been allowed in the probate court.

It was contended by the appellants that at the time the deed was executed Mrs. Parr was old and feeble, and that the grantees obtained the deed by undue influence; also that the deed was executed for the purpose of defrauding the creditors of Mrs. Parr. The findings are adverse to all the contentions of the appellants as to the facts. The court finds that Mrs. Parr was perfectly rational when she made the deed, that she did not believe she was indebted to any person except Doctor Pennington, and that one of the grantees expressed at the trial a willingness to pay the doctor's bill and the funeral expenses.

It is insisted by the appellants that Mrs. Parr had no right to make a gift of the property to the grantees and thus defraud her creditors, and that if the conveyance was made in repay- ment for services rendered by the grantees, it is void as against the creditors because the services rendered were not equal to the value of the property. For several reasons these con-

tentions can not be sustained, whether we regard the conveyance as a gift outright or as a payment for services, or as in part a gift and in part a payment for care and attention rendered her by the grantees. The actual intent to defraud creditors can not be inferred merely because the probate court has allowed the claims of the other daughters. When the deed was executed Mrs. Parr did not know she had a creditor other than Doctor Pennington and she made arrangements to have that debt and the expenses of her last illness and burial satisfied.

No motion for a new trial was filed and the findings of fact are not disputed. The appellants' contention is that on the findings the court erred in holding that the conveyance was not in fraud of creditors. There is a finding that Mrs. Parr occupied the premises as her homestead. Authorities, therefore, holding that proof of an intent to defraud is not necessary where the effect of the conveyance is to hinder, delay or defraud an existing creditor can have no application to the facts here. "A debtor cannot commit a fraud upon his creditor by disposing of his homestead. (*Hixon v. George,* 18 Kan. 253, 260.)" (*Winter v. Ritchie,* 57 Kan. 212, 214, 45 Pac. 595, 57 Am. St. Rep. 331. See, also, *Wilson v. Taylor,* 49 Kan. 774, 31 Pac. 697; *Roser v. National Bank,* 56 Kan. 129, 42 Pac. 341.) A debtor may convey the homestead with or without consideration, and the creditor can not complain. (*Hixon v. George,* supra.)

The judgment is affirmed.

Saar v. Railway Co.

No. 19,959.

MYRTLE Y. SAAR, as Administratrix, etc., *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. DAMAGES—*Evidence Sufficient against Demurrer.* The evidence has been examined and found to be sufficient against a demurrer thereto, and sufficient to sustain the findings of the jury.

2. FEDERAL EMPLOYER'S LIABILITY ACT—*Death—Excessive Verdict—Option of Plaintiff.* In an action for damages under the federal employer's liability act, where a verdict rendered is excessive because the jury did not substantially diminish the damages on account of the negligence of the injured employee, this court will offer the plaintiff the option of accepting a judgment for a designated sum or a new trial.

Appeal from Neosho district court; JAMES W. FINLEY, judge. Opinion filed March 11, 1916. Modified.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley,* all of Topeka, for the appellant.

*H. P. Farrelly,* and *T. R. Evans,* both of Chanute, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff recovered judgment for the death of her husband, John C. Saar. The defendant appeals.

This action comes under the provisions of the federal employer's liability act. (Part 1, 35 U. S. Stat. at Large, ch. 149, 4 U. S. Comp. Stat. 1913, §§ 8657-8665.) John C. Saar was a brakeman on the defendant's road and was killed at Independence by falling from or being thrown from the top of a freight car under the wheels of the train on which he was working. The jury made special findings of fact as follows:

"Was the deceased, John C. Saar, guilty of any negligence that contributed to his injury. Ans. To a limited extent.

"If you answer the above question in the affirmative, how much do you deduct from the amount you would otherwise give the plaintiff? A. $100.

"Was the engineer of the defendant guilty of any negligence in the manner in which he was handling the train at the time the deceased was killed? Ans. Yes.

"Did the engineer, Paddy Ryan, use ordinary care and diligence in the manner in which he handled the train at the time of the injury to the deceased, John C. Saar? Ans. No.

"Is it not a fact that the ground and the tracks and the cars, at the time and place of the accident, were covered with ice, and very slick? Ans. Yes.

"Was engineer Ryan a careful, prudent and experienced engineer? Ans. Was experienced, but not duly careful and prudent at this time.

"How fast was the train moving at the time brakeman Saar fell? Ans. Slowly.

"If you find for the plaintiff in this action, in what respect do you find that the defendant, its officers, its agents and employes, were negligent? Ans. The engineer failed to use due care in handling his train.

"If you find for the plaintiff in this action, what act or omission on the part of the defendant caused the injury? Ans. Violent jerking of the train.

"Did the deceased, John C. Saar, know of the slick, icy condition of the ground, track and cars at the time and place of the accident? Ans. Yes.

"What precaution did the deceased, John C. Saar, take to safeguard himself against the accident? Ans. By holding onto the brake with both hands."

1. The defendant's first complaint is that there was no evidence that the alleged jerking of the train was of such a violent or unusual character as to indicate negligence on the part of the engineer, and therefore the demurrer to the evidence should have been sustained; and that the jury's findings of the defendant's negligence are contrary to and unsupported by the evidence.

The evidence to support the findings was, that the tops of the cars and the ground were covered with ice and sleet; that at the time of the accident, about 6:30 p. m., sleet was falling; that the train men were picking up three or four cars in the yards; that after making a coupling, the deceased went on top and was walking over the cars; that the tops were slick and he walked "with a little caution"; that the train by that time was moving; that it jerked two or three times as he walked; that the switching was "pretty rough"; that as he stepped from the second car to the third he grasped the brakewheel on one of the cars and stepped upon the brakewheel platform; that the cars jerked again and he fell between them; that the brakewheel was about two feet above the top of the car and was connected with the brake by an iron rod which extended through a plat-

form at the end of the car about two feet below the top; and that the deceased was standing on this platform holding to the wheel when he fell. From this evidence men might reasonably come to different conclusions concerning the negligence of the defendant in jerking the train. That made the question one for the jury, and it would have been error for the court to have sustained a demurrer to the evidence of the plaintiff. It necessarily follows that there was evidence sufficient to sustain the findings of the jury.

2. The defendant also contends that the findings of the jury as to the contributory negligence of the deceased are inconsistent with the general verdict because the verdict was reduced by only $100 on account of the negligence of the deceased, while the verdict returned in favor of the plaintiff, after making that reduction, was for $9000. Section 3 of the federal employer's liability act provides that—

"The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."

If the deceased was guilty of contributory negligence, his negligence must have been more than a one-ninety-first part of all the negligence that caused his injury. That amount would have been so small as to render it not worthy of notice. Either the deceased was not negligent, or, if he was negligent, his negligence contributed substantially to his injury. There is nothing to indicate passion or prejudice on the part of the jury. Under these circumstances, a new trial must be ordered, or the judgment must be reduced.

"In many of the states appellate courts have adopted the practice, where the damages are excessive but the plaintiff is entitled to something substantial, of indicating the excess, and of giving or directing the trial court to give the plaintiff the option to remit the excess and allow him to take judgment for the residue. Such action on the part of the appellate court is no invasion of the province of the jury, or of the rights of the defendant." (*Mo. Pac. Rly. Co. v. Dwyer,* 36 Kan. 58, 74, 12 Pac. 352.)

(See, also, *U. P. Rly. Co. v. Mitchell,* 56 Kan. 324, 331, 43 Pac. 244; *Railway Co. v. Brandon,* 77 Kan. 612, 95 Pac. 573; *Telegraph Co. v. Bodkin,* 79 Kan. 792, 797, 101 Pac. 652;

*Davis v. Railway Co.,* 81 Kan. 505, 508, 106 Pac. 288; *Yard v. Gibbons,* 95 Kan. 802, 814, 149 Pac. 422.)

Other cases are *W. & C. Rly. Co. v. Gibbs,* 47 Kan. 274, 27 Pac. 991; *Frankhouser v. Cannon,* 50 Kan. 621, 32 Pac. 379; *Dennis v. Benfer,* 54 Kan. 527, 38 Pac. 806; *Railway Co. v. Meyer,* 58 Kan. 305, 49 Pac. 89; *Railway Co. v. Turley,* 71 Kan. 256, 80 Pac. 605; *Argentine v. Bender,* 71 Kan. 422, 80 Pac. 935; *Francis v. Brock,* 80 Kan. 100, 102 Pac. 472.

If the plaintiff will consent, a judgment will be entered in her favor for six thousand dollars, with interest from the date of the original judgment; otherwise a new trial will be ordered.

MARSHALL, J. (dissenting) : The determination of the amount by which damages shall be diminished by the jury on account of the negligence of an injured employee under the federal employer's liability act, is by that act placed within the province of the jury. The act fixes no rule by which to determine the amount that shall be allowed on account of the contributory negligence of an employee engaged in interstate commerce, except that the damages shall be diminished in proportion to the amount of negligence attributable to such employee. It is the duty of the court to instruct the jury concerning this matter. It then becomes the duty of the jury to determine what shall be deducted because of the contributory negligence of the employee. This must be arrived at under the evidence in each case by the jury, and its conclusion is binding unless the result shows the influence of passion or prejudice or is not supported by any evidence. The judgment should be reversed and a new trial ordered, or it should be affirmed. (*Railroad Co. v. Richards,* 58 Kan. 344, 49 Pac. 436; *Atchison v. Plunkett,* 61 Kan. 297, 59 Pac. 646.)

No. 19,961.

A. B. WILSON, *Appellee,* v. W. H. HAUN and GEORGE J. DROLL,
Partners, etc., *Appellants.*

### SYLLABUS BY THE COURT.

1. AGENCY—*Express Appointment Not Essential—Appointment May be
   Implied.* To establish the relation of agency an express appointment
   and an acceptance thereof is not essential, but it may be implied from
   other facts, such as the statements of the parties, their conduct and
   the relevant circumstances.

2. SAME—*Evidence Shows Agency to Buy Cattle.* The evidence herein
   examined and *held* to be sufficient to uphold a finding of the jury that
   one who purchased the plaintiff's cattle and shipped them to the de-
   fendants was acting in the capacity of agent of the defendants.

Appeal from Sedgwick district court, division No. 2;
THORNTON W. SARGENT, judge. Opinion filed March 11, 1916.
Affirmed.

*Chester I. Long,* and *A. M. Cowan,* both of Wichita, for the
appellants.

*Fred Stanley, Claude C. Stanley,* and *Benjamin F. Hegler,*
all of Wichita, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: A. B. Wilson brought this action against
W. H. Haun and George J. Droll, partners doing business as
the Haun-Droll Live Stock Commission Company, to recover
the value of his cattle which had been received by the defend-
ants. The cattle were purchased from the plaintiff by W. B.
Gillespie, who bought cattle from several parties and shipped
them to the defendants, giving to the purchasers drafts from
a book furnished him by the defendants. According to the
testimony of the plaintiff, at the time the cattle were purchased
from the plaintiff, Gillespie began to write out a check, when
the plaintiff objected and stated that he must have the money;
but Gillespie then showed the plaintiff the draft book which
had been furnished him, saying: "It is not my check, it is
Haun-Droll's check. You won't have any trouble about it,

they are responsible. You will sure get your money." The
following is a copy of one of the drafts issued to plaintiff:

"This draft is void only in payment for livestock.

No. Hogs............                                    No. 1608
No. Cattle..........
Weight .............
Price...............,

THE HAUN-DROLL LIVE STOCK COMMISSION CO.
Wichita, Kansas, 9/4/1912.

Pay to the order of A. B. Wilson,.......................$545.00
Five Hundred Forty-Five and no/100 Dollars.
To Union Stock Yards National Bank, Wichita, Kansas.

Buyer,      W. B. GILLESPIE."

When Gillespie entered into business relations with the de-
fendants they gave him the draft book and directed him to use
it in paying for cattle that were shipped to them and they
admonished him to "buy them close." He was to buy and ship
cattle to the defendants and to draw on them to pay for the
cattle with the drafts so furnished him. As will be observed,
the book of drafts had written across the face of each draft
and near the top in bold type the name "Haun-Droll Live Stock
Commission Co." and at the bottom was printed the word
"Buyer," following which the name "Gillespie" was written.
Across the top of the check was printed the warning: "This
draft is void only in payment for livestock." The plaintiff
states that he relied on the representations made and under-
stood that he was dealing with the defendants; that his cattle
were shipped to and received by them; but that the drafts
issued were protested, and have never been paid. The de-
fendants admit giving Gillespie the book of drafts and also
that they instructed him not to make any drafts on them until
the cattle for which they were issued had been shipped to the
defendants, but say that he was never authorized to act as
their agent in buying cattle. It appears that several bunches
of cattle were purchased by Gillespie and shipped to the de-
fendants, and it is claimed by them that they kept an account
with him and that when cattle were shipped to them they re-
mitted the proceeds of the sale after deducting their commis-
sion and the advances made to him. It appears that in one
case they paid a draft for a thousand dollars which Gillespie
had issued as a forfeit on cattle bargained for and which were

never shipped to or received by the defendants. It appears that the drafts for plaintiff's cattle were turned down by the defendants because Gillespie had drawn on them for a greater amount than the value of the cattle that had been shipped to them. Gillespie never had any account in the bank on which the drafts were drawn and no credit there. The jury found that Gillespie purchased the cattle as the agent of the defendants and not for himself.

Upon this appeal the principal contention is that the finding of the jury is not supported by the evidence. The plaintiff asked a recovery upon two grounds: (1) that the sale was made for cash, that the check was not payment, and that there was no transfer of the title to the cattle until the check was honored or the price paid, and the defendants were therefore liable for the conversion of the plaintiff's cattle; and (2) upon the theory that Gillespie was the agent of the defendants and purchased the cattle for them in that capacity. The appeal will be disposed of upon the theory of agency.

The evidence appears to be sufficient to warrant the inference that Gillespie purchased the cattle as the agent of the defendants. There was no proof of an express appointment of Gillespie or of his acceptance, but agency may be implied from the conduct of the parties and the circumstances of the case. (*Banks Bros. v. Everest & Waggener,* 35 Kan. 687, 12 Pac. 141; *Raynor v. Bryant,* 43 Kan. 492, 23 Pac. 601; *Hansford v. Meserve,* post, p. 450, 53 Pac. 835; *Linscott v. Conner,* 85 Kan. 865, 118 Pac. 693; 2 C. J. 435.) As we have seen, Gillespie was authorized to buy and ship cattle to the defendants, who cautioned him to buy them closely. They sent him out with their book of drafts, which fairly indicated that they were the purchasers of the cattle for which the drafts were to be issued. Besides labeling the drafts in bold type with the name of their company, they had printed below the word "Buyer," after which the one who happened to be sent out to purchase the cattle might sign his name. They printed on the draft an admonition to the effect that it would only be honored when issued in payment for live stock. When this book was presented to the plaintiff it would strongly tend to allay any apprehension he might have as to the capacity in which Gillespie was acting. The drafts were drawn upon de-

fendants' bank in Wichita and one in which the buyer had no funds or credit. Gillespie was directed by the defendants not to send drafts until the cattle had been shipped and billed to them. Notwithstanding this direction it appears that they paid drafts before cattle were received and which Gillespie had advanced on an option to purchase cattle. These facts furnished a basis for the inference by the jury that Gillespie was acting for the defendants. Evidently they were regarded to be more reliable and to show the real relations between the parties better than the testimony given by the defendants.

It is said that there is an element lacking in the proof as to ostensible agency or agency by estoppel, in that it is not shown that the plaintiff knew of other transactions between the defendants and Gillespie when he sold his cattle. Plaintiff claimed that Gillespie was in fact the agent of the defendants and he produced evidence from which a real agency may be implied. In 2 C. J. 444, it is said:

"An implied agency is an actual agency and is a fact to be proved by deductions or inferences from other facts, while in a strict sense agency by estoppel should be restricted to cases in which the authority is not real but apparent."

The distinction between implied and ostensible agency is stated in 31 Cyc. 1236, as follows:

"The doctrine of estoppel involves apparent or ostensible agency, which exists where the principal intentionally, or by want of ordinary care, induces third persons to believe another to be his agent, although he did not in fact employ him. As to third persons the distinction between actual and apparent or ostensible agency is unimportant, as the liability of principal and agent is the same in either case, but as between the parties themselves of course the ostensible agent is no agent at all. Apparent or ostensible agency is really agency by estoppel, and it is more strictly accurate to say that liability arises for the acts of such a so-called agent, not because there is any agency, but because the principal will not be permitted to deny it."

To prove actual agency it was competent not only to show the book of drafts which the defendants had placed in the hands of Gillespie, but also to show that Gillespie had purchased and shipped other cattle to the defendants which had been paid for with drafts furnished by the defendants, as well as any other competent fact or circumstance. That which was shown upon the face of the drafts which Gillespie was author-

ized to use tended to prove an implied appointment, and it also went towards establishing ostensible agency, as the book of drafts given to Gillespie had the appearance of authority from the defendants. From these the plaintiff was led to believe that Gillespie had authority and relied upon what he told him. If a person knowingly causes or permits another to act as though he were his agent, he is estopped to deny such agency to the injury of a third person who, relying upon the appearance of agency, in good faith and without negligence, dealt with such agent. This rule applies in cases in which there is an apparent instead of a real agency, and there the principles of estoppel apply and can only be invoked by one who knew and relied on the acts and conduct of the principal. (31 Cyc. 1237; 2 C. J. 461.) As already said, the evidence which went towards proving ostensible agency tended also to show a real implied agency, and with the additional facts which might not have been admissible to show agency by estoppel is deemed to be sufficient to uphold the finding that there was an implied agency.

Complaint is made of an instruction which in effect stated that if the drafts given by the defendants to Gillespie and containing a certain notation were actually used in payment for the cattle and were paid by the defendants knowing that they had been given in payment for cattle, the jury *should* consider this fact in determining the interpretation put on the notation by the defendants and the meaning in which it was used. Exception was also taken to another instruction which substantially advised the jury that if the defendants furnished the drafts and instructed Gillespie to buy cattle which were to be delivered to them and that they were to pay his drafts, but that the drafts were not to be delivered until the cattle had been billed to the defendants, and that Gillespie had bought other cattle and given drafts therefor which the defendants had paid, the jury *should* consider this as a circumstance tending to show that he was acting as the agent of the defendants. The contention is that the word "should" is of an imperative character, and so considered there was an invasion of the province of the jury. The term as used is subject to criticism, but judging from the whole record it was evidently used in a

29—97 KAN.

permissive sense and meant no more to the jury than if the word "may" had been used. It is not deemed to be a ground for reversal.

The judgment of the district court is affirmed.

---

No. 10,772.

*JAMES HANSFORD, *Appellee,* v. W. S. MESERVE, as Guardian, etc., *Appellant.*

### HEADNOTE BY THE REPORTER.

NOTE—*Mortgage—Payments—Agency.* An agent who loans money, and collects and remits interest to a nonresident holder of note and mortgage, and is expressly authorized to remit principal and interest after a loan is due, is authorized to receive payment on said note and mortgage, although they are not at the time in his possession.

Appeal from Wyandotte district court. Opinion filed July 8, 1898. Affirmed.

*C. S. McLane,* and *Reed & Reed,* for the appellant.
*Mills, Smith & Hobbs,* for the appellee.

*Per Curiam:* The Gossard Investment Company was a corporation for the loan of money, handling of securities, and for acting as agent for investors. Nathaniel Stevens, of New Hampshire, was a patron of the company. He made investments through it and it acted as his agent for the collection of moneys due upon his securities, payment of taxes for him, etc., etc. He died leaving John H. Stevens, a minor son, as an heir. The defendant was appointed by a probate court in New Hampshire as guardian of the minor. The Nathaniel Stevens estate had five thousand dollars in the hands of the Gossard Investment Company. The administrator of the estate allowed this sum to the defendant as a portion of the distributive share due his ward, John H. Stevens. Upon application of Mrs. Lilly D. Gregory, made to the Gossard Investment Company and forwarded to the defendant, he authorized the in-

---

*NOTE.—This case was not reported in full when the opinion was filed (see *Meserve v. Hansford,* 59 Kan. 777), and is reported here because it was cited in the case of *Wilson v. Haun,* ante, p. 445.

vestment company to loan the money in its hands for him as guardian. This was done, security taken in the name of the investment company, and by it forwarded to the defendant.

He kept these securities in his possession, but shortly before the maturity of interest coupons thereon forwarded them to the investment company for collection. The company remitted the interest at maturity except in a few instances when payment was delayed. The amount loaned to Mrs. Gregory was secured by two different mortgages upon different pieces of property. One piece of this property was sold and conveyed by her to the plaintiff soon after the making of the loan upon it. He assumed the mortgage and thereafter made the interest payments upon it. Before the maturity of the principal debt he made two payments upon it aggregating nineteen hundred dollars. These payments were made to the Gossard Investment Company. The plaintiff was aware that the company had sold the mortgage securities, but supposed it to be still the owner. These payments of principal were not remitted to the defendant, and he was ignorant of the fact they had been made. At the maturity of the principal debt the plaintiff tendered the unpaid balance and demanded a surrender and cancellation of the mortgage. This was refused, whereupon he instituted an action to compel its cancellation and to quiet his title against the claim of mortgage lien. The court below made findings of fact and rendered judgment in his favor. The material findings for the purposes of the case as we view it are as follows:

"31. That W. S. Meserve held and owned said note and mortgage as the guardian of John H. Stevens. That John H. Stevens was the son and heir of one Nathaniel Stevens. That said Nathaniel Stevens in his lifetime had been dealing with the Gossard Investment Company for several years, buying mortgages, and other securities, from it, and entrusting said company with the caring for his securities and with the collection of interest and principal thereon.

"That said W. S. Meserve as guardian for John H. Stevens took possession of his ward's estate, including said mortgages and other securities negotiated by the Gossard Investment Company in 1889, and by correspondence and in person continued the handling of said securities through the Gossard Investment Company until about August 1, 1894. That said Gossard Investment Company collected all the principal and interest that was collected on said mortgages, and as the same was collected gave W. S. Meserve as guardian credit therefor, on its books, except as hereinbefore stated.

"32. That there existed an open book account between said company and said guardian all the time since said guardian took charge of said estate, a part of the time said guardian being in overdraft with and indebted to said company and a part of the time said company being indebted to said guardian. That said company allowed said guardian interest at the rate of six per cent per annum on all balances of account in his favor, and said guardian allowed said company interest at the same rate on all balances in its favor. That said company debited said account with mortgages furnished and remittances made to said guardian, and credited said account with collections of principal and interest made on said securities.

"33. That said company had prior to October 1, 1891, made a number of collections on other mortgages on account of both principal and interest, without having the notes or mortgages or coupons therefor in its possession. That said W. S. Meserve, guardian, had no other agent or party representing him or collecting interest or principal, or giving his securities any care or attention, in Kansas City, than said company until 1894. That said company attended to foreclosing all mortgages and paying all taxes for said guardian whenever necessary.

"34. That all collections on account of interest made by said Gossard Investment Company on the mortgages in controversy in this suit were immediately credited to the account of said guardian but said payments on account of principal were carried in the 'Certificate of Deposits' account until August 1, 1894, when the said company credited the said guardian's account with the sum of nineteen hundred dollars, on account of the principal of said mortgage."

The above findings are decisive of the case in favor of plaintiff. We have taken the trouble to examine them in the light of the evidence, particularly of the account of dealings between the parties, and the correspondence between them. They are well supported by the evidence. In fact, the evidence more positively establishes the fact of an agency in the Gossard Investment Company for defendant than the court has stated in its findings. Under the law the payment of money to an agent authorized to receive it is a payment to the principal.

The judgment of the court below is affirmed.

No. 19,962.

F. W. HEATON, *Appellant,* v. JOHN H. BURNSIDE and R. J.
TERWILLIGER, *Appellees.*

### SYLLABUS BY THE COURT.

INJUNCTION—*Restraining Order Rightfully Issued—No Liability on In-
junction Bond.* In an action for specific performance an injunction
was granted restraining the disposition of property. The bond
was conditioned for the payment of damages if it were decided the
injunction ought not to have been granted. Subsequently the in-
junction was modified and a portion of the property was released,
not because the injunction was wrongfully issued, but because the
plaintiff could be protected and the defendant advantaged. The de-
fendant disposed of all the property, the remedy of specific perform-
ance became valueless, the action proceeded as one for damages, and
the plaintiff recovered. In an action for damages for breach of the
injunction bond the records in the specific-performance action showing
the foregoing facts were made a part of the petition. *Held,* no breach
of the bond was disclosed and a demurrer to the petition was properly
sustained.

Appeal from Seward district court; GEORGE J. DOWNER,
judge. Opinion filed March 11, 1916. Affirmed.

*F. S. Macy,* of Liberal, for the appellant.

*William Easton Hutchison,* and *C. E. Vance,* both of Garden
City, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one on an injunction bond con-
ditioned for the payment of damages if it were decided that
the injunction ought not to have been granted. A demurrer
was sustained to the petition and the plaintiff appeals.

The plaintiff, Heaton, contracted to sell to the defendant,
Burnside, two hundred tons of hay, and to grant Burnside a
variety of valuable privileges not now material. The hay was
in stacks which were to be measured by a certain rule. The
sale included five specified stacks. The remainder of the two
hundred tons was to be chosen by each party, stack and stack
about. Burnside brought an action for specific performance
of the contract and secured a restraining order preventing

Heaton from disposing of any of his hay, amounting altogether to some three hundred and fifty tons. The bond was given in connection with this order. Thirteen days later the district court modified the restraining order by releasing all hay except two hundred tons, including the five particular stacks, the remainder of the two hundred tons to be average hay. When the specific-performance action came on for trial Heaton had disposed of his hay, specific performance was no longer possible, and it was stipulated the action should proceed as one for damages. The result was a judgment in favor of Burnside for $450.

In this action the records and files of the specific-performance suit were referred to and made a part of the petition. The damages claimed were for a fall in the price of hay within the thirteen days the restraining order stood unmodified, and for attorney fees and expenses.

It is said that the modification of the restraining order constituted an adjudication that the order was wrongfully granted. Instead of this, the modification in effect merely made the choice of stacks of hay, which the parties to the contract were entitled to make, by giving Burnside the five stacks and enough average hay to bring the quantity up to two hundred tons, and released the remainder. Under the contract Burnside had the right to choose from all Heaton's hay and was entitled to have all the hay kept subject to his choice of stacks. When the court in furtherance of justice gave Burnside a sufficient quantity of average hay in place of hay of his own choosing, it did not follow that the order restraining disposition of all the hay was wrong or improvident. There can be no doubt of this, because the district court has in effect interpreted its order modifying the restraining order. After the proceeding to modify had been concluded a journal entry was prepared and filed reciting that the restraining order had been wrongfully obtained. When the matter was called to the court's attention it corrected the journal by striking out the recital that the restraining order had been wrongfully obtained.

It is said that when Burnside elected to proceed as if the specific-performance suit were simply one for damages his conduct amounted to an abandonment of the cause of action to

which the injunctive relief was an incident, and to a confession that the restraining order was wrongfully obtained. (See, *Tullock v. Mulvane*, 61 Kan. 650, 60 Pac. 749.) The journal entry of judgment, however, shows that the hay had been disposed of and could not be delivered. Consequently Burnside had no election between specific performance and damages, but was obliged to accept the remedy by way of damages in lieu of the remedy by specific performance which he desired. The final judgment was, as has been stated, in favor of Burnside and not of Heaton.

Since the petition failed to disclose a breach of the bond, the demurrer was properly sustained and the judgment of the district court is affirmed.

---

No. 19,963.

DRUSILLA PYLES, as Administratrix, etc., *Appellee*, V. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. WRONGFUL DEATH—*Contributory Negligence — Inconsistent Findings.* In an action for wrongful death, under the federal employer's liability act, a general verdict for the plaintiff must be set aside where the jury declares in one finding that the accident would have happened even if the decedent had not been negligent, and in another that his negligence contributed to it, no deduction from the amount allowed appearing to have been made on that account.

2. SAME — *Rule of Railroad Company — Switch Yards — Approaching Trains—Duty of Employees.* A rule of a railroad company that at certain places all trains and engines will have the right to work within yard limits regardless of extra trains, but will give way as soon as possible upon their approach, and that such trains must approach yard limits under control, the responsibility for accident at such points resting upon them, does not place a duty upon employees in charge of a switch engine working upon the main track at a station to withdraw therefrom immediately upon notice of the approach of an extra train at some distance.

3. SAME—*Duty of Employees in Charge of Switch Engine.* Such a rule, however, does not exempt the employees in charge of the switch engine from taking any precautions to avoid collision with an approaching extra that may, in view of all the circumstances, be necessary to the exercise of reasonable care.

4. SAME. Whether such a rule by itself constitutes a sufficient means for protecting the crew of an incoming extra from collision is ordinarily a question of fact.

Appeal from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed March 11, 1916. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott, Harlow Hurley,* all of Topeka, and *J. E. Torrance,* of Winfield, for the appellant.

*Alfred M. Jackson, Albert L. Noble,* both of Winfield, and *William A. Ayres,* of Wichita, for the appellee.

The opinion of the court was delivered by

MASON, J.: Walter Pyles, the engineer of an incoming extra freight train, was killed in a collision with a switch engine, attached to a number of box cars, at work in the yards of the Santa Fe company, at South Winfield. Under the federal employer's liability act his widow recovered a judgment for $12,000 against the company, and it appeals.

The defendant maintains that the accident was the result solely of the negligence of the decedent in passing the yard limits without having his train under control, contrary to the rules of the company. The petition alleged various forms of negligence, but the basis of liability adopted by the jury was the failure of the switching crew to keep out of the way of the incoming train.

These facts are covered by the special findings, or shown by evidence which is not disputed: The track from the South Winfield station runs somewhat east of south; at about a thousand feet from the station it curves to the east for a like distance, and then maintains a steady curve to the west until it crosses the Walnut river, just south of which it curves back to the east, before again making a turn to the west. The house track switch, near which the yard crew were working when the accident occurred, is about half a mile south of the station. The collision took place some 900 feet south of the switch. The north end of the bridge over the river is 1315 feet further to the south, and the yard limits 655 feet beyond that. The wreck occurred between nine and ten o'clock on a dark and rainy night. Shortly before it took place the switch

engine was at the station, running backward and drawing twenty-two cars, some of which were to be placed on the house track. While the switching crew were at the station they saw the reflection in the sky of the electric headlight of the extra freight approaching from the south. The foreman told the switchman whose duty it was to "follow the engine" to stay on the footboard at its south end and hold up the incoming train until the cars were placed on the sidetrack. They pulled down to the switch at the rate of six to eight miles an hour. The switchman referred to saw the headlight of the freight train just before it reached the bridge. As it was coming over the bridge he swung his lantern across the track as a signal for it to stop, the distance between them at this time being about 1500 feet, although he estimated it at a half mile. He received an answer—two short whistles. He then dropped off his engine and walked out a little ways from the track, so that he could see his own engineer and the other switchman (called the "man in the field"), and gave his engineer a signal to stop. His engineer then "whistled out a flag," that is, signaled him to flag the incoming train again. He did so, but it was too late. The train was coming down grade; it was not under control when it passed the yard limits, but was running twenty-five to thirty miles an hour; it still had a speed of fifteen to eighteen miles when the collision occurred. The switch engine had about come to a stop. It carried an oil headlight at its south end. Evidence given at a former trial by the head brakeman of the freight train was introduced, to the effect that as the engine passed over the bridge he heard the fireman say he could see something ahead, but he didn't know whether it was in the clear.

(1) The jury returned an affirmative answer to the question: "If the deceased, Walter Pyles, had had his engine and train under control, as required by the rules, when he entered the yard limits at South Winfield on April 1, 1912, would the accident have happened?" This finding, among others, is attacked by the defendant as without support in the evidence. "Under control" was defined by the rules as meaning—"ability to stop a train within the distance track is seen to be clear." Inasmuch as the switchman's flag, or signal made by swinging his lantern across the track, given while the incoming train

was on the bridge, something over 1500 feet away, was seen by the engine crew (as shown by the answering whistle) it seems clear that if the train had been even then under control the collision would have been prevented. Moreover the jury also answered affirmatively the question: "Did the negligence of the deceased contribute in any degree to the accident which caused his death?" The two findings, in view of the whole situation, are in absolute conflict—they can not be reconciled. Nor can it be ascertained upon which of them the jury acted. Whether any deduction from the amount of the verdict which would otherwise have been returned was made on account of the negligence of the decedent is not disclosed by the record, no question on that subject having been submitted. This conflict in the findings upon a vital point in the case requires the setting aside of the verdict.

(2) The defendant maintains that upon the evidence and findings judgment should be ordered against the plaintiff, on the ground that they show the accident to have resulted solely from the negligence of the decedent, no other employee of the company having been at fault. The decision of this question turns in part upon the construction and application of a rule reading as follows, particularly with respect to the phrase here italicized:

"Stations having yard limits will be designated in special rule in time-table. [South Winfield was one of the stations so designated.] All trains and engines will have the right to work within such yard limits regardless of second or third-class trains or extras, but will give way *as soon as possible* upon their approach. All except first-class trains will approach yard limits under control, and responsibility for accident at such points will rest with the approaching trains."

As the defendant interprets the rule, the approaching train having been an extra, the switching crew were under no duty to keep out of its way for the purpose of avoiding a collision; the requirement that they should give way "as soon as possible" meaning merely that they should be diligent in getting out of the way in order not to delay traffic more than was necessary. The plaintiff, however, insists that inasmuch as those in charge of the switch engine, while they were still at the station, saw the reflection of the headlight of the approaching train and knew that it would arrive shortly, the rule made it their duty to get off the main line immediately, leaving a

clear track for the freight, and that their negligent omission to do so was at least a contributing cause of the wreck, rendering the company liable. Up to this point we concur in the view of the defendant. Upon the entrance of an extra into a yard where switching is being done, the primary duty of avoiding a collision is cast upon its engineer, who is required to have his train under control, in order that if any obstacle is seen he may stop before it is reached. (*Central R. Co. of New Jersey v. Young,* 200 Fed. 359; *Rosney v. Erie R. Co.,* 135 Fed. 311.) The switching crew is given the right to work regardless of such a train, but must give way as soon as possible in order not to make unnecessary delay. The crew at work in the yard are not required, in order to make a collision impossible, to withdraw from the main track the instant they learn of the approach of an extra, at any distance. The instructions embodied substantially this view, the jury being told that the employees at work in the yard had a right to assume that the train would come in under control, and to act accordingly, until they had some notice to the contrary.

(3) On the other hand, the rule can not be regarded as exempting the switching crew from taking any precautions to avoid a collision that under all the circumstances would constitute an exercise of reasonable care. Such a construction would render it unreasonable and void. (*Chicago, Rock Island Ry. v. Wright,* 239 U. S. 548; *Southern Ry. Co. v. Craig,* 113 Fed. 76.) The jury found specially that the liability of the defendant was based upon the negligence of the switching crew in not getting off the track on the approach of the train; that under the rules they had no right on the main track because they had notice of the approaching extra by the reflection of its headlight. These findings indicate the adoption of the theory that the switch engine should have been sidetracked as soon as the reflection of the headlight of the train was seen in the distance. But the jury also found that when the engine of the train was on the bridge its rate of speed showed the switching crew that its engineer was not going to obey the rule. An instruction was given that from the time the employees had notice of this fact it was their duty to exercise ordinary care to avoid a collision. This is objected to on the ground that it was conclusively shown that they had no such knowledge until

it was too late to prevent the catastrophe. We think under all the evidence it was a fair question for the jury whether in the exercise of reasonable prudence the switching crew could not have anticipated that the engineer might, in the darkness and fog, inadvertently run past the yard limit without reducing speed, and whether, after the train was near enough so that its speed could be ascertained, they could not have backed away from it in time to prevent the accident or materially lessen the consequent injury. These considerations preclude a judgment for the defendant at this time.

(4) The defendant complains of an instruction reading as follows:

"It was the duty of the Railway Company . . . to provide suitable means whereby those managing trains may have notice of switch engines and trains upon its tracks in such positions as are likely to be dangerous to such employees, and to exercise ordinary care in order not to place such switch engine or other obstructions upon its tracks without such notice, in such a position as to be likely to endanger those engaged in managing other engines or trains."

It argues that the rule already quoted was the means provided for the end indicated; and that therefore an instruction given elsewhere, that the rules introduced in evidence were "reasonable and sufficient," amounted to a statement that sufficient means had been adopted to advise the crews of incoming trains of the presence of engines and cars on the track. The argument gives too much scope to the word "sufficient," which must be taken to mean sufficient for the particular and limited purpose to which the rule was directed—not sufficient to cover the whole field and give all the protection needed by those for whose benefit it was promulgated. There was some evidence from which an inference might be drawn that the deceased engineer, being unfamiliar with the run, and unable by reason of the weather to tell when he had reached the yard limits, passed them at a high speed without knowing it. Whether the rules gave all the protection reasonably needed to meet a situation of that kind was a fair jury question.

The judgment is reversed and the cause remanded for a new trial.

No. 19,964.

PAUL D. COLE, a Minor, etc., *Appellee,* v. THE ATCHISON, TO-
PEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

NEGLIGENCE—*Personal Injuries—Pleadings—Evidence—Findings.* In this
case the evidence and special findings are examined and it is held that
findings of negligence are within the issues raised by the pleadings;
that the findings are consistent with each other and with the general
verdict.

Appeal from Cowley district court; CARROLL L. SWARTS,
judge. Opinion filed March 11, 1916. Affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and
*Harlow Hurley,* all of Topeka, for the appellant.

*Alfred M. Jackson, Albert L. Noble,* both of Winfield, and
*Charles T. Atkinson,* of Arkansas City, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Paul D. Cole was an assistant clerk in the em-
ploy of defendant at its station at Anthony. On October 5,
1911, he was assisting another employee in sealing the vent
doors of some refrigerator cars that were standing on the side-
track near the station. It was seven o'clock in the evening,
and dark. The men were on top of one of the cars, and while
Cole stooped over holding a lantern to enable the other workmen
to seal the door, another car was shunted against the string of
cars with such force that he was thrown to the ground and in-
jured. A former judgment in his favor was reversed because
of error in refusing to submit important questions of fact to
the jury and for inconsistencies in the special findings. (*Cole
v. Railway Co.*, 92 Kan. 132, 139 Pac. 1177.) On the second
trial he recovered a judgment for $1000 and the railway com-
pany appeals.

The petition was drawn under the federal employer's lia-
bility law, and stated that defendant was operating a railroad
engaged in interstate commerce. There was no material dif-
ference in the evidence at the two trials, nor in the special
findings, except that the court submitted to the jury two ques-

tions erroneously refused at the first trial. These questions with the answers returned by the jury are:

"1. If you find for the plaintiff in this action, in what respect do you find that the defendant, its officers and agents and employes were negligent? Ans. Not giving proper instruction to plaintiff and in using too violent force in coupling.

"2. If you find for the plaintiff, state what particular act or acts, or omissions on the part of the defendant, its officers, agents and employes, caused the injury? Ans. Brakeman was not in proper location to give signal to engineer to prevent a violent coupling."

It is insisted that in answer to the first question the jury found the negligence to consist of something not alleged in the petition nor claimed at the trial. The contention is over the word "instruction" in the answer. Neither in the pleadings nor in the evidence was any claim made that the plaintiff should have been instructed how to perform his work or how to protect himself from injury. The case was not tried upon any such theory. It is quite obvious, we think, that the jury used the word "instruction" in the sense of *information* or *notice*. Failure to notify or inform the plaintiff to look out for the impact of the cars is one of the omissions which it is alleged was negligence. The findings must be construed together for the purpose of upholding the verdict, if that can be done. We discover no difficulty in respect to the first finding when it is read together with the second and considered in connection with the real issues on the trial. In answer to the second interrogatory the jury state what particular acts or omissions of the defendant's employees caused the injury. Their answer is: "Brakeman not in proper location to give signal to engineer to prevent a violent coupling." Taking the findings together, we think it is clear that the jury meant by the first that plaintiff should have been informed or notified that the coupling was to be made in order that he could protect himself.

There is nothing substantial in the contention that the negligence found in the answer to the second interrogatory was not alleged in the petition. The petition alleged that the defendant was negligent in backing the car with such force and violence, and that defendant failed in its duty to have a man near the end of the cars on the sidetrack to give warning to persons that might be on or about them.

Some of the findings of the jury are against the weight of

the evidence, but that is something about which we are not concerned. It is urged that there is no evidence to support finding No. 5, in which the jury say the reason the plaintiff did not attend to sealing the cars while it was daylight was that he was handling freight and inspecting seals. There is some evidence. The plaintiff testified that the cars could not be sealed until the train came in at 6:40, and that he took a record of seals on that train. He also testified that after the station agent left he helped bill some freight and then waited until the man he was to help went to seal the cars. His duties were to take a record of the seals and to see that the other man properly did the work of sealing.

In answer to questions 10 and 11 the jury found that plaintiff did not know that trains were engaged in switching in the yard when he went upon the car, nor that he would be exposed to danger by reason of the switching of trains and because of the darkness. Plaintiff testified that before he started to do the work a brakeman on the train that came in from the south told him they had quit switching. The inconsistency between findings 7 and 18 is only apparent. In number 7, the jury find that plaintiff could have avoided the accident if he had been watching out for the backing up of the cars on the track where he was at work. Finding number 18 reads:

"Did plaintiff look or listen or take any precaution, before or at the time he went upon the car, to ascertain whether there were any switch engines or trains switching in close proximity to the place where he was working? Ans. Yes."

If by their answer to question 7 the jury had reference to the time plaintiff was on the car and occupied with his duty, which required him to stoop over and hold the lantern while assisting the other workman, there is no inconsistency in the two findings.

Plaintiff repeatedly testified that he looked before and after he went upon the car, that he was only upon the car a minute or two before he was thrown off, that he did not see any cars switching, and that the engine and cars were on another track about two blocks distant. We discover no such inconsistency in the findings as would warrant a judgment for the defendant, and there being some evidence to support the findings the judgment will be affirmed.

No. 19,966.

THE ST. MARYS MACHINE COMPANY, *Appellee*, v. THE IOLA MILL & ELEVATOR COMPANY et al. (CAROLINE FRANTZ, Intervenor, *Appellant*).

### SYLLABUS BY THE COURT.

1. MECHANIC'S LIEN—*Machinery Unattached to Building—Not Part of Realty*. Machinery purchased for use in a mill, intended to be permanently fastened in place by bolts, does not ordinarily become a part of the realty until the physical attachment is accomplished. And where such machinery is sold under a contract reserving title in the vendor until payment is made, it does not become subject to a mechanic's lien, notwithstanding the contract is not filed for record until after the lien has accrued and the machinery has been deposited in the building, provided such record is made before it is set up and. fastened in place.

2. SALE—*Machinery—Contract Reserving Title—Purchaser with Notice*. Under the circumstances stated, one who, with notice of the existence of the contract, purchases the real estate at a sheriff's sale based on the judgment in an action foreclosing the mechanic's lien, acquires thereby no title to the machinery.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed March 11, 1916. Affirmed.

*Charles H. Apt*, and *Frederick G. Apt*, both of Iola, for the appellant.

*S. N. Hawkes*, of Topeka, for the appellee.

The opinion of the court was delivered by

MASON, J.: The St. Marys Machine Company sold two gas engines to the Iola Mill & Elevator Company, under a written contract providing that title should remain in the vendor until the purchase price was paid. Payment was not made, and the seller brought replevin for the engines, which in the meantime had been set up and bolted to concrete bases in a building erected by the buyer. Caroline Frantz, who by a sheriff's deed had acquired title to the building, intervened and claimed the engines as a part of the real estate. The plaintiff recovered, and the intervenor appeals.

The sheriff's deed was based upon a judgment foreclosing

a mechanic's lien. The machinery must be regarded as having become attached to the realty so as to pass with it, unless this result was precluded by the existence and record of the contract reserving title in the plaintiff. The contract was filed with the register of deeds on June 29, 1910. The engines were delivered to the mill company and deposited in the building March 6, 1910, but they were not set up or fastened to the bases until the following December. The statement for the mechanic's lien was filed March 22, 1910. The action to foreclose it was begun February 6, 1911, the machine company not being a party, and judgment was rendered in July of the same year.

(1) The engines were not made a part of the real estate by merely depositing them in the building. To change their character as personalty it was necessary that they should be set up and permanently attached. The contract reserving to the machine company the title to the engines had no validity as against any one acquiring a claim upon them before it was filed for record. But no claim to them was asserted except by virtue of proceedings which affected only real estate, and irrespective of the contract they were personal property until they were set up and bolted to the floor, in December, 1910. Before this time the contract had been made of record, and being thereby validated, it prevented their becoming a part of the realty so as to be subject to any then existing lien. These conclusions are not only consistent with what has been decided in a somewhat similar case, but are regarded as following from what was there said. (*Geppelt v. Stone Co.*, 90 Kan. 539, 135 Pac. 573, 94 Kan. 560, 146 Pac. 1157.)

(2) While there is some conflict on the subject, we think the better view, as well as that supported by the weight of authority, is that a valid agreement between the owner of personal property, who is guilty of no misconduct or concealment, and the owner of the real estate to which it is annexed, that its character as personalty shall not thereby be affected, binds not only these parties, but all other persons, unless an exception be made in favor of purchasers for a valuable consideration without notice. (19 Cyc. 1050-1055; Note, 49 L. R. A., n. s., 396.) A buyer of land sold at a sheriff's sale may

30—97 KAN.

sometimes be regarded as an innocent purchaser. (*Lee v. Bermingham*, 30 Kan. 312, 1 Pac. 73.) But the intervenor in this case can not be accorded that standing. There was testimony that she was represented in the matter by her husband, who knew of the existence of the contract. Moreover the petition in the action on which the sale was based recited that the machine company claimed a lien under a chattel mortgage. The evidence justified a finding, which the trial court must be deemed to have made, that the property was bought with notice of the machine company's rights.

The judgment is affirmed.

---

No. 19,970.

LODIE T. BRUCE, *Appellant*, v. WILLIAM MATHEWSON and MRS. WILLIAM MATHEWSON, *Appellees*.

SYLLABUS BY THE COURT.

DEED—*No Valid Delivery—Intention of Parties—Trial.* A finding of the trial court that a certain deed purporting to have been executed by a grantor to his wife and which was placed on record by her was not intended to be delivered and become effective as an absolute conveyance of title to the land, is *held* to be sufficiently sustained by the testimony; and further *held*, that no material error was committed in the trial of the case.

Appeal from Sedgwick district court, division No. 1; FRANK F. PRIGG, judge *pro tem.* Opinion filed March 11, 1916. Affirmed.

*R. L. Holmes, Charles G. Yankey,* and *W. E. Holmes,* all of Wichita, for the appellant.

*H. C. Sluss,* and *C. V. Ferguson,* both of Wichita, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action brought by Lodie T. Bruce against William Mathewson and his wife to recover an undivided three-eighths interest in a tract of land near the city of Wichita, in which action she also asked for a share of the rents and profits, that the land be partitioned, and that

Bruce v. Mathewson.

she have her share of certain money paid to the defendants by the city of Wichita under condemnation proceedings for part of the land taken by the city.

In answer to the petition the defendants alleged that the plaintiff is the daughter of one Caroline Mathewson, a former wife of defendant William Mathewson, and that the plaintiff's claim of title is based upon a deed purporting to convey the land to Caroline Mathewson, executed by William Mathewson in 1894 while the latter was engaged in a hazardous undertaking in New Mexico, but that it was the intention that the deed should take effect as a conveyance of the land only in case he should lose his life while in New Mexico; that the deed was never delivered to Caroline Mathewson; and that the only possession she ever had of the deed was holding it for Mathewson. Mathewson also claimed to be entitled to the entire estate by adverse possession for over fifteen years. The plaintiff's reply alleged that the deed was made for a valuable consideration, that it was duly executed and delivered to Caroline Mathewson and recorded, and that she was the owner of the property at the time of her death. It was further alleged that whatever possession defendant Mathewson may have had was not adverse to the rights of Caroline Mathewson and the plaintiff, and that his possession was as the agent and husband of Caroline Mathewson.

It appears that Elizabeth Mathewson was the first wife of William Mathewson, that she owned the land in controversy, and when she died, in 1884, William Mathewson inherited one-half of the same and each of their two children, Lucy E. and Alfred W., inherited one-fourth of it. In 1886 Mathewson married Caroline Tarlton, a widow with two children, Richard B., and Lodie Tarlton the plaintiff herein, and Mathewson and Caroline lived together as husband and wife until her death in 1909. In 1901 Lucy Mathewson executed a deed in blank purporting to convey her one-fourth interest in the land and subsequently the name of Caroline Mathewson was written in the instrument as grantee, this being done without the consent of Lucy, she having stated that the deed was to be made to her father.

The case was tried by the court without a jury, and the main controversy which divided the parties was whether the deed

executed by Mathewson to his wife in 1894 was intended to be delivered as an absolute conveyance of the land. Mathewson testified that he had obtained and was executing a contract for carrying the United States mail through the Indian country in New Mexico and occupied in part by the Apache Indians, who were then on the warpath, and that he had prepared and signed the deed to his wife, which was not to be delivered unless he was killed by the Indians, but in case he never came back the deed was to be recorded and the land would belong to his wife. There had been correspondence between him and attorneys who had been acting for him and his wife in a number of business transactions. In a letter written in August, 1894, he stated to his attorney that his business was not successful, that he was owing his wife, he presumed, about eight thousand dollars, and suggested that she select such of his property as she desired, and for them to prepare and send to him a deed conveying the land selected by her and that he would execute it and forward it to Kansas. He added: "Out in this wild country a man is not sure of anything but death. This is why I desire to have everything fixed up in case there should anything happen to me." A deed was prepared and sent to him, which he executed in New Mexico, but he says that it was sent with a letter either to his attorneys or to his wife with an instruction to the effect that it was not to be recorded nor to take effect unless he was killed. This letter had been lost and secondary evidence of its contents was received. Mathewson testified that he did not owe his wife any money, that he never received any consideration for a transfer of the land, and that he never surrendered possession or control of it. The trial court found that Mathewson executed the deed and sent it with a letter written either to his lawyers or to his wife, that it was not to take effect unless he should die before his return home, and that he did not intend that the deed so forwarded should be delivered or become effective as a conveyance of title to his wife except on the happening of the contingency mentioned— that he should lose his life before his return home. The conclusion of law of the court was that the deed never became effective as a conveyance. There was a further holding that the instrument signed by Lucy to Caroline Mathewson, the validity of which was contested, had become effective through

the operation of the statute of limitations, and the plaintiff was therefore adjudged to be the owner of a one-eighth interest in the land.

An examination of the abstract shows that there is testimony which fairly supports the finding of the court. It is true that there is much in the correspondence and surrounding circumstances which strongly tends to uphold the theory of the plaintiff that it was the purpose of Mathewson to make an absolute conveyance of the land to his wife. Where the evidence is conflicting and the credibility of witnesses is involved, the finding of the trial court must control. If the evidence in behalf of the defendants, standing alone and considered apart from that offered by the plaintiff, is legally sufficient to support the finding of the trial court, the end of the inquiry on the disputed fact has been reached. That offered on behalf of the defendants, although contradicted, was believed by the trial court, and some of the circumstances in the case are confirmatory of it, and it supports the conclusion reached by the court. It was shown that subsequent to the execution of the deed, and after his return to Kansas, Mathewson continued in possession of the land, claiming it to be his own, and continued to claim and exercise rights of ownership while his wife was living and all the time from 1896 to the time of trial, a period of more than eighteen years. During this period he paid all of the taxes assessed against the property and made valuable and permanent improvements thereon with his own funds, and he appears to have appropriated as his own all of the proceeds of the products of the land. It also appears and was found that Caroline Mathewson at no time after the execution of the deed ever took possession of the land or asserted ownership of it and that the plaintiff never made any claim of right or interest in the land during all the years until about the time the action was begun.

There is some complaint that more elaborate findings were not made by the court, but those made appear to sufficiently cover the essential facts in the case.

Objection was made to the admission of testimony as to the delivery of the deed and that no consideration was paid for it. The primary question was whether there was a delivery of the instrument with the intention that it should transfer title to

the land. Before it could operate as a transfer of title there must have been an intention of the grantor that it should become effective as a present conveyance. Such intention is to be derived from the testimony as to the acts and words of the grantor relating to the execution and delivery of the deed and may be shown by parol. (*Doty v. Barker,* 78 Kan. 636, 97 Pac. 964; *Worth v. Butler,* 83 Kan. 513, 112 Pac. 111; *Morris v. Blazer,* 96 Kan. 466, 152 Pac. 767.) It having been found on sufficient testimony that the deed was never intended as a transfer of title and did not become effective, questions as to varying its terms by parol proof are not material.

Sufficient testimony was offered to show that the letter which accompanied the instrument signed by Mathewson was lost or beyond his reach and control, and therefore secondary evidence of its contents was admissible.

The exclusion of the files and records in a case of a bank against certain defendants, including Mathewson, wherein a judgment was rendered against defendants in 1896, and of a return made upon an execution issued in the case that no property could be found on which to levy, and an affidavit of garnishment in the action, was not material error.

The judgment of the district court is affirmed.

---

No. 19,971.

FRANCES KECK, *Appellee,* v. J. J. JONES and C. M. HAVER-STOCK, *Appellants.*

SYLLABUS BY THE COURT.

1. AUTOMOBILE—*Injuries—No Joint Liability of Dealer Who Sold the Car and Purchaser Who Was the Driver.* An automobile dealer ordered a Ford taxicab for a customer. The car arrived at the dealer's garage, was supplied with gasoline, oil, water and air, was inspected, and was tested by running it, all before noon of a certain day. In the afternoon the purchaser came for the car, paid for it, declined assistance in operating it because he had had experience, and drove it away. After driving the car for probably an hour the purchaser returned to the garage and asked for some one to accompany him to observe the mechanical operation of the car and make any adjustments that might be necessary. The dealer considered it a part of his business to see that the car was in proper working order and sent an employee, who was a machinist, with the purchaser to observe the mechanical workings of the car

and correct the same if found defective, and for no other purpose. The purchaser started for a school to get his daughter. On the way he collided with a pedestrian, who was injured. The machinist did not interfere with the operation of the car. *Held*, the owner and driver of the car was not the agent or servant of the dealer, the dealer had no authority to control the driver in the operation of the car, and consequently the dealer was not responsible for the owner's negligent handling of the car.

2. SAME—*Negligence Found—Not Charged in Petition—No Recovery.* In an action for damages by the injured pedestrian the petition charged that the driver of the car was negligent in enumerated particulars. The jury were asked to state in what his negligence consisted if they found he was negligent. The answer was that he was negligent in a particular not complained of in the petition. *Held*, the driver was entitled to judgment on the special finding.

Appeal from Sedgwick district court, division No. 2; THORN-TON W. SARGENT, judge. Opinion filed March 11, 1916. Reversed.

*J. N. Haymaker, A. V. Roberts, W. D. Jochems, J. D. Houston,* and *C. H. Brooks,* all of Wichita, for the appellants.

*R. L. Holmes, Charles G. Yankey,* and *W. E. Holmes,* all of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for personal injuries sustained by being struck by an automobile. The defendants were the owner of the automobile, who was the driver, and the dealer from whom the automobile was purchased. The plaintiff recovered against both defendants, who appeal.

The petition charged that it was a part of the business of the dealer, Jones, to teach customers needing instruction how to operate automobiles which they purchased from him; that Haverstock purchased a Ford taxicab; that Jones sent an employee, Smith, as a demonstrator and teacher to give Haverstock a lesson in driving; and that the accident occurred while Haverstock, as the agent of Jones, was operating the car in furtherance of the business of Jones. The negligence charged was that Jones permitted inexperienced Haverstock to operate the car on the crowded streets of the city of Wichita; that the

car was driven at a rate of speed forbidden by city ordinance; that while driving north a turn was made to the east on the wrong side of an intersecting street, contrary to city ordinance; and that, although Haverstock saw the plaintiff in time to avoid a collision, he failed to give any signal of an intention to make the turn described, so that the plaintiff was not aware that the course of the automobile was to be changed. The proof was that the car, which had been ordered for Haverstock, arrived at Jones's garage, was supplied with gasoline, oil, water and air, was inspected, and was tested by running it, all before noon of a certain day. In the afternoon Haverstock came for the car, paid for it, declined assistance in operating it because he had had experience, and drove it away. After driving the car about town for probably an hour he returned to the garage and asked for some one to go with him to listen to the working of the car, see if it was running properly, and if it were not to make the necessary adjustment. The employee, Smith, who was a machinist and not a demonstrator or teacher, got into the car for this purpose only, and Haverstock started for a certain school to get his daughter. On the way the accident happened.

The jury returned the following special findings of fact:

"1st: Who was driving the car at the time of the accident in question? Answer: C. M. Haverstock.

"2nd: If you find that the defendant Haverstock was driving the car at the time in question, state where he was going and for what purpose. Answer: He was going to test the operation of the car and to the Washington schoolhouse to get Haverstock's daughter.

"3rd: Had not the defendant Haverstock paid and settled for said car prior to the accident in question? Answer: Yes.

"4th: State who, if any one, was riding with the defendant Haverstock at the time of the accident in question. Answer: Curtis Smith.

"5th: If you find that one Curtis Smith was riding in said car at the time of said accident, is it not true that Smith's only duty was to observe the mechanical workings of said car and correct the same if found defective? Answer: Yes.

"6th: Was it any part of the duty of said Smith to teach defendant Haverstock how to drive the car? Answer: No.

"7th: Is it not a fact: (a) That defendant Haverstock desired some one to accompany him to observe the mechanical operation of the car? Answer: (a) Yes.

(b) To make any adjustments that might be necessary? Answer: (b) Yes.

Keck v. Jones.

"(c)  That Smith was riding in the car at the time in question for that purpose only?  Answer: (c) Yes.

"8th:  How much experience, if any, had the defendant Haverstock had in driving automobiles prior to the accident in question?  Answer: Not very much.

"9th:  Had the defendant Haverstock driven a Ford automobile prior to the day on which the accident occurred?  Answer: Yes; once.

"10th:  Had the defendant Haverstock driven any other cars than the Ford car prior to the day of the accident?  Answer: Yes.

"11th:  If you find the defendant Jones guilty of negligence, state in what the negligence consisted.  Answer: In allowing Haverstock with insufficient experience in running a Ford car to run the car on a close-in crowded street.

"12th:  If you find the defendant Haverstock guilty of negligence, state in what the negligence consisted.  Answer: In not stopping the car as quickly as he could have.

"13th:  State who was in control of the car in question at the time of the accident.  Answer: C. M. Haverstock and Curtis Smith."

There was no evidence that the situation presented by the petition, a dealer performing his customary function of teaching an inexperienced customer how to drive, existed.  On the other hand, the proof was clear and undisputed that the automobile was not being driven for the purpose of giving Haverstock instruction, that Smith was not a demonstrator or teacher, that he was not in the automobile to teach Haverstock how to drive, that Smith had no right to control the operation of the car and did not attempt to do so, and that whenever a purchaser claims he knows how to operate a car, takes charge of it, and drives off, no instructor is sent with him.  The result is the 11th finding has no basis upon which to rest.  The duty which it assumes was not discharged, to see that the automobile was carefully operated while a customer received instruction in driving, did not exist, and, indeed, the nonexistence of this duty was established by the first seven special findings.  Likewise the portion of the 13th finding which states that Smith was in control of the car is without any support in the evidence.

As indicated, the petition alleged that Haverstock was the agent of Jones at the time of the accident and that the operation of the automobile at that time was in furtherance of Jones's business.  No facts as to the nature of the agency and no facts as to the extent and purpose of Jones's business were stated other than it was a part of his business to instruct inex-

perienced purchasers of automobiles, and that Haverstock was receiving instruction when the plaintiff was injured. The plaintiff's evidence was confined to proof of the case thus made. On cross-examination of one of the defendants' witnesses, called to prove that Smith did not go with Haverstock to teach him to drive, it came out that the practice is to inspect cars to see that they run properly. The proof which destroyed the plaintiff's case against Jones, that Smith was not an instructor and Haverstock was not his pupil, included proof that Smith went with Haverstock to adjust the carburetor and spark plugs if "they were not hitting right." An effort is made to erect a foundation for the judgment against Jones out of this material—a new cause of action not stated in the petition, not in the mind of the plaintiff up to the time when she rested her case, and suggested for the first time on cross-examination of a witness for the defendants.

It is a cardinal rule of interpretation that general averments in a pleading will be referred to specific matters particularly pleaded and not to some distinct and independent matter of which no hint is given. In the present instance the petition was drawn on the single, definite theory that it was a part of Jones's business to teach the inexperienced Haverstock how to drive his new car, and that in driving the car Haverstock acted as the agent of Jones in furtherance of that business. No issue was tendered, either expressly or by inference or implication, that it was a part of Jones's business to put cars in proper running order, that this car required testing and possible adjustment, that Smith was sent out with the car for that purpose, and that Haverstock was the agent of Jones to operate the car in furtherance of that business. There was no cause of action of that kind to submit to the jury.

The court gave some instructions relating to the subject of common enterprise which authorized the jury to consider the case in the aspect just discussed, and the question of Jones's liability on that theory may be determined.

The car had been sold, delivered, and taken from Jones's possession and control by the purchaser. Haverstock was driving the car to test its operation and to bring his daughter from school. He asked for one of Jones's men to go with him to observe the mechanical working of the car and to make ad-

justments if any were necessary. Jones had tested the car by operating it before delivery to Haverstock, but it was a part of his business to see that the car was in working order and he complied with Haverstock's request by sending Smith. Smith's duty began and ended with observation of the mechanical working of the car and mechanical adjustment of the parts if necessary. Neither Smith nor his master, Jones, had any authority to start or stop the car, to direct when or where or how it should go, or to control a single one of its movements while in operation. The evidence and the findings of the jury were that Haverstock, not Jones, desired some one to accompany Haverstock, that Haverstock desired some one to accompany him, not to drive but to observe mechanical operations, and if necessary to make adjustments, and that Smith was riding in the car for that purpose only. Haverstock, the owner and driver, surrendered none of his dominion over the car and its management, and Smith did not in fact interfere with Haverstock's management of it. Although the enterprise was in a sense joint for certain purposes, management of the car was not one of them; and in the absence of right on the part of Jones to control the movements of the car, or actual interference with Haverstock's control, Haverstock's negligence in operating the car could not be charged to Jones.

In the case of *Corley v. Railway Co.*, 90 Kan. 70, 133 Pac. 555, it was said:

"Where two persons are engaged in a common enterprise, using a conveyance for their purpose, each is said to be responsible for the acts of the other, but for this situation to arise each must have an equal right of control." (p. 74.)

The Corley case, however, was one in which the injury was inflicted by the railway company on one of the occupants of the automobile while his companion was driving.

In the case of *Anthony v. Kiefner*, 96 Kan. 194, 150 Pac. 524, the driver of an automobile injured a third person, and an effort was made to charge his mother, who was riding with him, with liability. It was held the facts did not show the occupants of the automobile were engaged in a common enterprise, although the jury had so determined. In discussing the subject of the liability of one person for the negligent conduct of another when both are engaged in a mutual under-

taking the court expressly recognized the principle that right of control over the means and agencies effecting the injury, either control in fact at the time or control as master or principal, is essential to such liability.

The case of *Judge v. Wallen,* (Neb. 1915) 152 N. W. 318, L. R. A., 1915 E., 436, resembles the one under discussion. The syllabus, a portion of which is italicized to call attention to the principle involved, reads as follows:

"While two traveling salesmen are engaged in the joint enterprise of transporting themselves by automobile over the territory canvassed by both for different merchants, one of the salesmen owning and operating the automobile and the other paying sums about equal to the cost of gasoline and oil consumed, the latter, *if possessing joint control over the automobile,* may be liable for the negligence of the other in operating it; both being occupants at the time."

Leaving decided automobile cases at one side, the question presented is easily solved by the application of elementary principles of law to the established facts. If Jones be liable it must be on the principle of *respondeat superior* for the performance of the negligent act charged. The criterion of this liability is power of control. Unless the person sought to be charged with liability had authority to direct and control the action of the alleged servant or agent, the relation of master and servant or principal and agent did not exist and there was no superior to answer for the negligent act. Since Jones could not command Haverstock, either as servant or agent, with respect to what streets Haverstock used, or the rate of speed at which he drove, or when he turned, or how he turned, or on what side of the street he drove, or what signals he gave, Jones was not responsible for the way in which the car was operated.

In the case of *Judge v. Wallen,* referred to above, it was left to the jury to say whether or not the occupant of the automobile who was not driving had joint authority with the driver to control the car. The court said it was proper to do this because of certain facts recited in the opinion and because of "certain obvious rights" growing out of the mutual undertaking. Whenever the facts are disputed or give rise to conflicting inferences the question should be submitted to the jury, under appropriate instructions. In this case there is no

conflict in the evidence relating to the controlling facts, the most material of which were correctly found by the jury in the first seven findings of fact. The evidence not only afforded no ground for the inference that Smith was in control of the car but showed affirmatively that he was not in control.

The 12th finding of fact was outside the issues and acquitted Haverstock of the negligence charged in the petition. (*Creamery Co. v. Daniels,* 72 Kan. 418, 419, 83 Pac. 986; *Corley v. Railway Co.,* 90 Kan. 70, 71, 133 Pac. 555; *Martin v. City of Columbus,* 96 Kan. 803, 153 Pac. 518, and cases cited in the opinion.) The charges of negligence contained in the petition have been stated. It is contended that the last one may be interpreted as asserting that Haverstock was negligent in not stopping the car sooner than he did. Haverstock was proceeding toward the north and turned toward the east at a street intersection. The allegation was that he knew the intersection of streets was much used by pedestrians, that he saw or should have seen the plaintiff approaching the crossing, and saw or should have seen the plaintiff as she was proceeding southward immediately before the collision and in ample time to avoid it—

"*But that* the said Smith and the said Haverstock omitted carelessly and negligently to give any signal or sign of intention to turn to the east so that the said plaintiff was not aware and had no notice of the intention of the said occupants of said machine to turn or change the course of the machine."

This allegation is susceptible of but one meaning. It does not pretend to charge that Haverstock ought to have stopped but could not or did not do so quickly enough. The sole fault attributed to him is that he did not signal the plaintiff so that she could have notice of his intention to change the course of the automobile.

The judgment of the district court is reversed and the cause is remanded with direction to set aside findings numbered 11 and 13 and render judgment for the defendant.

No. 19,972.

JULIA HAYS et al., *Appellees*, v. W. S. PATTERSON, *Appellant*.

SYLLABUS BY THE COURT.

1. DEED—*Mental Incapacity of Grantor—Evidence.* The evidence examined and held to tend to show a grantor's want of mental capacity to make a deed.

2. SAME—*Mental Incapacity—Undue Influence.* Upon appeal from a judgment setting aside a deed, if a finding that it was made while the grantor was without mental capacity is sustained, questions of error affecting only a finding that undue influence was exercised upon him become immaterial.

3. SAME—*"Adequate Consideration"—Legally Sufficient.* A finding that the consideration of a deed was not adequate does not mean that it was not legally sufficient.

Appeal from Ottawa district court; DALLAS GROVER, judge. Opinion filed March 11, 1916. Affirmed.

*R. B. Caples,* of Glasgow, Mo., *F. D. Boyce,* and *E. C. Sweet,* both of Minneapolis, for the appellant.

*C. W. Burch,* and *B. I. Litowich,* both of Salina, for the appellees.

The opinion of the court was delivered by

MASON, J.: T. J. Patterson, at the age of eighty-nine, executed a deed conveying to W. S. Patterson, his son, a quarter section of land, worth about $10,000, the expressed consideration being one dollar, love and affection, and the grantee's promise to support him and provide him with a home during his life. A contract was signed at the same time allowing the grantor to collect the rent during his lifetime. He died two months later. Other heirs brought an action to set aside the deed on the ground of want of capacity and undue influence. A jury found in favor of the plaintiffs upon both propositions, answering a number of questions in harmony with that view. The court approved all the findings excepting one which gave an affirmative answer to the question, "Did the defendant urge, ask, or solicit his father, Thomas Patterson, to deed him the land in question?" Judgment was rendered for the plaintiffs and the defendant appeals.

(1) The defendant maintains that there was no substantial evidence to warrant the findings or the judgment. Testimony was given by witnesses who had opportunity to observe him, and who were present at the trial, to the effect that at about the time the deed was made the grantor was forgetful; that "his memory did n't seem to be good"; that "he would sit down and tell something and in ten or fifteen minutes tell the same thing over"; that he would tell it three or four times within an hour; that he would tell the same story repeatedly, apparently having no recollection that he had told it the first time; that he failed to recognize old acquaintances, whom he had known for years; that "his mental condition was very weak"; that he was childish; that "he was a feeble and childish old man in his talk"; that "he was like a child"; that he was "feeble-minded"; that "his mind appeared weak"; that he seemed to be "very childish and feeble"; that he was "just as childish as he could be"; that "he was awfully feeble and he was lots different from what he had been in years before, more a child than he was a man"; that he was "failing pretty fast"; that he was "failing in mind." One witness said: "I considered him like a little child." Another: "I can not think he was capable of transacting business." While there was much evidence to the contrary, we think this testimony tended to show incompetence to do business, and therefore afforded a substantial basis for a finding that the grantor lacked mental capacity to make the deed. That being the case, the decision of the trial court on the subject is final. Special objection is made to a finding that at the time the deed was executed the grantor did not know, even in a general way, what property he owned. There was no direct evidence which specifically supported this proposition, although one witness said that he had expressed a wish that his children should share his property equally, and another that he did not make inquiries about this land or his business. But the evidence of his enfeebled mental condition justified an inference supporting this answer, as well as others to which similar objection is made.

(2) As the finding of want of capacity is upheld, and is sufficient to sustain the judgment, we need not decide whether there was any evidence of the deed having been procured through undue influence, or whether any error was committed

with reference to that feature of the case. An instruction concerning the burden of proof in that respect is complained of, but for the reason stated the question so raised need not be considered.

(3) In response to a question submitted to them the jury answered that the consideration expressed in the deed was not adequate for a conveyance of the land. This finding is criticised in part upon the theory that it means that the deed was not supported by a sufficient consideration, whereas the element of love and affection would alone serve that purpose. The word "adequate" in this connection, however, is not to be interpreted as the equivalent of "legally sufficient." (*Rosseau v. Rouss*, 91 App. Div. 230, 238, 86 N. Y. Supp. 497, 502.) It refers rather to the proportion between the value of what is given and what is received. (9 Cyc. 365.) But in any event, whatever bearing this finding has is upon the question of undue influence rather than upon that of mental capacity.

The judgment is affirmed.

---

No. 19,974.

JOEL S. NICHOLSON, *Appellant*, v. THE ATCHISON, TOPEKA & SANTA FE HOSPITAL ASSOCIATION, *Appellee*.

SYLLABUS BY THE COURT.

1. CHARITABLE ASSOCIATIONS — *Negligence of Physicians and Attendants—Liability of Association.* Charitable associations conducting hospitals are not liable for the negligence of their physicians and attendants resulting in injury to patients unless it is shown that the association maintaining the hospital has not exercised reasonable care in the employment of its physicians and attendants.

2. SAME—*Railroad Employee—Neglect of Physicians—Liability.* The foregoing rule is applied in an action by the father of a deceased employee of a railroad company against a hospital association for the neglect of its physicians and attendants in failing to give the son suitable care and attention, where it appears that the defendant is an association maintained by the railroad company for the treatment of its employees while sick, and is supported by the monthly contributions of all its employees who, so long as they remain in the service of the railroad company and contribute to the fund, are entitled to the benefits of the hospital free of charge.

3. SAME—*Petition—Subject to Demurrer.* In such an action a petition

which fails to allege that the defendant did not exercise reasonable care in the selection of its physicians and attendants is subject to demurrer.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed March 11, 1916. Affirmed.

*Edwin L. O'Neil,* of Topeka, and *R. B. Forrest,* of El Reno, Okla., for the appellant.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellee.

The opinion of the court was delivered by

PORTER, J.: In this case the father of a deceased employee of a railroad company is suing a hospital association for neglect of its physicians and attendants in not giving to the son suitable care and attention. The defendant is an association maintained by the railroad company for the treatment of its employees while sick, and is supported by the monthly contributions of all its employees; and, so long as they continue in the employ of the railroad company, contributors to the fund are entitled to medical aid, surgical attendance and medicines free of charge.

The petition alleges that plaintiff's son became ill at his boarding house in Topeka while in the employ of the railroad company and was being cared for and treated there by competent physicians; that while in that condition he was removed against his protest to the hospital by the agent of the company; that they carried him from a warm, comfortable room into the outer air and failed to protect his person from the cold; that he became chilled and suffered an attack of pneumonia from the effects of which he died. It is further alleged that after his removal to the hospital the defendant wholly failed to give him medical treatment and professional care during his illness; that he was taken to what is known as the convalescent ward of the hospital where the windows were kept open, subjecting him to drafts of cold air without sufficient bed covering; that no stethoscope was used to discover the condition of his lungs, and no effort was made by any of the physicians, servants or attendants of defendant to deter-

31—97 KAN.

mine his condition until a few hours before his death. It is alleged that his death was the result of these acts of negligence on the part of the association by its physicians and attendants.

The trial court sustained a demurrer to the petition. Plaintiff elected to stand upon his petition, and appeals.

All contributors to the fund by which the association is maintained are entitled, so long as they remain in the employ of the railroad company, to the benefits of the hospital. They may in case of accident, sickness or disease of any kind be taken to the hospital where they are given, free of all expense, such medical or surgical care and attention as may be necessary. The institution is maintained for the mutual benefit of the contributors to the fund, and in no sense is it maintained for profit. Its liability to a patient for injuries resulting from negligent failure of the physicians and attendants in its employ properly to care for the patient must be determined upon the same principles of law which govern similar actions against eleemosynary or charitable associations conducting hospitals. The rule seems fairly well established that charitable associations conducting hospitals are not liable for the negligence of their physicians and attendants resulting in injury to patients unless it is shown that the association maintaining the hospital has not exercised reasonable care in the employment of its servants and physicians. This rule has been applied to a case where the patient who claimed to have been injured occupied a room in a building maintained in part by donations notwithstanding she paid full compensation for her own care and treatment. (*Duncan v. Nebraska Sanitarium & Benevolent Ass'n.,* 92 Neb. 162, 137 N. W. 1120.)

On the other hand it was held that where a railroad company maintained a hospital under the same plan as in the present case, but made each year a profit of several thousand dollars which went to the credit of the railroad company, it was liable for the negligence of its hospital employees. (*Texas and Pacific Coal Company v. Connaughton,* 20 Tex. Civ. App. 642, 50 S. W. 173.)

A case more directly in point is *Union Pac. Ry. Co. v. Artist,* 60 Fed. 365, 9 C. C. A. 14. The action there was sought to be maintained against the railroad company. It was held that if

Nicholson v. Hospital Association.

the company had used reasonable care in the selection of its physicians and attendants, that was all the law required of it.

This court, in *A. T. & S. F. Rld. Co. v. Zeiler,* 54 Kan. 340, 38 Pac. 282, approved the doctrine of the Artist case, *supra,* so far as it applies to the duties and liabilities of a railroad company in calling a physician or surgeon to care for an injured employee or passenger. In the opinion the court said:

"The law is well settled that a railroad company having used reasonable care in his selection is not chargeable with the want of skill in a physician or surgeon whom it calls for a passenger or injured employé, and this is so even where the law requires a steamship company transporting immigrant passengers to carry a physician. (*O'Brien v. Steamship Co.,* 154 Mass. 272, 28 N. E. 266; *Laubheim v. Steamship Co.,* 107 N. Y. 228, 13 N. E. 781; *Secord v. Railway Co.,* 18 Fed. 221; *U. P. Rly. Co. v. Artist,* 60 Fed. 365.)" (p. 350.)

In the present case the petition does not state that the hospital association failed to use reasonable care in this respect. Plaintiff attempts to avoid the necessity of such an allegation by insisting that it makes no difference how skilled or efficient the servants and physicians of defendant may have been, for the reason that he seeks only to recover for the failure of the physicians and servants to give his son treatment of any kind. But this is a narrow contention, in view of all that is said in the petition. The names of several physicians in the employ of the association are given in the petition; it is said that plaintiff's son was taken there while sick; that the physicians and attendants in the employ of the defendant neglected him, and that from the neglect his death resulted. There is a complaint that a stethoscope was not used to determine the nature of the disease or the condition of the patient's lungs. The whole petition taken together shows that plaintiff is attempting to recover damages for the negligence of the physicians and attendants who are said to be employees of the defendant, in their failure to give to his son proper medical care and attention. Of course it is not claimed that the physicians neglected the patient intentionally or maliciously; all that is claimed is that the physicians and attendants at the hospital neglected to give him proper medical attention in time to prevent his death.

Under the authorities cited as well as by the weight of reason the plaintiff is not entitled to recover on the facts stated. Suits of this nature against associations not established for

profit, but for the purpose of mutual benefit, ought not for reasons of sound public policy to be encouraged. Employers of large numbers of workmen should be encouraged to establish institutions of this kind for the mutual benefit of their employees. It is well known that the employees of the railroad company are entitled to medical and surgical care in the hospital regardless of the nature of their employment or the cause or occasion of their sickness. Doubtless in many instances employees are enabled to avail themselves of these benefits when otherwise, because of their financial condition, they would be unable to obtain necessary medical care and attention.

The judgment sustaining the demurrer to the petition is affirmed.

---

No. 19,978.

WILLIAM HALVERHOUT, *Appellee*, v. THE SOUTHWESTERN MILLING COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. WORKMEN'S COMPENSATION ACT—*Claim for Compensation before Commencing Action Rendered Unnecessary.* Plaintiff was injured in defendant's mill, and a doctor attended him before he was removed therefrom. A few days thereafter he called up the mill and told the timekeeper he wanted a settlement and wanted a doctor sent out, and was referred to the defendant's main office. On calling there he was referred to the defendant's attorneys and in a day or two a doctor was sent out. A little later he went with counsel to see the defendant's attorneys about a settlement, which was discussed, but none was made. Shortly thereafter the action was brought which resulted in a lump-sum judgment. The answer admitted an injury and liability for compensation beginning at the end of the second week of the disability, and averred readiness to pay compensation and that the plaintiff had been notified thereof and refused to accept. *Held,* that the claim required by section 6 of chapter 216 of the Laws of 1913 to be made within three months after the accident was rendered unnecessary.

2. SAME—*Judgment in Lump Sum.* Rule followed that a lump-sum judgment was properly rendered.

3. SAME—*Attempt to Settle by Agreement or Arbitration.* Rule followed that an attempt and failure by the plaintiff to settle by agreement or arbitration is not a condition precedent to maintaining an action.

Appeal from Wyandotte district court, division No. 3; HUGH
J. SMITH, judge. Opinion filed March 11, 1916. Affirmed.

*T. F. Railsback,* of Kansas City, *W. S. Hogsett,* and *Murat
Boyle,* both of Kansas City, Mo., for the appellant.

*J. O. Emerson,* and *David J. Smith,* both of Kansas City, for
the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant appeals from a lump-sum judg-
ment under the workmen's compensation act.

Plaintiff was injured on June 12, 1914, while at work for
the defendant in its mill. He testified that a doctor attended
him before he was removed from the mill, that six or seven
days after the injury he called up the mill and stated to the
timekeeper that he wanted a settlement for his foot and
wanted a doctor sent out, and was referred by the timekeeper
to the company's main office. On calling up the main office
he was referred to a firm of attorneys, and in a day or two he
called on these attorneys and then a doctor came. On or about
July 15 he employed counsel and went with them to the office
of the defendant's attorneys for the purpose of obtaining a
settlement, and they there talked of the injury. Discussion
was had as to the method of settlement, either by a certain
sum by the week or by a lump sum, and some dissatisfaction
with the workmen's compensation act was expressed by one
of the plaintiff's attorneys. Shortly afterwards the action
was begun, resulting in a judgment for plaintiff in the sum of
$1027.87. The answer, after certain admissions, including the
injury of the plaintiff, but denying the extent of such injuries
or the consequent incapacity to be as great as alleged, averred
that the plaintiff was entitled to compensation beginning at
the end of the second week of disability, but that he did not
notify the defendant of his accident or make any claim for com-
pensation, but that the defendant on or about the 21st of July
and prior to the filing of the suit notified the plaintiff that the
defendant was ready and willing to pay such compensation
then due and to continue the same as provided for by the
statute during the time he should be disabled, which offer
was by the plaintiff refused; that the defendant had at all

times been ready and willing to pay under the terms and provisions of the act, and that the plaintiff was not entitled to maintain the action until he had made some effort to settle with the defendant.

The failure to give a written notice within ten days after the injuries was expressly waived when the case was reached for trial.

A motion was made to dismiss on the opening statement of plaintiff's attorney because no claim for compensation had been made and no effort to agree with the defendant upon the amount of compensation. The question was raised in the ways already mentioned, and also by demurrer to plaintiff's evidence and by request for a peremptory instruction. In view of the knowledge which the defendant, through its various representatives, had of the injury and the desire of the plaintiff to be paid therefor, the claim required by section 6 of chapter 216 of the Laws of 1913 to be made within three months after the accident was rendered unnecessary within the principle announced in *Roberts v. Packing Co.,* 95 Kan. 723, 149 Pac. 413, and *Ackerson v. Zinc Co.,* 96 Kan. 781, 153 Pac. 530.

An argument is made against the propriety or legality of a lump-sum judgment, but the question has already been settled and disposed of. (*Gorrell v. Battelle,* 93 Kan. 370, 144 Pac. 244; *Cain v. Zinc Co.,* 94 Kan. 679, 148 Pac. 251; *Roberts v. Packing Co.,* 95 Kan. 723, 728, 149 Pac. 413; *McCracken v. Bridge Co.,* 96 Kan. 353, 153 Pac. 525.)

Certain complaints are made touching instructions, the admission of evidence and the amount of the verdict, but we find nothing substantially prejudicial in the matters thus complained of.

The principal contention is that the suit could not be maintained until after an effort for settlement on the part of the plaintiff had failed. Section 36 of chapter 218 of the Laws of 1911 provides that "A workman's right to compensation under this act, may, in default of agreement or arbitration, be determined and enforced by action in any court of competent jurisdiction." It is forcibly urged that the purpose and policy of the act were to avoid lawsuits and substitute settlement instead (2 M. A. L. 471), and there is much in the language of

Knox v. Farguson.

the statute and the arrangement of its sections to lead to this conclusion. But when the precise matter came to be treated by the legislature the language just quoted was employed, and this means practically the same as if instead of the phrase "in default of agreement or arbitration" the words "in the absence or omission of an agreement or arbitration" had been used. (2 Words & Phrases, p. 1929; 13 Cyc. 759.) While the expression frequently means failure to perform a duty or obligation, other definitions are also given. "Default. A failing or failure; omission of that which ought to be done." (Webster's New Int. Dict. 1910.) "In default of, owing to lack or failure of." (Funk & Wagnalls' New Stand. Dict. 1913.) "Omission; neglect or failure; . . . default of issue: Failure to have living children or descendants at a given time or fixed point." (Black's Law Dict., 2d. ed.)

Nothing can be found in the entire statute which requires that such a settlement be attempted by the plaintiff as a condition precedent to maintaining an action at law, and the courts can not add a requirement either purposely or carelessly omitted by the legislature. This question was decided in *Ackerson v. Zinc Co.*, 96 Kan. 781, 153 Pac. 530, which decision is now approved and followed.

The judgment is affirmed.

---

No. 19,981.

H. M. KNOX, *Appellee*, v. J. G. FARGUSON et al. (E. M. FARGUSON, *Appellant*).

SYLLABUS BY THE COURT.

1. TENANTS IN COMMON—*Voluntary Division—Deed to Tenant's Wife—No Trust Created.* Where parties own land in common and divide it by making deeds to each other, and one of the parties has the deed for his share made to his wife, that deed is not governed by sections 9699 and 9700 of the General Statutes of 1909, relating to trusts.

2. FRAUDULENT CONVEYANCE—*Remedies—Action to Set Aside—Attachment.* Lands conveyed in fraud of the rights of creditors can not be subjected to the payment of their claims until the claims have been reduced to judgment, or, if the debtor is a nonresident of this state, until the lands have been attached and held subject to the payment of such judgment as may be rendered in the action.

Appeal from Finney district court; GEORGE J. DOWNER, judge. Opinion filed March 11, 1916. Reversed.

*Richard J. Hopkins,* of Garden City, for the appellant.

*H. O. Trinkle,* of Garden City, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: In December, 1903, defendant J. G. Farguson executed a promissory note to the plaintiff. This action was brought against defendant J. G. Farguson to recover on the note, and against defendant E. M. Farguson to subject to the payment of the note certain real property situated in Finney county.

The evidence proved that defendant J. G. Farguson, together with S. J. Farguson, E. C. Farguson, and M. F. Green, were tenants in common of this and other real property; that in March, 1912, they divided this real property by executing deeds to each other; and that the part set off to J. G. Farguson was at his request deeded to his wife, defendant E. M. Farguson. The petition alleges that this deed was fraudulent as to creditors. On the trial, M. F. Green, a witness for the plaintiff, testified that J. G. Farguson stated at the time the division was made that he would make the deed for his share to his wife and that he owed her more than that. J. G. Farguson did not appear in the action and no service was made on him other than by publication notice. The real property was not attached. Defendant E. M. Farguson introduced no evidence. A demurrer to the evidence was filed. This was overruled. Judgment was rendered, finding that $242.74 was due the plaintiff from defendant J. G. Farguson on the note, decreeing the deed to E. M. Farguson void as against the plaintiff, and that E. M. Farguson held the title to the land in trust for the plaintiff as creditor of J. G. Farguson; and ordering the property sold and the proceeds applied in payment of the costs of the action and the indebtedness to the plaintiff. Defendant E. M. Farguson appeals.

1. She contends that the demurrer to the plaintiff's evidence should have been sustained. The plaintiff bases his right to recover on sections 9699 and 9700 of the General Statutes of 1909. These sections read:

"When a conveyance for a valuable consideration is made to one person and the consideration therefor paid by another, no use or trust

shall result in favor of the latter; but the title shall vest in the former, subject to the provisions of the next two sections.

"Every such conveyance shall be presumed fraudulent as against the creditors of the person paying the consideration therefor; and where a fraudulent intent is not disproved, a trust shall in all cases result in favor of prior creditors to the extent of their just demands, and also in favor of subsequent creditors if there be sufficient evidence of fraudulent intent."

The deeds from and to the parties to the division of the property owned by them in common were not such conveyances as are mentioned in section 9699. No land was purchased. Each party owned as much before as he did after the conveyances were made. Their act divided the land between them and had the same effect as a partition in an action in the district court. These parties could have signed and acknowledged a single written instrument dividing the property, specifying what each should hold in severalty, and then they could have had the writing recorded and the division would have been made. Their deeds had the same effect. There was a consideration for the deeds, but that consideration was not paid. The consideration for each deed was the right of each grantor in that deed to hold his property separate and apart from the others. The deed to E. M. Farguson had the same effect as if it had been made directly by J. G. Farguson to her; it carried the same right and was burdened with the same disabilities. If it was fraudulent as to the creditors of J. G. Farguson, it was so under section 3834 of the General Statutes of 1909, and not under the sections above quoted. If the plaintiff desired to attack that deed as fraudulent as to him, it was incumbent on him to prove that the conveyance was made with fraudulent intent. (*Dodd, Brown & Co. v. Hills & Kramer,* 21 Kan. 707; *Baughman, Sheriff, v. Penn,* 33 Kan. 504, 6 Pac. 890; *Hartman v. Hosmer,* 65 Kan. 595, 70 Pac. 598.) The plaintiff did not introduce any evidence to show that the conveyance was fraudulent. For this reason the demurrer to the plaintiff's evidence should have been sustained. However, the cross-examination of one of the plaintiff's witnesses tended to show that the deed was made to E. M. Farguson because J. G. Farguson owed her more than the value of his interest in the land.

2. Other reasons not advanced in brief or argument exist why the plaintiff can not recover in this action. The plaintiff's claim was in the form of a promissory note. It had not been put into judgment. Although J. G. Farguson was a party to the action, the court did not have jurisdiction of him. No judgment could be rendered against him. (*Repine v. McPherson,* 2 Kan. 340, 346; *Zimmerman v. Barnes,* 56 Kan. 419, 421, 43 Pac. 764.) This action is in the nature of a creditor's bill, and such an action can not be maintained until judgment has been rendered on the indebtedness. (*Tennent v. Battey,* 18 Kan. 324; *Underwood v. Fosha,* 96 Kan. 549, 553, 150 Pac. 571.)

It appears from the record, which we have before us, that defendant J. G. Farguson was a nonresident of this state. If the conveyance to E. M. Farguson was fraudulent, a writ of attachment could have been levied on that property, and it could have been held in the custody of the law to await any judgment that might be rendered in the action, and then sold to satisfy that judgment. The attachment would have been subject to the right of defendant E. M. Farguson to protect her interest in the property in any proper proceeding.

The judgment is reversed. The trial court is directed to sustain the demurrer to the plaintiff's evidence and to render judgment for defendant E. M. Farguson.

---

No. 19,982.

W. H. EMERY, *Appellant,* v. EDGAR BENNETT, *Appellee.*

### SYLLABUS BY THE COURT.

1. PROMISSORY NOTE — *Pleadings — Waiver of Verification of Answer.* Although section 110 of the civil code requires that the answer to a petition in an action founded on a written instruument for the unconditional payment of money shall be verified, the verification is waived when the plaintiff joins issue on the answer, introduces evidence contradicting such defense, and asks instructions covering his theory of the law pertaining thereto.

2. TRIAL—*Objection to Pleadings Must be Specific—Duty of Attorneys.* The duty of an attorney as an officer of the court is to assist the court in arriving at a just and lawful conclusion and judgment in every cause; and when he has a proper objection to the pleadings or pro-

Emery v. Bennett.

ceedings, he should point out clearly and specifically the grounds for his objection; and when he fails to make it with such clearness and precision that the court can understand it, he will ordinarily be held to have waived his objection.—Following *Riverside v. Bailey*, 82 Kan. 429, 431, 108 Pac. 796.

3. APPEAL — *Affidavit of Trial Judge — No Part of Record.* It is not proper for a trial judge, by his personal affidavit, to supplement the record of what did or did not transpire in the trial of a cause before him.

Appeal from Washington district court; JOHN C. HOGIN, judge. Opinion filed March 11, 1916. Affirmed.

*A. J. Freeborn,* and *J. R. Hyland,* both of Washington, for the appellant.

*Charles W. Clarke,* and *Edgar Bennett,* both of Washington, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The appellant, plaintiff below, sued the defendant on a promissory note. The defendant's answer admitted the execution but denied the delivery of the note, and alleged that it was only a memorandum of a gift, but that about a year after its execution it had been delivered by mistake along with some other papers. The appellant was the defendant's father-in-law. We may infer that the reciprocal relation of paternal regard and filial respect which may have existed between the parties at the time of the alleged gift has changed. Hence this lawsuit.

The verdict was for the defendant. The special findings read:

"1. At the time plaintiff gave defendant his check for $500.00, did he at that time intend to make an unconditional gift of that amount of money. A. Yes.

"2. Did the defendant when he executed the instrument sued on, intend it as a promissory note for the payment of money? A. No.

"3. Did defendant ever intentionally deliver the instrument sued on to the plaintiff? A. No."

The principal error assigned is in the admission of evidence, because the defendant's answer was not verified as required by the new code. (Civ. Code, § 110; *Rose v. Boyer*, 92 Kan. 892, 141 Pac. 1006; *Read v. Dodsworth*, 95 Kan. 117, 147 Pac. 799.)

This assignment would be good, but appellant filed a reply which joined issue on the pleaded defense. Evidence *pro* and *con* was received concerning it, and the appellant asked, and to some extent obtained, instructions covering the defense pleaded. Counsel for the appellant never did point out to the trial court frankly and specifically the defect in defendant's answer, which was the want of verification.

Counsel for appellant tacitly admit that they were not as helpful to the trial court as they might have been. In their reply brief they say:

"We submit that it is an absolute right of counsel in the conduct of a trial, and especially where the attitude of the trial court is unfriendly or hostile, to make objection, demurrer or motion concerning the insufficiency of a pleading, in general terms, and are not required to make specific objections thereto unless required by the trial court."

This doctrine contended for by appellee has been disapproved by this court. In *Riverside v. Bailey*, 82 Kan. 429, 108 Pac. 796, it was said:

"During this hearing the defendants were challenged to point out to the court wherein the verdict was excessive or erroneous, as alleged in the motion. This they declined and failed to do, and the court for this reason denied the application. This refusal on the part of the defendants' attorney was alone sufficient to justify the court in denying the motion for a new trial, and sufficient to constitute a waiver of any error which the court might have committed in the decision. It is the duty of every attorney engaged in the presentation of a cause to a court to assist in reaching a just conclusion, by stating fully and frankly to the court, when requested, all that he knows about the question under consideration. With such a statement the court might be able to grant the relief at once and save further delay and expense. A court has the right, upon such an application, to have the errors complained of pointed out fully and clearly, and concealment or evasion of pertinent facts by the attorney is a violation of professional duty which will justify a refusal of the order requested. (*The State v. Everett*, 62 Kan. 275; *The State v. Balliet*, 63 Kan. 707, 710.)" (p. 431.)

We do not think that counsel are warranted in permitting even "an unfriendly court" to commit error by overruling an objection which they fail to make sufficiently precise for the trial judge to understand and rule on intelligently. Can there be any doubt, if the objection had been timely and clearly made, that the court and opposing counsel would have seen it, and that leave would have been asked and granted to permit the answer to be verified? (*Taylor v. Hosick, Adm'r, &c.*, 13 Kan.

518, 526; *Mortgage Co. v. Lash,* 60 Kan. 141, 55 Pac. 846.) The new code, which accounts for this oversight on the part of an experienced and capable judge and competent and experienced counsel, has another provision which we must not overlook.

Section 581 of the civil code provides:

"The appellate court shall disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining, where it appears upon the whole record that substantial justice has been done by the judgment or order of the trial court; and in any case pending before it the court shall render such final judgment as it deems that justice requires, or direct such judgment to be rendered by the court from which the appeal was taken, without regard to technical errors and irregularities in the proceedings of the trial court."

(See *Hamilton v. Railway Co.,* 95 Kan. 353, 359, 148 Pac. 648.)

Moreover, it has always been the law that traversing an issue pleaded waives the insufficiency of the pleading.

In *Mitchell v. Milhoan,* 11 Kan. 617, it was said:

"The subsequent proceedings, however,—the answer, the reply, the evidence, the findings or verdict,—often cure a defective petition. (*Barrett v. Butler,* 5 Kan. 355; 359; *Mo. Valley Rld. Co. v. Caldwell,* 8 Kan. 244; *Zane v. Zane,* 5 Kan. 140.) This is generally the case where no objection is made to the petition in the court below, or where the objection is made by merely objecting to the introduction of any evidence under the petition; and except where the objection is made by demurrer, or by a motion to require the plaintiff to make his petition or some allegations thereof more formal or more definite and certain, the objection should generally be overruled, unless there is a total failure to allege some matter essential to the relief sought; and the objection should seldom, if ever, be sustained, where the allegations are simply incomplete, indefinite, or conclusions of law. (*Laithe v. McDonald,* 7 Kan. 254, 261, 262; *Fitzpatrick v. Gebhart,* 7 Kan. 35, 40, 41; *Greer v. Adams,* 6 Kan. 206; *Hawley v. Histed,* 10 Kan. 266." (p. 626.)

In *Loan Co. v. Organ,* 53 Kan. 386, 36 Pac. 733, it was said:

"It is said that the court was not justified in inquiring whether the judgment had been wrongfully obtained, because the reply of Kenyon was not verified, and for the further reason that it did not set forth the judgment sought to be vacated. The absence of a verification or the sufficiency of the pleadings was not brought to the attention of the district court, but the plaintiff proceeded to trial on the merits as though the reply was sufficient and the issues properly closed. Under these circumstances, the objection is raised too late, and a verification to the reply must be deemed to have been waived." (p. 390.)

(See, also, *Ciesielski v. Nowacki*, 39 Kan. 340, 18 Pac. 232; *Hoopes v. Implement Co.*, 45 Kan. 549, 26 Pac. 34; *Bishop v. McHenry*, 4 Kan. App. 525, 44 Pac. 1016.)

2. We see no point to appellant's contention that the evidence for the defense tended to vary and contradict the express terms of the promissory note. The chief defense was that there was no intended delivery. Certainly under such an issue evidence was competent. And since there was no intentional delivery of the note, it could not be incompetent, and certainly not prejudicial, to admit evidence that the check for $500 from the appellant to his son-in-law was a gift or advancement to the defendant and his wife. The demurrer to the evidence for defendant was properly overruled; and the instructions contained nothing approaching reversible error.

3. The appellee has filed and incorporated in his brief an affidavit of the trial judge that the question of verification of defendant's answer was never called to his attention at the trial. This is irregular and can not be considered. (*Mason v. Harlow*, 92 Kan. 1042, 142 Pac. 243.) Whatever a judge may with propriety do should be done in the course of the trial and chronicled as a part of it, and not by supplementing the record by his personal affidavit.

The judgment is affirmed.

DAWSON, J. (concurring specially) : I think that plaintiff's reply alone cured the want of verification in defendant's answer. I do not think that the amended code (§ 110) intended that the rules of pleading in vogue in the time of Coke and Littleton should be resurrected. And even in the far away time of those revered jurists a defective pleading, such as the want of a requisite verification to an answer, was cured by pleading over. In both *Rose v. Boyer*, 92 Kan. 892, 141 Pac. 1006, and *Read v. Dodsworth*, 95 Kan. 117, 147 Pac. 799, the effect of plaintiffs' *replies* to defendants' *unverified answers* was not discussed or considered, and I am strongly persuaded that if this sensible and time-honored point had been pressed a different result might have been reached—at least so far as the defects in the pleadings were concerned.

While in recent years little concern is given to the names of pleadings, and the defective answer could have been assailed

by demurrer, motion for judgment, or indeed by any objection which directly and specifically challenged the court's attention to the defect, yet all authorities agree that no general demurrer or general objection to the introduction of evidence would reach it. (*Howard v. Carter*, 71 Kan. 85, 90, 80 Pac. 61.) The proper way to have reached the defect would have been by special demurrer, or by demurrer which "shall specify distinctly the grounds of objection." (Civ. Code, §§ 94, 104, 105.) This rule is almost as old as the hills. (27 Eliz. ch. 5.)

In 7 Bacon's Abridgement, p. 667, it is said:

"Indeed, the very intent of requiring mistakes, in point of law, to be shown for cause of demurrer, was, to give the party an opportunity of amending. And even where the proceedings are entered on record, and the demurrer has been argued, the court will give leave to amend, where the justice of the case requires it, and there is anything to amend by."

In Chitty on Pleading, 16th Am. ed., p. 831, it is said:

"When the objection is a defect in matter of *form*, a *special* demurrer is still permitted; for as observed by Lord Hobart, 'the statute of Elizabeth requiring a special demurrer does not utterly refect form, for that would be destructive of the law as a science, but it only requires that the defect in form be discovered, and not used as a secret snare to entrap.'"

In Phillips on Code Pleading, § 225, it is said:

"Objection to a pleading, for want of verification, or for defective verification, should be made by motion to strike from the files. But such omission or defect is waived by demurring, or by pleading over, or by confession on a warrant of attorney releasing all errors."

(See, also, 31 Cyc. 719, 732, 733, 735.)

That pleading over without a demurrer (or other appropriate challenge specifically made) waives defects as to the form of an antecedent pleading, see, also, Phillips on Code Pleading, §§ 304, 305.

After diligent search, I am unable to find any authorities to the contrary.

No. 19,983.

T. A. CAMPBELL and HENRY DAVIS, Partners, etc., *Appellees,*
v. RALPH MOWRER, *Appellant.*

### SYLLABUS BY THE COURT.

EXCHANGE OF PROPERTY—*Fraudulent Representations—Repudiation of Contract—Instructions—New Trial.* In an action of replevin for property which the defendant claims he obtained in a contract of exchange made with the plaintiffs, and in which the plaintiffs allege that they are the owners and entitled to the possession of the property which is wrongfully detained by the defendant, and where the defendant answers with a general denial, the plaintiffs may offer testimony to show that the negotiations between the parties did not result is a completed contract and change of ownership, and also that if a contract was in fact made it was invalid because of the misrepresentations and fraud of the defendant, the contract having been immediately repudiated by the plaintiffs.

Appeal from Pratt district court; PRESTON B. GILLETT, judge. Opinion filed March 11, 1916. Affirmed.

*W. B. Hess,* and *R. F. Crick,* both of Pratt, for the appellant.

*William Barrett,* and *L. G. Turner,* both of Pratt, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action of replevin to recover a team of mules alleged to be the property of T. A. Campbell and Henry Davis and of which Ralph Mowrer had gained possession. The trial resulted in a verdict for the defendant, but the court granted a new trial on the specific ground that error had been committed in refusing to instruct the jury that if a trade or exchange of mules had been agreed upon and effected, but had been brought about by the misrepresentations and fraud of the defendant, the plaintiffs would be entitled to rescind the contract and regain the possession of the mules if they immediately returned the mules received from the defendant and demanded the return of their own. There was testimony of a conversation between an employee or agent of the plaintiffs and the defendant with reference to trading plaintiffs' team of mules for a span of mules which the

Campbell v. Mowrer.

defendant owned. The testimony is in conflict as to whether a trade was actually agreed upon or was conditional upon the subsequent examination and approval of another agent of the plaintiffs. At any rate, defendant obtained the possession of plaintiffs' mules, either as a result of a trade or for the purpose of testing them, and left those which he had owned at the plaintiffs' barn. The next day the plaintiffs returned to the defendant the mules he had left with them, and they testified that they found one of them to be wind-broken, weak in the back and practically worthless. It was in testimony that in the negotiations between the parties the defendant assured the plaintiffs' agent that his mules were sound and all right and that there was "not a blemish or pimple on them." He further said it was not worth while looking at them and hence the agent said he made no examination of the mules. There was also testimony that as the agent approached the head of one mule the defendant advised him not to get too close as he was "foolish about the mouth," and when he started to walk behind the mule the defendant said, "You better watch out, he might kick you."

In instructing the jury the court submitted the question whether or not a trade had actually been made, but declined to submit the question whether the exchange of mules was obtained through the misrepresentation and fraud of the defendant. By this refusal the court practically excluded from the jury all the testimony which had been received upon that theory of the case. There being testimony of latent defects in one of the defendant's mules appearing to have been intentionally concealed by the defendant, and of misrepresentations and fraud by him to induce a trade, of a kind which would justify the plaintiffs in treating the contract of exchange as void, it became the duty of the court to submit that question to the jury. The plaintiffs were entitled to present both theories: (1) that they were the owners and entitled to the possession of the property because the negotiations did not result in a completed contract and change of ownership; and (2) that if a contract was made it was rendered nugatory by the fraud of the defendant for which the plaintiffs promptly repudiated it. The petition of the plaintiffs set forth that

32—97 KAN.

they were the owners and entitled to the immediate possession of the mules and that the defendant wrongfully detained them, and this was met by an answer containing a general denial. Upon the issues thus closed the plaintiffs were justified in offering testimony as to their right to possession under either or both theories, and the defendant was warranted in making any defense and proving any fact which tended to show that the plaintiffs did not own the mules, or were not entitled to the possession of them. (*Wilson v. Fuller,* 9 Kan. 176; *White v. Gemeny,* 47 Kan. 741, 28 Pac. 1011, 27 Am. St. Rep. 320; *Street v. Morgan,* 64 Kan. 85, 67 Pac. 448; *Colean v. Johnson,* 82 Kan. 655, 109 Pac. 403; *Ely v. Holloway,* 95 Kan. 8, 147 Pac. 1128; *Benesch v. Waggner,* 12 Colo. 534, 21 Pac. 706, 13 Am. St. Rep. 254; *Phenix Iron Works Co. v. Mc-Evony,* 47 Neb. 228, 66 N. W. 290, 53 Am. St. Rep. 527.) The failure to present both phases of the case to the jury was error and the court ruled correctly in granting a new trial.

The judgment is affirmed.

---

No. 19,986.

MOLLIE J. DENTON, *Appellee,* v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

AUTOMOBILE—*Driven by Husband—Collision—Injuries to Wife—Negligence.* The evidence and special findings of fact examined and held that a woman who was riding in an automobile driven by her husband and who was injured by a collision between the automobile and a switch engine on a street crossing was not guilty of negligence as a matter of law.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed March 11, 1916. Affirmed.

*W. W. Brown, James W. Reid, E. L. Burton,* and *J. W. Iden,* all of Parsons, for the appellant.

*C. E. Pile, W. D. Atkinson,* and *L. E. Goodrich,* all of Parsons, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for injuries which a woman, riding in an automobile driven by her husband, sustained by being struck by a switch engine on a street crossing in the defendant's yards in the city of Parsons. The plaintiff recovered and the defendant appeals.

The plaintiff, her husband, F. M. Denton, her son, E. E. Denton, and her son's wife occupied the automobile. F. M. Denton, sitting on the right-hand side, was driving the car. E. E. Denton occupied the front seat with the driver. The plaintiff and her daughter-in-law occupied the rear seat. Crawford avenue in the city of Parsons extends east and west across the defendant's tracks, twenty-four in number, and the automobile was proceeding toward the west. In the midst of the tracks and north of the crossing stood a car barn. On the first track west of the car barn stood a stock car, the south end of which was in the street. On the next track toward the west stood a coal car, the south end of which was a few feet north of the south end of the stock car. A switch engine moving toward the south on the third track west of the car barn struck the automobile. The engine bell was ringing at the time and a track foreman of the defendant testified it could be heard at a distance of four hundred or five hundred yards. The plaintiff and her husband had not been on the crossing before. The plaintiff's son was an employee of the defendant, was familiar with the crossing, and said to his father that he would look out for trains. He testified there was danger in stopping an automobile there because cars were likely to be moved at any time. The automobile proceeded as slowly as possible without killing the engine, at a speed of about four or five miles per hour. The plaintiff testified that as they entered the crossing she could see tracks covering approximately a block to the west. The tracks seemed to be pretty thick clear across. The east tracks were farther apart than those at the west. The plaintiff had frequently ridden in the automobile with her husband and had confidence in his ability as a driver. She looked for a flagman and saw none. She saw no engine and she heard no bell. The defendant was negligent in not complying with a city ordinance requiring a flagman to be stationed at the crossing. With a

general verdict for the plaintiff the jury returned the following special findings:

"1. Did the plaintiff, just before the collision in question, see cars upon the sidetracks and observe the condition of the crossing with reference to obstructions that would obscure her view of an approaching engine from the north? Ans. Yes.

"2. Did the plaintiff on approaching the crossing at which the collision occurred, see a railroad track beyond the obstructions and know that engines or cars were likely to be passing over said tracks at any time? Ans. Yes.

"3. Did said plaintiff endeavor to have said automobile stopped at any time when passing over the tracks of defendant before it went upon the crossing where the collision occurred? Ans. No.

"4. Did the noise of the automobile prevent plaintiff from hearing the ringing of the bell of the engine, as said engine approached the crossing on which the collision occurred? Ans. No.

"5. What, if anything, did the plaintiff do to avoid the collision? Ans. Looked and listened.

"6. When it first became possible for plaintiff to observe an engine approaching on the tracks where the collision occurred, was the automobile just entering upon said tracks? Ans. Yes.

"7. Was said engine stopped as soon as it could be stopped after the employes of defendant discovered the automobile approaching? Ans. Yes.

"9. If you find for the plaintiff, state what elements of damage you include in your verdict. Ans. Bodily pain and permanent injury.

"10. Was the automobile on approaching the crossing, under the control of the operator so that it could have been stopped at any point before entering upon the crossing? Ans. Yes.

"11. Do you find that the view of the defendant's employes who were riding upon said engine was obstructed by the cars so that they could not see the approaching automobile until it came from behind the cars about six or seven feet from the crossing? Ans. Yes.

"12. Do you find that the employes of the defendant made every effort, after discovering the automobile, to stop said engine and to prevent the collision? Ans. Yes."

The defendant's principal contentions are that the plaintiff was guilty of negligence as a matter of law and that judgment should have been rendered for the defendant on the findings of fact.

This is a second appeal. (*Denton v. Railway Co.*, 90 Kan. 51, 133 Pac. 558.) A paragraph of the syllabus of the first opinion reads as follows:

"Where a woman is injured through the negligence of a railway company, she is not precluded from recovery by the fact that a contribut-

ing cause of her injury was the failure of her husband to exercise due care in the management of the automobile in which they were riding." (¶ 4.)

This is the law, and the plaintiff can be defeated only because of her own negligence. (Note, L. R. A. 1915 B, 953.)

The plaintiff was required to take the precautions which a reasonably prudent person, not in the situation of the automobile driver, but in her situation, would have taken. The argument is that she should have stopped the automobile or should have called her husband's attention to the conditions and requested him to exercise reasonable care. Why should the plaintiff have called her husband's attention to the conditions and exhorted him to use due care? She had confidence in his ability as a driver. The conditions were just as obvious to him as to her. He could see and hear all she could see and hear. He was responsible for the operation of the automobile, not she, and she had no reason to doubt that he was exercising his faculties with diligence. Besides this, there was another observer in the front seat with the driver who was in fact familiar with the crossing. His safety and his wife's safety were at stake, and there is no evidence of any fact indicating to the plaintiff that her son was not exercising his faculties of observation with diligence. Why ought the plaintiff to have arrogated to herself control over the automobile and command it to stop? The finding is that she saw a track beyond the obstructions to her vision and knew engines and cars were likely to pass over it at any time. There is no finding and no evidence that from her place in the back seat she could see this track was so close to the one on which the coal car stood that the automobile would be in danger before her husband on the front seat could see toward the north. Her opportunities of observation were not equal to those of her husband. She knew his ability as a driver and trusted him, and what is more, she had the right to trust him.

In the case of *Williams v. Withington*, 88 Kan. 809, 129 Pac. 1148, it was said:

"Common sense would dictate that when a wife goes riding with her children in a rig driven by her husband she rightfully relies on him not to drive so as to imperil those in his charge. The law does not depart from common sense by requiring her, under the circumstances shown here, to impugn her husband's ability to drive and assume the prerogative to dictate to him the manner of driving." (p. 813.)

This doctrine applies to the case of a wife riding in an automobile driven by her husband, unless she should know him to be incompetent or under some disability.

In the case of *Bush v. Railroad Co.*, 62 Kan. 709, 64 Pac. 624, cited by the defendant, the person injured was not relying on the driver of the vehicle in which she was riding, was looking out for herself independently of him, had equal opportunity with him to see and appreciate the danger which threatened them, and in fact was the first to see the approaching train. In the case of *Railway Co. v. Bussey*, 66 Kan. 735, 71 Pac. 261, cited by the defendant, the person injured did nothing at all for her own safety. She did not even look or listen although in the presence of danger, and the accident might have been prevented had she done so.

The result is the question of the plaintiff's negligence was properly submitted to the jury. The finding that she exercised due care for her own safety, included in the general verdict, is sustained by the evidence, and judgment for the defendant on the special findings was properly denied.

The court had no authority, on application by the defendant, to require the plaintiff to join her husband as a defendant. The subject of the ringing of the bell was sufficiently presented to the jury by the instructions given.

The judgment of the district court is affirmed.

---

No. 19,990.

LETITIA E. DROLLINGER and EDWARD G. DROLLINGER, *Appellees*, v. DAVID L. CARSON and HATTIE T. CARSON, *Appellants*.

SYLLABUS BY THE COURT.

1. SALE—*Land—Default of Purchaser—Ejectment—Tender of Deed.* Where a contract for the sale of land gave the vendor a right to declare a forfeiture for the nonpayment of the purchase price, a statement by the buyer, made after default but before the expiration of additional time that had been given him, that he could not complete the purchase, is sufficient to excuse a formal tender of a deed, no offer to complete the payment ever having been made.

2. SAME—*Declaration of Forfeiture at Fixed Time—Ejectment.* Under such a contract, where the whole purchase price is due and unpaid, the vendor, after giving notice that he will declare a forfeiture unless payment is made by a day named, may maintain ejectment if the default continues beyond that time.

Drollinger v. Carson.

3. SAME — *Ejectment — Improvements by Defaulting Purchaser — No Allowance Therefor.* In the circumstances of the present case it is held that the improvements made by the purchaser do not prevent the maintenance of such an action, nor require any allowance to be made to him on that account.

4. SAME—*Assumption of Mortgage by Purchaser—No Obstacle to Rescission of Contract.* The fact that by the terms of such a contract the purchaser assumes the payment of an existing mortgage interposes no obstacle to a rescission by the vendor, where the mortgagee has done no act in recognition of the purchaser's obligation beyond accepting interest paid by him at a bank.

5. SAME—*Acceptance of Interest by Vendor—No Obstacle to Forfeiture for Purchaser's Default.* Under such a contract the acceptance by the vendor, on the day the payment of the purchase price is due, of the interest maturing at the same time, does not preclude his declaring a forfeiture for the failure of the purchaser to pay the principal at a subsequent time fixed in a notice that such action would be taken.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed March 11, 1916. Affirmed.

*R. F. Hayden,* and *George P. Hayden,* both of Topeka, for the appellants.

*A. A. Godard,* and *J. Arthur Myers,* both of Topeka, for the appellees.

The opinion of the court was delivered by

MASON, J.: Letitia E. Dollinger and her husband on March 1, 1910, entered into a written contract with David L. Carson by which they agreed to sell to him a tract of land, subject to a mortgage for $700, which he assumed, for $1800, to be paid July 1, 1914, he to pay interest at five per cent in the meantime and to keep up the taxes. Carson and his wife were placed in possession of the property. They paid interest and taxes, but failed to pay anything on the principal. On August 6, 1914, the Drollingers notified Carson that unless payment were made by the 15th of that month they would declare his right to the land forfeited and demand possession. No further payment was made, and on August 20, 1914, they brought ejectment against Carson and his wife. The plaintiffs recovered and the defendants appeal.

(1) The only controversy over the facts related to negotiations which the plaintiffs relied upon to excuse their omission

to make a tender of a deed. The question whether a tender had been waived was submitted to the jury, whose verdict implied an affirmative answer. A suggestion was originally made that the plaintiffs should have been required to prove their own title, but this has not been insisted on, the rule being recognized that the defendants, having obtained possession from the plaintiffs under the contract referred to, can not raise that question. (*Baldridge v. Gentgraf*, 82 Kan. 240, 108 Pac. 83; 39 Cyc. 1614; 29 A. & E. Encycl. of L. 706.) The defendants maintain that there was no evidence to support the finding that their conduct amounted to a waiver of the tender of a deed. There was testimony that David L. Carson about the first of August referred the plaintiffs' representative to his wife as the one who was looking after the matter, saying that while the contract was in his name he was allowing her to handle the business; that later Mrs. Carson told him it was absolutely impossible for them to pay the purchase price due at that time. Under such circumstances the offer to deliver a deed would have been a barren formality, and its omission does not affect the rights of the parties. (39 Cyc. 1541; 29 A. & E. Encycl. of L. 691.) It is urged that this was thirty days after the tender should have been made, but the delay was immaterial since no change of conditions took place in the meanwhile and the time allowed the defendants for payment had been extended. Decisions are cited that a tender made after the time set are unavailing (see 29 A. & E. Encycl. of L. 691), but they were made in cases where the time originally fixed was treated as being of the essence of the contract, and there had been no extension. A further objection is made that, because the property was occupied as a homestead, a waiver of tender could only be effective if made jointly by the husband and wife. As the husband had authorized his wife to act in the matter her statement may well be regarded as that of both. The whole controversy about a tender is rather unsubstantial, however, for there is no suggestion that the defendants were at any time ready to carry out the contract.

(2) The defendants maintain that in the situation stated ejectment was not an available remedy; that where time is not made of the essence of a contract for the sale of land, the buyer when placed in possession becomes the equitable owner, the

seller holding the legal title as security for the purchase price; that upon default in payment the seller can only foreclose his lien as an equitable mortgage, or (where the equities permit) bring an action to rescind the contract and recover possession. It may be remarked in passing that there is not much practical difference between ejectment and an action for rescission and possession. The rule invoked has been applied in a number of Kansas cases. (*Holcomb v. Dowell*, 15 Kan. 378; *Campbell v. Town Co.*, 69 Kan. 314, 76 Pac. 839, and cases there cited.) But in none of them had the buyer agreed that the seller should have any right of forfeiture or rescission, and in most of them that fact is noted and treated as an important factor.

"Whether or not an executory contract to convey land contains a condition for a forfeiture in the event of the vendee making a default in his payments, is a question having an important bearing upon the right of the vendor to recover possession of the premises in case the vendee fails to comply with the terms of the agreement." (Note, 107 Am. St. Rep. 723.)

Here the contract, while not in so many words making time of performance an essential element of the agreement, contained this language:

"If default be made in fulfilling this agreement, or any part thereof, by or on behalf of said party of the second part [the buyer], this agreement shall, at the option of said parties of the first part [the sellers], be forfeited and determined, and said party of the second part shall forfeit all payments made by him on the same, and such payments shall be retained by said parties of the first part in full satisfaction and in liquidation of all damages by them sustained, and they shall have the right to re-enter and take possession of said premises."

Such provisions are sometimes said to make time of the essence of the contract. (39 Cyc. 1369, 1370.) However that may be, a vendor who is not in default may make time essential by demanding of the purchaser that he perform his part of the agreement within some stated reasonable period, under penalty of a rescission or forfeiture. (*Roberts v. Yaw*, 62 Kan. 43, 61 Pac. 409; *Knipe v. Troika*, 92 Kan. 549, 141 Pac. 557; 39 Cyc. 1370.) Under the circumstances of the present case the time (August 15, 1914), fixed by the plaintiffs on August 6, 1914, within which payment must be made was not unreasonable. While it might seem somewhat short there is nothing in the record to suggest that if a longer period had been named the

defendants would have availed themselves of it to carry out the contract.

In the situation presented ejectment was a remedy open to the plaintiffs. (39 Cyc. 1886, 1889; Note, 107 Am. St. Rep. 724; 29 A. & E. Encycl. of L. 671.) The defendants could not have been ousted from the land by a summary proceeding before a justice of the peace for forcible detainer, that method not being adapted to the settlement of the controversies involved. (*Bramwell v. Trower*, 92 Kan. 144, 139 Pac. 1018.) But in an action for the possession of real property, in the district court, equitable as well as legal rights may be determined, and such relief can be granted as will do justice in the particular case. For instance, where the circumstances make it desirable, a conditional judgment may be rendered, providing for a delivery of possession unless payment shall be made, or some other act performed, within a designated time. (15 Cyc. 182; 39 Cyc. 1899.)

(3) The decision in *Roberts v. Yaw*, 62 Kan. 43, 61 Pac. 409, can not be regarded as establishing the principle that when the vendor rescinds a land contract because of the failure of the purchaser to perform his part he can under all circumstances enforce the forfeiture of the payments already made. Where the buyer had paid a considerable part of the purchase price the agreement for its forfeiture by the failure to meet a later payment might perhaps be regarded as unenforceable because in the nature of a promise to pay a penalty. (See the discussion in *National Land Co. v. Perry*, 23 Kan. 140.) But here nothing had been paid but the interest and taxes. The only basis for a claim that the judgment is inequitable on the facts is a showing that the defendants had expended $900 in the improvement of the property. Much of this expenditure— perhaps $200—was for items of ordinary repairs and maintenance—such as painting and papering—which served the purpose of the occupants as much as that of the owner. Some of it—possibly a greater amount—was for changes which would not necessarily add to the value of the real estate—at least in proportion to their cost—and which may not have been desired by the plaintiffs. One who occupies land under a contract providing that he shall have title upon completing the purchase

Drollinger v. Carson.

price, but must give up the property if he makes default, has no absolute right with respect to improvements he may make. His agreement gives him none, and the occupying-claimant act (Civ. Code, § 622) does not apply, for he is not within its letter or spirit. (16 A. & E. Encycl. of L. 96.) The ordinary rule is that he is allowed no compensation for his betterments, although there are cases to the contrary. (16 A. & E. Encycl. of L. 97; 39 Cyc. 1401.) Whatever concession is made to him in this regard must result from circumstances rendering it inequitable that he should lose his entire investment—a matter to be determined upon the facts of each particular case. The trial court evidently concluded that inasmuch as the defendants had had the use of the property during the period of more than five years that the contract had been in force, equity did not require any allowance to them on account of what they had invested in permanent improvements. In this conclusion we concur.

(4) It is contended that, inasmuch as the purchaser assumed payment of the existing mortgage, it was incumbent upon the plaintiffs, in order to effect a valid rescission of the contract, to procure his release from the personal obligation thus incurred. His liability was not irrevocable until the mortgagee had acted upon it. (20 A. & E. Encycl. of L. 999.) No showing was made that the owner of the mortgage had accepted the purchaser's promise, or acted upon it beyond the mere receipt of interest which he had paid at the bank, and therefore the assumption of the mortgage by the purchaser interposed no obstacle to the rescission of the contract sale.

"A contract for the assumption of a mortgage, on a sale of the mortgaged premises, may be rescinded or canceled between the parties to it, so long as the mortgagee has done nothing to show his adoption of the benefits of such contract or his acceptance of the purchaser as the principal debtor; and this may be accomplished either by a formal release or revocation of the contract, or by a rescission of the contract of sale or reconveyance of the property." (27 Cyc. 1360.)

"The fact that the purchaser has agreed, as a part of the consideration, to assume mortgages on the land, will not affect the vendor's right to rescind if the purchaser's promise has not been accepted by the mortgagee, and where the contract provides that, in case of default in payments, the contract shall be void, the vendor may forfeit, although the mortgagee knew of the agreement and notified the purchaser of maturing interest." (39 Cyc. 1363.)

(5) On the day the whole amount of the purchase price became due (July 1, 1914) the plaintiffs accepted the payment of six months' interest, which also matured at that time. The defendants insist that this constituted a waiver of the right to declare a forfeiture. If the plaintiffs had a right to rescind the contract merely because the principal was not paid at maturity, they may have waived it by accepting the interest payment made at that time. But this did not prevent their fixing a time in the future within which the purchaser's interest should be terminated unless the default should be remedied. Indeed, such action was perhaps a necessary preliminary to declaring a forfeiture in any event. In *Cue v. Johnson,* 73 Kan. 558, 85 Pac. 598, the vendor, having the right to declare a forfeiture for the failure to pay interest when due, led the purchaser to understand that he would be given further time. Without fixing any other date of payment the vendor afterwards determined to insist upon a forfeiture, and in two weeks brought an action for the purpose of having it declared. Ten days later, in an amended petition, he for the first time tendered back the purchaser's unpaid notes given for the land. The purchaser then tendered the overdue payment, which was refused. The court refused to allow the forfeiture. That decision does not militate against the plaintiffs' contention in the present case. If here the defendants had offered to make payment before August 15, 1914, they could have compelled its acceptance. If they had made such an offer at any time before the judgment possibly the court in the exercise of its equitable jurisdiction could have relieved them from the effects of their delay. But in the absence of such an offer at any time the judgment rendered imposes no such hardship as to call for an interference by this court. The mere delay to insist upon a forfeiture at the earliest moment it could be claimed does not of itself constitute a waiver. (*Mo. River, Ft. S. & G. Rld. Co. v. Brickley,* 21 Kan. 275, 295; 39 Cyc. 1392.) Nor does an extension for a definite period have that effect. (*Long v. Clark,* 90 Kan. 535, 135 Pac. 673; 39 Cyc. 1393.) In 29 A. & E. Encycl. of L. 685, it is said:

"Where the vendor receives payments on the contract or interest thereon, after the expiration of the time prescribed in the contract, he waives the right to declare a forfeiture for failure to make the payments within the required time."

But this statement immediately follows:

"The right to declare a forfeiture for nonpayment of the purchase price, according to the terms of the contract, is waived by an extension of the time of payment, but by extending the time for payment the pro·vision in the contract for forfeiture is not done away with, but it is incorporated in the agreement as if originally there. After the time for performance has been extended, the vendor is not entitled to declare a forfeiture without notice, as he has thereby waived his right to proceed strictly under the contract."

The judgment is affirmed.

---

No. 19,992.

ARCHIBALD BLACK et al., *Appellees,* v. RALPH L. FUNK, Individually and as Executor, etc., *Appellant,* and LIZZIE ADAMS et al., *Appellees.*

### SYLLABUS BY THE COURT.

WILL—*Contest—No Evidence of Undue Influence—Will Valid.* A will, made by one having testamentary capacity, disposing of valuable property, making a number of bequests to friends and relatives and to other objects in which the testatrix is interested, naming complicated conditions and making provision for carrying the will into execution, can not be said to have been executed under undue influence, where the testatrix directed all the bequests and prescribed all the conditions without the presence of any except the scrivener who wrote the will and without suggestion or assistance from any one at the time it was written.

Appeal from Brown district court; WILLIAM I. STUART, judge. Opinion filed March 11, 1916. Reversed.

*S. F. Newlon,* of Hiawatha, and *S. M. Brewster,* of Troy, for the appellant.

*James Falloon,* of Hiawatha, *Joseph S. Rust,* of Kansas City, Mo., and *Horace M. Baldwin,* of Seneca, for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: This is an action to set aside a will. Judgment was rendered declaring all bequests and devises to Ralph L. Funk, his appointment as executor, and all authority granted to him under the will, invalid, because of undue influence exercised by him over the testatrix, Mattie J. Adams. Ralph L. Funk, individually and as executor, appeals.

This is the second time this case has been before this court. (*Black v. Funk*, 93 Kan. 60, 143 Pac. 426.) A statement of the facts made in the former opinion corresponds very closely with the facts established by the evidence as shown in the abstracts now before the court. The principal differences are that Mrs. Adams selected the witnesses to the will and they were paid at her request, and the facts shown by the evidence of S. F. Newlon, the attorney who as scrivener drew the will.

The former judgment of the trial court was reversed and the cause sent back for a new trial on the question of undue influence and fraud on the part of Dr. Funk with respect to the provisions of the will beneficial to him; this because the court excluded the evidence of S. F. Newlon, the attorney who drew the will. That evidence was admitted on the trial from which this appeal is taken, and it showed that the will in all its details was drawn as directed by Mrs. Adams; that as each of the several parts of the will was reduced to writing it was submitted to Mrs. Adams for approval or change before being put in the final draft; that some of the provisions as first written were changed at her direction; that no other person was in the room with Mrs. Adams and Mr. Newlon while they were talking about the will and while it was being written; that no person made any suggestion to Mrs. Adams concerning what should go into the will; that Newlon made no suggestion concerning the will but wrote it as she directed; and that all the details of the will were directed by Mrs. Adams, but the language was framed by Mr. Newlon.

There was no direct evidence to show that Doctor Funk exercised any influence over Mrs. Adams in the making of her will or that he made any suggestions whatever to her concerning the matter; neither was there any evidence to show that Doctor Funk had ever been dishonest with Mrs. Adams in the conduct of her business affairs while she was living.

The will itself should be considered. It is in part as follows:

"*First.* I desire that all of my just debts be paid by the first moneys that come into the hands of my executor hereinafter appointed, for any part of my estate, and I desire that I may be buried in a manner suitable to my condition and surroundings in life.

"*Second.* I will, devise and bequeath to Lizzie Fields the sum of $3000 during the natural life of her the said Lizzie Fields, with the remainder over, after the death of the said Lizzie Fields, to her son, Cecil Fields.

. . . hereby giving to the said Lizzie Fields, the use and benefit of said above mentioned $3000 during her life, with the provision, and this bequest made on this condition that $1000 of said $3000 shall be invested in a home for the said Lizzie Fields, and the remainder of the said $3000 shall be invested in a first mortgage or mortgages in real estate in Brown county, Kansas, the said Lizzie Fields to have the full use, rents and profits of said home during her natural life, and the full use, interest, rents and profits of the said $2000 so as above mentioned, during her natural life, and on the death of the said Lizzie Fields, said home so bought as above mentioned, shall go to said Cecil Fields absolutely, but that the said above mentioned property going to the said Cecil Fields shall remain in the care and control of my executor until the said Cecil Fields becomes twenty-one years of age, except what may be necessary, in the judgment of said executor, for his care and maintenance.

"*Third.* I will, devise and bequeath to the Powhattan Cemetery Association, the use, rents and profits of the sum of $3000 to go to the keeping up and maintenance of the Powhattan Cemetery, in Brown county, Kansas, said sum of three thousand dollars to be invested by my executor and put out by him in first mortgage, or mortgages, in Brown county real estate, said Cemetery Association to get the benefit of the rents and profits of said sum of $3000 to assist in keeping up and maintaining said cemetery, said rents and profits to be used in said maintenance according to and under the advice of my said executor.

"*Fourth.* I will, devise and bequeath and set apart the sum of $5000 to be invested by my executor in first mortgage, or mortgages, on Brown county real estate, the rents and profits and interest of said above mentioned $5000 to go·to the maintenance and care of a cemetery lot, on which I and my deceased husband have a vault, said rents and profits to be used in the purchase and planting of flowers in and upon said lot, and in beautifying the same, and taking care of and preserving said lot and the vault thereon. Said money to' be invested as above mentioned, in said Brown county real estate by my said executor.

"*Fifth.* I will, devise and bequeath to my niece, Mrs. R. D. Jones, the sum of $5000 in cash.

"*Sixth.* I will, devise and bequeath to my niece, Mrs. F. M. Cooper, the sum of $3000 in cash.

"*Seventh.* I will, devise and bequeath to Millard Short, the sum of $3000, said sum of $3000 to be invested by said executor for the use and benefit of the said Millard Short, until he becomes twenty-five years of age, the said rents, and profits of said above mentioned $3000 to be used by my said executor for the care and maintenance of the said Millard Short, if in the judgment of my said executor, he needs the rents and profits and interest thereon for his care and maintenance before he arrives at the age of twenty-five, but if in the judgment of my said executor he does not need said interest, rents and profits for his care and maintenance until he becomes twenty-five years of age, said rents and profits are also to be invested by my said executor until the said Millard

Short becomes twenty-five years of age, all of which said $3000 and rents and profits to be invested in first mortgages on Brown county real estate, provided, if he die under twenty-five years of age said $3000 shall go as hereinafter provided.

"*Eighth.* I will, devise and bequeath to the Methodist Episcopal Church of Powhattan, Brown county, Kansas, the sum of $3000 to be invested in a first mortgage or mortgages on real estate in Brown county, Kansas, the interest, rents and profits to be used under the advice of my said executor in the maintenance and care of the church building and grounds of said Methodist church, said sum of $3000 to be a perpetual fund to said church, the said rents and profits, only, to be used as above mentioned.

"*Ninth.* I will, devise and bequeath to my nephew, Charles Black, the sum of $3000 in cash.

"*Tenth.* I will, devise and bequeath to Mrs. Augusta Lytle, wife of William Lytle, the sum of $2000 in cash.

"*Eleventh.* I will, devise and bequeath to James M. Adams and Susan C. Adams, his wife, the sum of $3000 during the natural life of the said James M. Adams and Susan C. Adams, or as long as they, or either of them, may live, that is to say, that during the lifetime of both of them, they have the use, interest, rents and profits, of said above $3000 and on the death of one of them, the survivor has the use, rents and profits and interest of said above described and mentioned $3000 as long as the survivor lives, but on the death of said survivor, the remainder shall go as hereinafter specified.

"*Twelfth.* The remainder and residue of all my property of all kinds, nature and description, after the payment of the above legacies, as above mentioned, I will, devise and bequeath to Dr. Ralph L. Funk, this bequest to the said Ralph L. Funk is made to him by reason of work he has done, care and maintenance he has taken of me and my property, and for the further consideration that the said Ralph L. Funk is to be and will be nominated and appointed as the executor of this my last will and testament, and this bequest includes to the said Ralph L. Funk, the remainder in the $3000 willed to the said James M. Adams and Susan C. Adams, after the life estates of the said James M. Adams and Susan C. Adams have been terminated by the death of the said James M. Adams and his wife, Susan C. Adams, hereby willing, bequeathing and devising to him, the remainder in said sum of $3000 and also, including the said sum of $3000 willed and devised and bequeathed to the said Millard Short, provided the said Millard Short should die before he arrives at the age of twenty-five years.

"*Thirteenth.* I hereby instruct and give my executor hereinafter appointed, full power to reduce all of my property to money, and to sell any and all real estate of all kinds that I own, and reduce the same to money, hereby giving and devising to my said executor full power to make any and all transfers by deed, or otherwise, and hereby giving him full power to sign any and all deeds and papers necessary to reduce my said estate into money, and to sell and convey any and all realty that I

may own at the time of my death, and transfer all title therein, and place the purchaser or purchasers in possession thereof.

"*Fourteenth.* I hereby nominate and appoint Ralph L. Funk as the executor of this my last will and testament."

One with testamentary capacity, yet under the undue influence of another, could not do what the evidence of Newlon shows was done by Mrs. Adams when the will was being drawn, without the presence and suggestion of.the person exercising the influence. The evidence of S. F. Newlon and the will itself establish the fact that undue influence was not exercised by Doctor Funk at the time the will was drawn, notwithstanding the circumstantial evidence, which, without the evidence of Newlon, tended to show that undue influence might have been exercised.

In many respects this case in its facts is very similar to *Hopper v. Sellers,* 91 Kan. 876, 139 Pac. 365. In that case the question of undue influence turned largely on the evidence of the attorney who acted as scrivener in drawing the will, concerning what took place at the time the will was being written. In the present case the evidence of S. F. Newlon, not in any way attacked or disputed by evidence, finding, brief or argument, together with the will itself, is controlling as against the circumstantial evidence, which is just as consistent with good faith on the part of Doctor Funk as it is with the exercise of undue influence on his part.

In *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, this court said:

"To vitiate a will there must be more than influence. It must be undue influence. To be classed as 'undue,' influence must place the testator in the attitude of saying: 'It is not my will but I must do it.' He must act under such coercion, compulsion or constraint that his own free agency is destroyed. The will or the provision assailed does not truly proceed from him. He becomes the tutored instrument of a dominating mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and by overcoming his power of resistance impels him to do what he would not have done had he been free from its control." (p. 725.)

Under this rule, undue influence is not shown in the present case.

The trial court, with the evidence of S. F. Newlon, reached the same conclusion on the last trial that it did without that

evidence on the former trial. In this we think the court made a mistake. The judgment is reversed, and the cause is remanded with directions to enter judgment sustaining the will in all its parts.

---

No. 19,993.

THE PNEUMATIC SCALE COMPANY, LIMITED, *Appellee*, v. THE CAREY SALT COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

USE OF WEIGHING MACHINE—*Rents—No Error in Record.* The issues, evidence, rulings and judgment in an action for rents for the use of a weighing machine examined and the result approved.

Appeal from Reno district court; FRANK F. PRIGG, judge. Opinion filed March 11, 1916. Affirmed.

*C. M. Williams,* of Hutchinson, for the appellant.

*W. G. Fairchild,* and *H. S. Lewis,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff recovered judgment against the defendant for $650 for the use of a weighing machine for twenty-six months.

In July, 1909, pursuant to the terms of a written lease, the plaintiff, The Pneumatic Scale Company, installed a weighing machine in the establishment of the defendant, The Carey Salt Company, at Hutchinson, for the use of which the latter agreed to pay $25 per month for a term of three years, and unless written notice of a desire to terminate the lease was given sixty days prior to the end of the term the lease was to continue for another three years' term. If the lease was not renewed, the machine was to be returned to Boston, with transportation charges paid by the defendant. The first term expired November 22, 1912. About August 1, 1912, the traveling agent of the scale company called upon the defendant and informed it that his principal was manufacturing and distributing a superior machine and that his company was desirous of taking up the older scale and replacing it with a

new machine under a different contract.   The acting officer of the defendant salt company told the agent of the scale company that he did not like the rental contract, but that he would purchase one of the new scales.

The parol testimony, which was probably incompetent, since the bargain between the plaintiff's agent and the salt company was reduced to writing, showed that the agent of the plaintiff made a contract with the defendant for the sale of one of the new machines at $1500, and that rent should cease on the old machine forthwith, but that it might be retained and used until the new machine was installed.   However that may be, no such contract was reduced to writing. On the contrary, and at the time of this agreement, the agent of the plaintiff produced a four-page printed document, the first page of which was a form of application addressed to The Pneumatic Scale Corporation, Limited, requesting it to install one of its new automatic weighing machines at the defendant's factory and agreeing among other matters that if the new scale gave satisfaction "that fact shall constitute an acceptance of said machine by us upon the terms and conditions set forth in the lease attached hereto marked 'Lease A' and said lease shall thereupon be in full force and effect," etc.

At the bottom of the first page, constituting the application for the installation and leasing of the new machine, the plaintiff's agent inserted the following:

"If at any time within sixty days of the date of the accepting of said machine the Lessee elects to purchase the same it may do so by the payment to the lessor of $1,500.00 less the total sum to that date paid by the lessee as installation charge and rent."

This application was signed by the defendant.

The next three pages of the document, neither filled out nor signed, contained the form of "Lease A."   In the printed matter of "Lease A" was the following:

"16. None of the terms of this lease shall be held to have been waived or altered unless such waiver or alteration is in writing and has been signed by the General Manager or other specially authorized officer of the Lessor."

The plaintiff scale company promptly disavowed the action of their agent, it being their contention that he had no authority to sell the new machine for less than $2000.   The agent also with profuse apologies promptly acknowledged his

error in fixing the price of the new machine at $1500. Much correspondence passed between the parties, the defendant insisting upon its bargain with the plaintiff's agent, and, in effect, insisting that as per an oral agreement with the agent it was to be relieved from further rental charges on the old machine until the new one was installed.

From the judgment for plaintiff the defendant appeals.

We can not agree with appellant's contention that the plaintiff's agent was authorized to contract with the salt company for a new machine at $1500. The testimony of the plaintiff's manager was that the agent was merely "an agent of the plaintiff to solicit application for the sale or leasing of machines." The application for the lease of the new machine which defendant's manager signed, and in which the terms of purchase were interlined, specifically referred to "Lease A." which provided that alterations could only be made if signed by his superior officer. This recital itself was notice of the limitations of his authority. It is of little consequence what the plaintiff's agent and the defendant's manager said to each other prior to the alleged execution of the new contract. Their negotiations were inserted in their contract, which was on its face only an application to lease with option to purchase, and if the contract itself was unauthorized because the agent had no authority, the negotiations, like the contract itself, came to naught. The negotiations, the new contract, and the correspondence between the parties would be sufficient for one purpose only, and that would be to serve as a notice that the appellant did not desire to renew the lease on the old machine; but that point is not urged, and even in that respect it would have been necessary to ship the old machine to Boston with transportation charges paid in order to relieve the defendant from further rental payments on the old machine. The defendant made no claim for damages on account of the breach of a contract made with the plaintiff's agent within the apparent scope of the agent's authority. Probably such claim would have been futile, since the negotiations between the agent and the defendant culminated in a mere written application for the installation and lease of a machine with option of purchase.

We can perceive no error in the judgment of the district court and it is therefore affirmed.

No. 19,999.

NELLIE MAY BARNES and ELIZABETH AMELIA KYLE, *Appellants,*
v. MARTIN B. BROWNLEE et al., *Appellees.*

SYLLABUS BY THE COURT.

1. WILL—*Foreign Judgment Admitting Will to.Probate—When Conclusive
against Collateral Attack.* In a proceeding to establish and probate a
will in another state the judgment recited that jurisdiction had been
obtained by the service of a citation and notice upon the parties therein
"in the manner and for the length of time required by law." *Held,*
that the finding and adjudication is·conclusive evidence that notice was
duly given and jurisdiction acquired in the case as against a collateral
attack.

2. WILL — *Destroyed by Fire — Execution and Contents Proven — Ad-
mitted to Probate in Foreign Court—Entitled to Full Faith and Credit.*
In the proceeding to establish and probate the will which had been
destroyed by a fire that had caused the death of the testatrix, it was
found that the will so accidentally destroyed had been duly executed and
had never been revoked. The conditions of the will were found and
declared; the names and residences of the heirs were stated; the reason
why the original will could not be produced was recited; and the will
proven was admitted to probate. *Held,* that the adjudication so made
stands as evidence of the will of the testatrix and the disposition that
she made of her property, and that an authenticated copy of the judg-
ment establishing and declaring the provisions of the will is entitled
to be admitted to record in the probate court of any county of this
state in which property of the estate may be situated.

Appeal from Douglas district court; CHARLES A. SMART,
judge. Opinion filed March 11, 1916. Affirmed.

*J. B. Wilson, B. V. Pardee,* and *W. E. Emick,* all of Lawrence,
for the appellants.

*J. H. Mitchell,* and *S. D. Bishop,* both of Lawrence, for the
appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by Nellie May
Barnes and Elizabeth Amelia Kyle to recover for each a one-
eighth interest in a quarter section of land in Douglas county;
also for a partition of the tract and for certain rents and
profits. The questions involved were determined on a de-

murrer to the petition, and also upon the files and records in a proceeding in a Texas court probating the will of Mary H. Pritchett, which the parties agreed should be considered by the trial court in making its decision.

It appears that Mrs. Pritchett died April 12, 1899, as the result of burns received when the family home in Jasper county, Texas, was burned the preceding day. She left surviving her, her husband, Reuben Pritchett, and four children, Raymond, Albert E., Nellie May, and Elizabeth Amelia—the last two of the children having married and are the plaintiffs in this action. The family formerly lived in Kansas, and the will in controversy was executed by her in Kansas on November 10, 1889. In the will, according to the testimony in the probate proceedings, she gave all her property, real and personal, to her husband, and provided that any property remaining at his death should pass in equal proportions to their children. It was also provided that the husband should act as the sole executor without bond, and that no proceedings in court should be had except to probate the will and make an inventory of the property. The will was duly signed by her and by subscribing witnesses whose names were not remembered when it was probated. Subsequently the family removed to Jasper county, Texas, and the will was deposited with the judge of the county court of the county for safe-keeping. On the day the home was burned, her son Albert was sent by her to obtain the will, and he told the judge that his mother desired to examine it. It was delivered to him, and on that day it was examined by the testatrix and the members of the family and its terms and provisions were considered and discussed by them. Two or three hours later the residence caught fire and Mrs. Pritchett was severely burned while trying to save valuable papers which included certain deeds, her husband's will giving his property to her, and the will in question. She died from the effects of the burning, on the following day. Proceedings were subsequently taken in the county court of Jasper county, Texas, to probate the will, and the judgment there entered recites that the application for probate was in due form, that the citation had been served in the manner and for the length of time required by law, that due proof had been made of the death of Mrs. Pritchett, that the will had

been duly executed by her when she was of sound mind, and that it had never been revoked. The court, upon proof offered, found and adjudged what the contents and provisions of the will were, reciting that it could not be produced in court for the reason that it had been burned in the fire which caused the death of the testatrix. The judgment admitting the will to probate provided also for the appointment of Reuben Pritchett as executor without bond in accordance with the request made in the will and directed him to file an inventory of the property of the estate. On November 30, 1900, the will so probated was admitted to record in the probate court of Douglas county, Kansas, and on April 2, 1902, the executor conveyed the land to Martin B. Brownlee, one of the defendants herein. It is alleged by the plaintiffs that Brownlee had actual and constructive notice of the condition of the title to the land at the time of its purchase. On consideration of the averments of the petition and the files and records of the Texas court submitted at the same time, the court sustained the demurrer to plaintiffs' petition holding that the transfer of the land to the defendant was effective and valid.

The first contention is that the judgment of the Texas court is void, it being alleged in the petition that the citation or notice of the probate proceedings was not served upon the plaintiffs. The statutes of Texas provided that such a citation shall be served in a particular way and for a certain length of time. The judgment rendered by that court recites that it appeared "that said application is in due form, and that service of citation has been served and returned in the manner and for the length of time required by law." The action brought by the plaintiffs is a collateral attack on the Texas judgment. The facts essential to the jurisdiction of the court to render the judgment were found to exist and that adjudication is not open to collateral attack. As the jurisdiction of the court depended on due service of a citation, the fact that jurisdiction was exercised implies a finding that legal notice was given. (*In re Wallace,* 75 Kan. 432, 89 Pac. 687.) In this case there is an express finding in general terms that notice was given and that it was legally sufficient as to manner and time, and this judicial determination must stand as conclusive evidence of these facts until it is set aside in a direct proceeding. The

rule in such cases was concisely stated in *Miller v. Miller*, 89 Kan. 151, 130 Pac. 681, where it was said:

"It is a law of this state that whenever the jurisdiction of a court depends upon a fact properly litigated and determined in the action itself, the judgment rendered finding the fact is conclusive evidence of its existence and of the jurisdiction of the court until the judgment is vacated, reversed or annulled in a direct proceeding instituted for that purpose." (Syl. ¶ 2. *In re Wallace,* supra; *Carter v. Hyatt,* 76 Kan. 304, 91 Pac. 61; *McCormick v. McCormick,* 82 Kan. 31, 107 Pac. 546; *Carter v. Carter,* 89 Kan. 367, 131 Pac. 561.)

The claim that jurisdiction was acquired by fraud and that the judgment probating the will was induced by false testimony were matters inherent in the action that were investigated and determined by that court, and it is well settled that such a determination is not open to collateral attack. (*Plaster Co. v. Blue Rapids Township,* 81 Kan. 730, 106 Pac. 1079; *McCormick v. McCormick,* supra; *Miller v. Miller,* supra. See, also, *Bleakley v. Barclay,* 75 Kan. 462, 89 Pac. 906.)

It is contended that the will was not effective because it was not in existence when the testatrix died and that an authenticated copy of the will was not admitted to the record in Kansas in the manner required by law. It appears that the testatrix executed a will, and in doing so complied with every requirement to make it valid and effective. It satisfactorily appears that it had never been altered or revoked in any of the ways by which the revocation of wills may be accomplished. The destruction of a will to which she did not consent, whether done accidentally or fraudulently, does not operate as a revocation of a will in the absence of a statute providing that to be the effect. (Schouler on Wills, 3d ed., § 385.) A will may be established and proved that a testator during his last illness was fraudulently induced to destroy, through fear or for any other cause unduly exercised so as to take away his free and voluntary mind and capacity to act. (*Batton et al. v. Watson,* 13 Ga. 63, 58 Am. Dec. 504.) Where a will is destroyed or missing at the time of the testator's death, there is a presumption that it has been revoked by him, but this presumption may be overcome by proof. (Schouler on Wills, 3d ed., § 283; 1 Underhill on the Law of Wills, § 272.) Here it is shown that the will was in existence until it was destroyed by fire, and that instead of anything having been done towards

revocation, the testatrix lost her life in the effort to preserve it from destruction. The facts in the case indicate that the burning which she suffered disabled her from doing anything towards revocation, and the circumstances under which she died, within a few hours after the burning, are wholly incon- sistent with intentional revocation. No act or word of hers indicated a purpose to revoke the will, but, on the contrary, everything said and done by her prior to the fire and her death gave ample proof of approval and adherence to its provisions. The destruction and absence of the will were satisfactorily accounted for, and the presumption arising from the fact that it was not produced after her death has been fully met and overcome. (*Steele, &c., v. Price and Wife,* 44 Ky. 58; *Scoggins v. Turner,* 98 N. Car. 135, 3 S. E. 719; *In re Hedgepeth,* 150 N. Car. 245, 63 S. E. 1025.)

Before admitting a destroyed or lost will to probate, its con- tents must be shown by evidence which is clear and satisfactory (*Davis & others v. Sigourney,* 49 Mass. 487), but upon the facts brought before the trial court in the case, all of the material provisions of the will were fully proven. More than that, the judgment of the Texas court recites that the provi- sions of the burned will were proven, and that it had been exe- cuted with the formalities and solemnities necessary to make it a valid will. The statutes of Texas provide how missing wills, or wills which can not be produced, must be established and probated. It requires that proof shall be made of the reasons why the will could not be produced, the contents of the will, the names and residences of the heirs if known, and if not known, that fact must be stated. (2 Vernon's Sayle's Texas Civ. Stat. 1914, §§ 3253, 3272.) In *Tynan v. Paschal,* 27 Tex. 286, 84 Am. Dec. 619, it was held that an unrevoked will, lost or destroyed before the testator's death, may be established and probated by parol testimony, but that it is incumbent on the party seek- ing to establish it, to prove not only that it was duly executed, but to rebut the presumption of revocation which arises from the fact that it could not be found at the time of the testator's death. It is held that the testimony in such a case should prove the facts with as much certainty as in cases where the will it- self is before the court. The will of the testatrix was estab- lished and probated in conformity with the Texas statute and

the rules laid down by the supreme court of that state. The contents of the will having been established and proven as the law requires and its provisions copied into the judgment entered by that court, its judgment is to be regarded as the declaration of the mind and will of the testatrix as to the disposition of her property after her death. Having been legally established, the record so made is as good evidence of her will as if the original will had been before the court when it was probated. Our statute provides that authenticated copies of wills executed and proven according to the laws of another state shall be admitted to record in the probate court of any county in this state wherein any property of the estate may be situated, and that it shall have the same validity as if made in conformity to the law of this state. (Gen. Stat. 1909, §9800.) It is argued that under this section only true and exact copies of wills can be recorded, and that a transcript of a proceeding establishing and proving a will in another state can not be regarded as an authenticated copy. The record legally made in Texas is the adjudicated evidence of the contents of the will. The unrevoked will having been destroyed, the record establishing its contents is the reproduction of the original, and is conclusive evidence of the will of the testatrix and the disposition which she made of her property. As ordinarily understood, a copy is a transcript of the original document, but the court having found and adjudicated what were the contents and provisions of the destroyed will, which had never been altered or revoked by the testatrix, its judgment is to be treated as the will, and a copy of the same is in effect an authenticated copy of the will. The presentation of a will so probated is a substantial compliance with the provision of section 9800 of our statute, which warranted its admission to record in the probate court of Douglas county, and when so recorded, is as effectual as if the original will had been proved and admitted in Kansas.

The judgment of the district court is affirmed.

No. 20,001.

F. E. BEESON, *Appellant*, v. WILLIAM O. TRAINER, *Appellee*.

SYLLABUS BY THE COURT.

1. REAL-ESTATE AGENT—*Acting in Dual Capacity—Findings—Commissions*. Findings of fact examined and held to be consistent with each other and with the general verdict. Held further, that the rule that a real-estate agent acting for both vendor and purchaser must do so with the full knowledge and consent of both in order to recover a commission from both was complied with.

2. SAME—*Contract Between Agents to Divide Commission—Maturity*. A real-estate agent employed another to assist him in negotiating a trade, agreeing in writing to divide a commission of $5000, to be paid by the principal, upon payment by the principal. The agent settled with the principal for a sum less than $5000, which the principal paid. *Held*, the contract impliedly warranted that the principal would pay the sum of $5000 as a commission and that the contract matured when the principal settled with his agent.

Appeal from Riley district court; FRED R. SMITH, judge. Opinion filed March 11, 1916. Reversed.

*Edgar Bennett*, and *Charles W. Clarke*, both of Washington, for the appellant.

*Hal E. Harlan*, of Manhattan, for the appellee.

·The opinion of the court was delivered by

BURCH, J.: The action was one by a real-estate agent to recover a commission which another real-estate agent agreed to pay. The general verdict was for the plaintiff. The court granted a new trial on the ground that certain special findings returned by the jury were inconsistent with themselves and with the verdict. The plaintiff appeals.

The defendant, Trainer, who lived in Chicago, represented Cooper, the owner of the Admar ranch in Kingman county. The plaintiff, Beeson, who lived in Washington, Kan., had on his list a body of land situated in Pottawatomie county belonging to Williamson. Trainer's advertisement of the Admar ranch was answered by Hackney, a real-estate agent of Washington, Kan., and Hackney arranged for a meeting between Trainer and Williamson to take place at Manhattan.

Beeson went to Manhattan at the request of Hackney and
Williamson. Trainer expected to find Hackney at Manhattan,
but was told by Beeson that Hackney did not think it was
necessary for him to be present so long as Beeson was there.
Negotiations resulted in a trade between Cooper and William-
son. Trainer, Beeson and Williamson met at the Gillett Hotel
in Manhattan to conclude the transaction. Trainer dictated
a contract between Cooper and Williamson, which was signed
by Trainer for Cooper, and by Williamson. At the request of
Beeson, Trainer then wrote a contract to pay Beeson one-half
of $5000, the commission coming to Trainer from Cooper, and
wrote a contract for Williamson to sign, wherein he agreed to
pay Beeson a commission for representing him. These in-
struments were talked about and were signed in the presence
of Trainer. Both commission contracts were in accordance
with previous oral agreements, and Beeson promised to pro-
tect Trainer against any claim which Hackney might make.
Williamson fully understood that Beeson was to receive a com-
mission from Trainer, and freely consented that he should
do so.

The action was founded on the written contract between
Trainer and Beeson. The principal defense was that Trainer
was induced to agree to pay Beeson a commission through false
representations that Williamson would not pay Beeson a com-
mission, and that Trainer was ignorant of the fact that Beeson
was getting a commission from Williamson. Another defense
was that Beeson agreed to release Trainer if Williamson finally
agreed to pay a commission to Beeson. These defenses failed,
and Beeson's claim was ultimately resisted on the unpleaded
ground that Beeson did not fully disclose his dual agency to
Williamson.

The special findings of fact read as follows:

"1. Do you find that the plaintiff, Beeson, fully made known to the
defendant, Trainer, the fact that Williamson agreed to pay him, the
plaintiff, a commission for his services as agent, and that Beeson dis-
closed this fact to the defendant prior to the time the written agreement
sued on was signed by Trainer? A. Yes.

"2. Did the defendant, Trainer, freely consent that plaintiff, Beeson,
should act for both the defendant and Williamson, and that he should
receive commission from both parties? A. Yes.

"3. Did the defendant, Trainer, have knowledge that Williamson had
signed an agreement to pay plaintiff, Beeson, a commission of $1890

for his services as agent, prior to the signing of the written agreement by Trainer? If you find in the affirmative, state the source of his knowledge, when he acquired it and where? A. Yes. When he had written the agreement and gave to Williamson to sign. Jan. 18th, 1913. In the Gillett Hotel.

"4. Did the plaintiff, Beeson, fully disclose to his principal, Williamson, the fact that the defendant, Trainer, had agreed to pay him, the plaintiff, a commission of $2,500 for his services as agent of defendant, and did the plaintiff fully disclose the fact of his employment by Trainer to Williamson prior to accepting a written agreement for compensation from Williamson. A. No.

"5. Did Williamson freely consent that the plaintiff, Beeson, should act as the agent of both the defendant and Williamson, and that the plaintiff should receive compensation from both parties? A. He did.

"6. Did Williamson have knowledge that his agent, the plaintiff, had accepted employment in this transaction from the defendant, Trainer, and that he had accepted a written agreement from said Trainer for the payment of a $2,500 commission, at any time prior to the consummation of this trade? If you answer this question in the affirmative, state the source of his knowledge, when he acquired it, and where. A. No.

"7. Was the written agreement between Trainer and Beeson procured by false and fraudulent representations made by Beeson to Trainer, relative to his, Beeson's, not being able to get Williamson to pay plaintiff a commission? A. No.

"8. Did Beeson render any service to defendant under a contract, express or implied, with the defendant in effecting an exchange of said properties? If you answer in the affirmative state when, where and how said services were rendered. A. Yes. From the time he met Trainer at the Gillett, until the 19th of Feb. 1913. In Kingman Co., Manhattan and Topeka. By helping to bring the parties concerned together and consummating this trade."

The court having specified the ground on which a new trial was granted, none other is open to consideration.

The supposed inconsistency is between findings 4 and 6 and finding 5. Questions 4 and 6 were compound questions. It is the duty of the court to interpret the answers in such a way as to harmonize all the findings with each other and with the general verdict if it be possible to do so. In order to do this, the answer to a compound question may be considered as a literal response to the entire question and not as if independent answers were made to each inquiry. Beeson did not disclose to Williamson the fact that Trainer had agreed to pay Beeson *a commission of $2500;* so the fourth finding was properly in the negative. Williamson did not know that Beeson had accepted *a written agreement* from Trainer for the payment of a

commission prior to the consummation of the trade, because there was no written agreement relating to commission prior to the consummation of the trade; so the sixth finding was properly in the negative. Williamson might freely consent that Beeson should act for both Trainer and himself and receive compensation from both without knowing just how much Trainer was to pay, and without knowing whether the arrangement between Trainer and Beeson was oral or in writing. With respect to the division of commission between Trainer and Beeson, Williamson testified he understood Trainer was dividing commission with Beeson, but that it was none of his (Williamson's) business if Trainer were giving part of it or all of it. Of course it was not material whether the agreement between Trainer and Beeson to divide Trainer's commission were oral or in writing. That Williamson did freely consent that Beeson should act for Trainer as well as for himself and receive a commission from both was fully established by Williamson's own testimony. Under these circumstances the findings may not only stand with each other but may stand with the general verdict.

The defendant assigns as error the overruling of his demurrer to the plaintiff's evidence. The argument is that the evidence shows Beeson forfeited his commission because he did not fully disclose to Williamson his relation to Trainer. In order to meet the demands of public policy, a real-estate broker acting for both vendor and purchaser must do so with the full knowledge and consent of both in order to recover a commission from both. Full knowledge means knowledge of every fact which would naturally affect the action of the agent. (*Crawford v. Investment Co.*, 91 Kan. 748, 139 Pac. 481; *Hoffhines v. Thorson*, 92 Kan. 605, 141 Pac. 253.) In the Crawford case, Hughes, one of the landowners, knew nothing whatever of the commission, and only a bare hint of the dual relation was given to the secretary of the investment company. In the Hoffhines case, Snyder, one of the parties to the trade, did not know that the agent was acting for the other party. In this case the amount of the commission to be paid by Trainer and the manner in which it was secured, whether by oral or written promise, were unimportant. The fact of the dual agency was the important thing, and this fact was understood

and consented to by Williamson from the beginning. It will be recalled that Hackney brought Williamson and Trainer together. It was Hackney who arranged for the Manhattan meeting. Before doing this Hackney corresponded with Trainer and secured from him an agreement to pay a commission. Hackney showed this correspondence to Williamson, and Williamson believed that Hackney and Beeson were working together. Under these circumstances, Hackney and Williamson both asked Beeson to go to Manhattan, and Hackney did not go because it was not necessary so long as Beeson was there. Williamson testified as follows:

"Q. Did you know at that time of Beeson's having secured a written agreement from Trainer for a division of commission? A. Did I know that he had—

"Q. Secured a written agreement for it? A. Beeson?

"Q. Yes. A. Why no, I don't think I knew that. I did n't know they went into any agreement, that is, as a written agreement. I don't remember anything like that.

"Q. Did Beeson inform you of the fact that he had a written agreement or expected to receive a commission from Trainer? A. Well, he did n't say anything about a written agreement, but they had—it was my understanding that he was dividing a commission with Trainer; *yes, that was the understanding.*"

It may be true that Beeson did not at any time say to Williamson in so many words that he was acting for Trainer, but it was not necessary that he should do so, because Williamson himself brought Beeson into the negotiations on the assumption and with the understanding that Beeson was to receive a commission from Trainer. All that was then necessary was that Trainer be informed of Beeson's relation to Williamson, and consent to it. There is no claim that Beeson fraudulently favored one client at the expense of the other, and both parties having had the benefit of his knowledge, advice, and assistance, he is entitled to the compensation which each agreed to pay.

The contract between Trainer and Beeson reads as follows:

"*To Mr. F. E. Beeson:*

·' "I herewith agree to pay you one-half of five thousand dollars to be paid me by S. T. Cooper upon payment by said Cooper as your pay for aiding me in securing sale of the lands of said Cooper under the terms of contract made January 18, 1913, between Matt V. Williamson and S. T. Cooper.        WILLIAM O. TRAINER."

There was evidence that Cooper had settled with Trainer for $2875 and that nothing more was due. Trainer argues that time for payment to Beeson has not yet arrived because Cooper has not yet paid $5000. Contracts are not so easily defeated. This one impliedly warranted that the amount to be paid by Cooper was $5000, one-half of which was due Beeson when Cooper paid. Cooper has paid, and Trainer must now pay.

The judgment of the district court is reversed and the cause is remanded with direction to enter judgment on the general verdict.

---

No. 20,008.

THE WICHITA ACETYLENE MANUFACTURING COMPANY, *Appellee*, v. JOHN HAUGHTON, *Appellant*.

SYLLABUS BY THE COURT.

1. RULINGS—*Made After Appeal—Not Subject to Review.* Rulings of the trial court can not be reviewed in an appeal which was perfected before they were made.

2. HOMESTEAD—*Improvements—Exemptions—Journal Entry.* Language of a journal entry, to the effect that the obligation sued on was found to have been contracted for the erection of improvements on a home, held to show a judgment that the homestead was not exempt from sale for its payment.

3. SAME—*Obligations Incurred for Improvements—Never Attached to Homestead—No Lien on Homestead.* The provision of the constitution, that no property shall be exempt from sale for the payment of obligations contracted for the erection of improvements thereon, does not apply to a claim for material furnished for the improvement of a homestead, but not actually used for that purpose.

Appeal from Greenwood district court; ALLISON T. AYRES, judge. Opinion filed March 11, 1916. Modified.

*Owen S. Samuel,* and *Oscar B. Hartley,* both of Emporia, for the appellant.

*E. L. Foulke, C. A. Matson, J. D. Wall,* all of Wichita, *L. E. Clogston,* and *R. H. Clogston,* both of Eureka, for the appellee.

The opinion of the court was delivered by

MASON, J.: The Wichita Acetylene Manufacturing Company sued John Haughton for the price of a lighting plant, including its installation. The defendant denied liability. A

jury trial resulted in a verdict against him on October 28, 1914. A motion for a new trial was overruled on November 27, 1914, at which time judgment was rendered. The journal entry of the proceedings on that day, after reciting the ruling on the motion, continues: "The Court further finds that the cause of action involved in this case and the verdict of the jury rendered herein was on an obligation contracted for the erection of improvements on Defendant, John Haughton's home described in plaintiff's petition." The remainder of the entry recites merely a money judgment for the amount of the verdict. On February 19, 1915, the defendant appealed from the judgment.

(1) It appears that after the appeal was taken (no stay bond having been given) an execution was issued, upon which the property referred to has been sold, the sale having been confirmed on July 7, 1915. The defendant complains of the confirmation of the sale; but if that ruling would otherwise be open to review, it is not a proper subject of consideration in this proceeding, because it was made after the present appeal was perfected. (4 Enc. L. & P. 330.)

(2) The only other matter complained of is the inclusion in the entry of judgment of the words quoted in the foregoing statement. The plaintiff contends that they constitute no part of the judgment itself, but a mere finding of fact, which is not open to examination here, because no motion was made in the district court with regard to it. In view of the entire record, we think the words referred to must be regarded as recording the decision of the court upon a question of law affecting the means open for the enforcement of the plaintiff's claim, and therefore as being a substantial part of the judgment rendered. The pleadings and instructions, as well as the evidence, show that while the material for the purpose was delivered to the defendant, the lighting plant never was installed; the generator was never set up—never placed upon a foundation—nor were the fixtures attached. The cause of action pleaded was based upon the refusal of the defendant to allow the installation. On the undisputed facts the material did not become a part of the realty. (*Machine Co. v. Elevator Co.*, ante, p. 464. In this situation the language in question is fairly to be

34—97 KAN.

construed as a declaration, as a matter of law, that the debt to be enforced was one contracted for the erection of improvements on the defendant's homestead, within the meaning of the exception, on that ground, incorporated in the provision of the state constitution exempting a homestead from forced sale. (Const., art. 15, § 9.) That is a matter which may be adjudicated in an action for a money judgment. (See *King v. Wilson,* 95 Kan. 390, 148 Pac. 752.) And the apparent intention of the court in this instance was to decide that question, there being otherwise no purpose in referring to the matter in the journal entry. Such a decision, in the circumstances stated, forms a part of the final judgment, and is open to challenge on appeal without having been attacked in the trial court. (*Comm'rs of Wyandotte Co. v. Arnold,* 49 Kan. 279, 30 Pac. 486.)

(3) Whether the decision was correctly made depends upon the construction of the language of the constitutional provision. Read literally it might cover such a case as the present, for, in a sense, an obligation may be contracted for the erection of improvements which are never in fact made. But the accepted rule is to construe an exception to the exemption with some strictness. (21 Cyc. 518.) Our statute gives a mechanic's lien to one who furnishes material "for the erection" of improvements on real estate. (Civ. Code, § 649.) This is held to apply only where the material actually becomes a part of the realty, although somewhat similar statutes have been given a different construction elsewhere. (*Lumber Co. v. Douglas,* 89 Kan. 308, 131 Pac. 563.) If any distinction is to be made, a provision limiting the homestead right should be more strictly construed than one giving a lien to material men. We conclude that a homestead may not be sold to satisfy a judgment for materials furnished for its improvement unless they were actually used for that purpose.

The judgment will be modified by striking from it the language quoted, leaving it as one merely for the recovery of money, the question of exemption not being determined.

No. 20,010.

THE UNITED STATES TIRE COMPANY OF NEW YORK, *Appellant*,
v. ALBERT E. KIRK and ELMER C. ASPEY, Copartners, etc.,
*Appellees*.

SYLLABUS BY THE COURT.

1. GENERAL SALES AGENT—*Authority to Make Settlement by Accepting
   Return of Goods.* On the facts stated in the opinion it is held there
   was sufficient evidence from which the jury might infer that a general
   sales agent had authority to make an agreement to accept a return
   of the goods and merchandise sold to a creditor of the principal in
   payment of the purchase price.

2. SAME—*Settlement Made—Constructive Delivery of Goods.* The facts
   stated in the opinion are held sufficient to sustain a finding of a settle-
   ment between the plaintiff and the defendants, by the terms of which
   the plaintiff agreed to accept a return of the specific goods sold and
   give credit to the defendants' account for the amount thereof, and
   that the settlement was executed by the constructive delivery of the
   goods to the plaintiff's agent.

Appeal from Reno district court; FRANK F. PRIGG, judge.
Opinion filed March 11, 1916. Affirmed.

*W. G. Fairchild,* and *H. S. Lewis,* both of Hutchinson, for
the appellant.

*F. L. Martin,* and *Van M. Martin,* both of Hutchinson, for
the appellees.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was to recover
the sum of $4490.58, the balance claimed on an account for
goods and merchandise sold and delivered by the plaintiff
to the defendants from August 2 to November 25, 1913.
The defendants filed a voluminous answer, setting up several
defenses, including misrepresentation as to the quality of the
goods; fraud and deceit; damages to their business; and the
further defense of a settlement. Some of the defenses were
eliminated by the rulings of the court; others were submitted
to the jury, but the only one which needs to be considered in
this appeal is that involving the question of a settlement.

There is no controversy over the fact that the defendants

owed the plaintiff the amount sued for, as the balance due on
the account, unless the indebtedness is discharged by the alleged
settlement. The jury returned a general verdict in favor of
the defendants and answered certain special questions, and
found that the account had been settled as claimed by the de-
fendants. A number of questions are raised by the plaintiff's
appeal, but the only real question remaining for determination
is whether the special finding that there was a settlement
which bars the plaintiff's right to recover is contrary to the
law and the evidence.

The plaintiff is engaged in the manufacture of automobile
tires, casings and tubes. On the 15th of January, 1913, it
entered into a written agreement with the defendants by which
the latter were to purchase, sell and distribute goods manu-
factured by the plaintiff. The contract expired by its terms
on August 1, 1913. The defendants handled the goods of the
plaintiff for the territory surrounding Hutchinson, and did a
jobbing and retail business. The contract provided that they
were to settle on the 10th of each month for goods purchased
and delivered during the month previous, and were to make all
adjustments on tires and tubes that might become necessary
under the guarantee of the tire company, in accord with in-
structions from the plaintiff from time to time; and credit was
to be given the defendants for all proper replacements and
adjustments made with customers according to the terms of
the guarantee, which was on a mileage basis of 3500 miles.
Prior to August 1, when the contract expired, the business
transacted between the parties amounted to about $40,000.
All goods purchased previous to that date had been settled
for at the end of each month.

As early as July the defendants complained of the quality
of the casings and tubes, and claimed they were obliged to
make too many adjustments with customers. There was con-
siderable correspondence between the parties from that time,
involving complaints on the part of defendants in regard to
the quality of the goods and complaints on the part of the
plaintiff that the defendants were too liberal in their allow-
ances to customers in adjustments. Notwithstanding these
complaints, the defendants early in September applied for a
renewal of the contract for the ensuing season, but two weeks

later, while their application was being considered by plaintiff, they entered into a contract for the coming year with another tire company. Meanwhile they continued to order goods from the plaintiff, and their aggregate purchases from August 2 to November 25 amounted to over $15,000. Cash payments were made by them during this time to the amount of $5000. The credits to which they were entitled for adjustments left the balance for which the plaintiff sued.

The settlement is pleaded in the answer substantially as follows: The defendants demanded of plaintiff that the latter accept a return of the goods on hand because of the inferior quality thereof, and give the defendants credit for the cost price; that—

"31. . . . thereupon the plaintiff, through its agent, L. A. Brown, informed the defendants that it would settle with them and accept the said tubes, tires and casings which were unsold and promised the defendants that it would send their representative to check over all of the said tires, casings and tubes on hand and give the defendants credit for the amount thereof and accept a return of the said goods and discontinue the business dealings provided for in the said contract with the defendants. That thereupon the defendants and the plaintiff, through the said agent, L. A. Brown, and other agents of the plaintiff, G. S. Shugart and Jno. J. Watts, did proceed to make a complete check and invoice of all the tires, casings and tubes on hand in the defendants' possession in accordance with the said agreement and contract and thereupon these defendants tendered to the said plaintiff all of said tubes, tires and casings unsold and of the aggregate invoice price of about $4800 to the plaintiff and thereupon the plaintiff's agent, G. S. Shugart, refused to carry out the contract made for a settlement of the matter between the plaintiff and defendants and refused to accept the said tires and casings.

"32. Defendants say that said adjustments and settlements were made in good faith by the defendants and that by reason thereof, the refendants are entitled to a credit upon the itemized account exhibited to the plaintiff's petition, for the full amount of all of said casings, tires and tubes."

L. A. Brown was the sales manager of the plaintiff at Kansas City and the business with the defendants was transacted through his office, except that all payments by defendants were made direct to the general office of the plaintiff at New York City. Albert E. Kirk, one of the defendants, transacted most of the business for the defendants, and his testimony with reference to the settlement is, that in September, while his application for a renewal of the contract was pending, he

had the first conversation concerning a settlement with Brown at Kansas City, in which he informed Brown that he was contemplating making a contract with another tire company for the coming season, and said:

" 'Brown, you have n't got anything for me only a lot of junk, I have got to get something else or lose my business,' and he said, 'I will take it up with the company.' He came to Hutchinson—in the meantime he had Mr. Watt come here and check up our tires to see if we had enough to check up our account. Mr. Brown says to me, he said 'Can I have these tires if I want them?' I said, 'Take them, they are yours.' He said, 'I will let you know in two or three days,' and he went back to Kansas City; in a short time after that he called up and said, 'On Tuesday Mr. Shugart and I will be down to check this stuff out; we will probably want to send it to Kansas City or Wichita.' "

Kirk further testified:

"Q. Did you go over all your accounts and check the whole thing over? A. Yes, sir.

"Q. According to this agreement? A. Yes, sir; and we checked up the tires and found that there was plenty to cover the account.

"Q. How many tires did you have on hand, in dollars, compared with the amount of the accounts? A. $6500 and their claimed account was about $4,490, I think, in that neighborhood.

"Q. Where were these tubes and casings at that time? A. All setting in the tire racks in our place of business.

"Q. You may state whether or not you were able to pay the freight on them to Wichita or Kansas City. A. Yes, sir.

"Q. And were you willing to do so. A. Yes, sir.

"Q. Did you inform them of that fact? A. Yes, sir. We paid plaintiff under this contract between $35,000 and $36,000 which does not include goods on hand at the time of this settlement."

Over plaintiff's objections the court admitted in evidence a letter written by the defendants to the plaintiff company dated October 31, 1913, which contained the following statements:

"On July 28th we wrote a letter to your Kansas City branch telling them that unless your tires of the G. & J. line was made to give better service, it would be necessary for us to change to another line.

"We have had a constant fight in regard to adjustments we have been making. Have been compelled to raise our percentage of adjustments or lose the privilege of adjusting tires. This was all previous to our signing for the new contract. We were then having considerable trouble, but in the last 40 days we have adjusted $3,000.00 worth of tires. These tires are coming in on us so fast that we notified your Mr. Brown at Kansas City that we would change to another line and that we could not continue to fight with you people in our efforts to

give our customers service, and it was injuring our prospects for tire business in this territory.

"We later arranged for the Fisk line of tires. Last week your Mr. Brown called the writer up and told him not to ship any of these tires back to the factory, that we had on hand which amounts to between $4,000.00 and $4,500.00 worth that had not been settled for, that he and Mr. Shugart would be here the following Tuesday and would probably want to ship them to Wichita or Kansas City, and that they would check them out, inasmuch as we were dissatisfied with them.

"Mr. Brown and Mr. Shugart came and we checked up tires unpaid for and found that we were entitled to check back about $4,400.00 worth of tires. However, this does not include Red tubes, or Wrapped tread casings with the G. & J. brand on them, as these tires and tubes have been giving us good service, and we have paid for these and expect to sell them.

"Mr. Shugart positively declined to take these tires over as per Mr. Brown's agreement over the phone while in Kansas City, and demanded his money and finally wound up by promising us that he would put this matter in the hands of a collector. . . . We would like to know just what disposition you mean to make of this matter, as these tires are here subject to your disposition. These tires were never checked over to the Hutchinson Motor Car Company after dissolution, and the new concern has nothing to do with them.

"The writer offered to box the tires in question up and deliver them to the depot, and in case the company wished it, ship them to either Wichita or Kansas City, freight prepaid. We give you timely notice in regard to this matter. . . . Trusting we will hear from you as to what disposition you are making of these tires, at an early date, we are."

The objection to the admission of the letter to support defendants' contention as to the settlement relied upon are, that it contains many self-serving declarations as to the facts, including statements of an alleged conversation with Brown in which he is said to have agreed to accept a return of the goods, and the letter appears by its date to have been written after the refusal to accept a return of the goods and when defendants knew that plaintiff was intending to hold them liable for their purchase price. If it was not competent evidence there is force in the claim that its admission was prejudicial error; inasmuch as it is largely made up of a statement by defendants of facts favorable to defendants' contention relating to the alleged settlement, and the burden of proving the settlement rested upon defendants. The majority of the court are of opinion that, since the writer of the letter appears to have testified substantially to the same facts, and the plaintiff had

an opportunity to answer the letter with a denial of the facts if it desired to do so, there was no prejudicial error in the admission of the letter in evidence.

Brown was a witness for the plaintiff, and denied that he had ever agreed to take back the goods and credit them on the account, and also denied that he had authority to enter into such an agreement. No testimony was offered to contradict his statement that his authority as agent of the plaintiff was limited to the usual duties of a sales agent and that he was not authorized to receive goods and credit them on a customer's account. The testimony of defendants is that all remittances for payment in cash were made direct to the company at its New York office. It appears, too, that while Brown made the preliminary arrangements for the contract covering the season of 1913, the contract itself was made with the New York office; that the defendants, when they applied to Brown for a renewal of the contract, knew that the application had to be approved by the company at headquarters. In the first conversation which Kirk testified he had with Brown when the question of the settlement was broached, Kirk said Brown had told him he would "take it up with the company." On these facts plaintiff insists that no authority to make the alleged settlement is shown, and that, on the contrary, it is self-evident that defendants were fully aware that Brown, as agent, lacked authority to make such an agreement, and decisions are cited to the effect that a sales agent has no implied authority to collect the purchase price of merchandise sold nor to agree to accept a return of the goods in lieu of payment.

The majority of the court are of the opinion that there was evidence for the jury to determine the question of the *implied,* which means the *actual,* authority of Brown. (See discussion of the law in reference to an agent's *implied* as distinguished from his *ostensible* authority in *Wilson v. Haun,* ante, p. 445.) From the evidence showing that after Brown agreed to "take it up with the company" he went to Hutchinson, checked up the stock on hand and made the statements testified to by Kirk, the jury might have believed he had obtained from his principal the necessary authority to make the arrangements for accepting the goods in lieu of the cash price. Brown's

Tire Co. v. Kirk.

testimony is that he went to Hutchinson and checked up the goods on hand and the account with the defendants at the request of the credit department of the plaintiff company, because there was some question respecting the financial responsibility of defendants. It appears that the defendants, who had conducted their business under the name of the Hutchinson Motor Car Company, dissolved their partnership—just when is not stated, but apparently the plaintiff had been informed of the fact before Brown and Shugart, the latter, plaintiff claims, representing the credit department, went to Hutchinson. The jury may have disbelieved Brown's statement of the purpose of his presence and conduct in checking over the accounts and stock.

The conclusion of the court is, that there was sufficient evidence from which the jury might infer that he had actual authority to make the settlement. The plaintiff, conceding, for the purposes of argument, that Brown possessed the necessary authority, strenuously urges that there was no agreement that the contract for the settlement should satisfy the debt, but only that the goods should be taken back and defendants' account credited with the cost price thereof; that as the agreement was not executed and the goods remained in the possession of the purchaser, there was and could be no payment of the debt by virtue of the agreement until it was fully executed by an acceptance of the goods. On this question the majority of the court holds there was evidence to sustain a finding (which must be regarded as included in the general verdict) to the effect that there was a constructive delivery. Kirk's testimony is that he said to Brown, "The goods are yours, take them"; also that he informed Brown that he was able, ready and willing to prepay the freight to the place where plaintiff desired them shipped.

For the reasons stated, the judgment will be affirmed.

PORTER, J. (dissenting): I have grave doubts whether there was any evidence upon which the jury could infer authority on the part of the sales agent, Brown, to make an agreement to accept goods in payment of the price, but, aside from the question of his authority, I can not concede that either the agreement to take them back or what occurred at

the time the goods were checked over satisfied the debt the defendants owed for the purchase price.

The defendants' case must either stand or fall upon the fact that Brown agreed to accept a return of the goods to the amount of the debt, or upon what occurred at the time the goods were checked up. The agreement itself could not satisfy the debt in the absence of a contract to that effect. If the agreement had been that Brown was to accept defendants' note due in the future, and defendants had tendered their note, a refusal to accept it would not have discharged the debt. To have that effect the contract must have been that the execution and delivery of such a note was to constitute payment. After the goods had been checked up and it had been found that there were $6500 worth of them on hand, all of which Kirk says were sitting in the racks at defendants' place of business, this is what occurred: Brown said: "Can I have these tires if I want them?" Kirk said: "Take them, they are yours." Brown then said: "I will let you know in two or three days." In addition to this Kirk testified that he offered to prepay the freight on the goods to the place plaintiff might desire them shipped. Shugart notified the defendant very shortly afterward that the plaintiff would not accept the goods and that the claim would be placed in the hands of a collector. On cross-examination Kirk's testimony shows that after the refusal to accept the return of the goods defendants treated the goods as their own and continued to sell from the stock without discrimination. In fact, no discrimination was possible, because the particular goods to satisfy the debt had never been set aside from the rest of the tires purchased from the plaintiff, and there was no way to identify them. At the time of the trial Kirk said he had on hand only about $2700 worth of tires and tubes, but that he had on hand $900 from adjustments. Of course defendants' right to make adjustments at the expense of plaintiff terminated with the contract, and, moreover, the proceeds of the adjustments and the value of the goods remaining amounted to only $3600, while the debt was $4490. It is true that when the obligation is payable in specific goods, a tender of the specific articles need not be kept good, because the tender vests the title in the tenderee and discharges the obligation. (38 Cyc. 165.) The obligation of the defendants was to pay cash by the 10th of each month.

While the ordinary rule is that, unlike a tender of money, a tender of specific goods need not be kept good, it is otherwise when after the tender has been refused the tenderer treats the specific property as his own and sells it.    (38 Cyc. 166.)

"Where a creditor offers to receive payment of his debt in certain property at a certain price, and the debtor tenders the property accordingly, which is refused by the creditor, and the debtor retains the property and disposes of it as his own, it is not a satisfaction of the debt." (*Mayfield v. Cotton,* 21 Tex. 1, syl.)

, An examination of the answer as set forth in the majority opinion shows that defendants claimed no more with respect to the settlement than an agreement with Brown to accept a return of enough goods to be checked up at cost price to pay the debt, the checking of the goods, a tender of the goods and a refusal to accept them. As a conclusion of law, the answer states that by reason of all this, and the fact that the settlement was made in good faith on their part, defendants are entitled to a credit for the cost price of the goods tendered. I think that so long as the goods remained mingled with the general stock of similar goods in the racks in defendants' warerooms, there was neither an actual tender nor constructive delivery, and that because the defendants after the refusal to accept the goods treated them as their own and sold them, the defense of a settlement fails.

In my opinion it was error to admit in evidence defendants' letter to the plaintiff written after the refusal to accept the return of the goods and containing defendants' version of the facts.

No. 20,011.

EDITH L'ECUYER, *Appellee,* v. THE INDEMNITY LIFE & ACCIDENT COMPANY OF MINNEAPOLIS, *Appellant.*

SYLLABUS BY THE COURT.

ACCIDENT INSURANCE — *Death by Fire — Not Within Terms of Policy.* The undisputed facts involved herein examined and held to be such that it was error to overrule the demurrer to the plaintiff's evidence, and that the instructed verdict requested by the defendant should have been directed.

Appeal from Cloud district court; JOHN C. HOGIN, judge. Opinion filed March 11, 1916. Reversed.

*Homer Kennett, Olin Hunter,* both of Concordia, *Henry W. Benton,* and *Frank J. Morley,* both of Minneapolis, Minn., for the appellant.

*Edgar Bennett,* of Washington, *Park B. Pulsifer, Charles L. Hunt, Clyde L. Short,* all of Concordia, and *P. M. Harmon,* of Clyde, for the appellee.

The opinion of the court was delivered by

WEST, J: Plaintiff sued to recover on an accident insurance policy for the death of her husband, alleging that he received his injuries by the burning of a grocery store while he was therein. The clause of the policy relied on by the plaintiff provided for the payment of $2400 for death caused "(4) By the burning of a Dwelling, Hotel, Office Building, Theatre, School Building, Lodge Room, Club House, Store or Barn, while Assured is Therein." Several members of the family were in the building at the time of the injury, and the testimony was, in substance, that the day was very hot, the store building was about eighty feet long north and south, a coal-oil tank being in the southeast corner, an elevator on the west, a cashier's desk about twenty-five feet north of the elevator. About five-thirty in the evening the deceased went back to the tank to pump three gallons of oil into a five-gallon can, and was pumping it from a measuring tank of oil. An explosion occurred, after which the deceased was seen getting up from the floor. One witness looked towards the southeast

corner of the store, and all he could see was flames; did not see the decedent then, but did in a minute or two. The latter ran out of the building enveloped in flames and threw himself into a water tank. He had on a pair of pants and a shirt, which were found saturated with coal oil. The fumes of kerosene could be smelled in the room after the explosion, but none was burned except what was in the five-gallon can. The main tank was not affected. The five-gallon can was found split open, but the cap was still on the spout, the latter being blown from the can and about fifteen feet therefrom. Flames were seen in the southeast corner of the store; fire ran to the north door, some sixty or seventy feet. A refrigerator and all articles within twenty-five feet of the back end, and the floor, were burned. Ceiling, shelving and counters were burned. Fire ran clear to the north door, sixty or seventy feet, and broke the plate glass in front; collected $900 loss on building from insurance company. The burns were first, second and third degrees, on the neck, right ear, right arm, back and abdomen, causing death in about one week. One witness testified that before the deceased reached the tank he looked like a ball of fire; that the upper part of his clothing was mostly burned off; left leg of trousers burned; pulled the back of the trousers off and pulled a button out of the flesh with the clothing; burned more by the collar, under the ear, than any other place. The father testified, among other things, that the building was not on fire prior to the explosion; that the decedent got up immediately after the explosion and ran out of the building, his clothing on fire; also that the noise attracted his attention; he looked southeast towards the corner of the store and all he could see was flames. In a minute or two the decedent "came from under there, was thrown down and he came out and I saw him then. He raised up and run out of the building, from the flames to the door." Also that he looked that way the instant he heard the explosion "and saw Albert come out of flames . . . Albert was afire and ran ahead and I followed him out." The widow testified guite similarly, stating, among other things, that she did not see any fire prior to the explosion, but she heard the explosion, looked southeast "and saw flames and smoke, she later saw her husband, he was on his hands and knees starting to get

up. He started and ran towards front of the store, his clothing was on fire then."

Plaintiff recovered and the defendant appeals, the principal contention being that the facts did not show liability except for a minor sum under another clause of the policy, which sum was tendered by the defendant. It is claimed that the evidence did not show that the deceased caught on fire from the building, but only that the building itself caught on fire after the explosion, and did not show at what point or time the deceased received his injuries. The jury were instructed that if the accident was caused by fire which burned wholly or in part a store building while the deceased was therein, and that the required proofs of death were furnished, the plaintiff was entitled to recover, but that if he received his injuries from any other source, whether prior to or simultaneous with the accident which set fire to the building, the amount sued for could not be recovered; that some part of the building or of the material of which it was composed must have been consumed by the fire, and not merely blackened by smoke or scorched by heat.

The defendant insists that the death was caused by an explosion, and not by the burning of the building within the terms of the policy; that the explosion of the coal oil in the small can set fire to the building; that the oil was sprayed upon his clothing, which burned by reason of the oil therein, and that "The only rational conclusion to be drawn from all the undisputed facts is that deceased's injuries were due to the explosion of the can of coal oil, and that the burning of the building did not contribute to them and was only an incident to the explosion." There was no dispute as to the facts, save as the witnesses gave different versions and word pictures of the scene in various parts of their testimony, and while it does appear that the building itself was partially burned, it seems beyond question that the explosion of the can and not the burning of the building caused the death. Manifestly the decedent was out of the building before the fire had made any progress towards consuming any portion of the building, and it could not have been the burning of the building while he was therein which caused his death. This being apparent, it was error to overrule the demurrer to the plaintiff's evidence and

Ladd v. Railway Co.

submit the case to the jury, and refuse the defendant's request for an instructed verdict.

Other matters are discussed, but in view of this conclusion they do not require consideration.

The judgment is reversed and the cause remanded with directions to render judgment for the amount tendered by the defendant in its answer.

WEST, J. (dissenting) : The evidence, to my mind, was such as should have been submitted to the jury, and such as to warrant the verdict returned. On the theory that the death was caused by the explosion, the persistent question is, What caused the explosion? Doubtless it must have been ignition, and according to the stories of the witnesses when, attracted by the explosion, they looked around, they saw the room in flames, and shortly thereafter saw the decedent rising from the floor covered with flames. The building was burned nine hundred dollars' worth. Only one fire is spoken of. The deceased was in the building when it was full of flames. He was then on fire, and ran out covered with flames, and these facts seem fairly to fill the requirements to render the company liable.

---

No. 20,014.

M. F. LADD, *Appellee*, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Appellant*, et al.

SYLLABUS BY THE COURT.

1. RAILROADS—*Personal Injuries—Release of Claim for Damages.* A release of a claim against a railway company for damages for personal injury, for a nominal consideration, procured by false representations as to the conditions and effect of the release, signed under the mistaken belief that the injuries were neither serious nor permanent, that belief having been brought about by the statements of the railway company's doctor, is not binding on the person signing the release, where the injuries finally prove to be serious and permanent.

2. SAME—*Evidence—Statement of Railroad Physician.* In an action for personal injury, it is not reversible error to receive in evidence the statement of the defendant's doctor, to whom the plaintiff had been directed at the time of the injury by the defendant's agents in the performance of their duty, without first showing that in examining the plaintiff the doctor was acting for the defendant.

3. SAME—*Personal Injuries—Reduction of Earning Capacity.* A person whose capacity to labor has been permanently diminished by physical injury wrongfully inflicted on him by another can recover damages therefor without proof as to his earning capacity before or after the injury.

4. TRIAL—*Special Questions Refused.* It was not reversible error to refuse to submit to the jury certain special questions.

5. SAME—*Answers to Special Questions.* Contentions that answers to certain questions had no evidence to support them, that answers to others should have been made definite, and that the answers to questions were evasive, have been examined. The matters complained of are not sufficient to warrant a reversal of the judgment.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed March 11, 1916. Affirmed.

*Paul E. Walker, Luther Burns,* both of Topeka, *R. R. Vermilion, Earl W. Evans,* and *Joseph G. Carey,* all of Wichita, for the appellant.

*J. D. Houston,* and *C. H. Brooks,* both of Wichita, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff recovered judgment against the Chicago, Rock Island & Pacific Railway Company for injuries sustained while she was a passenger on its railway. The defendant appeals. The plaintiff alleges that she was injured by the defendant's negligence. The defendant answers that the plaintiff, for a valuable consideration, settled and released her claim for her injuries. The plaintiff replies that this settlement was procured by fraud.

The evidence tended to establish the following facts: August 27, 1912, the plaintiff was injured in the yards at Kansas City while a passenger from Chicago to Wichita, on one of the defendant's trains. The injuries were caused by the jerking or bumping of the car in which she was riding. She signed a train conductor's report of the accident. The employee who procured this report told her to go and see Dr. Oldham, the company's physician at Wichita. Some days after reaching Wichita, the plaintiff, with her daughter, who was a passenger with her mother at the time of the accident, went

to Dr. Oldham's office. The plaintiff then claimed to be suffer-
ing. He examined her and told her that he did not find any
bruise or permanent injury or broken skin, but that her neck
was swollen, and directed her to go home and bathe her neck
with hot water to take the swelling out. The doctor gave this
direction as a "placebo." The plaintiff believed Dr. Oldham's
statement. He did not make any charge for his services.
He was, and had been for years, the local physician for the
Rock Island at Wichita. Some days after this examination
was made, the claim agent of the defendant went to the home
of the plaintiff, and on paying her $5 procured her signature
to a release. The claim agent stated to the plaintiff, at the time
this release was obtained, that the release was for the injury
sustained up to the time of signing it, but that the case could
be reopened if further injury developed. The plaintiff relied
on these statements, believed her injuries were not permanent,
and did not want any money from the defendant unless they
were so. Her injuries proved to be serious and permanent.
January 24, 1914, the plaintiff signed a statement to the claim
agent, in which she said:

"Regarding my accident at Kansas City on August 27, 1912, while
a passenger on a Rock Island train—I remember of reading the release
over and then signing it and then receiving a Rock Island check for $5.
I do not say that I did not sign the release, but did not think I was in-
jured to amount to anything or think that the injury would result in
what it has. I have been laid up for over 12 weeks which is the result
of the injury. My spine was injured in such a way that it has weakened
me until I could not walk or get around. I have had a doctor who comes
and gives me treatments every other day. I repeat again that I signed
the release and thoroughly understood it, and only signed it thinking
that I was not seriously injured—in fact, I did not know how bad I was
injured, as I was told by Dr. Oldham that I was not hurt to amount to
anything."

January 23 she wrote the agent. This letter contained the
following language:

"As I have already acknowledged, I signed the paper with the as-
surance that the hurt was n't anything serious; which has proved itself
not so."

The jury returned answers to special questions as follows:

"Q. 1. Did you find that Dr. Hoffman examined and treated plaintiff
in October or November, 1912, for pain in the region of the back and neck
and nervousness? Ans. We find he examined her.

35—97 KAN.

"Q. 3. Do you find that plaintiff on or about January 23, 1914, wrote the Rock Island claim agent, George Kimmerle, a letter in which, among other things, she said: 'As I have already acknowledged, I signed the paper with the assurance that the hurt was n't anything serious?' Ans. Yes, at that time.

"Q. 4. Do you find that plaintiff on or about January 21, 1914, signed and gave to the Rock Island claim agent, George Kimmerle, a statement containing among other things the following: 'I remember of reading the release over and then signing it and then receiving a Rock Island check for $5,' and 'I repeat again that I signed the release and thoroughly understood it?' Ans. Yes, through misrepresentation.

"Q. 5. If you find from the evidence that plaintiff was defrauded into giving the release in question, state in what such fraud consisted. Ans. Misrepresentation.

"Q. 6. Do you find that the Rock Island check or draft to plaintiff's order for $5 which plaintiff received from claim agent Kimmerle at the time of the settlement in question was retained by plaintiff from September 12, 1912, until she endorsed and had it cashed on or about December 28, 1912? Ans. Yes.

"Q. 9. On the occasion of the conversation with Dr. Oldham when Mrs. Ladd claims to have been misled by him, did Dr. Oldham know of any contemplated settlement with the Rock Island, or negotiations therefor? Ans. We believe he did.

"Q. 10. Do you find that at any time after the accident and before she got home to Wichita plaintiff complained of any trouble with her head, neck, spine, and nervousness? Ans. We do."

1. The defendant relies on the release. The plaintiff says that the release was procured by fraud; that it was signed by her under a mistake of fact; and that it was never intended to be a release for the damages on account of the injuries sustained by her. The findings of the jury support her contention as to fraud. The evidence sustains her position as to the mistake on her part, and that the release was not intended to be a satisfaction of the damages for permanent injuries sustained by her. She, Dr. Oldham and the agent believed that the injuries were not serious or permanent. The evidence tends to show that the $5 was a gratuity on account of the annoyance and inconvenience that she had suffered. Under these circumstances the release is not binding. This case is within the rule announced in *Railway Co. v. Goodholm*, 61 Kan. 758, 60 Pac. 1066. Authorities are ample to sustain an avoidance of this release on account of the mistake of fact made by the plaintiff. (*Bertha v. Regal Motor Car Co.*, 180 Mich. 51, 146 N. W. 389; *Great Northern Ry. Co. v. Fowler*,

Ladd v. Railway Co.

136 Fed. 118; *Johnson v. Chicago, M. & St. P. Ry. Co.*, 224 Fed. 196; *St. Louis, I. M. & S. Ry. Co. v. Hambright*, 87 Ark. 614, 113 S. W. 803; *St. Louis & S. F. Ry. Co. v. Richards*, 23 Okla. 256, 102 Pac. 92; 34 Cyc. 1055, 1058; *Nelson v. Chicago & N. W. Ry. Co.*, 111 Minn. 193, 126 N. W. 902, and note appended to this case in 20 Ann. Cas. 748, 750-753, on "Avoidance of release of claim for personal injuries on account of misstatements by physician as to nature of injuries"; Note, 11 L. R. A., n. s., 201; Note, 48 L. R. A., n. s., 449.)

2. The defendant complains of the evidence of the plaintiff concerning what Dr. Oldham said at the time he examined her, for the reason that he was not shown to have been acting for the company in making that examination. Circumstances are against the defendant in this contention. The plaintiff told Dr. Oldham that she had been sent there by the defendant's agent. He examined her injuries, but made no charge for his service. For a number of years he had been the company's doctor at Wichita, and the plaintiff had been directed to go to him by the company's agents while in the performance of their duty. There was no error in admitting this evidence.

3. The defendant complains of the instruction to the jury that, if they found for the plaintiff, in determining the amount of recovery they might consider how far the injuries were reasonably calculated to and would with reasonable certainty impair the plaintiff's capacity to earn a livelihood in the future. The defendant contends that there was no evidence to justify such an instruction. While such evidence was admissible, yet the judgment will not be reversed because it was not introduced. If the plaintiff never earned any money, never performed any service of any value for any other person, still it would be proper for the court to submit this question to the jury.

"A person whose capacity to labor has been permanently diminished by physical injury wrongfully inflicted upon him by another can recover damages therefor, notwithstanding there may have been no proof as to what such person's earnings were before or after the injury." (*City Council of Augusta v. Owens*, 111 Ga. 464, syl. ¶ 8, 36 S. E. 830.)

(See, also, *Railway Co. v. Moffatt*, 60 Kan. 113, 55 Pac. 837; *O'Connor v. Railway Co.*, 144 Iowa, 289, 122 N. W. 947; *Dallas Consol. El. St. Ry. Co. v. Motwiller*, 51 Tex. Civ. App. 432, 112 S. W. 794; *City of Louisville v. Tompkins*, (Ky.

1909) 122 S. W. 174; *Storrs v. Los Angeles Traction Co.*, 134 Cal. 91, 66 Pac. 72; *Melone v. Sierra Railway Co.*, 151 Cal. 113, 91 Pac. 522; *Washington v. Pacific, etc., Ry. Co.*, 14 Cal. App. 685, 112 Pac. 904; *Fisher et al. v. Jansen*, 128 Ill. 549, 21 N. E. 598.)

4. The defendant complains of the court's refusal to submit the following special questions:

"Question 2. If you find that plaintiff. discovered or noticed any injuries or ailments after giving the release that she did not discover or notice before, state as nearly as you can what date plaintiff first noticed or discovered such subsequent injuries or ailments.

"Question 5. If you find from the evidence that plaintiff was defrauded into giving the release in question, state in what such fraud consisted and through whom it was committed.

"Question 7. If you find from the evidence that plaintiff was induced by any alleged representation of Dr. Oldham to sign the release mentioned in evidence, do you find that plaintiff would have refused to sign said release but for such representations on the part of Dr. Oldham?

"Question 8. If you find from the evidence that plaintiff was induced by any alleged representation of Dr. Oldham to sign the release mentioned in evidence, do you find that Dr. Oldham believed such statements to be true when he made them to plaintiff?

In *Railroad Co. v. Aderhold*, 58 Kan. 293, 49 Pac. 83, this court said:

"Each special interrogatory submitted to the jury should be so framed as to present distinctly a single material fact involved in the issues of the case." (Syl. ¶ 3.)

The second question was compound and complex, and was immaterial. The fifth comes within the objections named in *Anderson v. Heasley*, 95 Kan. 572,.148 Pac. 738. It likewise was a compound question. The seventh was entirely speculative. In *Manley v. Railway Co.*, 82 Kan. 211, 212, 107 Pac. 540, it was held that there was no error in refusing to submit questions substantially like the eighth. While these questions might have been submitted, it was not reversible error to refuse to do so.

5. The defendant contends that the answers to questions four and nine have no evidence whatever to support them; that the jury should have been required to make definite its answer to question five; and that the answers to special questions were evasive and equivocal. The answer to question four is in effect "yes," although there is the qualification that

the release was signed through misrepresentation.   This is supported by evidence.   The answer to the ninth question is not a direct answer either way, although there was evidence from which the jury could have given an affirmative answer. The answer to question five is definite and is sufficient.   The answers to all the questions, although cautious, are sufficiently direct to enable any one to understand them.

There may be, and probably is, some justification for the argument of the defendant on these questions, but on the whole we think substantial justice has been done, and that the judgment should not be reversed because of the slight departure from strict rules in the answers.

We do not find any substantial error in the trial of this cause, and the judgment is affirmed.

PORTER, J. (concurring specially) : I concur in holding that the release was given for a mere nominal consideration, that it was signed by plaintiff at the urgent solicitation of the claim agent, when, as she stated to him, she wanted no damages unless she had been injured, and at that time she did not believe she had sustained any permanent injury.   I agree that the release is void; but I find nothing in the evidence tending to suggest bad faith in the conduct of the physician employed by the railroad company.   He evidently thought from his examination of the plaintiff that she had not received any substantial injuries, and she thought the same thing.

---

No. 20,030.

JOSEPH EPLEY, *Appellant*, v. J. M. HALL, as Director, etc., et al., *Appellees*.

SYLLABUS BY THE COURT.

1. SCHOOL-DISTRICT BOARD—*May Provide Instruction in Music.*   Under the provisions of section 7478 of the General Statutes of 1909 it is competent for a school-district board to provide that other branches shall be taught than those specifically enumerated in the section, and in the discretion of the board they may provide for instruction in music by a qualified teacher.

2. SAME — *Teaching of Music — Authorized by Statute.*   The uniform course of study prepared by the state board of education for the common schools of the state for the year 1914, under the authority of chapter 272 of the Laws of 1913, authorizes the teaching of music in such schools.

3. SAME—*Board May Employ Separate Music Teacher.* It is within the discretion of the school-district boards to determine whether all subjects, including music, shall be taught by a single teacher or to provide that music shall be taught by another teacher, provided such other possesses the qualifications and authority required by the school laws.

Appeal from Harvey district court; FRANK F. PRIGG, judge. Opinion filed March 11, 1916. Affirmed.

*Frank L. Martin,* of Hutchinson, *Cyrus S. Bowman,* and *J. Sidney Nye,* both of Newton, for the appellant.

*Charles E. Branine,* of Hutchinson, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This suit was brought by Joseph Epley, a taxpayer of Harvey county, to enjoin J. M. Hall, George Kline and Otis Moots, members of the school board of district No. 41, from paying any money out of the funds of the school district to defendant Irene Kelley, a music teacher employed by the board. The injunction was denied.

The case was tried before the court upon an agreed statement of facts, setting forth that Irene Kelley, who held a certificate as a qualified teacher of vocal music, applied to and was employed by the board, in addition to the regular qualified teacher, to supervise and teach music in the district school, which had about twelve pupils. Under the plan adopted she visited the school once each month while school was in session and in the presence of the regular teacher, gave a model lesson in vocal music and left directions with the regular teacher to be followed during the coming month, after reviewing the work that had been done during the previous month. Her salary for this work was fixed at five dollars a month. Before employing Miss Kelley, the board had had some correspondence with the state superintendent of public instruction and the attorney-general with reference to the legality of making the contract for this work, and were advised that it was within their authority.

Plaintiff contends that the contract was unauthorized and illegal, as being an attempt to substitute Miss Kelley's plan of music study for the plan adopted by the state board of education pursuant to chapter 272 of the Laws of 1913, providing

for a uniform course of study for rural schools.  Defendants contend that the law authorizes the board to provide for the teaching of music, and the question as to how they should provide for it was a matter within their own discretion, whose exercise is not to be reviewed in a court if there is no abuse of their power and discretion.

In respect to rural schools the law provides:

"That in each and every school district shall be taught orthography, reading, writing, English grammar, geography, arithmetic, history of the United States and history of the state of Kansas, and such other branches as may be determined by the district board: *Provided,* That the instruction given shall be in the English language." (Gen. Stat. 1909, § 7478.)

The provision which permits other branches to be taught vests the district board with authority to provide for the teaching of music. (*Board of Education v. Welch,* 51 Kan. 792, 33 Pac. 654.)

It is contended that the question whether or not music shall be taught is controlled by chapter 272 of the Laws of 1913. That act provides in effect that the state board of education shall prepare a course of study for the common schools of the state of Kansas, and arrange it so that no pupil shall be required to study or recite in more than six of the subjects comprising the curriculum, and providing that the course of study shall be wholly based upon texts which have been duly adopted by the state school book commission.  Certain subjects are designated as major subjects, upon which the pupils are required to study and recite, but different provisions may be made as to other subjects, and while music is not mentioned as one of the major subjects comprising the curriculum, the teaching of vocal music was authorized in the course of study prepared for 1914, the year in which this controversy arose. There was a provision that fifteen minutes of every morning should be given to general exercises, including devotionals, and that in these exercises music might be varied with current events and stories having ethical value, but suggesting that two mornings of each week be given over to music.  It appears that music was not only recognized by the board as a proper part of the course of study, but in the prescribed course, those

in charge of the schools were urged to make provision for training the pupils in music, as follows:

"Teach vocal music, if you can, during your period for general exercises. Give at least two lessons each week. Write the scale on the board and drill on singing it. Use any device for developing a tone and giving the timid confidence enough to make an effort. Sing frequently. Many pupils are afraid to sing in school, but they should be encouraged to make the attempt. Singing exerts only the best influence over a school. Learn many good rote songs. If possible, get song books for your school."

Thus it appears that although music was not designated as a major subject, it was included in the regular course of study prepared by the state board. Under these provisions, the district board therefore had abundant authority to provide for music in the school and pay for the same.

Being vested with authority and discretion in the employment of teachers, the district board was at liberty to determine whether the interests of the pupils would be best subserved by the employment of more than one teacher, and the branches to be taught by each. The board was, of course, required to employ qualified teachers, and it appears that the one employed in this instance had passed the examination required by law and held a certificate which certifies that she had furnished satisfactory evidence of good moral character, successful experience in teaching, and was otherwise legally qualified as a teacher.

The judgment is affirmed.

Hoffman v. Charlett.

No. 20,031.

MRS. ADELE HOFFMAN, *Appellee,* v. F. W. CHARLETT, *Appellant.*

SYLLABUS BY THE COURT.

AUTOMOBILE—*Passing Buggy—Collision—Findings Consistent—Instructions.* Findings of fact examined and held to be consistent with each other and with the general verdict. Held further that an instruction was properly given the jury relating to the management of vehicles on a public highway when the driver of an automobile intends to pass a horse and buggy in front of it.

Appeal from Edwards district court; ALBERT S. FOULKS, judge. Opinion filed March 11, 1916. Affirmed.

*A. C. Dyer, A. L. Moffat,* both of Kinsley, and *Charles E. Lobdell,* of Great Bend, for the appellant.

*F. Dumont Smith,* of Hutchinson, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for injuries which the plaintiff sustained by being struck by the defendant's automobile. The plaintiff recovered and the defendant appeals.

The plaintiff was driving a single horse hitched to a buggy in which the plaintiff and her two children were riding. The defendant approached them from the rear. As he did so the plaintiff turned to the right. The traveled part of the highway was forty feet wide, and the plaintiff testified she turned clear out of the wheel tracks so as to give the defendant plenty of room to turn out. There was evidence that the automobile struck the buggy, threw the plaintiff out, and as she attempted to get up from the ground the automobile struck her in the back. The defense was that after turning to the right the plaintiff's horse suddenly turned back into the road, that the automobile probably did not strike the buggy and did not strike the plaintiff, and that the plaintiff's injuries resulted from her jumping out of the buggy. The jury returned the following special findings of fact:

"Q. No. 1—Do you find that defendant was guilty of negligence or carelessness in the operation of his car?  A. No. 1—Yes.

"Q. No. 2—If you answer the foregoing question in the affirmative, state in what particular he was negligent. A. No. 2—He failed to stop his car.

"Q. No. 3—What, if anything, did defendant omit in the handling of his car that ordinary carefulness and prudence would require? A. No. 3—Did not use his brake.

"Q. No. 4—What, if anything, did defendant do in the operation of his car that was not ordinarily careful and prudent? A. No. 4—He failed to turn to the left.

"Q. No. 5—After defendant saw the buggy ahead of him did he slow down to a reasonable and proper speed under the circumstances? A. No. 5—No.

"Q. No. 6—Did defendant after sounding his horn keep his car under reasonable and proper control? A. No. 6—No.

"Q. No. 7—Did defendant follow plaintiff out of the main track and strike her buggy while there? A. No. 7—No.

"Q. No. 8—Did plaintiff's horse and buggy after turning out to the right, turn again to the left across the main road? A. No. 8—No.

"Q. No. 10—Do you allow plaintiff anything for permanent injury? A. No. 10—No.

"Q. No. 13—Did defendant's car strike plaintiff? A. No. 13—Yes."

The principal contentions of the defendant are that findings 7 and 8 are in his favor and that findings 7, 8 and 13 can not all be true. The argument is that the plaintiff testified she turned to the right, clear out of the main track. If the defendant did not follow her out of the main track from which she had wholly departed, and the horse and buggy did not turn back across the main track, there could be no collision. The jury evidently considered the entire event. Believing the autmobile struck the buggy, the jury doubtless concluded the plaintiff's observation and memory of the distance she turned to the right were not exact and that she did not succeed in getting the rear of the buggy entirely clear of the right-hand wheel track of the traveled part of the road, although she believed and testified that she had done so. The jury were not bound to accept the testimony for the plaintiff as being verbally accurate and absolutely true, or else reject it entirely and accept the testimony for the defendant as absolutely true, and if the plaintiff in her testimony overestimated the distance she turned to the right she did not defeat her cause of action.

The court instructed the jury on the law of the road governing the management of vehicles when the driver of one behind another intends to pass the one in front. It is said there was

no evidence warranting this instruction, and among other things it is said there was no evidence that the defendant desired to pass the plaintiff. The facts and circumstances disclosed by the evidence were abundantly sufficient to establish such an intention, and it was proper for the court to instruct the jury concerning the respective duties of the parties should the jury conclude the case was one involving the passing of a vehicle in front of another by the one in the rear.

The judgment of the district court is affirmed.

---

No. 20,032.

THEODORE SCHULTZ, *Appellant* and *Appellee*, v. ALFRED STINER, *Appellee* and *Appellant*, and MAUD STINER et al., *Appellees*.

SYLLABUS BY THE COURT.

1. ATTACHMENT AFFIDAVIT—*Defective—Capable of Amendment*. An attachment affidavit which omits to state the sum the affiant believes the plaintiff ought to recover, but which recites that the defendant has been sued as endorsee of a note, and that the claim is just, due and unpaid, is not void, but capable of amendment.

2. SAME—*Order of Attachment—Not Fatally Defective*. Attachment proceedings are not rendered materially defective by an omission of the order expressly to limit to his own county the sheriff's action under it, or by the fact that the county and state in which attached real estate is situated are mentioned in the return only in the report of the appraisers.

3. JUDGMENT—*Motion to Set Aside after Term—Statutory Procedure*. After the expiration of the term of court at which it was rendered, a judgment which is not absolutely void can not be set aside on motion unless attacked in due time in accordance with some express statutory procedure. In the present case it is held that the consideration of other questions presented by a motion to set aside a judgment, because of a defective service, is prevented by the incorporation of nonjurisdictional grounds therein.

4. MORTGAGE FORECLOSURE—*Receiver—Disposition of Income from Mortgaged Property*. By virtue of the statute authorizing the appointment of a receiver in an action to foreclose a real-estate mortgage, if the property is insufficient to discharge the debt, the mortgagee, where that condition exists, has a right to look to the income of the property prior to its sale, and through a receiver appointed after judgment may enforce that right from the time of such appointment.

Appeal from Decatur district court; WILLIAM S. LANGMADE, judge. Opinion filed March 11, 1916. Affirmed except as to one ruling, which is reversed.

A. C. T. Geiger, of Oberlin, and R. W. Hemphill, of Norton, for the plaintiff.

J. P. Noble, of Oberlin, for the defendants.

The opinion of the court was delivered by

MASON, J.: Theodore Schultz, the holder of a note secured by a real-estate mortgage, sued its makers, Alfred Stiner and his wife, asking judgment also against the payee, Howard L. Vale, as endorsee. Judgment was rendered foreclosing the mortgage and confirming an attachment levied upon land belonging to Vale. Thereafter a receiver of the mortgaged property was appointed. After the expiration of the term of court at which judgment was rendered against him, Vale, who was served only by publication, and who had previously made no appearance, moved to set it aside on the ground, among others, that the attachment affidavit and the published notice were defective. The motion was sustained and the plaintiff appeals. Stiner and his wife appeal from decisions of the trial court the effect of which was to authorize the receiver to pay to the plaintiff the income derived from the mortgaged property prior to its sale.

(1) The attachment affidavit was defective in that it omitted to state the amount which the affiant believed the plaintiff ought to recover, as required by the statute (Civ. Code, § 191). It did recite, however, that the plaintiff had begun his action upon notes made by the Stiners and endorsed by Vale, and that the claim was just, due, and wholly unpaid. This statement could not be true unless the plaintiff was entitled to recover the amount sued for as shown by the petition. The omitted matter, therefore, was fairly to be inferred from what was expressly stated. When the sufficiency of the affidavit was challenged the plaintiff tendered an amended affidavit supplying the omission. A liberal policy has been adopted in this state with regard to permitting amendments under such circumstances. (Eckhardt v. Taylor, 90 Kan. 698, 136 Pac. 218; Rothweiler v. Mason, 92 Kan. 612, 141 Pac. 245.) We think

the amendment should have been allowed, and it will be treated as though incorporated in the original affidavit, thereby curing its defect.

(2) The contention is also made that the order of attachment was defective because it commanded the sheriff to levy upon the property of the defendant, without adding "in your county," as the statute directs. . (Civ. Code, § 193.) As the sheriff could only execute the writ within his own county, the omission was immaterial. A similar criticism is made of the return, because, while its description of the attached property was otherwise sufficient, the county and state in which it was situated were not named. Its location, however, was sufficiently shown by the appraisment, which was a part of the return, and which gave a full description of the land. (*Moser v. Wagstaff*, post, p. 559, 55 Pac. 554.)

(3) The publication notice stated that if Vale did not answer within the time named judgment would be rendered against him for a specified amount, and for the sale of the attached property, which was not described. This omission made the notice defective, but not void. (*Sharp v. McColm*, 79 Kan. 772, 101 Pac. 659.) After the expiration of the term of court at which it was rendered, a judgment which is not absolutely void can not be set aside upon motion, unless attacked in due time in accordance with some procedure prescribed in the statute. (*Chapman v. Irrigation Co.*, 75 Kan. 765, 90 Pac. 284; *Lewis v. Woodrum*, 76 Kan. 384, 92 Pac. 306; *Vail v. School District*, 86 Kan. 808, 122 Pac. 885.) In two cases similar to that here presented it seems to have been assumed without discussion that the attacks there made upon the judgments were authorized by the code, perhaps upon the supposition that they were within the operation of the third clause of section 596. (*Adolph Cohen v. C. B. Trowbridge*, 6 Kan. 385; *Cackley v. Smith*, 38 Kan. 450, 17 Pac. 156.) Whether such assumption was well founded need not now be considered, for the present controversy can be disposed of upon another consideration. In the motion to set aside the judgment Vale undertook to appear only specially. But one ground upon which he asked relief was that he was not liable on the note sued on, because no notice of nonpayment was ever served on him. By incorporating in his motion this nonjurisdictional

ground he placed himself in the same position as though he had appeared at the trial. (*Barnett v. Insurance Co.*, 78 Kan. 630, 634, 97 Pac. 962.) The motion to set aside the judgment should have been overruled on that account, whether or not it was otherwise tenable.

(4) The judgment foreclosing the mortgage was rendered January 10, 1914. The application for the appointment of the receiver was made April 3, 1914. The mortgaged land was sold December 14, 1914. The mortgagors contend that no receiver should have been appointed, and that they should not have been deprived of the income of the property. The act of 1893 relating to the redemption of real estate from judicial sales did not repeal the statute authorizing the appointment of a receiver in an action to foreclose a mortgage where the property is probably insufficient to discharge the debt. (Civ. Code, § 266, subdiv. 2; *Beverly v. Barnitz*, 55 Kan. 466, 480, 42 Pac. 725. See, also, *Bank v. Grain Company*, 63 Kan. 343, 65 Pac. 676; 27 Cyc. 1251, 1252.)

In the Beverly-Barnitz case it was said:

"In such cases a receiver may be appointed at any time after the action is commenced, and the receivership may continue until the sale of the land by the sheriff, when the mortgagee's claim upon it is satisfied and extinguished, and as a creditor he has no further concern with it. The act of 1893 does not become operative until after the sale." (p. 480.)

The plaintiff made a showing that the lien against the property exceeded its value. This entitled him to look also to its income up to the time of sale. His failure to ask for a receiver before judgment did not prejudice the mortgagors, nor effect a waiver of his rights. (34 Cyc. 43.) The interval between the judgment and the sale was considerable, but as the right of the mortgagors to the posession and income of the property during the statutory period allowed for redemption was not interfered with, it does not appear that they were in any way injured thereby. Had they shown to the trial court that they were prejudiced by the delay, its discretion was broad enough to prevent the use of the receivership as a means of oppression.

The order setting aside the judgment against Vale is reversed; in other respects the action of the district court is affirmed.

No. 462.

*ELIAS MOSER et al., *Appellants*, v. MARTHA P. WAGSTAFF,
*Appellee*.

### HEADNOTE OF THE REPORTER.

ORDER OF ATTACHMENT—*Return of Sheriff—Description of Property—
Appraisement*. Where the return on an order of attachment did not
describe the property attached, but it referred to the inventory and
appraisement in which was the necessary description, and which was
a necessary part of the return, the attachment was valid.

Appeal from Brown district court. Opinion of the Kansas
Court of Appeals, Northern Department, Eastern Division,
filed December 15, 1898. Affirmed.

*James Falloon*, of Hiawatha, for the appellants.

*R. T. Herrick*, and *Guthrie, Austin & Wilson*, for the ap-
pellee.

*Per Curiam:* This action was brought by Elias Moser and
Simon Fraser upon two promissory notes given by John H.
Fraser and secured by said John H. Fraser and his wife, Mar-
garet J. Fraser, by a mortgage upon a lot in Hiawatha, dated
May 23, 1888. The petition alleges that on May 30, 1884, said
lot was the property of Thomas G. Wagstaff, and said Thomas
G. Wagstaff and his wife, Martha P. Wagstaff, conveyed the
lot to William Welcome; and William Welcome and his wife,
Fannie Welcome, conveyed it to said Martha P. Wagstaff; and
that said deed from the Wagstaffs to Welcome and the one
from Welcome to said Martha P. Wagstaff were without con-
sideration and made solely to defraud the creditors of said
Thomas G. Wagstaff; that in 1887 John H. Fraser recovered a
judgment in said court against Thomas G. Wagstaff, and said
town lot which had been therein attached was ordered sold to
pay said judgment, and said property was on April 6, 1888,
sold to said John H. Fraser; that said sale was duly confirmed
and a deed made therefor; that since the year 1884 said

*NOTE.—This case was not reported in full when the opinion was
filed (see 8 Kan. App. 855), and is reported here because it was cited in
the case of *Schultz v. Stiner*, ante, p. 555.

Martha P. Wagstaff has been a nonresident of this state, and has not been in the state since said date; that Arnold Moser obtained a tax deed on said lot, which was void; and praying judgment against the said John H. Fraser upon the notes sued on and a foreclosure of the mortgage securing the same; that the deed by which the title was attempted to be conveyed to said Martha P. Wagstaff be declared fraudulent and void and the tax deed set aside.

The principal issues in the case, and the only ones which we are called upon to consider, were between the plaintiffs therein and the defendant, Martha P. Wagstaff, and relate: First, to the question of the validity of the proceedings which culminated in the sheriff's deed to John H. Fraser; and second, to the validity of the transfer of the lot in question from Thomas G. Wagstaff through William Welcome to said Martha P. Wagstaff.

These issues were tried to the court, who submitted certain special questions of fact to a jury and made certain additional findings of his own. As conclusions of law the court found:

1. That the tax deed of Arnold Moser is void and that said Arnold Moser has a first lien on said lot for $219.27.

2. That the plaintiffs recover a judgment against the defendants John H. Fraser and Margaret J. Fraser for $2221.63, to draw interest at ten per cent per annum; that the same is a valid mortgage lien on said lot, second and subject only to the lien for taxes in favor or said tax-deed holder.

3. That the excess in value of said lot over the two liens belongs to Martha P. Wagstaff.

4. That the plaintiff recover costs of said Martha P. Wagstaff.

Thereupon judgment was rendered accordingly and the matter brought to this court for review.

1. It is contended by the defendant that the court erred in admitting the attachment order and return, judgment, order of sale and sheriff's deed in the case of *John H. Fraser v. Thomas J. Wagstaff;* first, because no copy of the attachment order was left with the occupant or posted on the premises; second, because the property attached was not described in the return; third, that no lien was created thereby and that the sheriff's deed was void. The return itself did not describe

the property attached, but it referred to the inventory and appraisement which formed a part of it, in which was the necessary description.

On the authority of *Dunlap v. McFarland, Adm'r,* 25 Kan. 488, and *Wilkins v. Tourtellott,* 42 Kan. 176, 22 Pac. 11, the omission in the return of the statement of service of a copy is a mere irregularity and does not render the attachment void. As the second allegation of error as argued in the defendant's brief is founded upon the supposed invalidity of the attachment, it requires no special consideration.

The second reason why it is claimed the demurrer to the evidence should have been sustained is that there was no evidence to sustain the allegation of the plaintiff that the transfer of title to the lot from Wagstaff to his wife was fraudulent. As was said by Brewer, J., in *Kurtz v. Miller,* 26 Kan. 314:

"A fraudulent purpose is known only to the parties to the transaction, and they do not hasten to tell it. As a rule, fraud, therefore, only is disclosed by the condition of the parties, the details of the transaction, and the surrounding circumstances. The evidence is usually circumstantial." (p. 318.)

We think there was sufficient evidence to go to the jury, and the court did not err in overruling the demurrer nor in overruling the motions of said defendant based upon the alleged insufficiency of the evidence.

We have examined the instructions refused and the instructions given, complained of by the defendant, and we are satisfied that the court properly and correctly instructed the jury on the law of fraud as applicable to this case. A careful consideration of all the allegations of error argued by the plaintiffs in their brief fails to satisfy us that the court below committed any reversible error herein.

The judgment of the court below is affirmed.

No. 20,035.

M. D. GONDER, *Appellant*, v. J. F. DODGE et al., *Appellees*.

SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Payment of Preëxisting Debt—Burden of Proof*. *Prima facie* a promissory note is not a payment or discharge of the original indebtedness and the burden rests upon the person who claims that it was given and accepted as such.

2. PETITION—*Two Counts—Only One Count Tried—New Trial as to the Other*. A petition contained two counts, one for the recovery of a real-estate agent's commission, and one upon a promissory note the consideration of which was the same indebtedness. The answer was a general denial and a plea that the note was materially altered subsequent to its delivery. The issue as to the alteration of the note was the only one submitted to the jury, and there was a verdict for the defendants. *Held*, that the proceedings do not show an intention to waive the right to recover on the first count and that plaintiff is entitled to a trial on that cause of action.

Appeal from Gray district court; GORDON L. FINLEY, judge. Opinion filed March 11, 1916. Reversed.

*C. M. Williams*, and *D. C. Martindell*, both of Hutchinson, for the appellant.

*George W. Finney*, and *Roscoe E. Peterson*, both of Larned, for the appellees.

The opinion of the court was delivered by

PORTER, J.: Appellant, who is a real-estate agent, sued to recover for services in procuring an exchange of properties. The petition contained two counts. The first alleged the performance of the services upon a written contract fixing the amount of the commission, and a copy of this contract and copies of other written acknowledgments of the amount due were attached as exhibits. The second count was on a promissory note given by Dodge and wife to the plaintiff for $440 in part payment of the same indebtedness. The answer, in addition to a general denial, alleged a material alteration in the note subsequent to its execution; that when executed and delivered it contained no provision for the payment of interest, and subsequently the plaintiff had altered it by inserting an obligation that it should bear ten per cent interest per annum.

The court ruled that the defense had the burden of proof, and counsel for appellees made a statement of their case to the jury, in which it was said, in substance, that there was no dispute over any of the facts except in respect to the claim that the note had been materially altered. Counsel for appellant in his opening statement proceeded upon the theory that appellees all the while recognized their indebtedness to the appellant, and stated to the jury that there would be no contention on the part of appellees that they did not owe appellant $640. This statement was not challenged. The court asked counsel for both parties if there was any controversy over anything more than the matter of the note, and stated that there seemed to be more to the petition than had' been referred to in the opening statements. Appellant's counsel replied that there would be no other cause of action.

Appellees' evidence tended to show that there had been a subsequent alteration of the note by inserting the figures "10" in the blank space provided for the rate of interest. Appellant's evidence was directly to the contrary. The jury found that the note had been altered as appellees claimed, and returned a verdict in their favor. Appellant moved for judgment on the first count upon the undisputed facts and because the verdict was based solely upon the second count. This motion and the motion for a new trial were overruled, and judgment was rendered in favor of appellees for costs.

It is urged by appellees that appellant abandoned his first cause of action, and by the statement of his counsel in answer to the court's inquiry as to what was involved in the case is estopped to claim the right to recover on that part of his petition. We think otherwise. There was another claim or cause of action alleged in the petition against Chas. O. Johnson, with whom the trade was made, and appellant sought to recover judgment against him, alleging that Johnson had agreed to deposit part of the purchase money in a certain bank, and that appellees had given appellant a written order on the bank to pay his commission out of these proceeds; that Johnson had wrongfully violated his agreement and was liable to appellant for the loss of his commission. This cause of action was abandoned at the trial.

The record does not bear out the claim that appellant in-

tended to abandon his claim to recover upon the first cause of action. He was vigorously denying the charge that he had altered the note, and doubtless preferred to have a verdict in his favor on the cause of action resting upon the note. There was a general denial in the answer, but it was conceded at the trial that the appellant rendered the services to appellees and there was no dispute as to the amount of his commission nor claim that it had been paid. It is suggested that there was an amended answer on file which alleged that the note was given in full payment of the original indebtedness. But after statements amounting to an admission of the original indebtedness, appellees offered no evidence of any agreement that the note was to extinguish the debt, and their attitude and statements left the court and counsel for the appellant in a situation where it might fairly be assumed that such defense was not intended to be relied upon. The presumption is that the note was not given with the understanding that it would extinguish the debt. The burden was on appellees to prove an express agreement to that effect. (*Mentzer v. Burlingame,* 78 Kan. 219, 220, 97 Pac. 371.) *Prima facie* the note is not a payment or discharge of the original indebtedness. (*Bradley v. Harwi,* 43 Kan. 314, 316, 23 Pac. 566; *Webb v. Bank,* 67 Kan. 62, 72 Pac. 520.) In the last case cited the syllabus reads:

"The taking of a note of either the debtor or a third person for a pre-existing debt is not payment unless it is expressly agreed to accept such note as payment. Whether it was so taken is a question of fact, and the burden is on the party who asserts it to establish the fact by proof."

In the case at bar there was no allegation that the alteration was fraudulently made, and there was a sharp conflict in the testimony as to whether it was made at all. That issue has been decided against appellant, but he is entitled to recover the consideration for which the note was given unless the appellees are able to sustain the further defense that by agreement of both parties the note was intended to extinguish the debt. All other issues have been determined. The court might have rendered judgment in appellant's favor on the undisputed facts, or if satisfied that appellees were entitled under the circumstances to try the other issue, a new trial should have been granted.

The judgment will be reversed and a new trial ordered upon that single issue.

No. 20,036.

J. J. MUENZENMAYER et al., Partners, etc., *Appellees*, v.
JOSEPH HOOD and WILLIAM HOOD, *Appellants.*

SYLLABUS BY THE COURT.

PROMISSORY NOTE — *Warranty of Machinery — Purchaser Estopped to Recoup Damages for Breach Thereof.* The plaintiffs assisted a machinery company in selling an engine and separator to one of the defendants for $1200 and $1105 respectively, for which he gave notes in the sum of $2305. The plaintiffs guaranteed the machinery to work satisfactorily, and purchased the notes given to the vendor. The engine proved defective and the purchaser made repeated complaints, and after certain efforts by the plaintiffs to adjust it they advised the purchaser to see what he could do with it another season. Long after this, with their consent, he traded the engine towards a new one and took up the old notes with the ones sued on, which he secured by a mortgage covering the separator and the new engine. This was some two years after the execution of the original notes, and when giving the new notes he was told by the plaintiffs that he would finally be allowed for the time he had lain idle with the old engine. During the first season he paid $500, the next season $400, and later $500 more. In an action on the notes last given he sought to recoup damages for breach of warranty of the old engine. *Held,* that he is estopped.

Appeal from Geary district court; ROSWELL L. KING, judge.
Opinion filed March 11, 1916. Affirmed.

*W. S. Roark,* of Junction City, for the appellants.
*I. M. Platt,* of Junction City, for the appellees.

The opinion of the court was delivered by

WEST, J.: Plaintiffs sued on two promissory notes and recovered. The defendants appeal. The plaintiffs, who seem to have been implement dealers, helped the agent of a machinery company sell to defendant Joseph Hood a separator and a second-hand engine, and one of the plaintiffs appears to have guaranteed the engine to do good work and to be satisfactory and that he would stand behind the deal. There is no showing of serious defects in the separator, but there was testimony that the engine would not work and that complaint was made to the plaintiffs, who became the owners of the notes

given to the machinery company, and a man was sent to adjust it, but did not succeed. Complaints and exhortations to try it further were exchanged for two thrashing seasons, the purchaser in the meantime offering to return the machinery for a return of the purchase price, and offering at another time $500 to take it back, but making payments thereon of $500 the first year and $400 the second, and later another of $500. He was advised to go to Kansas City at plaintiffs' expense and trade the engine towards another. This journey was taken, but without success, and later a trade was made elsewhere of the old towards a new engine, the old one for which Hood was to have given $1200 being turned in at $400, and a new mortgage was made to cover the new engine and secure the notes sued on herein. Damages by loss of time and expenditures for repairs were testified to, and also that when the new notes were given one of the plaintiffs said:

"Well, you go ahead and sign these notes and see what you can do threshing and whenever you get through we will settle up and I will pay you for the time you lost when you was laying idle with your old engine."

This was stricken out as being new matter not pleaded in the answer. The answer of William Hood alleged that he signed the notes as surety, and adopted the averments of Joseph Hood's answer. The latter alleged, among other things, that the notes were given for machinery expressly guaranteed to be free from defects and to work satisfactorily; that he relied on such guarantee by W. F. Muenzenmayer, in whom he had confidence, who assured him that if the engine and separator did not work satisfactorily they would be made to do so; that the engine was of $750 less value than the agreed price therefor, and was old, defective and broken in parts; that plaintiff, on being so advised, refused to take back the property, or return the consideration or make good his guaranty.

The notes sued on were given to the plaintiffs in 1911 to take up a series of notes given to the Avery company in 1909, from whom they had been purchased by the plaintiffs. A demurrer to the defendants' testimony was sustained, and this ruling is complained of as precluding an accounting to which the defendants are entitled.

This is the situation: In 1909 the separator was purchased of the Avery company for $1105, according to Joseph Hood's

testimony, and the engine for $1200, making $2305, and of this sum he paid respectively during two or three seasons, $500, $400 and $500, making $1400, and he admitted that there was nothing substantially wrong with the separator. These facts, together with the giving of the new notes two years after the first ones were executed, present so strong a case of acquiescence and estoppel that the majority of the court are of the opinion that no defense was shown and that the demurrer was properly sustained. (See *McCreary v. Parsons, Executrix,* 31 Kan. 447, 2 Pac. 570, and *Hartwell v. Manufacturing Co.,* 78 Kan. 259, 263, 97 Pac. 432.)

The judgment is affirmed.

WEST, J. (dissenting) : The testimony, which as against a demurrer must be taken as true, seems to bring the case within the rule announced in *Lyman v. Wederski,* 95 Kan. 438, syl. ¶ 2, 148 Pac. 642, holding, like other decisions there cited, that for breach of warranty damages may be recouped when suit is brought to recover the consideration. (3 R. C. L. 947; 14 A. & E. Encycl. of L. 169.) The change of ownership and renewal of the notes do not preclude the defense in view of the connection the plaintiffs have had with the entire transaction from the beginning. (*Hodge v. Bishop,* 96 Kan. 419, 151 Pac. 1105.)

---

No. 20,037.

PHILLIP WENSLER and VIOLA WENSLER, *Appellants,* v. THOMAS TILKE, *Appellee.*

SYLLABUS BY THE COURT.

1. VENDOR AND PURCHASER — *Default of Purchaser — Abandonment of Contract—No Recovery of Payments Made.* A purchaser of real property who fails to make the payments provided for in his contract, and who, being requested by his vendor to either make the payments or move off the property, fails to make the payments, abandons his contract, and moves off the property, can not recover from his vendor any part of the purchase money he has paid.

2. SAME. Such a purchaser of real property is not entitled to the crops growing thereon at the time he leaves the premises.

Appeal from Geary district court; ROSWELL L. KING, judge. Opinion filed March 11, 1916. Affirmed.

*Lee Monroe,* of Topeka, and *W. S. Roark,* of Junction City, for the appellants.

*James V. Humphrey,* and *Arthur S. Humphrey,* both of Junction City, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: In this action the plaintiffs seek to reform a contract for the purchase of real property and to recover money paid on the purchase price. Judgment was rendered in favor of the defendant on a demurrer to the plaintiffs' evidence. The plaintiffs appeal.

September 29, 1909, the plaintiffs and the defendant signed a simple written contract for the purchase of real property, by which the plaintiffs were to pay the defendant $45 per acre for 200 acres of land. The first $1000 was paid as provided in the contract. Semiannual interest at six per cent was to be paid on the remainder of the purchase price. The plaintiffs went into possession of the land. Later the defendant caused a survey to be made, which revealed the fact that there were 194.52 acres in the tract sold. A new contract was drawn to correct the statement concerning the number of acres sold. By the terms of the new contract time was made the essence of the contract, and provision was made for forfeiture in case of nonfulfillment of the contract by the plaintiffs. The plaintiffs allege that these provisions were fraudulently inserted in the new contract. The plaintiffs defaulted in the payment of interest and in the payment of taxes on the land. After default in the first interest payment, in December, 1910, the defendant and Philip Wensler had a conversation, in which Wensler told the defendant that he could not then pay all the interest due. The defendant requested additional security for the interest. This was refused. Wensler was then told by the defendant that if he could not "pay it all, unless you give me a mortgage on your stock and wheat crop, you will have to move." Wensler testified that he supposed Mr. Tilke would be more than glad to receive the payments; that he would have been "willing to have remained on it and tried to have paid it out if he had let me stay"; and that they left because they were told to leave by the defendant. Viola Wensler testified that in February,

1911, the defendant came to the farm while the men were away and told her that "we had his land and we had n't paid him his money, and we had to get out, and I told him, yes, and he had our thousand dollars, too." March 24, 1911, before the second installment of interest became due, the plaintiffs vacated the premises while the defendant, Tilke was in Texas, and went upon other land rented in February by them. There was some evidence that the plaintiffs had other reasons for leaving besides being ordered off the land. On cross-examination Phillip Wensler said, "I made up my mind that it was n't hardly worth keeping," and "I saw at that time that I had got stung good and proper." When the plaintiffs left the premises they left 30 acres of wheat growing thereon, which was harvested by the defendant, and from which he received 289 bushels of wheat.

The plaintiffs contend that they should have returned to them a portion of the $1000 paid by them, and the proceeds of the crop of wheat left by them growing on the premises. They argue that the second contract was procured by the fraud of the defendant's agent, that it is therefore not binding, and that their rights should be determined under the first contract. The first contract did not provide for forfeiture nor make time the essence of the contract. The defendant contends that the plaintiffs voluntarily signed the second contract, that no fraud was practiced on them, that the second contract is substantially the same as the first, and that they voluntarily abandoned the contract and left the premises.

1. Did the plaintiffs voluntarily abandon the land and their contract for the purchase of the same? If they did, the changes made in the contract at the time the second contract was signed are immaterial. The evidence clearly shows that the option of complying with the contract was always with the plaintiffs; that the defendant was ready at all times to receive his payments and complete the contract; but that upon the plaintiffs' failure to comply with their contract the defendant insisted on having possession of the premises. The plaintiffs failed to pay the interest, to pay the taxes on the land, and moved away on the request of the defendant that they pay the interest or move off. This shows a voluntary abandonment of the land and of the contract on their part.

In *Hillyard v. Banchor,* 85 Kan. 516, 118 Pac. 67, this court said:

"It is a general rule that a purchaser of land who has made an advance payment and then failed to fulfill his contract without default on the part of the vendor can not recover the amount so paid." (Syl. ¶ 4.)

The contract in that case contained no express provision of forfeiture. This court there quoted from *Ketchum v. Evertson,* 13 Johns. (N. Y.) 358, and from *Hansbrough v. Peck,* 72 U. S. 497, 506, 18 L. Ed. 520, language which conclusively shows that the plaintiffs in this case can not recover under their pleadings and the evidence introduced by them. (*McAlpine v. Reichenaker,* 56 Kan. 100, 42 Pac. 339; *Roberts v. Yaw,* 62 Kan. 43, 61 Pac. 409; *Nason v. Patten,* 88 Kan. 472, 129 Pac. 138; *Long v. Clark,* 90 Kan. 535, 135 Pac. 673.)

2. The plaintiffs contend that they are entitled to an accounting and reimbursement for the wheat crop left on the land when they moved away. The defendant and the plaintiffs were not landlord and tenants; they were vendor and purchasers. In 39 Cyc. 1627, under the title "Vendor and Purchaser," this language is found:

"As to the ownership of crops subsequently grown the relation of a vendor and a purchaser in possession under a contract of sale is said to be analogous to that of landlord and tenant."

In 24 Cyc. 1071, under the title "Landlord and Tenant," we find this:

"Where a tenant before the expiration of his term surrenders to the landlord, or by breach of condition forfeits his lease, and the landlord reenters, the latter is entitled to the growing crops upon the land, and no right or title therein remains in the tenant."

In 1 Tiffany or Real Property, § 56, it is stated that a lessee has no right to the annual crops if he himself terminates the tenancy. (See, also, § 224.) There is nothing contrary to this principle in *Story v. Lang,* 87 Kan. 727, 731, 125 Pac. 72, cited by the plaintiffs. The plaintiffs in the present action abandoned their contract and terminated their interest in the land, and were not entitled to the crops growing on the lands when they left.

This is not an action on the part of the defendant to enforce a forfeiture under the provisions of the last contract. It

is an action by the plaintiffs to recover the money paid by them
after they had failed to comply with the terms of their con-
tract; be that contract either the first or second one signed.
They can not recover under either.

The judgment is affirmed.

---

No. 20,041.

FRANK TACHA, *Appellee,* V. THE CHICAGO, ROCK ISLAND &
PACIFIC RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. DAMAGES BY FIRE—*Special Findings Inconsistent with Verdict—No
Negligence Shown.* Rule followed that special findings of the jury,
when inconsistent with the general verdict, control the latter, and
judgment should be entered accordingly. (Civ. Code, § 294; Laws
1913, ch. 239.)

2. SAME—*Presumption of Negligence Overcome by Defendant's Evi-
dence.* Special findings of fact examined and held to show that the
defendant sustained the burden of proof to overcome the statutory
presumption of its negligence with respect to a fire which started near
its right of way.

3. REVIEWED—*No Motion for New Trial.* Rule followed that questions
of law as applied to ascertained facts are subject to review on appeal
although no motion for judgment was filed in time in the district court.

4. SAME. Rule followed that the filing of a motion for a new trial in the
district court is not necessary to secure a review of questions of law in
the supreme court.

Appeal from Decatur district court; WILLIAM S. LANG-
MADE, judge. Opinion filed March 11, 1916. Reversed.

*Paul E. Walker,* and *Luther Burns,* both of Topeka, for the
appellant.

*J. P. Noble,* of Oberlin, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff recovered judgment against the
Rock Island Railway Company for $104.20 as damages to his
pasture, fencing, cow shed and barn caused by a fire alleged to
have been set out by defendant's engine. It was shown that
the only railway engine which by any possibility could have

caused the fire within the time of its occurrence, between 12:30 and 2 p. m., was the one which passed about 1 p. m.

The jury made the following findings of fact:

"1. Did the said fire start at a point off the defendant's right-of-way? Answer. Yes.

"2. What time of the day did the said fire occur? Answer. 12:30 to 2:00 p. m. (Central time).

"3. How far from the defendant's track did the said fire start? Answer. About 150 feet.

"4. What time did the last train pass over the defendant's track prior to the discovery of the fire? Answer. Near 1 p. m. (Central time).

"5. Was such engine, at the time the fire was alleged to have escaped, handled in a competent, careful and skillful manner? Answer. Apparently it was.

"6. Was such engine of an approved pattern and an approved construction? Answer. Yes.

"7. Was such engine supplied with approved appliances to prevent the escape of sparks? Answer. Apparently it was.

"8. Was such engine examined with reference to its appliances to prevent the escape of sparks immediately before it started out on its trip upon which the fire is alleged to have escaped? Answer. Apparently it was.

"9. Upon the special examination, in what condition was the engine found? Answer. Good condition.

"10. If you find that the defendant was negligent in any particular which directly contributed to the plaintiff's damage, state fully and in detail in what such negligence consisted, and give the names of the employes who were negligent. Answer. No negligence shown."

The special findings acquit the defendant of negligence. Section 294 of the civil code (Laws 1913, ch. 239) provides:

"When the special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court may give judgment accordingly."

So say all the decisions of this court for the last forty years, beginning with *Nichols v. Weaver*, 7 Kan. 373, decided in 1871, down to *Martin v. City of Columbus*, 96 Kan. 803, 153 Pac. 518, decided in 1915.

But it is urged that defendant's motion for judgment on the special findings and motion for a new trial were not filed within three days as the code requires. Where does this leave the appeal? All matters which should be presented on a motion for new trial are eliminated from our consideration on appeal. Does the same effect follow the failure to move in time for judgment on the special findings? It seems not. A motion

Tacha v. Railway Co.

for judgment, whether on the pleadings, special findings, default or admissions of the opposing party, or otherwise, is but a convenient and appropriate method of seeking to bring a lawsuit summarily to a close. It need not be formal. Unless it is a motion where notice is required it need not be in writing. (Civ. Code, §§ 556, 558.)

"Probably a written motion for judgment on the findings is not essential. When inconsistent with the general verdict they control, and it is the duty of the court, with or without formal application, to give judgment accordingly. Civil Code, § 288." (*Railroad Co. v. Holland*, 58 Kan. 317, 319, 49 Pac. 71. See, also, *Clement v. Hartzell*, 60 Kan. 317, 321, 56 Pac. 504.)

Moreover, the appellant is entitled to a review of the questions of law involved, and we are bound to hold that the special findings of fact settled by the jury entitled the appellant and not the appellee to judgment. In *Comm'rs of Wyandotte Co. v. Arnold*, 49 Kan. 279, 30 Pac. 486, it was said:

"The supreme court will review the form and substance of a final judgment and correct all substantial errors therein, whether the judgment has been excepted to in any form or not.

"If, upon the trial, the court, at the request of the parties, states in writing the conclusions of fact separately from the conclusions of law, and the conclusions of fact are inconsistent with the conclusions of law and the judgment rendered thereon, the supreme court may direct judgment upon the conclusions of fact found, although no exceptions are taken to the conclusions of law. The conclusions of fact control, and judgment must be given accordingly." (Syl. ¶¶ 1, 2.)

In *Ritchie v. K. N. & D. Rly. Co.*, 55 Kan. 36, 39 Pac. 718, it was said:

"When, however, all questions as to the facts have been eliminated, this court is in as good a position to determine issues of law upon a written statement of facts as any trial court can be, and no necessity exists for the trial court to again pass on the identical questions of law arising in the case. This view of the law has been steadily adhered to by this court in very numerous decisions. (*Osborne v. Young*, 28 Kan. 769; *Horn v. Newton City Bank*, 32 Kan. 518; *Lender v. Caldwell*, 4 Kan. 339; *Coburn v. Weed*, 12 Kan. 182; *Holcomb v. Dowell*, 15 Kan. 379; *St. L. & S. F. Rly. Co. v. Shoemaker*, 38 Kan. 723; *Stettauer v. Carney*, 20 Kan. 474; *Stapleton v. Orr*, 43 Kan. 170; *Windmill Co. v. Buchanan*, 46 Kan. 314; *Comm'rs of Wyandotte Co. v. Arnold*, 49 Kan. 279.) This conclusion in no manner conflicts with the cases of *Nesbitt v. Hines*, 17 Kan. 316; *City of Atchison v. Byrnes*, 22 Kan. 65, or *Lucas v. Sturr*, 21 Kan. 480. We still adhere to the rule that, in order to review any errors of law occurring at the trial of an issue of fact, a motion for a new trial must be duly filed and considered by the trial court." (p. 50.)

The railroad's liability in this case was grounded on the statutory presumption of its negligence. (Gen. Stat. 1909, § 7079.) If there was any positive evidence offered by the plaintiff it was. disbelieved by the jury. (Finding No. 10.) The railroad company met and overcame the statutory presumption by its proof.

This necessitates a reversal of the judgment with instructions to enter judgment for the appellant on the jury's special findings of fact.

---

### No. 20,311.

THE STATE OF KANSAS, ex rel. THE STATE TAX COMMISSION OF THE STATE OF KANSAS, *Plaintiff*, v. A. J. KLINGINSMITH, as County Clerk, etc., et al., and THE INDEPENDENT SALT COMPANY, *Defendants.*

### No. 20,312.

THE STATE OF KANSAS, ex rel. THE STATE TAX COMMISSION OF THE STATE OF KANSAS, *Plaintiff*, v. A. J. KLINGINSMITH, as County Clerk, etc., et al., and THE CRYSTAL SALT COMPANY, *Defendants.*

### No. 20,313.

THE STATE OF KANSAS, ex rel. THE STATE TAX COMMISSION OF THE STATE OF KANSAS, *Plaintiff*, v. A. J. KLINGINSMITH, as County Clerk, etc., et al., and THE ROYAL SALT COMPANY, *Defendants.*

#### SYLLABUS BY THE COURT.

MANDAMUS—*Judgment Enjoining Collection of Tax—Binding on State Tax Commission.* A judgment against a county treasurer enjoining him from collecting a tax levied on certain property under an assessed valuation fixed by the state tax commission is binding on the commission.

Original proceedings in mandamus. Opinion filed March 11, 1916. Writs denied.

*S. M. Brewster*, attorney-general, and *John L. Hunt*, assistant attorney-general, for the plaintiff.

*Ira E. Lloyd*, and *N. F. Nourse*, both of Ellsworth, for the defendants.

The opinion of the court was delivered by

MARSHALL, J.: In these actions the state seeks to compel the county clerk of Ellsworth county to place on the tax rolls for the purpose of taxation the properties of defendant salt companies at the amounts assessed by the state tax commission.

Defendant salt companies' answer is that these matters have been adjudicated in actions in the district court of Ellsworth county, wherein the salt companies were plaintiffs, and the county treasurer and county commissioners of that county were defendants, in which actions the county treasurer and board of county commissioners were enjoined from collecting the taxes levied upon the assessment made by the state tax commission.

In 1914 the county assessor assessed the property of each of the defendants at certain figures. In May the county commissioners, as a county board of equalization, lowered these assessments. The county assessor then appealed to the state tax commission and that body raised the assessments. In January, 1915, the salt companies commenced their actions to enjoin the collection of the tax. June 17, 1915, judgments were rendered enjoining the county treasurer and the county commissioners from collecting taxes on these assessments and ordering the salt companies to pay taxes on the assessments as made by the county board of equalization.

The question for determination is, Does a judgment rendered by a district court enjoining the collection of a tax bind the state tax commission? Section 265 of the code of civil procedure in part reads:

"An injunction may be granted to enjoin the illegal levy of any tax, charge or assessment, or the collection of any illegal tax, charge, or assessment."

By this statute the state provides that its acts and the acts of all its departments in levying or in collecing any tax may be questioned, and a judgment may be rendered enjoining the levy or collection of that tax. The statute contemplates that the judgment shall be final and conclusive. The state tax commission fixed the valuation of the properties of defendant salt companies. The proper taxing officers levied taxes on all prop-

erty in their respective jurisdictions. The defendants then enjoined the county treasurer of Ellsworth county from collecting taxes on the assessments that were fixed by the state tax commission; and were by that judgment directed to pay taxes on their properties under the assessments as fixed by the county board of equalization. If the statute is to be given effect, one judgment that determines the validity of the tax is sufficient and that judgment binds all departments of the state government.

It is contended that the judgment is not binding on the state tax commission. That commission fixed the valuation of the properties and certified that valuation to the proper officers. They entered the valuation on the tax rolls. Taxes were levied according to law. The state tax commission then had nothing further to do with the matter.

The writ of mandamus is denied.

DAWSON, J. (concurring specially) : I am satisfied with the decision, but I wish to add that I very seriously doubt the right of the tax commission to litigate in the name of the state. (*State of Kansas v. Anderson,* 5 Kan. 90, 116; *The State, ex rel., v. Bentley,* 96 Kan. 344, 347, 150 Pac. 218.)

---

No. 20,314.

NICK F. ARNHOLD, *Appellee,* v. GUST KLUG et al., *Appellants.*

SYLLABUS BY THE COURT.

1. CITY OF SECOND CLASS—*Contract for Pumping City Water—No Previous Estimate of Costs Required.* The officers of a city of the second class owning and operating a $50,000 waterworks system have discretion to contract with an electric-light company to pump the water for the system and such contract is not for a work or improvement for which a previous estimate is required by section 1413 of the General Statutes of 1909. (Gen. Stat. 1909, § 1373; *Asher v. Water Co.,* 66 Kan. 496, 71 Pac. 813.)

2. SAME. Usually such a work or improvement implies some physical change or construction effecting an amelioration in the condition of the property involved.

3. SAME—*Parties—Injunction—Resident Taxpayer.* A resident taxpayer affected by the expense of such contemplated arrangement may maintain injunction if it appears that the city is proceeding without authority.

Arnhold v. Klug.

4. SAME—*Installation of Pump—Estimate of Cost by Engineer.* The necessity of an estimate of the cost of installing in the well of the plant referred to a motor-driven pump sufficient to operate such plant before contracting therefor, suggested.

5. SAME. Such estimate is required only when the city contracts with some other party to do or supply some such work or improvement for the city, and not when the city itself contracts so to do or supply for another.

Appeal from Ellis district court; JACOB C. RUPPENTHAL, judge. Opinion filed March 11, 1916. Reversed.

*David Ritchie, G. A. Spencer,* both of Salina, and *Charles W. Reeder,* of Hays, for the appellants.

No appearance was made for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff, a resident taxpayer of the city of Hays, brought this action to enjoin certain of the city officers and an electric-light company from entering into a certain contract. He alleged that the city has and operates a waterworks system costing about $50,000, the pumps and engines of which with their installation cost at least $9500, the engines having power sufficient to pump 50,000 gallons of water an hour and the pumps when working at full efficiency being sufficient to throw that amount of water an hour into the mains and tanks of the city; that an ordinance was enacted authorizing a contract with the electric-light company to pump all of the water for the city for five cents a thousand gallons, not to exceed $2000 for any year, the city to install a motor-driven pump in the large well at the city's pump house; that no estimate by the city engineer had been made of the cost of pumping water by motor-driven pumps, and that the cost of the city for pumping under the proposed contract would be greater than by the use of the present system. A temporary injunction was granted, and upon motion to dissolve certain evidence was heard and a modified order made enjoining the defendants from proceeding without first submitting an estimate from the engineer as to the cost of the work and materials called for in the contract, but not re-

37—97 KAN.

straining them from proceeding anew whenever such requirements should be met. Other matters were averred and other points considered which need not be mentioned. The defendants appeal and contend that neither the contract for pumping nor the agreement to install a motor-driven pump is a work or improvement within the meaning of section 1413 of the General Statutes of 1909 requiring an estimate, but are matters within the discretion of the city officials; and also that the plaintiff was not authorized to bring this suit. The plaintiff has filed no brief.

Chapter 122 of the Laws of 1911 authorizes the city to purchase, procure, provide and contract for the construction of various things, including electric current. Section 1413 of the General Statutes of 1909 provides:

"Before the city council shall make any contract for building bridges or sidewalks or for any work on streets, or for any other work or improvement, an estimate of the cost thereof shall be made by the city engineer and submitted to the council; and no contract shall be entered into for any work or improvement for a price exceeding such estimate."

This is section 68 of the city of the second class act of 1872 (Laws 1872, ch. 100), and is found in article 3, concerning the general powers of the mayor and council, and follows various sections providing for improvements, including streets, sidewalks, shade trees, market houses, hospitals, waterworks, levees and "all improvements of a general nature in the city." (Gen. Stat. 1909, § 1379.)

In considering a similar provision it was stated in *Kansas City v. Cullinan,* 65 Kan. 68, 68 Pac. 1099:

"It is quite apparent that the purpose of this section is to prevent fraud and imposition in the letting of contracts, as well as to inhibit the creation of a liability against the city by the mayor and council before the maximum cost of a proposed improvement shall be known." (p. 72.)

(See, also, *Abilene v. Lambing,* 78 Kan. 484, 96 Pac. 838.)

A work or improvement within the meaning of this section usually implies some physical change or construction. "Improvement" has been defined as—

"An amelioration in the condition of real or personal property effected by the expenditure of labor or money for the purpose of rendering it useful for other purposes than those for which it was originally used, or more useful for the same purposes. It includes repairs or addition to buildings, and the erection of fences, barns, etc." (2 Bouvier's Law Dictionary, Rawle's Third Revision, p. 1517.)

A "local improvement" has been defined as—

"A public improvement which by reason of its being confined to a locality, enhances the value of adjacent property, as distinguished from benefits diffused by it throughout the municipality." (*City of Chicago v. Blair*, 149 Ill. 310, syl. ¶ 4, 36 N. E. 829.)

In the same decision such an improvement was held to involve the idea of permanency. (See *I. C. R. R. Co. v. City of Decatur*, 154 Ill. 173, 176, 38 N. E. 626.) The change of the plan from doing the pumping to contracting to have it done by the electric-light company, aside from the installation of the pump in question, does not involve a physical construction or change, but appears to be within the general powers of the city officers. (Gen. Stat. 1909, § 1373; *Asher v. Water Co.*, 66 Kan. 496, 71 Pac. 813.)

It is contended that the provisions of section 265 of the civil code, that "any number of persons whose property is or may be affected by a tax or assessment so levied, or whose burdens as taxpayers may be increased by the threatened unauthorized contract or act, may unite in the petition filed to obtain such injunction," are not sufficient to authorize the maintenance of this suit by the plaintiff.

Decisions are cited as to the special interest in the subject matter of the action that one must have before he can be a plaintiff. This section has been passed upon, however, and in *Gas Co. v. Railway Co.*, 74 Kan. 661, 87 Pac. 883, the right of an individual taxpayer to maintain such a suit was upheld. This was followed and approved in *Meistrell v. Ellis County*, 76 Kan. 319, 91 Pac. 65.

A careful examination of the record shows that while the contemplated contract involves the installation by the city of the motor-driven pump referred to, it does not appear that the city has contracted with any one for erecting or furnishing such pump. Section 1413 covers contracts made by the city with some other party for some work or improvement to be furnished or supplied by such party to the city, and does not apply under the circumstances here presented. Very likely, before the city enters into a contract with any one to furnish or install for it such pump, an estimate of the cost will be

necessary, but this question is not now before us and is not decided.

The arrangement thus far appears to be within the discretion of the city officials. The modified order of injunction is therefore reversed.

---

No. 20,358.

EMELIA NEW, and ROBERT H. CLOGSTON, as Trustee of Emelia New, a Convict, *Appellees* and *Appellants*, v. J. A. SMITH, *Appellant* and *Appellee*, and H. M. BROWN.

### SYLLABUS BY THE COURT.

1. EJECTMENT—*Mortgages Paid by Tenant—Offset by Rents and Profits —Statute of Limitations.* When a defendant has wrongfully withheld possession of plaintiff's farm for many years, but who on the broadest principles of equity is allowed a claim for mortgages paid by him, the plaintiff may set up a claim for the reasonable rental value of the farm to meet defendant's claim, and the statute of limitations is no bar to such claim for rents and profits, following section 102 of the civil code.

2. SAME—*Protracted Litigation—Duty of Court of Equity.* When a lawsuit has been in court for fourteen years, during which time it has been appealed to the supreme court five times, it is imperative that some broad general principles of law and equity be rigorously applied, and the litigation brought to a close and final judgment ordered. This rule applied here.

Appeal from Greenwood district court; ALLISON T. AYRES, judge. Opinion filed March 11, 1916. Modified.

*John Stowell,* of Seneca, *R. H. Clogston, L. E. Clogston,* both of Eureka, *A. E. Crane,* of Atchison, *E. D. Woodburn,* and *F. T. Woodburn,* both of Holton, for plaintiff Emelia New *et al.*

*T. A. Kramer,* of El Dorado, for defendant J. A. Smith.

The opinion of the court was delivered by

DAWSON, J.: This is the fifth time this case has been before this court. (*New v. Smith,* 68 Kan. 807, 74 Pac. 610; 73 Kan. 174, 84 Pac. 1030; 86 Kan. 1, 119 Pac. 380; 94 Kan. 6, 145 Pac. 880.) It would serve no good purpose to restate the

details of the litigation. The curious and the studious may refer to its earlier chapters in the reports of this court.

It is chiefly a lawsuit for the recovery of a farm. When the case arose, the plaintiff was a prisoner in the penitentiary for the murder of her husband. Her life sentence was commuted by Governor Leedy, and some years ago she received a pardon from Governor Hoch.

This lawsuit has become a public nuisance, and it must be concluded. The last time it was here the court, in the hope of terminating this controversy, suggested how it might be done. It was held that although the plaintiff was entitled to the recovery of her farm, the defendant had an equitable claim for mortgages paid by him, and that if there was a claim for rents and profits, pleadings pertaining thereto might be filed, the amount ascertained and the litigation closed.

When the case was remanded to the district court, a so-called supplemental petition was filed, claiming rents and profits for the years 1898 to 1910 inclusive—another and separate action having theretofore been filed for the rents for the years 1911, 1912 and 1913—and asking for an accounting; and if an accounting could not be had, that she be awarded the reasonable value of the rents, and that so much thereof as necessary be applied to the satisfaction of the mortgages paid by defendant, and for further equitable relief, etc.

To this a technical demurrer was filed, as if the broad principles of equity had nothing to do with the case—those very principles which had been applied by this court most generously in defendant's behalf to refund to him the amount of the mortgages paid off, notwithstanding he was a trespasser *ab initio,* having acquired possession of Mrs. New's farm in January, 1898, from one who had defrauded her of it, with defendant's constructive or actual notice of the fraud, as has been heretofore adjudicated. The demurrer set up a denial of jurisdiction, another action pending, no cause of action, and improper joinder. The demurrer was overruled. Defendant then answered, setting up the action pending for the rents for the years 1911-1913; that the instant cause had not accrued within two years, nor within three years, nor within five years, nor within fifteen years; that he had paid off a mortgage on one quarter section for $325 in December, 1898, and another mortgage on the same quarter section for $682.37 in

March, 1907; and that he paid off still another mortgage on an additional eighty acres of the farm for $444.70 in March, 1907; that he had expended certain sums for the maintenance and improvement of the property; that he had paid the taxes for 1898 and succeeding years, and that he did not know what rents had been collected and could not make an accounting thereof.

The court found that the fair and reasonable rental value of the farm was $325 per annum, being $200 for the quarter section and $125 for the additional eighty acres.

Findings of fact and conclusions of law were made by the trial court, but too extended for repetition here. Both parties appeal, with long assignments of errors.

The most practical way to deal with these matters is to consider very briefly what has already been determined in this case.

In the first appeal, decided in 1903, the pleadings were in question, and while they were held to be defective, the petition attempted to state a cause of action in ejectment, a cause of action for relief on the ground of fraud and for the rents and profits then accrued. The action had been begun on April 2, 1901. This data is gleaned from the files of this court.

In the second appeal, decided in 1906, the petition was again the subject of criticism, but it continued to urge a cause of action in ejectment and for rents and profits.

In the third appeal, decided in 1911, the petition still recited a cause of action in ejectment, but claimed nothing for rents and profits unless that be assumed from the prayer for "all other proper relief." But among the many defenses set up in the answer, filed January 21, 1908, nothing was mentioned concerning the mortgages paid by defendant. That defense, or equitable claim, had not yet been raised, although one of the mortgages had been paid in 1898, nearly ten years before, and the other two had been paid about ten months before the answer was filed. This court held that while the action sounded in ejectment, it was in essence an action for relief on the ground of fraud.

In the fourth appeal, decided in 1915, the petition was substantially the same as in the third appeal, and the answer was simply a general denial except as to an admission of defend-

ant's possession of the premises. While this was all that was technically necessary to raise every possible defense, it is worthy of note that defendant's claim for mortgages paid by him was first raised in the oral statement of his counsel at the trial in May, 1913, over twelve years after this lawsuit was begun! This court modified the judgment of the district court, affirming plaintiff's judgment for the recovery of her farm, but granting to defendant an equitable claim, somewhat akin to that of a mortgagee in possession, for the payment of the mortgages by him during the years when he wrongfully held the plaintiff's property.

The district court found that the reasonable rents of the quarter section far exceeded the mortgages and taxes paid thereon by defendant, and allowed them to be set off against each other, and no further. (Civ. Code, § 102.) For no very logical reason apparent to us, a somewhat different consideration was given to the status of the additional eighty acres. Perhaps this was on the ground that although the eighty acres was an integral part of the farm and that although the defendant had wrongfully held the possession thereof for all these years, he acquired a colorable right in equity to hold the eighty acres in March, 1907, by paying off the mortgage on it, which altered his situation as a trespasser—his status for the preceding nine years. It was apparently on this theory that by the trial court's mathematical computations, which we will not analyze, a balance of $70.59 was still due to defendant before plaintiff would be let into possession of the eighty acres. Apparently no consideration, or allowance, was accorded to plaintiff for the reasonable rental use of the eighty acres for the first nine years of defendant's wrongful possession.

It ought to be apparent that defendant's contentions as to the statute of limitations have no place in this lawsuit. In the early years of the litigation, the plaintiff's petitions, however crude and in need of the amendments made from time to time, persisted in a claim for rents and profits. True, the specific claim therefor was dropped as the years went by and as the case went from court to court; but it should be borne in mind that the lawsuit was a dozen years old before she was called upon to meet defendant's claim for mortgages paid. And in fairness and equity it must be borne in mind also that the rea-

sonable rents and profits of the farm, always equitably due to plaintiff, were invariably equal to and aggregated more than enough to meet the mortgages, taxes, repairs and improvements made by defendant. So it is not a very unreasonable contention made by plaintiff's counsel when they urge that all of defendant's expenditures were made with moneys equitably belonging to plaintiff.

When the plaintiff recovered judgment in the district court for the possession of the farm in May, 1913, she very naturally filed a new action for the rents and profits for the three preceding years, on the assumption that she was barred by the statute of limitations from claiming rents for the thirteen earlier years. But this court held that she must reimburse the defendant for the mortgages paid by him. This equitably entitled her to claim rents and profits for all the years she was dispossessed. The code says:

"When cross-demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim or set-off could have been set up, neither can be deprived of the benefit thereof by the assignment or death of the other or by reason of the statute of limitations; but the two demands must be deemed compensated so far as they equal each other." (Civ. Code, §102.)

She should, of course, have dismissed the separate action for the rents for the years 1911, 1912 and 1913, and amended her petition, setting up all the rents due her. And yet that would have availed her but little, seeing that the rents which she did claim from 1898 to 1910 were more than sufficient to compensate defendant for the mortgages, interest, taxes and farm expenses, and she was not permitted to recover the surplus. This, of course, was according to law, for the bar of the three years' statute on the recovery of rents and profits (Civ. Code, § 17, subdiv. 2; *Gatton v. Tolley*, 22 Kan. 678) would only be taken down in her favor to meet the defendant's cross-demands so far as they equaled each other. (Civ. Code, § 102.) It does follow, however, that since her claim for the rents of 1911, 1912 and 1913 could have been presented and adjudicated here, and if adjudicated here it would have only served as a set-off to the mortgages, and, as we have seen, the mortgages were sufficiently met by the rents which she did set up, and because this cause, covering this general matter, has pro-

ceeded to judgment, the claim for the rents for the years 1911, 1912 and 1913 may be deemed to be abandoned. We recognize that what we say touching this last proposition is not squarely before the court; but it was pleaded; it was recognized by the court in its findings, and we are urged to say what we think about it; and owing to the extraordinary duration of this litigation, and still persisting in the hope of concluding this controversy, as expressed by Mr. Justice West in the last appeal, we suggest that the case touching the rents and profits for the years 1911, 1912 and 1913 be dismissed.

Some criticism is made touching the apportionment of the costs in the district court. The court exercised its best judgment, and we do not see any serious occasion or any very tangible basis for our interference. The costs of this appeal will be divided and the judgment modified by setting aside the finding that $70.59 is still due defendant on the mortgage covering the eighty acres paid in 1907, with instructions to find that it has likewise been met and satisfied by the rents which he has been permitted to keep; and thus modified, the judgment is affirmed.

---

No. 20,382.

THE STATE OF KANSAS, ex rel. S. M. BREWSTER, as Attorney-general, etc., *Appellee,* v. THE GRAND LODGE OF THE ANCIENT ORDER OF UNITED WORKMEN OF THE STATE OF KANSAS et al., *Appellants.*

SYLLABUS BY THE COURT.

FRATERNAL INSURANCE—*United Workmen—Certificate Holder Seventy-five Years Old—Certificate Must be Paid in Full at Death.* Under section 4303 of the General Statutes of 1909, a fraternal beneficiary association can not discharge its obligation to a member who has reached the age of seventy-five years and is in needy circumstances, except by paying on the death of the member the amount provided in the certificate, although the association adopts a by-law authorizing such settlement of its obligation.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed March 11, 1916. Affirmed.

*H. P. Farrelly*, and *T. R. Evans*, both of Chanute, for the appellants.

*S. M. Brewster*, attorney-general, and *John H. Crider*, of Fort Scott, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: In this action the plaintiff seeks to enjoin the defendant from proceeding under a by-law adopted by it. The plaintiff recovered judgment and the defendant appeals.

The defendant, The Grand Lodge of the Ancient Order of United Workmen, is a fraternal beneficiary association organized under the laws of this state for the following purposes: ·

"The purpose for which this corporation is formed shall be the mutual benefit of the members of the Ancient Order of United Workmen of the State of Kansas, and for the purpose of insuring the lives of the members of that order in accordance with the rules and regulations thereof."

The Ancient Order of United Workmen has been doing business in this state for a number of years. In March, 1915, it adopted a by-law, which in part is:

"SEC. 1. That any member of the Ancient Order of United Workmen of Kansas, that is in good standing and has attained the age of seventy-five years, may have a settlement with the Grand Lodge upon his insurance contract and certificate, by and with the consent of the Grand Lodge officers as herein provided, and by and with the consent of his beneficiary or beneficiaries, under the conditions and according to the provisions of this act and not otherwise.

"SEC. 2. Any such member who shall have attained the age of seventy-five years and is in needy circumstances, may be paid in such settlement such sum of money, not exceeding the amount such member may have paid into the beneficiary fund on the amount or face of his certificate, at such time as may be agreed upon in writing by and between such member and his beneficiary or beneficiaries, and the Finance Committee of the Grand Lodge, by and with the approval of the Grand Master Workman and the Grand Recorder; and upon the payment of the amount agreed upon, such member shall surrender his certificate, which shall be cancelled, and thereafter all financial obligations between such member, his beneficiary or beneficiaries, and the Grand Lodge, shall be terminated.

"SEC. 5. Nothing contained in this act shall be construed to in any manner, directly or indirectly, require or obligate the Grand Lodge to enter into or make such settlement as herein provided, but its actions as well as that of the member and his beneficiary or beneficiaries, shall be purely and wholly voluntary. And nothing contained in this act shall

in any manner, directly or indirectly, excuse or relieve any such member from paying his dues and assessments in full, promptly, as provided by the laws of the Order, until full and final settlement is consummated and his certificate cancelled."

The sole question in this case is the validity of this by-law.

The Ancient Order of United Workmen derives its authority to do business from section 4303 of the General Statutes of 1909, which in part is:

"Every fraternal beneficiary association . . . shall make provision for the payment of benefits in case of death, and may make provision for the payment of benefits in case of sickness, temporary or permanent disability, either as a result of disease, accident or old age: *Provided*, The period of life at which physical-disability benefits on account of old age commences shall not be under seventy years."

The charter powers of the association are in subordination to this statutory provision. Under this statute it is authorized to make provision for the payment of benefits in case of death, sickness, temporary or permanent disability. Under the by-law in question the association seeks to pay a sum less than that named in the certificate to those of its members who have attained the age of seventy-five years, without regard to disability, and thereby discharge its obligation to pay on the death of the member. In *Kirk v. Aid Association,* 95 Kan. 707, 149 Pac. 400, this court said:

"A fraternal aid association, under a charter granted in 1894 authorizing it to bestow substantial aid upon totally disabled members, and under section 4303 of the General Statutes of 1909, is not authorized to issue a certificate providing for the payment of a specified sum to the holder thereof upon his reaching the age of seventy years, without regard to whether or not there is any disability, and if such a certificate was issued it can not now be enforced against the association." (Syl. ¶1.)

The court further said:

"This statute [Gen. Stat. 1909, § 4303] does not in terms permit the payment of any sum to the holder of a certificate upon his reaching the age of seventy years. In addition to reaching that age, he must be either temporarily or permanently disabled, by reason of his age. The certificates issued by the association must be those authorized by the statute, or they can not be enforced. The certificate issued by the defendant in this case provides for payment upon the holder's attaining the age of seventy years, without regard to disability. The statute does not authorize this payment." (p. 711.)

The Ancient Order of United Workmen could not enter into a contract with any of its members by which it obligated itself

to do that which it now seeks to do by virtue of this by-law. Such a contract would have been nonenforceable, under *Kirk v. Aid Association,* supra. If the defendant can now make this kind of a settlement with its old members, it could have contracted with them in the first place to make this payment under the conditions named in the by-law. The defendant association can not now legally do that which it could not legally contract to do.

The association argues that the question of issuing certificates of insurance is not here involved, that this by-law provides for the settlement of maturing obligations and for that reason will be beneficial to the organization. All the defendant's obligations are maturing. It issues a certificate to a man twenty-five years old. The presumption is that such certificate will mature by death. When it matures it must be paid. The defendant is not authorized by law to discharge one of its obligations before the death of its member. The statute says the association "shall make provision for the payment of benefits in case of death." That must be done.

The judgment is affirmed.

---

No. 20,395.

THE STATE OF KANSAS, *Appellant,* v. T. J. LYONS, *Appellee.*

### SYLLABUS BY THE COURT.

OUSTER—*County Officer—Findings Sustained by Evidence.* The material portions of findings of fact returned in an action to remove a county officer from office held to be sustained by sufficient evidence.

Appeal from Wyandotte district court, division No. 3; HUGH J. SMITH, judge. Opinion filed March 11, 1916. Affirmed.

*S. M. Brewster,* attorney-general, *W. P. Montgomery,* of Topeka, *James M. Meek,* and *H. E. Dean,* both of Kansas City, for the appellant.

*J. H. Brady, James F. Getty, L. W. Keplinger,* and *C. W. Trickett,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action in the district court was one to oust the defendant from office as a member of the board of county commissioners of Wyandotte county. Judgment was rendered in his favor and the state appeals.

The assignments of error which are argued are that various findings of the trial court are not sustained by any evidence whatever. There is sufficient evidence in the abstracts to sustain the material portions of each finding. No useful purpose would be subserved by debating the matter, and the ordinary rules, long established and well understood, govern.

The judgment of the district court is affirmed.

DAWSON, J., not sitting.

---

No. 20,415.

THE CITY OF WICHITA, *Appellee*, v. E. A. LEWIS, *Appellant*.

SYLLABUS BY THE COURT.

CITY ORDINANCE—*Regulating Sale of Nonintoxicating Beverages—Limits of Title.* The title of a city ordinance which reads, "An ordinance regulating the sale, barter and gift of Malt, Hop Tea, Hop Tea Tonic, Two Percent, Tin Hop, Health Tone, Rosenbrew, and all other nonintoxicating malt or other beverages containing any per cent of alcohol whatever," is not broad enough to include a provision in the body of the ordinance attempting to regulate the sale of nonintoxicating beverages that contain no per cent of alcohol, and that part of the ordinance is void because in conflict with section 1060 of the General Statutes of 1909.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed March 11, 1916. Reversed.

*C. V. Ferguson,* and *E. J. Dierks,* both of Wichita, for the appellant.

*James A. Conly,* city attorney, and *S. S. Hawks,* assistant city attorney, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The appellant was convicted of the charge of violating a city ordinance by making a sale of one glass of a beverage "known as and commonly called "Temp-Brew." The validity of the ordinance is the sole question raised by the appeal.

The city of Wichita is a city of the first class. In 1909 it passed an ordinance the title of which reads:

"An ordinance regulating the sale, barter and gift of Malt, Hop Tea, Hop- Tea Tonic, Two Percent, Tin Hop, Health Tone, Rosenbrew, and all other nonintoxicating malt or other beverages, containing any per cent of alcohol whatever, in the city of Wichita, and providing a penalty for the violation of this ordinance, and repealing ordinance number 3187 and all other ordinances or parts of ordinances in conflict with this ordinance."

The words *"containing any per cent of alcohol whatever"* appear in the title, but are omitted in the body of the ordinance.

The provision of the ordinance which appellant was charged with violating is that part of section 1 which reads:

"That it shall be unlawful for any person or persons to sell, barter or give away in the city of Wichita, any Malt, Hop Tea, Hop Tea Tonic, Two Percent, Tin Hop, Health Tone, Rosenbrew, or any other nonintoxicating malt or other beverage in less quantities than one (1) gallon at a sale."

At the trial the cause was submitted upon an agreed statement of facts, which is embodied in the court's findings. This statement is, that the beverage sold by the appellant was known as "Temp-Brew"; that it had been subjected to a chemical analysis which showed that the beverage contained "no alcohol, maltose, malt, or yeast cells, and that it furnished no evidence of fermentation." The court found it to be "a beverage having the color and appearance of beer" and "an odor similiar to beer," that when drawn from a keg it "foams like beer, but does not taste like beer, and that it is a brewery product" which "in color, odor, and appearance as to foaming is very similar to 'Two-Percent' but not similar in taste."

All parts of the ordinance, including the title, should be read together in order to determine the object and purpose of its enactment. The title shows that the city intended to prohibit the sale of all beverages which are specifically enumer-

ated therein and "all other nonintoxicating beverages containing any per cent of alcohol whatever." It is unreasonable to suppose that it was intended to prohibit the sale of all nonintoxicating beverages, although section 1 reads, "or any other nonintoxicating malt or other beverage," for literally the ordinance would prohibit the sale, in quantities less than one gallon, of lemonade, tea, milk, soda-pop, coffee, buttermilk, and all kinds of beverages usually dispensed at drug stores and soda founts, regardless of whether they are intoxicating or nonintoxicating.

It is more in accord with reason to hold that it was the intention of the city to prohibit the sale, in quantities less than one gallon, of all nonintoxicating beverages containing any per cent of alcohol whatever. If, as argued by the city, it was the intention to prohibit the sale of any beverage which is a brewery product, whether intoxicating or nonintoxicating, and regardless of whether it contains any per cent of alcohol, then the ordinance would be open to the objection that it is unreasonable and void. The legislature has not authorized cities to prohibit the sale of harmless beverages merely for the reason that they are manufactured in breweries. A brewery might engage in the manufacture of grape juice, soda-pop, bottled lemonade, or other harmless beverages.

But there is no occasion for speculation concerning the motive or wisdom or propriety of the provisions which appellant is charged with violating. The broad language of section 1 of the ordinance is necessarily limited by the language of the title. (Gen. Stat. 1909, § 1060; *City of Winfield v. Hackney,* 87 Kan. 858, 126 Pac. 1088, and cases cited in the opinion.)

Referring to the constitutional provision in regard to the title of a statute it was said:

"Where the title to an act is not broad enough to include everything contained in the act, that which is not included within the title must be held to be invalid, for such is evidently the manifest intention of the constitution; and the courts have no power to enlarge or extend or amplify the title to an act, any more than they have to enlarge or diminish or modify or change the act itself." (*The State v. Barrett,* 27 Kan. 213, syl. ¶ 9.)

Nothing in the title indicates a purpose to classify the products of breweries and prohibit or regulate their sale; and it

is equally silent as to any purpose to regulate or prohibit the sale of beverages not containing some per cent of alcohol. The title is sufficiently broad to include the regulation of the sale of all beverages "containing any per cent of alcohol whatever" in addition to the particular beverages specifically mentioned in the title; but in order to hold that it includes the regulation of the sale of beverages that do not contain "*any per cent of alcohol whatever*," requires us to legislate something into the title which is not there. This we are forbidden to do. (*The State v. Barrett, supra.*) The ordinance is penal and must be construed strictly, the same as a criminal statute; which means "that the language is not to be extended by implication so as to embrace cases or acts not clearly within the prohibition of the statute." (*The State v. Prather,* 79 Kan. 513, 515, 100 Pac. 57, 21 L. R. A., n. s., 23, 131 Am. St. Rep. 339.)

The provisions of section 1 of the ordinance, so far as they apply to the admitted facts in this case, not being included in the language of the title, are in conflict with section 1060 of the General Statutes of 1909, and therefore must be held void.

The judgment is reversed.

---

No. 20,418.

THE STATE OF KANSAS, ex rel. C. L. RANDALL, as County Attorney, etc., *Appellee,* v. R. S. LITCHFIELD et al., as Receivers of the Kansas Natural Gas Company, et al. (THE OLATHE GAS COMPANY, *Appellant*).

### SYLLABUS BY THE COURT.

GAS—*Olathe Gas Company—Agent and Distributor for Kansas Natural Gas Company—Rates Subject to Control of Utilities Commission.* Under the provisions of a contract herein set forth between the Olathe Gas Company, which had a franchise from the city for the sale and distribution of gas to the inhabitants of the city, and a gas company which had a trunk line through the state and furnished gas to this and other companies, to be distributed and sold by them to their patrons, and also under the agreed facts herein, it is held, that the Olathe Gas Company is acting as the agent of the trunk-line company in the distribution and sale of gas, and that it is therefore subject to the jurisdiction and control of the public utilities commission in the matter of fixing rates to be charged for gas sold to consumers.

Appeal from Johnson district court; JABEZ O. RANKIN,, judge. Opinion filed March 11, 1916. Affirmed.

*C. D. Walker,* of Atchison, and *W. F. Guthrie,* of Kansas: City, Mo., for the appellant.

*C. L. Randall,* of Olathe, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: A temporary restraining order was obtained, at the instance of the state, against R. S. Litchfield and John M. Landon, receivers of the Kansas Natural Gas Company, and also the Olathe Gas Company, preventing them from advancing the existing rate for gas in the city of Olathe and in Johnson county. The Olathe Gas Company moved to dissolve the injunction, and it was agreed by the parties that the hearing upon the motion should be treated as one on the application of the Olathe Gas Company to vacate and on the application of the plaintiff for a temporary injunction. The motion was denied and the temporary injunction issued, and the Olathe Gas Company appeals.

The Olathe Gas Company was engaged in furnishing natural gas to the inhabitants of Olathe and a number of patrons along its line in Johnson county. The gas furnished was partly obtained from its local fields and an additional supply was obtained from the Kansas Natural Gas Company, with whom it had entered into a contract for a portion of its supply. The Olathe Gas Company was operated under a franchise granted by the city of Olathe on August 7, 1908, to parties whose rights had been assigned to that company, which authorized the company to charge twenty-five cents per thousand feet of gas for one year after the franchise became effective and thereafter thirty cents per thousand. At the time of this suit the one-year limit had expired and the company had given notice of a proposed advance in the rate. At the time the franchise was granted the Olathe Gas Company had been supplying its customers from the local wells which it owned, but within a few days after the franchise was obtained the company entered into the contract with the Kansas Natural Gas Company for an additional supply of gas. In fact, the Olathe franchise was obtained in contemplation of making the contract with the

Kansas Natural Gas Company. Since the execution of that contract the principal part of the gas has been furnished by the Kansas Natural Gas Company, and that, with the gas obtained from the local wells, has made, we are told, an adequate supply for the people of the city. The Kansas Natural Gas Company, with which the Olathe Gas Company contracted, has been engaged in transporting gas through Kansas and into Missouri. The gas which it has sold has been delivered to consumers in the communities and cities along its pipe lines by distributing companies that were operating under franchises granted by the respective municipalities. The contract with the Olathe Gas Company differs from that made with other distributing companies in that part of the supply of gas furnished the people of Olathe and the nineteen patrons outside has been obtained from its own wells. In a litigation between the state and the receivers of the Kansas Natural Gas Company as well as the distributing companies, it was determined that the power of fixing the rates to be charged consumers was vested in the public utilities commission and that application for an increase in rates must first be presented to that commission. (*The State, ex rel., v. Flannelly,* 96 Kan. 372, 152 Pac. 22.) The trial court at first granted the temporary injunction preventing the proposed increase of the rate from twenty-five cents to thirty cents per thousand, but at a later time and after a showing that the public utilities commission had made an order permitting distributing companies to charge twenty-eight cents per thousand, the court modified its former order so as to permit the Olathe Gas Company to charge the twenty-eight-cent rate as fixed by the utilities commission.

The contention of the Olathe Gas Company is that it has a franchise from the city of Olathe, a city of the second class, which permits it to charge the thirty-cent rate; that the company is principally engaged in supplying the people of the city of Olathe, since it furnishes gas to no one outside of the city except to nineteen farmers residing near its pipe line; and that the public utilities commission has no authority to fix the rate which it shall charge. On behalf of the state it is contended that the Olathe Gas Company, under its contract with the Kansas Natural Gas Company in contemplation of which the Olathe franchise was obtained, became the agent of the

Kansas Natural Gas Company and is therefore subject to the jurisdiction of the public utilities commission.

If the contention of the state is correct the order of the district court must be upheld. No question is raised as to the validity of the franchise obtained from the city of Olathe nor as to the purpose of any of its provisions. It does not appear that the city has attempted to change the rates specified in the franchise and it does appear that the public utilities commission has not authorized an increase of the rate. Neither party has offered testimony as to what would be a reasonable or compensatory rate to be charged for gas. The controlling question in the case is whether the Olathe Gas Company, in the position which it has chosen to take, is subject to the jurisdiction of the public utilities commission so that the rate to be charged for gas can not be increased except with the concurrence and authority of that tribunal. If it is an agency of the Kansas Natural Gas Company and its receivers in the sale and delivery of gas to the consumers, it is necessarily within the jurisdiction of the utilities commission. In *The State, ex rel., v. Flannelly,* supra, the relation of the distributing companies to the Kansas Natural Gas Company was considered, and it was said "these distributing companies act as the agents of the Kansas Natural Gas Company in the distribution and sale of gas." (p. 378.) The relationship of the distributing companies to the Kansas Natural Gas Company was practically conceded in that case, but it is insisted here that the Olathe Gas Company stands in a different relation because of the peculiar provisions in its contract and under which it sells and distributes more gas than is obtained from the Kansas Natural Gas Company. The provisions of the contract which it made with that gas company must determine the capacity in which it is acting.

In describing the parties to the contract the Kansas Natural Gas Company is designated as the "gas company" and the Olathe Gas Company as the "agent." The relations of the parties were considered when the contract was executed, and that the franchise from the city must be considered in connection with the contract in determining the relationship follows from the recitals in the latter. It is recited that the agent is about to become the owner of a franchise to maintain

a system for the sale and distribution of gas in the city, and has some wells about nine miles from the city from which it has been obtaining gas, but this supply has become insufficient and is expected to diminish until it is exhausted, and that therefore the Olathe Gas Company has asked for the appointment as agent of the Kansas Natural Gas Company, and that the appointment had been made. It is agreed, in effect, that the gas company would lay a branch line from its trunk line to the limits of the city and should install a reducing station there through which gas would be delivered into the system of the agent; that the gas company should deliver a volume of gas sufficient, with what the agent obtained from the local wells, to maintain a pressure not exceeding six ounces to the square inch, and if unable to furnish that pressure to all distributors it would furnish a *pro rata* share of its production. The agent of the company is specifically given "the sole and exclusive agency to distribute, market and sell its natural gas for domestic and manufacturing purposes," the agency to continue until August 7, 1928. This exclusive agency is declared to be a personal one which can not be transferred without the consent of the gas company. It is agreed that the agent shall keep up its system of pipes, mains and attachments in a condition sufficient to supply the inhabitants with gas and distribute and sell the same to the people, and that all the expense of maintaining the system and of making the sale and distribution is to be borne by the agent. It is required to charge a certain maximum rate to consumers, and a penalty is to be assessed against those who fail to pay bills promptly when due, and a minimum rate is to be fixed. The agent agrees to sell no gas for other than domestic purposes without the written consent of the gas company, and it is provided that it may sell for manufacturing purposes at prices to be fixed by the gas company, but that the right to do this may be withdrawn by the gas company absolutely or it may fix new prices and terms which likewise will be subject to withdrawal at its pleasure. The agent agrees to furnish and install meters through which it shall receive gas from its local fields, and during the months of December, January and February it is to receive all the gas which, with that obtained from the local fields, will fully supply the demand, and through each of the

other nine months to receive the same proportion sold for that month as the amount received by it from the gas company during the three preceding months of December, January and February bears to the total receipts from the gas company and local wells during those three months, but that during each of the nine months the agent shall account and settle for such proportion of gas "whether it receives the same in that month or not, the Gas Company being ready and able to deliver it." Provisions are made for measuring the gas received from the different sources of supply, and it is specified that no part of the gas furnished free by the agent to the city shall be charged against the gas company until the supply from the local fields is exhausted. It is further provided that the agent shall distribute and sell the gas delivered to it and account to the gas company for sixty-six and two-thirds per cent of the gross sales, including the minimum charges and penalties for delinquencies in payment, and seventy-five per cent of that sold for manufacturing purposes. The agent agrees to read its meters, and to keep copies of all contracts and accounts with consumers, which shall always be open for inspection by the gas company. In consideration of the exclusive agency granted by the gas company, the agent agrees that it will not distribute and sell the gas of other persons and companies. In the contract "it is expressly understood and agreed that the title to the gas which shall be delivered to the Agent by the Gas Company for sale under the terms hereof shall be and remain in the gas company until sold and delivered to the consumer," but that the agent is to accept the gas at the reducing station and bear all the risk and expense of distribution after the gas has passed that station. There are many other provisions in the contract, but these are the ones that bear most directly on the relationship of the parties.

The provisions of the contract indicate that the Olathe Gas Company, which designated itself as agent of the Kansas Natural Gas Company, intentionally entered into the relationship of agency with that company. The name given or assumed is not controlling, of course, but the intention and character of the relationship is sufficiently shown by the undertakings of the parties. The contract contains evidence both

of the appointment by the principal and its acceptance by the agent. While the agent bears the expense in the distribution and includes some of its own gas in that which it distributes through its mains, it is done under the supervision and control of the gas company; and that there might be no question of its control and of its position as principal, the contract expressly recites that the gas company shall remain the owner of the gas until its delivery to the consumers. By the contract the Olathe Gas Company has in effect made itself and its system of distribution a part of the system of the Kansas Natural Gas Company. As we have seen, the obtaining of the franchise was one of the considerations for entering into the relationship and the privileges of the franchise are made subjects of the contract. Together they show that the re-relationship is that of principal and agent rather than buyer and seller. Nothing is seen in the contract with the Olathe **Gas Company which takes it** out of the decision made in *The State, ex rel., v. Flannelly*, 96 Kan. 372, 152 Pac. 22, as to the attitude of the distributors, where it was held that the distributing companies are to be regarded as the agents of the gas company, and in the matter of rates are subject to the control of the public utilities commission.

The judgment of the district court is affirmed.

---

No. 20,474.

THE CITY OF PRATT, *Plaintiff*, v. W. E. DAVIS, as State Auditor, etc., *Defendant.*

SYLLABUS BY THE COURT.

SEWER BONDS—*Assessments—Interest Thereon—Injunction—Limitation of Actions.* Certain sewer bonds bearing interest at five per cent were not irregularly or illegally issued because the ordinance levying special assessments for such improvement provides for interest on such assessments at seven per cent. The thirty-day limitation for attacking such assessments (Laws 1911, ch. 124, § 1) having expired before such bonds were presented to the respondent for registration, their registration is required.

Original proceeding in mandamus. Opinion filed March 11, 1916. Writ allowed.

*W. B. Hess,* of Pratt, for the plaintiff.

*S. M. Brewster,* attorney-general, and *James P. Coleman,* of Topeka, for the defendant.

The opinion of the court was delivered by

WEST, J.: The city of Pratt brings this original proceeding in mandamus to compel the state auditor to register certain sewer bonds issued by the city. The refusal to register is upon the grounds that while the bonds bear five per cent interest the special assessments draw seven per cent, and that, therefore, the auditor can not certify under the seal of his office upon such bonds the fact that they have been regularly and legally issued. (Gen. Stat. 1909, § 581.)

Section 1466 of the General Statutes of 1909 provides that when bonds are issued for the payment of the cost of any improvements which are a charge against specific property the mayor and council shall apportion such special assessment by ordinance, and the city clerk shall annually certify the amounts due on the tracts, which shall include the annual installments "and interest on all unpaid balances for one year at a rate not to exceed seven per centum per annum." Prior to this enactment section 1022 of the General Statutes of 1901 required an interest rate of eight per cent.

Section 1 of chapter 124 of the Laws of 1911 provides that such assessment shall be certified to the county clerk and by him placed upon the tax roll for collection, "subject to the same penalties, entitled to the same rebates, and collected in the same manner as other taxes"; that none of the bonds shall bear interest at a rate exceeding six per cent per annum; that such bonds shall not be issued in excess of the actual cost of improvement except that the installment coupon shall include interest on such installment to the maturity thereof; that when the cost is charged against specific property by special assessment "the mayor and council shall levy special assessments each year sufficient to redeem the installment of such bonds next thereafter maturing."

Section 1 of chapter 111 of the Laws of 1915, concerning such improvements in cities of the first class, expressly provides that the interest shall be the same as the rate provided for in

the bonds, but no such provision is found in the law relating to cities of the second class.

The statutes already referred to make the two requirements that the assessment shall bear interest and shall be sufficient to provide for the installment due. With the rebates allowed, the proceeds of these assessments may not be any more than sufficient.

Nothing irregular appears in the proceedings so far as the bonds themselves are concerned, and the thirty-day limitation for bringing proceedings to enjoin the levy of special assessments had expired when the bonds were presented to the auditor and he may properly certify and should certify that they were legally and regularly issued.

The writ is allowed.

---

No. 20,484.

*In re* NINA WILL, *Petitioner.*

SYLLABUS BY THE COURT.

HABEAS CORPUS—*City Ordinance—Case Pending—Jurisdiction in Habeas Corpus.* Rule followed that the supreme court will not interfere with the orderly jurisdiction of an inferior court by summary discharge of a petitioner on habeas corpus, when the petitioner's cause is still pending and undetermined in such lower court, and where all the objections to the validity of the proceedings being taken against the petitioner can still be urged before the court whose process has deprived her of her liberty. (Civ. Code, § 699; *In re Gray*, 64 Kan. 850, 68 Pac. 658.)

Original proceeding in habeas corpus. Opinion filed March 11, 1916. Writ denied.

*David Ritchie,* and *G. A. Spencer,* both of Salina, for the petitioner.

*W. B. Crowther,* of Salina, for the respondent.

The opinion of the court was delivered by

DAWSON, J.: The petitioner has invoked the original jurisdiction of this court under a writ of habeas corpus, in which she seeks her liberty. She was arrested by the chief of police of the city of Salina on a warrant issued by the police court of that

*In re* Will.

city, in which it is recited, with appropriate preliminaries, that "on or about the 25th day of November, A. D. 1915, at the city of Salina, county of Saline and state of Kansas [Nina Will] did then and there unlawfully transport, carry and haul spiritu-ous, vinous, fermented and malt liquor upon the streets, ave-nues and alleys of the city of Salina, Kansas, contrary to ordi-nance No. 1879 in such cases made and provided."

The ordinance reads, in part, as follows:

"Section 1.   Be it ordained that it is unlawful for any person, indi-vidual, company or corporation to transport or carry any spirituous, vinous, fermented or malt liquor or any imitation thereof upon the pub-lic streets, avenues and alleys of said City of Salina, or to haul the same upon said streets, avenues or alleys."

Section 2 provides punishment for the violation of the ordi-nance; and section 3 exempts interstate commerce from inter-ference under it.

In the brief for petitioner many objections are made to the ordinance. It is argued, in substance, that it is against com-mon right and unconstitutional and void; that the city has no power to enact such an ordinance; that the hauling of liquors on the street is neither *malum in se* nor *malum prohibitum.*

In some peculiar cases persons restrained of their liberty have been permitted to "cut across lots" for the purpose of securing a summary discharge through writs of habeas corpus. (*In re Dill, Petitioner,* 32 Kan. 668, 691, 5 Pac. 39; *In re Neagle,* 135 U. S. 1; 21 Cyc. 287, Note, 25.)

After conviction under a void statute or ordinance, and when the time to appeal has expired, a discharge by writ of habeas corpus may be secured, for in such case it is the only remedy. (*In re Jarvis,* 66 Kan. 329, 71 Pac. 576.)   So, also, where the judgment is void. (*In re Smith, Petitioner,* 52 Kan. 13, 33 Pac. 957; *In re Norton,* 64 Kan. 842, 68 Pac. 639; *In re Spaulding,* 75 Kan. 163, 164, 88 Pac. 547.)

But many years ago this court decided, after full considera-tion, that where the case in the lower court had not been dis-posed of, and where the regularly established procedure was still available to the party seeking redress, the orderly juris-diction of the lower court which issued the warrant and the ordinary procedure for trial and appeal should not be inter-fered with through writs of habeas corpus out of this court.

In the case of *In re Gray,* 64 Kan. 850, 68 Pac. 658, it was held that the courts and judges of this state are without power to inquire into the constitutionality of a city ordinance upon the application of one arrested for a violation of such ordinance who, in default of recognizance, is committed to the city jail to await a speedy trial for the offense charged.

In the case of *In re Terry,* 71 Kan. 362, 80 Pac. 586, it was held that habeas corpus will not lie to inquire into the legality of a warrant or commitment issued from a court of competent jurisdiction before final trial and judgment.

In the case of *In re Sills,* 84 Kan. 660, 114 Pac. 856, it was held that a party to a criminal action pending in a court of competent jurisdiction is not entitled to a discharge on habeas corpus before final trial and judgment on the ground that the complaint is based upon an unconstitutional statute, although a motion to quash the complaint on the ground stated has been denied.

In the very recent case of *In re McKenna,* ante, p. 153, 154 Pac. 226, Mr. Justice Marshall said:

"This court will not release, on habeas corpus, one who is held under a warrant issued on an information that does not charge any offense, before an application of any kind is presented to the court issuing the warrant. Many informations are defective and must be amended before the defendant can be properly placed on trial on the charge attempted to be set out therein, but habeas corpus is not the means resorted to for the purpose of protecting the defendant. Subdivision 4 of section 699 of the code of civil procedure prohibits habeas corpus where the one applying for the writ is held on a warrant issued on an information." (p. 154.)

No refinement of reasoning would justify a distinction between a warrant based on an information and a warrant based on a complaint.

We do not think it proper at this time to determine the validity of the ordinance.

The application is denied and the petitioner is remanded.

No. 19,569.

ERNESTINA DURANT, *Appellant*, v. E. C. WHITCHER, as Administrator with the Will Annexed, etc., et al., *Appellees*.

SYLLABUS BY THE COURT.

1. WILLS—*Lawyer Who Drew the Will—Competent Witness.* The rule applied that in an action to set aside a will the lawyer who drew it may testify to the conversation had at the time between himself and the testator.

2. SAME — *Mental Condition of Testator — Competent Witnesses.* The scrivener and subscribing witnesses of a will held to be competent witnesses as to the mental condition of the testator.

3. SAME—*Evidence Sustains the Validity of Will.* The evidence held sufficient to sustain a judgment upholding a will against an attack on the ground of want of capacity and fraud.

Appeal from Cloud district court; JOHN C. HOGIN, judge. Opinion filed April 8, 1916. Affirmed.

*Park B. Pulsifer,* and *Charles L. Hunt,* both of Concordia, for the appellant.

*F. W. Sturges,* and *Fred W. Sturges, jr.,* both of Concordia, for the appellees.

The opinion of the court was delivered by

MASON, J.: In June, 1906, T. J. Durant executed a will giving half his property to his wife, making specific devises to her and to a brother of a former wife, and leaving the residue to his nephew and to nieces and nephews of his former wife. He died in February, 1909, being then 79 years of age. He left no children. His widow brought an action to set aside the will on the ground of want of testamentary capacity and fraud. Judgment was rendered for the defendants, and she appeals.

Complaint is made of the rejection of evidence that the testator's brother-in-law, to whom the will gave an eighty-acre tract of land, already owned more than a thousand acres. The matter does not seem of vital importance, but in any event the ruling can not be reviewed, because the evidence was not produced at the hearing of the motion for a new trial. (Civ. Code, § 307.)

(1) The draftsman of the will—a lawyer—was permitted to testify in detail as to conversations between himself and the testator at the time of its preparation and execution. This is objected to as a violation of the rule relating to privileged communications between attorney and client. (Civ. Code, § 321.) The ground upon which the petition attacked the will (apart from the question of capacity) was that the testator's signature was procured by the representation of the lawyer that it was a paper of a wholly different character. That the lawyer's testimony was competent is settled by a recent decision where the witness' relation to the testator was subsantially the same as in the present case, and where his testimony covered practically the same field. (*Black v. Funk*, 93 Kan. 60, 143 Pac. 426, *ante*, p. 509, 155 Pac. 959. See, also, *Lumber Co. v. Cox*, 94 Kan. 563, 147 Pac. 67.)

(2) The testimony of the scrivener and the subscribing witnesses concerning the testator's capacity is objected to on the ground that they were asked the direct question whether he was of sound mind, instead of being required to state their opinions, and on the further ground that their acquaintance with him was not such as to render their opinions competent. There is hardly a substantial difference between asking a witness his opinion of the mental condition of another and asking him to state what that condition was, but if any particular questions were incompetent in form the error in their admission was immaterial, for they are not shown to have affected the judgment. (*Kimball v. Edwards*, 91 Kan. 298, 137 Pac. 948.) The other objection goes rather to the weight than to the admissibility of the evidence. Any witness who has "a fair basis for an opinion" concerning the mental condition of another person is qualified to testify. (*The State v. Beuerman*, 59 Kan. 586, 589, 53 Pac. 874.) "Whether there is a fair basis for an opinion by a witness must be left largely to the trial court." (*Kempf v. Kappa*, 74 Kan. 153, 155, 85 Pac. 806.) The effect of the evidence is for the determination of the tribunal before which it is given. (*Howard v. Carter*, 71 Kan. 85, 80 Pac. 61.) Here each of the subscribing witnesses had done business with the testator and had had considerable opportunity for observing his conduct. Their relation to the making of the will disposes of any question regarding their competence.

"Whatever the result of the controversy as to lay witnesses in general all Courts have preserved the traditional practice of receiving the opinions of attesting witnesses to wills. The theory that the law had provided this preappointed testimony for the express purpose of securing witnesses to the testator's capacity as well as to his signature, as well as the unquestioned practice, prevailed over any theory that the judges might have as to the bearing of the Opinion rule." (3 Wigmore on Evidence, § 1936.)

(3) The principal contention of the plaintiff is that the judgment is not supported by the evidence. The trial court must be deemed to have accepted the version of the lawyer who drew the will as to what took place at that time, and this disposes of all question regarding the practice of the fraud alleged in the petition. A large amount of evidence was given tending to show that the testator was enfeebled in body and mind and was incapable of transacting business. But there was also competent and substantial oral evidence to the contrary. The lawyer said: "I think he was of sound mind and memory. He had sufficient mind to know what he was doing, and to know what property he possessed." One subscribing witness said: "I had no question as to his soundness of mind at that time; I believe and thought he was of sound mind and I now say he was." The other said: "I supposed he was mentally sound and when the will was drawn; I know it just as much as I know any man was." We can not review the decision of the trial court upon the conflicting oral evidence.

The judgment is affirmed.

No. 19,674.

*In re* THE DISBARMENT OF OTTO J. BRILEY.

SYLLABUS BY THE COURT.

ATTORNEY AT LAW—*Disbarment Proceeding—Dismissed.* A proceeding for the disbarment of an attorney is dismissed because no four of the justices concur in a decision on the merits, two being disqualified from sitting.

Original proceeding in disbarment. Opinion filed April 8, 1916. Proceeding dismissed.

*F. P. Lindsay,* and *S. M. Brewster,* both of Topeka, for the accuser.

*Otto J. Briley,* formerly of Chanute, *pro se.*

The opinion of the court was delivered by

MASON, J.: Affidavits were presented to the board of bar examiners charging Otto J. Briley, of Chanute, a member of the bar, with unprofessional conduct. Most of the affidavits had been made during an investigation by a committee of lawyers of Neosho county, in March, 1913. The board on August 5, 1914, filed in this court an accusation upon which his disbarment was asked. Notice was served on Briley as required by law. An answer was filed September 15, 1914, and a reply ten days later. On June 16, 1915, the affidavits which had been before the board were filed here, and a copy of them was served upon the accused, with the intent that they should become admissible as evidence unless he should give notice of objection within five days, in accordance with the statute (Civ. Code, § 350). He gave no such notice. The case was set for trial in October, 1915, and as no further appearance was made by or for the accused it was submitted on the evidence of the prosecution and a judgment of disbarment was rendered against him. Within twenty days he filed a verified petition for rehearing, giving his version of the transactions on which the prosecution was based, and alleging "that he had never been advised of there being any rule of law or court that an exception must be taken to an affidavit in five days or that it

*In re* Briley.

should be considered as a deposition in the case, and if such a rule of law exists, that it is not to be applicable in this case, for the affidavits were taken in another proceeding, before another tribunal, and nearly two years before this action was instituted." A rehearing was granted, and time was given for the taking of any evidence desired, additional to that already on file. The case has again been submitted on the same evidence, together with a few additional affidavits, including those of the accused, and some documents.

The court is asked to disregard the affidavits presented by the prosecution on the grounds indicated in the part of the petition for a rehearing above quoted. Whether the objection would have been sustained if seasonably made need not be determined. In view of what has already been stated, the accused is not now in a position to urge it. The affidavits will not be excluded, but all the circumstances attending their making will be considered in determining their weight.

The accusation contains four charges. The first one is that he brought two actions without the authority of the plaintiffs, and in violation of their express direction not to do so. The following facts in regard to the matter are not disputed. In November, 1908, Briley brought thirty-two attachment actions before F. M. Groome, a justice of the peace, against the proprietor of a traveling show, for the wages of employees. The showman replevined the attached property and began a suit against Groome and another justice of the peace, before whom some other similar cases had been brought, and two constables, to enjoin any further attachments, a restraining order being allowed. Briley filed a demurrer in the injunction suit for Groome, and for B. F. Nye, one of the constables. On June 28, 1909, the suit was dismissed by the plaintiff. On October 29, 1909, Briley, as attorney for Groome and Nye, began an action for each of them upon the injunction bond. In July, 1910, each filed an affidavit stating that he had not authorized such a suit. A hearing was had on the matter, at which they testified orally, and the court dismissed the cases at the cost of Briley.

It is quite clear that on the day the injunction action was dismissed (June 28, 1909) Groome and Nye each signed a cost bond for the other as a basis for an action on the injunction

bond. It appears that at one time they denied signing the cost bonds, but this denial was doubtless due to the long interval between their execution and the bringing of the actions. It was natural that they should at first fail to connect the papers they had signed in June with the actions that were brought in their names in October. An affidavit of Groome is to the effect that he and Nye told Briley they did n't want to be made subject to any costs in the matter, and that as an offset to any costs that were likely to follow they "gave him a bond for claiming fees" in case they were taken to Erie; that the same evening they received word that the injunction case had been dismissed and the costs paid; that the next morning they went to Briley's office and instructed him not to file the cases, as the injunction suit had been dismissed, and they thought that should satisfy everybody; that Briley said he thought so too—thought they were right; that Groome and Nye only learned of the filing of the actions in their names about a year later, by reading of it in the papers. An affidavit of Nye confirms Groome's version of the conversation with regard to dropping the proposed actions on the bond, and as to the actions being begun without their knowledge.

Briley denies the conversation referred to, and asserts that Groome and Nye authorized him to bring the actions for them. In one of his affidavits he says that the attorney for the showman "bluffed the said Groome and Nye into making a statement that they had not authorized suit." He also verifies by his oath an assertion that the district court assessed to him the costs in the Groome and Nye cases "without authority of law" and "arbitrarily." These declarations of course amount only to an expression of opinion.

There is a direct issue of fact between Groome and Nye on the one hand and Briley on the other. The district court, having heard the oral testimony, evidently accepted their version of the affair or it would not have taxed the costs to Briley. This evidence is quite persuasive that Briley was not in fact authorized to bring the actions, but does not to the same extent exclude the possibility that he may have been under a misapprehension in the matter, and may have supposed his course was satisfactory to Groome and Nye.

The second charge is that the accused, having begun an

action upon several notes in the name of one claiming to have purchased them from the payee, and having attached to the bill of particulars the original notes, which were not indorsed, afterwards withdrew them, supplying copies in their place, and at the trial undertook to introduce them in evidence, the indorsement of the payee having in the meantime been placed upon them; but upon the attention of the court being called to the change, dismissed the case. Briley's version of the affair is that the letter transmitting to him the notes for collection stated that they had been indorsed, and that he attached them to the petition supposing that to be the case; that upon discovering the omission he withdrew them, with the consent of the justice of the peace, substituting copies, and returned them to the sender to have the indorsement made, receiving them back after they had been indorsed by the payee. So far his statement is supported by the record and documentary evidence. He further testifies, in substance, that after receiving the notes the second time he told the maker he would dismiss the case if shown that the goods for which the notes were given had been returned; that the defendant showed him bills of lading indicating such return, and he thereupon dismissed the case. The attorney who represented the maker of the notes states in an affidavit that when the case was called for trial Briley introduced the notes in evidence, and only dismissed the case after objection had been made on the ground that the indorsements had been written since the commencement of the action. Letters written to Briley by the lawyer from whom he received the notes laid stress upon the fact that his desire was to cut off the defense based on the return of the goods by invoking the protection given by the law to innocent indorsees. Briley's own statement indicates that he had become convinced that the defense referred to could be established if it were open. The fact that after acquiring this information he offered the indorsed notes in evidence seems to three members of the court strongly to support the view that it was his purpose to obtain judgment upon the notes, if possible, upon the theory that they had been indorsed to the plaintiff before maturity, while he knew the fact to be otherwise, and that he dismissed the case only when he found that the time of the indorsement was known to his opponent. The statute makes the

39—97 KAN.

willful violation of his oath a ground for disbarring or suspending an attorney. (Laws 1913, ch. 64, ¶ 2.) Attorneys of this court are required to swear that they will not knowingly foster or promote, or give their assent to, any fraudulent, groundless or unjust suit. (Rule 23.) The action upon the notes in question, so far as it was based upon the plaintiff's claim to be a holder in due course, was a fraudulent, groundless and unjust suit.

The third charge is that the accused refused to pay over on demand money collected for a client. The undisputed facts in the matter are these: Briley was employed by Ed McClane to prosecute a personal-injury action under an agreement that he was to receive a fee equal to half the amount recovered, McClane to pay all costs and expenses. With the consent of Briley, McClane later employed another attorney to assist in the case. A settlement was had for $300, which was collected by the other attorney, who paid the costs, amounting to about $30, and retained his own fee, remitting the balance, $201.01, to Briley. Briley paid McClane $75 and kept the remainder. In the accusation it is assumed that the compensation of the other attorney was to come out of Briley's fee of fifty per cent, but no showing is made on either side as to what the agreement was in that regard. Briley testifies that he had incurred expenses in the matter for which under the contract he was entitled to reimbursement in excess of what he deducted on that account, the amount of the expense or the deduction not being stated, and that McClane was satisfied with the settlement. McClane's testimony was not produced. This charge therefore is not established.

The fourth charge is that the accused told an attorney who held for collection a note given by him for law books, title to which was reserved as security therefor, that he would deliver the books or pay the money at once; that later he told him the books were in his office, but that he had decided not to deliver them, and would pay for them when he could; that the attorney at once brought replevin, but the accused then said that the books had been in Oklahoma for two months. Briley states that the publishers have his title-note, on which $89 remains unpaid, for the books referred to, and that he shipped them to Oklahoma; but he denies that he did so to evade the

replevin process, denies the statements attributed to him regarding the delivery of the books, and says that he offered to pay $92 in full of the claim against them, and the offer was refused. Some controversy exists as to the amount owing on the books, but this is not vital. The important question is whether Briley delayed the replevin action by promises in order to get the property beyond the reach of process. This turns largely upon the issue of veracity or memory between Briley and the attorney representing the book company, there being, however, some room for mutual misunderstanding.

Two members of the court do not participate in the hearing, one of them having signed the accusation as attorney-general and the other having been consulted regarding the matter while still in the practice. Of the remaining five members three think a case has been made out against the accused requiring discipline in some form, and the other two are of the contrary opinion. As the concurrence of four justices is necessary to a decision in a case heard by the whole court—by the court when not sitting in divisions—no determination on the merits can be had, and the proceeding must be dismissed.

MARSHALL, J., and DAWSON, J., not sitting.

---

No. 19,801.

SHELDON M. GRISWOLD, *Appellant*, v. T. P. QUINN, as County Treasurer, etc., and AMOS GODFREY, as County Clerk, etc., *Appellees*.

SYLLABUS BY THE COURT.

TAXATION—*Residence of Episcopal Bishop—Not Exempt from Taxation.* Under section 9216 of the General Statutes of 1909 a church is entitled to have the residence owned by it and occupied by its pastor exempt from taxation, and the trial court having found that the dean of the Episcopal church at Salina is its pastor, and that his residence is and always has been treated by the taxing officers as exempt, it is held, that the residence of the bishop of the diocese of Salina is not exempt from taxation.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed April 8, 1916. Affirmed.

*C. W. Burch,* and *B. I. Litowich,* both of Salina, for the appellant.

*Leonard W. Hamner,* county attorney, and *S. M. Brewster,* attorney-general, for the appellees.

The opinion of the court was delivered by

PORTER, J.: The bishop of the diocese of Salina of the Protestant Episcopal church brought suit to enjoin the taxing officers from placing upon the tax rolls the residence of the bishop, claiming the property to be exempt under the statute. The court denied the injunction and plaintiff appeals.

The facts found by the trial court are these:

"1. The plaintiff, Sheldon M. Griswold, is a Bishop of the Episcopal Church, his title being Bishop of Salina. The District over which he has jurisdiction comprises all that portion of the State of Kansas that lies West of the Sixth P. M.

"2. The property in controversy in this action is the South half of lot number 6, on South Santa Fe Avenue, in the City of Salina, Saline County, Kansas. It has a frontage of 77½ feet, and a depth of 202 feet, and is less than one-half acre in area.

"3. The plaintiff is a married man and occupies the said property with his family as a residence, and has so occupied the same ten years last past.

"4. The plaintiff has charge of all the churches in his said district, and he is directly responsible for the work of the Church therein. The said work is carried on by priests sent to their various charges by the plaintiff as his representatives.

"5. The church in Salina, Kansas, is called a Cathedral. It is owned by a church society called the Cathedral Chapter. This society is a corporate body, organized and existing under the laws of the State of Kansas. There is no other church of the Episcopal denomination in said Salina.

"6. Two priests, a Canon and a Dean, carry on the work of the church in the Cathedral. These priests work under the direction of the plaintiff, the Bishop of Salina. The Dean is the immediate minister of the congregation that worships in the Cathedral, but at times the plaintiff, as Bishop of Salina, performs all the functions of the office of Dean. By giving the Dean a three days' notice the plaintiff can supersede him in the matter of conducting services in the Cathedral.

"7. Plaintiff, as Bishop of Salina, preaches and conducts services on stated occasions in all the churches of his district.

"8. The Cathedral Chapter is also the owner of the building called the Deanery, which is the dwelling house or residence of the Dean of the Cathedral. This building is also situated in the city of Salina.

"9. The Deanery has always been treated by the authorities of Saline County as exempt from taxation, as the residence of the Dean.

or pastor of the congregation that worships in the Cathedral. It was so treated by said authorities at all times mentioned in plaintiff's petition.

"10. The property in controversy is not owned by the Cathedral Chapter. The title is in plaintiff and his successors, as Bishop of Salina.

"11. The real estate described in plaintiff's petition, being the property in controversy in this action, was assessed for taxation for the year 1912, and the taxes thereon for that year were duly levied and placed on the tax rolls of Saline County, Kansas, for that year. The tax rolls were delivered to the County Treasurer of said county for collection on November 1st, 1912. Thereafter the said County Treasurer proceeded to the collection of said taxes upon said property in manner provided by law, and advertised said property for sale for said taxes, said sale to be had at the said County Treasurer's office, in the courthouse in the city of Salina, in said Saline County, on the 2nd day of September, 1913, and but for this action the said County Treasurer would have sold said real estate at the said sale for the collection and payment of said taxes for the year 1912.

"12. Said property was assessed for taxation for the year 1913. The taxes for that year were levied upon said real estate and were placed upon the tax rolls of said Saline County by the County Clerk of said County. Said tax rolls were delivered to the County Treasurer by the County Clerk on November 1st, 1913, and unless restrained and enjoined the said County Treasurer will proceed to the collection of said taxes and the sale of the said property in manner as provided by law.

"13. T. P. Quinn is the regularly elected, qualified and acting Treasurer of said Saline County, and said Amos Godfrey is the regularly elected, qualified and acting Clerk of said County.

"14. The Cathedral, under the laws of the Episcopal Church, is the Bishop's Church. The plaintiff may, when he chooses, perform any of the duties of pastor of the Cathedral in the city of Salina, Kansas."

That part of the exemption statute under which plaintiff contends the property is not subject to taxation reads:

"First, all buildings used exclusively as places of public worship, as public school-houses, or both, with the furniture and books therein contained and used exclusively for the accommodation of schools and religious meetings, together with the grounds owned thereby, not exceeding in any one case ten acres, if not leased or otherwise used with a view to profit; and also any parsonage or dwelling owned by any church society and occupied by its pastor as a residence, together with the ground on which it is situated, not exceeding in any one case one-half acre." . . . (Gen. Stat. 1909, § 9216.)

There is no contention by the defendants that the residence of the pastor of the Episcopal church at Salina is not exempt, and the controversy turns upon the question, Who is the pastor of that church? The court finds as a fact that the *immediate minister* of the congregation using the church as a place of

worship is the dean, and that his residence, known in church parlance as the deanery, has always been treated by the taxing officers as the residence of the pastor of the congregation within the contemplation of the statute and as exempt from taxation. The court finds that plaintiff, as bishop of the diocese, may, by giving the dean three days' notice, supersede him in conducting services in the cathedral, and that, as bishop, the plaintiff preaches and conducts services on stated occasions in all the churches in his district. The plaintiff insists that the language of the statute, "and also any parsonage or dwelling owned by any church society and occupied by its pastor as a residence," is broad enough to include the property in question, because the Salina church or cathedral is known as the "Bishop's Church," the head church of the diocese, the one from which the plaintiff exercises his authority over the entire body of churches in his jurisdiction. It is said that the facts bring the plaintiff within the definition of "a pastor," as declared in the case of *Presbyterian Church v. Myers,* 5 Okla. 809, 50 Pac. 70, as follows:

"A pastor is one who has been 'installed according to the usage of some Christian denomination in charge of a specific church or body of churches.'" (p. 825.)

The ecclesiastical definition of a pastor as given by Webster is, "a minister having the charge of a church and parish." Of course, the plaintiff is a pastor in charge of a body of churches, but is he the pastor of the church at Salina? Is he "its pastor" within the contemplation of the statute? We think there can be but one answer to this question, and that the trial court determined it correctly. The plaintiff is no more the pastor of the church at Salina than he is the pastor of each and every church in his diocese. The fact that the cathedral at Salina is called the "Bishop's Church" to distinguish it from the other churches in his jurisdiction does not constitute him its pastor. The particular church at the national capital which the nation's chief executive attends is usually called the "President's Church"; but mere names and appellations are not controlling. The almost universal rule is, that each church congregation has but one pastor. There are at this time in Kansas possibly a half-dozen exceptions to the rule. If the legislature intended to exempt from taxation more than one

Griswold v. Quinn.

parsonage for each congregation it would doubtless have said so in express terms.

Taxation is the rule; exemption is the exception, and statutes granting exemption from taxation are construed strictly.

"Any person or corporation claiming immunity from the common burdens of taxation, which should rest equally upon all, must bring himself or itself clearly within the exemption; and hence a provision creating an exemption from taxes must be construed strictly." (*Stahl v. Educational Assoc'n*, 54 Kan. 542, syl. ¶ 1, 38 Pac. 796. See, also, *Mason v. Zimmerman*, 81 Kan. 799, 106 Pac. 1005.)

The fact that before the bishop has authority to conduct the regular services in the cathedral he must give the dean three days' notice, when for that particular occasion he supersedes the dean, shows, we think, beyond controversy that except on these stated occasions the authority of the dean as pastor of that church or parish is superior to the authority of the bishop, and that it can not be said that the bishop's relation to the church or parish at Salina is that of "its pastor." In our opinion, upon the facts as found, the plaintiff is not regarded by the Episcopal church as the pastor of any particular church, society or parish within his jurisdiction. He is a pastor with certain authority over all the churches in his jurisdiction, but the work of the local church is carried on by the local pastor, who is called the dean. As we construe the statute, the church at Salina is entitled to have the residence of its pastor exempt from taxation. The court has found that the dean is the pastor of that church, and that his residence is and always has been treated by the taxing officers as exempt.

The judgment is affirmed.

JOHNSTON, C. J., BURCH, J., and DAWSON, J., dissenting.

No. 19,810.

BESSIE BELL, *Appellant*, v. W. H. BELL, *Appellee*.

SYLLABUS BY THE COURT.

1. DIVORCE—*Sufficient Affidavit for Publication Service.* An affidavit for service by publication in a divorce case which states that the whereabouts of the defendant is unknown to the affiant, and that her post-office address can not be ascertained by any means within his control, carries a sufficient inference of diligent inquiry as to the defendant's residence to save such affidavit from total insufficiency under section 79 of the civil code.

2. DIVORCE—*Service Procured by Perjury—Setting Aside Decree—Limitation of Actions.* A decree of divorce rendered on service by publication only, and procured by the perjury of the plaintiff in the affidavit for publication, may on proper showing any time within two years from its rendition be opened up and vacated for fraud in its procurement.

Appeal from Jefferson district court; OSCAR RAINES, judge. Opinion filed April 8, 1916. Reversed.

*S. F. Newlon*, of Hiawatha, for the appellant.
*H. N. Casebier*, of Oskaloosa, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff appeals from an order refusing her application to open up and vacate a decree of divorce.

November 11, 1912, the defendant was by the district court of Jefferson county granted a divorce from the plaintiff. The service was by publication, the affidavit stating that with due diligence the plaintiff was unable to procure personal service within the state, "that the whereabouts of said defendant is unknown to affiant, and that her post-office address can not be ascertained by plaintiff by any means within his control." In January, 1914, the plaintiff filed her petition in the same court to open up the decree, and in March, 1914, filed her amended petition. To this a demurrer was filed, on the ground of failure to state facts sufficient to constitute a cause of action, and sustained.

The plaintiff contends that the court was without jurisdiction to grant the divorce for the reason that no proper affidavit

Bell v. Bell.

for publication was made, such affidavit being insufficient for failure to show diligent inquiry as to the residence of the defendant, citing *Van Gundy v. Shewey,* 90 Kan. 253, 133 Pac. 720. The affidavit there held insufficient failed to show even by inference that diligent inquiry had been made or that the affiant had been unable to learn the place of residence. While the statute (Civ. Code, § 79) requires a statement that the plaintiff has diligently inquired as to the residence, a statement that the address can not be ascertained by the plaintiff by any means within his control carries the inference that diligent inquiry has failed to discover such address, at least an inference sufficient to save such affidavit from total insufficiency.

Plaintiff's petition averred that the decree of divorce was procured by fraud in that she, during all of the time, was living at Fairview in Brown county, where she was a resident in good faith, which was well known to the plaintiff, who falsely and fraudulently and with intent to deceive the court and to cheat and defraud the plaintiff made the false affidavit; that the ground for divorce alleged and sworn to by the plaintiff was false and the decree was procured by the defendant's perjury and deceit, and that the plaintiff had no notice of the proceeding until long after the trial was had. Further, that she had a complete defense to the action and would have appeared and defended had she been duly summoned or had proper notice. She set forth a complete defense, and also a sufficient affirmative ground for divorce.

The defendant takes the position that a decree of divorce can not be opened up for fraud in its procurement unless the proceeding therefor is begun within the six-months period at the close of which the decree becomes absolute. (Civ. Code, § 674.)

In case of an ordinary judgment or decree plaintiff's amended petition would be fully sufficient for the purpose intended. (*Daniel Hill v. Elias Williams,* 6 Kan. 17; *Laithe v. McDonald,* 7 Kan. 254; *Laithe v. McDonald,* 12 Kan. 340; *Fullenwider v. Ewing,* 30 Kan. 15, 1 Pac. 300; *Mulvaney v. Lovejoy,* 37 Kan. 305, 15 Pac. 181; *The State v. Soffietti,* 90 Kan. 742, 136 Pac. 260; *Milling Co. v. Stevens,* 94 Kan. 745, 748, 147 Pac. 815.)

The real question for determination is whether or not a decree of divorce is governed by a different rule on account of

public policy and the consequences involved. *Lewis v. Lewis,*
15 Kan. 181, is relied on. It was there held, after considering
various decisions of other states, that former section 77 of the
civil code (Civ. Code, 1909, § 83), providing for opening up
judgments, did not apply to proceedings for divorce. It was
said to apply only when the judgment had been rendered with-
out other service than by publication in a newspaper, and that
as a copy of the petition and notice had been mailed as required
by section 641 (Civ. Code, 1909, § 666) this must be deemed
a part of the service. It was also said that ofttimes the hard-
ness of an adverse ruling had induced the magnifying of
matters of minor importance. In *Hemphill v. Hemphill,* 38
Kan. 220, 16 Pac. 457, it was decided that section 77 applied
if availed of within the six-months period, and that the filing
of the affidavit that the defendant's whereabouts was un-
known did not amount to service other than by publication in
a newspaper. It was pointed out that since the Lewis decision
section 647 of the civil code had been amended (Civ. Code,
1909, § 674) and its operation enlarged so as to apply to divorce
actions if the proceeding to open up be begun within six months
from the rendition of the judgment. In *Larimer v. Knoyle,*
43 Kan. 338, 23 Pac. 487, it was said (p. 349) that the affi-
davits for publication and in lieu of sending a copy are no
parts of the service itself. Also, that if actual notice were not
received within the six-months period so as to proceed under
section 77 the judgment might be opened up and vacated under
some provision of section 568 of the former code, or by any ac-
tion in the nature of a suit in equity. It is significant that by
the amendment of former section 647 (Civ. Code, 1909, § 674),
it was provided that "no proceeding for reversing or vacating
the judgment or decree divorcing said parties shall be com-
menced unless within six months after the rendition of said
judgment or decree." (Laws 1881, ch. 126, § 1.) This ex-
pression was omitted by the amendment of 1889, and the sec-
tion made to read as it does in the present code. (Laws 1889,
ch. 107, § 6, Civ. Code, 1909, §674.) Hence, since this amend-
ment the only provisions for vacating a decree of divorce, aside
from an ordinary reversal, are those found in sections 596 to
602 of the present code. The question is set at rest, however,
by the decision in *Blair v. Blair,* 96 Kan. 757, 153 Pac. 544,

where it was said (p. 763) that the Lewis decision is supported by some rather artful reasoning because the court was appalled at disastrous social consequences in cases involving a second marriage. It was held that in respect to opening up judgments, "The statute does not make an exception of divorce decrees, or of divorce decrees in case a second marriage occur, and the statute itself is notice of power retained over the decree for a limited time." (p. 763.)

It is stated in the brief of the defendant that he has remarried and a child has been born of the union. But lamentable as the consequences may be to the innocent child and its mother, the right of the plaintiff to clear herself and her child from a stigma still more unjust, if her petition is true, is in no wise impaired.

The statute having provided a way, which the plaintiff has followed, for vacating decrees procured by the fraud of the prevailing party, and having made no exception in favor of a decree of divorce it was error to sustain the demurrer to the amended petition.

The judgment is therefore reversed and the cause remanded for further proceedings.

---

No. 19,815.

CHARLES C. BAILEY, *Appellee and Appellant,* v. THE WESTERN UNION TELEGRAPH COMPANY, *Appellant and Appellee.*

No. 20,078.

CHARLES C. BAILEY, *Appellee,* v. THE WESTERN UNION TELEGRAPH COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. TELEGRAM—*From Vermont to Kansas—Delay—Action for Damages —By What Law Governed.* Where a telegraph message is sent from Vermont to Topeka and the receiver pays the charges, his right to recover damages for delay in the delivery of the message is governed by the laws of this state, except as modified by acts of congress.

2. SAME—*Interstate Commerce—Damages Governed by U. S. Statutes.* Under the act of congress of June 18, 1910 (Part 1, 36 U. S. Stat. at Large, ch. 309, pp. 539, 544), a rule of an interstate telegraph company limiting its liability on account of its negligence in the delivery

of an interstate message to certain sums governed by the classification of the message is valid and binding, and damages can not be recovered beyond the amount named.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed April 8, 1916. Affirmed.

*Edwin D. McKeever*, and *Edwin E. Brookens*, both of Topeka, for the plaintiff.

*Charles Blood Smith*, and *Samuel Barnum*, both of Topeka, for the defendant; *George H. Fearons*, and *Albert T. Benedict*, both of New York, N. Y., of counsel.

The opinion of the court was delivered by

MARSHALL, J.: In this action the plaintiff seeks to recover ninety cents actual and $1200 exemplary damages for delay in the transmission and delivery of a telegram notifying the plaintiff of his father's death.

1. The defendant, for a part of its answer, set up as a defense that the contract for the transmission and delivery of the message was made in Vermont; that no negligence was committed on the part of the defendant in Kansas; that any negligence, if any, in the transmission and delivery of the telegram occurred exclusively within the state of Missouri, and that by the laws of the states of Vermont and Missouri a master is not liable for punitive or exemplary damages unless the master participated in, authorized, or ratified the tort committed by the servant; and that the defendant did not participate in, authorize, or ratify the breach of any duty committed by its servants in the transmission of the telegram. A demurrer to this part of the answer was sustained. From this the defendant appeals.

There is some conflict in the decisions of the courts of this country concerning the liability of a telegraph company for exemplary or punitive damages for failure to deliver a message, where by the law of the state from which the message was sent such damages can not be recovered. We think the rule is that for failure to deliver a message the person to whom it is sent can recover such damages as is permitted by the law of the state in which the message was to be delivered, although

that law may be contrary to the law of the state from which it was sent. Supporting this proposition, see *North Packing & Provision Co. v. W. U. Tel. Co.*, 70 Ill. App. 275; *Howard v. Western Union Tel. Co.*, 119 Ky. 625, 86 S. W. 982, 7 Ann. Cas. 1065; *Western Union Telegraph Co. v. Lacer*, 122 Ky. 839, 93 S. W. 34, 5 L. R. A., n. s., 751; *Western Union Telegraph Co. v. Hill*, 163 Ala. 18, 50 South. 248, 23 L. R. A., n. s., 648; *Gentle v. Western Union Telegraph Co.*, 82 Ark. 96, 100 S. W. 742; *Balderston v. Telegraph Co.*, 79 S. Car. 160, 60 S. E. 435; *Carnahan v. The Western Union Telegraph Company*, 89 Ind. 526. Exemplary damages have been allowed in this state under similar circumstances. (*Telegraph Co. v. Gilstrap*, 77 Kan. 191, 94 Pac. 122; *McInturf v. Telegraph Co.*, 81 Kan. 476, 106 Pac. 282.)

Can the plaintiff recover under the laws of this state, when the negligence of the defendant, if any, occurred in Missouri? The message should have been delivered promptly to the plaintiff in Topeka. The delay in the delivery of the message caused the injury for which this action is brought. That delay may have been caused by the defendant's negligence in Missouri, but the plaintiff's action is not for that negligence. It is for delay in delivering the message in Kansas. The message was to be transmitted from Vermont to Topeka, not from Vermont to Missouri and then from Missouri to Topeka. The plaintiff's right to recover, so far as the laws of the several states through which the message passed are concerned, is governed by the laws of this state. The plaintiff's demurrer to this part of the answer was properly sustained.

2. The answer alleged that the receipt, transmission and delivery of the message was a part of interstate commerce and was governed by the act of congress approved June 18, 1910 (Part 1, 36 U. S. Stat. at Large, ch. 309, pp. 539, 544), and that by the defendant's rule its liability was limited in case of an unrepeated message to the amount received for sending the same, and in case of a repeated message to fifty times the sum received; in no event to exceed $50. A demurrer to this defense was overruled. From this the plaintiff filed a cross-appeal.

Attached to the defendant's answer as "Exhibit A" was a

copy of the telegram, on the back of which this language appeared:

"All messages taken by this company are subject to the following terms which are hereby agreed to. To guard against mistakes or delays, the sender of a message should order it repeated, that is, telegraphed back to the originating office for comparison. For this, one-half the unrepeated message rate is charged in addition. Unless otherwise indicated on its face, this is an unrepeated message and paid for as such, in consideration whereof it is agreed between the sender of the message and this company as follows:

"1. The company shall not be liable for mistakes or delays in the transmission or delivery, or for nondelivery, of any unrepeated message, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery, or for non-delivery of any repeated message, beyond fifty times the sum received for sending the same, unless specially valued; nor in any case for delays arising from unavoidable interruption in the working of its lines; nor for errors in cipher or obscure messages.

"2. In any event the company shall not be liable for damages for any mistakes or delay in the transmission or delivery, or for the non-delivery of this message, whether caused by the negligence of its servants or otherwise, beyond the sum of fifty dollars, at which amount this message is hereby valued, unless a greater value is stated in writing hereon at the time the message is offered to the company for transmission, and an additional sum paid or agreed to be paid based on such value equal to one-tenth of one per cent thereof.

"3. The company is hereby made the agent of the sender, without liability, to forward this message over the lines of any other company when necessary to reach its destination.

"4. Messages will be delivered free within one-half mile of the company's office in towns of 5000 population or less, and within one mile of such office in other cities or towns. Beyond these limits the company does not undertake to make delivery, but will, without liability, at the sender's request, as his agent and at his expense, endeavor to contract for him for such delivery at a reasonable price.

"5. No responsibility attaches to this company concerning messages until the same are accepted at one of its transmitting offices; and if a message is sent to such office by one of the company's messengers, he acts for that purpose as the agent of the sender.

"6. The company will not be liable for damages or statutory penalties in any case where the claim is not presented in writing within sixty days after the message is filed with the company for transmission.

"7. No employee of the company is authorized to vary the foregoing."

Can the plaintiff recover damages other than those specified in the defendant's answer and in the printed rules as set out in the exhibit attached thereto?

Bailey v. Telegraph Co.

The defendant argues that congress has taken exclusive control of interstate telegraphic business by the amendatory act of June 18, 1910 (Part 1, 36 U. S. Stat. at Large, ch. 309, pp. 539, 544). By this act interstate commerce in telegraph messages is placed under the control of the interstate commerce commission. Under this act, common carriers of interstate commerce may limit the amount of the recovery on account of damage inflicted to the property of a shipper by the carrier's negligence, and these limitations have been held valid and binding. (*Kirby v. Railroad Co.*, 94 Kan. 485, 146 Pac. 1183, and cases there cited; *Horse & Mule Co. v. Railway Co.*, 95 Kan. 681, 683, 149 Pac. 436; *Ray v. Railway Co.*, 96 Kan. 8, 149 Pac. 397.) The rules that justify common carriers of interstate commerce in limiting their liability for their negligence also justify interstate carriers of telegraph messages in limiting their liability for their negligence.

Prior to the passage of the act of congress in June, 1910, whatever may have been the law governing the right to recover damages on account of the delay in the delivery of telegraph messages, since the passage of that act the decisions appear almost unanimous that the limitations on the liability of telegraph companies for damages caused by delay in delivering the messages are governed by the regulation above set out, and that no other recovery can be had. (*West. Un. Tel. Co. v. Brown*, 234 U. S. 542, 34 Sup. Ct. Rep. 955, 58 L. Ed. 1457; *H. B. Williams v. Western Union Telegraph Co.*, 203 Fed. 140; *Western U. Teleg. Co. v. Dant*, 42 App. D. C. 398; *Western Union Telegraph Co. v. Compton*, [Ark. 1914] 169 S. W. 946; *Western Union Telegraph Co. v. Johnson*, [Ark. 1914] 171 S. W. 859; *Western Union Telegraph Co. v. Simpson*, [Ark. 1915] 174 S. W. 232; *Western Union Tel. Co. v. Bilisoly*, 116 Va. 562, 82 S. E. 91; *W. U. Tel. Co. v. N. B'k. Berryville*, 116 Va. 1009, 83 S. E. 424; *Strause Co. v. West. Un. Tel. Co.*, 59 Pa. Super. Ct. 122; *White v. Western Union Telegraph Co.*, 33 I. C. C. 500.) The demurrer to this part of the answer was properly overruled.

It follows that the judgments are affirmed.

No. 19,820.

J. W. SAYLOR et al., *Appellees*, v. EDWIN R. CROOKER et al. (THOMAS H. MURRAY and L. H. JACKSON, as Sheriff, etc., *Appellants*).

### SYLLABUS BY THE COURT.

1. ATTACHMENT LIEN—*Attaches Only to Existing Interest of Debtor.* Rule followed that an attaching or judgment creditor çan not subject to the satisfaction of his claim or judgment any greater interest in property than that owned by the debtor.

2. SAME. Where a debtor holds only the naked legal title to property, and that title was vested in him only as a mortgagee, and the mortgage itself was unenforceable and void, an attaching or judgment creditor can not subject such property to the payment of the debts or judgment liabilities of the debtor.

3. ENDLESS CHAIN CONTRACT—*Patent Right Agency—Exchange for Deed —Rights of Attaching Creditors.* The plaintiff purchased from a patent holder of a crude oil burner an agency contract to sell "family rights" and "agency contracts." The agency contract was a characteristic scheme in the nature of "an endless chain," and void as against public policy. To secure the purchase price of the agency contract the plaintiff gave the patent holder a deed to some property, the deed being intended to operate as a mortgage. An attaching and judgment creditor of the patentee sought to subject the property to the satisfaction of his claim and judgment against the patent holder. *Held,* that the fact that the plaintiff, in the original contract, was in equal wrong with the patent holder will not prevent a court of equity from granting plaintiff relief when its refusal to do so would in effect give countenance, force and effect to the original illegal contract between the plaintiff and the patentee and carry its consequences even further than the contracting parties intended.

4. PRACTICE—*Wrong Reasons Given by Trial Court for Correct Decision.* —Where proper findings of fact based upon the evidence have been made, it is not ordinarily important what course of judicial reasoning is announced by the trial court in arriving at its decision when the decision itself is correct.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed April 8, 1916. Affirmed.

*C. E. Pile, E. L. Burton, L. E. Goodrich,* and *George F. Burton,* all of Parsons, for the appellants.

*W. S. Hyatt, Paul MacCaskill, C. E. Cooper,* and *John Madden,* all of Parsons, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs brought this action to restrain the defendants from selling certain property claimed and occupied by plaintiffs but the title to which was in the name of Edwin R. Crooker, a judgment debtor of Thomas H. Murray. Plaintiffs alleged that the deed from them which had conveyed the property to Crooker was in reality a mortgage to secure the payment of J. W. Saylor's share of the purchase price of an agency contract for the sale of "family rights" and "agency contracts" pertaining to a patented crude oil burner owned by Crooker, and that the conditions of the mortgage obligation had been discharged and satisfied.

A demurrer to plaintiffs' petition was sustained by the district court and on appeal that judgment was reversed. (*Saylor v. Crooker*, 89 Kan. 51, 130 Pac. 689.) Thereupon the cause was remanded and tried by the court without a jury, and extended findings of fact and conclusions of law were made and a judgment for plaintiffs was rendered.

The defendants appeal, and the various errors assigned mainly turn on the question as to the duty of a court of equity when one who has deliberately engaged in an illegal enterprise seeks relief from its consequences.

There can be no doubt about the illegality of the contract between J. W. Saylor and Edwin R. Crooker. It was one of those characteristic "endless chain" swindles which appear occasionally in various parts of the country, designed to prey on the cupidity of the gullible. This is what the trial court said about it:

### FINDINGS OF FACT.

"*Twelfth:* The agency contract purchased by said Saylor and Tinder from Edwin R. Crooker, and those authorized to be sold by them, thereby, were and are what is known as 'endless chain contracts' by the terms of which said Crooker in each several contract, by whomsoever sold, was to receive one-half of the consideration paid by the purchaser for such contract. Saylor and Tinder were, by such contract and the power of attorney attached thereto and made a part thereof, made, constituted, and appointed the lawful attorneys of the Little Crater Crude Oil Burner Company, and thereby authorized and required to sell contracts identical with the one purchased by them, as well as 'Standard' and 'Special' contracts, and they were thereby authorized to sign the name of such company to

40—97 KAN.

all such contracts as they might find purchasers for, and they were limited as to place of sale, only within the limits of the United States, and were thereby authorized to execute powers of attorney to sell said agencies identical with their own, and they in turn to execute such powers of attorneys, and so on without end, so that each purchaser of a patentee agency contract was obligated to sell such contracts to others, anywhere within the limits of the United States, and delegating like powers and authority to such others, *ad infinitum.*

"*Thirteenth:* Saylor and Tinder having contracted to pay $5000.00 for their agency contract, by the terms thereof, they having to pay one-half of the amount received from the sale of their contracts, to said Crooker, would have to sell two similar contracts in order to get a return of their money thus invested, and the two to whom they sold would have to sell four of such contracts in order to get a return of their investment, the four would be compelled to find purchasers for eight thereof in order to make themselves whole in the transaction, and to get away from Crooker with ten separate groups of purchasers, the last group would have to sell 1024 agency contracts of a like kind to break even with their investment, in such a deal none of the purchasers would have made a cent in the transactions and Crooker would have thus stolen a sum equal to $5,080,000.00, and yet there would have been but 2046 of the hundred million people of the United States who had been duped, continue the deal but two groups further, or to twelve away from Crooker, and we would have 5118 who had been robbed, and Crooker will have reaped a harvest of $20,440,000.00 for all of which neither he nor any of said agents ever gave one cent's consideration; to pursue this a few groups further, and the figures would become so enormous that it would almost stagger one to contemplate it."

It is familiar law that where two parties to an illegal transaction are equally in the wrong, neither can ordinarily obtain relief from a court of equity. The court will simply leave them where they placed themselves. There are some qualifications upon that rule, however, although it may not be necessary to bring them to the fore in the instant case. Let us first apply this elementary rule here. Crooker's deed to Saylor's property is in fact a mortgage. The mortgage was given by Saylor in payment of the purchase price of an illegal agency contract. The Saylors are in possession. Here the ancient maxim naturally intrudes: "*In pari delicto melior est conditio possidentis*" (Where parties are equally at fault, the situation of the possessor is the better one). Crooker holds only an unenforceable mortgage on Saylor's property. Murray, an attaching creditor of Crooker, can neither attach, acquire nor subject to execution sale any greater interest in the Saylor property than

Saylor v. Crooker.

Crooker. An attaching creditor seizes only the existing interest of his debtor. No more. (*Hall v. Terra Cotta Co.*, ante, p. 103, 154 Pac. 210, and cases cited.) The fact that the record title was in Crooker takes nothing from the certainty of this proposition. (*Harrison & Willis v. Andrews*, 18 Kan. 535; *Holden v. Garrett*, 23 Kan. 98; 4 Cyc. 564; 17 Cyc. 967.)

Viewing this case from another angle, and again applying the elementary doctrine that the courts will not aid in carrying out an illegal transaction, it must be clear that if this attaching creditor of Crooker is permitted to seize and sell Saylor's property to satisfy Crooker's debt to Murray, there is in effect an active and positive judicial interference to aid in carrying out to its completion the illegal transaction between Saylor and Crooker, and to give Crooker the full benefit of that illegal contract.

Moreover, there is still another view, and one well sustained by the authorities. Equity does sometimes interfere to relieve one of two parties who are *in pari delicto*. It will do so if its forbearance would result in a still greater offense against public morals and good conscience. This doctrine is well illustrated in the case of *Hobbs v. Boatright*, 195 Mo. 693, 93 S. W. 934, 5 L. R. A., n. s., 906, where the plaintiff was permitted to recover $6000 which he had lost in a fake foot race, although he himself was a party to a conspiracy to defraud others. It was there said:

"The difficult question in the case is, upon which side of this controversy should the law of public policy be applied? Plaintiff schemed with men, as he supposed, to defraud others; his only disappointment was that the men with whom he thought he was scheming had readily schemed to defraud him, and they did fleece him to the sum of $6,000. If we should now say to the plaintiff, 'you cannot recover because, although you did not accomplish what you intended, yet your purpose was to assist those men to defraud others, and, therefore, you are as guilty as any of them,' we would, by so saying, allow the gang and their aiders and abetters to go free, retain the booty, and set their traps again. The doctrine that courts will not aid a plaintiff who is *in pari delicto* with the defendant is not a rule of universal application, it is based on the principle that to give the plaintiff relief in such case would contravene public morals and impair the good of society; therefore the rule should not be applied in a case in which to withhold the relief would, to a greater extent, offend public morals. To promote the good of the public is the highest aim of the courts in the application of this doctrine. Under the head of exceptions to the rule in 9 Cyc. 550, it is said: 'Although

the parties are *in pari delicto*, yet the court may interfere and grant relief at the suit of one of them where public policy requires its intervention, even though the result may be that a benefit will be derived by a plaintiff who is in equal guilt with the defendant. But here the guilt of the parties is not considered as equal to the higher right of the public; and the guilty party to whom the relief is granted is simply the instrument by which the public is served.' A question of what is public policy in a given case is as broad as a question of what is fraud in a given case, and is addressed to the good common sense of the court." (p. 715.)

(See, also, the citations and the Note in the foregoing L. R. A. report.)

We would hardly say that the Saylor-Crooker contract was as vicious and immoral as the transaction in the Boatright case just cited. Its illegality is more analogous to that of the "Bohemian Oats" swindle which was perpetrated repeatedly over a wide section of the country thirty years ago. (*Shipley v. Reasoner*, 80 Iowa, 548, 45 N. W. 1077; *McNamara v. Gargett*, 68 Mich. 454, 36 N. W. 218; *George Shirey v. Isaac Ulsh*, 2 Ohio C. C. 401; *Richard Carter v. J. W. Lillie et al.*, 3 Ohio C. C. 364)

In all these cases, the parties seeking relief were denied it because to do so would give countenance to the illegal transactions. Here, however, unless equity interposes, the mortgage given as consideration for the illegal contract will be enforced—aye, more, it will be given all the potency of a valid and indefeasible conveyance, and the property will be subjected as legitimate assets of Crooker to the satisfaction of Crooker's debts. This would be carrying the illegal contract much further than Saylor and Crooker ever contemplated, and attaching consequences to it which it would not warrant if the transaction had been entirely free from legal infirmities. In such a situation, neither equity nor good conscience should hesitate to frustrate such result.

In the trial court's conclusions of law it was assumed that in our former decision directing that the demurrer to the petition be overruled we necessarily considered and determined that the Saylor-Crooker contract was "fair, valid and binding." Nothing to that effect was said in the opinion, and by resorting to the briefs in that case the writer finds that the question as to the legality of the contract was not discussed by counsel for either party. Indeed, the briefs gave not the slightest hint

as to the views of the trial court on the illegality of the Saylor-Crooker contract. (Vol. 7, Briefs 89 Kan. Files of State Library.) Very properly, then, this court's decision was confined to the propositions which counsel chose to present.

However that may be, by a very different course of reasoning the trial court arrived at a just and equitable result, and its judgment is substantially correct.

The judgment is affirmed.

Nos. 19,833 and 20,508.

A. H. McINTYRE, as Trustee, etc., *Appellee*, v. THE AMERICAN SURETY COMPANY OF NEW YORK, *Appellant*.

SYLLABUS BY THE COURT.

1. INDEMNITY BOND—*Bond Construed—Liability of Surety.* In an action to recover upon a surety bond which provided that the obligor would pay the shortage of the bonded party if his liability "is caused by robbery, fraud, defalcation, breach of trust or other intentional offense against the property of his employer, or which the latter may have entrusted to him, either as agent, employee or attorney," there may be a recovery upon proof that the default of the bonded party was caused by his fraud or by a breach of trust; and a showing that he had embezzled the money or property entrusted to him was not necessary to a recovery.

2. SAME—*Fraud or Breach of Trust of Bonded Party—Burden of Proof.* It devolved on the plaintiff to produce satisfactory evidence of the fraud or breach of trust of the bonded party and sufficient to overcome the presumption of honesty, but in such a case the strictness of proof required in a criminal proceeding is not essential to a recovery.

3. NEW TRIAL—*Newly Discovered Evidence—Petition.* A petition for a new trial upon the ground of newly discovered evidence to be sufficient must, among other things, set forth facts showing that the proposed testimony is newly discovered and that it could not with reasonable diligence have been obtained at the time of the trial, and a general averment that diligence had been exercised is a conclusion of law and is insufficient without a statement of the facts constituting the alleged diligence.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge. Opinion filed April 8, 1916. Affirmed.

*Robert F. Porter,* of Kansas City, Mo., for the appellant.

*Arthur J. Stanley,* and *Guy E. Stanley,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: On March 3, 1914, A. H. McIntyre, as trustee of the Clark Paint, Varnish and Plantation Company, a defunct corporation, brought her action against the American Surety Company upon a fidelity bond issued by the latter company covering the liability of one Joseph T. Miller as vice-president of the defunct corporation. The case was tried before a jury, which on October 7, 1914, rendered a verdict for the plaintiff. The defendant's motion for a new trial having been denied, it appealed to this court on November 25, 1914. On September 9, 1915, and while that appeal was still pending, the surety company filed a petition for a new trial on the ground of newly discovered evidence. It was held that this petition did not state grounds for a new trial, and from that ruling the surety company appealed on the 7th day of December, 1915. On motion filed in this court the two appeals have been consolidated.

The transactions giving rise to this litigation had their beginning early in 1910 in old Mexico. The corporation for which the plaintiff, McIntyre, was trustee was organized with H. H. Clark as president, Joseph T. Miller, vice-president, and Hans G. Weide, secretary, and had its headquarters in Kansas City, Kan. One of the projects undertaken by this corporation was the developing of a five-hundred-acre plantation in Mexico. Under an agreement Miller was employed to go to Mexico and have active management of the plantation. To secure Miller's performance of his duties he secured a bond from the American Surety Company through its Mexican branch in the sum of $1000, which it appears is the equivalent of $500 of American money. In the bond it was provided that the surety company was bound with Miller "to pay the sums of money or securities which said bonded party may be short, up to the sum of $1000, always provided that the liability of the bonded party is caused by robbery, fraud, defalcation, breach of trust or other intentional offense against the property of his employer, or which the latter may have entrusted to him either as agent, employee or attorney."

McIntyre v. Surety Co.

The claim of the plaintiff was that Miller had been unfaithful and that the conditions of the bond had been broken. There was testimony to the effect that Miller had been furnished funds to the amount of $600 and supplies for the plantation amounting to about $1200 which he had not accounted for, and that instead of making reports weekly, as he had agreed to do, no reports were made, and that he had abandoned the plantation and could not even be found. The surety company was notified of the default and given an itemized statement of the moneys and property entrusted to Miller, but the search by the company for him was unsuccessful.

Upon the trial the main contention of the surety company was that the evidence did not warrant a recovery upon the bond. It was not necessary, as the defendant appears to contend, to show that the funds and property entrusted to Miller had been embezzled. Under the conditions of the bond it was enough to show that the default was caused by fraud, breach of trust or any intentional offense against the property placed in his possession. The money and property of the plaintiff was to be used for a specific purpose, and instead of applying these as directed he appears to have decamped, and although search was made for him he had eluded discovery either by the plaintiff or the surety company until after the trial, a period of more than four years. It devolved on the plaintiff, of course, to show a breach of the conditions of the bond, but it can hardly be said that there was no evidence of a breach of trust.

Competent testimony of the breach must be produced by the plaintiff and sufficient to overcome the presumption of honesty, but the strictness of proof required in a criminal proceeding is not essential to a recovery upon the bond. In a civil case a preponderance of the evidence is enough to justify the verdict, although it may involve a finding of fraud or other wrongdoing. (Redden v. Tefft, 48 Kan. 302, 29 Pac. 157; 17 Cyc. 760.) The instruction on this phase of the case, upon which some complaint is made, required the plaintiff to prove that the money and property entrusted to Miller had been appropriated or fraudulently withheld and disposed of by him. The substantial issue in the case was fairly presented by the instructions and we find no substantial error in the charge. Sufficient

notice of the default appears to have been given to the surety company, upon which it acted, but it was unable to find Miller until after the trial was had.

The second appeal in the case is based on the holding that the petition for a new trial filed more than eleven months after the rendition of the judgment was insufficient. In it defendant alleged that diligent search had been made to find Miller, but without success, and that it had been unable to find him and obtain the testimony in his possession until June 1, 1915. It is alleged that the testimony of Miller and some of that in his possession will show that that given in behalf of the plaintiff was untrue. In an affidavit made by Miller he states that he came to Kansas City about June 1, 1914, and had been employed in a department store at the head of one of the departments, and that he was still engaged in that store when the trial occurred. Much of the proposed testimony is not new, and only goes to contradict or impeach that given on the trial. The petition for a new trial was properly held to be insufficient in that it failed to show that due diligence had been exercised by defendant to find Miller and to produce his testimony at the trial. Before a party is entitled to a new trial on the ground of newly discovered evidence it must appear to be newly discovered, and further, that it could not with reasonable diligence have been obtained at the time of the trial. (*Sexton v. Lamb,* 27 Kan. 432; *Carson, Pirie, Scott & Co. v. C. M. Henderson & Co.,* 34 Kan. 404, 8 Pac. 727; *Manufacturing Co. v. Rice,* 95 Kan. 816, 149 Pac. 742.) The petition was filed about five years after the defendant had notice of the default of Miller and about eighteen months after the action was begun, and was not filed for more than three months after the evidence was discovered. What was done to find Miller or to obtain the testimony in his possession is not stated. The defendant did state that it made diligent effort to find Miller, but that is a legal conclusion and not a statement of fact. A conclusion of law adds nothing to a pleading, and an averment that diligence had been used can not be the basis of an issue unless the facts constituting the diligence are stated. The denial of such an averment raises no issue for determination. (*The State, ex rel., v. Williams,* 39 Kan. 517, 18 Pac. 727; *Houser v. Smith,*

Reed v. Bostleman.

80 Kan. 260, 101 Pac. 1001; *Leas, Harsh & Sinclair v. White,* 15 Iowa, 187; *Wakefield v. First Nat. Bank,* 19 Ky. Law Rep. 426, 40 S. W. 921; 31 Cyc. 57.)    It follows that no error was committed in holding the petition to be insufficient.

The judgment of the district court is affirmed.

---

No. 19,843.

C. H. REED, *Appellant,* v. GEORGE H. BOSTLEMAN, *Appellee.*

SYLLABUS BY THE COURT.

VENDOR AND PURCHASER—*Breach of Contract—Action—All Issues Involved Should Have Been Determined.* The purchaser under a contract involving an exchange of property performed on his side. He was not to receive the property coming to him until he paid a note given to the vendor. After default in payment of the note the vendor brought an action to quiet his title to the property he was to convey, the contract having been filed for record. The answer was that the contract was procured by the vendor's fraud and that the vendee was entitled to rescission, cancellation and damages. The court found there had been no fraud and ordered the vendor to convey, but refused to make any adjudication respecting the note. *Held,* the petition and answer brought before the court the entire transaction, the entire controversy should have been adjudicated, and nothing involved in it should have been left undetermined which might furnish the foundation for future litigation.

Appeal from Decatur district court; WILLIAM S. LANGMADE, judge.  Opinion filed April 8, 1916.    Reversed.

*G. A. Spencer,* and *David Ritchie,* both of Salina, for the appellant.

*W. R. Mitchell,* of Mankato, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to determine the rights of the parties to a contract for the exchange of property. The plaintiff agreed to convey a tract of land in Kansas to the defendant. The defendant agreed to convey land in Nebraska and to transfer other property in Nebraska to the plaintiff. Besides this, the defendant agreed to make a cash payment, give his note to the plaintiff for $1750, and assume a mort-

gage on the Kansas land. The contract provided that the plaintiff should not convey the Kansas land until the defendant paid the note and that if the note were not paid when due the defendant should forfeit all money paid and property transferred to the plaintiff. The defendant gave the note, made the cash payment, and conveyed and transferred the Nebraska property. When the note became due he refused to pay it. The plaintiff then brought suit to enforce the forfeiture provided for in the contract and to quiet his title to the Kansas land, the defendant having filed the contract for record. The defense was that the plaintiff was not entitled to enforce forfeiture, that the contract had been procured by fraud, and that the defendant was entitled to rescission, cancellation and damages. After a trial the court found the contract had not been induced by fraud, and stated the following among other conclusions of law.

"*Second:* A provision for forfeiture should not be enforced when it is inequitable to do so, or when the amount is not of proportion to the loss sustained by the party claiming the forfeiture.

"*Third:* No fraud in the procurement of the contract being shown, it should be enforced to the extent that the deeds to the Kansas land be delivered to the defendant, and his title quieted therein.

"*Fourth:* The prayer of the plaintiff to quiet title should be denied."

The judgment was that the plaintiff convey the Kansas land to the defendant. The plaintiff asked that he be given a lien on the Kansas land for the amount of the note with right to sell as upon execution. The request was denied, and the court declined to make any adjudication whatever respecting the note. The plaintiff appeals.

The note is an enforceable obligation against the defendant or it is not. If it is enforceable the amount of it should be declared to be a lien upon the Kansas land. If it is not enforceable it should be delivered up and canceled. The judgent of the district court should not have halted in the solution of the rights of the parties, but should have put an end to the entire controversy.

The defendant argues that the plaintiff framed his own case, demanded relief which equity forbids should be granted, and consequently can not complain because the court did not award some other relief. The petition and the answer, however, brought before the court the entire transaction and all

Hazelwood v. Mendenhall.

the differences between the parties respecting it.   When this was done the statements in the petition and answer of the relief to which the pleaders supposed themselves to be entitled became of minor importance.   The policy of equity to make a full and complete adjudication of any subject presented for adjudication, the policy of the revised civil code to avoid a multiplicity of suits and to make one complete adjustment of disputes between litigants, and justice to the plaintiff and defendant under the particular circumstances of this case, all required that the court should leave nothing undetermined which might be the foundation of further litigation respecting the transaction investigated.

The findings of fact and conclusions of law already stated will stand, but the cause is remanded to the district court to proceed further in accordance with this opinion.

No. 19,859.

F. B. HAZELWOOD, *Appellant,* v. J. F. MENDENHALL, *Appellee.*

OPINION ON REHEARING.

SYLLABUS BY THE COURT.

1. APPEAL—*Amount in Controversy—Matters for Review.*   Where an appeal is properly taken to this court, the amount in controversy being over $100, all rulings complained of by the appellant will be considered although as to some of them a reversal might not make a difference of that amount in the result.   And when the court acquires jurisdiction by the appeal of one party his opponent may obtain a review of any adverse rulings although because of the smallness of the judgment against him he could not have appealed in the first instance.

2. ANIMALS—*Escaping from Pasture—Liability for Damages to Crops.*   A herd law, making owners of animals which are permitted to run at large liable for injuries done to crops, does not apply where the injury is done upon unenclosed land by cattle that without fault of their owner have escaped from a pasture surrounded by a fence strong enough to show the exercise of reasonable diligence for their restraint.

3. SAME—*Instructions.*   The evidence held to require an instruction on the point covered by the foregoing paragraph.

Appeal from Gove district court; JACOB C. RUPPENTHAL, judge.   Opinion on rehearing filed April 8, 1916.   Reversed.

(For original opinion of modification see *ante,* p. 116, 154 Pac. 275.)

*John R. Parsons,* of Quinter, and *Arch L. Taylor,* of Russell, for the appellant.

*R. H. Thompson,* of Gove, *Lee Monroe, James A. McClure,* and *C. M. Monroe,* all of Topeka, for the appellee.

The opinion of the court was delivered by

MASON, J.: On the appeal of the plaintiff in this case the judgment was ordered modified with respect to the taxation of costs. (*Hazelwood v. Mendenhall,* ante, p. 116, 154 Pac. 275.) The defendant had given notice of his purpose to ask a review of rulings with regard to the instructions, and presented a question in that connection which was not mentioned in the original opinion, because, through a misapprehension of the record, it was not thought to be material. The attention of the court was called to the matter and a rehearing was granted upon that feature of the case.

(1) The plaintiff suggests that so far as affects the right of the defendant to appeal the judgment fixes the amount in controversy, and as this was less than $100 no proceedings in the nature of a cross-appeal can be entertained. Where an appeal is properly taken to this court, the amount in controversy being over $100, the practice is to consider all rulings complained of by the appellant, although as to some of them a reversal might not make a difference of that amount in the result. This is illustrated by the fact that in the decision of this case the only contention of the appellant that was sustained had relation merely to the costs—a matter which could not have been the basis of an appeal. Consistently with this practice it must be held that where the court obtains jurisdiction by the appeal of one party, his opponent, having a right under the statutes to what is in effect a cross-appeal (Civ. Code, § 578), may obtain a review of any adverse ruling, although because of the smallness of the judgment against him he could not have appealed in the first instance. This is in accordance with the usual rule, although there are decisions to the contrary. (3 C. J. 432.)

Hazelwood v. Mendenhall.

(2) The defendant asked an instruction to the effect that, the action being brought under the herd law, which imposes a liability for damages done to crops by live stock permitted by the owner to run at large, no recovery could be had for injuries done on unenclosed land by animals which without the fault of the owner had escaped from a pasture enclosed by a lawful fence, or by an ordinary fence, such as is generally required to restrain that kind of stock. This was refused, and the court instructed that the plaintiff might recover even if the defendant's cattle had escaped from an enclosure surrounded by a lawful fence, and injured crops upon the plaintiff's unenclosed land before they could be apprehended. The law has been settled in accordance with the view presented by the defendant. (*Railway Co. v. Olden,* 72 Kan. 110, 112, 113, 83 Pac. 25.) In *McAfee v. Walker,* 82 Kan. 182, 107 Pac. 637, it was said:

"The common law places the responsibility wholly upon the owner of animals to keep them from his neighbor's premises, and makes him liable for any injury resulting from his failure to do so. The fencing act (Gen. Stat. 1868, ch. 40, art. 1, § 1, Gen. Stat. 1901, § 3071) changes the rule and requires the neighbor to protect himself from such injury up to a certain point by erecting a fence of a fixed power of resistance. The adoption of the herd law in turn eliminates the intervening statute and restores the common law, by canceling that requirement." (p. 185.)

The last sentence quoted requires some explanation and perhaps modification. The requirement that the crops shall be protected by a legal fence is canceled by the herd law only so far as relates to animals that are "running at large." Any that without fault of their owner have escaped from an enclosure surrounded by a barrier reasonably adapted to their restraint are not regarded as within that term, and the definition of a legal fence has reference to that which protects crops, and not to that which restrains cattle within an enclosure. "It was not intended that the fence law should, and it does not, furnish a rule by which to determine whether the owner of stock in herd-law counties is guilty of negligence in enclosing them." (*Railway Co. v. Olden,* supra, p. 112.)

(3) There seems to have been some evidence warranting the submission to the jury of the question whether the defendant's cattle had escaped without his fault from an en-

closure surrounded by a fence reasonably adapted to their restraint. The instructions given and refused relating to this matter were therefore material and the departure from the established rule requires a new trial.

Instead of the modification heretofore indicated, the judgment will be reversed and a new trial ordered. The costs in this court will be divided.

---

No. 19,890.

THE STATE OF KANSAS, ex rel. JOHN S. DAWSON, as Attorney-general, etc., *Appellant*, v. THE CITY OF VICTORIA et al., *Appellees*.

SYLLABUS BY THE COURT.

1. INCORPORATION OF CITY—*Number of Petitioners—Finding of County Commissioners Upheld.* Under a statute authorizing the county commissioners to incorporate a city upon a petition signed by a majority of the electors of the territory, but making no requirement that the fact of the signers constituting such majority shall be recited in the petition or in the record, an order of incorporation will be upheld which contains no reference to the matter except a statement that the petition showed that it was signed by the requisite number, while the petition itself in fact contained no recital on the subject.

2. INCORPORATION OF CITY—*Number of Inhabitants—Territory to be Included in Corporation—Petition.* The statement in a petition for the incorporation of a city, following the language of the statute, as to the number of inhabitants of the "town or village" which it is desired to have incorporated, refers to the inhabitants of the territory proposed to be included within the corporate limits, platted or unplatted, notwithstanding a subsequent statement in the petition that the town and its additions have been platted.

3. SAME—*"Metes and Bounds" of Proposed City—Description Sufficient.* A requirement that the boundaries of a proposed city shall be set forth in the petition by metes and bounds is sufficiently complied with by any description that indicates clearly the territory intended to be included.

4. SAME. Various irregularities of description held not to be fatal.

5. INCORPORATION OF CITY—*County Commissioners Acted on Petition at "Regular Session" — Completed at Adjourned Session — Proceedings Valid.* The requirement that the board of county commissioners shall act on a petition for the incorporation of a city at a regular session is met where such action is taken at an adjourned session of a regular meeting, notwithstanding the matter had already been partly considered and that no order had been made continuing the hearing to any particular time.

6. INCORPORATION OF CITY—*Journal Entry of Proceedings of County Commissioners Sufficient.* A requirement that an order incorporating a city shall recite the substance of the petition therefor is complied with where the journal of the county commissioners' proceedings contains a recital that on a certain day the petition was filed, stating its substance, and that on a later day it was granted, the details of the order being set out in the record of the proceedings of that day.

7. SAME—*Order of County Commissioners Included a Description of the Territory Covered by the Proposed City.* Under a statute providing that upon the presentation of a petition asking that a city be incorporated, with boundaries therein stated, the county commissioners may make an order of incorporation which shall include a description of the territory covered, changes in the boundary being neither expressly forbidden nor expressly permitted, the proceedings are not invalidated by excluding from the order tracts included in the petition, nor by including in the order tracts not referred to in the petition, where the tracts so included are parts of streets, or strips corresponding to streets, or form minor portions of tracts, the greater part of which were included in the petition, and such changes do not bring into the city any inhabitants who were not residents of the territory described in the petition.

8. SAME—*Petition for Incorporation—Description of Territory.* In the part of a petition for the incorporation of a city describing the territory sought to be incorporated, a reference to a tract as an original town as platted and on file in the office of the register of deeds is to be interpreted as intended to designate all the territory covered by the original plat, notwithstanding an order had been made vacating two of the blocks and a part of the adjoining streets.

9. SAME. Various apparent inconsistencies and obscurities in describing the boundary of the territory incorporated held to be cured by applying the usual rules of interpretation.

Appeal from Ellis district court; JACOB C. RUPPENTHAL, judge. Opinion filed April 8, 1916. Affirmed.

*S. M. Brewster,* attorney-general, *E. A. Rea,* of Hays, *C. W. Burch,* and *B. I. Litowich,* both of Salina, for the appellant.

*A. D. Gilkeson, J. H. Simminger,* both of Hays, *Lee Monroe, James A. McClure,* and *C. M. Monroe,* all of Topeka, for the appellees.

The opinion of the court was delivered by

MASON, J.: The board of county commissioners of Ellis county undertook to incorporate a city of the third class by the name of Victoria, making an order to that effect, under which

an organization was effected. The state brought an action to have the proceedings set aside on various grounds. The district court held the incorporation to be valid, and the plaintiff appeals.

The order undertaking to create the city is not open to attack for any mere irregularity or mistake of fact. (*The State, ex rel., v. Holcomb,* 95 Kan. 660, 149 Pac. 684.) This court is of the opinion that none of the defects pointed out are so serious as to amount to a want of jurisdiction. They will be briefly stated, together with the grounds upon which they are regarded as not being fatal.

(1) The statute involved reads as follows:

"Whenever a petition signed by a majority of the electors of any unincorporated town or village within the state shall be presented to the board of county commissioners of the county in which such town or village is situated, setting forth the metes and bounds of their village and commons, and stating as near as may be the number of the inhabitants of such town or village, and praying that such town or village may be incorporated as a city, with satisfactory proof that such petition has been published in full in some newspaper printed in the said town or village at least once a week for three consecutive weeks, and the said board of county commissioners shall be satisfied that a majority of the taxable inhabitants of such town or village are in favor of such incorporation, and that the prayer of the petitioners is reasonable, and that the number of the inhabitants of such town or village exceeds two hundred and does not exceed two thousand, such board of county commissioners may, at any regular session thereof, by order reciting the substance of such petition and the due publication thereof, and their finding that a majority of the taxable inhabitants of such town or village are in favor of such incorporation, and that the prayer of the petitioners is reasonable, and that the number of the inhabitants of such town or village is within the limits hereby required, declare such town or village incorporated as a city of the third class, by the name and style of 'The city of ——' (naming same), and designating in such order the metes and bounds thereof." (Gen. Stat. 1909, § 1511.)

The petition asked for the incorporation in one municipality of the two towns of Herzog and Victoria, one on the north side of the Union Pacific railroad, the other on the south. It did not recite that the signers constituted a majority of the electors of these towns, and the commissioners' record does not show an express finding to that effect, although it refers to the petition as showing the fact. The statute does not require the petition to contain such a recital, so its omission to do so is un-

important.   The commissioners are authorized to make an order of incorporation if they find certain enumerated facts, that with respect to the number of signers not being among them.   The trial court found that the petition was sufficiently signed.   The action of the commissioners implied such a finding on their part (*Schade v. Theel*, 45 Kan. 628, 26 Pac. 38), and this implication was supported by the recital that the petition showed the fact.   The failure of the record to show a specific and express finding on the subject does not invalidate the proceedings.

(2)   The petition is required to state "as near as may be the number of inhabitants of such town or village"—that is, of the town or village the incorporation of which is sought. The plaintiff contends that this requirement was not met, because the allegation of the petition in that regard was that the combined population of such towns was about 800 inhabitants. The petition also stated that the towns and their additions had been platted, and the streets and alleys therein laid out and named, and the point sought to be made against the petition is that it must be interpreted to mean that the population of the platted territory was about 800, without giving any information whatever regarding the number of inhabitants of the unplatted tracts which were included within the boundaries of the proposed corporation.   The reference to the plats was unnecessary, and was obviously intended as an argument in favor of the reasonableness of the request.   We do not regard it as committing the petitioners to the theory that by the word "towns" in the clause relating to the population they meant solely the territory that had been platted.   The petition in this respect follows the phraseology of the statute, which speaks of the number of inhabitants of the "town or village," plainly meaning of the territory, including such town or village, the incorporation of which is desired.   The statute recognizes that the boundaries of the town or village are not precisely defined, and requires the petitioners to set forth "the metes and bounds of their village and commons."   The requirement that the petition shall be signed by a majority of the electors of the town or village plainly means that the signers shall constitute a majority of the electors of the territory de-

scribed by metes and bounds, the phrase "the town or village" being used as a convenient expression to convey that idea. The words are used in the same sense in the petition, and the subsequent reference to the platting of the towns and additions does not alter their meaning.

(3) The description of the territory comprising the proposed city, as given in the petition, is criticized as not complying with the statute for want of a statement of its "metes and bounds." Some of the tracts to be included are described by metes and bounds, and others as the original towns of Herzog and Victoria and certain enumerated additions. The reference here is obviously to the recorded plats. The descriptions are readily intelligible and entirely definite. This constitutes a substantial compliance with the statute. It is not necessary that the description shall be literally by metes and bounds— that is, by describing the boundary line by course and distance. (*The State, ex rel., v. Young,* 61 Mo. App. 494; *State v. Bay City,* 65 Ore. 124, 131 Pac. 1038; *Duquesne Borough,* 147 Pa. St. 58, 23 Atl. 339; *Beecher v. Parmele et al.,* 9 Vt. 352; *Williams v. Willard,* 23 Vt. 369.)

(4) The description is also criticized as indefinite in several particulars. In one instance a course is given as "northwesterly" without indicating the angle. The fair inference is that what was intended was a line prolonging that of a lot at the corner of which it started. A change of direction to a "northeasterly" course presumptively contemplates a right angle, and this interpretation gives a connected boundary. A point in the boundary is described as the intersection of an east-and-west public highway with the north side of the railroad right of way, running northeast and southwest, without indicating whether the north or south side of the road was intended. The ambiguity is not sufficiently serious to vitiate the proceedings. The line of "First Street" is used as a boundary, without other identification. It is sufficiently obvious that First street in Victoria was intended.

(5) The petition was presented at the regular meeting of the county board in April, 1913. It was acted on at adjourned sessions of that meeting, without orders having been made continuing the consideration of this particular matter to any specified time. The requirement that action should be taken

at a regular session was not violated. By virtue of the statute county warrants may not be issued at an adjourned meeting (Gen. Stat. 1909, § 2104), but in other respects it is a part of the session at which the adjournment was taken (7 Words & Phrases, p. 6039; *Sawyer v. Bryson,* 10 Kan. 199). It was not necessary that the time when the consideration of the incorporation matter would be resumed should have been stated. (*People v. Town of Linden,* 107 Cal. 94, 40 Pac. 115; *Wayne Borough Incorporation,* 12 Pa. Super. Ct. 363, 368.)

(6) A "journal entry" of the proceedings prepared by the county attorney was adopted by the board in May and made of record. It recited that on April 19, 1913, the petition had been considered, and that the board had then decided to grant it, and had instructed the surveyor to make a survey, and the county attorney to prepare a journal entry for submission. It also recited the making of the formal order on May 31, the details of which were stated. The plaintiff treats the matter as two separate attempts at incorporation, and contends that the first was void because not complete, and the second because it did not recite the substance of the petition. We regard what was done on the two days as parts of the same order of incorporation. The record of the proceedings of April 19 is to be deemed a part of the order, and this recites the substance of the petition. At that session it was decided that the petition should be granted, and on May 31 the details and form of the order were determined.

(7) The boundaries of the city as stated in the order of incorporation do not correspond exactly with those set out in the petition. Some tracts included in the petition were excluded in the order. Of this no complaint is made. Some tracts not a part of the territory described in the petition were included in the order of incorporation, and this is strongly objected to. "The boundaries of the corporation, as established by the board, would not necessarily be identical with those stated in the petition. The statute contemplates that the order shall show what the petitioners prayed for and what the board granted." (*The State v. Bilby,* 60 Kan. 130, 133, 55 Pac. 843. See, also, *People v. Town of Loyalton,* 147 Cal. 774, 82 Pac. 620; *Tullytown Borough,* 11 Pa. Co. Ct. 97; *Morris v. Taylor,* 70 W. Va. 618, 74 S. E. 872.) A chief pur-

pose of requiring the petition to be published is doubtless in order that persons living within the territory described may be advised of the pendency of the matter in order that they may be heard upon it if they should so desire. It may be that the policy of the statute forbids bringing into the city non-residents of the territory described in the petition. Here, however, the new territory included no property on which persons were living, and therefore its inclusion in the city did not alter the number or personnel of inhabitants whose interests might be affected. Most of the added tracts were streets or parts of streets, or strips of ground corresponding to streets, that had not been included in the territory described in the petition. Changes such as these were no more objectionable than the dropping out of tracts that had been covered by the petition. One considerable addition was made by enlarging an included tract, which was 900 feet long and some 780 feet wide, by adding 115 feet to its width. This was done "to avoid running the city boundary through buildings of some of the occupants of the tract." It "did not add any new tracts nor new occupants, but simply took more of certain strips or tracts which were already included in the petition." These changes did not affect the validity of the order.

(8) The plaintiff contends that the order of incorporation includes another tract than those already referred to, which was not within the boundaries as described in the petition. This contention is based on the circumstance that two blocks of the original plat of Victoria (the one in the northeast corner and that just south of it) together with the streets east and north of them, and between them, and alleys in them, had been vacated by an order of the commissioners made in 1905. The petition in describing the territory proposed to be incorporated included as one tract "The Original Town of Victoria, as the same is platted and on file and of record in the office of the Register of Deeds." The boundary line of the city, as defined by the order of incorporation, enclosed the territory covered by the original plat of Victoria, including the two blocks referred to. The argument is that by reason of the order of vacation the description employed in the petition did not include these blocks. We think the natural interpretation of the language of the petition is that it was intended to refer

to the territory which had been covered by the original plat of the town of Victoria. The term "original plat" is that ordinarily used to distinguish the first plat of a town from the subsequent additions, and "original town" is employed in the same way. The vacation of the two blocks and a part of the adjoining streets eliminated a part of the block lines and made one "acre tract" of what had been two blocks separated by a street, but made no other change. The property still lay within the lines of the original plat. It could properly and appropriately be described as an unnumbered lot, block or parcel of ground, of stated dimensions, lying in the northeast corner of the original town. If the two blocks had been in the interior of the plat a reference to the "original town" could hardly be supposed to exclude them. They happened to be outside blocks, but we do not regard this circumstance as justifying reading the description as though it read "The original town of Victoria, not including any blocks or streets that have been vacated."

(9) The length of one line of the boundary, lying nearly north and south along the outside of an addition, was stated in the order of incorporation as 1803 feet. This was an obvious mistake, as the end of the addition named was reached at about 1503 feet. That this was the point intended as the end of the line is indicated by the fact that the boundary (as shown both in the petition and order) there makes a jog of thirteen feet to the east, and that the next calls are then made consistent instead of impossible. The next line is described as running north to the north "side or line" of Delaware street. Delaware street does not extend quite so far east, but the reference is plainly to the north line of the street extended to the point of intersection. In other instances streets are spoken of at places to which they do not reach. The meaning is not obscure, and the description must be held to apply to the positions the streets designated would occupy if extended. The terms "northwesterly" and "northeasterly" are used without indicating the angle; but this is sufficiently indicated by the directions of the lot and block lines at the point in question. The tracing of the boundary having reached the north line of the railroad right of way, the next call reads "Thence south Four Hundred (400) feet to the south line of said right-

of-way." Literally pursued this call is impossible, for the other side of the right of way could not be reached by going 400 feet directly south. And if it followed the direction specified the boundary line would fail to connect with other monuments designated. But if the language is taken to mean that the line is to run in a southeasterly direction, at right angles to the railroad, the difficulty in tracing the boundary is overcome. That this is what was intended appears from the fact that as the right of way is but 400 feet wide, the only direction in which its south side could be reached in 400 feet is that suggested. The boundary line was sufficiently indicated throughout, for the usual rules of interpretation are sufficient to clear up the obscurities and reconcile inconsistencies. (4 R. C. L. 110.)

On July 6, 1913, the commissioners directed the county clerk to enter upon the journal an order for the purpose of correcting some of the irregularities already referred to. As we find the original record sufficient the effect of the subsequent order need not be considered.

The judgment is affirmed.

DAWSON, J., not sitting.

---

No. 19,900.

THE VAN ARSDALE - OSBORNE BROKERAGE COMPANY, *Appellee*,
v. A. E. JONES and T. M. JONES, *Appellants*.

SYLLABUS BY THE COURT.

1. NONRESIDENT DEFENDANT—*No Fraud Shown in Procuring Service.* The record held not to show fraud in procuring service upon a nonresident defendant.

2. PLEADING—*Amendment—Continuance Refused.* The allowance of an amendment to the reply without granting a continuance held not to have been prejudicial.

3. TRIAL—*Case Taken from Jury—Not Material Error.* The taking of a case from the jury held not to constitute material error, because, although a formal issue of fact was presented, the real matters in controversy turned wholly upon questions of law.

4. INSURANCE—*Solicitor's Contract—Overdue Premium Notes—Commissions.* Under a contract that where an insurance solicitor should

accept a premium note he should be paid by his employer a cash commission, to be charged back to him if the note should remain unpaid for six months after maturity, no provision being made for his subsequently receiving credit for it under any circumstances, the right of the agent to the commission ceases when a note, without the fault of the employer, has remained unpaid and overdue for six months, and is not restored by a subsequent extension or collection.

5. SAME—*Unpaid Premium Notes—Action to Recover Commissions Paid Thereon.* In an action upon such a contract to recover from the agent commissions paid him on notes that remained unpaid for six months after maturity, it is not incumbent on the plaintiff to show that it had taken affirmative steps to enforce their collection.

6. TRIAL—*Evidence.* Rulings concerning the admission and rejection of evidence held not to constitute prejudicial error.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed April 8, 1916. Affirmed.

*H. E. Walter,* and *John H. Connaughton,* both of Kingman, for the appellants.

*E. L. Foulke, C. A. Matson,* and *J. D. Wall,* all of Wichita, for the appellee.

The opinion of the court was delivered by

MASON, J.: The Van Arsdale - Osborne Brokerage Company employed A. E. Jones as an agent to solicit fire insurance, under a written contract which among other things provided that he should receive a commission upon the premiums; that where premium notes were given the brokerage company would remit to Jones on the first of the ensuing month the amount of his commissions thereon, but that "in all cases where notes are taken by him for insurance and said notes remain unpaid for six months after due, the commission advanced by said Company shall be refunded by said solicitor." Provision was also made for charging back to the solicitor commissions on policies that were subsequently canceled. Jones worked under the contract from August 1, 1909, to March 30, 1912, at which time the agency was transferred. On April 14, 1913, the company brought action against Jones, joining as a defendant T. M. Jones, who had signed a bond for his faithful performance of his contract, upon an account for $184.64, con-

sisting of items charged to the agent because of the cancellation of policies, and because of the nonpayment within six months after maturity of premium notes on which he had received a commission. Upon trial the court directed a verdict for the plaintiff, on which judgment was rendered. The defendants appeal.

(1) A reversal is asked on the ground that service in Sedgwick county was procured by fraud, in that A. E. Jones, a resident of Kingman county, was induced to come to Wichita on the representation that the company desired to discuss a settlement with him, when in fact the purpose was to have him served with summons in the present action. In the plaintiff's abstract it is said that at the hearing of the motion to set aside the service oral evidence was introduced, of which no transcript or abstract was made. If that is the case, and the statement has not been challenged, no review of the ruling on the motion can be had unless the admitted facts show that fraud was practiced in obtaining service. The parties agree that the account against A. E. Jones was placed for collection in the hands of a Kingman attorney, who told Jones that unless it was paid he would have to bring an action upon it; that there was talk between them of the withholding of the suit for a time, of his entering an appearance later, and of his going to Wichita to confer with the plaintiff, the evidence being in conflict as to the details of the conversations; that a little later Jones called at the plaintiff's office in Wichita to discuss a settlement, and was there served with summons. These facts fall short of making out a case of procuring service in Sedgwick county by fraud, there being no admission that the defendant was induced by the plaintiff's representative to make the trip to Wichita for the purpose of discussing a settlement. (*McLain v. Parker*, 88 Kan. 717, 129 Pac. 1140.)

(2) The answer of A. E. Jones alleged that the plaintiff had extended the time of payment of the notes the nonpayment of which was the basis of the demand for the refunding of his commissions. The reply was a general denial. At the trial the plaintiff was permitted to amend the reply by pleading that any extension of time that was given was a mere indulgence, not supported by any consideration. The defendants objected unless a continuance were had, and now complain

of the ruling. The allowance of the amendment was within the discretion of the court, and it does not appear that a delay would have benefitted the defendants. And in any event the matter presented in the amendment is not vital to the result, as will appear from what is hereinafter said.

(3) Technically a case was presented for submission to the jury, the burden of proof being on the plaintiff. A formal issue had been raised as to the terms of the written contract of agency, but the document was produced at the trial and its genuineness is not controverted, so that no real question exists in that regard. Upon the matters of substantial dispute the plaintiff relied upon the testimony of its secretary, May O. Jones, who had charge of the accounts of all agents. She testified, largely from the records of the company, concerning the transactions had with respect to each of the controverted items. The defendants were entitled as an abstract proposition to have the jury pass on the credibility of the witness, but no challenge of her veracity is made, and in other respects the effect of her statements depends upon the soundness of the propositions of law upon which the defendants ask a reversal. Under these circumstances the omission to refer the matter to a jury is not regarded as material.

(4) The substantial controversy between the parties turns upon the force of this sentence of the agency contract: "And it is further agreed by said solicitor that in all cases where notes are taken by him for insurance and said notes remain unpaid for six months after due, the commission advanced by said Company shall be refunded by said solicitor." It was shown that in a number of instances in which the company had charged back to the agent the commission paid him on a particular premium note, the company had extended the time of payment, sometimes upon the giving of security; and that in other instances, after a commission had been charged back to the agent, the company had collected the note without giving the agent any credit therefor. But no such extension or collection was shown to have been made until after the expiration of six months from the original maturity of the note.

The defendants are right in asserting that there was an implied obligation on the part of the company not to do anything to interfere with the prompt payment of the premium notes.

(*Currier v. Mutual Reserve Fund Life Ass'n*, 108 Fed. 737; *Reed v. Union Life Insurance Co.*, 21 Utah, 295, 61 Pac. 21.) And if the company, before a note had become six months overdue, had granted the maker an extension, whether for a consideration or otherwise, it would thereby have waived its right to charge back the agent's commission because of a non-payment within the time originally fixed. But the defendants also maintain that even where a commission had properly been charged back to the agent because of the nonpayment of a note for six months after maturity, he was entitled to a credit whenever it was collected; and that even where an extension was granted after a note had remained six months overdue, the right of the agent to a contingent credit revived, and he could not be required to refund the commission until the expiration of six months from the new date of maturity. We can not agree that such is the fair construction of the contract. It provides that whenever a note remains unpaid for six months after maturity the commission is to be refunded by the agent. No provision is expressly made for reopening the account in that regard, and we think none is to be implied. By the literal terms of the contract the right to the commission is destroyed by a default of six months in the payment of the note. The requirement that the commission shall be contingent not only upon the payment of the note but upon its prompt payment is somewhat strict, but not so harsh as to justify a strained construction to avoid its enforcement. Its obvious purpose is to give the agent a strong motive to see that the notes taken shall be such as will be paid without delay and without inconvenience or expense being caused to the company. As the right of the agent to a commission was absolutely cut off whenever (without fault of the company) a note remained unpaid for six months after maturity, it was of no consequence to him what extensions were made after that time, for a consideration or otherwise, or whether collection was ever effected. And the liability of the bondsman is measured by that of the agent, whose faithful performance of the contract he had guaranteed. (*Milwaukee Mechanics' Ins. Co. v. Warren*, 150 Cal. 346, 89 Pac. 93; *Van Arsdale-Osborne Brokerage Co. v. Riner*, [Okla. 1915] 153 Pac. 859.)

(5) The defendants argue that the burden of proof was on

the plaintiff to show that it had diligently endeavored to collect the notes. There is nothing in the record that suggests a want of reasonable diligence in that regard. The company was bound not to do anything to encourage delay, but was not required to take any particular steps in the effort to enforce collection.

(6) Complaint is made of the sustaining of objections to two questions asked of the plaintiff's witness on cross-examination. One of them referred to a matter already held to be immaterial. The other is not regarded as of sufficient importance to be the basis of a reversal whether the ruling was correct or not. An objection is made to a part of her testimony as immaterial. If it was immaterial it could not under the circumstances have been prejudicial. A. E. Jones pleaded that after the written contract had been executed a representative of the plaintiff orally agreed with him that the commissions on unpaid notes should not be charged back to him. Presumably in support of this allegation he offered to testify to a conversation with an agent of the plaintiff, but his testimony was ruled out, apparently for want of proof of the agent's authority. The ruling seems to have been correct, but in any event it can not be reviewed, for the character of the excluded evidence was not shown. (Civ. Code, § 307.)

The judgment is affirmed.

---

No. 19,924.

THE KANSAS STATE MUTUAL HAIL ASSOCIATION, *Appellant*, v. THE TITLE GUARANTY & SURETY COMPANY, *Appellee*, and THE AMERICAN SURETY COMPANY.

OPINION DENYING A REHEARING.

Appeal from McPherson district court; FRANK F. PRIGG, judge. Opinion denying a rehearing filed April 8, 1916. (For original opinion of affirmance see *ante*, p. 271, 155 Pac. 13.)

*Alex S. Hendry,* of McPherson, for the appellant.

*G. F. Grattan,* and *J. M. Grattan,* both of McPherson, for the appellee.

The opinion of the court was delivered by

MASON, J.: In affirming this case the court decided that the evidence justified submitting to the jury the question whether the insurance association, in the application to the bonding company for a bond for its employee, should have mentioned as a debt the fifty dollars which it had advanced to him, and whether the failure to mention it proceeded from bad faith. In a petition for a rehearing the plaintiff criticises the instruction submitting that question on the ground that it was outside the issues made by the pleadings. The answer did not directly and distinctly refer to this matter, but it did allege that the statements in the application were willfully false, and this particular question was developed at the trial. In a supplemental petition for a rehearing it is said that the evidence on the subject was objected to by the appellant as not constituting a debt, and as not within the issues in the case. We do not find in the abstracts any mention of the latter objection. No injustice is apparent in the submission of this issue to the jury. The plaintiff asserts that the instructions made it a special feature by repeating it so many times. We find it mentioned but once, and then only incidentally, save in the particular instruction to which objection is made. As stated in the original opinion, it is very unlikely that the verdict was influenced by this phase of the matter. The jury found specifically that Calder had not authorized any part of his remittances to be applied on the expense account, and this implies that there was no agreement pledging all his receipts to the payment of the advances made him. This finding indicates the basis of the decision, and renders immaterial any error respecting the issue of fraud.

The failure of the court to instruct on other issues is also now complained of, but the specifications of error were silent on the subject.

The petition for a rehearing quotes these words from the original opinion: "He [the employee, Calder] was authorized to retain twenty per cent from each premium collected." It then adds: "There was not a syllable of evidence offered, nor was it alleged that agent Calder was authorized to retain his commissions at all. In fact he was not. . . . The assump-

tion in the opinion that the agent was authorized to retain twenty per cent from each premium collected, is without foundation." In view of the court's expressed judgment on the matter this language is somewhat dogmatic, but it will be assumed that counsel intends no discourtesy. The plaintiff's principal witness, the secretary of the insurance association, who transacted all the business with the agent, replied in the negative to the question: "If you had never advanced any money to Mr. Calder, would he owe this company anything?" He testified: "Each report [sent in by Calder] shows the total premiums received, *the agent's commission retained* and the amount due the company." He was asked: "Was there any premiums, cash premiums through Calder, that your company did n't get?" He answered: "No, sir." The examination then proceeded thus:

"Q. How many dollars of premiums did this man write? A. A little over $2000, was n't it? $2099.

"Q. He deposited that to your company's credit in the Stockton National Bank, did n't he? A. A part of it.

"Q. What part, your part? A. Yes, sir.

"Q. All of your part went there, did n't it? A. Yes, sir."

Calder testified that he was to receive twenty per cent on all the business written by himself and his subagents, and that the company was to receive the remainder—"to receive their net [proceeds] of their insurance."

The plaintiff's present conception seems to be that the agent was to be paid a salary equal to twenty per cent of the premiums he collected—that he had no authority to retain any part of the collections, but was bound to turn them all in, the company as a separate transaction to pay him a salary measured by the amount of business done. At the trial the right of the agent to withhold his commission from what he had collected appears not to have been challenged, except by reason of the advances that had been made him. It is clear that the company advanced him money to enable him to pay his expenses in getting started, expecting to receive it back out of his share of the premiums collected. The real controversy was whether, as he testified, he was to repay it as he found himself able to spare sums from time to time out of his share of the proceeds — as his commissions yielded something over his

necessary expenses; or whether, as claimed by the company, all his share of the proceeds—all his twenty per cent commissions—stood pledged to the repayment of the money advanced him, so that he was not entitled to retain any of it while any part of his debt remained unpaid. The jury decided this question of fact against the plaintiff. Their decision is not reviewable here, and really determines everything of substance that is involved in the lawsuit.

The petition for a rehearing is denied.

No. 19,930.

IDA M. DEGITZ, *Appellee*, v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellant.*

No. 20,125.

MARIAN HAUSERMAN, *Appellee*, v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. WRONGFUL DEATH—*Injuries to Licensees While Inspecting Cars— Negligence of Switching Crew.* At a junction of two railroads a certain track owned by one of the railroad companies was designated as a transfer track and was used by both companies for the purpose of the transferring of cars from one line to the other. Before a transfer was made, an inspection by the receiving company was required, and it was the custom for the delivering company to place cars intended for transfer upon the transfer track. When they were so placed they were supposed to be ready for inspection by the inspectors of the receiving company. The delivering company had notified the receiving company that an incoming train had a car of live stock intended for shipment over the line of the receiving company, which had a train going out shortly after the arrival of the train of the other company. When the train of the delivering company pulled into the yard it placed three of the cars of the train apart from the others upon the transfer track. One of the three was not intended for transfer, and an effort was made to take it out at the north end of the transfer track, but that was found to be impracticable, and the three cars were then left together on the transfer track where cars were customarily placed for inspection and transfer. Inspectors of the receiving company then proceeded to make an inspection of the stock car, one of the three so set apart. The engine of the delivering company was taken around on another track to the south end of the yard and there attached to the remaining cars of its train, and without any signal

or warning the train was pushed up with considerable violence against the three cars set apart, one of which was being inspected, and the collision resulted in killing two inspectors. In an action to recover for their death it is held that they are to be regarded as invitees, and that under the circumstances the delivering company was bound to anticipate that inspectors might be about the cars, and that reasonable care should have been exercised and reasonable warning given to them of the approach of the train before colliding with the cars so set apart; and whether the delivering company. was guilty of negligence or whether the inspectors were guilty of contributory negligence were questions for the determination of the jury.

2. SAME—*Evidence Supports the Findings.* The evidence examined and held to be sufficient to support the special findings made by the jury, which in effect held that the defendant was negligent and that the deceased inspectors were not guilty of contributory negligence.

Appeals from Geary district court; ROSWELL L. KING, judge. Opinion filed April 8, 1916.  Both affirmed.

*W. W. Brown, James W. Reid,* both of Parsons, and *W. S. Roark,* of Junction City, for the appellant.

*James V. Humphrey,* and *Arthur S. Humphrey,* both of Junction City, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.:  Two actions were brought against the Missouri, Kansas & Texas Railway Company for damages, one for the death of Louis Degitz, the other for the death of Edward W. Hauserman, both employees of the Union Pacific Railroad Company, who were engaged at the time they were killed in inspecting a car which had been placed upon the transfer track of defendant in Junction City.  The jury in each case rendered a verdict for the plaintiff and also made certain special findings.  The cases were tried separately, and as both men were inspecting the same car and were killed by the same movement the issues and the testimony in the cases were substantially similar.  The appeals were argued together and they may be disposed of in a single opinion.

Junction City is a terminal point of the Missouri, Kansas & Texas railway, which enters the city from the south, and its main track running north and south connects with the main line of the Union Pacific.  East of the north end of the Missouri, Kansas & Texas main track it has a switching yard

composed of four sidetracks running parallel to the main track and connected with the latter by means of two connecting tracks, one at the north running in a northwesterly and southeasterly direction, and one at the south running in a southwesterly and northeasterly direction. These were known as the north and south "leads" and the distance between them where they touched the main track was approximately fourteen hundred feet. A large proportion of the cars arriving on the Missouri, Kansas & Texas were consigned to points on the Union Pacific, and by an agreement between the two roads this part of the main track between the leads was designated as a transfer track, where cars that were to be transferred to the Union Pacific were placed to be taken over by the latter road. It was the usual custom of the Missouri, Kansas & Texas to pull their trains in upon this transfer track, leaving the cars to be transferred near the north end of that track, then run the engine over the north lead to one of the sidetracks and go to the south end of the train where it would switch out and place on the sidetracks all the cars not destined to points on the Union Pacific. Before cars consigned to the Union Pacific were taken over by the latter they were always inspected by employees of that road, and whenever a car of live stock or perishable freight came in consigned to the Union Pacific the Missouri, Kansas & Texas would give the other road notice so that the car could be inspected in time to get it started out promptly on the Union Pacific.

The accident in which Hauserman and Degitz were killed occurred about ten o'clock at night on December 3, 1913. A Missouri, Kansas & Texas train consisting of ten cars and caboose had arrived and was pulled upon the transfer track. A number of the cars were to be consigned to the Union Pacific, and that company had been notified during the afternoon that one of these cars in the train contained live stock. Three of the cars were cut off of the train and left up at the north end of the transfer track. The southernmost car of the three was not intended to be transferred to the Union Pacific, and it appears that the crew of the train undertook to place the third car on one of the sidetracks by running the three cars up to the north lead, but they were unable to get in at that end as there was not room for the engine and three cars to get past

the north switch without encroaching upon the yard and tracks of the Union Pacific. Then the three cars were pushed back and left on the transfer track about six hundred feet from the remaining cars of the train. The engine alone was then taken around by way of the third sidetrack to the other end of the yard and went in on the south end of the transfer track and coupled to the caboose and the other cars of the train left at the south end. The train was then pushed north on that track, and with considerable force, against the three cars which had been left on the north end, including the car of live stock, which was the northernmost of the three. When the engine left the three cars at the north end, the inspectors Hauserman and Degitz and an assistant named Fink proceeded to inspect the live-stock car which it was anticipated would be picked up by the Union Pacific and attached to a train which was due to leave shortly after the arrival of the Missouri, Kansas & Texas train. On opening the boxes it was discovered that some packing was necessary, and Fink was sent for waste to pack the boxes. It appears that he went a distance of about two hundred and fifty feet, and on returning with the waste heard the contact of the train with the three cars which had been left at the north end, also an outcry from some one, and then discovered Degitz and Hauserman underneath the north truck of the stock car. Hauserman was dead. Degitz was still living but died shortly after he was found.

The inspectors, it appears, carried lanterns with reflectors at one side, but apparently their lights were not seen by the trainmen of the defendant. It is evident that the inspectors thought that the cars placed at the north end had been left for inspection, as they began the work of inspection shortly after the cars had been placed there. It appears that during the afternoon a dispatch had been sent by the defendant to Junction City to the effect that probably a car of live stock would be on the defendant's train destined for Kansas City over the Union Pacific railroad, and this message had been brought to the attention of the Union Pacific agent. The defendant's train, which was due about six o'clock that evening, did not arrive until after ten, and the Union Pacific train, which was scheduled to leave Junction City at 9:30 p. m., did not, on some account, leave that night until 11:50 p. m. Whether the

delay was due to the happening of the accident is not definitely shown. Under railroad regulations inspection of the car was required. Because of the character of the shipment and the shortness of the time to make the transfer it was necessary that there should be promptness and dispatch in the inspection. The inspectors were informed of the arrival of the train and that a car of live stock would be placed on the transfer track for inspection. They went over to that track and found three cars set out upon it, one of which was the stock car, which they proceeded to inspect, beginning on the west side of the car. Fink, the assistant inspector, said that he saw Degitz start around the north end of the car, but no witness saw them at work on the east side of the car. Degitz, who was alive when found, said, according to one witness, that "We were walking around the end of the car when they hit us." A witness of the defendant quoted Degitz as saying: "We started around the end of the car headed west when they coupled into us." A verdict was rendered in each case in favor of the plaintiff, and with them special findings to the effect that the part of the track where the inspectors were killed had been designated by agreement as a transfer track on which cars intended for delivery to the Union Pacific should be set; that it was the custom of the inspectors of the Union Pacific to inspect cars when placed upon that track; that the stock car in question had been placed on this track in the usual manner and apparently for inspection and delivery; that it was the practice to make reasonable efforts to get cars of live stock, which had been brought in by the defendant and destined for Kansas City, taken out on the same evening by the Union Pacific; that the deceased inspectors had been notified of the arrival of the car and were proceeding to inspect it in the usual manner when they were killed; that defendant's employees suddenly bumped cars into the one they were inspecting, with unnecessary force and violence, and without giving any signal or warning; that these employees should have anticipated the presence of the inspectors, and by the exercise of ordinary care would have discovered them in time to have avoided the accident; that the inspectors had been engaged in inspecting this car from two to five minutes when they were struck and killed and had not had time to finish their work;

that the negligence of the defendant on which the verdicts were based was reckless, careless switching; and that the deceased inspectors were not guilty of contributory negligence.

There is little dispute between the parties as to the principles of law involved, but it is urged by the defendant that the evidence does not sustain the special findings or the general verdict returned by the juries, and further, that it does establish contributory negligence on the part of the deceased inspectors. There is a contention that under the circumstances the defendant owed no duty to the inspectors except to refrain from wantonly injuring them; that the defendant had not yet finished the switching, and the car that was being inspected had not been finally delivered to the Union Pacific company, and hence the inspectors were not warranted in going upon the transfer track for inspection nor for any other purpose. The inspectors can not be regarded as tresspassers, nor can the duty owed by the defendant to them be measured by the rule of care due to trespassers. While the defendant owned the track on which the car had been placed, that track had been dedicated to the use of both companies for transfer purposes, and the defendant was bound to anticipate that employees of the other company would be on or about the track and was therefore required to exercise reasonable care for their safety. (*Linker v. Railroad Co.*, 82 Kan. 580, 109 Pac. 678; *Losey v. Railway Co.*, 84 Kan. 224, 114 Pac. 198; *Aaron v. Telephone Co.*, 89 Kan. 186, 131 Pac. 582; *McMarshall v. The Chicago, R. I. & P. Ry. Co.*, 80 Iowa, 757, 45 N. W. 1065, 20 Am. St. Rep. 445; *C. N. O. & T. P. Ry. Co. v. Winningham's Admr.*, 156 Ky. 434, 161 S. W. 506; 33 Cyc. 811; 3 Elliott on Railroads, 2d ed., § 1265.) The cars had been set apart from the other cars of the train on the transfer track in the customary way of placing them for inspection and transfer. The engine had been uncoupled from them and taken to another part of the yard, and the situation so created indicated that the cars so separated had been left for inspection and transfer. It is true that one of the three so set out was a local car not intended for transfer, but the usual segregation had been made and no notice had been given of a purpose to couple on to them or that they were to be moved again. A different situation would have been presented if these cars had been

pushed back with the other cars of the train. All concerned knew that one of them was a stock car and that it must be expeditiously inspected in order to get it into the outgoing Union Pacific train and avoid the damage and liability that would result if the stock should be held over another day. Having separated these cars and placed them on the transfer track, as had been customarily done where cars had been set out for inspection, the inspectors naturally assumed that they might safely proceed with inspection. They are to be regarded as invitees and not trespassers and are entitled to the care due to those rightfully in and about the stock car. In the conditions which the defendant had created it should have anticipated that inspectors were likely to come there, it should have kept a lookout for them, and at least have given timely warning before moving the cars or bumping into them. (*Missouri & N. A. R. Co. v. Duncan,* 104 Ark. 409, 148 S. W. 647; *Lake Erie, etc., R. Co. v. Hennessey,* 177 Ind. 64, 97 N. E. 331; *Gjorvad v. Minneapolis, St. P. & S. Ste. M. Ry. Co.,* 116 Minn. 233, 133 N. W. 609; *St. Louis & S. F. R. Co. v. Cole,* [Okla. 1915] 149 Pac. 872; *El Paso & S. R. Co. v. Darr,* [Tex. Civ. App. 1906] 93 S. W. 166; *J. Rosenbaum Grain Co. v. Mitchell,* [Tex. Civ. App. 1911] 142 S. W. 121.)

It is urged that the deceased inspectors failed to take due care for their own safety when they entered upon the task of inspection. There is a finding by the jury exonerating them from this charge. The claim that they were not warranted in beginning work so soon has already been considered. Defendant insists that there was no occasion for them to go into a place of danger in making the inspection and that it could have been efficiently done from the sides of the car. A passing glance as a car moves by or a long-range view from the sides would hardly meet the requirements of a careful and proper inspection of a car that was to be transferred to another line. There is testimony to the effect that an inspector must examine drawbars, couplers, air cylinders, sills, underframes, hose, safety appliances and brake rigging, as well as ladders, doors, hinges and the upper parts of the cars. To inspect some of the parts it was shown to be necessary to go to the ends, as well as to lean over the rail and look underneath the car, and that it takes from two to ten minutes to accomplish an inspection. In

inspecting the drawheads, couplers and the under parts of the car, it may have been necessary for the inspectors to examine from the ends of the car, or at least to lean over the rail so far that a violent and unlooked-for movement of the car would throw them underneath and into the positions in which they were found.

It is said that as Fink heard the engine moving on the east tracks of the yard and later saw the train moving from the south, they too should have observed these movements, and also that they should have seen the lights carried by the trainmen of the defendant as they approached the stock car. These were all proper considerations for the jury in determining whether due care was exercised by the inspectors for their own safety. These, with other testimony, only raise a question of fact for the determination of the jury, and that question has been decided against the contention of the defendant.

It is urged that under the rules the inspectors should have placed blue lights at the side of the car while they were in a place of danger during the making of the inspection. It appears, however, that the rule invoked is not applicable in an ordinary inspection, but is only to be applied when persons go under a car and in places of danger to make repairs. An illustration of the application of the rule may be found in *Pullin v. Railway Co.*, 96 Kan. 165, 150 Pac. 604. In view of the fact that the placing of blue lights was not required in cases of inspection, the criticism made upon an instruction which related to a waiver or abandonment of the rule is immaterial.

Nothing substantial is found in other criticisms of the instructions nor in the objections made to rulings refusing to require more definite answers to special interrogatories. An examination of the evidence satisfies us that under the rule governing a review of findings made by a jury there is testimony sufficient to uphold the special findings and the general verdict in each of the cases, and therefore the judgment in both of the cases must be affirmed.

No. 19,943.

L. M. HICKS, *Plaintiff*, v. W. E. DAVIS, as State Auditor, etc., *Defendant*.

OPINION DENYING A REHEARING.

HEADNOTE BY THE REPORTER.

STATUTE—*Amendments*—*Constitutional Provisions*. Section 16 of article 2 of the constitution which reads "No law shall be revived or amended unless the new act contain the entire act revived or the section or sections amended; and the section or sections so amended shall be repealed," is mandatory and invalidates all acts in contravention of its terms.

Original proceeding in mandamus. Opinion denying a rehearing filed April 8, 1916. (For original opinion allowing writ see *ante*, p. 312, 154 Pac. 1030.)

*W. A. Snook*, of Kansas City, for the plaintiff.

*S. M. Brewster*, attorney-general, and *John L. Hunt*, assistant attorney-general, for the defendant.

The opinion of the court was delivered by

DAWSON, J.: In a petition for a rehearing, the defendant contends that the act of 1915 (Laws 1915, ch. 14) which attempted to repeal the item appropriated for plaintiff in the act of 1913 (Laws 1913, ch. 61, item 106) was held invalid by the court on grounds argued by neither party. (*Hicks v. Davis*, ante, p. 312, 317, 318, syl, ¶¶ 5, 6, 154 Pac. 1030.) This is. true. Does this necessitate a rehearing? Can there be any doubt of the soundness of the proposition covered by paragraphs 5 and 6 of the syllabus and the corresponding portion of the opinion?

We have no doubt that for fifty years the operative interpretation of section 16 of article 2 of the constitution has been as given in our first opinion. Witness the act on the subject of legislative apportionment (Gen. Stat. 1868, ch. 4) and later reënactments down to chapter 3 of the General Statutes of 1909 (§§ 321-334), where the numbered subsections are usually repeated verbatim. Note also the act authorizing the creation of corporations. (Gen. Stat. 1868, ch. 23, § 5.) How many

times has that long section with numbered subsections been entirely rewritten by the Kansas legislature for the sole purpose of adding or taking out a single subsection or part thereof? See, also, chapter 91 of the Laws of 1897, relating to limitations, where the section with numbered subsections was entirely rewritten for the sole purpose of adding one additional numbered subsection. These illustrations could be multiplied indefinitely.

It would have been easy for the legislature in these apportionment acts, in the act relative to corporations, in the act relating to limitations, and in all similar statutes, to have made sections of each of the numbered subsections. It did not choose to do so. The rhetorical arrangement is within the province of the legislature. So, too, in the act of 1913 (ch. 61) each of the numbered items appropriating money for various purposes might have been rhetorically arranged in separate sections of the act instead of being incorporated as subparagraphs of one section. It is purely a matter of literary diction. But it must be dealt with as written:

"No law shall be revived or amended unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed." (Const., art. 2, § 16.)

Instances are cited where this rigid rule in other states with constitutions not unlike our own has been softened away by sophistical refinements which we are not disposed to adopt and which we think would be mischievous to follow.

But we do not need to go abroad for a precedent. In 1897 a compiler of the General Statutes of this state arbitrarily divided a long section of the prohibitory act into two convenient paragraphs and published them as such. The legislature afterwards amended one of the paragraphs arranged by this compiler. The amendment was one of much importance. On this subject the court said:

"In the parliamentary practice of England, the United States, and all other countries where the science of legislation has been cultivated and developed, it is customary to divide legislative enactments into sections. (*Town of Martinsville v. Frieze*, 33 Ind. 507, 509.) By the constitution of this state the section is made the indivisible unit of the legislative fabric. To insure the diligent attention of the legislative mind, the reading of a bill by sections at the time of final passage in no case can be dispensed with. (Const., art. 2, § 15.) To prevent members of the leg-

islature from practicing deception by the enactment of blind and confusing amendments, to prevent them from misleading themselves and the public as to changes in the law, and to remove the difficulties and uncertainties accompanying extended examinations and comparisons of various acts to ascertain the true state of the statute law upon any subject (*The People v. Mahoney,* 13 Mich. 481), the constitutional provision quoted above was adopted by the people, making it necessary to embody in every amendatory act the entire section or sections amended and providing that the section or sections amended shall be repealed. This constitutional requirement is mandatory and invalidates all acts in contravention of its terms. (*The State v. Guiney,* 55 Kan. 532, 40 Pac. 926; *In re Ashby,* 60 Kan. 101, 55 Pac. 336; 26 A. & E. Encycl. of L. 709.)" (*The State v. Carter,* 74 Kan. 156, 162, 86 Pac. 138.)

In the Indiana case, cited in *The State v. Carter,* supra, the syllabus reads:

"Under section 21 of article 4 of the constitution of Indiana, a section of a statute can not be amended without setting forth and publishing at full length the *whole* section as amended, however long it may be, or into however many clauses it may be divided." (*Town of Martinsville v. Frieze,* 33 Ind. 507.)

In the opinion it was said:

"It has been the custom, in modern times, in England, and the United States, and probably all other countries where the science of legislation has made any considerable progress, to divide legislative enactments into sections; and this was undoubtedly had in view when the constitution was adopted. The framers of that instrument intended that upon the amendment of a statute, nothing less than the whole section as amended should be set forth, having in view the custom of thus dividing statutes into sections. Were it to be held that because a section happened to be divided into different clauses, the requirements of the constitution might be dispensed with, and a *clause* substituted for a *section* in setting forth the amendment, the door would be opened to other evasions of the constitutional requirement." (p. 509.)

In *Lehman v. McBride,* 15 Ohio St. 573, it was said:

"As we understand this clause of the constitution, it requires, in the case of an amendment of a section or sections of a prior statute, that the new act shall contain, not the section or sections which it proposes to amend, but the section or sections in full, *as it purports to amend them.* That is, it requires, not a recital of the *old section,* but a full statement, in terms, of the *new one.*" (p. 602.)

In *Tuskaloosa Bridge Co. v. Olmstead,* 41 Ala. 9, the syllabus reads:

"The constitutional provision contained in the second section of the fourth article, declaring that 'no law, nor any section of any law, shall

be revised or amended by reference only to its title and number, but the law or section revised or amended shall itself be set forth at full length,' not only prescribes a rule of legislative procedure, but renders null and void any law which does not conform to its requirements." (Syl. ¶ 1.)

The petition for a rehearing is denied.

---

No. 20,044.

R. H. BROWN, *Appellant*, v. THE MODERN WOODMEN OF AMERICA et al., (SEWALL G. BROWN et al., *Appellees*).

### SYLLABUS BY THE COURT.

1. FRATERNAL INSURANCE—*Contract of Member to Change Beneficiary— Change Not Complete—Rival Claimants—Equities.* Generally the rights of holders and beneficiaries under fraternal benefit certificates rest solely upon the contract between the member and the association as found in its constitution and by-laws. But when potent and manifest equities appear in favor of some of the rival claimants by reason of contracts made and carried out with the deceased member, the association raising no objection, the contest may become one purely for equitable cognizance and determination.

2. SAME—*Right of Member to Change Beneficiary.* While ordinarily the member has no vested right in the fund, still by an agreement to change beneficiaries in consideration of funds advanced he may so bind himself as to preclude his beneficiary or heirs from asserting their claim to the proceeds against a party who advanced large sums on the strength of such agreement, although a completed change of beneficiary was not made in accordance with the constitution and by-laws of the association.

3. SAME—*Contract to Change Beneficiary—Money Loaned—Premiums Advanced—Rights of Claimants Determined upon Equitable Considerations.* The holder of a fraternal benefit certificate in consideration of loans advanced and to be advanced and premiums paid and to be paid by his brother made him beneficiary. Later a son of the brother repaid his father and made further advancements to the member upon consideration of being substituted as beneficiary. The request for cancellation of the certificate and issuance of a new one with the nephew as beneficiary was duly executed by the member and turned over to the brother, who delivered it to his son, but it was never transmitted to the association. After the member's death, the nephew who had advanced considerably more than his promised portion of the proceeds of the certificate, and two sons of the former member who died leaving no beneficiary, became rival claimants for such portion of the fund, the association paying the money into court and raising no question as to change of beneficiary. Upon the amended petition and

opening statement for plaintiff, disclosing substantially the foregoing, judgment was rendered for the defendants. *Held*, error, and that all the evidence should be received and the cause determined upon equitable considerations.

Appeal from Riley district court; FRED R. SMITH, judge. Opinion filed April 8, 1916. Reversed.

*John E. Hessin,* and *John Clarke Hessin,* both of Manhattan, for the appellant.

*F. B. Dawes,* and *R. C. Miller,* both of Clay Center, for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiff appeals from a judgment denying his right to certain proceeds of a policy issued by the Modern Woodmen of America. From the amended petition and the opening statement it appears that R. G. Brown, in 1898, wrote to his uncle, A. B. Brown requesting financial assistance. From that time up to 1902 he received such aid to the amount of $803.53, when, calling for further aid, he agreed in order to secure past and future advances to take out a $3000 policy, making his wife a beneficiary to the extent of $500, and his uncle, A. B. Brown to the amount of $2500, the uncle agreeing to take such policy as collateral security and to keep up the premiums and assessments. The policy was issued, received and retained by A. B. Brown, and he, by April, 1905, had paid out by way of advancements, premiums and assessments $1486.56. At this time the plaintiff, R. H. Brown, son of A. B. Brown, went with his father to see R. G. Brown, and the latter was advised that A. B. Brown could no longer carry out the contract, he being then 77 years of age and out of employment. It was agreed orally that the policy should be sold and assigned to R. H. Brown for $1486.56, which he was to pay his father, he to continue the assessments and premiums and to advance such sums to R. G. Brown as he could for the latter's support and maintenance, R. G. Brown agreeing to secure him for his interest and for all future advancements by having the policy canceled and a new one issued making the wife of R. H. Brown beneficiary for $500 and R. H. Brown for $2500. In pursuance of this agreement R. G. Brown indorsed on the

policy a request to cancel it and to issue a new one as already indicated, acknowledging such request before a notary public and delivering it to A. B. Brown to take to some camp clerk, A. B. Brown agreeing to pay the necessary fifty cents to have the change made. R. H. Brown paid to his father the advancements made by him, and also advanced to R. G. Brown, before his death in 1913, $620, making in all $3025.56 paid by him. The policy was never delivered to the Modern Woodmen. A. B. Brown instead of turning it into some head camp went on a journey, and upon his return gave it to the plaintiff in a sealed envelope which was not opened until after his death. The plaintiff brought this suit to recover on the policy, the issues were made up, trial was begun, a jury impaneled and an opening statement made for the plaintiff, whereupon a motion for judgment on the statement and pleadings was made and sustained. The society paid the money into court and was discharged, the contest over the $2500 being between the plaintiff and two sons of R. G. Brown.

The by-laws provided that for a member in good standing to change beneficiaries he was required to pay to the camp clerk a fee of fifty cents and deliver his certificate with the surrender clause on the back thereof duly filled out and executed by him, designating therein the desired change, such execution to be in the presence of and attested by the camp clerk or by some person authorized by law to administer oaths and take acknowledgments. No change was to be effective until the old certificate had been delivered to the head clerk and a new one issued during the lifetime of the member. The by-law in force in 1905 provided that no change in the designation of beneficiaries should be of binding force unless made in compliance with the provisions referred to. In the revision of 1911-1912 this was enlarged to read that—

"Any attempt by a member to change the payee of the benefits of his Benefit Certificate by will or other testamentary document, contract, agreement, assignment or otherwise than by strict compliance with the provisions of this section relating to change of beneficiary shall be absolutely null and void. Any agreement entered into by the member, by the terms of which he attempts to assign the benefits agreed to be paid under the certificate or any part thereof, to any other person or persons than the beneficiary or beneficiaries designated in the certificate, shall be absolutely void; as shall any agreement entered into by which the

member agrees not to change his beneficiary if he afterwards violates such agreement and exercises his right to at any time before death change his beneficiary."

The member lived about eight years after executing the indorsement, the brother about four years.

Many decisions from other states are brought forward to uphold the doctrine that the matter is purely one of contract and that the equities of a given case will not justify a departure from that principle. Both sides also invoke former decisions of this court. The plaintiff calls attention to *Savage v. Modern Woodmen,* 84 Kan. 63, 113 Pac. 802, holding that one who helps to pay the assessments upon a certificate in his favor under an agreement with the holder that the beneficiary will not be changed, acquires a vested interest, and the association having paid the money into court, such original beneficiary can recover, notwithstanding the beneficiary was changed. There for ten years the wife had helped pay the assessments, the assured changing beneficiaries only three days before his death. Here for eleven years the brother and then his son, the plaintiff, not only paid the premiums and assessments, but completed advancements amounting in all to much more than could possibly come to either beneficiary under the certificate. And all this was done in pursuance of agreements to secure the benefactors by making them the beneficiaries. The defendants rely largely on *Kemper v. Modern Woodmen,* 70 Kan. 119, 78 Pac. 452. In that case the member held a certificate payable at death to his wife. He duly executed a proper blank form requesting a new certificate payable to his brother. This, with the fee, was remitted, but one day before they were received the holder died. The widow sued and recovered. Then the brother's administrator sued the association, and it was held that he could not prevail, because his right rested in contract, and the method of changing beneficiaries provided in the by-laws constituting the contract with the holder and the association was not followed. It was remarked that the new certificate was never delivered and that the member died before his request for a change was received. The Titsworth case (*Titsworth v. Titsworth,* 40 Kan. 571, 20 Pac. 213) was distinguished as one in which the new certificate had been issued and delivered in the lifetime of the member, and it was said

in the Kemper case: "This is a controversy directly between
the new beneficiary and the society which insured the life of
the deceased" (p. 124), a fact which differentiates the Kemper
case from this. It was said also that the court was merely
upholding the stipulations of the member's contract that no
change in beneficiary should take effect until the delivery to
him of the new certificate. *Pilcher v. Puckett,* 77 Kan. 284, 94
Pac. 132, involved the right to the proceeds of a certificate in
the Modern Woodmen of America held by William Pilcher
payable to his wife. The wife departed this life and the hus-
band made no change in beneficiary except an attempted
change by will. The contest was between his heirs and his
step-children, the association having paid the money into court.
It was held that a member has no interest in the fund, simply
the power of appointment, which if not exercised becomes in-
operative, and that the attempt to dispose of the fund by will
was nugatory, not being the manner provided in the by-laws.
It was said:

"Cases may arise where equity would aid in an attempted but un-
completed change of beneficiary—where the assured had done his part in
making the substitution in accordance with the rules and by-laws of the
order, but no such case is presented here." (p. 290.)

*Boice v. Shepard,* 78 Kan. 308, 96 Pac. 485, was another
case in which the money was paid into court, the contest being
between rival claimants, and it was again held that the insured
has no interest in the fund.

While generally in case of the holder's death the fund goes
to his beneficiary or to his heirs, and not to his administrator,
and can not be disposed of by his will, still if he, having re-
ceived large benefits, in order to secure the person bestowing
them, agrees to name him as beneficiary, then it would seem
that an interest or equity may arise as in the Savage case. In
*Knights of Pythias v. Ferrell,* 83 Kan. 491, 112 Pac. 155, the
holder of a certificate in part performance of an antenuptial
contract procured a change making his wife equal beneficiary
with his children. Having executed the contract on her part,
it was held that she had a vested interest in the policy, of which
the husband could not divest her without her consent.

The recent well-considered opinion in *Mod. Woodmen of
America v. Headle et al.,* 88 Vt. 37, 90 Atl. 893, supports the

contention of the defendants and holds, among other things, that the power of appointment can be exercised only in the manner provided in the by-laws, and that the society by bringing a bill of interpleader and paying the fund into court does not waive the requirements of the by-laws since the rights of the parties became fixed at the moment of the member's death. (See, also, Note, L. R. A., n. s., 1916 A, 877, 879.) But neither in this nor in any of the other cases relied upon by the defendants do we find conditions similar to those presented here. Neither does the case turn on either one of the three exceptions discussed by Mr. Justice Brown in *Supreme Conclave, Royal Adelphia, v. Capella,* 41 Fed. 1, but upon the effect to be given to the agreements entered into between the member and his benefactors. The decision in the Ferrell case (83 Kan. 491, 496) cites *Stronge v. Knights of Pythias,* 189 N. Y. 346, 82 N. E. 433, 12 L. R. A., n. s., 1206. There the member, being sick, agreed with his sister-in-law that for certain care and attention by herself and husband he would make her beneficiary in his certificate. This was done and the certificate was issued and delivered to her. Afterwards he attempted to change the beneficiary, and it was held that he could not do so in violation of his sister's rights. It was urged that the constitution and general laws of the defendant constituted the contract binding on the member and the beneficiary; that the plaintiff had no vested right in the certificate, and whatever right she had was subject to revocation. The court said:

"But can there be any doubt that a member of one of these associations might say to a person that if the latter would loan him a thousand dollars he, the member, would take out a certificate designating the creditor as beneficiary as security for such loan, such designation not to be canceled or changed without the consent of the creditor, and that this contract and agreement would estop and prevent the member from changing the designation whatever might be the ordinary privileges and regulations as between him and the association when no rights of a third party had intervened? . . . The appellant performed her part of the contract and Irvine performed his so far as procuring the certificate to be issued was concerned, and the law now prohibits him from destroying the rights which appellant has acquired in the certificate for a valuable consideration." (pp. 351, 352.)

In *Binkley v. Jarvis,* 102 Ill. App. 59, 206 Ill. 541, 69 N. E. 582, a beneficiary assigned her certificate to secure a grocery bill. It was said that the only right the company had to com-

plain was that the agreement was void under its charter but that it was entirely content and made no objection on that ground, and that while such a certificate is not assignable by law all beneficiary interests therein may be transferred in equity. This was affirmed by the supreme court. (*Jarvis v. Binkley,* 206 Ill. 541, 69 N. E. 582.) In *McGrew v. McGrew,* 190 Ill. 604, 60 N. E. 861, a certificate issued by the Ancient Order of United Workmen was made payable to the member's daughter, who advanced to him an amount about equal to the face value of the certificate. The member afterwards had a new certificate issued payable to his second wife. The by-laws provided that its certificates could not be made payable to a creditor nor be held wholly or in part, nor assigned, to secure a debt of a member. It was held that while the certificate was not assignable a beneficial interest could be transferred which would be protected by a court of chancery, and that the daughter was entitled to recover. In *Hodge v. Ellis, guardian,* 76 Ga. 272, a man holding two benefit policies assigned the smaller to secure money to pay the premiums and future assessments, entering into a written contract to reserve from the proceeds of the policies $2500 for the lender. It was determined that although the father may not have had the strict legal right to make this contract binding on his minor child, equity would decree that the ward do what was right towards one who had preserved the fund for her. *Coleman v. Anderson,* 98 Tex. 570, 86 S. W. 730, is to the effect that though the laws of the benefit society, which forbade the assignment as collateral to the benefit certificate, left to the assured no interest in the contract except the right to name or change the beneficiary within certain limits, and to the beneficiary no interest except a contingent right to the insurance in the absence of any change in the beneficiary, nevertheless when the beneficiary with the consent of the insured pledged the certificate to a third party to secure assessments neither the insured nor the beneficiary could recover the certificate from such pledgee without the payment of the assessments advanced by him on the faith of such pledge, "though it was forbidden by the laws of the society issuing the certificate." (Syl. ¶ 2.) In *Brett v. Warnick,* 44 Ore. 511, 75 Pac. 1061, it was decided that lack of actual substitution as beneficiary, pursuant to the

constitution and by-laws of an association, does not affect an agreement by which a person not named therein is to receive the insurance and so deprive him of his equity to claim the same as against the beneficiaries named therein, "where the association does not insist on it, and pays the fund into court to be awarded to the contestant entitled thereto." (Syl. ¶ 2.) It seems, however, that in that case the member had the consent of the beneficiary to make the agreement. In the case of *Benard v. Grand Lodge A. O. U. W.*, 13 S. Dak. 132, 82 N. W. 404, it appeared that the insured shortly before his death surrendered a life certificate payable to his wife and received one payable to his sister. The constitution and by-laws provided that there should be no vested right in the sum provided in the policy and that it could not be assigned. The husband had obtained the certificate under an agreement with his wife that she should help pay therefor, which she did. It was held that she had an equitable interest superior to the right of her sister, the liability of the association being admitted and the controversy being between the rival claimants. In the opinion it was said that the rights must be determined by equitable principles, and that "defendant can not, by any rule or by-law, change the law applicable to such a controversy, as between the parties who claim the fund." (p. 135.)

Section 306a of volume 1 of the third edition of Bacon on Benefit Societies and Life Insurance thus states the rule:

"Although it is settled law that the beneficiary named by the member of a fraternal organization has no property in the benefit agreed to be paid, nor vested right therein; so as to deprive the member of the right to change the beneficiary at will, yet there may be conditions under which it would be held that the beneficiary has acquired equitable rights in the benefit, which will be recognized and protected, and the member become estopped from exercising his rights under the contract. In these cases it is not held that, under the contract, the beneficiary has acquired a vested right, but the member has parted with a right which he otherwise might have exercised."

The author quotes from *Jory v. Supreme Council, A. L. H.*, 105 Cal. 20, 38 Pac. 524, 26 L. R. A. 733, wherein it was said:

"If the original beneficiary's interest was vested no subsequent conditions could possibly arise which would defeat his right, and for this reason, we think it can hardly be termed a vested interest. The whole matter seems to be rather a question of equities, and the stronger and better equity must prevail." (p. 28.)

Brown v. Modern Woodmen.

In section 310*b* it is said:

"When the association pays the money into court it waives the right to question the validity of the assignment. It follows that the court, having possession of the fund, will dispose of it in accordance with the principles of equity and the limitations imposed by the statutes of the forum."

"It is generally held that the regulations concerning the method of changing beneficiaries are prescribed for the protection of the society, and that if the society has by waiver or estoppel lost its right to object to a change of beneficiary no one else may raise that objection." (29 Cyc. 135.)

(See, also, 14 M. A. L. 206; Note, 33 L. R. A., n. s., 773; 29 Cyc. 128.)

Usually the rights of the holder and the beneficiary rest on the contract found in the constitution and by-laws, and ordinarily no other contract is invoked. But here the defendants, sons of the former member, are confronted with agreements made in good faith by their father which brought not only a living to his family for years but the very means to keep the certificate alive. He not only made his brother a beneficiary as he agreed but he did his part to carry out the subsequent agreement with his nephew by duly indorsing and delivering the certificate to the brother for surrender to the association. The father, if living, would not be heard to deny the plaintiff's right to the agreed portion of the proceeds. His sons, standing on the strict letter of the by-laws—not invoked by the order itself—claim the entire proceeds. They press the point that all the remaining years of his father's life from 1905, when the indorsement was made, the plaintiff slept on his rights and neglected to have the new certificate issued. According to the opening statement this is explained if not justified by the sacredness with which he regarded the sealed envelope containing his father's last will and other papers, and by his supposition that the matter had been attended to promptly. But this delay did not change the act and intention of the member to make the plaintiff the beneficiary, the consideration for which has been more than paid. Upon the principles followed in the cited cases bearing similarity to this, all the evidence should be heard, the controversy then to be adjusted upon equitable considerations.

The judgment is reversed and the cause remanded for further proceedings.

Mr. Justice Burch and Mr. Justice Marshall dissent.

43—97 Kan.

No. 20,046.

ROBERT H. JACKSON, doing business as The Superior Hatters & Cleaners, *Appellee,* v. THE UNCLE SAM OIL COMPANY OF KANSAS, *Appellant.*

### SYLLABUS BY THE COURT.

1. PLEADINGS—*Petition—Motion.* A motion to require a plaintiff to make his petition more definite and certain by setting out facts which are evidentiary in their nature is properly denied, where the ultimate facts to be proved are alleged.

2. SAME—*Petition—Demurrer.* The petition and demurrer thereto have been examined, and it is held that the demurrer was properly overruled.

3. TRIAL—*Court Excluded Incompetent Evidence.* A trial court does not commit error in excluding incompetent and irrelevent evidence, although no objection is made by the party against whom the evidence it attempted to be introduced.

4. TRIAL—*Error in Admission and Rejection of Evidence.* Certain contentions of error in the admission and exclusion of evidence have been examined and found not sufficiently prejudicial to warrant a reversal of the judgment, under section 581 of the code of civil procedure.

5. TRIAL—*Demurrer to Plaintiff's Evidence.* Where a petition states a cause of action and the evidence tends to prove that cause of action, it is not error for the court to refuse to withdraw all evidence of damage from the jury or to refuse to sustain a demurrer to the plaintiff's evidence.

6. TRIAL—*Exemplary Damages—Instructions.* Instructions concerning exemplary damages, although correct, but erroneously given, will not cause a reversal of a judgment where the verdict of the jury shows that no exemplary damages were allowed.

7. TRIAL—*Damages—Motion to Set Aside Verdict Denied.* In an action for damages, it is not error to refuse to set aside a verdict, where the several items of damage allowed by the jury are proved and the findings of the jury are consistent with each other and with the general verdict.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed April 8, 1916. Affirmed.

*Albert L. Wilson,* and *Mark T. Wilson,* both of Kansas City, Mo., for the appellant.

*William Keith,* and *Monroe Wright,* both of Wichita, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff recovered judgment for damages sustained by reason of the purchase of gasoline mixed with coal oil from the defendant. The defendant appeals.

The plaintiff conducted a clothes-cleaning establishment. He purchased gasoline from the defendant to use in his business. This gasoline was mixed with coal oil. He used it in cleaning clothes, whereby they were damaged and he was compelled to reclean them. On account of the coal oil being in the gasoline used by the plaintiff, he lost a number of his customers. The jury returned a verdict in favor of the plaintiff for $575 but deducted $95.29 due the defendant for gasoline sold the plaintiff, leaving a balance of $479.71 for the plaintiff; and answered special questions as follows:

"1. Did the plaintiff on or about December 12, 1913, discover the odor and oily appearance of coal oil in the gasoline he had received from defendant? Answer: Yes, about that time.

"2. If you answer Question 1 in the affirmative, did he make any examination of the gasoline to determine the quality thereof before continuing its use in his business? Answer: No.

"3. Was all of the cleaning which was unsatisfactory to plaintiff's customers done by plaintiff after he had discovered the odor and oily appearance of coal oil in the gasoline used by him? Answer: No.

"4. If you find for plaintiff, how much do you allow him?
　(a)　For his labor in recleaning?
　(b)　For expense of recleaning?
　(c)　For gasoline affected?
　(d)　For cleaning storage tank system and machinery?
　(e)　For soap?

Answer:
　(a)　75.
　(b)　25.
　(c)　60.
　(d)　20.
　(e)　10.
　　———
　　190.

"5. If you find for plaintiff, how much do you allow him for loss of trade? Answer: 385."

1. The defendant filed a motion asking the court to require the plaintiff to make his petition more definite and certain. This motion was sustained in part and denied in part. The

defendant's contention is that the entire motion should have been sustained. The plaintiff then filed an amended petition. No good purpose will be served by setting out either the petition or the amended petition. It is sufficient for the purposes of the present consideration to say that the amended petition stated facts which, when proved, established a cause of action against the defendant. It stated these facts with sufficient particularity to inform the defendant of each element of the plaintiff's cause of action. It was not necessary to state evidentiary facts. The defendant's motion, so far as it was denied, asked that the plaintiff be required to set out evidentiary facts. It was not error to deny the motion in these particulars.

2. The defendant demurred to the amended petition on the ground that there were two causes of action improperly joined, that the petition did not state facts sufficient to constitute a cause of action, that the plaintiff did not use any care or caution to avoid the damage sustained by him, and that the petition did not state facts sufficient to entitle the plaintiff to recover certain specific items of damage set out therein. If the allegations of the plaintiff's petition were true—and the demurrer admits they were true—a recovery should be had against the defendant on the petition as a whole and on each of the items against which the demurrer was directed. The demurrer was properly overruled.

3. The defendant contends that the court erred in assisting the plaintiff's counsel in the conduct of the trial by sustaining objections to questions before objections were made, and by suggesting to counsel for the plaintiff that an objection to certain evidence would be sustained if made. We have examined these rulings of the court and the questions asked by the counsel for the defendant, and are unable to see that the court abused its discretion in anything that it did in these matters. It was the court's duty to control the introduction of evidence and to confine counsel to the introduction of evidence that was material and relevant to the issues on trial, although counsel for both sides may have consented to the introduction of the evidence excluded.

4. Other contentions are that the court erred in admitting illegal, irrelevant, incompetent and immaterial evidence; and in excluding legal, competent, relevant and material evidence.

The abstracts submitted to this court do not disclose any substantial or prejudicial error in the admission or exclusion of evidence. Section 581 of the code of civil procedure requires this court to disregard all mere technical errors and irregularities which do not appear to have prejudicially affected the substantial rights of the party complaining, where it appears upon the whole record that substantial justice has been done by the judgment or order of the trial court.

5. Other complaints are that the court erred in not withdrawing and excluding from the consideration of the jury all evidence of damage sustained by the plaintiff; and that the court erred in overruling the defendant's demurrer to the evidence. The evidence tended to prove that damage was sustained by the plaintiff as alleged in his petition, and to prove all the allegations of the petition necessary to establish a cause of action against the defendant.

6. The defendant's next contention is that the court erred in giving the fifth, sixth, seventh, eighth, ninth, tenth, thirteenth, fourteenth, and fifteenth instructions. The fifth, sixth, seventh, eighth, ninth and tenth instructions were applicable to the facts shown by the evidence and correctly stated the law. The thirteenth, fourteenth and fifteenth instructions concern punitive damages. They state the law correctly. Admitting that they should not have been given for the reason that there was no evidence on which to base them or to justify the jury in including in the verdict any amount for punitive or exemplary damages, it does not necessarily follow that the judgment must be reversed and a new trial granted.

This court in *K. C. Ft. S. & G. Rld. Co. v. Kier,* 41 Kan. 671, 21 Pac. 770, said:

"Where there is no testimony showing that the negligence is so gross as to amount to wantonness, and no willful or malicious acts are proven, actual or compensatory damages merely, is the rule. Therefore, to leave the question of punitive or exemplary damages to the jury, when there is no testimony which would warrant a verdict for such damages, is improper." (Syl.)

In that case the verdict was for $7000. The court directed a remission of $2000 and allowed judgment for $5000. In *K. P. Rly. Co. v. Cutter,* 19 Kan. 83, an action for wrongful death, damages beyond pecuniary loss sustained were assessed

by the jury amounting to $2200. The pecuniary loss was found to be $1320. This court said that the case did not warrant exemplary or punitive damages. The judgment was modified by striking out the $2200 awarded for exemplary damages, and affirmed as to the rest. In *C. K. & W. Rld. Co. v. O'Connell*, 46 Kan. 581, 26 Pac. 947, the judgment was reversed because of an instruction permitting the jury to find punitive damages, there being no evidence to sustain such damages. There was nothing to indicate any way to separate actual damages allowed from the punitive damages that might have been allowed. This is also true of *A. T. & S. F. Rld. Co. v. Winston*, 56 Kan. 456, 460, 43 Pac. 777.

In the present case the jury did not allow anything for exemplary damages. It comes within the principles of *K. P. Rly. Co. v. Cutter*, supra, and *K. C. Ft. S. & G. Rld. Co. v. Kier*, supra. Under these cases and section 581 of the code of civil procedure, the error, if any, committed in giving instructions concerning exemplary damages must be disregarded.

7. The defendant's last contention is that the court erred in refusing to set aside the general verdict and in denying the defendant's motion for judgment on the answers of the jury. This matter is practically determined by what has been said. The several items of damage allowed by the jury were proved by ample evidence. The findings of the jury are consistent with each other and with the general verdict.

The judgment is affirmed.

Coblentz v. Putifer.

No. 20,049.

KATE BELLE COBLENTZ, *Appellee*, v. DAVID PUTIFER et al.,
*Appellants*.

### SYLLABUS BY THE COURT.

1. GIFTS—*Inter Vivos—Undue Influence—Burden of Proof.* Rule followed that persons enjoying a confidential relationship with the grantor of gifts *inter vivos* have the burden of showing that such gifts were made without undue influence.

2. SAME—*Undue Influence—Question for Jury.* Rule followed that the fact of undue influence is ordinarily a proper question for the jury.

3. SAME. The facts surrounding gifts of land and personalty by a mother to her three sons about three days before her death and during her last illness, and other attendant and related circumstances, examined and held sufficient to present a fair question of undue influence ,in an action by a daughter who was deprived of a share of her mother's estate by the gifts in controversy.

Appeal from Reno district court; FRANK P. HETTINGER, judge *pro tem.* Opinion filed April 8, 1916. Affirmed.

*C. M. Williams,* of Hutchinson, for the appellants.

*F. L. Martin,* and *Van M. Martin,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff is the daughter of Joseph Putifer and Lucy A. Putifer, his wife. The defendants are her three brothers. The father died about 1896. The mother died in 1906. Three or four days before the mother's death, she executed deeds of all her real estate to her three sons, and also executed a bill of sale to them of all her personal property. The result cut off the daughter without a penny or a penny's worth of her mother's property.

The plaintiff brought this action against the defendants to set aside the deeds and bill of sale and for an accounting and partition, and charged that the conveyances were made by her mother through the undue influence of her brothers, etc.

Part of the evidence tended to show that the mother's estate originated and grew out of the unadministered estate of

the father, who had been a tenant farmer, and also from the labor of the plaintiff and her brothers during their minority. The daughter, being the eldest, left home after reaching her majority, and there is some unpleasant reading in the record as to the lack of affection between the sister and her brothers which occasioned her leaving and may have tended to prejudice her in her mother's estimation.

The general verdict was for the plaintiff, and certain special findings were made by the jury:

"Q. 4. Did Lucy A. Putifer execute the deeds in question by reason of undue influence of the defendants, or either of them, as defined by the instructions of the court herein? A. 4. Yes.

"Q. 5. If you answer the last above question in the affirmative, then which of the defendants exercised such influence? A. 5. All of them.

"Q. 8. Did Lucy A. Putifer, at the time she executed the deeds in question, believe and understand that a large portion of the property conveyed by said deeds had been accumulated and paid for by the defendants? A. 8. No.

"Q. 9. Did the plaintiff perform any labor or contribute any money or property towards procuring the property conveyed by said deeds. A. 9. Yes.

"Q. 10. If you answer the last question in the affirmative, then when and how was such contribution made? A. 10. By leaving her personal property with her mother when she left home."

While several errors are assigned, the one chiefly relied upon is that there was no evidence to support the special findings of the jury. We can not agree with this contention of appellants, although the evidence is mostly circumstantial. The hostility of the brothers toward their sister is clear. At one time when she proposed to come home for a short visit to her mother, one of the brothers wrote:

"I am running the place at present. I will answer your letter myself. We are too busy with our own troubles to be annoyed with visitors, besides we can not afford to make your living for you."

This, of course, does not go far to prove undue influence, but it is one of a number of circumstances which showed the confidential and exclusive relationship between the mother and the plaintiff's brothers—that they did n't want her, a mere visitor ( ?), coming home, and one brother's assuming to answer her letter himself. It was clearly a case where the burden of overcoming the presumption of undue influence was properly imposed on defendants. (*Smith v. Smith*, 84 Kan.

242, syl. ¶ 2, 114 Pac. 245.) Nor can it be said that there was a total want of evidence tending to show undue influence. It was shown that the brothers affected to believe that their sister was not of good character and called her bad names, but whether in their mother's presence is not clear; the neighbors had been telling the mother "lies" about plaintiff; soon after plaintiff left home the mother told a neighbor that "Belle was a good girl," and the mother blamed other people entirely for Belle's leaving home. There is circumstantial evidence that some of plaintiff's letters were withheld from the mother; about six weeks before her death the mother said she had not heard from Belle for some time, and did n't know why she did n't come home. It is tolerably clear that the attitude of the brothers constrained the plaintiff to leave home, and restrained her from returning more frequently to visit her mother—to keep alive and warm the natural affection and esteem which should exist between them. Even in the mother's last illness, which was known to be fatally impending, the evidence justifies the inference that the brothers did not even advise their sister that their mother was ill. All the news they sent her was to tell her that their mother was dead. The fact that the deeds and bill of sale were made during the mother's last illness is itself an evidential circumstance worthy of note. We think there was sufficient evidence of undue influence to submit the case to the jury. (*Acker v. Norman,* 72 Kan. 586, 84 Pac. 531; *Avery v. Howell,* 96 Kan. 657, 153 Pac. 532.)

As to the other assignments of error, which are scarcely pressed, it is sufficient to say that the admission of the letters from the plaintiff to her mother was competent; that defendants' demurred to the evidence was properly overruled. So, too, the overruling of the motion to set aside findings 4 and 5.

This case is not much of a lawsuit, notwithstanding it has been tried three times. And the plaintiff's case is about as strong in equity as it is in law. It is urged that the mother's estate, which was virtually family property and its natural accumulations, was augmented by the labor of the sons. It was likewise augmented by the labor of the daughter who in maidenhood had toiled in the fields to feed the defendants and to help keep the family and family property together. Perhaps

the sons have claims against the estate for services since their majority. That matter is not in shape for us to decide. The plaintiff also left some of her own chattels in the family pool when she left home. These helped to earn and increase the family property. There is no objection to taking all these matters into consideration in any accounting to be had.

The plaintiff has prevailed three times before the jury. (*Coblentz v. Putifer,* 81 Kan. 905, 106 Pac. 1011; *Coblentz v. Putifer,* 87 Kan. 719, 125 Pac. 30.) It is unlikely that a jury would ever return any other verdict than for the plaintiff. Indeed, appellants virtually concede this. They say:

"Do not send the case back again to be retried before a jury, where again human sympathy will be such a dominant factor in the procuring of an *unjust* judgment."

As the case now comes before us, we think some adjective more apt than *"unjust"* could be used to characterize this judgment; and since no error is apparent, the judgment must be affirmed.

---

No. 20,050.

VICTOR HENRY, a Minor, etc., *Appellee,* v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

COAL MINING—*Failure to Keep Props in Easy Access to Miner—Negligence—Injuries.* The furnishing of prop timber at a point half a mile from the place where miners are working is not a compliance with the statutory requirement that those in charge of a coal mine shall keep in easy access to the miner props of suitable length and size for the places where they are to be used, although a miner may obtain them in accordance with a custom in the mine by requesting a driver who may pass his room to select the props at the place where they are kept and bring them when he returns from depositing his load of coal.

Appeal from Crawford district court; ANDREW J. CURRAN, judge. Opinion filed April 8, 1916. Affirmed.

*W. W. Brown, James W. Reid,* both of Parsons, and *D. H. Woolley,* of Girard, for the appellant.

*C. A. McNeill,* of Columbus, and *C. S. Denison,* of Pittsburg, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This is an appeal from a judgment secured by Victor Henry, a minor, against the defendant railway company for damages sustained as a result of a large rock falling upon him while at work in one of the rooms of the defendant's coal mine in Cherokee county.

It was alleged in the petition that the injury was caused by the failure of the defendant to comply with the provisions of section 4987 of the General Statutes of 1909, requiring mines to be supplied with prop timbers of suitable length and size, and easy of access; and that if such timbers had been properly placed at the disposal of the plaintiff he could have used them to prevent the rock from falling upon him. The answer of the defendant alleged that at the time of the accident there was a supply of these prop timbers kept at a certain location in the mine in accordance with a custom common to all such mines and known to and acquiesced in by the plaintiff, under which a miner working in a room of a mine was to notify the owner or operator of the mine when he needed prop timbers at the place in which he was working. It was further alleged that the defendant never received any request for such timbers from the plaintiff before the accident occurred and did not know that the plaintiff had any need of them; and that the injuries suffered by the plaintiff were due in whole or in part to his own negligence.

The rock, about three thousand pounds in weight, which injured the plaintiff had been embedded in the roof of the chamber or room where he was working, and about three days before the accident occurred, noticing that it was loose, he made an unsuccessful attempt to pull it down. He testified that he notified the superintendent of the mine of the condition of the roof and asked for timbers to prop it up, specifying the kind wanted, and the superintendent said, "All right," but did not furnish any, and he said that he made no attempt other than this to get the prop timbers for his room. In the testimony of the superintendent he denied that he had had any conversation with the plaintiff with regard to the condition of the roof of the room. It seems that the supply of prop timbers for the mine was kept at a place called the "parting," which is

the place where the drivers deposit their loads and take back their empties, and ordinarily when a miner needs props he asks the driver as he passes the room to bring him the size and kind wanted, and the latter goes to the parting where the props are kept, selects the proper ones, and leaves them in front of the miner's room on his return trip. This parting is about half a mile from the room where the plaintiff was working. The plaintiff testified that he knew where the props were situated and how to get them, but that he made no attempt to procure them except when he notified the superinendent that he needed them. There was testimony that after the accident some props were seen near the plaintiff's room, as well as eight or ten in a breakthrough across the way from his room, and the superintendent testified that those in the breakthrough had been there for three or four weeks. A witness of experience in mining testified that in his opinion it would not have been good practice to have timbered the rock but that it should have been taken down.

The principal question upon which the parties divided is whether there was a reasonable compliance with the statutory provision requiring the owner, agent or operator of a coal mine to supply mines with prop timbers of suitable length and size and kept within easy access. (Gen. Stat. 1909, § 4987.) Under this statute providing for the health and safety of miners, an owner, lessee or operator of a mine is liable for any injury suffered by the miner resulting from a violation of the act or a willful failure to comply with its provisions. (Gen. Stat. 1909, § 4992.) In respect to a compliance with the statute it has been said:

"No voluntary act in violation of the statute is excused, and no inaction where the statute requires something to be done is excused unless it be involuntary. In the case of omissions neither bad purpose nor determined obstinacy is required, and one charged with the duty to observe the statute, who intentionally suffers mining operations to proceed without taking prescribed precautionary measures when the circumstances demand that they should be taken, is guilty of a willful failure within the meaning of the law." (*Cheek v. Railway Co.*, 89 Kan. 247, 267, 131 Pac. 617.)

Were the props which were kept at the parting about half a mile from the room where the plaintiff was working and which he could have obtained upon a request of a driver, who would

have brought them on his return for another load, within easy access? The principal purpose of the requirement to keep props within easy access was the safety of the miners, but that was not the only consideration. It has been said that "these props are placed within convenient reach of the miner, so that he can get them and put them in proper place, when needed, without unreasonable loss of time." (*Ozorkiewicz v. Carr*, 83 Kan. 473, 474, 112 Pac. 135.) Ordinarily the compensation of the miner is measured by the quantity of coal mined by him, and delay occasioned by waiting for props to be brought by drivers would proportionately diminish the coal mined and the miner's compensation. Although plaintiff could have obtained props by that means it would have been necessary for him to await the coming of a driver, and, after the request was made, to wait until the driver took his load to the parting, a distance of half a mile, and when the load was dumped and the props obtained and loaded on the car he must still wait and lose the time it takes for the return trip. After learning of the necessity of the props and requesting that they be furnished the miner must either suspend his work and lose the time that will elapse while waiting for the bringing of the props or risk the danger of falling rocks, slate or earth while at work. In making this requirement the legislature evidently intended that props should be within easy reach of the miner in order that there should be no loss of time, and certainly it did not intend that miners should work under a defective or dangerous roof.

It has been held that the obligation imposed by the statute with reference to props is not conditioned upon the making of a demand for them by the miner. (*LeRoy v. Railway Co.*, 91 Kan. 548, 138 Pac. 646.) Ordinarily it is a question of fact for the determination of the jury whether the props furnished are of easy access to the miner, and under the testimony and finding it must be held that no props were kept for the miner nearer than the parting. Assuming, as we must, that suitable props were kept at the parting, and that in accordance with the practice in the mine props could have been obtained by the miner upon request of the drivers, it must be held that the props were not within easy access to the miner and that the method used by the defendant did not constitute a reasonable compliance with the statutory requirement. The instructions

of the trial court accord with the view which we have taken of the question, and nothing substantial is found in the objections to the instructions or to the rulings in the admission of testimony.

The judgment of the district court is affirmed.

PORTER, J., and DAWSON, J., dissent.

---

No. 20,056.

JOHN LIPHART, *Appellant*, v. H. G. MYERS, *Appellee*.

SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Payment Indorsed thereon—Limitation of Action.* A receipt of money indorsed on the back of a promissory note after the statute of limitations has barred action does not indicate part payment by the maker which would revive liability.

2. SAME. In an action on a note bearing such an indorsement the petition must allege payment by the debtor in order to remove the apparent bar of the statute.

3. SAME—*Petition—Amendment—New Cause of Action—Limitation of Action.* In an action on a note bearing such an indorsement, commenced within five years (the statutory period) after the date of the indorsement, the petition did not contain an allegation of the kind mentioned. More than five years after the date of the indorsement the petition was amended to include such an allegation. *Held*, a cause of action was then stated for the first time, and too late.

Appeal from Jewell district court; RICHARD M. PICKLER, judge. Opinion filed April 8, 1916. Affirmed.

*D. M. McCarthy, G. H. Bailey*, both of Mankato, *F. W. Mahin*, and *I. M. Mahin*, both of Smith Center, for the appellant.

*R. W. Turner*, and *Donald F. Stanley*, both of Mankato, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on two promissory notes. The petition was amended and a demurrer to the amended petition was sustained on the ground that the action was barred by the statute of limitations. The plaintiff appeals.

The petition contained two causes of action, one on each

note. The circumstances are such that if one be barred the other is barred, and consequently but one need be considered. One of the notes, with the indorsements upon it, reads as follows:

"$225.00                              LENA, ILL., Mar. 26, 1892.
   "Thirty months after date I promise to pay to the order of G. M. Holley Two Hundred Twenty five Dollars. Value received with interest before and after maturity at the rate of 7 per cent per annum until paid.
                                          H. G. MYERS.
   "Received $75.00 on the within Aug. 31st, 1909.
   "Without recourse pay to John Liphart.
                                          G. M. HOLLEY."

It will be observed that the five-year statute of limitations had run before the date of the $75 credit. The action was commenced within five years after the date of that credit, but the petition did not allege that the $75 was paid by the maker as part payment of the principal or interest on the note. The petition was amended to include such an allegation, but the amendment was not made until more than five years had elapsed after the indorsement of the credit on the note.

Before the amendment was made the petition did not state a cause of action. The indorsement was not a written acknowledgment of an existing liability signed by the party to be charged. Nothing else could revive liability except payment of a part of the principal or interest by the debtor. (Civ. Code, § 23.) The petition did not allege such a payment and the indorsement on the note did not either expressly or impliedly assert such a payment. An indorsement of a receipt of money, made after the statute has run, is regarded as a self-serving declaration of the creditor and not as evidence against the debtor. (*Easter v. Easter,* 44 Kan. 151, 24 Pac. 57; *Hamilton v. Coffin,* 45 Kan. 556, 558, 26 Pac. 42.) The fact of payment by the debtor is not indicated by the indorsement, but must be proved by other evidence. To permit the introduction of such evidence the petition must contain an allegation of the fact. If the petition had contained an allegation that the payment indorsed on the note was made by the debtor, the allegation would have been taken as true unless denied under oath. (*Pears v. Wilson,* 23 Kan. 343.) But without the allegation the indorsement itself did not assert payment by the debtor, nothing concerning the indorsement was taken as true, ex-

cept the date, and the petition disclosed upon its face that the action was barred. The amendment containing the necessary allegation was made after the bar of the statute was complete. A cause of action was then stated for the first time (*Railway Co. v. Bagley,* 65 Kan. 188, 69 Pac. 189), and too late.

The judgment of the district court is affirmed.

---

No. 20,057.

A. V. ANGELL and EMILY J. ANGELL, *Appellees,* v. THE CHICAGO ROCK ISLAND & PACIFIC RAILWAY COMPANY et al., *Appellants.*

SYLLABUS BY THE COURT.

1. RAILROAD CROSSING — *Injuries — Actionable Negligence Shown.* The evidence held to warrant a finding of actionable negligence on the part of a railway company with respect to a crossing accident.

2. SAME—*Injuries—19-year-old Girl—Carriage Driven by Another—Negligence.* It can not be said as a matter of law that a girl of nineteen, riding in the rear seat of a carriage driven by her brother-in-law, is bound to advise him with respect to the management of the team on approaching at night a railroad crossing where obstructions prevent a view of the track from a greater distance than about fifteen feet, although she is familiar with the surroundings and he is not.

3. PRACTICE — *Amendment to Pleading During Trial — Judicial Discretion.* It is not an abuse of discretion to refuse a request, made after the impaneling of a jury, to allow an answer, which alleges only personal contributory negligence on the part of the person for whose death a recovery is sought, to be amended so as to charge also imputed negligence.

4. RAILROAD CROSSING—*Habit of Person Killed May be Shown.* Upon the issue whether a person killed in a crossing accident had looked and listened for a train upon approaching a railroad crossing, his habit in that regard may be shown.

5. TRIAL—*No Prejudicial Error in Instructions.* Rulings relating to instructions held to be either correct or nonprejudicial.

6. PRACTICE — *Separate Defendants — Represented by Separate Attorneys—Error to Deny the Right.* The fact that several defendants, whose interests are not entirely similar, have in the earlier stages of a case been represented by the same counsel, does not prevent their insisting upon being heard through separate attorneys at the trial. And the refusal of the court to allow one of them to have the adverse witnesses cross-examined in his behalf by his own lawyer is such a denial of his right to a full hearing as to require a new trial.

Angell v. Railway Co.

Appeal from Meade district court; GORDON L. FINLEY, judge. Opinion filed April 8, 1916. Affirmed as to the railway company; reversed as to the other defendants.

*Paul E. Walker*, and *Luther Burns*, both of Topeka, for appellant The Chicago, Rock Island & Pacific Railway Company.

*John W. Davis*, of Greensburg, for appellants J. W. Crowley and H. B. Johnson.

*C. A. McNeill, Charles Stephens, Lee Shepherd*, all of Columbus, and *F. B. Wheeler*, of Pittsburg, for the appellees.

The opinion of the court was delivered by

MASON, J.: Goldie Angell, nineteen years of age, was killed in a collision between a Rock Island passenger train and a carriage in which she was riding. Her parents recovered a judgment against the railway company and its engineer and fireman, and they appeal.

The accident occurred at about half past ten o'clock on a moonlight night, in Plains, a city of the third class, having about 400 inhabitants, at a much traveled crossing—the only one for a distance of half a mile in either direction. The railroad runs approximately east and west. The train came from the east, the carriage from the north. A view of the track to the east from a vehicle approaching from the north was cut off, until the observer should be about fifteen feet from the track, by the station and other buildings, by some box cars standing upon the house track fifty feet to the north, and by a signboard 60 to 70 feet north of that. An ordinance prohibited trains from running faster than ten miles an hour within the corporate limits. The mayor had written to the company to the effect that a speed of twenty miles an hour would not be objected to if the street were kept free from standing cars for its entire width. The jury found that the train was making forty miles an hour at the time of the accident. There was evidence that no bell was rung and that a whistle was blown while the train was more than a mile from the station, but not later.

(1) The jury based its verdict on three forms of negligence —failing to give a proper warning, violating the speed limit,

44—97 KAN.

and blocking the view of an approaching train. The defendants maintain that neither the failure to give a proper warning nor the speed of the train was a proximate cause of the accident, and that the obstruction of the view of the track was not negligent. On the first proposition the substance of the argument seems to be that if the occupants of the carriage had been exercising any reasonable degree of care they would have heard the whistle or the noise of the train, and that as they were paying no attention to the matter whatever they would not have heard the whistle if it had been blown again or the bell if it had been rung. Whether that was the case was a question of fact which the jury must be regarded as having determined against the defendant. With regard to the violation of the ordinance, it is argued that as the driver testified that he did not see the train before the team was upon the main line and the front wheels of the carriage were going upon the crossing the accident would have occurred if the rate had been but twenty miles an hour, or even ten. There was also evidence, however, that the engine struck the rear wheels of the carriage, so there is room for the inference that if the speed had been ten miles an hour, or even twenty, the driver would have been able to cross in safety. The effect of the mayor's statement that under certain conditions the violation of the ordinance would not be objected to is therefore not important, but as such a regulation has the force of law (*Denton v. Railway Co.*, 90 Kan. 51, 55, 133 Pac. 558) the suggestion that it could be nullified or modified otherwise than by repeal or amendment lacks plausibility (see 33 Cyc. 977; *Garber v. St. Louis Southwestern Ry. Co. of Texas*, [Tex. Civ. App. 1909] 118 S. W. 857). The obstruction of view which the plaintiff relied on as constituting negligence on the part of the railway company was that due to the placing of the freight cars on the house track. The company maintains that although the cars were so placed as to have that effect, no showing was made that such arrangement was unnecessary or improper. The fact that the view was so far cut off by other obstructions, which presumably were necessary, warranted the conclusion that if practicable the cars should be so placed as not to restrict it still further. There was perhaps room for a finding that some other disposition could and should have been made.

Angell v. Railway Co.

But this element of negligence could be eliminated without requiring a reversal.

(2) The principal contention of the defendants is that the evidence conclusively shows the decedent to have been guilty of contributory negligence. She was familiar with the crossing and had often driven over it. On the night of the accident she went in the carriage, belonging to her parents, with whom she was living, accompanied by two sisters and a younger brother, from their home to attend a revival meeting. Another sister and her husband went with visiting friends in an automobile. All the family knew that they could return in any way they desired, as no plans had been made in that regard. After the services the married sister and her husband expressed a desire to go back in the carriage with the decedent and one of her sisters, and this arrangement was acquiesced in by the others. There was no conversation as to who should do the driving, but the married couple took the front seat and the husband drove. When the carriage reached the point where the street crosses the house track the team was slowed down from a trot to a walk, and was driven to the crossing without stopping and without further slowing up. Nothing was said by any of the party after reaching a point about a block north of the main track until the carriage was on the crossing. The court submitted to the jury the question whether the decedent was negligent in failing to request the driver to stop before attempting to cross, and they specifically found that she used reasonable and ordinary care as the team approached and passed upon the track. The question was a fair one for determination by the jury. The driver testified that he was not familiar with the crossing, although he had been about Plains for two months. Whether this circumstance, if known to his sister-in-law, in view of her own greater familiarity with the surroundings, made it incumbent upon her to advise him as to the management of the team can not be said to admit of only one reasonable opinion. He had assumed the responsibility of driving, and the court can not say as a matter of law that she was bound to distrust his ability or his caution. (*Denton v. Railway Co.*, ante, p. 498, 155 Pac. 812.)

(3) The answers pleaded that the decedent had been personally negligent but did not charge that the negligence of the

driver was imputable to her. After the jury had been im-
paneled the defendants asked leave to amend by alleging that
she was chargeable with his negligence. The request was
renewed at the close of the plaintiffs' evidence. Permission
to amend was in each instance refused, and the rulings are
complained of. The allowance of amendments to pleadings is
largely in the control of the trial court, and in view of the
late hour at which the request was preferred in this instance
its refusal can not be regarded as an abuse of discretion.

(4) A witness for the plaintiffs was permitted to testify
that the decedent had been in the habit of looking before driv-
ing over this crossing, and that when she saw a train approach-
ing would insist on waiting until it was past. The defendants
objected to each question by which this evidence was developed
"as incompetent, irrelevant and immaterial; as it calls for the
opinion and conclusion of the witness." An argument is made
that inasmuch as there was positive evidence of the conduct of
the decedent at the time of the accident, no occasion existed
for invoking any presumption in the matter. There was di-
rect evidence that she said nothing until the collision had be-
come inevitable, but whether she looked and listened for a
train was a matter of inference, upon which her habit in that
regard may have had some bearing. (*Railway Co. v. Moffat,*
60 Kan. 113, 55 Pac. 837.) The testimony objected to did not
call for a conclusion or for expert opinion. The question of
the admissibility of similar evidence has lately been discussed
in a case where no decision was found to be necessary. (*Fike
v. Railway Co.,* 90 Kan. 409, 417, 133 Pac. 871.) The citations
there made show a preponderance of authority in favor of
accepting the evidence, and we regard that rule as the better
one. Other cases are collected in a note in 14 Michigan Law
Review, p. 411.

(5) Complaint is made of the refusal of a number of in-
structions relating to contributory negligence. The jury were
told, in substance, that no recovery could be had if the decedent
failed in any duty incumbent on her; that it was her duty to
look and listen for a train as the carriage approached the
track; and that whether it was also her duty to insist that the
driver should stop before driving upon the track was a ques-
tion of fact for their decision. The defendants maintain that

they were entitled to the more specific instructions which they asked. Each of these is regarded as containing some element justifying the refusal. One related to the conduct of "the occupants of the vehicle," and was open to the interpretation that the decedent might be held responsible for the conduct of others than herself. Another said that if the deceased knew of the approach of the train the failure of the engineer to give a signal was immaterial, ignoring the contingency that, until it was too late to take any effective action herself, she might have reasonably supposed that the driver also knew of its coming and intended stopping. Another stated that the failure of the decedent to remonstrate with the driver was negligence in law, if she saw the approaching train, without referring to the time of her seeing it, thus charging her with negligence although she may have first seen it after the collision had become inevitable. Another placed upon the plaintiffs the burden of disproving contributory negligence. Two others were to the effect that if the decedent could not herself ascertain whether or not a train was coming it was her absolute duty to request the driver to stop. In view of the driver's more advantageous position we think it can not be said as a matter of law that she had no right in that situation to depend upon his judgment. An instruction regarding imputed negligence, on the theory of a common purpose and common right of control, was properly refused because that issue had been excluded. It is contended that the matter of the obstruction caused by the freight cars should have been withdrawn from the jury because it had not been pleaded as a ground of recovery and because there was no evidence of negligent conduct in that regard. The petition alleged that the accident was due solely to the negligent conduct of the engineer and fireman in running at an excessive speed and failing to give any warning at a time when the view was negligently and unnecessarily obstructed by the cars on the house track. Even if these allegations are so construed as to forbid a recovery on account of negligence in placing the box cars, no reversal can be had on that account, because the existence of the other two grounds relied upon was specifically found.

(6) The final complaint is of the refusal of the court to allow an attorney representing the engineer and fireman to

cross-examine the plaintiffs' witnesses. A separate answer had been filed for them, signed by two attorneys, who also signed that of the railway company. When the case was called for trial these attorneys formally withdrew as counsel for the engineer and fireman, and a third attorney announced that he would alone represent them, a notation to that effect being made on the docket. During the trial this attorney, after counsel for the railway company had completed the cross-examination of witnesses for the plaintiff, undertook to cross-examine them in behalf of the other defendants. The trial court refused to allow this, saying that the railway's attorneys had signed all of the papers and represented all three of the defendants at hearings in chambers, and were considered as still representing them, adding that they would not be permitted to withdraw during the trial at any stage of the proceedings. The fact that the same attorneys had prepared the pleadings for all the defendants did not commit them to the policy of being represented by the same counsel throughout the trial. The interests of the railway company and of the engineer and fireman were in some respects dissimilar. For instance, a finding that the negligent obstruction of view by the box cars was the sole cause of the collision would have fastened liability upon the company and exonerated these employees. The individual defendants had a right to present their side of the controversy, unembarrassed by any question of the effect upon the corporation. The cross-examination of the adverse witnesses was an essential part of their presentation. (*McIntosh v. Oil Co.*, 89 Kan. 289, 131 Pac. 151.) Their right in that connection had not been forfeited, and its denial prevented their having the full opportunity for a hearing to which they were entitled. The error requires a new trial as to them, but does not affect the judgment against the company.

The judgment is affirmed as to the railway company, but reversed with directions for a new trial as to the other defendants.

No. 20,058.

GEORGE J. McCLURE, as Trustee, etc., *Appellee*, v. THE FREE-BORN ENGINEERING & CONSTRUCTION COMPANY et al. (THE BANKERS SURETY COMPANY, *Appellant*).

### SYLLABUS BY THE COURT.

INDEMNITY BOND—*Failure to Give Notice of Default—Surety Suffered No Damage Thereby—No Defense to Action on Bond.* Failure to comply with a provision in an indemnity bond issued by a surety company which required the obligee to give written notice of the default within ten days after learning of the fact is no defense to an action on the bond where it is neither claimed nor proved that the company suffered any loss or damage from the failure to give notice. (*Republic County v. Guaranty Co.*, 96 Kan. 255, 150 Pac. 590.)

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed April 8, 1916. Affirmed.

*S. B. Amidon, D. M. Dale, Jean Madalene, S. A. Buckland,* all of Wichita, *M. A. Fyke,* and *E. L. Snyder,* both of Kansas City, Mo., for the appellant.

*J. D. Houston,* and *C. H. Brooks,* both of Wichita, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The defendant, a surety company, executed its bond to indemnify plaintiff in the event a construction company failed to complete the erection of a cement plant on or before July 1, 1911. On the failure of the company to complete the building plaintiff brought suit on the bond and recovered judgment. The bond contained the following provision:

"That in the event of default on the part of said principal a written notice of such default shall be delivered to the Surety at its office in the city of Cleveland, Ohio, said notice to be deposited within the mails within ten days after such obligees, or their representatives shall learn of such default."

The defendant's appeal is based upon one contention, which is that the evidence conclusively shows the failure of plaintiff to give the required notice. On February 27, 1911, the con-

struction company wrote plaintiff asking for an extension of time for completing the work, and in the letter said: "It is very probable that we may not have the plant entirely completed by the first day of July." Plaintiff replied by letter that he would prefer not to grant the extension until further inquiry in the matter and stating that the bond was good until July 1, 1911. On March 4 the construction company wrote him again, asking a definite reply to their request; and here the correspondence ended. The plaintiff testified that he did not learn until August 16, the same date he notified defendant, that the plant was not completed by July 1.

The defendant's demurrer to the evidence was overruled. The defendant elected to stand upon the demurrer, and judgment went in plaintiff's favor. If the court believed plaintiff's testimony that he first learned of the default August 16, the letter of that date notifying the defendant was all that was required under the provisions of the contract. Besides, the defendant has neither alleged nor attempted to show that it suffered any loss by failure to receive notice earlier. "Actual damage resulting from failure to give notice must be pleaded and proved as a defense" (*Republic County v. Guaranty Co.,* 96 Kan. 255, 258, 150 Pac. 590) in an action against a surety company engaged in the business of furnishing bonds of this character for compensation.

Judgment affirmed.

---

No. 20,059.

PALM, FECHTELER & COMPANY, *Appellant,* v. THE UNCLE SAM OIL COMPANY, *Appellee.*

### SYLLABUS BY THE COURT.

SALE—*Shipment of Goods Different from Those Ordered—Special Findings—Contrary to General Verdict.* The jury returned a general verdict in favor of the plaintiff for certain articles ordered by and shipped to the defendant, but by their answers to special questions found that the sizes of such articles were not approved by the defendant and were different from those specified in the order, and the trial court set aside the general verdict and rendered judgment for the defendant on such answers. *Held,* proper.

Palm & Co. v. Oil Co.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge. Opinion filed April 8, 1916. Affirmed.

*L. O. Carter,* and *Jacob S. Detwiler,* both of Kansas City, for the appellant.

*Albert L. Wilson,* and *Mark T. Wilson,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff recovered a verdict for $757.02 for 165,000 decalcomania name plates. In addition to the general verdict the jury returned answers to certain special questions. On motion of the defendant the verdict was set aside and judgment was entered in its favor on these answers. From this ruling the plaintiff appeals.

The essential facts of the case are that the plaintiff by its traveling salesman took an order of the defendant through its general sales manager for the name plates. The answer alleged that the order was taken on condition that the defendant could induce other oil companies to take a certain number of the articles, and the plaintiff's agent was notified not to transmit the order to the plaintiff but to hold the same until notified so to do by the defendant. The jury, however, not only found in favor of the plaintiff, but in answer to a special question whether the order was given with such understanding answered, No. It seems, however, that with the order was a list of dimensions indicating the sizes of the plates desired by the defendant, and that upon its receipt the plaintiff's artist, finding that such sizes would need to be somewhat different in order to be of proper proportions, the defendant was so advised, and in reply wrote, among other things—

"You understand if you manufacture these signs, you will have to hold them until such time as may come when we would be able to use them, as I instructed you not to go ahead with the order."

It is admitted in the answer that the plaintiff submitted to the defendant sketches of the name plates for approval, but it is averred that such approval was never given and that the defendant never authorized the plaintiff to make the plates it alleged it had manufactured for the defendant. After receipt of the letter last quoted from, the plaintiff wrote that the order

could be completed and shipped or the work stopped and the defendant be charged with the work already done plus profits, to which the defendant replied, reiterating that no authority had been given to manufacture the goods, and adding, "We can not entertain your proposition in your letter at all, and as soon as we need them, we will order them out."

Further correspondence repeated the claims of both parties, the defendant writing, among other things: "After giving you such positive instructions not to make shipment of this goods, we feel as though we are not under any obligations to your company."

The president of the plaintiff company testified, among other things, that the goods were in strict accordance with the order and the sketches submitted and approved. Also, that the designs were made up by the plaintiff's art department, "who figured the spaces and style of letter that would look best in the space where the transfers were to go, from the catalogue that was sent us with the order. . . . Where our customer specifies a definite size in his order, but tells us where he wants the transfer to go in a certain space—and we are to make up sketches for his approval, we consider the customer's dimensions only approximate, and draw up the sketches in a way that will look best in the given space. We then submit the sketches for his approval. If he approves of them, we make up the design accordingly, but if he does not, we make new designs. We make no changes in the transfers except those that have been first approved by the customer. When a transfer is finished and delivered, it is exactly the size that the customer has approved of." The artist testified that he considered the dimensions given as only approximate and did not follow exactly those given in the order. The plaintiff's sales agent testified without dispute that once when he called on the defendant's general sales manager the latter said that the submitted sketches were all right as far as he had seen them.

When the consignment was shipped it was refused by the defendant, and the defendant's general sales manager testified:

"It was refused because we could not use 165,000, and they had violated our instructions.

"Q. Yes, if you had been able to, you thought, to use 165,000 this

order would have been right, would it not, Mr. Winters?  A. Well, if they had been made according to our specifications.

. . . . . . . . . .

"Q. They never were tried at all?  A. No, sir.

"Q. Did you ever examine them?  A. No, sir.

"Q. Do you know whether they could have been used or not?  A. I didn't examine them.

"Q. Then you don't know whether they could have been used or not?  A. No, sir.

"Q. Do you say they weren't so they could have been used on your cans?  A. I don't know whether they can or not.  I don't know whether they will fit.

"Q. Then that wasn't the reason for refusing the order, was it?  A. It wasn't my reason, no.

"Q. What was your reason?  A. Because we couldn't use that many and they hadn't gone according to our instructions."

It will be seen from the foregoing that the sizes of the articles furnished were not precisely those specified in the catalogue accompanying the order, and that in the defendant's general sales agent's testimony this variance was mentioned as one of the reasons for refusing the payment.

The following answers were returned by the jury:

"7. Were the sketches of the articles to be manufactured made by plaintiff changing the size of the articles?  Answer: Yes.

"8. Were said sketches approved by the defendant?  Answer: No.

"9. Were the articles which were shipped to defendant made according to said sketches?  Answer: Yes."

It would seem, therefore, that the trial court concluded that because the sizes had been changed and the change had not been approved, the contract had been departed from so that the plaintiff was not entitled to recover.  The jury were instructed that the plaintiff was bound to manufacture and deliver the transfers in strict conformity with the order, and that a failure so to do would be sufficient ground to refuse acceptance.  The defendant's position is thus stated in its brief.

"There is no question in this case concerning defects in the articles manufactured.  Appellee simply contends that it is not liable on the contract because appellant never *performed the contract* and not because appellant substantially performed the contract and made a breach of *warranty* as to quality.  The question as to what reason appellee had for refusing to accept the shipment is not material. . . . It makes no difference why appellee refused the shipment, because before appellant can recover on the contract it must prove that it shipped to appellee the identical articles ordered."

The plaintiff insists that the variance was immaterial and one that rendered the articles no less usable and valuable than they otherwise would have been. Attention is called to authorities holding that an implied warranty does not go with the sale of mill machinery by a dealer that it shall answer the particular purpose intended (*Ehrsam v. Brown,* 76 Kan. 206, 91 Pac. 179) ; that a refusal to accept on account of dissatisfaction must be in good faith (*Hollingsworth v. Colthurst,* 78 Kan. 455, 96 Pac. 851; *Ramey v. Thorson,* 94 Kan. 150, 146 Pac. 315), and other decisions more or less analogous. But the question here concerns a variance from the sizes of articles ordered, not a divergence in quality or a lack of fitness for the desired purpose. Even in such a case it has been held that a sale of goods of a described quality implies a warranty of such quality. (*Johnston v. Lanter,* 87 Kan. 32, 123 Pac. 719.) There the order was for No. 1 cypress lath, and while it was stated as the general rule that prompt inspection and rejection with notification must follow receipt of the article ordered, promptness was held to be a question of fact dependent on circumstances. In *Wolf v. Boston Veneer Box Co.,* 109 Mass. 68, the contract was to deliver monthly throughout the year logs averaging a certain diameter, option with the defendant to end the contract at any time and pay the cost of the logs on hand. He ended the contract in October and was held liable for the cost of the logs then on hand though not up to the average, but upon the ground that had the contract continued to the end of the year the average might have been brought up. In *Forke v. E. C. Meacham Arms Co.,* (Texas, 1892) 19 S. W. 550, a shipment of bullets was refused because not packed in the usual style of box. It was decided, however, that the bullets ordered having been sent, and the style of box not having been indicated by the defendant, he must pay. *Loftus v. Riley & Co.,* 83 Iowa, 503, 50 N. W. 17, is cited in support of the argument that substantial correspondence with the specifications is sufficient, but in that case, involving a large order of paving blocks, the circumstances were such that the decision does not materially assist in the determination of the case before us.

The record here shows that there is no market for the articles refused, such things being manufactured to fill special

orders and not otherwise salable. There is much to indicate a purpose to refuse the shipment because too large an order had been given. The jury found for the plaintiff but at the same time said that the articles shipped were not of the sizes ordered, but were made after sketches not approved by the defendant, the equivalent of saying that the plaintiff sold one kind and delivered another kind of article. Not only was this inconsistent with the general verdict, but it was deemed by the trial court to be within the rule requiring judgment on the special findings. The majority of the court hold such ruling to have been correct. (*Hogue v. Mackey*, 44 Kan. 277, 24 Pac. 477; *L. N. & S. Rly. Co. v. Wilkins*, 45 Kan. 674, 26 Pac. 16; *Windmill Co. v. Buchanan*, 46 Kan. 314, 26 Pac. 708; *School District v. Lund*, 51 Kan. 731, 33 Pac. 595; *Kansas City v. Brady*, 52 Kan. 297, 34 Pac. 884; *Beech v. Railway Co.*, 85 Kan. 90, 116 Pac. 213; *McClain v. Railway Co.*, 89 Kan. 24, 130 Pac. 646.)

The judgment is affirmed.

PORTER, J. (dissenting): Not until after the suit was brought did the defendant suggest as a reason for escaping liability the fact that it had never approved the designs. That this defense is an attempt of defendant to mend its hold is obvious from the manner in which the answer refers to the matter and what its counsel said in his opening statement to the jury. The answer states:

". . . That defendant never approved of said sketches, and never at any time or in any manner authorized the plaintiff to make the nameplates it alleges it has manufactured for the defendant."

Whether it ever authorized the plaintiff to make the identical name plates is not important. It gave the unconditional order, knowing the goods had to be manufactured before the order could be filled. In the opening statement for defendant it was said:

"Six hundred and some odd dollars' worth of those papers would be an excessive expense to the company. They would not use them up in five or ten years, perhaps, and so in good faith he went to these other oil companies to try to get them to join in and take a part of it, and if he could, why he would direct Mr. Meyer to send this order in, and he could n't. They would n't take any of them, and so the order was never given to Meyer to send the order in."

The jury find that the defendant gave the written order for the goods. When asked the question whether the defendant approved the designs, the jury answered correctly in the negative, but there are two reasons why this finding furnishes no possible ground for defense to the action to recover the purchase price.

*First,* the contract contained no provision that designs should be submitted by plaintiff and approved by defendant before the contract became binding. It was an unconditional order for certain goods to be manufactured and delivered by plaintiff at prices named, and when the order was accepted by plaintiff it bound defendant to receive and pay for the goods unless they were not made according to the contract. The sales manager of the defendant testified that he never examined the goods when the shipment arrived, and that he gave orders that they were to be returned without examination or inspection.

*Second,* this court has repeatedly held that "where a party gives a reason for his conduct and decision touching anything involved in a controversy, he can not, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law." The foregoing language is taken from *Railway Co. v. McCarthy,* 96 U. S. 258, 267, and was approved in *Redinger v. Jones,* 68 Kan. 627, 637, 75 Pac. 997, and again in *Sandefur v. Hines,* 69 Kan. 168, 171, 76 Pac. 444. In the last case cited the syllabus reads:

"Where a party bases his refusal to consummate a sale of property in accordance with an alleged agreement upon one ground, he can not, after litigation has begun, change his position and defend such refusal upon another and wholly different ground." (Syl. ¶ 2.)

The same doctrine was approved and followed in *Stanton v. Barnes,* 72 Kan. 541, 84 Pac. 116. In that case certain grounds were stated for refusing to complete a contract, but no objection was raised upon an additional ground which was first offered as a defense after action was begun. It was held that it was too late to urge the other ground not presented in the first instance.

If defendant was intending to rely upon the fact that it had

not approved the designs, what did it mean by the letter written after being informed that the manufacture of the goods had been commenced, in which it stated "we can not entertain your proposition in your letter at all, *and as soon as we need them, we will order them out?*" ·

The order was given in February, and as late as July 23 defendant wrote plaintiff a letter in which it states:

"And we asked him to hold the order until such time as we could have the order come forward. . . . After giving you such positive instructions not to make shipment of these goods, we feel as though we are not under any obligation to your company."

Winters, the sales manager of the defendant, testified that he did not know whether the labels could be used; he did not refuse to accept the order for that reason. "Q. What was your reason? A. Because we could n't use that many, and they had n't gone according to our instructions." His testimony, together with his letters written to the plaintiff, shows that the defendant refused to accept the goods because it had given too large an order and had not been able to induce other oil companies to take part of the goods, and also that the "instructions" to which the witness referred in his testimony meant instructions contained in letters directing plaintiff not to ship the goods until further orders. The contract, however, contained no provision that the goods were not to be manufactured nor shipped until the defendant should further direct the plaintiff. The sales manager testified that he had been unable to induce other oil companies to accept a part of the goods, and that this fact was one reason for his attempted cancellation of the contract. The jury have found that the plaintiff's salesman never agreed with the defendant that sketches of the name plates would be submitted to the defendant for approval before manufacture.

I think the trial court erred in setting aside the verdict and findings and in granting a new trial. As I construe the contract the findings are perfectly consistent with the evidence and the general verdict. The trial court apparently concluded either that the defendant could modify the contract by subsequent letters instructing plaintiff not to forward the goods until further notice, or else that there was no liability because defendant had not approved the designs. The latter reason

was never suggested as a ground for refusing to accept and pay for the goods until after the litigation commenced, and to allow it is to permit defendant to mend its hold. The other involves a misconception of the contract.

In my opinion the judgment should be reversed and remanded, with directions to enter judgment on the verdict and special findings in favor of the plaintiff.

MARSHALL, J. (dissenting) : The special findings of the jury do not justify judgment for the defendant as against the general verdict, and for that reason the judgment should be reversed and a new trial directed.

WEST, J., authorizes me to say that he concurs in this dissent. (*Ratliff v. Railroad Co.*, 86 Kan. 938, 122 Pac. 1023.)

---

No. 20,060.

ROSE C. MILLER, *Appellant*, v. MELVIN D. MILLER, *Appellee*.

### SYLLABUS BY THE COURT.

DIVORCE—*Amount of Alimony—Judicial Discretion*. Before a judgment awarding alimony will be reversed it must appear by all the circumstances surrounding the parties to the action that the trial court abused its discretion in determining the amount.

Appeal from Crawford district court; ANDREW J. CURRAN, judge. Opinion filed April 8, 1916. Affirmed.

*J. I. Sheppard,* of Fort Scott, and *C. S. Denison,* of Pittsburg, for the appellant; *John L. Kirkpatrick,* of Pittsburg, of counsel.

*B. S. Gaitskill,* of Girard, *John P. Curran,* and *J. J. Campbell,* both of Pittsburg, for the appellee.

The opinion of the court was delivered by

MARSHALL, J. : The plaintiff was granted a divorce from the defendant because of his extreme cruelty to the plaintiff. From the judgment awarding alimony to her she appeals.

The divorce was not contested by the defendant. There was a contest concerning the alimony. At the time the action was tried the defendant owned property valued at about $53,000.

The plaintiff as alimony was awarded property valued at about $10,000. They had been married about a year. The defendant had been previously married and had two children living by his first wife. At the time of his first marriage the defendant had about $1500 in money and property, and his wife had and furnished to him $10,000 in cash, which went into the defendant's estate. At the time the action was tried the defendant was engaged in the hardware business with J. H. Beasley. The plaintiff before her marriage to the defendant worked for the defendant's firm for $60 per month, and continued to work for the firm at the same salary after her marriage. One child, born after the divorce was granted, resulted from the marriage of the plaintiff and the defendant. This child has been sickly ever since its birth. The plaintiff was given the care, custody and control of this child, but no provision was made for its maintenance.

The plaintiff complains of the amount awarded to her as alimony.

"The amount of permanent alimony varies with the circumstances of each case. It must be reasonably within the means of the husband and must be sufficient for the needs of the wife considering her ability, her age and condition. The fact that she contributed to amassing the husband's estate is always a factor in determining the amount, as is also the fact that she assumes the custody and support of the children." (3 M. A. L. 500.)

"The determination of the amount of permanent alimony is controlled by no fixed standard, but rests, rather, in the sound discretion of the court, which, being judicial in character, is not liable to be reviewed by an appellate court except where it is evident that there has been a clear abuse thereof." (1 R. C. L. 929.)

"The amount to be awarded as permanent alimony is largely in the discretion of the court." (14 Cyc. 773.)

This rule is supported by *Blankenship v. Blankenship,* 19 Kan. 159; *Avery v. Avery,* 33 Kan. 1, 5 Pac. 418; *Snodgrass v. Snodgrass,* 40 Kan. 494, 501, 20 Pac. 203; *Leach v. Leach,* 46 Kan. 724, 729, 27 Pac. 131; *Galutia v. Galutia,* 72 Kan. 70, 82 Pac. 461. The trial court had an opportunity of seeing the parties and witnesses and of hearing all of the testimony, oral and otherwise, and had a better opportunity of knowing what would be exact justice between the parties than this court has. (*Snodgrass v. Snodgrass,* supra; *Galutia v. Galutia,* supra.)

"The defendant's case is not like the case of that class of wives who bring something to their husbands, or who after marriage assist their husbands in accumulating wealth or property, for she brought nothing to her husband, and afterwards largely retarded and hindered him from accumulating wealth and property, and was largely the cause of reducing his wealth." (*Leach v. Leach*, 46 Kan. 724, 729, 27 Pac. 131.)

No provision has been made for the maintenance of the child of the plaintiff and the defendant. That matter may yet be adjusted as circumstances may justify. (*Riggs v. Riggs,* 91 Kan. 593, 138 Pac. 628; *Cheever v. Kelly,* 96 Kan. 269, 150 Pac. 529; *Rowell v. Rowell,* ante, p. 16, 154 Pac. 243.) We can not say that the trial court abused its discretion in the amount awarded to the plaintiff for alimony.

The judgment is affirmed.

---

No. 20,062.

GEORGE C. MEADOR et al., revived in the name of EUGENE B. MEADOR, as Executor, etc., et al., *Appellees*, v. ORLANDO MANLOVE et al., as Executors, etc., et al., revived in the name of L. R. SELLERS, as Administrator, etc., et al., *Appellants.*

SYLLABUS BY THE COURT.

1. JURISDICTION—*To Declare Trust in Land in Another State.* Where a court of general jurisdiction has secured jurisdiction of the parties who hold the legal title to land in another state, it may render a judgment to impress a trust as to such land and order the trustees to execute a conveyance thereof; and the possible difficulties which may attend the enforcement of its judgment do not in any wise abridge its jurisdiction.

2. NONRESIDENT DEFENDANTS—*Voluntary General Appearance.* Where defendants who have been summoned personally and defendants who have been summoned by publication service join in a pleading or motion raising questions of law and questions of fact involved in the general issue of a cause, a general appearance is thereby entered by all the defendants.

3. ORAL AGREEMENT TO WILL PROPERTY—*"Heirs" to be Benefited.* Where a husband and wife agree to make wills of all their respective properties in each other's favor upon condition that the survivor of the two shall make a new will after the death of the first bequeathing the property received by such a will to the heirs of the deceased spouse, the heirs intended to be benefited thereby are the next of kin who would take under the statute of descents and distributions.

4. SAME—*Statute of Frauds—Statute of Trusts and Powers.* Neither the statute of frauds nor the statute of trusts and powers is a bar to the enforcement of an oral agreement to make a will when it has been fully performed by one of the parties, following the rule announced in *Gemmel v. Fletcher,* 76 Kan. 577, 92 Pac. 713, and *Smith v. Cameron,* 92 Kan. 652, 141 Pac. 596.

5. EVIDENCE—*Interest of Witness—No Disqualification.* There is no disqualification of witnesses in this state merely because such witnesses are directly or indirectly interested in the outcome of a lawsuit, but their interest may be shown as affecting their credibility. (Civ. Code, § 317.)

6. PRACTICE—*Findings—Conflicting Evidence.* Rule followed that the trial court's findings of fact, when based upon sufficient though disputed or conflicting testimony, will not be disturbed on appeal.

7. VARIANCE—*Pleading and Proof.* Where a judgment is not traceable to a variance between the pleading and the proof, and that variance is not brought to the attention of the trial court, the variance can not be made the basis of reversible error on appeal.

8. ORAL AGREEMENT FOR MUTUAL WILLS—*Performance by Wife—Breach by Husband—Land Held in Trust for Benefit of Wife's Heirs.* A husband and wife without children made an oral agreement to make wills of all their property in each other's favor upon condition that when one of them died the surviving spouse would make a new will bequeathing the property received by such a will to the heirs of the deceased spouse. In accordance with this agreement both made such wills. The wife died first. Thereafter the husband, in violation of the agreement, made a will bequeathing all his property to his own kindred, including what he had received by his wife's will, and cutting off entirely the heirs of the wife, her parents. *Held,* that those who took title to the husband's property under the will made in breach of the agreement did so as trustees for the benefit of the wife's parents, and where the parents died during the progress of the litigation pertaining to the enforcement of such trust, the trustees will be decreed to hold the title of the property as a constructive trust for the benefit of the heirs and legal representatives of the wife's parents.

Appeal from Linn district court; CHARLES E. HULETT, judge. Opinion filed April 8, 1916. Affirmed.

*John A. Hall,* of Pleasanton, and *L. A. Jarman,* of Rushville, Ill., for the appellants.

*W. P. Dillard, J. I. Sheppard, J. G. Sheppard, Kate Sheppard,* all of Fort Scott, and *John O. Morse,* of Mound City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal from a judgment of the district court of Linn county, and in which it was decreed that certain beneficiaries of the will of David C. Manlove held title ·to forty acres of Illinois land in trust for the plaintiffs, and directing them to convey this land to plaintiffs; and in which it was also decreed that certain moneys and bank shares were held by David C. Manlove's executor in trust for the plaintiffs, and directing the transfer and delivery thereof to the plaintiffs.

An abridged statement of the facts is as follows: In 1896 David C. Manlove, a bachelor, of Prescott, Kan., married Emma C. Price, a widow, of Macomb, Ill. Each was possessed of considerable property and they had no children. Sometime during the earlier years of their married life they made an oral agreement that they would make wills conveying all their property to each other, and that after one of them had died the other would make a new will bequeathing to the heirs of the first that estate which would come to the second by the will of the one dying first. Thus, if David died first, Emma would take all by his will but in turn would bequeath the property received from him to his heirs. On the other hand, if Emma died first, David would take all by her will, but he would be·· queath to Emma's heirs the property received by him through Emma's will.

Accordingly, on September 11, 1899, David made a will bequeathing all his property to Emma; and on March 20, 1900, Emma made a will bequeathing all her property to David. Emma died on July 30, 1911, and her will was probated. David qualified as executor and took possession of the property as beneficiary. On June 3, 1912, David made a new will, after Emma's death, which wholly ignored the oral contract with his wife. He bequeathed his entire estate, including what he had acquired by his wife's will, to his own relatives, excepting one item to a personal friend. David died on August 11, 1912.

The original plaintiffs were the parents of Emma. They have died, and the action is prosecuted by their executor and their heirs and beneficiaries. The defendants are the sole surviving executor of the will of David and the beneficiaries of David's will.

The trial court made findings of fact and conclusions of law and gave judgment for the plaintiffs. The defendants present a formidable assignment of errors and support it with a brief of one hundred and fifty-nine pages and a reply brief of fourteen pages. These briefs display a comprehensive research and review of authorities and an industry which is marvelous, but space and time will only permit us to discuss the principal points which must control this appeal. These we will note as nearly as convenient in the order of their presentation.

1. Did the district court of Linn county, Kansas, have jurisdiction to render a decree declaring a trust in relation to the Illinois land and directing defendants to convey it to the plaintiffs? If the court had jurisdiction of the defendants, it seems settled by the authorities that it did have such jurisdiction. (*Fall v. Fall*, 75 Neb. 104, 120, 106 N. W. 412, 113 N. W. 175; affirmed in *Fall v. Eastin*, 215 U. S. 1. See, also, Notes in 69 L. R. A. 678 *et seq.*, and 27 L. R. A., n. s., 420, 421.) In *Manley v. Carter*, 7 Kan. App. 86, 52 Pac. 915, in which *Massie v. Watts*, 10 U. S. 148, and *Phelps v. McDonald*, 99 U. S. 298, 308, are cited, it was held that a court of equity having jurisdiction of the parties may render a judgment to enforce a trust as to land not within its territorial jurisdiction. We will not now concern ourselves as to how the district court may be able to enforce its decree nor what may be the status of the title to the land in Illinois if the decree directing its conveyance to plaintiffs is not obeyed. (7 R. C. L. 1062.) The defendants' only claim to the title to the land in Illinois is based on the will of a citizen of Kansas, a will made in Kansas and its terms modified by a Kansas court of competent jurisdiction, for such is virtually the effect of the judgment under review.

Since the court had personal jurisdiction of Orlando Manlove, both personally and as executor, and later, upon Orlondo's decease, it had personal jurisdiction of his executor and his heirs, no great difficulty is likely to arise in making the court's decree effective so far as relates to Orlando's undivided one-third interest in the Illinois land, whatever obstacles may arise in giving effect to the decree so far as the title is held in trust by the two nonresidents, Dora Rexroat and Louisa Crandall. But we will not wrong these defendants by assuming that they will be recalcitrant nor that they will attempt to

hold as their own that which has been lawfully decreed to belong to others.

2. Did the district court have jurisdiction of the parties? This question only relates to the appearance of the nonresident defendants, as personal service of summons was obtained on the others. Service by publication was made as to the nonresidents. This was challenged by a motion which was filed by all the defendants, residents and nonresidents, in which the defendants (all of them) moved the court—

"for an order quashing the service of summons by publication upon such of these defendants as are shown to be nonresidents of the State of Kansas by the records herein, so far as this action in any way relates to real estate not situated within the State of Kansas, and as to any personal action for damages or otherwise against them.

"And these defendants in support of this motion show to the court that Emma C. Manlove did not at the time of her death own any real estate whatever within the State of Kansas, but that the said Emma C. Manlove did at the time of her death own certain real estate in the State of Illinois, described in the affidavit herein filed by C. E. Crandall.

"These defendants show to the court that this court has not jurisdiction to render any judgment relating to the said Illinois land."

It will be noted that this motion raised nonjurisdictional questions. It was filed by all the defendants. It did not challenge the jurisdiction of the court over the persons of defendants nor of any of them. It did not raise the question that the action was *in personam* and that publication service was not authorized under the statute. It raised questions of law on the merits—the right of the court to give judgment concerning the Illinois land. It also raised a question of fact involved in the general issue—whether Emma Manlove owned any real estate in Kansas at the time of her death. It therefore becomes unnecessary to determine whether the nonresident defendants could have been brought into court by publication; for this motion contained other than jurisdictional questions, and as such it had the effect of a general appearance. (*Meixell v. Kirkpatrick,* 29 Kan. 679; *Frazier v. Douglass,* 57 Kan. 809, 48 Pac. 36; *Investment Co. v. Cornell,* 60 Kan. 282, 56 Pac. 475; *Abercrombie v. Abercrombie,* 64 Kan. 29, 67 Pac. 539; *Frazier v. Resor et al.,* 23 Ill. 88; *Kenyon v. Shreck et al.,* 52 Ill. 382; 3 Cyc. 511-513.)

Counsel for appellees furnish us another answer to this as-

signment of error.  Appellants' abstract does not show the date of the filing of this motion to quash.  Appellees point out that it was verified on July 24, 1913.  Prior thereto, one of defendants' counsel had entered an appearance consenting to an order reviving the action against the heirs and representatives of Orlando Manlove, who had died since the action was begun. Altogether it must be held that a general appearance was made for all the defendants and that the court had jurisdiction of all parties to the action.

3.  The next question concerns the "heirs" of Emma Manlove under the agreement with her husband, who were to receive Emma's property by the will which David agreed to make after Emma's death.  Who were these heirs for whose benefit this agreement was made?  The trial court found the facts to be that aside from David, Emma's husband, Emma's heirs were her father and mother.  The evidence warranted that finding.  In the absence of any evidence, the same result would follow under Kansas law.  It is plausibly contended that under Kansas law her husband was her sole heir.  But it is manifest that the bargain between Emma and her husband did not relate to their heirship of each other in the absence of a will by either.  They both clearly showed a determination not to die intestate.  The bargain between them was founded on the right of each to bequeath half their respective properties as they chose, and while each was desirous of bestowing all their property on the survivor of the two, each had also a well-defined and not unnatural inclination to provide that after the death of the survivor the heirs of each should receive their respective properties.  Of course this desire could have been accomplished by bestowing life estates upon each other, with remainders to next of kin; but with full confidence in each other, and not desiring to impose upon the survivor the technical responsibilities attaching to life tenancies, with frequent accounting to the probate court, they chose the method of disposing of their properties presented here.

4.  But it is said that the statute of frauds and the statute of trusts and powers bar all consideration of the alleged oral agreement between David and Emma.  It must be conceded that unless some clear and precise ground is established which by "operation of law" (Gen. Stat. 1909, § 3837) or "by im-

plication of law" (Gen. Stat. 1909, § 9694) takes this oral agreement out of these statutes, this contention is correct. It has often been regretted by the courts that exceptions have been made to the rule which requires agreements concerning important interests in land to be in writing. There is much to be said on both sides. It must suffice here to say that exceptions do exist, and that these statutes themselves recognize that there are such exceptions. (*Gemmel v. Fletcher*, 76 Kan. 577, 92 Pac. 713; 39 Cyc. 169, 177, 182, 186, 187.) Many such cases involving the recognized exceptions to the ordinary rule requiring such contracts to be in writing have been considered by this court. (*Long v. Duncan*, 10 Kan. 294; *Baldwin v. Baldwin*, 73 Kan. 39, 84 Pac. 568; *Gemmel v. Fletcher*, supra; *Bichel v. Oliver*, 77 Kan. 696, 95 Pac. 396; *Heery v. Reed*, 80 Kan. 380, 102 Pac. 846; *Wooddell v. Allbrecht*, 80 Kan. 736, 104 Pac. 559; *Bless v. Blizzard*, 86 Kan. 230, 120 Pac. 351; *Nelson v. Schoonover*, 89 Kan. 388, 131 Pac. 147; *Holland v. Holland*, 89 Kan. 730, 132 Pac. 989; *Smith v. Cameron*, 92 Kan. 652, 141 Pac. 596; *Eadie v. Hamilton*, 94 Kan. 214, 146 Pac. 323; *Holland v. Holland*, ante, p. 169, 155 Pac. 5.)

The gist of all these cases is that where an oral contract concerns interests in land which would ordinarily be invalid under the statute of frauds or the statute of trusts and powers has been performed by one of the parties, equity will give effect to the contract. This is sometimes done on the theory that the other party is equitably estopped to plead these statutes. Sometimes it is done by impressing the property which was the subject matter of the contract with a trust "by implication of law" in favor of the party who had performed his part of the contract. Sometimes the trust has been impressed in favor of third parties—those for whose benefit the contract was made.

In the case before us, there was full and complete performance of the oral contract by Emma Manlove, so far as it was to be performed unless she outlived David. Relying upon his promise to bequeath all her property to her heirs if she died before he did, she waived her absolute right to will them half her property or otherwise to bestow it upon them during her lifetime. Nothing remained unperformed on her part at her death. And while the oral contract was abundantly proved by parole testimony, there were letters written by David after

his wife's death which are highly probative.  He wrote to Eugene Meador, Emma's brother, the plaintiff's executor, as follows.

". . . I do now say and I mean it at my death—by will—Emma's folks that treat me with respect will be remembered with more than what the dear woman ever brought into our savings, *for I think Emma would have done as I wanted her to do after she had proposed the plan.*"

The words which we have italicized strongly corroborate the oral evidence of the agreement between David and Emma notwithstanding the equivocal language in the earlier part of the quotation.  Elsewhere he wrote:

"The 40 acres you refer to you said to me in Macomb you thought Emma had left it to me my lifetime and said nothing against it.  You also expressed a desire to own it some day.  It is not impossible to so arrange that you may some day get it. . . . As I said when there, at my death, double the amount of the 40 will go back to Emma's people." . . .

We have not quoted largely from the letters; and triers of fact, whether court or jury, might find inconsistent language in these letters.  To us they read as if they were knowingly addressed to one who knew of the agreement between David and Emma and indicated a half-formed intention on David's part to break his agreement, or at least that it would only be carried out if he were treated right, or that Emma's people would only get Emma's property at his death if his aged father-in-law would give him the share of the elder Meador's estate which would have gone to Emma if she had survived her father.

Since the evidence of the parole agreement is clear and convincing, and since Emma's part of it was performed, under the precedents which we have cited and which could be indefinitely amplified from the decisions of other states, it must be held that neither the statute of frauds nor the statute of trusts and powers will defeat this action.  Nor can it be said that there is any weakness in the evidence as to the terms of the agreement, even if tested under all the rules urged by appellants.

5. Were plaintiffs' witnesses competent?  The chief witnesses were Emma Manlove's brothers and sisters and the husband of a sister.  Of course they were interested.  Their parents, the original plaintiffs, were very old.  Naturally the

property would descend ere long to these witnesses. The interest of these witnesses might affect the credence to be given their testimony but it could not affect their competency.

"No person shall be disqualified as a witness in any civil action or proceeding by reason of his interest in the event of the same, as a party or otherwise, . . . but such interest . . . may be shown for the purpose of affecting his credibility." (Civ. Code, § 317.)

6. Certain findings of fact are assailed in appellants' assignment of errors. We have carefully examined these and find that they were supported by competent and sufficient testimony. The "weight of the evidence," where it may have been conflicting, was the concern of the trial court, and its findings a court of review can not disturb.

7. One other point requires notice. On a motion of defendants, plaintiffs were required to make their petition more definite and certain, particularly with reference to the date of the agreement between Emma Manlove and her husband. The original petition alleged that this agreement was made on or about March 1, 1900. The amendment pleaded another and apparently supplemental agreement necessitated by Emma's discovery or belief that David had only willed her a life estate; and that this agreement "was made after March 20, 1900, and prior to December, 1906, and that these plaintiffs are unable to fix the date of the making of said oral agreement with any more certainty." This presents no serious difficulty. The findings of fact do not show this supplemental agreement. The decision does not rest on it. The variance, if it may be called a variance, was not challenged at the trial. It is too late to raise it for the first time on appeal. (*Bailey v. Gatewood*, 68 Kan. 231, 74 Pac. 1117; *Grimshaw v. Kent*, 75 Kan. 834, 89 Pac. 658.)

So much for the principal errors assigned. With the aid of the briefs of counsel and our own studies we have examined many cases analogous to the one at bar where oral agreements to make wills have been enforced. usually as done here by recognizing the technical legality of the mere naked title vested by wills or conveyances made in violation of such agreements, but declaring such title holders to be mere trustees for the parties equitably entitled to the property. Such trusts are termed constructive trusts, trusts *ex maleficio,* trusts by impli-

cation of law, involuntary trusts, trusts *ex delicto*, and the like. To extend this opinion by citations would merely be to repeat what was so well set forth by the late Mr. Justice Graves of this court in *Gemmel v. Fletcher*, 76 Kan. 577, 92 Pac. 713. See *Ransdel v. Moore*, 153 Ind. 393, 53 N. E. 767, 53 L. R. A. 753, where the leading cases of England and America are collated and discussed. (See, also, Notes in 8 L. R. A., n. s., 698; 31 L. R. A., n. s., 176; 33 L. R. A., n. s., 996; also Note in 106 Am. St. Rep. 95.)

No difficulties of any sort attend the trial court's disposition of the property located in Kansas.

The judgment is affirmed.

---

No. 20,068.

THOMAS I. ROCKHOLD, *Appellee*, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE — *Coemployee — Personal Injuries — Evidence*. The evidence examined and held to warrant a finding of negligence on the part of the engineer of a switch engine which struck a brakeman who, in the course of duty, alighted from the tender of a road engine as it was in the act of stopping on a track next to the one which the switch engine was using.

2. SAME—*No Assumption of Risk—Statutes*. The brakeman did not assume the risk of injury occasioned by the negligence of the engineer, because of the provisions of section 1 of chapter 239 of the Laws of 1911, making a railway company liable in damages to an employee for injuries resulting in whole or in part from the negligence of a coemployee.

3. SAME—*Contributory Negligence—Diminution of Damages*. Contributory negligence of the brakeman did not bar recovery of damages from the railway company and could be considered only in diminution of damages. (Laws 1911, ch. 239, § 2.)

4. SAME—*Contributory Negligence—Findings—Verdict Not Excessive*. The evidence examined and held the jury were justified in acquitting the brakeman of great fault. Presumably the amount of negligence attributed to him was small, and in the absence of special findings it can not be said that the jury did not deal justly in the matter of damages, the verdict being for a reasonable sum.

5. SAME — *Negligence of Coemployee — Proximate Cause of Injuries*. When the brakeman alighted he slipped on icy ground, was overbal-

anced by the weight of an appliance which he held in one hand, and in order to regain his balance took a step or two toward the track on which the switch engine was negligently operated. He was struck by the pilot bar of the switch engine and injured. *Held,* the negligence of the engineer of the switch engine was the proximate cause of the injury.

6. SAME—*Injuries—Findings—Damages.* The evidence examined and held that the jury were authorized to conclude that certain physical disabilities of which the brakeman complained were the result of his injury.

Appeal from Wyandotte district court, division No. 3; HUGH J. SMITH, judge. Opinion filed April 8, 1916. Affirmed.

*Paul E. Walker,* and *Luther Burns,* both of Topeka, for the appellant.

*A. B. Crum,* of Lyndon, *C. A. Bowman, J. E. McFadden,* and *O. Q. Claflin, jr.,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover damages for personal injuries inflicted upon the plaintiff, who was an employee of the defendant, by being struck by one of the defendant's switch engines. The plaintiff recovered and the defendant appeals.

The accident occurred in the defendant's yards at Horton, where it maintains, among others, three parallel tracks running east and west which are known in order from south to north as track No. 1, Kansas main line, and Nebraska main line. These tracks are of standard gauge—four feet, eight and one-half inches—are about ten feet apart, and are connected by crossovers. In the eastern portion of the yards is a caboose track extending from the Kansas main line across track No. 1 in a southwesterly direction. In the western portion of the yards and north of the Nebraska main line is a roundhouse. The plaintiff was head brakeman of a freight train which came into the yards from the west on track No. 1. When the train arrived a switch engine was using the caboose track. The road engine was detached from the train, waited for the switch engine to clear the track ahead of it, and then moved forward, took a crossover to the Nebraska main line, and backed toward the roundhouse, which was its destination. The way car of

the train was left at the rear of the train in the western part of the yards. On the way to Horton one of the cars toward the front of the train had a hot box which was cooled by an appliance called a hot-box cooler, and which railroad men call a "Keeley." The proper place for the cooler when not in use was in the way car. It was the plaintiff's duty to go with his engine to the roundhouse. On the way to the roundhouse the way car would be passed, and the plaintiff, standing on a step on the southwest corner of the tender of his engine and holding to a grab iron with his right hand, carried the cooler in his left hand. After clearing the track in front of the road engine the switch engine, by use of crossovers, passed westward to the middle track to pick up a caboose. As the road engine, backing westward on the north track, passed this caboose the switch engine was backing toward the east to couple with the caboose. The road engine proceeded westward at a rate of probably fifteen miles per hour. When within seven or eight car lengths of the way car the engineer of the road engine gave several blasts of the whistle, slowed down, and stopped opposite the way car, which was only about twenty-five feet away, toward the south. The blasts of the whistle were given to call the rear brakeman from the way car to take the hot-box cooler. When the road engine was in the act of stopping the plaintiff let go of the grab iron on the tender and stepped to the ground. The ground was slippery because of ice, the plaintiff slipped, was overbalanced by the weight of the cooler, and took a "couple of steps" in a southwesterly direction to regain his balance. These movements carried him toward but not upon the middle track and he was struck by the pilot bar of the switch engine, which had followed up the road engine and was moving at a rate of speed variously estimated at from ten or twelve to twenty or twenty-five miles per hour. The plaintiff was struck in the back above the left hip, was knocked about twenty feet, was rendered unconscious and remained unconscious for five hours after being taken to a hospital. He testified that he did not realize what had happened until the next day. The jury returned a verdict in his favor for $3000.

The principal contentions of the defendant are that the engineer of the switch engine was not guilty of negligence, that the plaintiff assumed the risk of being injured as he was, that

the plaintiff was guilty of contributory negligence, that the proximate cause of the plaintiff's injury was an independent, intervening fact—slipping and becoming overbalanced—and that the verdict was improperly arrived at and was excessive.

The court is of the opinion there was sufficient evidence of negligence to carry the case to the jury. The road engine stopped to deliver the hot-box cooler approximately 1120 feet west of the point at which it passed the switch engine. While the road engine was going that distance at a rate of fifteen miles per hour and was slowing down to a stop, the switch engine backed several feet to the caboose, coupled to it, started up and overtook the road engine. While there was evidence that the bell on the switch engine was ringing, the plaintiff heard no bell and the engineer of the road engine heard no bell. The whistle of the switch engine was not sounded. The clear space between the tender of the road engine and the pilot bar of the switch engine was approximately five feet. The plaintiff's body and the cooler in his left hand reduced this space. The blasts of the road engine whistle were given as a signal to the rear brakeman and the purpose of signaling him was to have him come and get the cooler. The rear brakeman, who was inside the way car when the signal was given, understood the signal, understood it was given for him, and went out of the way car to get the cooler. A rule required the engineer of the switch engine to run with his engine under control, that is, to be able to stop within the distance the track was seen to be clear of obstruction. The engineer of the switch engine plainly saw the plaintiff's position on the tender of the road engine all the way to the place where the plaintiff alighted, observed that the plaintiff's back was toward him, saw that he had the cooler in his hand, knew where the cooler was carried on the freight train, and knew that its place when not in use was in the way car. The engineer of the switch engine heard the signal to the rear brakeman, observed the fact when the road engine commenced to slow down, and observed the fact that he was gaining on the road engine. The speed of the switch engine was not slackened and its engineer saw the plaintiff step to the ground opposite the way car with the cooler in his hand when within eighteen or twenty feet of him, but it was then too late to avoid a collision. The engineer of the switch

Rockhold v. Railway Co.

engine testified he was running at a speed of only eight or ten miles per hour, that the signal he heard was not for anything in particular, that he had no idea of what the road engine was slowing down for—might have been for something wrong with the engine—and that he was not thinking about the plaintiff getting off.  He testified further as follows:

"Q.  You knew that if Rockhold got off of that engine and started across the track with that Keeley, that your engine would hit him? A. Not necessarily; if he staid within the 6 or 7 feet there is between the two tracks, I could n't hit him and he could n't be hit.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q.  You did n't think he was going to take that Keeley to the roundhouse?  A.  They do do it."

Very likely this kind of testimony did not help the defendant's case, and the jury were warranted in believing that the engineer of the switch engine understood the situation perfectly, knew the cooler was to be left at the way car, knew that the road engine was stopping opposite the way car and several hundred feet from its destination for that purpose, and knew that the plaintiff, whose face was toward the west, would drop off the tender to icy ground with the cooler in his hand in the very narrow space between the tracks.  If the jury so believed, it was a fair question whether or not the engineer of the switch engine should have sounded the whistle when he saw he was overtaking the plaintiff, and should have had his engine under control, regarding the plaintiff, under all the circumstances stated, as a very probable if not a certain obstruction to the switch engine's progress.

The defense of assumption of risk was eliminated by chapter 239 of the Laws of 1911, which contains the following provision:

"That every company, corporation, receiver or other person operating any railroad in this state shall be liable in damages to any person suffering injury while he is employed by such carrier operating such railroad .   .   .   for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier."  (§ 1.)

The provision quoted is in effect a continuation of a statute originating in 1874 and given different forms in 1903, in 1905, and in 1907.  (Laws 1874, ch. 93; Laws 1903, ch. 393; Laws 1905, ch. 341; Laws 1907, ch. 281.)   In the case of *Railway Co.*

*v. Green,* 75 Kan. 504, 89 Pac. 1042, the statute in the form given it by the act of 1903 was interpreted. It was decided that the plaintiff did not assume the risk of injury occasioned by the negligence of a coemployee, and that it would nullify the statute to hold otherwise.

Contributory negligence of the plaintiff did not constitute a bar to the recovery of damages, and could be considered only in diminution of damages. (Laws 1911, ch. 239, § 2.) The jury were justified in relieving the plaintiff of great fault, and presumably the amount of negligence attributed to him was small. The plaintiff was in the discharge of duty in riding where he did and in alighting when he did. He testified he did not know the caboose was to be brought westward by the switch engine on the middle track, and did not expect the switch engine to come up to the vicinity of the way car on that track. When the road engine commenced to slow down he looked back over his left shoulder to see that there was nothing on the middle track. It was his duty to look and he did look, because, as he said, it is natural for a man who works in the yards to do so. Looking over his left shoulder he could see toward the east six or seven car lengths (240 to 280 feet), and he did not see the switch engine. He heard no bell, heard no whistle and heard no noise of a moving train until he had released his hold of the grab iron and his feet were in the act of striking the ground. From sounds made by the switch engine on the rails and the exhaust he could then tell that the engine was coming at a rapid rate of speed. The fault of the plaintiff lay in not looking over his right shoulder or in not looking again just before he alighted. Had he done either of these things he could have seen the switch engine. However, under all the circumstances stated, he took a fair measure of precaution for his safety, and the amount of his recovery should not have been greatly diminished because he did not take measures to assure himself beyond all doubt. There were no special findings, and it can not be said as a matter of law that the jury did not deal justly with the subject.

The defendant's negligence was clearly the proximate cause of the injury. The two causes contributing to the plaintiff's injury were not distinct and independent of each other (*Railway Co. v. Columbia,* 65 Kan. 390, 69 Pac. 338), but were re-

lated to each other in their operation (*Mosier v. Butler County*, 82 Kan. 708, 109 Pac. 162). The defendant's negligence was proximate in point of time because the negligently managed engine struck the plaintiff after he became overbalanced, and was proximate in causal relation because without it becoming overbalanced would have been without injurious consequence. The subject is sufficiently covered by two decisions of this court in which accidental slipping of the plaintiff, combined with negligence of the defendant, produced injury—*City of Atchison v. King*, 9 Kan. 550, and *Barnett v. Cement Co.*, 91 Kan. 719, 139 Pac. 484.

The plaintiff testified that after he was injured he suffered from impaired eyesight, impaired hearing, and an impediment in his speech. He further testified that he had lost from thirty-two to thirty-five pounds in weight, that he suffered from weakness and dizziness, suffered continually from pains in his back and in his head, that he was very nervous, especially when he worked hard, suffered from lack of sleep and had lapses of memory, and that because of these physical conditions, none of which existed before the injury, he was incapacitated to perform the only kind of labor he was fitted to perform. The plaintiff was injured on December 29, 1913. He was taken to the private hospital of Dr. Reynolds, in Horton, where he remained one week. No bones were broken or dislocated and the doctor said he found no contusions on the defendant's body. There were abrasions on the bridge of the nose, the right eyebrow and right cheek. The doctor said that the plaintiff's stunned and unconscious condition was temporary only, that there was nothing to indicate permanent injury, and that when he left the hospital "he was all right in every way." There was a dressing still on his face and the cinder stains where cinders had been ground into his face were so deep as to be permanent. Another doctor, Doctor Nichols, was called on January 6, 1914. He found the plaintiff's head bandaged and treated the plaintiff several times at the plaintiff's home and then at the doctor's office. There is no evidence abstracted that this doctor made any examination of the plaintiff whatever except with respect to the injuries to his face, of which the plaintiff was then complaining. The plaintiff's eyes were tested some months before he was injured and again in February,

46—97 KAN.

1914. The oculists testified that the defect in the plaintiff's vision was due to astigmatism. One of the oculists gave it as his opinion that the plaintiff's stammering did not result from his injury. There was proof that stammering results from a nerve lesion destroying coördination between muscles of the throat and muscles of the tongue. None of the four professional witnesses referred to testified that the plaintiff had difficulty with his speech when he was examined or treated. Other proof showed that the plaintiff had no impediment in his speech before he was injured. The defendant argues that the jury arbitrarily disregarded the medical testimony and rendered an excessive verdict for physical disability which the jury traced to the plaintiff's injury without any evidence whatever. Very clearly this is not the case. It is a matter of common knowledge, and there was no proof to the contrary, that all the consequences of such a violent concussion as the plaintiff indisputably received may not develop within a week, the time the plaintiff was in Dr. Reynolds' hospital. The jury had the right to discount Dr. Reynolds' optimistic opinion that when the plaintiff left the hospital he was "all right in every way." The opinion of Dr. Nichols, who did nothing but examine the plaintiff's face, that the plaintiff was not permanently injured was valueless. Leaving defect of vision out of account, the plaintiff's physical condition was attributable to nerve lesions, that is, nerve injuries. His disabilities did not exist before the switch engine struck him, they followed that occurrence, and the jury had the right to believe they were consequences of that occurrence. The sum allowed as damages was not excessive.

The judgment of the district court is affirmed.

No. 20,073.

I. E. MARTIN, *Appellee,* v. WILLIAM D. MILLER et al.
(P. K. LEWIS, *Appellant*).

SYLLABUS BY THE COURT.

1. MORTGAGE—*Decree of Foreclosure—Error in Period of Redemption—
   Valid Until Modified or Set Aside.* Where a judgment foreclosing a
   real-estate mortgage erroneously fixes a shorter period of redemption
   than that allowed by the statute, it is not error for the court on con-
   firmation of the sale to refuse to extend the limitation to the statutory
   period, so long as the original judgment remains unchanged.

2. SAME—*Method of Correcting Error in Period of Redemption.* If the
   part of a judgment of foreclosure which unduly limits the right of
   redemption is the result of inadvertence or misapprehension of the
   facts, the proper method for its correction is by a motion under the
   statute relating to irregularities, a remedy which is open to one pur-
   chasing the land after the rendition of the judgment from a defendant
   who was not personally liable for its payment.

3. SAME — *Error in Decree of Foreclosure — Can be Corrected Only in
   Manner Prescribed in Statute.* The circumstance that the plaintiff,
   being also the purchaser at the sheriff's sale, asks the court upon con-
   firmation to shorten the time for redemption to six months, on the
   ground that the lien foreclosed was for purchase money (a claim found
   not to be sustained by the facts), does not authorize the court to dis-
   regard the terms of the original judgment and fix the period at eigh-
   teen months.

4. SAME—*Judicial Discretion.* Although the trial court by liberality of
   construction might have treated a request made after sale, to fix the
   time of redemption at the statutory period, as a motion to correct the
   original judgment in that regard, the omission to do so in the present
   case held not to constitute error.

Appeal from Sedgwick district court, division No. 2; THORN-
TON W. SARGENT, judge. Opinion filed April 8, 1916. Affirmed.

*R. L. Holmes, Charles G. Yankey,* and *W. E. Holmes,* all of
Wichita, for the appellant.

*S. B. Amidon, D. M. Dale, Jean Madalene,* and *S. A. Buck-
land,* all of Wichita, for the appellee.

The opinion of the court was delivered by

MASON, J.: I. E. Martin brought an action for the fore-
closure of several mortgages upon land the title to which was
in Jay L. Williams. Williams was a party but did not appear.

Judgment was rendered on June 24, 1913, finding that the property had been abandoned by the defendants and ordering that (inferentially on that account) it should be sold subject to a right of redemption to be exercised within one year from the date of the sale. On August 5, 1913, Williams executed a quitclaim deed to P. K. Lewis. Four days later Lewis filed a motion setting out that he was the owner of the property and asking that he be permitted to plead. On September 13, 1913, he filed what he designated as an interplea, reciting that the court had granted him permission to do so, and alleging that by virtue of the quitclaim deed he was the owner of the land subject to the mortgages. On March 11, 1914, the sheriff's sale was had, and the plaintiff, Martin, bid the property in. On the same day Lewis filed a motion asking that the sale be set aside, or, if it should be confirmed, that the period of redemption should be fixed at eighteen months, alleging in effect that the entry showing a limitation to one year had been made inadvertently. Martin about the same time filed a motion for confirmation, in which he alleged that the lien to be enforced was for the purchase price of the land, and asked that the right of redemption be limited to six months. The motions were heard together, evidence being received regarding the origin of the lien. The court found that "the obligation sued upon by the plaintiff herein was not given for purchase money and that therefore the period of redemption should be eighteen months, but on account of the fact that at the time of the rendition of the decree herein the period of redemption was fixed at twelve months the court will not now change said period of redemption as heretofore fixed." The sale was confirmed, the decree following the judgment in providing that the land must be redeemed, if at all, within one year from the day of sale. Lewis appeals.

(1) It has been said by text-writers that "the court can not bar the right of redemption when it is given by statute" (24 Cyc. 68), and that " if the statute gives the right of redemption from a judicial sale, a clause in the decree ordering the sale, that declares that the sale shall be absolute, will not bar the right of redemption; that portion of the decree will be regarded as inoperative, and a redemption will be ordered as in other cases" (17 A. & E. Encycl. of L. 1034). The doctrine

that a clause in a decree shall be disregarded if it is in conflict with the statute relating to redemption has been declared in one case. (*Fitch v. Wetherbee et al.*, 110 Ill. 475, 492.) In another the same rule has been followed, but with the reservation that if the question of the right of redemption were directly raised in the action a determination thereof in the decree of foreclosure would not be open to collateral attack by an objection to the confirmation of the sale. (*County of Logan v. McKinley-Lanning Loan & Trust Co.*, 70 Neb. 406, 101 N. W. 991.) Other cases sometimes cited as supporting the same view hold merely that the part of a judgment which conflicts with the statute is erroneous and may be corrected by direct proceedings for that purpose, or that the particular judgment in question was to be so interpreted as to conform to the statute. In this state it is settled that notwithstanding the statute no redemption may be had from a sale made under a decree which declares the right thereto to have been cut off. (*Ehrsam v. Smith*, 61 Kan. 699, 60 Pac. 740.) And it seems clear on principle that however much error may have been committed in the rendition of a judgment, the effect of a sale made under it must be measured by its terms. The bidder at a judicial sale may properly look to the language of the judgment under which it is made for reliable information as to what he will get if his bid is accepted. The right to a deed and possession unless the property is redeemed within a year is quite a different thing from a right to a deed and possession unless redemption is made within eighteen months.

(2) If the provision of the judgment that the period of redemption should be limited to one year was the result of an inadvertence, or of some misapprehension of the facts, it could have been corrected on the application of Williams, even after the expiration of the term, under the statute in relation to irregularities. (Civ. Code, § 596, subdiv. 3; *Bank v. Ross, Ex'x*, 90 Kan. 423, 133 Pac. 538.) Upon such an application the court could have corrected the judgment and set aside the sale, or with the consent of the bidder could have confirmed the sale and fixed the time of redemption at eighteen months. As the judgment against Williams had relation merely to the enforcement of a lien against the land, the execution of the deed transferred whatever rights he had to attack the judgment to

his grantee. Such is the rule with respect to statutory proceedings for opening default judgments (*Leslie v. Gibson,* 80 Kan. 504, 103 Pac. 115), and the reason on which it is based applies to such a case as the present, although a difference is recognized between an ordinary judgment and one which does not become absolute until the lapse of some fixed period within which it may be opened as a matter of right. (Note, 26 L. R. A., n. s., 1064.)

(3) But no motion was made to set aside, modify or correct the judgment, and the order appealed from simply followed its provisions. So long as the judgment remained unchanged a sale made under it would necessarily be subject to redemption only for the period of one year therein provided. The fact that the plaintiff (who was also the purchaser) asked the court at the time of confirmation to make a further restriction upon the time allowed for redemption, by limiting it to six months, does not lessen the binding effect of the judgment.

(4) If the trial court had treated Lewis' request as a motion to modify the judgment, and upon a finding of inadvertence or irregularity had changed the period of redemption as there fixed, from twelve months to eighteen, its action in that regard would have been unassailable. But we can not say that it was compelled to pursue such course, or that it committed error in adhering to the terms of the original judgment, and in requiring redemption to be made, if at all, within the time there set.

The judgment is affirmed.

Cathcart v. Myers.

No. 20,075.

MARGARET C. CATHCART, *Appellee,* v. JOHN Q. MYERS, as Administrator with the Will Annexed, etc., et al., *Appellants.*

### SYLLABUS BY THE COURT.

SPECIFIC PERFORMANCE — *Agreement to Leave Property to Adopted Child.* In a suit against the legal representatives and devisees under the will of a deceased person to compel the specific performance of a contract made by the testator, the facts stated in the opinion are held sufficient to support the trial court's findings that the deceased made a contract with plaintiff's father when she was 14 years of age, agreeing to adopt her as his daughter and at his death to leave her all his property in consideration of the father's surrender to him of her care, custody, control, society and education, and the further finding that the contract had been fully performed by the plaintiff and her father.

Appeal from Jackson district court; OSCAR RAINES, judge. Opinion filed April 8, 1916. Affirmed.

*I. T. Price,* of Holton, *T. F. Garver, R. D. Garver,* both of Topeka, *W. S. McClintock, A. L. Quant,* and *Edwin A. Krauthoff,* all of Kansas City, Mo., for the appellants.

*F. T. Woodburn, E. D. Woodburn,* both of Holton, and *A. E. Crane,* of Atchison, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was brought by the plaintiff to enforce specific performance of an alleged oral agreement between her father, William Cooney, and Felix C. Duffy, deceased, by which it is claimed the latter agreed to leave her all the property of which he might die seized in consideration of her father's surrender to him of her custody and permitting him to adopt her. The district court found that such contract was made and adjudged that plaintiff should have all the estate of Felix C. Duffy, subject to the payment of debts. From that judgment defendants appeal.

Felix C. Duffy was a Catholic priest of the parish at Monmouth, Ill., from 1882 to 1887, and of a parish at Kewanee, Ill., from 1888 until 1897, when he removed to Danville, Ill., and was in charge of the parish there until 1910. Plaintiff's

aunt, Mrs. Mary Bailey, then Mary Cooney, was housekeeper for Father Duffy. Her brother, William Cooney, had removed from Illinois to Graham county, Kansas, where he took a claim and lived with his family. Mrs. Bailey visited her brother on several occasions, and in 1890 took the plaintiff, who was seven years old, with her to Kewanee, and the plaintiff lived with her in the parish house with Father Duffy. At that time Wm. Cooney was in poor financial condition and had seven children. Plaintiff remained in the parish house until her aunt's marriage, when she made her home with the Baileys in Kewanee. After plaintiff left the parish house, in 1892, Father Duffy frequently visited her at the Bailey home and she visited him at the parish house, and they became much attached to each other. He made her presents of various kinds, dresses and other apparel. She was taken sick with typhoid fever while at her aunt's home, and Father Duffy took her to his house and provided a trained nurse and medical attention, paying all the expenses of her sickness. He was a distant relative of the Cooney family, and when Margaret's mother died in 1894 in Graham county, Kansas, he brought the child to the funeral and preached the sermon. In the fall of 1896 Father Duffy visited William Cooney in Kansas and offered to adopt Margaret, and said that if Cooney would consent to the adoption he would maintain and educate her and give her all the property he possessed at his death. The proposal was not accepted by Cooney at this time. In January, 1897, Father Duffy again visited William Cooney and repeated his offer. William Cooney testified that this time Father Duffy entered into a parol contract with him by the terms of which Cooney agreed to surrender to him the right to the care, control and custody of plaintiff, the right to have and receive plaintiff's obedience, society and love in all respects as though she were his own child, and Cooney was to consent to an adoption of plaintiff by Father Duffy, in consideration of which the latter agreed to accept the plaintiff as his own child, care for her and raise and educate her, adopt her and make her his heir; and further agreed that she should receive whatever property he possessed at his death. In pursuance of this agreement Cooney surrendered control and care of plaintiff to Father Duffy, and on the following day, January 14, 1897, Father Duffy and William

Cooney went before the probate court of Jackson county at Holton, where the plaintiff was legally adopted by Father Duffy.

Immediately thereafter Father Duffy returned to Kewanee and informed Mrs. Bailey, his former housekeeper, of the terms of this agreement, and requested her to inform the plaintiff, which she did. The foregoing statement of facts is taken substantially from the findings of the trial court. In addition thereto, the court made findings that William Cooney fully performed his part of the agreement, and that plaintiff on her part at all times complied with the terms of the contract, yielding to him the full duty of a child to a father; that during the remainder of his life Father Duffy at all times enjoyed to the full the love and affection of the plaintiff and her society in all respects as desired by him, visiting with her at the home of the Baileys, and that she visited him at Chicago and other places and joined him in a trip to Europe. The court further finds that Father Duffy complied with the contract in part; that he adopted the child and educated her and looked after her welfare during her schooling and afterward; that when she contemplated marriage he was pleased with her choice and consented thereto; that after her marriage in 1909 to Sloan Cathcart he provided a house for her and her husband and paid the expenses of improving it.

After her marriage Father Duffy lived for a time in her home with her husband while she was absent taking treatment for an affection of the eyes. He made large financial investments in and near Mayetta, Kan., where plaintiff and her husband lived, and did so in the belief that it would be for her best interests. The court further finds that in all respects he continued to manifest a natural father's interest in and affection for her, and complied with all the terms and conditions of the agreement with William Cooney, except that he failed and neglected to give her the property he had at his death.

At the time of making the contract with William Cooney, Father Duffy owned 200 acres of land near Mayetta, subject to a mortgage of $3000. He was receiving by way of salary and perquisites of his calling about $1400 a year, with the free use of the parish house. The court finds, however, that in 1905 he was given a deed for a tract of land in Illinois which he af-

terward sold for $54,000, and that during seven years ending in 1909 he served as a trustee of the estate of Michael Kelly, at Danville, Ill., and for his services received the sum of $25,000; that at the date of his death Father Duffy owned real estate, situated for the most part in Jackson county, stock in a bank at Mayetta, an interest in several business enterprises in Mayetta, together with property in Illinois and Ireland; and that he was indebted to a large amount, the exact total of which had not been determined.

Additional findings of the court are:

"After the adoption Father Duffy paid Mrs. Bailey for keeping plaintiff and he furnished her clothing and other necessaries until she was sent away to school, and thereafter he bore all her expenses until her marriage. . . . .

"Prior to his last trip to Europe, Father Duffy signed and acknowledged a deed conveying to the plaintiff the property in Mayetta in which she lived, and left the deed in the First National Bank of Mayetta. After Father Duffy's death, the cashier of the bank handed the deed to Sloan Cathcart, husband of the plaintiff, but neither the plaintiff nor her husband had any knowledge of the existence of the deed until after the grantor's death. At the date of his death this property was of the value of about $2000.

"At his death he left no direct descendants, his only relatives being brothers and sisters, who except for his adoption of plaintiff would have been his heirs at law.

"From and after March 1, 1913, Felix C. Duffy was somewhat enfeebled in body and mind.

"In the spring of 1913 he went to Ireland, and while there he executed a will by which, after making provision for masses, he gave 400 pounds to each of his brothers and sisters and the residue to the Bishop of Ardagh Diocese, County of Longford, Ireland, to be by him used in the erection of a church. In this will no mention whatever was made of the plaintiff. Said will was admitted to probate in Ireland on the 6th day of October, 1913, and thereafter was admitted to probate in the probate court of Jackson County, Kansas, on an authenticated transcript of the record of the court in Ireland and the defendant, John Q. Myers, was duly appointed and qualified as the administrator with the will annexed of the estate of Felix C. Duffy, deceased.

"Prior to the adoption Father Duffy conceived the idea that William Cooney might take the plaintiff away from Kewanee and deprive him— Father Duffy—of her society, and in the autumn of 1896, he visited Mr. Cooney in Kansas and requested his consent to Margaret's adoption by him and proposed to the father that if he would consent to the adoption, he, Father Duffy, would maintain and educate her and give to her all the property he possessed at his death, which proposition was not acceded to by William Cooney at that time. . . .

"This contract is reasonable in its terms and was freely and fairly entered into between the parties and was fully performed by the plaintiff and her father."

As a conclusion of law the court held that plaintiff is entitled to a decree for specific performance of the contract, subject to the payment of the debts which may be proved against the estate of Father Duffy.

The trial court having found that an oral agreement as claimed by the plaintiff was entered into between Father Duffy and William Cooney, that the contract has been executed by performance in full on the part of plaintiff and her father, William Cooney, and that the contract was reasonable, there is little left for this court to decide; for we think there was evidence sufficient to sustain the findings of fact.

In the briefs of defendants' counsel we have been referred to a multitude of cases from other courts refusing to decree specific performance of contracts of this nature except where made in writing or established by the most clear and convincing testimony of disinterested witnesses. It is hardly necessary to review these decisions because the same questions frequently have been before our own court in a number of recent cases in which contracts of the same kind have been enforced upon testimony not differing materially in character. (*Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743, 9 L. R. A., n. s., 229; *Bichel v. Oliver*, 77 Kan. 696, 95 Pac. 396.) In the latter case it was said in the opinion:

"An oral agreement that operates as a transfer of land must, of course, be made out by clear and satisfactory proof, but it is not essential that it be established by direct evidence. If the facts and circumstances brought out are such as to raise a convincing implication that the contract was made and to satisfy the court of its terms, and that there would be no inequity in its enforcement, it is enough. (*Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743; *Edson v. Parsons*, 155 N. Y. 555, 50 N. E. 265.)" (p. 700.)

To the same general effect are, *Phillips v. Bishop*, 92 Kan. 313, 140 Pac. 830, and *Smith v. Cameron*, 92 Kan. 652, 141 Pac. 596. In the last case cited it was said in the opinion:

"An oral agreement of this nature, established by satisfactory proof and kept in good faith, affords solid ground for the exercise of the powers of a court of equity by a decree for specific performance." (p. 660.)

None of the letters written by Father Duffy to the plaintiff which were offered in evidence contained any reference to the

alleged agreement. All of them are filled with expressions of a father's sincere love and affection. Many of them contained remittances of substantial sums of money as gifts to the plaintiff. In one letter written from his hotel in New York city on the eve of his departure on one of his numerous trips to Ireland, there is mention of a will. The letter reads:

"I sail tomorrow on Umbria Cunard line. I hope for pleasure and profitable trip. Do not tell any person. I dont forget you. Mr. Keegan, lawyer of Danville, has my papers now. Good night and God bless her.

Very afft & faithfully yours,

F. C. DUFFY.

*"Please know* there is a will addressed to Mr. Keegan here in Astor House safe until I or he calls for it.          F. C. D."

As was said in the case of *Winne v. Winne,* 166 N. Y. 263, 59 N. E. 832, 82 Am. St. Rep. 647, cited in *Anderson v. Anderson,* supra.

"The obvious purpose of Mrs. Winne in entering into this contract was to secure to herself not only the prospective services, but also the enjoyment of the society of the plaintiff as her own child, with the hope that she might thus gratify her motherly love, and rear to manhood one who would prove worthy of her bountiful care. In this she was not disappointed." (p. 272.)

To quote from the brief of counsel for plaintiff:

"When a child comes into a man's life, it makes him a better man. After such an event, a man loves all children better. In fact, such love makes him more charitable toward his fellow man. A man's heart is kept tender by the memory of the pure innocence and love of childhood. . . . The feelings and instincts which cause lonely and childless people to yearn for the pure, innocent love of childhood come from the goodness of their hearts. . . . Father Duffy dearly loved the little girl and he wanted her as his own. He wanted to gratify his fatherly love and rear this girl to womanhood. He had the pleasure of doing so. He saw her grow to womanhood, a beautiful and accomplished woman, and he had the pleasure of knowing that he had helped her when she needed help. . . . The sweetness and perfume of such a life developing under his care enriched his own life and gave a sweet perfume to his soul. With his blessings she became a wife and he lived to see her a mother. He was always solicitous about her welfare. To him she was always 'my dear Margurite.' "

We recognize the frequency with which cases of a similar nature are finding their way into the courts, and the great temptation there often is to set up fraudulent claims against the estates of deceased persons. We recognize also the duty of

courts to look upon the evidence by which it is sought to establish contracts of this kind with great jealousy and to weigh it with utmost care in order to determine whether the witnesses are telling the truth. But this duty rests in the first instance and with the greater force upon the trial court.

In this case we think there was sufficient evidence, direct and circumstantial, to sustain the court's finding that the contract was made as alleged and fully executed by the plaintiff and her father.

For these reasons the judgment is affirmed.

DAWSON, J., not sitting.

---

No. 20,077.

NATHAN A. CLARK, *Appellant,* v. GEORGE SHOESMITH, as Executor, etc., and LYDIA J. CLARK, *Appellees.*

SYLLABUS BY THE COURT.

ACTION TO HAVE DEED DECLARED A MORTGAGE—*Conflicting Evidence.* The testimony examined, and support for the theories of both sides being found therein, the rule that this court can not weigh competent conflicting oral evidence is followed.

Appeal from Republic district court; JOHN C. HOGIN, judge. Opinion filed April 8, 1916. Affirmed.

*W. D. Vance, R. E. McTaggart,* both of Belleville, and *R. D. Sutherland,* of Nelson, Neb., for the appellant.

*Nelson J. Ward,* of Belleville, and *Park B. Pulsifer,* of Concordia, for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiff sued to redeem from a deed which he prayed might be decreed a mortgage and for an accounting and to recover $8000 alleged to be due from the defendant executor. After the former decision holding the petition good as against a demurrer (*Clark v. Shoesmith,* 91 Kan. 797, 139 Pac. 426), it was stated when the trial was reached that no judgment would be asked for any balance, that the plaintiff was asking simply for an accounting to determine whether or

not the mortgage had been paid in full and as to whether or not he was entitled to a reconveyance and interest in the land. The trial resulted in a general holding in favor of the defendants, no special findings being returned. The plaintiff appeals upon the theory that the trial court determined the case upon a misapprehension as to correct rules governing such a controversy, and upon the theory that a deed can not be declared a mortgage without direct evidence detailing all the terms and conditions of the agreement. In reality, however, the appeal practically presents the question: Was the general finding of the trial court supported by the evidence? It is also argued that the action was barred by the statute of limitations and by laches of the plaintiff.

The testimony of the plaintiff's wife was to the effect that in 1894, her brother, John Shoesmith, loaned her husband $4000, taking a note therefor, due in five years at 7 per cent interest, secured by mortgage on a half section of land in Republic county owned by the husband, who also had a school-land contract for forty acres adjoining in Jewell county. In addition to the loan, Shoesmith was to complete the payments for the school land and receive the patent therefor, the plaintiff, however, to retain the management and receive the proceeds. In 1898, in addition to the $4000 already mentioned, the plaintiff owed a $2000 mortgage on the land to one party and a $1500 mortgage to another, and his brother-in-law, Shoesmith, had paid out about $390 on the school-land tract; that John Shoesmith suggested taking a deed to the land instead of a mortgage and that he would hold it for a while, that plaintiff could manage the land just as he had been doing, and at any time Shoesmith would deed it back. The witness drew the deed, and having written the consideration of $1 she testified that Shoesmith remarked that as they had refused $9500 for the half section of land covered by the deed the consideration might be stated at that amount and it was so done; that Shoesmith said, among other things: "I will manage the farm and make it pay off and any time you want the deed back you shall have it." That he had idle money and would charge a lower rate of interest than those holding mortgages upon the land, and that he could be repaid from the proceeds of the farm; that he thought it advisable to sell the school land and

one eighty of the half section and apply it on the indebtedness. The deed for the Republic county land was not immediately delivered, but after having been retained a few months by the plaintiff was by him recorded and sent to Shoesmith. The plaintiff had a tenant on the land named Bothwell, who was farming it on shares, considerable stock was handled, and there was a large amount of personal property on the place. The witness further testified that after a time the relations between Shoesmith and Clark became strained, and that in about three years from the time the deed was made Shoesmith stated to her that he would deed the land back to her provided she would deed it to the children, reserving a life estate for herself and husband. She testified that upon reporting this declaration to her husband he expressed some dissatisfaction, but stated that it had better be left that way.

Bothwell remained on the farm and seems to have managed it to the satisfaction of Shoesmith. To Bothwell, Clark found fault with Shoesmith, claiming he had not treated him properly. Shoesmith kept a memorandum book in which he entered a detailed account of the transactions concerning the farm, which he nearly always referred to as "my farm." With the consent of the plaintiff's wife and by the aid of Bothwell the one eighty of the Republic county land and the school-land tract were sold. It appears that when the deed was made the land was burdened with debts, including accrued interest on the three mortgages, amounting to eight or nine thousand dollars and possibly more. There was an abundance of testimony that at that time it was worth only $20 an acre, or $6400. It has since become much more valuable. Shoesmith having died, his executor was sued, and the decedent, having willed one-half of the land to the plaintiff's wife she was joined as a defendant.

There was evidence entirely sufficient to establish the claim that the deed was taken on account of the indebtedness against the land, and while some of the testimony tends strongly to show an understanding and agreement at the time that upon repayment of the debt the land was to be reconveyed to the plaintiff, other evidence is about as clear that it was to be deeded back to whomsoever Shoesmith might choose. After receiving the deed Shoesmith in many ways treated the land

as his own, referred to it as his own, and seemed inclined to use it for the benefit of his sister, and seems early in the history of the transaction to have abandoned any possible intention to reconvey to Clark in whom he had no confidence as a business manager.

Bothwell testified that in February, 1899, the plaintiff told him he did not own the farm any more, that John owned it, meaning Shoesmith, that he turned it over to John to protect himself, that he expected to have it back inside of eighteen months or probably never; that Shoesmith in conversations frequently stated to Bothwell that so far as Mrs. Clark was concerned he would see that she was cared for but he would not help the plaintiff any more; that Mrs. Clark told the witness in 1905 that her husband thought he was going to get the land but that John was going to give it to her; that she had forgotten just what Shoesmith paid for it, but it was something over $10,000 that he had taken the farm at. In addition to various statements of Shoesmith and certain entries in his account book apparently recognizing his interest as that of mortgagee, there was other testimony showing statements by him indicating that he considered the land his own, including his will in which he devised to his sister one-half of the remaining 240 acres. The record is voluminous, and numerous items and incidents could be given in line with those already mentioned.

John Shoesmith was a wealthy man who was evidently attached to his sister, plaintiff's wife, and while her testimony as to the transaction in 1898 would of itself amply support the contention that the deed was intended as a mortgage, still much of the other evidence, and especially that showing the way John Shoesmith treated, mentioned and regarded the land and the complete and absolute dominion over it which he exercised up to the time of his death, all lend support to the conclusion of the trial court—so much support that without undertaking to weigh conflicting oral evidence we can not say that the decision is wrong.

The wife has already by the will received all or more than would accrue to her by the plaintiff's success in this action, while the plaintiff himself, who claims now that the evidence shows a payment of the indebtedness, permitted his brother-

Heavey v. Bridge Co.

in-law for some nine years to proceed in practical and open disregard and renunciation of any trust or obligation to reconvey to him; and in view of the entire evidence in the case, the result reached by the trial court must be allowed to stand. The judgment is therefore affirmed.

---

No. 20,085.

JOSEPH H. HEAVEY, a Minor, etc., *Appellee,* v. THE LEAVENWORTH TERMINAL RAILWAY & BRIDGE COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. DRAWBRIDGE—*Negligence of Superintendent—Injury to Employee—Petition—Evidence.* In an action for damages for personal injury sustained in opening the draw span of a bridge across a navigable river, an allegation of the petition that the bridge was not sufficiently open to permit the passage of a boat when the signal was given to the boat pass through is supported by evidence tending to prove that the draw was opened by levers and keys operated by hand, that when the draw was open at an angle of about forty-five degrees the defendant's foreman signaled the boat to pass through, that the boat then started through, that the foreman then signaled the plaintiff with the other workmen to close the bridge, that they started to do so, that the boat started to drift, that the bridge was not opened wide enough to permit the boat to pass through, that the foreman then gave a signal to open the draw wider, that this signal came too late, and that the boat struck the end of the draw span, causing the levers and keys to revolve rapidly, thereby injuring the plaintiff.

2. SAME—*Drawbridge Not Sufficiently Open—Proximate Cause.* Under such circumstances, the finding of the jury that the negligence of the defendant in not having the bridge sufficiently open was the cause of the plaintiff's injury shows that the negligence alleged was the proximate cause of the injury.

3. SAME—*Instructions—Dangerous Employment.* Under such circumstances, it was not error to give instructions concerning dangerous employment.

Appeal from Leavenworth district court; JAMES H. WENDORFF, judge. Opinion filed April 8, 1916. Affirmed.

*A. E. Dempsey,* and *William W. Hooper,* both of Leavenworth, for the appellant; *John Barton Payne,* of Chicago, Ill., of counsel.

*John T. O'Keefe,* of Leavenworth, for the appellee.

47—97 KAN.

The opinion of the court was delivered by

MARSHALL, J.: This is an action for damages for personal injury. The plaintiff recovered judgment and the defendant appeals. The action arises out of the same accident as that described in *Stocks v. Bridge Co.*, 94 Kan. 604, 146 Pac. 1178.

1. The facts as now presented differ a little from those presented in that case. The defendant operated a bridge across the Missouri river at Leavenworth. Near the Kansas side there was a draw span in the bridge, which opened to permit the passage of boats. At the time of the accident, a steamboat pushing a barge loaded with stone was attempting to pass through the bridge. The plaintiff with others was employed to open it. This was done by means of levers and operating keys, which turned the draw span. When the bridge was open about half-way, at an angle of forty-five degrees, the defendant's foreman, who was stationed on the bank of the river, signaled the boat to pass through. The boat started to do so, when the foreman ordered the men to close the bridge. This they started to do. While passing through the boat began to drift. The foreman then signaled to open the draw. This signal came too late. The boat hit one end of the draw, causing the keys and levers to revolve rapidly and to strike the plaintiff, inflicting the injury complained of.

The defendant contends that the finding of negligence was not supported by pleading or proof. One of the allegations of negligence is that the bridge was not sufficiently open, when the signal was given to the boat, to permit it to pass through. The defendant argues that it is not alleged that before the boat got fully through the defendant prematurely began closing the draw span. Was it necessary that this be alleged? The allegation is that the draw-span was not sufficiently open, when the signal was given to the boat, to permit it to pass through. The evidence shows that the boat could not get through, and that the foreman ordered the men to open the draw wider to let the boat through. Why open the draw wider? There is only one answer. That is that the bridge was not sufficiently open to let the boat pass through. This evidence tends to prove the specific act of negligence alleged in the petition. The failure to allege that before the boat got

fully through the draw span the defendant prematurely began closing it is immaterial. Sufficient negligence was alleged, and the evidence tended to prove that negligence.

2. It is argued that the negligence alleged was not the proximate cause of the injury. It is necessary that the negligence alleged be proved, and that it be the proximate cause of the injury. The jury answered questions, among others, as follows:

"What negligence of the defendant do you find was the cause of the injury to the plaintiff? A. Bridge was not sufficiently open.

"Did the striking of the draw span by the boat cause the lever which plaintiff was working with to revolve rapidly and strike the plaintiff? A. It did and the rapid revolution of the lever was the cause of the injury to the plaintiff."

The findings of the jury answer the defendant's argument.

3. The court instructed the jury concerning dangerous employment. Of this the defendant complains, and argues that these instructions were erroneous for the reason that they did not apply to the facts shown by the evidence. Before the accident that resulted in the injury to the plaintiff the work of opening the draw did not appear to be dangerous. It was a railroad and wagon bridge. The weight of the span was necessarily great. If any accident or mishap occurred in the opening of the span the work necessarily immediately became highly dangerous. The accident out of which this action grew demonstrated that fact. Under these circumstances it was not prejudicial error for the court to give these instructions to the jury.

The judgment is affirmed.

No. 20,087.

THE CAHILL SWIFT MANUFACTURING COMPANY, *Appellant*, V.
T. P. HAYES et al., *Appellee*.

SYLLABUS BY THE COURT.

1.. MOTION—*To Set Aside Judgment—General Appearance—Waiver of Notice.* When a judgment is taken by default and a motion to set it aside is filed, service of notice of the motion is waived when the plaintiff appears and contests the motion on various nonjurisdictional grounds.

2. SAME—*No Appearance—Witness in Attendance.* One against whom a lawsuit is pending does not enter appearance therein when he is only in attendance in court as a witness duly served with a subpœna.

3. CITY COURT.—*Appearance Within the Hour—Jurisdiction.* A city court, having jurisdiction similar to that of a justice of the peace, does not lose jurisdiction of the parties under section 17 of the justices' civil code, which provides that a defendant is not bound to remain longer than one hour after the time fixed for his appearance, if the plaintiff does not appear, unless the evidence is clear and convincing that the plaintiff failed to appear within the hour.

4. SAME—*Case Not Entered on Unofficial Docket—Jurisdiction Not Lost.* When a defendant has been regularly sued and regularly summoned in a case regularly entered on the official docket of a city court the court does not lose jurisdiction of the defendant because the case against him is not entered on an unofficial trial docket prepared by the clerk of the court for the judge's convenience, nor because the judge by mistake tells the defendant that there is no case set for that date.

5. SAME—*Two Defendants—Judgment against Both Valid.* Where two defendants are sued in a city court as partners, and one of the defendants asks for and obtains a continuance of the case, the court does not thereby lose jurisdiction to render a judgment on a later date, to which the action was continued, against the codefendant who was present and ready for trial on the day and hour when the case was first set.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed April 8, 1916. Reversed.

*E. L. Foulke, C. A. Matson,* and *J. D. Wall,* all of Wichita, for the appellant.

*Glenn Porter,* of Wichita, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff company sued T. P. Hayes and Louis M. Clark in the city court of Wichita, alleging that the defendants were partners and indebted to it for a sum of money for which it asked judgment.

The city judge, whose jurisdiction is much like that of a justice of the peace, issued summons directing defendant Hayes to appear at 8 o'clock a. m., on October 8, 1913. Hayes appeared and remained until 9 o'clock, when the cases set for that date were called. The case against Hayes was not called. The attorney for Hayes asked the judge if there was a case of *Cahill-Swift Manufacturing Company v. Hayes* set for trial on that date and the judge informed him that there was not. In this the judge was mistaken. There was such a case on the official docket, and the summons to defendant so advised him. The court had a trial docket in which the cases to be tried each day were entered by the clerk for the judge's convenience, and this case had been omitted from it. Sometime after 9 o'clock a. m. Hayes and his attorney left the court room and never returned.

After several continuances, a trial was had and judgment rendered against defendants Hayes and Clark, but it was not satisfactory to the plaintiff company, so it appealed to the district court, and there again a judgment was rendered against Hayes. No appearance was made in the district court by Hayes nor was he served with summons, but he was present and testified as a witness, having been brought there by subpœna. The judgment against Hayes in the district court was entered on March 24, 1914.

On February 27, 1915, Hayes filed a motion to set aside the judgment on the ground that no summons had been served on him, that the court had no jurisdiction to render judgment against him, and that the judgment was null and void.

No summons or notice of this motion to vacate the judgment was served on plaintiff or its counsel. When the motion was called for hearing, counsel for plaintiff objected for the reason that the court was without jurisdiction. The objection was overruled. Plaintiff's counsel, however, did contest the proceedings throughout, objected to the competency of evi-

dence, cross-examined the witnesses produced by Hayes to support his motion, demurred to the evidence, introduced the transcript of the city court proceedings, produced witnesses who testified for plaintiff, and introduced the files and records as evidence in opposition to the motion to vacate.

Defendant's motion to set aside the judgment was sustained. Hence this appeal.

We have mentioned in detail what was done by counsel for plaintiff after their objection to. the jurisdiction was overruled because it is not entirely clear whether they intend to assign error thereon or not. They mention the matter but do not press it, and we think that since all that was wanting was a notice of the motion, and since it was contested on other than jurisdictional grounds, it must be held that a general appearance was entered to resist it. (*Frazier v. Douglass*, 57 Kan. 809, 48 Pac. 36; *Investment Co. v. Cornell*, 60 Kan. 282, 56 Pac. 475; *Thompson v. Pfeiffer*, 66 Kan. 368, 71 Pac. 828; 3 Cyc. 511.)

It seems clear that where a person presents himself as a witness in response to a subpœna he does not thereby enter an appearance as a party litigant. In such case he appears by compulsion. The command to appear, *subpœna* (subject to punishment for disobedience), is not voluntary, and he waives no right by his obedience.

Since the city court is not a court of record, being merely that of a justice of the peace, the evidence of defendant touching what transpired there when he appeared on the day and hour mentioned in the summons was competent.

The appellee contends that the plaintiff did not appear within the hour mentioned in the summons for appearance in the city court, and that he was therefore entitled to depart *sine die*, and that the nonappearance of the plaintiff divested the court of jurisdiction. This contention would be good if this fact was established. (Jus. Civ. Code, § 17; *True v. Mendenhall*, 67 Kan. 497, 73 Pac. 67; *Dickinson v. Hoffman*, 90 Ill. App. 83; *Brady v. Taber*, 29 Mich. 199; *Todd v. Doremus*, 60 Hun [N. Y. Supr. Ct.], 385; *Sprague v. Shed*, 9 Johns. [N. Y.] 140; 24 Cyc. 487.)

But the difficulty on this phase of the case is that we can find not a syllable of evidence showing that the plaintiff did

not appear at the time set for the trial in the city court. Anxious not to disturb the judgment of the district court, we have resorted to the transcript and to the files of both courts below and have considered the matter from every possible angle. Some evidence tended to show that the defendant was present when counsel for his codefendant asked and obtained a continuance until the next day. Some evidence tended to show that counsel for the plaintiff was present when the attorney for Clark, the codefendant, applied for a continuance. This attorney testified that he was present, that he recollected that Clark's attorney asked for a continuance. He·said:

"I asked for judgment which was not allowed. I know I was not allowed to take judgment. The court would not allow it."

The district court was within its discretion to disbelieve this testimony, but since there is a total want of affirmative evidence tending to show the absence of the plaintiff or his attorney in the city court of Wichita on October 8 at the hour when the case was to be called for trial or lawfully continued, the motion to set aside the judgment could not be sustained on that ground. Neither could it be sustained on the ground that the city judge said that there was no case on the docket against Hayes set for that day. In all probability the judge's answer was based on the fact that the case had been continued on the application of Hayes' codefendant.

Since the city court had jurisdiction of appellee by lawful summons, and it is not shown on any ground that this jurisdiction was lost, the motion to vacate the judgment in the district court should have been overruled, and this case is reversed with instructions to that effect.

No. 20,089.

GEORGE NUZUM, *Appellee,* v. JOE SPRINGER and WILLIAM OGDEN, Intervenor, *Appellants.*

### SYLLABUS BY THE COURT.

1. ATTACHMENT—*Land Allotted to Iowa Indian—Patented to His Heirs —Subject to Attachment by Heir's Creditor.* The allotment of the lands in the reservation of the Iowa Indians in Nebraska and Kansas was made under the act of congress approved January 26, 1887, and was subject to the restrictions therein imposed as to taxation, alienation or forced sale, and a deed issued to the heirs of an allottee of that tribe before the trust period had expired in pursuance of the provisions of an act approved June 21, 1906 (Part 1, 34 U. S. Stat. at Large, ch. 3504, p. 349), operated to end the trust period and to remove all restrictions imposed in the allotment act, and the land s'o patented was thereafter subject to taxation, sale, attachment and execution to the same extent as lands owned by others.

2. TRIAL—*Impeaching Party's Own Witness.* Ordinarily a party may not impeach his own witness, but in the interest of truth and justice it may sometimes be done, and when it is permissible is largely within the discretion of the trial court.

Appeal from Brown district court; WILLIAM I. STUART, judge. Opinion filed April 8, 1916. Affirmed.

*S. L. Ryan,* and *W. F. Means,* both of Hiawatha, for the appellants.

*S. F. Newlon,* of Hiawatha, and *S. M. Brewster,* of Topeka, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an attachment proceeding which involved the question whether a certain tract of land that had been allotted to an Indian of the Iowa tribe and subsequently patented to an heir was subject to an attachment, and whether a certain deed was delivered prior to the levy of the attachment. The land had been allotted to Min-Cath-Way, a member of the Iowa tribe, under an act of congress which provided that it should be held by the government in trust for a period of twenty-five years, after which it should be conveyed by patent in fee simple to the allottee or his heirs. The allotment

appears to have been made in 1891, and before the expiration
of the trust period Min-Cath-Way died, leaving as his heirs his
wife, Catherine, and a daughter. Catherine also died before
the trust period ended, and left as her heirs the daughter of
the allottee and Joseph Springer, who was the son of Catherine
by a former husband, and inherited a share of the land from
his mother. After her death, and on November 21, 1910, the
secretary of the interior issued a patent to the tract in ques-
tion, giving an interest to Joseph Springer, who then resided
in Oklahoma. Prior to that time Springer had executed a
number of promissory notes in favor of George Nuzum, and
to recover on these Nuzum brought an action against Springer
on January 6, 1911, and caused an attachment to be levied on
the land as the property of Springer. William Ogden inter-
pleaded in the action and alleged that he was the owner of the
land, Springer having executed a deed to him on the day of
the attachment but before the time it was levied upon the land.
Springer filed a motion in the case to dissolve the attachment,
but based it on the ground that he had conveyed the land and
had no interest in it. At the trial a question arose as to
whether the levy of attachment was prior to the delivery of
the deed from Springer to Ogden. It appears that the deed
was signed on the morning of January 6, 1911, and that Ogden
then turned over to him two checks as payment for the land.
Ogden testified that the deed was then formally delivered to
him. On the other hand, testimony was offered to the effect
that the deed was to be delivered when the money was paid
upon the checks and that Springer accompanied Ogden to Kan-
sas City for the purpose of having the checks cashed. The
checks were in the possession of Ogden in Kansas City, and
on the morning of January 7, 1911, they were presented to a
bank in Kansas City, payment was made, and the deed was
then delivered. The trial court found and adjudged that
Springer had an interest in the land subject to attachment,
and that the attachment was levied before the Ogden deed
was delivered.

On this appeal it is contended that the land was not subject
to attachment as it had been allotted under an act which pro-
hibited the forced sale of the land for debt during the trust
period of twenty-five years, which had not expired when the

attachment was levied. (24 U. S. Stat. at Large, ch. 47, p. 367.) Reliance is also placed upon an amendment to the Dawes act, which is to the effect that lands shall not be levied on to be taken in satisfaction of a debt contracted prior to the issuance of the patent. (Part 1, 34 U. S. Stat. at Large, ch. 2348, p. 182.) As we have seen, the land in controversy was not allotted under the Dawes act, but the allotment was made under the special act applicable to the Sac and Fox and Iowa reservations in Nebraska and Kansas. (24 U. S. Stat. at Large, ch. 47, p. 367.) That act provides that when the allotment is made a trust patent shall be issued to the allottee and the United States will hold the land in trust for the sole use and benefit of the allottee or his heirs for the period of twenty-five years, and at the end of the trust period shall convey the same to the Indian or his heirs by a patent in fee simple, discharged of the trust, and that during the trust no conveyance or contract to convey shall be valid "and such lands, during such time, shall not be subject to taxation, alienation, or forced sale, under execution or otherwise." Under that act the trust period may be ended by the issuance of a patent in fee simple conveying the land, discharged of the trust. The trust power was ended and the lands patented, not under the Dawes act, but in virtue of a special provision in an act of congress approved June 1, 1906, which provided:

"That the Secretary of the Interior be, and he is hereby, authorized, in his discretion, to issue patents in fee simple to the members of the Sac and Fox of Missouri and Iowa tribes of Indians for the lands heretofore allotted them in Kansas and Nebraska; and the issuance of such patents shall operate to remove all restrictions as to sale, taxation and incumbrance of the lands so patented." (Part 1, 34 U. S. Stat. at Large, ch. 3504, p. 349.)

The patent issued under this provision conveyed the land free from any prior conveyance or contract to convey, and at the same time it also conveyed it to the grantee free from the restrictions imposed in the act of allotment. The secretary of the interior was authorized to ascertain the heirs of the deceased allottee, and if satisfied of their ability to manage their own affairs he was empowered to issue a patent in fee simple to them. (Part 1, 35 U. S. Stat. at Large, ch. 216, p. 444.) When the patent in fee simple was issued, the land was dis-

charged of the trust as effectually as if the twenty-five-year period had expired, and thereafter it was subject to alienation, taxation or forced sale under execution for the debts of the owner. Congress might have provided, as it did in the case of some other Indians, that the land should never be taken for debts contracted prior to the issuance of the patent, but no such restriction was placed in the allotment act, nor in the one authorizing the issuance of the patent and the removal of the restrictions. The restrictions of the Dawes act have no application to the Iowa tribe of Indians or to the conveyance of their lands. Springer, therefore, was at liberty to convey the land at the time the deed was signed on January 6, 1911, and his land was likewise subject to attachment in satisfaction of his debts at that time.

The only question remaining arises on a ruling admitting testimony. The plaintiff took the deposition of Springer in Oklahoma, and while some of the testimony given supports the theory of the plaintiff that the deed was delivered in Kansas City, other of his answers tended to show that Springer accepted the checks of Ogden as payment for the land in Oklahoma and at the same time delivered the deed to Ogden. While testifying he was shown an affidavit previously made by himself, to the effect that he had refused to accept the checks or to deliver the deed until the checks were cashed, and that he kept possession of the deed until he and Ogden arrived in Kansas City and the money was paid on the checks at a bank in that city. His explanation was that he was frequently under the influence of intoxicating liquor and that he had no recollection of making the statements contained in the affidavit. It is contended that by the admission of the statement the plaintiff who took Springer's deposition was allowed to contradict or impeach his witness. The general rule is that a party may not impeach his own witness, but in the interest of truth and justice it may sometimes be done, and when a departure from this general rule is justified is largely within the discretion of the court. (*Johnson v. Leggett,* 28 Kan. 590; *The State v. Sorter,* 52 Kan. 531, 34 Pac. 1036; *The State v. Moon,* 71 Kan. 349, 80 Pac. 597; *Tacoma Ry. & Power Co. v. Hays,* 110 Fed. 496.) The affidavit so identified was attached to and included in the deposition, and this appears to have been done over the ob-

jection of the defendants. It does not appear from the defendants' abstract that the court made any ruling on the objection that was made when the deposition was taken, and so far as their abstract is concerned the testimony would appear to have been received without calling it to the attention of the court or obtaining a ruling on the objection. However, in the counter-abstract of the plaintiff it is stated that an objection was made to the admission of the affidavit by the defendants and that it was sustained by the court. We must therefore assume that the testimony was not received, and in any view no error is shown.

The judgment is affirmed.

---

No. 20,091.

A. C. MEANS, *Appellee,* v. THE MERCHANTS STATE BANK and THE MERCHANTS RESERVE STATE BANK, *Appellants.*

### SYLLABUS BY THE COURT.

1. BANKING—*Accommodation Note—Indorsed by Bank—Note Paid by Accommodation Maker—Liability of Bank.* Plaintiff executed to a bank his promissory note, which the bank sold and indorsed. The indorsee sued the plaintiff on the note and obtained judgment against him. In a suit by plaintiff to compel the bank to pay the judgment, the petition alleged that he was an accommodation maker, and that the president of the bank promised him that the bank would save him harmless from any liability on the note. *Held,* that as the note was given solely for the accommodation of the bank, which received and retained the consideration, the plaintiff may maintain the suit independent of the authority of the president to bind the bank by the promise.

2. SAME—*Findings Sustained by Evidence.* The evidence in this case is examined and held sufficient to sustain the general finding in plaintiff's favor.

3. SAME—*Note Not Executed to Deceive Bank Commissioner.* It is further held, upon the facts stated in the opinion, that the defendants failed to establish that plaintiff executed the note with the intent to enable the officers of the bank to deceive the bank commissioner or to conceal the condition of the bank from its stockholders and creditors.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed April 8, 1916. Affirmed.

*S. B. Amidon, D. M. Dale, Jean Madalene,* and *S. A. Buckland,* all of Wichita, for the appellants.

*R. L. Holmes, Charles G. Yankey,* and *W. E. Holmes,* all of Wichita, for the appellee.

The opinion of the court was delivered by

PORTER, J.: A. C. Means executed and delivered to the Merchants State Bank of Wichita two promissory notes, each for the sum of $5000, dated April 19, 1913. One of the notes was payable directly to the bank; the other, which is the one involved in controversy here, was payable to Means himself and he indorsed it to the bank. After he had renewed it once the renewal note was sold to a bank in Kansas City, which subsequently sued Means thereon and recovered judgment for the full amount and interest. In the meantime the Merchants State Bank and the Merchants Reserve State Bank, both of Wichita, consolidated, and Means brought this action against both banks to compel them to pay the judgment.

The petition alleged that the notes were executed as an accommodation to the Merchants State Bank, without any consideration being given, and under an agreement with J. W. Dice, president of the bank, by which the bank was to hold plaintiff harmless and free from any liability upon the notes.

The defendants answered that the arrangement between Dice and Means was an individual transaction; that Dice acted without authority of the board of directors and without their knowledge and consent; and further, that the transaction was for the fraudulent purpose of deceiving the state bank commissioner and the stockholders and creditors of the bank as to its condition, and that the plaintiff was estopped to say that he was not bound by the note.

At the trial the defendants objected to having a jury called, and claimed that the case was an equitable one for the court to decide. The court called a jury in an advisory capacity, and the jury made certain findings of fact. Without approving or disapproving the findings of the jury the court rendered a general judgment in plaintiff's favor for the expenses of defending the action brought against him on the note and directing the defendants to pay the judgment.

Plaintiff claims that the notes were given without consideration and under the following circumstances: In 1912 one W. H. Kelchner, who had been operating a meat market in Wichita, was largely indebted to the bank on notes, and the bank was compelled to take over the business. For a while it employed Kelchner to manage the business. Later it employed John Chain, paying him $25 a week, and in lieu of Kelchner's notes Chain gave his notes to the bank. Sometime in March, 1913, Means applied to the bank for employment, and the cashier told him that Chain's management of the meat market was not satisfactory, that the bank might give him the position under the same arrangement, and that if he wanted it, to see Mr. Dice, president of the bank. Mr. Dice told him that they were carrying $10,000 of Kelchner's notes in Chain's name, and said:

"Of course, your notes will simply replace Chain's. There is no liability whatever on it. There will be no liability in any way at all. You will never be asked to pay the notes or the interest. You are simply loaning your credit to the bank. In addition to this I will give you my personal guarantee that you will never get into trouble or be asked to pay these."

Several days later Means executed the notes for the accommodation of the bank, and took charge of the management of the meat market and continued there until sometime in November. Before the notes fell due Mr. Dice had severed his connection with the bank, and the president who succeeded him and one of the directors spoke to Means about the notes. Means testified that he told them he did not owe the notes, that they were accommodation paper and the bank had agreed to protect him; but that the new officers stated in substance that they understood the notes had been given to the bank in the regular course of business. Sometime later, at the request of Dice, the plaintiff renewed both notes.

The question is, whether upon the facts the plaintiff was entitled to judgment. One contention of the defendants is that Dice acted as an individual in the transaction, without authority from the board of directors, and therefore the bank is not bound by his agreement with the plaintiff. A number of authorities are cited which hold that an agreement with the president or cashier of a bank that the indorser of a promissory

note shall not be liable on his indorsement will not bind the bank for the reason that it is no part of the duties of the president or cashier to make such contracts. (*Bank of the United States v. Dunn,* 31 U. S. 51, 8 L. Ed. 316.) The correctness of this general rule may be conceded. On the other hand, plaintiff relies upon the well-settled doctrine that a principal can not repudiate the authority of an agent and at the same time ratify it by accepting and retaining the benefits therefrom. (*Bank of Lakin v. National Bank,* 57 Kan. 183, 185, 45 Pac. 587; *McKinstry v. Citizens' Bank,* 57 Kan. 279, 46 Pac. 302; *Aultman v. Knoll,* 71 Kan. 109, 79 Pac. 1074; *Watt v. Railway Co.,* 82 Kan. 458, 463, 108 Pac. 811.)

In our opinion, however, the case can not be made to turn upon the question of the authority of Dice as president to bind the bank by the agreement that Means should not be liable on the notes. If it be true that the notes were given solely for accommodation of the bank and the bank received the benefits of the transaction, the plaintiff, independent of any promise made by Dice, has the right to maintain this suit to compel the bank to take care of the obligation unless he be estopped on the ground that the transaction with the bank is against public policy.

And this brings us to the second contention of the defendants—that the entire transaction is void for the reason that the evidence conclusively shows that the transaction was entered into for the purpose of deceiving the bank commissioner and making it appear to the creditors and stockholders that the bank held these notes as valid notes. Authorities are cited holding that where an officer of a bank enters into a transaction with an individual with such a purpose, and executes legal instruments of an obligatory character for that purpose, the maker of the obligation can not thereafter be heard to say they are invalid. Thus, in *State Bank of Moore v. Forsyth,* 41 Mont. 249, 108 Pac. 914, it was held that under such circumstances "it is sound reason, as well as pure justice, to leave him bound who has bound himself." (p. 267.) The soundness of the general rule contended for by the defendants can not be doubted. A more serious question is, How can this principle of law be said to apply to the facts of this case, with a general finding by the trial court in plaintiff's favor, aided

by the inferences and presumptions to which it is entitled, and keeping in mind the well-established rule that if there be a theory fairly sustained by evidence and upon which plaintiff is entitled to recover we must affirm the judgment?

The defendants offered testimony showing that the bank commissioner had directed the Kelchner loans reduced; but we find nothing in the plaintiff's testimony showing that he had heard or known of this fact, and there is nothing in his testimony indicating that in executing the notes he had any thought or purpose of deceiving the bank commissioner or of misleading the stockholders and creditors of the bank. His testimony is, in substance, that Dice told him the bank did not care to have the public know it was operating a meat market. The bank had been operating this market for a considerable time before that, and presumably with the knowledge and consent of the bank commissioner. Banks are sometimes compelled to take over a mercantile enterprise in order to protect themselves from loss, and it is not necessarily fraudulent. or against public policy for a bank which is obliged to do so to conceal the fact from the public.

We think the plaintiff's evidence tended to support his theory that Dice had no individual interest in the transaction and was acting solely for the bank. The bank had taken over and was operating the Kelchner market long before either Chain or the plaintiff had anything to do with the business; and the evidence shows that the bank had found it necessary, in order to protect itself from loss, to purchase a chattel mortgage held by a packing company which was a prior lien. It paid $6600 and took an assignment of the mortgage, which it foreclosed. The money used to purchase the mortgage was derived from the sale to the Kansas City bank of one of Chain's notes for $5000, and in part from the proceeds of the other Chain note which the bank carried as an asset. Clearly, the Merchants State Bank received full consideration for the Chain notes. The note involved in this controversy is the one executed by Means which the bank used to replace Chain's note held by the Kansas City bank. It appears Chain loaned his credit to the Merchants State Bank, which it used to obtain $5000 from the bank in Kansas City; and when the note came due, the Merchants State Bank replaced it with the note obtained from

the plaintiff. In fact it surrendered to Chain both his notes, substituting therefor those executed by the plaintiff. To sustain the judgment in plaintiff's favor he is entitled to every reasonable inference which may be derived from the evidence. Independent of the agreement with Dice to hold the plaintiff harmless, the bank on this theory of the case is liable as the accommodated party and should reimburse the accommodation-maker or assume liability for the outstanding obligation.

It is difficult to see how it can be said that Means by loaning his credit to the bank assisted it in any fraud upon its stockholders and creditors, and it is not suggested that the bank sustained any loss by the transaction. The bank received the consideration for the note, and, moreover, it seems to have been used for a legitimate purpose. Through the sale of the note the bank received the full benefit of the arrangement, and to permit it to repudiate the transaction would result in a serious wrong to the plaintiff. It has been held that a national bank can not set up its want of legal capacity in order to escape a just responsibility. (*National Bank v. Case,* 99 U. S. 628.)

It is suggested by the defendants that the transaction was in violation of the penal statute (Gen. Stat. 1909, § 473) which forbids the making of false reports and entries by officers of banks. The defendants assume that in order to carry out the transaction it became necessary for some officer to make false entries upon the books of the bank and false reports to the banking department. The evidence does not show that any false entries or reports were made, or that if they were made it was with the knowledge or consent of the plaintiff.

It was urged in the court below that the notes were executed by Means for the purpose of enabling the bank to conceal its true condition from the bank commissioner, but the judgment is a finding against the defendants on this contention. We think the cases relied upon by the defendants, where obligations were entered into for the purpose of deceiving stockholders and creditors of a bank or state officers charged with the control of banks, have no application to the facts in view of the general judgment in plaintiff's favor.

It follows that the judgment will be affirmed.

48—97 KAN.

No. 20,097.

NOTLEY E. RECORD, *Appellee*, v. CARL ELLIS, as an Individual and as Administrator, etc., et al., *Appellants*.

### SYLLABUS BY THE COURT.

1. ILLEGITIMATE CHILD — *Recognition by Putative Father.* Upon the question of recognition, and especially upon the affirmative of that question, almost all of the evidence was by deposition. *Held,* that on appeal such evidence will be reviewed.

2. SAME—*Evidence Insufficient.* The testimony examined and found not to support a finding of general and notorious recognition by the father of the plaintiff's sonship as required by the statute (Gen. Stat. 1909, § 2956).

Appeal from Meade district court; GORDON L. FINLEY, judge. Opinion filed April 8, 1916. Reversed.

*Francis C. Price,* of Ashland, for the appellants; *H. Llewelyn Jones,* of Meade, of counsel.

*Albert Watkins, Arthur C. Scates,* both of Dodge City, and *Charles Clyde Barker,* of Denver, Colo., for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant, the administrator of the estate of William Ellis, deceased, appeals from a decision adjudging the plaintiff competent to inherit from the decedent. The questions of paternity and of general and notorious recognition are involved. (Gen. Stat. 1909, § 2956.)

The plaintiff, Notley E. Record, son of Mary Record, was born in Pendleton county, Kentucky, January 12, 1873. William Ellis, born and raised in the same neighborhood, was a single man about thirty years of age at this time and engaged to marry Miss Lydia B. Pribble who lived in the neighborhood. On February 26, 1873, Mary Record, a single woman living in the neighborhood, made complaint charging the decedent with being the father of her child. A warrant was issued, and returned on March 20, not executed. Soon after its issuance Ellis went to Indianapolis where in March he was married to Miss Pribble. They lived there until the following year, when they moved to a farm in Morgan county, Indiana, and re-

mained there until 1884, when they moved to Clark county, Kansas, near the Meade county line, in which vicinity Ellis and his wife lived together until his death in 1911, two sons, Frank and Carl, having been born to them. During these years Ellis made a number of visits to the old neighborhood in Kentucky, at which times he made statements and admissions which fully settle in favor of the plaintiff the question of paternity and which amounted to a recognition. It does not appear, however, that, with one exception, any one ever heard William Ellis acknowledge the paternity in Indiana, where he lived for ten years, or in Kansas, where he lived for twenty-seven years, and his wife and sons up to the time of his death claimed to have had no knowledge or information concerning the matter, although the wife, a cousin of Mary Record, had gone with him on a visit to the old neighborhood in 1883, and again in 1906, and the eldest son had visited in Kentucky with friends and relatives in 1904. One witness, who was visiting the decedent in Kansas, testified that Ellis requested him to say nothing to the children here about his life back there, but the intended significance of this remark is a mere matter of inference. Keeping the secret thus well in the neighborhood where he spent much of his married life and raised his children, the question remains whether the recognition shown elsewhere fills the requirement of the statute.

In addition to various statements concerning his relations with Mary Record, and concerning the failure of the constable to execute the warrant, an old farmer and school teacher testified that in 1875, in Indiana, when working with Ellis, the latter would frequently say in a reminiscent way, and sometimes in a jesting way, "I wonder how my boy, or how my Kentucky stock, is coming on back in Kentucky. My Kentucky stock, or my boy." Sometimes he would use the name Not or Notley, and refer to him as "my boy." He also testified that he heard Mrs. Ellis frequently ask something about her husband's Kentucky stock. This was denied by Mrs. Ellis. That when he would accuse Ellis of lying about having such a boy he would say, "I am not." Another witness testified that in 1878, in the old neighborhood, on meeting Ellis, he said, "How is my boy?" and on being asked What boy? he replied, "My boy, Not." Another, that on Christmas, 1883, at a wed-

ding, while the witness and decedent's father-in-law and others were sitting together, Ellis asked the witness: "How is my boy getting along? Is he big enough to do some work? I want to take him west with me to raise corn." The same witness, a brother of Mary Record, testified that in 1909 Ellis came into his booth at a fair at Falmouth, Ky., and asked where the plaintiff was, and requested witness to give him his address, saying: "It is funny I can't find that boy; he is roaming around in the west the same as I am." One witness deposed that before Ellis left he told witness's father that the child was his, and what he was working for was to get away and get shut of it; that on his return visits the witness frequently talked to Ellis about the matter, and he often inquired about the boy; that he heard a conversation between Ellis and the father of witness in which he said he would give the boy something when the time came, but his wife objected to it. Another, that he saw Ellis on a return visit, probably in 1893, rode with him two or two and a half miles, asked him if he had seen his boy since he had come in. He said no, but he would like to see him. He said:

"Well, I would like to see that boy; I would like to take him home with me, if he would go. I have got hold of a good deal of land down there in Kansas which some day will be valuable, and I could give Not a start if he would go home with me."

Another testified that he saw the foot-race when the constable went to arrest Ellis; that in talking about the matter on a return visit Ellis said it was his boy; that when the boy was about twelve or thirteen years old, while witness and Ellis and others were at a certain store, the boy came in for his mail. Some one remarked that that was his boy, and Ellis said, "I reckon it is." Notley Record testified that he never saw Ellis but once in his life, and that was when he was about sixteen; that he had known of his being in the neighborhood at other times, but if he saw him he did not know him; that in the instance mentioned he just happened to meet him at the cross-roads store. The storekeeper winked at Ellis and "I knowed I was trapped then. I had always shunned him," and Ellis there gave him a cigar.

What is meant by the requirement that the recognition must be general and notorious?

The supreme court of Iowa, whose statute is identical with ours, has ruled that "general" means "extensive, though not universal"; and "notorious" is synonymous with "open." (*Van-Horn v. Van Horn,* 107 Iowa, 247, 77 N. W. 846.) As defined by Webster "general" means "common to many, or the greatest number, widely spread; prevalent; extensive though not universal," and "notorious," "generally known and talked of by the public; universally believed to be true; manifest to the world." In *Watson v Richardson,* 110 Iowa, 673, 80 N. W. 407, it was said:

"Both of these words are used in the statute with the design of emphasizing the thought that the understanding of the father's recognition should be as extensive as the immediate community of his residence, and within the common knowledge of the public." (p. 691.)

In other instances the approved definitions were: "Extensive, common to many, or the majority, but not universal." "Not concealed, open, generally or commonly known or spoken of." (*McCorkendale v. McCorkendale,* 111 Iowa, 314, 316, 82 N. W. 754; *McNeill v. McNeill,* 166 Iowa, 680, 703, 148 N. W. 643.) The recognition required is not that of heirship but sonship. (*Alston v. Alston,* 114 Iowa, 29, 86 N. W. 55.) It need not be in a state which permits bastards to inherit. (*Van Horn v. Van Horn,* supra.)

In a recent decision it was held that it is not necessary that it (the recognition) should have been universal or made known to all or a majority of the community, but it was sufficient where the proof showed that the father frankly admitted the relationship when there was occasion for him to speak, and made no attempt to conceal the same, though it also appeared that there were many of his friends, relatives and acquaintances who had no knowledge thereof. (*Tout v. Woodin,* 157 Iowa, 518, 137 N. W. 1001.) In that case there was testimony that the putative father visited the mother while still in bed, held the child in his arms, and brought or sent supplies for its use. It was said that his statements were not made in confidence, but openly and without apparent reserve, and on so many different occasions that the recognition must be held general and notorious, although a number of acquaintances more or less intimate with him testified that they had never heard him admit the paternity of the child. But there were

some twenty distinct acts and statements of recognition. The rule therein announced was quoted with approval in *Hays v. Claypool,* 164 Iowa, 297, 300, 145 N. W. 874, but it was held in the latter case that it was necessary to show that the father acknowledged his parentage openly in his intercourse with his neighbors, associates and friends, whenever reference to the subject was made, without attempting to conceal it, and that the father, having lived fifty-seven years after the plaintiff's birth, no visit, communication or token of remembrance having passed between them, and as only four persons could be produced to whom declarations of parentage were ever made, the right to inherit was not established.

Counsel for the plaintiff call attention to a number of Iowa cases holding the proof sufficient, and we have examined them all. These are *Van Horn v. Van Horn, Alston v. Alston, Tout v. Woodin,* already referred to, and *Morgan v. Strand,* 133 Iowa, 299, 110 N. W. 596, and *Robertson v. Campbell et al.,* 168 Iowa, 47, 147 N. W. 301. In each of these cases save one the evidence of recognition was stronger than that found in the record before us. The exception is the Morgan case, and there the evidence showed statements to several persons, and once or twice publicly in the presence of thrashing crews, a settlement with the mother in a bastardly proceeding by the payment to her of a hundred dollars, and other facts which led the court to observe that there was little doubt of a general and notorious recognition that he had a child "back in Illinois," and that his acknowledgment of having such a child was generally understood in the neighborhood. In each of the other cases thus invoked there was testimony showing some personal recognition of the child by the father in addition to statements of acknowledgment to others.

*Markey v. Markey,* 108 Iowa, 373, 79 N. W. 258, is to the effect that it is not sufficient to show that plaintiff was reared at the home of the deceased in Ireland, when not elsewhere at work, until he reached the age of nineteen or twenty, when he came to this country at the expense of the deceased, and went to his house in Illinois, where he remained for two years; that the deceased furnished him with clothing and spending money, collected his wages, and introduced him as his son to some fifteen persons, five of whom testified to such fact. It was re-

marked that there was no evidence of any recognition while the parties resided in Ireland, nor after they separated in Illinois, nor of any communication between them.  In *Watson v. Richardson*, 110 Iowa, 673, 80 N. W. 407, evidence showing that a putative father recognized an illigitimate child as his own in the house of its foster parents during the first year of its life, and occasionally thereafter after removal to another state, was held insufficient, two of the justices dissenting.  The McCorkendale case (111 Iowa, 314, 82 N. W. 754) is quite similar to the one under consideration as to the recognition in the state where the child was born, but the right to inherit was denied.

In *Estate of Jones*, 166 Cal. 108, 135 Pac. 288, the statute providing for reception of an illegitimate into the father's family "and otherwise treating it as if it were a legitimate child" (p. 116), the quoted requirement was held to be met by evidence showing that the father often visited the child, contributed continuously to its support, had a paternal affection for it and acted towards it as a father would act towards a legitimate child.  In an earlier case (*In re Jessup*, 81 Cal. 408, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594) it was held that "public acknowledgment" requires that the father should have held the child out to his relatives, friends, acquaintances and the world as his child.  The majority opinion put stress on the danger of fraudulent claims of heirship, and pointed out that while Jessup protected the mother by providing for the child for a few years, and to a very limited number of persons spoke of him as his boy, he kept him out of the circle of his own association, did not visit him after he was two years old, and when visited by the boy later made the stays brief, making him only one present, a five-dollar watch.

"In his intercourse with his own family, he denied his relationship to the boy, and with those most intimately connected with him in his business relations, and who, by reason of such connection, acquired some knowledge of what he was doing, he never admitted or communicated that he was doing anything more than 'putting up' for the boy."  (p. 433.)

Cyc. thus states the rule, mainly deduced apparently from the Iowa decisions:

"While one may by his acts be held to have sufficiently recognized a child to legitimate it, loose acts of occasional recognition, or an oc-

casional apparent recognition during the first years of the child's life at
the home of its foster parents have been held insufficient." (5 Cyc. 633.)

The trial court in deciding the case observed, among other
things:

"These visits were of short duration, a few days at a time. William
Ellis never spoke or wrote directly to plaintiff as his own son. To several
witnesses, however, he openly acknowledged his parentage. . . . One
fact is noticeable, that out of the great number of witnesses herein, old
friends, acquaintances and relatives of William Ellis, not one witness
testified that William Ellis ever denied his parentage of plaintiff. . . .
The community generally believed him to be the father and this sentiment
he must have known, yet he said no word to clear himself of the charge;
when for the sake of his wife and their children he naturally might have
done so. His admissions of parentage were not many but, considering
the opportunities of the witnesses to meet William Ellis and the delicacy
of the subject, his conduct generally, and the fact that he really was the
father of plaintiff, it must be held that he generally and notoriously
recognized plaintiff as his own son."

The plaintiff invokes the rule that we can not interfere with
the result reached by the trial court upon consideration of con-
flicting competent evidence, twelve of the long list of witnesses
having testified orally, and calls attention to *McLean v. Mc-
Lean,* 92 Kan. 326, 140 Pac. 847, where it was held that recog-
nition is a question of fact, and where it was said in the
opinion, speaking of paternity and recognition:

"These are questions of fact for the determination of the jury under
proper instructions as to what constitutes a general and notorious rec-
ognition of the relation of father and son on the part of the father."
(p. 329.)

Again:

"It is only for us to determine whether there was sufficient evidence
to sustain their verdict and to justify the approval thereof by the court."
(p. 331.)

It has also been ruled that when there is some evidence
fairly supporting the conclusion of the trial court the result
will not be disturbed, although apparently against the weight
of the evidence. (*Cheney v. Hovey,* 56 Kan. 637, 44 Pac. 605.)
When, however, the question is presented on appeal without
oral testimony, and practically as it was in the court below,
the conclusion of the trial court does not relieve us of exercis-
ing our own judgment. (*Mathewson v. Campbell,* 91 Kan.
625, 138 Pac. 637.) It has also been held that when all of the

evidence as to the controverted points is in writing it may be examined independently of the prior adjudication of the trial court. (*Bartels v. School District,* 89 Kan. 233, 237, 131 Pac. 579.)

Upon the question of recognition, and especially upon the affirmative of this question, almost the entire evidence was by deposition, said to constitute 328 typewritten pages. Under these circumstances the question of general and notorious recognition becomes one proper to be reviewed and determined by this court.

In a geographical sense there was neither general nor open recognition in Indiana or in Kansas during the entire residence in either of those states, with the exception of the admission to one intimate friend in Indiana. While the acts and declarations of the decedent upon his visits to the old neighborhood amounted to a recognition, such recognition appears to have been restricted to a meager number of old neighbors and associates and not to have been by any means as open and widespread as his acquaintance in the vicinity. Having, a few months after the birth of the plaintiff, married a cousin of his mother, and having resided out of the state for a generation of time, yet his wife and children claimed to be without knowledge of the plaintiff's paternity. It is significant that the intimate business acquaintances of the decedent in Kansas had never heard of such a claim, and that William Ellis never at any time, by any communication, provision or present, expressed to the plaintiff any sort of care, solicitude or recognition.

Laying aside all definitions and taking the words "general" and "notorious" in their natural signification, it is quite plain that there was no such recognition in Indiana or in Kansas, and that while the reputation of paternity was general in the old neighborhood in Kentucky its recognition was not open and notorious nor sufficiently general to meet statutory requirements.

The right of such unfortunate persons to inherit at all is a matter of the humaneness of modern legislation, and while, when the facts justify, the right is to be upheld regardless of the regrettable consequences to others concerned, still when a man at the close of a long life leaves a wife and children and

something for a rainy day, such family and such competency are not to be shadowed and depleted by one claiming sonship and heirship unless established with that satisfactory clearness intended by the legislature as evidenced by its language chosen to prescribe the degree of proof required.

Such required showing was not made, and the judgment is reversed with directions to enter judgment for the defendants.

WEST, J. (dissenting from the first syllabus and corresponding portion of the opinion) : To my mind we are going beyond our province in reviewing the volume of conflicting evidence in this, a fact case pure and simple.

Twelve of the witnesses gave their testimony orally. One of these was the plaintiff, whose "strong resemblance" to the decedent was remarked by the trial court. Another was the widow of William Ellis, and two others were his sons.,

The rule that the testimony should be reviewed when all documentary should not be enlarged.

I am authorized to say that Mr. Justice MARSHALL concurs in this dissent.

---

No. 20;101.

G. F. CORWIN and SCOTT WOLF, *Appellees*, v. ZELLA SPENCER, *Appellant.*

### SYLLABUS BY THE COURT.

REAL-ESTATE AGENT—*Fraud—Instructions—Commissions.* In an action by Corwin and Wolf to recover commission for effecting the exchange of real property for the defendant, Spencer, where the evidence tended to show that Tate, acting for Corwin and Wolf, secretly agreed to pool commissions with Moseley, the agent of Noah Mortimer, the other party to the exchange, and that Spencer was thereby defrauded of a part of the real property owned by her, it was error to instruct the jury that any secret arrangement between Tate and Moseley with reference to pooling commissions would not be binding on Corwin and Wolf nor defeat their right to recover commission for making the exchange.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed April 8, 1916. Reversed.

*J. E. Alexander, S. T. Jocelyn,* and *John W. Adams,* all of Wichita, for the appellant.

*George McGill, Charles B. Hudson, Clyde M. Hudson,* and *John W. Blood,* all of Wichita, for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: This is an action to recover commission for the sale of real estate. The plaintiffs recovered judgment. The defendant appeals.

The defendant owned one hundred lots in Wichita. Noah Mortimer owned a section of land in Texas. The defendant appointed the plaintiffs her agents to exchange her one hundred lots for the section of land in Texas. Mortimer appointed J. W. Moseley his agent to exchange the Texas land for lots in Wichita.

From March, 1913, to July 12, 1913, G. F. Corwin, one of the plaintiffs, worked for N. O. Tate, a real-estate agent, of Wichita, on a salary. July 12, 1913, Corwin succeeded to the real-estate business of Tate, and on July 17 formed a partnership with Scott Wolf, the other plaintiff. After G. F. Corwin succeeded to the business Tate was much in the office of the plaintiffs, and when the plaintiffs were out would transact business for them. The defendant's first negotiation for the exchange of her property for the Texas land was had with Tate before the plaintiff succeeded to his business. After this Tate continued to conduct the negotiations, and on the 20th of August, 1913, procured a contract to be signed by the defendant with J. W. Moseley providing for the exchange of these properties. The plaintiffs were to receive $250 as their commission for making this exchange. Tate directed the defendant to execute a deed for seventy of the lots to Mortimer and thirty of them to Moseley. The evidence tended to show that the thirty lots were to be divided beween agents Tate and Moseley. The plaintiffs had no knowledge of this arrangement.

The defendant complains of certain instructions given by the court and of the refusal of the court to give instructions requested by her. The court instructed the jury, in part, as follows:

"No. 5. You are further instructed that any secret agreement between one N. O. Tate and one Moseley with reference to pooling com-

missions would not be binding on plaintiffs nor defeat their recovery in this action.

"No. 8. You are further instructed that if you find the owner of the Texas land offered and was willing to accept seventy lots from the defendant for this land, and that the plaintiffs knew of this fact directly or by one Tate, and concealed said fact from the defendant, and induced the defendant to exchange 100 lots for the Texas land when the same could have been exchanged for seventy lots, then you are instructed that such action on the part of the plaintiffs would be tantamount to bad faith and would be fraud upon the defendant and they would forfeit their claim to compensation for any services rendered in the transaction."

Instruction No. 8 correctly states the law. The defendant argues that the fifth instruction was erroneous. It is not a correct statement of the law as applied to the evidence in this case. It is positive and direct in its terms, and being erroneous, is entirely misleading. If N. O. Tate had secret arrangements with the other agents concerning the commissions to be paid by the defendant for the exchange of the land, the plaintiffs are bound by the consequences flowing from that agreement, because N. O. Tate was acting for them. By his action he defrauded the defendant out of thirty of her lots. The plaintiffs can not reap the benefit of that fraud and say they knew nothing about it and claim that they are not bound by the conduct of their agent in perpetrating the fraud. (2 C. J. 849; Note, 1 L. R. A. 144.)

Complaint is made of the refusal of the court to continue the cause at the close of the trial on the application of the defendant. On account of the conclusion reached on the other branch of the case, this matter becomes immaterial.

Because of the error in the instructions, the judgment is reversed and a new trial is directed.

No. 20,104.

R. H. GALLOWAY, as Administrator, etc., *Appellant*, v. WIL-
LIAM FREEBURG, as Administrator with the will annexed,
etc., *Appellee*.

SYLLABUS BY THE COURT.

1. DECEASED ADMINISTRATOR—*Right of Successor to Sue Deceased Ad-
ministrator's Estate*. An administrator appointed to succeed a de-
ceased administrator can maintain an action against the estate of his
predecessor to recover the unadministered assets of an estate and for
an accounting.

2. SAME. Rule followed that an administrator's action against the es-
tate of a deceased administrator is not limited to the one on the ad-
ministrator's bond, following *Hudson v. Barratt*, 62 Kan. 137, 147, 61
Pac. 737.

3. SAME—*"Unadministered Assets" of an Estate*. Where a personal
estate consists of money and mortgages which have been reduced to
money, the money, when not disbursed as directed by the will or by
the probate court, is "unadministered assets" to which an adminis-
trator is entitled on the death of a preceding administrator.

4. WILL—*Construction—Life Estate Created*. The text of a will ex-
amined and, aside from specific bequests therein made, held to create
only a life estate in personalty, in money and mortgages, following
*Chase v. Howie*, 64 Kan. 320, 67 Pac. 822.

5. ACTION—*Against Deceased Administrator's Estate—Petition States
Cause of Action*. A petition in an action brought by an administrator
in succession against the estate of a preceding deceased administrator
who was also the life tenant of an estate in personalty examined and
held sufficient against a demurrer based on the statute of limitations.

Appeal from Republic district court; JOHN C. HOGIN, judge.
Opinion filed April 8, 1916. Reversed.

*W. D. Vance,* and *R. E. McTaggart,* both of Belleville, for
the appellant.

*Nelson J. Ward,* of Belleville, *R. W. Turner,* and *Donald F.
Stanley,* both of Mankato, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This action was brought by the adminis-
trator of Jennet Neil's estate to recover from the estate of
Daniel Neil certain assets of the estate of Jennet, and for an
accounting.

Jennèt Neil died testate in 1905, bequeathing a life estate in all her real and personal property to her husband, Daniel Neil, subject to five specific bequests of. $500 each—one to her husband, and four others. Three nominal bequests were also made, and the remainder, after her husband's death, was to be sold and divided among her brothers' and sisters' children, and three other persons.

The husband, Daniel Neil, qualified as administrator and entered upon his official duties. He paid the four principal legacies of $500 each and filed receipts therefor with the probate court. He made no annual reports, and died in 1912 without a final settlement of Jennet's estate. The plaintiff was appointed to succeed Daniel Neil as administrator, and he brought this action against the administrator of the estate of Daniel.

The defendant's demurrer to plaintiff's petition was sustained, and this brings the case here.

The chief grounds of the demurrer urged by appellee are that the plaintiff has no legal capacity to sue, and that the petition does not state a cause of action.

Can the plaintiff maintain this action? Whatever may have been the rule at common law, it seems clear enough that he can do so under our liberal statutes. (Gen. Stat. 1909, §§ 3445, 3459, 3461, 3544.)

Section 3445 of the General Statutes of 1909 reads:

"The executor of an executor shall have no authority, as such, to administer the estate of the first testator; but on the death of the sole or surviving executor of any last will, administration of the estate of the first testator, not already administered, may be granted; with the will annexed, to such person as the court shall think proper to appoint."

Section 3459 reads:

"When the sole executor or administrator shall die without having fully administered the estate, the court shall grant letters of administration with the will annexed, or otherwise, as the case may require, to some suitable person, to administer the goods and estate of the dedeceased not already administered, if there is personal estate of the deceased not administered to the amount of twenty dollars, or debts to the like amount remaining due from the estate."

Section 3461 reads:

"An administrator appointed in the place of· an executor or administrator who has resigned, been removed, or whose letters have been re-

voked, shall be entitled to the possession of all the personal effects and assets of the estate unadministered, and may maintain an action against the former executor or administrator and his sureties on the administration bond, and for all damages arising from the maladministration or omissions of the former executor or administrator."

Section 3544 reads:

"When any executor or administrator shall die, resign, or be removed, or his letters revoked, without having fully administered the goods and estate of the deceased, a new administrator of the same estate shall be appointed."

Many other provisions of the statute relating to the powers and duties of the executors and administrators (Gen. Stat. 1909, §§ 3436-3645), all *in pari materia,* are to this intendment and effect; and no legal distinctions or limitations can be made as to the rights of a substituted administrator on account of the cause of the substitution, whether it was by the death, resignation, or removal of his predecessor.

In *Toffler v. Kesinger,* 80 Kan. 549, 102 Pac. 1097, the administrator who was appointed to succeed an administrator who had died without having completed the settlement of his testator's estate recovered a judgment against the estate of the first administrator. Then he sued the surety of the first administrator, and that action was the gist of the appeal, for the judgment in the case against the first administrator's estate was not appealed; but the discussion is instructive and harmonizes completely with the statutes quoted above and with appellant's theory in the action at bar.

But it is urged that if this action can be maintained at all, it must be on the administrator's bond. Not necessarily. That may come later. Presumably any judgment recovered by plaintiff will be paid out of the estate of Daniel Neil.

In *Davis v. Clark,* 58 Kan. 454, 49 Pac. 665, it was said:

"The liability of the administrator exists independently of the bond. . . . Our statute, however, gives the substituted administrator the right to maintain an action against his predecessor, as well as the sureties upon his bond." (pp. 458, 459.)

In *Hudson v. Barratt,* 62 Kan. 137, 61 Pac. 737, it was said:

"No good reason can be seen why the sureties on the executor's bond should be required to answer in court and harassed with litigation until it has been determined whether default has been made by the executor, or whether there is any liability on the bond, by the tribunal specially

provided to make such determination. If an accounting is had in the probate court, and the executor makes a complete and satisfactory settlement, and turns over to his successor all the property and assets of the estate in his hands and for which he is accountable, there will be no necessity for litigation with the sureties on the bond." (p. 147.)

It seems clear, also, that the petition stated a cause of action. It is settled law that where an administrator has been supplanted by another, the succeeding administrator is entitled forthwith to the unadministered assets. (*Toffler v. Kesinger*, 80 Kan. 549, 102 Pac. 1097.) And undistributed moneys are "unadministered assets" within our own precedents. (*Musick v. Beebe, Adm'r*, 17 Kan. 47, syl. ¶ 5; *Surety Co. v. Piatt*, 67 Kan. 294, 72 Pac. 775.) If this were otherwise, neither the administrator nor the probate court could ever discharge their duties and close up the estate of Jennet Neil.

It is next urged that by the will of Jennet, Daniel took the personal estate without limitation. A fair reading of the will does not warrant such interpretation. Only the personal estate is involved in this lawsuit, but the will reads:

"I give, devise and bequeath my estate and property both real and personal as follows:

"That is to say, to my dear husband, Daniel Neil, during his natural life time and at his death the property to be sold and divided as follows:

"Among my brothers' and sisters' children, etc.

. . . . . . . . . . . .

"I further bequeath the money on my notes and mortgages as follows:

"$500.00 to Daniel Neil, my husband."

[Four similar bequests to other legatees follow.]

The specific bequest of money to Daniel negatives the contention that he was to have an absolute estate in all the personalty, if, indeed, the text needs the aid of that argument. (See *Chase v. Howie*, 64 Kan. 320, 67 Pac. 822.) But a point is made that the will requires the property going to the remaindermen to be "sold" and divided. And it is urged that money could not be "sold." This reasoning is too subtle. The purpose of selling the property is to reduce it to money, for convenience and exactness in division, but the bequests must not fail nor be diverted because part of the personalty, or all of it, is already in cash ready for division.

Still another point raised is the statute of limitations. We fail to see its application. It is not apparent on the face of

the petition. Daniel Neil was in custody of the assets as administrator and also as life tenant. His legal rights to the assets in this dual capacity were so broad and comprehensive that it would have taken considerable ingenuity on his part to so breach his trust, with notice sufficient to bind the other parties interested, as to start the running of any statute of limitations in his own behalf.

The judgment of the district court is reversed with instructions to overrule the demurrer and for further proceedings consistent herewith.

No. 20,106.

SADIE KING, as Administratrix, etc., *Appellee,* v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. WRONGFUL DEATH—*Collision between Switch Engines at Crossing—Contributory Negligence for Jury.* The testimony relating to a collision between two switch engines at a crossing where the line of one railroad intersected that of another, and which resulted in the death of an engineer in charge of an engine, examined, and it is held that it tends to support the finding of the jury that the collision and resulting death were occasioned by the negligence of the defendant, and that the deceased, who first approached the crossing and gave the required signals and had the right of way, can not be held to be guilty of contributory negligence, although he proceeded to the crossing after he was told by his fireman that the latter did not believe those in charge of the defendant's engine were going to stop and give the signals for the crossing, as they were required to do.

2. SAME—*Contributory Negligence—For Determination of Jury.* The deceased, who had reached the crossing first and given the required signals when the defendant's engine had not yet reached the stopping board, had a right to assume that those in charge of defendant's engine would comply with the rules, stop within the prescribed limits, and yield the right of way to deceased, and as they did not stop and give the required signals, the question whether the deceased exercised due care and diligence thereafter to avoid a collision was one for the determination of the jury.

3. SAME—*Statements of Enginemen—Competent Evidence.* Expressions made by those in charge of defendant's engine immediately after the collision, relating to the care exercised by them in approaching the crossing, are deemed to have been instinctive and spontaneous, and testimony thereof to be admissible as *res gestæ.*

49—97 KAN.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed April 8, 1916. Affirmed.

*W. P. Waggener, A. E. Crane,* both of Atchison, *R. R. Vermilion,* and *O. H. Bentley,* both of Wichita, for the appellant.

*Henry Lampl, Tom Elcock, J. D. Houston,* and *C. H. Brooks,* all of Wichita, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action to recover damages for the death of William King, who was killed on May 9, 1914, in a collision between two switch engines in the city of Wichita. The action was brought by Sadie King, as administratrix of King's estate, for the benefit of herself as his widow. The jury returned a general verdict for the plaintiff and answers to certain special questions.

The collision occurred about 5 o'clock in the morning at a crossing of the Missouri Pacific and Rock Island tracks near Twenty-first street. The Rock Island track runs nearly north and south and that of the Missouri Pacific nearly northeast and southwest. To the northwest and near the crossing was a transfer track connecting the tracks of the two railroads, on which several box cars were standing. King was the engineer of the Rock Island engine, which shortly before the accident was running south towards the crossing, tender foremost, pulling several cars. Besides King and his fireman, there were two switchmen aboard. At Twenty-first street, which crosses the Rock Island track at a point three hundred thirty-two feet north of the crossing, the engine stopped and whistled twice for the crossing, and then proceeded again at a rate of about three or four miles an hour. As the engine was leaving Twenty-first street, one of the switchmen noticed the Missouri Pacific engine coming toward the crossing from the southwest and told the fireman about it. The latter immediately climbed up into his seat and observed that the Missouri Pacific engine, which was then about one thousand feet away, was coming at a rapid rate, and thereafter he kept a watch on the progress of the Missouri Pacific engine until the collision took place, except for a brief moment while the engine was passing the box cars

on the transfer track. The fireman had immediately notified King of the approach of the Missouri Pacific engine, telling him that the engine was still coming and that he did not believe it was going to stop for the crossing, and the reply of King was, "Watch him," or an expression of that import. According to the fireman's testimony, the approaching engine at this time was still within the limits for stopping; that is, between two hundred and eight hundred feet from the crossing. King made no effort to stop his engine afterwards except that there was a little slackening of speed immediately before the collision. The Missouri Pacific engine, which had no cars attached, approached the railway crossing at a rate of speed estimated by some of the witnesses to be twenty-five miles an hour. King and those with him seemed to have proceeded on the theory that he had the right of way, and that those in charge of the Missouri Pacific engine would stop and give the Rock Island engine time to pass over. The Missouri Pacific engine struck the tender of the Rock Island engine, pinning King underneath and killing him. The jury found that the defendant was negligent in not keeping a proper lookout for the Rock Island engine, also in approaching the crossing at an unlawful rate of speed, and further in running the crossing without stopping and giving the required signals. There were additional findings that the Rock Island engine had the right of way over the crossing, that the fireman saw the Missouri Pacific engine approaching in the distance and informed King that it was coming. It was also found that the fireman said to King that he did not believe that the engine was going to stop, and in reply King said, "Watch him." There was a further finding that King at that time had his engine under control and could have stopped it in a distance of twenty-five feet but did nothing toward stopping it.

It is insisted by the defendant that under the evidence as well as the findings King was guilty of contributory negligence which bars a recovery. The contention is that he was given timely warning of the approach of the Missouri Pacific engine, that his own was then under control running at a rate of about four miles an hour, and yet he did nothing to stop his engine or to avoid the collision. It can hardly be said, however, that the neglect of King was the proximate cause of the

collision and of his own death. He had the right of way over the crossing, and when he stopped and whistled, about three hundred and thirty feet from the crossing, the Missouri Pacific engine was then more than a thousand feet from the crossing. He proceeded slowly towards the crossing, and when about three car-lengths from the crossing, or one hundred feet, and although he was told by the fireman that the Missouri Pacific engine was coming and that those in charge of it acted as if they were not going to stop, it can hardly be said he was inattentive to his duties or took no precaution thereafter, because he admonished the fireman to watch them. The fireman who made this statement testified that he did not know whether or not the Missouri Pacific engine was going to stop, saying: "I did not know positively whether it was going to stop until it hit us." Notwithstanding the remark of the fireman, King had a right to expect that the other engine would stop and whistle as the rules and regulations required. The Missouri Pacific engine was still beyond the whistling post and in the limits within which the stop was to be made. Naturally he would think that the surmise of the fireman was not well founded, but at any rate he did not neglect the warning, as he said: "See if they stop and whistle." It does not appear that the fireman told King the result of the watch he was admonished to keep. According to the testimony of the defendant's witnesses the Missouri Pacific engine afterwards almost came to a stop when it was between two and three hundred feet from the crossing, where it is said one of the switchmen jumped off and went in front of the engine to obtain an order from the bill box. Whatever the fact may have been in this regard, the statement of the fireman that the engine was not going to stop was only a surmise, and the fact that it was made neither convicts nor absolves King of the charge of negligence. He could not absolutely rely on or be governed by the speculation of the fireman as to whether there was danger in proceeding nor upon his assurances that there was no danger. It still devolved upon him to use his eyes and ears and to exercise ordinary care in handling the engine and in avoiding the collision. The warning of the fireman was, of course, to be taken into account by the jury in determining whether he was exercising due care, but it was still incumbent on King

to decide for himself whether or not he could proceed over the crossing. Whether he exercised ordinary care under the circumstances in proceeding was a question for the determination of the jury. The jury have said that notwithstanding the statement of the fireman, King did not fail to exercise due care; that is, the care which ordinarily prudent persons exercise under similar circumstances. He had a right to assume, and probably did assume, that those operating the Missouri Pacific engine would obey the rules requiring them to stop and signal when they approached the crossing, and that they would yield the crossing to his engine, which clearly had the right of way and was then almost on the crossing. The special findings are not deemed to be inconsistent with the general finding which held King to be free from negligence, and upon the evidence it can not be said as a matter of law that King was guilty of contributory negligence.

An objection was made to the admission in evidence of statements made by the engineer and fireman in charge of the Missouri Pacific engine immediately after the collision, wherein it was testified that Norris, the engineer, said to Dotts, the fireman: "I thought you said the crossing was clear," and Dotts answered: "I did n't tell you any such damn thing," or words to that effect. The objection then made was that the evidence was incompetent, was not proper impeaching testimony, and no proper foundation had been laid. The contention now is that the objection should have been sustained because it was hearsay testimony, but, as has been seen, that was not the objection which was made when the testimony was produced. It is next said that the testimony could not be admitted in the case unless it was part of the *res gestæ*. The statements made by them immediately after their engine had struck and overturned that of King, killing him, was, in the nature of things, instinctive and spontaneous. They were made, too, by participants in the collision and so closely connected with the collision as to be a part of it. Within the authority of *Denver v. Railway Co.*, 96 Kan. 154, 150 Pac. 562, the statements were admissible as *res gestæ*.

There is some complaint of an instruction as to which of the engines had the right of way at the crossing. There is a rule to the effect that the senior company, which is the Mis-

souri Pacific, has the right of way where the engines simultaneously approach a crossing, and the jury were advised that if the two engines approached simultaneously the Missouri Pacific became entitled to the right of way, and in that event it was the duty of King to yield it to those in charge of the Missouri Pacific engine. On the other hand, they were told that if the engines did not approach the crossing simultaneously, but that King's engine came to a stop and gave the signal before the other had reached the crossing-post or had stopped and given the signal, it could not be said that there was a simultaneous approach to the crossing, and that King would therefore have the right of way over the crossing. Under the testimony, the approach of the Rock Island engine was so much earlier than that of the Missouri Pacific that there is no substantial basis for a claim of simultaneous approach and no possible error could have resulted from the instruction. The charge given fairly covered all the issues in the case, and we find nothing material in the complaint made as to those given or refused.

The judgment is affirmed.

---

No. 20,109.

WILLIAM J. ESTES, revived in the name of LAURA J. ESTES, as Administratrix, etc., *Appellee,* v. THE EDGAR ZINC COMPANY, *Appellant.*

#### SYLLABUS BY THE COURT.

1. DEATH OF PLAINTIFF—*Revived in Name of Administratrix—Sufficient Amendment to Petition.* While the action was pending the plaintiff died. The action was revived in the name of his administratrix, who by leave of court filed an amendment to the petition for the purpose of showing her authority to prosecute the action. The amendment stated that the plaintiff died intestate, a resident of a certain county, that by the consideration of the probate court of that county she was duly appointed administratrix of his estate, that she had duly qualified as such administratrix, and that she was the duly qualified and acting administratrix of the plaintiff. *Held,* the amendment was sufficient against an objection to the introduction of evidence.

2. PRACTICE, SUPREME COURT—*Second Review of Case—Issues Determined on First Appeal.* The plaintiff recovered judgment against the defendant. On appeal to this court the judgment was reversed on a

Estes v. Zinc Co.

specific ground and the cause was remanded for a new trial. The plaintiff again recovered and the defendant again appeals. *Held*, the defendant is not entitled as a matter of right to urge defects in the proceedings which might have been presented on the former appeal but which were not, or matters which were presented and decided on the former appeal.

3. SAME. To prevent the possibility of a miscarriage of justice the court has examined all the assignments of error relating to matters which were or which might have been decided on the former appeal and is satisfied that the defendant has not been prejudiced in any of its substantial rights.

4. TRIAL—*Refusal to Submit Special Questions Asked—No Error.* The refusal of the trial court to submit to the jury certain special findings of fact held to be without prejudice in view of other findings of fact which were returned.

Appeal from Montgomery district court; THOMAS J. FLAN-NELLY, judge. Opinion filed April 8, 1916. Affirmed.

*O. P. Ergenbright,* and *T. S. Salathiel,* both of Independence, for the appellant.

*Chester Stevens,* of Independence, and *Charles D. Welch,* of Coffeyville, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by an employee for damages resulting from personal injuries occasioned by the negligence of his employer. The plaintiff recovered. On appeal to this court the judgment was reversed because of a special finding that there was no evidence relating to a material fact, and a new trial was ordered. (*Estes v. Zinc Co.,* 91 Kan. 138, 136 Pac. 910.) Before the second trial the plaintiff died. The action was revived in the name of the plaintiff's administratrix, who prosecuted it to judgment. The defendant was again defeated and again appeals.

The defendant raises the question whether or not the record discloses a proper party plaintiff. The petition was amended by leave of court for the purpose of showing the appointment and qualification of the administratrix in whose name the action had been revived. The amendment reads as follows:

"Comes now Laura J. Estes, widow of William J. Estes, the above named plaintiff and for an amendment to the petition herein, she alleges

that William J. Estes, the above named plaintiff, departed this life intestate on the 25th day of January, 1914, during the pendency of this action; that at the time of his death he was a resident of Montgomery County, Kansas, and that on or about the 14th day of March, 1914, by the consideration of the Probate Court of Montgomery County she was duly appointed Administratrix of his estate, and that she has duly qualified as such Administratrix and is now the duly acting and qualified Administratrix of the estate of William J. Estes, deceased.

"That afterwards, to-wit, on the 14th day of November, 1914, on motion this court duly made an order reviving the above entitled action in her name as Administratrix of the estate of William J. Estes, deceased, and that she desires by this pleading to amend the original petition in this action, and that said action proceed on said petition as amended hereby."

No objection was made to the form of the amendment and no issue was taken upon it. At the beginning of the trial an objection was made to the introduction of evidence under the amended petition for the reason it did not state facts sufficient to constitute a cause of action in favor of the plaintiff. It is said that the amendment did not present in issuable form the facts from which the legal conclusion of due appointment and qualification might be deduced. The cases of *City of Atchison v. Twine,* 9 Kan. 350, and *C. B. U. P. Rld. Co. v. Andrews, Adm'r,* 34 Kan. 563, 9 Pac. 213, are cited. In those cases no amendment whatever was made to the petition. It does not take much of a pleading to be good against an objection to the introduction of evidence. Conclusions which apprise the opposite party of what is claimed are sufficient against such an objection, and, indeed, conclusions of that kind are sufficient against a formal demurrer when no motion to make definite and certain has been interposed. Besides this, as the court has remarked on numerous occasions, the important thing is not whether the technical requirements of the old artificial system of framing sharp issues has been complied with, but whether the plaintiff has stated what he claims in such a way that the defendant may know what he has to meet. It was important that the defendant should not be compelled to pay damages due to William J. Estes in his lifetime to some one not authorized to receive them, or to defend an action which might lead to that result. When Laura J. Estes came in and stated that while the action was pending William J. Estes died intestate, a resident of Montgomery county, that by the consid-

eration of the probate court of Montgomery county she was duly appointed administratrix of his estate, that she had duly qualified as such administratrix and was acting in that capacity, and that she desired the action to proceed on the original petition amended by her statement, she came very near to stating all that good pleading required. The defendant was quite as fully advised of the nature of her claim as if she had pleaded her letters of administration, the taking of her oath, and the giving of her bond and its approval, all matters of record which she was not required to exemplify. The defendant could not sit by until the trial was on and then say it was confronted by nothing at all. Furthermore, before the plaintiff's case was closed the records and documents were produced in evidence, which established the right of the administratrix to prosecute the action. Their authenticity and probative force were not contested, and no claim is now made that the administratrix did not in fact have capacity to prosecute the action. Objection was made to the proof but the defendant did not undertake to meet it in any way. There is not now and there never has been any doubt whatever that Laura J. Estes in her representative capacity was the proper party and had the right to go on with the litigation, and if the amendment to the petition were to be regarded as materially defective this court would now treat the petition as properly amended to conform to the proof.

The material facts of the case were sufficiently stated in the former opinion. Perhaps there should be added to the former statement the fact that the gear shifting device was located on the third floor of the building and that the line shaft was on the second floor. The evidence given by the deceased plaintiff at the former trial was read to the jury, and all the important and controlling evidence on behalf of the plaintiff at the second trial was substantially the same as at the first trial, with this addition: a witness not previously produced told of an instance when the machinery started apparently of its own accord, and testified that after the plaintiff was injured the line shaft was found to be four inches lower at one end than at the other, which would make one side of the belt tighter than the other and would cause the belt to run to the tight side. The defend-

ant introduced no evidence and the same instructions were given the jury as before.

The defendant assigns as error the overruling of a motion to make the original petition more definite and certain and the overruling of a demurrer to the original petition. The defendant further assigns as error the admission of certain evidence which was admitted at the first trial, and under an assignment that the court erred in overruling a demurrer to the evidence discusses the effect of evidence which was given at the first trial. The defendant is not entitled, as a matter of right, to be heard upon these assignments of error. On the former appeal the sufficiency of the petition was not challenged and the action of the court in admitting the evidence objected to was not challenged. It was argued that the plaintiff assumed the risk of his injury and that the evidence was insufficient to sustain a verdict in his favor. Defects in the proceedings which might have been presented on the former appeal, but which were not, were waived, and matters which were presented and which were decided against the defendant were concluded by the former judgment of this court which set aside the verdict because of a single fact, the special finding referred to.

"Whatever therefore, was at that time decided, is not now a matter for reëxamination. Nor is this limited to the mere questions noticed in the opinion, nor indeed to the actual matters presented by the respective counsel, and considered by the court. . . . A party may not settle the law of his case by piecemeal before this court, any more than he may settle the facts in that way before the district court." (*Headley v. Challiss*, 15 Kan. 602, 606, 607.)

This is the prevailing rule governing appellate practice. (3 Cyc. 398.) Simetimes, however, something of vital importance may have been overlooked on a former appeal which it would be wrong to ignore on a second appeal through slavish adherence to rule. Likewise it may be clear that the court made a serious mistake in its former decision and that greater injustice would result from it than would result from nonadherence to a salutary rule. Other grounds may exist for recognizing an exception to the general rule. (*Lorimer v. Fairchild*, 68 Kan. 328, 75 Pac. 124.) This being true, the court has investigated the assignments of error far enough to satisfy

itself that the defendant has not been seriously prejudiced in any of its substantial rights.

The petition stated a cause of action the nature of which, if not clearly understood before, was made very plain at the former trial. The evidence relating to the construction of the north elevator illustrated the defective construction of the south elevator boot. The letter objected to did not determine the answers to special questions which established liability, and the verdict was not excessive. The plaintiff testified that he pulled the machinery out of gear and, as the former opinion stated:

"We think the candor of the plaintiff was not only commendable, but that it did not weaken the force of his testimony or make it less convincing than a positive assertion of actual knowledge that the belt was out of gear." (91 Kan. 140.)

The plaintiff's statement that after he removed the obstructing ore "it did not go" did not completely destroy the force of his testimony that he pulled the machinery out of gear and his testimony indicating the belt would have burned out if the machinery had been in gear during the time he was cleaning out the boot. There was abundant evidence that the belt would shift of its own accord from the loose to the fixed pulley and thus unexpectedly start the machinery in motion. A sufficient explanation of this fact was found in the improper alignment of the power shaft, and the jury did not go contrary to the testimony of the expert witness, Mishner, in finding that the machinery got in gear because of "defective line shaft." In shifting the belt, force applied on the first floor of the building operated a device on the third floor which accomplished the desired result on the fourth floor, and the plaintiff was not obliged to confine either allegation or proof that the machinery was defective because it would go in gear automatically to any specific floor. Because the machinery would go in gear of its own accord, and because of the construction of the boot, the plaintiff did not have a safe place to do the work of taking out ore when the elevator clogged. On an occasion some three weeks before the plaintiff was injured he was working at the north crusher. He saw that the elevator of the south crusher (the one which injured him) had stopped and he pulled the rope to throw it out of gear to prevent the

belt from burning. Some time afterwards the defendant's machinist came to him, said the belt was burning, and asked the plaintiff why he had not thrown it out of gear. The plaintiff replied he had done so. At that time he could smell the burning belt. He did not know certainly whether he had succeeded in throwing it out of gear or whether it had worked back in gear. The fact that the plaintiff acquired this knowledge in this way of a single instance of irregular action on the part of the machinery did not establish the defense of assumed risk as a matter of law.

The defendant's request that the following questions be submitted to the jury was denied:

"Was it a rule of Edgar Zinc Company, defendant, that no employee should go down into the basement to unchoke the elevator boot without first knowing that the drive belt was out of gear?

"When William J. Estes went down into the basement to unchoke the elevator on the morning that he was injured, did he know that the drive belt was out of gear?

"Is it not a fact that William J. Estes could have determined with certainty whether or not the drive belt was out of gear before he went down into the basement?"

In a whip-sawing examination of the plaintiff he said he did not know whether or not he had thrown the machinery out of gear before commencing work in the elevator boot, but he demonstrated by other statements that he had all the assurance that he had done so which reasonable prudence required, considering the character of the belt-shifting apparatus which has been described. The word "know" had two meanings—possession of absolute knowledge, which was immaterial, and full assurance to the exclusion of doubt on the part of a reasonably careful person, which was material. Because of this fact the jury might have been confused by the questions. Any answers the jury might have returned would have allowed continued play upon the two significations. It made no material difference how the questions might be answered if the plaintiff, by employing the usual means in the usual way, threw the machinery out of gear. These subjects were sufficiently covered by the following special findings which were returned:

"Did William J. Estes try to throw the drive belt out of gear before he entered the basement? A. Yes.

"Was not pulling the rope, the end to be pulled being on the first floor,

the method which the defendant provided for the purpose of throwing the said elevator belt out of gear?  A.  Yes.

"State whether or not you find that said Estes pulled the rope in the usual and ordinary way for throwing machinery out of gear prior to commencing work in the elevator boot, where he was injured?  A.  Yes.

"Was the drive belt out of gear when William J. Estes entered the basement?  A.  Yes."

The defendant requested that the following question be submitted to the jury:  "Do you find defendant to have been negligent; if so state in what respect it was negligent?"  The court struck out the latter part of the question  and submitted the first part, which was answered in the affirmative.  The defendant was entitled to know in what respect the jury considered it to be negligent if it were found to be negligent, but no prejudice resulted from the court's action because the jury found the defendant was negligent in the very particulars alleged in the petition, and specified the cause of the machinery going in gear of its own accord, as appears by the following special findings:

"Do you find that the defendant Zinc Company furnished to William J. Estes a safe place to do the work at which he was engaged at the time of his injury?  A.  No.

"Was the failure of the defendant to furnish Estes with safe machinery with which to do the work, the proximate cause of his injury?  A.  Yes.

"Do you find that the elevator went into gear after Estes went down into the basement to unchoke the elevator boot?  A.  Yes.

"Do you find that the elevator belt started in motion while plaintiff was engaged in cleaning out the elevator boot, and without notice or warning to the said Estes?  A.  Yes.

"Is there any evidence before you to show that the drive belt changed of its own motion from out of gear into gear while William J. Estes was engaged in cleaning out the boot of the elevator on the morning when he was injured?  A.  Yes.

"If the drive belt got back into gear while William J. Estes was cleaning the boot, at the time of his injury, is there any evidence to show how it got back?  A.  Yes.

"If the drive belt was out of gear when William J. Estes entered the basement, state how it got in gear?  A.  Defective line shaft."

The judgment of the district court is affirmed.

No. 20,119.

HOWARD A. MILLER, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

INTERSTATE SHIPPING CONTRACT—*Delay—Damages—Time of Commencing Action—Divisible Contract.* A contract for the transportation of an interstate shipment of live stock on the customary printed form used by carriers, and signed by the carrier and the shipper, contained a provision that no action should be maintained to recover any damages for loss or injuries arising out of the transportation unless commenced within six months from the time the loss or injuries occurred. It contained also a number of provisions by which the carrier sought to limit its liability for loss occasioned by its own negligence which are against public policy and unenforceable. *Held,* that the contract is not void *in toto* on the ground that it violates section 20 of the commerce act, approved June 29, 1906, known as the Carmack amendment; that the contract should be regarded as divisible, in view of its general use by interstate carriers with the approval of the interstate commerce commission, and therefore plaintiff's failure to commence his action within six months after the loss and injury occurred bars his right to recover.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed April 8, 1916, Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley,* all of Topeka, for the appellant.

*A. M. Jackson,* and *A. L. Noble,* both of Winfield, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was to recover damages resulting from the delay in the transportation of cattle shipped from Akron, Kan., to Kansas City, Mo., and also for personal injuries to plaintiff while traveling with the stock on a shipper's pass and alleged to have been caused by negligence of the defendant. A trial resulted in a verdict and judgment in plaintiff's favor, from which the defendant appeals.

The answer alleged that the shipment was in accordance with the provisions of a written contract, a copy of which was

Miller v. Railway Co.

attached to the answer, under the terms of which it was agreed that no action should be maintained by the plaintiff to recover any damages arising out of the shipment unless commenced within six months after the loss or damage occurred, and it was alleged that the action was not brought until eight months after the loss and injuries complained of. The only question involved in the appeal is whether the contract is, as alleged in plaintiff's reply, void *in toto* because it violates section 20 of the commerce act, approved June 29, 1906, known as the Carmack amendment. The trial court instructed the jury that the contract is void because of certain provisions therein whereby the defendant sought to limit its liability in violation of the federal law, and therefore instructed that the failure to bring the action within six months would not defeat the plaintiff's right to recover.

The plaintiff concedes that at the time the contract was entered into the provision requiring the action to be brought within six months was not in violation of the interstate commerce law as it then read, and that in consideration of the reduced rate of carriage it was lawful at that time to agree upon a reasonable time within which the action should be brought; but the plaintiff's contention is that because the contract contains other provisions which are contrary to public policy, and which violate section 20 of the commerce act, the contract is wholly void; that the contract in an entire one and can not be divided as to the consideration. This was the view held by the trial court.

Section 20 of the commerce act, approved June 29, 1906, reads as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; *Provided*, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." (Part 1, 34 U. S. Stat. at Large, ch. 3591, p. 595.)

The shipment here was interstate, and the contract was, of course controlled by the foregoing section of the federal act, which supersedes all regulations and policies of the state on similar matters. (*Adams Express Co. v. Croninger*, 226 U. S. 491, 33 Sup. Ct. Rep. 148.) In that case, as well as in *Kansas Southern Ry. v. Carl*, 227 U. S. 639, 33 Sup. Ct. Rep. 391, the supreme court of the United States has said that this provision is a statutory declaration that a contract for exemption from liability for loss occasioned by the negligence of the carrier is against public policy and void.

The contract in the present case commences with the statement that the rate named in the contract is lower than that made by the railroad company for the transportation of stock at carrier's risk and without limitation of liability, and is based upon the conditions and agreements found in the contract and upon the valuations therein fixed. It contains a recital that the company agrees to transport for the shipper "in consideration of the foregoing and of the mutual covenants and conditions hereinafter contained." The contract is made up of a large number of separate clauses. In one of these the shipper agrees to hold the company not liable for any damage to stock on account of any defects in the cars which are not reported to the agent of the company in writing by the shipper. In another clause the shipper agrees that where the company shall furnish laborers to assist in the loading and unloading of stock it is understood that they are furnished for the accommodation of the shipper and shall be deemed the employees of the shipper while so engaged, and the company will in no wise be liable for their negligence. In the sixth numbered clause of the contract the shipper assumes and releases the company from risk of loss, injuries and delays caused by "any mob, strike, threatened or actual violence to real or personal property, or by the refusal of the company's employes to work or otherwise, or by failure of machinery, engines or cars, or injury to tracks or yards, storms, washouts, escape or robbery of any of said stock, overloading cars, fright to animals, or crowding one upon another, or from any and all other causes whatever."

On the back of the shipping contract and as part of it the shipper or person in charge of the stock, in consideration of

the free pass granted him, agrees that the company shall not be liable for any injury or damage sustained by him while in charge of the stock or on his return passage.

The contract is the usual shipping contract, which has frequently been before this court in actions involving the validity of some particular clause thereof, and is apparently the form in general use by common carriers. The question here involved has never before been suggested in this court. We have not been referred to any cases where the federal courts in passing upon the provisions of section 20 of the commerce act, known as the Carmack amendment, have had the precise question before it. The authorities upon which plaintiff mainly relies, aside from the decisions holding that certain of the provisions in this contract are void as against public policy, are cases which declare the doctrine announced in *Peckham v. Lane,* 81 Kan. 489, 106 Pac. 464, where a contract was held to be invalid on the grounds of public policy, there being no statute law prohibiting the act which furnished the consideration, nor any penalty fixed by law. In that case the substantial consideration for the conveyance of certain land to Peckham was the location of a station upon lands of defendant. The selection of the site for the station was an act committed to Peckham in his capacity as an officer of the corporation. It was held that the contract showed on its face that Peckham sought to derive a personal benefit from an act performed by him in behalf of the company in which he was bound to be guided only by regard for its welfare, and that because all contracts which tend to place officers under an inducement to disregard their duties to the corporation and to decide questions from a standpoint other than that of the company's good are void on grounds of public policy, therefore Peckham could maintain no action upon the contract. In this class of cases the contract is held to be against public policy on moral considerations, and as was said in the opinion, "the authorities are practically unanimous" in holding that such a contract constitutes a fraud or breach of trust on the part of the person who stands in a fiduciary relation to others. We think it is quite evident that the reasons for holding contracts of this character unenforceable can not be said to apply to the contract in the present case.

Another line of authorities relied upon is illustrated by the recent case of *Ridgway v. Wetterhold,* 96 Kan. 736, 153 Pac. 490. The contract there was to convey an interest in a patent right, the vendor having failed to comply with the provisions of a statute forbidding sales of any interest in a patent right unless the letters patent had first been filed for record in the county where the transaction took place. The statute declared the contract unlawful, and in addition made the owner liable to fine and imprisonment for violation of the statute. The contract was held not divisible, but entire, and being void by statute, no action to enforce any part of it could be maintained.

The contract in the present case contains a number of provisions which on their face are void. It is unnecessary to consider the reasons why they are unenforceable because they are only indirectly involved in this controversy. As to some of them, at least, it is not and can not be seriously contended that they are valid.

It will be observed that congress has not so far declared it to be a misdemeanor for the carrier to attempt to limit its liability by including in the shipping contract provisions contrary to the terms of the statute. If the statute were construed liberally it might be said even to contemplate the probability that carriers will in some instances issue receipts and formulate rules and regulations seeking to avoid the liability imposed by section 20. The statute merely declares that "no contract, receipt, rule, or regulation" shall relieve or exempt the carrier "from the liability hereby imposed." There is the further provision "that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law."

It appears from the abstract that the defendant has filed with the interstate commerce commission its two rates for the shipment of live stock and its form of contract where, as in this case, the stock is shipped on the lower of two rates.

The common law at first made the common carrier an insurer as to freight, and recognized but two exceptions—loss occasioned by the act of God, or of the public enemy. (Angell on The Law of Carriers, §§ 67, 135, 148; *Hale v. New Jersey Steam Navigation Company,* 15 Conn. 539, 39 Am. Dec. 398.)

In the gradual development of the law in relation to carriers the courts in furtherance of justice found it necessary to add other exceptions, and so where the loss was caused by some act of the shipper the carrier was relieved of liability. (*Hart v. The Chicago & N. W. Ry. Co.*, 69 Iowa, 485, 29 N. W. 597.) Likewise the courts found it necessary to engraft other exceptions, and declared that where the loss was occasioned by act of the public authorities the carrier should not be held, and that where the injuries or loss resulted from the inherent defects or essential qualities of the articles or merchandise the carrier should be relieved from liability. (*Evans v. Fitchburg Railroad Company*, 111 Mass. 142, 15 Am. Rep. 19.) It finally came to be held by the courts generally that the carrier may limit its liability to a certain extent by special contract, but these contracts being in derogation of common law have always been strictly construed and never enforced unless shown to be reasonable. (*Hinkle v. Railway Co.*, 126 N. Car. 932, 36 S. E. 348, 78 Am. St. Rep. 685.) Other exceptions were allowed where the strict common-law rule would work great hardships on the carrier, such, for instance, as where goods of great value, or subject to extra risk, were delivered to the carrier without notice of their character and contrary to published notices requiring shippers to inform the carrier of the extrahazardous nature or value of the goods. A very important modification in recent years is that the carrier is permitted by special contract to limit the amount of damages for which it shall be liable in consideration of accepting the goods at the lower of two published rates of which the shipper is given the choice, but the amount of damages must be reasonable. (*Christl v. Railway Co.*, 92 Kan. 580, 141 Pac. 587; *Kirby v. Railroad Co.*, 94 Kan. 485, 146 Pac. 1183.)

We have a statute which declares that "no railroad company shall be permitted, except as otherwise provided by regulation or order of the board [Public Utilities Commission], to change or limit its common-law liability as a common carrier." (Gen. Stat. 1909, § 7216.) Construing a similar provision in the old law of 1883, the opinion in *Railway Co. v. Sherlock*, 59 Kan. 23, 51 Pac. 899, said:

"The question whether upon common-law principles a common carrier may stipulate with the shipper for exemption from its common-law lia-

bilities is a vexatious and confusing subject of controversy in the courts. By some it is held that the public nature of the business of carrying imposes upon those who assume the conduct of such business, the obligations named, from which they can relieve themselves by no act of their own; that such obligations are conditions annexed to the office, from which the carrier can be exempted only by legislative enactment. Other and perhaps a greater number of cases hold that, while the law will not permit the carrier to contract for immunity from the consequences of its own negligence, it will allow it to agree with the shipper upon the extent of its liability in case of loss by the acts of others or by its own nonnegligent accidents; and still others hold that, while it may not stipulate for total exemption from liability for its own negligence, it may, nevertheless, as in the case of the insurance feature of its obligation, agree upon the extent of its liability in case of loss or injury through its own negligence. . . . What the common law in question really is, has been a subject of contrary opinion in this state. *Express Co. v. Foley,* 46 Kan. 457-472, 26 Pac. 665." (p. 27.)

The fact that the law respecting the right of common carriers of goods to limit by special contract the nature and extent of their liability for loss of this kind has so long remained in a state of comparative uncertainty, subject more or less to change and development by judicial interpretation, furnishes some excuse for the prevailing custom of the carriers to continue to issue bills of lading and shipping contracts containing provisions whereby the carriers seek to limit their liability in respect to matters where the question of their power so to do is involved in doubt. It is obvious, however, from a consideration of the terms and complex provisions of the bill of lading in question that the form of the contract needs drastic revision, eliminating therefrom numerous stipulations and provisions by which the carrier attempts to limit its liability for injuries and loss occasioned by its own negligence and that of its servants—provisions which have long been held by courts everywhere as having no force or virtue because contrary to public policy, conditions and terms which have no binding effect upon the shipper and which are never seriously relied upon by the carrier as defenses.

Section 20 of the commerce act has been in force since 1906. Congress has made elaborate provision for the regulation of interstate carriers by the interstate commerce commission, but it has so far not seen fit to prohibit in express terms the issuing of contracts containing these objectionable conditions.

Meanwhile, the interstate commerce commission has permitted the railways to file with it and publish tariffs based upon a form of contract identical with the one in question. The federal courts and this court have repeatedly upheld the validity of the provision requiring that no action to recover damages to live stock sustained during transportation shall be maintained unless the shipper give notice in writing to the carrier before the stock has mingled with other stock, and unless the action is commenced within a stipulated reasonable time after the loss or injury occurs. (*Nursery Co. v. Nursery Co.*, 89 Kan. 522, 132 Pac. 149; *Ray v. Railway Co.*, 90 Kan. 244, 133 Pac. 847; *Watt v. Railway Co.*, 90 Kan. 466, 135 Pac. 600; *Christl v. Railway Co.*, 92 Kan. 580, 141 Pac. 586; *Kirby v. Railroad Co.*, 94 Kan. 485, 146 Pac. 1183; *Broadhead v. Railway Co.*, ante, p. 222, 155 Pac. 20; *Adams Express Co. v. Croninger*, 226 U. S. 491, 33 Sup. Ct. Rep. 148; *Kansas Southern Ry. v. Carl*, 227 U. S. 639, 33 Sup. Ct. Rep. 391.)

In other words, the federal and state courts as well as the interstate commerce commission have apparently construed the contract in question not as an entire, but as a divisible one, and the provisions as to notice and the time within which actions may be brought as conditions precedent to the right to maintain the action. Up to this time sound public policy in respect to interstate carriers has been more concerned in securing uniformity in the rights and privileges granted to shippers, interstate and intrastate, than in guarding against attempts by carriers to secure unfair advantages by including in their shipping contracts provisions that are unenforceable. The courts in recent years have quite uniformly ignored these unlawful provisions and the public has not suffered. The tendency of legislative thought and of public policy is more and more toward uniform bills of lading, and doubtless when congress or the interstate commerce commission prescribes a form of special contract for shipments of live stock all unlawful and objectionable provisions will be eliminated.

It is against public policy to permit a common carrier to escape liability for loss and injury occasioned by its negligence, and for that reason certain provisions in the contract in question are void; but this is the extent to which the decisions and authorities have gone. It is not necessarily con-

trary to any public policy so far declared by the courts generally or by congress for an interstate carrier to insert in its shipping contracts provisions which for reasons of public policy the courts will not enforce.

Aside from plaintiff's neglect to give certain notices of his loss as provided for in the contract, the failure to bring his action within six months after it accrued as provided in the ninth clause of the contract is fatal to his right to maintain the action (*Watt v. Railway Co.*, 90 Kan. 466, 135 Pac. 600), and this applies to the cause of action for personal injuries as well as that for loss and injury to the live stock (*Barber v. Railway Co.*, 86 Kan. 277, 120 Pac. 359; *Koster v. Railway Co.*, 95 Kan. 109, 147 Pac. 798; *Enright v. Railway Co.*, 96 Kan. 546, 152 Pac. 629).

Plaintiff's testimony that he did not know there were two rates for the transportation of live stock until after the loss occurred can not avail him. The published tariffs were notice to him. (*Christl v. Railway Co.*, supra; *Kansas Southern Ry. v. Carl*, supra.) The shipping contract contained a statement that the agreement to carry the stock at the lower of the two rates was a part of the consideration. Plaintiff admitted that he had made one or two shipments of stock each year for several years and knew that he would be required to sign the contract; that the contract in this case was handed to him ten minutes before the train left. He was given a duplicate copy of the contract, which he used to secure his return transportation. He can not now be heard to say that the shipment was not made upon the written contract. (*Hayes v. Railway Co.*, 84 Kan. 1, 113 Pac. 421; *Barber v. Railway Co.*, supra.)

The judgment is reversed with direction to enter judgment for defendant.

No. 20,121.

THE BADGER LUMBER COMPANY, *Appellant,* v. AMANDA E.
COLLINSON, *Appellee.*

SYLLABUS BY THE COURT.

1. MECHANIC'S LIEN—*Foreclosure—Petition—Misnomer—Amendment—*
*Limitation of Action.* A petition to foreclose a lien for material alleged
that over three hundred dollars had been paid on the account. In the
exhibits the subcontractor's statement named the owner as S. D. C., the
notice of its filing giving her name as Mrs. S. D. C., and the petition
averring that the property belonged to Amanda E. C., and that she
is the same person as the one named in such notice. After a demurrer
had been overruled the petition was permitted to be amended by insert-
ing "Mrs." before the name in the subcontractor's statement. *Held,*
that such amendment was proper although made more than one year
after the filing of the lien. (Civ. Code, § 653.)

2. SAME—*Judgment on Pleadings—Erroneously Given.* In passing on
the motion for leave so to amend the court found that the person named
in the lien statement is the defendant Amanda E. C. and that she "has
been commonly known and designated in her business transactions in
the community in which she lives as Mrs. S. D. C." Thereafter de-
fendant's motion for judgment on the pleadings was sustained. *Held,*
error.

3. SAME. One may, without abandoning his real name and without
fraudulent intent, adopt any name different from his and by which
he may transact business, execute contracts, sue and be sued.

Appeal from Cowley district court; OLIVER P. FULLER, judge.
Opinion filed April 8, 1916. Reversed.

*Albert Faulconer,* and *C. Ward Wright,* both of Arkansas
City, for the appellant.

*C. T. Atkinson,* of Arkansas City, for the appellee.

The opinion of the court was delivered by

WEST, J.: This appeal presents the one question, "What's in
a name?" The defendant, Amanda E. Collinson, is the widow
of S. D. Collinson, who departed this life over fifteen years
ago. In March, 1913, being the owner of certain real estate
which she acquired a few years previously, Mrs. Collinson
made an oral contract with one D. C. Allen to furnish labor and
material and make certain improvements on this property.

Allen contracted with the plaintiff, The Badger Lumber Company, to furnish the material, which it did, and the improvements were made. Afterwards the lumber company filed a lien statement and caused a notice thereof to be served upon the defendant. This suit was brought to foreclose the lien, the petition alleging a payment of over $300 on the material account. In the exhibits it appeared that in the statement for a subcontractor's lien the defendant's name was given as S. D. Collinson, while in the notice of filing it was given as Mrs. S. D. Collinson, but it was averred that the real estate belonged to Amanda E. Collinson and that she is the same person as Mrs. S. D. Collinson mentioned in the exhibits. A demurrer to the petition was overruled, and afterwards by leave of court the prefix "Mrs." was placed before the name S. D. Collinson in the lien statement. After this was done the defendant filed a motion for judgment on the pleadings, which motion was sustained, and from this ruling the plaintiff appeals.

The motion for judgment confessed the allegations of the petition, including the averment that Amanda E. Collinson and Mrs. S. D. Collinson named the same person, the defendant. But it is sought to uphold the ruling on the ground that as the statute requires the name of the owner to be set forth (Civ. Code, § 651) the notice in question was deficient, and *Blattner v. Wadleigh,* 48 Kan. 290, 29 Pac. 165, is cited. It was there held that a statement which does not charge some particular person by name as owner is invalid. Attention was called to the fact that the statement of lien nowhere gave the name of the owner of the lot. But it has never been held by this court that the designation of the owner by the name which he has chosen to use in his business affairs is insufficient. Excessive strictness of construction is not required or permitted either by statute or by decision in this state. (Gen. Stat. 1909, § 9850; *Presbyterian Church v. Santy,* 52 Kan. 462, 34 Pac. 974; *Wall Paper Co. v. Perkins,* 90 Kan. 725, 136 Pac. 324.) Indeed the mechanic's-lien statute itself makes express provisions that "in case of action brought, any lien statement may be amended by leave of court in furtherance of justice as pleadings may be in any matter, except as to the amount claimed." (Civ. Code, § 653.) This was fully recognized in *Atkinson v. Woodmansee,* 68 Kan. 71, 74 Pac. 640. (See, also, *De Klyn v. Gould,* 165

N. Y. 282, 59 N. E. 95, 80 Am. St. Rep. 719; Phillips on Mechanics' Liens, § 342; Bloom, Law on Mechanics' Liens, § 848.)

It is urged that the amendment was erroneously permitted after the statute of limitations had run, contrary to the decision in *Powers v. Lumber Co.,* 75 Kan. 687, 90 Pac. 254. The distinction is that in that case there was a total failure to allege an essential fact and here a failure merely to set out in one statement the prefix in addition to the initials of the name under which the court found the defendant had been transacting business. Whether or not the amendment availed anything, no material error was committed in allowing it to be made. (*Alberti v. Moore, et al.,* 20 Okla. 78, 93 Pac. 543, 14 L. R. A., n. s., 1036; *Eberle et al. v. Drennan et al.,* 40 Okla. 59, 136 Pac. 162, 51 L. R. A., n. s., 68.)

In *Clark v. Clark,* 19 Kan. 522, it was held that a married woman who deserted her husband in another state, and eloped with another man and took up her residence with him in this state, assumed his surname and was introduced as his wife and became known by his name, could maintain in her assumed name an action against her paramour to recover borrowed money. In the opinion it was said that the real party in interest brought the action and that she brought it in the name by which alone she was known in the community in which she lived. (p. 524.)

It appears from the record before us that in ruling upon the motion for leave to amend the court found—

"That the S. D. Collinson owner in the lien statement . . . is the same person as Amanda E. Collinson named as the defendant in this action; that the defendant Amanda E. Collinson, has been commonly known and designated in her business transactions in the community in which she lives as Mrs. S. D. Collinson."

"The Christian name is that which is given one after his birth or at baptism, or is afterward assumed by him in addition to his family name. . . . Without abandoning his real name, a person may adopt any name, style, or signature, wholly different from his own name, by which he may transact business, execute contracts, issue negotiable paper, and sue or be sued." (29 Cyc. 264, 270.)

(See, also, 5 Words and Phrases, p. 4659.)

"A man's name is the designation by which he is distinctively known in the community." (*Laflin & Rand Co. v. Steytler,* 146 Pa. St. 434, 442, 23 Atl. 215, 14 L. R. A. 690, and Note, 693. See, also, *Valiquette v.*

*Clark Bros. Coal Mining Co.*, 83 Vt. 538, 77 Atl. 869, 34 L. R. A., n. s., 440; *De Renzes v. His Wife*, 115 La. 675, 39 South. 805, 2 L. R. A., n. s., 1089, and Note.)

The judgment is reversed and the cause remanded for further proceedings.

---

No. 20,122.

W. A. WEHE, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

AUTOMOBILE—*Crossing Railroad Track—Duty of Driver*. The driver of an automobile can not recover damages for injury to himself and his machine, where he approaches a railway track at a place at which he can not see along the track until his automobile is in a place where it will be struck by a passing engine or cars, and does not stop his car to ascertain whether or not there is danger, although he listens before going into the place of danger and does not hear any engine or cars coming.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed April 8, 1916. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott*, and *Harlow Hurley*, all of Topeka, for the appellant.

*Z. T. Hazen*, and *R. H. Gaw*, both of Topeka, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff recovered judgment for injury to himself and to his automobile, caused by a collision with one of the defendant's cars. The defendant appeals.

The yard of the Uncle Sam Oil Company fronts on the east side of Adams street in Topeka, on which street is a switch track of the defendant and a track of the Missouri Pacific Railway Company. The oil company's buildings and yard are about eight feet from the defendant's track. Because of a stone wall and buildings, it is impossible to see from the inside of the yard north or south along the defendant's track. Such a view can not be had until one is standing in the street in front of the building and within eight feet of the track. The plaintiff had gone to the yard for gasoline over a dozen times.

Just prior to the accident he had his tank filled with gasoline and started to drive slowly out of the yard, across the defendant's track. As he approached the gate, going west, he looked but could not see either north or south because of the buildings. He listened and did not hear any engine or cars. From the front end of his automobile to where he sat the distance was about eight feet. He could not see along the track until the front end of his automobile was where a passing car would strike it. He did not stop nor get out of his automobile to ascertain whether or not there was danger. Mr. Allen, one of the Uncle Sam Oil Company's employees, went outside the building to see if there was danger, at the same time the plaintiff started to go out with his automobile. When Mr. Allen got outside he saw a Santa Fe switch engine pushing two freight cars from the south. He immediately called to the plaintiff to "Look out!" and signaled to the trainmen to stop. At the same time the plaintiff's car came through the doorway approaching the defendant's track. A brakeman on the car immediately signaled the engineer, who at once applied the emergency brake, and the cars were stopped after running from ten to twenty feet. The plaintiff heard Allen's call and set the brakes as he approached the gate, but did not understand what the call was for and went ahead. Then through the crack between the gate post and the building to his left he saw the cars coming, and stopped the automobile. It was caught by the stirrup of the first car, dragged about ten feet, and damaged. The plaintiff was bruised. The engine and cars were coming down grade without steam pressure, moving about four miles an hour. The engine bell was not ringing. No whistle had been sounded.

The only question in the case is, Was the plaintiff, as a matter of law, required to get out of his automobile and ascertain whether or not an engine or cars were coming?

In *Jacobs v. Railway Co.*, ante, p. 247, 154 Pac. 1023, this court said:

"It has been held that it is the positive duty of the driver of an automobile to stop, look and listen before crossing railroad tracks. . . . On the other hand, it has been held that the driver of an automobile is not under all circumstances as a matter of law required to stop before crossing a railroad track. . . . This state follows the rule last stated." (p. 251.)

In *Railroad Co. v. Brock,* 64 Kan. 90, 67 Pac. 538, in the opinion written by Chief Justice Doster, this court said:

"The cases are rare indeed in which the question of the obligation of a traveler about to undertake the crossing of a railroad-track to stop in order the better to employ his senses of sight and hearing should not be submitted to the jury. There may be cases, possibly, in which none of the evidence tends to show that it would have been the part of wise caution to stop, and there are occasionally cases in which the evidence proves without doubt that the traveler should have stopped. In the latter class the obligation to stop must be declared as a matter of law by the court. (*Railroad Co. v. Willey,* 60 Kan. 819, 58 Pac. 472.) In all other cases we think the question of the plaintiff's justification in omitting the precaution should be submitted to the jury." (p. 92.)

A part of the opinion in *Denton v. Railway Co.,* 90 Kan. 51, 133 Pac. 558, is:

"Findings were made to the effect that the position of one of the freight cars obscured the view of the track so that the front of the automobile was on the track before the driver was able to see the engine. In somewhat similar situations it has been held that the question whether the exercise of due diligence required the traveler to stop, as well as to look and listen, is a question for the jury. . . . In exceptional cases the court has declared the failure to stop to be negligence as a matter of law." (p. 55.)

In *C. K. & W. Rld. Co. v. Fisher,* 49 Kan. 460, 30 Pac. 462, in the opinion by Valentine, J., this court said:

"We think the judgment of the court below must be reversed. In our opinion, it is the duty of any person intending to cross a railroad track where he knows that trains frequently pass, and where he knows that one is likely to pass at any moment, to look as well as to listen, and if dust should temporarily obscure his view, to wait until the dust shall pass away before he attempts to cross." (p. 485.)

This was quoted in *Butts v. Railway Co.,* 94 Kan. 328, 331, 146 Pac. 1142. The syllabus to *Railroad Co. v. Willey,* 60 Kan. 819, 58 Pac. 472, reads:

"When a traveler on a country highway comes to a railway-crossing with which he is familiar, knowing that a train is about due at that point and liable to pass at any time, it becomes his duty as an act of ordinary prudence to look and listen for its approach; and if the sense of sight be unavailing because of obstructions to the view, and the sense of hearing unavailing because of preventing noises, it becomes his duty, as a further act of ordinary prudence, to stop in order better to enable him to look and listen before entering upon the crossing; and in such case, if by stopping he can see or hear the approaching train, but fails to do so, his negligence in such respect should be declared as a matter of law, and not left to the determination of the jury as a question of fact."

This was followed in *Railroad Co. v. Mercer,* 61 Kan. 736, 60 Pac. 735; *Adams v. Railway Co.,* 93 Kan. 475, 144 Pac. 999; *Railway Co. v. Moore,* 10 Kan. App. 510, 63 Pac. 458.  In *Railway Co. v. Jenkins,* 74 Kan. 487, 87 Pac. 702, it was held that a traveler upon a highway should have stopped to look before driving his team upon a railway crossing.  The syllabus in that case when it was a second time before this court (79 Kan. 17, 98 Pac. 208) reads:

"The rule applied that if one about to cross a railroad track voluntarily creates such conditions that he can not by looking without stopping see an approaching train in time to prevent a collision he assumes the additional duty to stop and look, if by so doing he can protect himself."

"A traveler whose deafness prevented him from hearing the warning signals of an approaching train at a dangerous crossing with which he was familiar, drove upon the track and was struck by the train and injured.  His failure to stop and look from a position where he could have seen the train in time to avoid the injury is contributory negligence which will prevent his recovery in an action against the railway company." (*Butts v. Railway Co.,* 94 Kan. 328, syl., 146 Pac. 1142.)

A pedestrian is required to be diligent in looking out for his own safety in crossing a railroad track, but his duty is not very great to avoid running into a passing engine or train because of the danger of injury to those on the engine or train. The driver of a team of horses hitched to a vehicle is under the same duty to look out for his own safety as is the pedestrian. It is his duty to exercise some care for the safety of those riding on a train.  The driver of an automobile must exercise care for himself, and because of the character of the machine that he is driving—a heavy steel structure, dangerous to others—he must exercise some degree of care for the safety of those rightfully traveling on a railroad train when he is about to cross the track.  His machine is easy of control.  It will stand where he leaves it.  It will not get frightened.  If by his negligence he should derail the train he would be responsible to passengers injured, even though the men in charge of the train were guilty of negligence, if the rule applied to a passenger in an automobile when the driver of the automobile is guilty of negligence is applied to passengers on a train.  Under the circumstances surrounding this case, the plaintiff, being unable to see the engine and cars on the track until his machine was in a place of danger, was

as a matter of law required to stop his automobile and see whether there was an engine or cars coming before he drove his automobile on the defendant's track.

The judgment is reversed and judgment is directed for the defendant.

JOHNSTON, C. J., is of opinion that the evidence in the case does not warrant the court in holding as a matter of law that the plaintiff was guilty of contributory negligence and therefore dissents from the order directing judgment for the defendant.

---

No. 20,123.

THE EXCHANGE STATE BANK, *Appellant*, v. W. M. JACOBS et al., *Appellees*.

### SYLLABUS BY THE COURT.

1. PLEADINGS—*Pleading a Conclusion of Law—Motion to Strike Out.* Pleadings being for the information of the court and the litigants and not for submission to the jury, it is not ordinarily reversible error to overrule a motion to strike out a defense which pleads a conclusion of law even though such pleading be an erroneous statement of law.

2. PARTNERSHIP NOTE — *Liability of Partners — Competent Evidence.* Where, in a defense to a partnership note, the testimony of a witness was offered which tended to show that the note in question was a mere renewal of the individual obligation of one of the partners, it was proper to cross-examine the witness with a view to developing these facts completely and precisely, and sustaining an objection to such cross-examination was erroneous and prejudicial.

3. SAME. In an action to recover on a note alleged to have been executed on behalf of a partnership, where evidence of a defendant partner was given to the effect that owing to the confused state of the partnership accounts the defendant and his partner "could not complete the partnership," when the partnership had in fact been formed and had been in effect for three months at the time to which the evidence referred, such evidence was incompetent and its admission tended to, confuse and mislead the jury as to the legal responsibility of the defendant as a partner.

4. PARTNERSHIP — *Implied Liability of Each Partner — Partnership Notes.* Proof of a trading partnership having been established, the authority of each partner to execute promissory notes in furtherance of the partnership business is implied by law, and it was incompetent

and prejudicial to permit a defendant partner to testify before the jury that he had not in fact authorized his partner to sign any notes for the partnership firm.

5. SAME — *Partnership Note — Trial — Evidence — Demurrer.* Although the lawful defenses of a partner sued on a partnership note are narrow and limited, yet a demurrer to the evidence in support of such a defense is properly overruled if the evidence contains but a modicum of probative value tending to show the nonliability of the defendant partner.

6. PARTNERSHIP NOTE — *Instructions as to Liability of Each Partner.* Where a trading partnership has been established by the facts and no notice of its discontinuance or dissolution has been given, a plaintiff is entitled to have a plain and simple instruction given to the jury declaring the liability of each partner on a partnership note issued in furtherance of the partnership business, notwithstanding that other instructions may properly have been given covering the lawful defenses pleaded by the defendant partner.

7. SAME—*Debt for Which Note Was Given.* In an action on a partnership note the right of the plaintiff holder to recover thereon is not affected by a question whether the proceeds of the note were in fact used for the benefit of the firm or its business.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed April 8, 1916. Reversed.

*Paul H. Kimball,* and *Webster W. Kimball,* both of Parsons, for the appellant.

No appearance was made for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action by the appellant bank against W. M. Jacobs and Adam Faust to recover on a note executed and signed by Adam Faust, Lula Faust, his wife, and "American Home Bakery," it being alleged that Jacobs and Faust were engaged in the bakery business as partners and that the consideration for which the note was given was for the use of the partnership and used for its benefit, and that the note was not the obligation of Faust and wife individually. The petition also alleged that the signature, "American Home Bakery," was written by Adam Faust and that Jacobs had ratified it.

The note was dated November 21, 1913. On December 16, 1912, Faust and Jacobs made a written agreement to form a

partnership to operate a bakery under the firm name of "Adam Faust & the American New Home Bakery," in which it was provided that after certain allowances were made to Jacobs for moneys contributed, each was to share the profits and losses equally.

Jacobs' answer alleged that, pursuant to the partnership agreement, he furnished Faust at different times the sums of $1000, $300 and $300 respectively; that at the time of the partnership agreement Faust informed him that he had outstanding indebtedness in the sum of $1000 and not more; that about March 15, 1913, Jacobs examined the books and accounts and found that Faust's indebtedness was much greater than Faust had represented to him, and that the books had not been correctly kept, and that Jacobs could not ascertain the condition of the business; and on this date, March 15, 1913, he and Faust entered into an oral agreement that they should not enter into the partnership and that Faust should pay Jacobs eight per cent interest on the moneys advanced by Jacobs; and that afterwards Jacobs advanced and loaned to Faust further sums, to wit: $400 on March 20, 1915, and $300 on November 19, 1913.

Defendant Jacobs also pleaded certain transactions between the plaintiff bank and Faust, beginning with Faust's note discounted on February 6, 1913, and concluding with the note in controversy which was alleged to be a renewal of earlier individual notes of Adam Faust and wife and not acquired on defendant's credit as a partner.

It was neither pleaded nor proved that any notice of the dissolution or abandonment of the partnership was given publicly or otherwise brought to the knowledge of the plaintiff. The verdict and judgment were in favor of defendant and the bank appeals. The errors assigned will be examined in the order presented.

1. Plaintiff moved to strike out the third defense, which was an allegation that Faust had no authority to sign partnership notes for Jacobs. This motion was overruled. Of course, if Jacobs and Faust were partners, Faust did have authority to execute partnership notes in furtherance of the partnership business. (*Mills v. Riggle*, 83 Kan. 703, 705, 112 Pac. 617; 30 Cyc. 479; 9 M. A. L. 355.) But since the pleadings are for

the information of the court and the litigants, and not for the consideration of the jury, no error in the final result can clearly be traced to this assignment.   (Civ. Code, § 581; 31. Cyc. 642, 643.)

2. The defendant called the bank cashier as a witness to prove that the note in controversy was but a renewal of earlier individual obligations of Faust, and over plaintiff's objection testified concerning earlier notes, discounts and renewals between Faust and the bank.   On cross-examination by the plaintiff, this question was asked:

"Q.  Referring to the note for $500, which renewal is shown to you, dated in February, 1913, do you recall the circumstances of the discounting of that note by your bank?

"Defendant objects as not proper cross-examination.

"Objection sustained.   Plaintiff excepts."

This referred to a note for $500 dated February 10, 1913, payable to the bank's order due in ninety days, and signed by Adam Faust.   Since the purpose of the testimony developed by defendant was an attempt to trace the note sued on back through renewals to the individual obligation and not the partnership obligation of Faust, we can not understand the court's ruling.   The objection in the record was not good, and the question was pertinent and germane to the subject matter of the direct examination of the witness, and couched in language similar to the questions which had been permitted to be asked by defendant.   This error alone, however, might not warrant a reversal of this cause for it does not appear that the evidence excluded was brought forward as required by the code on the motion for a new trial.   (*Scott v. King,* 96 Kan. 561, 152 Pac. 653.)

3. Objection is also made to the testimony of Jacobs, the purpose of which was an effort to show that he had in fact no partnership with Faust, notwithstanding the written contract of partnership executed by Faust and Jacobs on December 16, 1912.

The abstract reads:

Jacobs [testifying as to his oral agreement with Faust, about March 15, 1913, to forego the partnership] :

"A.  I told him it was utterly impossible to see in what condition the business was by reason of him having used these receipts for paying

51—97 KAN.

bills contracted before December 16th, and I asked him to get the bills together to check them over and see what it was. He agreed to do this and told me to come down in about a week and he would think over that. The following Sunday I went down there and he said he wasn't able to do it. And I went down a week later on and he told me it was impossible; he could not straighten it out and could not distinguish what the debts were after the 16th of December. I told him he could pay me 8% interest on the money I loaned him and said I would continue to help him along and he could pay me interest on any additional money I put in.

"Plaintiff moves the court to strike out the answer of the witness.

"Motion overruled. Plaintiff excepts.

"Q. Was anything said in any of these conversations about the partnership?

"Plaintiff objects as incompetent, irrelevant and immaterial.

"Objection overruled. Plaintiff excepts.

"A. We could not complete the partnership.

"By the Court: He did not ask you what you could do. He asked you if there was any conversation concerning it.

"Q. That is what we want.

"Same objection by plaintiff as to previous question.

"Same ruling by the court.

"A. Yes, sir; I told him it was utterly impossible to complete the partnership and that we would continue by him paying me 8% interest, and he agreed to that. He said that was all right."

We think these rulings were erroneous. Faust and Jacobs were partners, and no equivocation of testimony could alter their status as such. If the note sued on was traceable to an original indebtedness of Faust unconnected with the partnership, or if the credit was not extended on the partnership's account, or if the bank had notice that Jacobs had retired from the partnership before the note was delivered, Jacobs is not liable. But the evidence of Jacobs that he and Faust "could not complete the partnership," three months after the partnership was in fact completed, after it was in fact effected and effective, was incompetent and prejudicial.

There was some more of this line of testimony:

"Q. Did you ever authorize Faust to sign any notes of the firm?

"Plaintiff objects as incompetent, irrelevant and immaterial.

"Objection overruled. Plaintiff excepts.

"A. No, sir.

. . . . . . . . . . . . . .

"Q. When was the first time that you learned that Faust had signed these notes at the Exchange State Bank?

"Same objection by plaintiff.

"Same ruling by the court.

"A. I think it was along toward July; it was way late, sometime after we had agreed not to complete that partnership.

"That was in the year 1913."

Such testimony could hardly fail to lead the jury astray. The existence of a contract of partnership, or the fact of partnership, is for the determination of the jury, but the legal consequences of a partnership, and the right of one partner to bind the firm, with or without the literal sanction of the other, is a matter of positive law, and Jacobs could not be relieved of his liabilities as a partner no matter what response he did make or might make to such questions.

Jacobs also testified, over objection, as to the confused state of the partnership accounts. We fail to see how that affected this lawsuit, or how it could assist the court and jury in determining the liability of Jacobs.

4. There was no error in overruling the demurrer to defendant's evidence. Jacobs' defense stood on narrow grounds, but the evidence offered in its support was not subject to a demurrer. Its probative weight was for the consideration of the jury. (*Acker v. Norman,* 72 Kan. 586, 84 Pac. 531.)

5. Error is also assigned on the instructions given and refused. While on the whole the instructions fairly covered the law of the case, it would have been better if a simple positive instruction had been given touching the liability of Faust and Jacobs as partners for any partnership obligation during the existence of the partnership, and also the liability of Jacobs after the dissolution, if there was a dissolution, until the bank had notice of it. (30 Cyc. 675, 677; 9 M. A. L. 350.) We note also that in instruction No. 22 it is said:

"You are instructed that if you find and believe from the evidence herein that at the time of signing the note, it was the intention of Adam Faust to sign the correct name of the firm thereto, and by oversight, inadvertence or mistake, signed The American Home Bakery, instead of the real name of the firm, and that the funds received therefrom were used for the benefit of the firm in its business, then and in that event the partnership and each member thereof would be liable." etc.

The *intention* of Faust should not govern the liability or nonliability of the partnership. It would be impossible for the plaintiff to prove Faust's intention. Again, suppose the funds were loaned on the credit of the partnership, would it relieve Jacobs if the funds were *not* used for the benefit of the partner-

ship? We think not. If the credit was extended by the bank on the partnership account, each partner would be liable no matter what Faust actually did with the funds.

The other errors need not be considered.

The judgment of the district court is reversed and the cause is remanded for a new trial.

---

No. 20,251.

W. E. S. MIELY, *Appellant*, v. BERT METZGER, as Director, etc., et al., *Appellees*.

### SYLLABUS BY THE COURT.

1. RURAL HIGH SCHOOL—*Legality of Organization—Can be Raised Only by the State*. The principle that the state alone can question the legality of the organization of a municipal corporation applied in an action brought by a taxpayer, suing under section 265 of the civil code, to enjoin a rural high-school district from securing a site for a school building and from issuing bonds for the construction of a school building.

2. SAME—*Locating Schoolhouse Site — Petition for Election — Location Sufficiently Definite*. Chapter 311 of the Laws of 1915, relating to the establishment of rural high-school districts, provides that the petition to the board of county commissioners to call an election to vote on establishing and locating a rural high school shall state the proposed location of the school. A petition gave the proposed location as "within Ozawkie, Kansas," Ozawkie being an unincorporated village within the boundaries of the proposed district. *Held;* the location was sufficiently definite, and that the district board, which is given power to secure a building site located as indicated, has authority to secure a site within the village of Ozawkie.

3. SAME—*Election—Bonds for High-school Building—Ballots Not Defective*. The statute referred to provides for voting on the subject of issuing bonds to construct a high-school building, the amount being stated in the petition, at the same time the organization of the district is voted on. It is held that ballots prepared according to the statute and used at an election were not defective because electors were given no opportunity to vote for constructing a building without issuing bonds.

4. SAME — *Territory Lying in Two Townships — Election — Location of Voting Places*. A proposed rural high-school district comprised territory lying in two municipal townships. The statute provides that the election shall be conducted according to the general election law when not contrary to the statute. It is held that the provision of the gen-

eral election law requiring a separate polling place for each township is not applicable. *Held,* further, that if the general law were applicable, and but one polling place in the proposed district were designated, the election would not be illegal or void unless electors were in fact misled or disfranchised.

Appeal from Jefferson district court; OSCAR RAINES, judge. Opinion filed April 8, 1916. Affirmed.

*W. O. Worswick,* of Oskaloosa, *Robert Stone,* and *George T. McDermott,* both of Topeka, for the appellant.

*H. T. Phinney,* and *H. N. Casebier,* both of Oskaloosa, for the appellees.

*Edwin Anderson,* of Council Grove, as *amicus curiæ.*

The opinion of the court was delivered by

BURCH, J.: The action was one to enjoin a rural high-school board from securing a site for a rural high-school building and from issuing bonds for the construction of such building. A temporary injunction was denied and the plaintiff appeals.

The plaintiff brought his action under section 265 of the civil code, authorizing a taxpayer to enjoin the illegal levy of a tax, to enjoin the collection of an illegal tax or any proceeding to enforce such tax, and to enjoin any public officer, board, or body from entering into any contract or doing any act which would result in the creation of an illegal tax or public burden. The organization of the rural high-school district, which was formed under the provisions of chapter 311 of the Laws of 1915, was attacked. The code provision cited did not authorize the plaintiff to question the legality of the corporate organization. The state alone can question the existence of the district as a corporate entity and its right to exercise corporate power. The principle is discussed in the cases of *Topeka v. Dwyer,* 70 Kan. 244, 78 Pac. 417, and *Horner v. City of Atchison,* 93 Kan. 557, 144 Pac. 1010. The opinions in those cases collate other decisions of this court.

The act of 1915, relating to the establishment of rural high-school districts, provides for a petition to the board of county commissioners to call an election, a call for a special election, notice of such an election, and an election held under the general election law, when not contrary to the act. The returns

are canvassed by the board of county commissioners and the result is reported to the county superintendent. Should the proposition submitted carry the county superintendent calls a meeting for the election of a rural high-school board. The rural high-school board is empowered to secure by donation, purchase or condemnation a site for the rural high-school building, located as provided in section 2 of the act, which reads in part as follows:

"Whenever a petition signed by two-fifths of the legal electors residing in the territory of the proposed rural high school district, to be determined by an enumeration taken for this purpose, shall be presented to the board of county commissioners of the county in which lies the greatest portion of territory comprising said district, reciting the boundaries of said proposed district and requesting said board of county commissioners to call a special election to vote on establishing and locating a rural high school and to vote bonds for the construction of a high school building, the proposed location and the amount of the bonds proposed to be stated in the petition, it shall be the duty of the board of county commissioners forthwith to call a special election in said proposed district to vote on establishing and locating a rural high school and to vote bonds therefor." (Laws 1915, ch. 311.)

It will be observed that the election is held to determine two questions, the establishing of a rural high-school district, the boundaries being stated in the petition, and the voting of bonds for the construction of a building, the proposed location and the amount of bonds being stated in the petition. The petition, which the election proclamation and the ballots used in the election substantially followed, gave the proposed location as "within Ozawkie, Kansas," Ozawkie being an unincorporated village within the boundaries of the proposed district. It is said that the electors alone were vested with authority to locate the proposed school, that they were not permitted to do so and did not do so because the proposed location was not stated with sufficient certainty, and that the power of the rural high-school board to secure a site is limited to securing the precise site selected by the electors. Numerous authorities are cited in which the words "locate" and "location" are held to refer to a definite spot designated with particularity and precision. The meaning of these words depends, of course, upon the subject matter and the context of the statute or instrument in which they occur. In the act of congress organizing the territory of Kansas the seat of government was "located tempo-

rarily at Fort Leavenworth." (Gen. Stat. 1909, § 66.) Section 8 of article 15 of the constitution reads as follows:

"The temporary seat of government is hereby located at the city of Topeka, county of Shawnee. The first legislature under this constitution shall provide by law for submitting the question of the permanent location of the capital to a popular vote, and a majority of all the votes cast at some general election shall be necessary for such location."

A state normal school was "permanently located at the town of Emporia" by the legislature. (Gen. Stat. 1909, § 8325.) Other illustrations might be given. One of the proper meanings of the word "location" is "locality." (Webster's New International Dictionary, title, location.) If, pending the election, one resident of the proposed district had inquired of another where the school building was to be located, the answer "in Ozawkie" would not only have been according to approved usage of the language (Gen. Stat. 1909, § 9037) but would doubtless have been satisfactorily definite. If the petition had designated the place where the school building was to be erected as the corner common to sections 29, 30, 31 and 32, no one could doubt that the location was specific and definite, although the matematical point was not intended and the particular acre, whether in one section or another, was not described. The court concludes that the location "within Ozawkie" was sufficiently definite and that the board has authority to secure a site within the limits of that locality.

The ballot used in the election contained two propositions: (1) to establish the district, and (2) to issue bonds in the sum of $10,000 to construct a building in Ozawkie. The ballot followed the statute, but it is said that the second proposition was dual in that an elector could not vote for a high-school building without voting for bonds, although he might be in favor of a building and against issuing bonds. When first organized a district is necessarily without funds, and under all ordinary circumstances a site can not be secured, a building erected, and a high school instituted without a bond issue. The statute recognizes these conditions and provides for voting on a bond issue of a predetermined amount at the same time the organization of the district is voted on. Section 5 of the act, which authorizes the high-school board to exercise the power of taxation, contains the following provision:

"And shall make the necessary levy for taxes not to exceed four mills on the dollar of valuation on all taxable property in the rural high

school district, to pay teachers to create a. certain fund to retire any indebtedness, and pay interest on the same, and the incidental expenses of said high school." (Laws 1915, ch. 311.)

The probabilities are so remote that with this limitation on its power to raise revenue a district could establish a high. school in a building of its own without issuing bonds, the question of building or no building is in effect identical with the question of bonds or no bonds.

The district comprised territory lying in two municipal townships. The general election law provides for polling places in each township. The election was conducted at a single polling place within the proposed district. While the language of the statute makes the general election law applicable when not contrary to the statute, it evidently means that the general election law shall govern so far as applicable. It might be that all but a small fraction of a section of land would lie in one township. In such case a separate polling place for that tract would be absurd. The reasons which led to the adoption of the township as an election district for the holding of general elections do not apply, and the proposed school district in which the election is to be held should be regarded as the election district. Besides this, since it does not appear that any person was misled or disfranchised, or that the election was otherwise irregular or unlawful, holding it at an unauthorized place did not render it illegal or void. (*Wakefield v. Patterson,* 25 Kan. 709. See Note, "What Irregularities Will Avoid Elections," 90 Am. St. Rep. 46, 75.)

The failure to designate a separate polling place in each township was one of the objections made to the validity of the corporate organization. The other objection to the validity of the corporate organization was based on a clerical error, so evident as to correct itself, in describing the boundary of the proposed district. An objection to the constitutionality of the law was held to be not well taken in the case of *Rural School District v. Davis,* 96 Kan. 647, 152 Pac. 666.

The judgment of the district court is affirmed.

No. 20,302.

## *In re* CLAY MILLER, *Petitioner.*

SYLLABUS BY THE COURT.

1. HABEAS CORPUS — *Arrest Under City Ordinance — Case Pending — Habeas Corpus Not the Proper Remedy.* The purposes for which the writ of habeas corpus may be issued and the methods of obtaining the remedy may be regulated to some extent by statute, and under our statutory provision regulating the use of the writ it will be denied to one who has been arrested and is held for trial upon a complaint in a court of competent jurisdiction where the ordinary remedies are available to him and where the questions as to the validity of an ordinance and the legality of his arrest may be promptly determined.

2. SAME—*Arrested on View—Written Complaint Filed.* The statutory restriction to the effect that the writ shall not be issued when the person has been arrested and is held upon a warrant or commitment issued from a court of competent jurisdiction upon an indictment or information applies to a case where the person was arrested while engaged in the commission of an alleged offense and where a written complaint is promptly filed in the court as the statute authorizing such an arrest provides.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed April 8, 1916. Reversed.

*T. A. Pollock,* of Kansas City, *R. J. Ingraham,* and *L. E. Durham,* both of Kansas City, Mo., for the petitioner.

*R. J. Higgins,* and *W. H. McCamish,* both of Kansas City, for the respondent.

The opinion of the court was delivered by

JOHNSTON, C. J.: On December 8, 1913, Clay Miller was arrested on view by W. W. Gordon, chief of police of Kansas City, Kan., while the former was driving a beer wagon containing several cases of beer along one of the streets of that city, and taken to the city hall, where, in the absence of the police judge, Gordon fixed Miller's bond at $500, and then allowed him to go to communicate with his counsel. About three hours later he was released from Gordon's custody upon a writ of habeas corpus issued by the probate court. Gordon ar-

rested Miller on the ground that he was violating an ordinance of Kansas City, Kan., providing that it was unlawful for a person to drive a wagon along any of its streets, loaded with intoxicating liquor, or which bore the name of any person, firm, or corporation engaged in the liquor business, and declaring the wagon and its cargo and the horses drawing it public nuisances. The ordinance does not apply to persons who personally bring into the city liquors purchased outside the state, or receive liquors so purchased brought to them by a common carrier. The next day Gordon swore to a complaint charging Miller with violation of the ordinance, and a warrant was issued thereon, but he had been already deleased upon the writ of habeas corpus.

The contention of Miller was and is that the ordinance for the violation of which he was arrested is invalid, that the police court, before which he was taken, had no authority to render any judgment against him, and that he was not held under any complaint or process when this proceeding was begun. The respondent made a return stating that Miller was engaged in assisting to make and in making sales of intoxicating liquors in the city in violation of certain ordinances of the city and that a written complaint had been filed by him specifically charging the offenses, and that the case had been set down for trial in the police court of the city. In the petitioner's reply to the return he alleged that he was engaged in transporting beer from Missouri into Kansas, but that the beer was in original packages, and that he was delivering them to consumers who had previously given written orders for beer, and had purchased it for their personal use. He further alleged that he was not transporting or selling beer to persons who had not ordered it, nor in any other manner except as above stated, and further, that the city had no authority to prohibit or punish his acts in carrying and delivering beer as aforesaid, and that he was not selling or delivering it in a way that would subject him to prosecution and punishment under any law. A motion to quash his reply was overruled by the probate court and the petitioner discharged. An appeal was taken to the district court where a decision in favor of the petitioner was given, and from that judgment respondent appeals.

*In re* Miller.

It is contended by the respondent that the case was standing for trial in a court of competent jurisdiction where any and all questions as to whether he was transporting and selling intoxicating liquors contrary to law, and also as to the validity and scope of the city ordinances, may be determined. Courts of record have jurisdiction in cases of habeas corpus to inquire into alleged unlawful restraints, but the purposes for which the writ may be issued and the methods of obtaining the remedy are to quite an extent regulated by statute. Our statute provides:

"No court or judge shall inquire into the legality of any judgment or process whereby the party is in custody, or discharge him when the term of commitment has not expired, in either of the cases following: . . . *Fourth,* upon a warrant or commitment issued from the district court or any other court of competent jurisdiction upon an indictment or information." (Civ. Code, § 699.)

The courts will look into an application far enough to ascertain whether the remedy is available under the prescribed limitation or whether the relief sought may be speedily obtained in the court from which the process has issued. This statutory regulation of the exercise of the power to issue the writ of habeas corpus has been frequently applied. It has been held that the writ would not issue for the release of one arrested for the violation of a city ordinance where the validity of the ordinance and the legality of the arrest could be promptly determined in the court from which the warrant issued. The decision was that the police court, which had full authority and was ready to proceed to a determination of the question, was a court of competent jurisdiction within the meaning of the statute, and that as the ordinary remedy was available and all the questions raised by the petitioner might be determined in that court it was unnecessary to shift the inquiry into another court of competent jurisdiction for the determination of the same questions. (*In re Gray,* 64 Kan. 850, 68 Pac. 658.) It can not be assumed that the court which issued the warrant will not decide all questions of power and jurisdiction correctly, nor is there any reason why these questions may not be as speedily determined in the ordinary way without resorting to habeas corpus. In all such cases the restriction of the statute governs. Exceptional cases may arise

where the ordinary remedies are wholly inadequate and in such cases the writ may be issued. An instance of this kind is found in the case of *In re Jarvis*, 66 Kan. 329, 71 Pac. 576. There the petitioner had been convicted under a statute which he insisted was invalid. The time for an appeal from the judgment had passed and none of the ordinary remedies was open to him, and it was therefore held that the writ of habeas corpus might issue. The writ has been issued and relief has been given in cases where a judgment of conviction is final and absolutely void. (*In re Smith, Petitioner*, 52 Kan. 13, 33 Pac. 957; *In re Norton*, 64 Kan. 842, 68 Pac. 639; *In re Spaulding*, 75 Kan. 163, 88 Pac. 547.) Other instances of an exceptional character may arise which will warrant a release of a prisoner upon habeas corpus, but the present case falls fairly within a number of cases where the court has declined to inquire into the legality of a commitment issued from a court of competent jurisdiction before trial has been had upon a complaint or information. (*In re Terry*, 71 Kan. 362, 80 Pac. 586; *In re Sills*, 84 Kan. 660, 114 Pac. 856; *In re McKenna*, ante, p. 153, 154 Pac. 226; 21 Cyc. 287.) A case very similar to this one was determined by the court a few days ago. There the petitioner had been arrested by the chief of police for the violation of a city ordinance which it was alleged the city had no power to enact. Before trial was had he applied to this court for a writ of habeas corpus, insisting that the lower court had no authority to render a judgment against him and that therefore the restraint was illegal. It was held that as the ordinary remedy and the regularly established procedure were available to him, where all the objections to the validity of the complaint and arrest might be presented and determined, the writ of habeas corpus would not be issued. In that decision the rule was well stated, the cases carefully reviewed and the restriction of the statute upheld. (*In re Will*, ante, p. 600, 155 Pac. 934.)

It is further contended that the statutory restriction does not apply since the petitioner was arrested upon view and when no complaint had yet been filed against him. A complaint was filed shortly after the arrest was made but not until the writ herein had been issued. An arrest upon view and upon the oral charge of the officer was authorized by law.

Messick v. McEntire.

(Gen. Stat. 1909, § 982.)   Complaint was promptly filed as the statute requires, and it was set forth in the return made by the officer.  To that return the petitioner replied, and upon the issues so formed the case was tried.  The oral charge that the petitioner was engaged in the commission of an offense when the arrest was made served the purpose of a complaint for the time being, and the complaint was subsequently reduced to writing and filed as the statute provides.  So made, it met the requirements of the law and fairly comes within the statutory provision that the writ is not available where one has been committed for and is awaiting trial upon an information.

The judgment will be reversed and the case remanded with the direction that the application for the writ be denied.

---

No. 20,347.

B. F. MESSICK, *Appellee*, v. GEORGE P. MCENTIRE and RALPH N. MCENTIRE, Partners, etc., *Appellants*.

SYLLABUS BY THE COURT.

WORKMEN'S COMPENSATION ACT—*Personal Injuries—Contributory Negligence of Plaintiff—No Bar to Recovery.*  In an action under the workmen's compensation act (Laws 1911, ch. 218) the admitted facts showed that plaintiff was injured by being caught in the revolving cylinders of a machine while standing in or upon it and applying compressed air for the purpose of cleaning the cylinders.  Covers or hoods were provided for use when the machine was in operation, but in order to clean the machine the covers had to be removed.  The plaintiff could have stood on the ground and applied the air without danger of coming in contact with the revolving cylinders.  On these facts and others stated in the opinion it is held that plaintiff is not barred from the right to recover compensation by the provision of section 1 of the compensation act on the ground that his injury resulted from his deliberate intent to cause the injury or from his willful failure to use a guard provided for him as protection against accident.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge.  Opinion filed April 8, 1916.  Affirmed.

*Edwin A. Austin,* of Topeka, *Adrian F. Sherman,* and *Thad B. Landon,* both of Kansas City, Mo., for the appellants.

*F. T. Woodburn,* of Holton, and *A. E. Crane,* of Atchison, for the appellee.

The opinion of the court was delivered by

PORTER, J.: This is an appeal from a judgment in plaintiff's favor under the workmen's compensation act.

The plaintiff was in the employ of the defendants at their mattress factory in Topeka. He was in charge of a felting machine the cylinders and rollers of which are covered with sharp teeth and prongs to tear cotton apart. In order to protect workmen from injury by these revolving surfaces there are safety covers or hoods which completely cover the cylinders or rolls when in operation. It becomes necessary from time to time to clean the machine because the teeth of the cylinders become matted with cotton. In cleaning the machine the safety covers are removed. Some rolls are removed from the machine and scraped separately with a wire brush. Other cylinders and rolls are not removable and are scraped as they are turned by hand. Compressed air is used to blow out bits of cotton and dust remaining on the surfaces of the cylinders. There is a tube from a tank of compressed air with a hose and nozzle by which the air is applied.

On the morning of the accident the plaintiff took off the five removable cylinders and cleaned them. He then cleaned with the wire brush the remaining cylinders or rolls in the machine, turning each by hand little by little as became necessary. He then put the machine in motion under the power of the factory, applied the air, took the hose and climbed upon the endless belt of wooden slats in the middle of the machine with the cylinders revolving under power beyond his control. In some way he lost his balance, and in trying to save himself struck his hand on the inturning surface of the main cylinder and received his injuries.

There is practically but one contention raised by the defendants, and it is, that the act of the plaintiff in turning on the power and climbing upon the machine after the hoods or covers were removed constitutes a willful failure to use a guard or protection provided by his employer for his protection against accident—a willful failure within the terms of the compensation act which provides that an injury so resulting to the workman shall be disallowed. It is claimed that upon the undisputed evidence the court must assume that plain-

tiff's injury resulted from his deliberate intention to cause the injury.

The workmen's compensation act contains a provision that—

"If it is proved that the injury to the workman results from his deliberate intention to cause such injury, or from his willful failure to use a guard or protection against accident required pursuant to any statute and provided for him, or a reasonable and proper guard and protection voluntarily furnished him by said employer, or solely from his deliberate breach of statutory regulations affecting safety of life or limb, or from his intoxication, any compensation in respect to that injury shall be disallowed." (Laws 1911, ch. 218, § 1.)

The plaintiff testified that he had always cleaned the rolls and cylinders in the same way. We take this to mean, not that he always climbed upon the machine when applying the compressed air, but that he used the air while the machine was in motion. A witness for defendants testified that the machine could not be cleaned without taking off the hoods and that the hoods afforded no protection when the machine was cleaned while running. The foreman of defendants' factory testified that he had frequently seen the plaintiff have the machine running while he used the blower, that he never saw it cleaned any other way, and that he had seen defendants clean it in that manner. No witness testified, however, to seeing any other person do as plaintiff did on the occasion of the accident, that is, get in or upon the machine to use the blower with the machine in operation, and the testimony was that the plaintiff could have stood on the floor and used the air to clean the rolls while the machine was running.

The evidence therefore establishes the fact that in attempting to use the blower with the machine running the plaintiff was following his usual method as well as that in common use by other employees and by defendants. It is conclusively shown that the guards or hoods for protecting employees from injury by the revolving cylinders were not provided for nor intended to afford any protection while the rolls were being cleaned. Therefore, plaintiff's injury did not result from his failure, willful or otherwise, to use the guard or protection provided for him. Of course, it did not result from his "deliberate intention" to injure himself, and the particular provision of the statute relied upon by defendants can not possi-

bly apply. We may concede that, in getting into or upon the machine to apply the air while the machinery was operating rapidly and beyond his control, with the hoods or guards removed, plaintiff was guilty of negligence—probably negligence of a gross kind; but the statute does not make his negligence, gross or ordinary, a bar to his right to recover compensation. Nothing save his *deliberate intention* to cause the injury, his willful failure to use guards or protection provided for him, his deliberate breach of some statutory regulation, or his intoxication can deprive him of his statutory right to compensation for an injury. This is not an action to recover under the factory act, but for compensation under the workmen's compensation act. Doubtless if plaintiff had used the blower while standing on the ground he would not have been injured; but his failure to do so was only negligence.

We agree with defendants' statement in their brief that the question of where the burden of proof rested was immaterial, because "either the admitted facts were sufficient to disallow compensation, or they were not." It is unnecessary, therefore, to consider the alleged errors in the instructions. Upon the admitted facts plaintiff's injury did not result from his failure to use a guard provided for his protection for the reason that he was injured while cleaning the machine at a time when the guards or covers had to be removed.

Defendants' counsel, who are also counsel for an employers' interinsurers association, conclude their brief with one more effort to "thresh out old straw" by protesting against previous decisions where in construing the workmen's compensation act this court has repeatedly held that the legislature meant exactly what it said in the following provision of the act:

"The judgment in the action, if in favor of the plaintiff, shall be for a lump sum equal to the amount of the payments then due and prospectively due under this act, with interest on the payments overdue, or, in the discretion of the trial judge, for periodical payments as in an award." (Laws 1911, ch. 218, § 36. *Roberts v. Packing Co.*, 95 Kan. 723, 149 Pac. 413; *McCracken v. Bridge Co.*, 96 Kan. 353, 150 Pac. 832, modified, 96 Kan. 799, 153 Pac. 525.)

Their contentions that judgments for lump sums are contrary to the spirit and purpose of the act, that this court can control the sound discretion exercised by the trial courts in refusing to render judgments for periodical payments, have

not, as counsel suggest, met with our approval.   In fact, we have dismissed appeals in compensation cases 'as being without merit where it was shown that counsel persisted in urging these same contentions as grounds for reversal.   (*McCracken v. Bridge Co.*, supra.)

However desirable it may be to have the law read as compensation acts in some states read, that the judgment shall be for periodical payments, and may in the trial court's discretion be rendered for a lump sum, the change can not be made by the courts.   The legislature alone possesses the necessary power.

The judgment is affirmed.

---

No. 20,470.

THE LEAVENWORTH NATIONAL BANK et al., *Plaintiffs*, v. H. V. REILLY, as County Treasurer, etc., et al., *Defendants.*

SYLLABUS BY THE COURT.

1. "FISCAL YEAR"—*What it Embraces.*   The term "fiscal year" is the year embraced in the annual term for the opening and closing of financial accounts.

2. SAME—*When "Fiscal Year" in Leavenworth County Begins.*   The "fiscal year" in Leavenworth county, for the regulation of its county finances and for the opening and closing of its financial accounts, begins on the second Tuesday in October of each year.

3. COUNTY WARRANTS—*Limitation of Issue.*   The issue of warrants in any one fiscal year to defray the general expenses of Leavenworth county is limited to the maximum revenues which the levy for that fiscal year will produce, and is determinable by a calculation applying the levy to the assessed valuation of the county.

4. SAME.   The board of county commissioners of Leavenworth county has no power to issue county warrants for the payment of current expenses in excess of the revenues to be derived from the general tax levy made to meet such expenses.

5. SAME.   The board of county commissioners of Leavenworth county has no power to issue county warrants in any one year to be redeemed by anticipating and impairing the revenue of succeeding years.

6. "FISCAL YEAR"—*County Commissioners No Power to Change.*   The board of county commissioners of Leavenworth county has no power to change the beginning of the fiscal year from the second Tuesday of October, 1914, to January 1, 1915, to serve the temporary financial convenience of the county.

52—97 KAN.

7. SAME—*Certain Former Opinions Disapproved.* The cases of *Garfield Township v. Dodsworth,* 9 Kan. App. 752, 58 Pac. 565, and *Garfield Township v. Hubbell,* 9 Kan. App. 785, 59 Pac. 600, disapproved as precedents governing the case at bar.

8. VOID COUNTY WARRANTS—*Issued for Valid Indebtedness—May be Paid How.* When county warrants have been issued in excess of the general maximum revenue fund for the current fiscal year, but for which the county got value received, they can be paid in two ways; (1) by the slow collection of delinquent taxes and miscellaneous items which may inure to the general revenue fund; or (2) by application to the legislature and obtaining its sanction authorizing their payment out of later general revenues of the county.

9. VOID COUNTY WARRANTS—*Purchasers Subrogated to Rights of Original Creditors—Payment by Future Levies.* Where county warrants are void only because issued in excess of the maximum revenues derivable from the general levy for the current fiscal year, the holders of such warrants are subrogated to the rights of the original creditors whose claims against the county were the basis of such void warrants; and if the claims were lawful, the county is liable to the subrogated holders of such claims and provision may be made to meet their payment in future annual levies, but no such future annual levy can exceed the maximum fixed by statute.

Original proceeding in mandamus. Opinion filed April 8, 1916. Writ denied. Opinion denying a rehearing (*post.,* p. 827) filed May 13, 1916.

*W. W. Hooper, A. E. Dempsey,* and *Louis H. Wulfekuhler,* all of Leavenworth, for the plaintiffs.

*Lee Bond,* and *M. N. McNaughton,* both of Leavenworth, for the defendants.

The opinion of the court was delivered by

DAWSON, J.: This action invokes the original jurisdiction of this court for a writ of mandamus to compel the county treasurer of Leavenworth county to pay certain county warrants held by the plaintiffs, which are the principal banking houses of the city of Leavenworth.

The petition alleges that in March, 1915, Leavenworth county was without funds to pay its current obligations, matured and maturing, during the year 1915, except by issuing county warrants, and that the board of county commissioners requested a conference with the bankers of Leavenworth, and that such conference was held and it was orally agreed thereat that the plaintiff banks would cash all warrants lawfully

Bank v. Reilly.

issued, not to exceed the amount that could be levied and raised by taxation for current expenses during the year 1915, which was approximately $52,000, and it was further orally agreed that the county warrants would be taken by the banks at par, and would be paid out of the first money available, "collected for taxes under the levy made by the board of county commissioners in August, 1915, for the current general taxes of that year."

The plaintiffs cashed warrants amounting to $24,793.95, which were issued between April 1, 1915, and November 1, 1915. The warrants were presented to the county treasurer, and registered, numbered, and stamped "Not paid for want of funds."

On November 1, 1915, the warrants were presented for payment, there being then ample funds in the county treasury raised by the levy made in August, 1915; but payment was refused by the treasurer on the ground that the funds raised by the levy of 1915 could not be devoted to the payment of these warrants.

The board of county commissioners make no defense to this lawsuit.

In his return to the alternative writ of mandamus, the county treasurer alleges that there is no record of the alleged agreement between the plaintiffs and the county commissioners; that the fiscal year of Leavenworth county begins on the second Tuesday of October; that he has been in the public service in the county treasurer's office almost continuously for over twenty years, and that during all that time the financial affairs of the county had been conducted on that basis; that when he became county treasurer, in October, 1915, he found that between April 1, 1915, and October 1, 1915, warrants amounting to $39,601.93 had been issued and stamped "Not paid for want of funds"; that he immediately examined the records and found that the general fund for the year 1914 had commenced on the second Tuesday in October, 1914; and that (by order of the board of county commissioners) the general fund for the year 1914, was changed to begin January 1, 1915, but that the other funds continued as theretofore, the only changes being those affecting the general funds of 1914 and 1915.

Answering further, the county treasurer recites that he discovered that the sum of $14,987.05 remained in the general fund for 1914, and thereupon he paid out that amount to the plaintiffs on the warrants held by them; that the total amount of warrants between October, 1914, and October, 1915, was $76,580.48, and that the levy for that year raised $53,261.67, and that (by law) no part of the next succeeding year's levy and revenue could be devoted to the payment of the excess warrants of the preceding year; that he is at all times ready to pay the plaintiffs' warrants out of any funds which may yet be realized from the levy of 1914; that he has no personal interest in this action except to protect himself and his bondsmen from the consequences of paying out public moneys illegally, and asks for his costs and a reasonable attorney's fee.

Reduced to shorter terms, the questions to be considered are: (1) Does the fiscal year of Leavenworth county begin on the second Tuesday in October in each year? (2) Are the general expenditures of the county limited to the revenues raised by the levy of that year, together with the miscellaneous fees and minor items which accrue to the general revenues? or can the board of county commissioners disregard the maximum general revenues possible in any year and issue warrants in excess thereof? and (3) Can the county commissioners change the date of the fiscal year to suit the temporary financial convenience of the county?

Before examining these questions, we note that there is nothing vicious, fraudulent, or questionable in the slightest degree inhering in any of the warrants, and that the county got value received for each of them. Whether their payment can be compelled at this time by mandamus is the gist of this controversy.

1. There is no general uniformity throughout the state touching the beginning of the fiscal year. A fiscal year is simply the year embraced in the annual term for the opening and closing of financial accounts.

In *Moose v. State*, 49 Ark. 499, 5 S. W. 885, which was a prosecution of a county clerk for failing to publish a financial report of the county within thirty days after the annual settlement with the collector (treasurer) of the county for the fiscal year, it was held that the fiscal year, so far as it relates to the

financial affairs of the counties, must mean the current year embraced between the dates of the collector's (county treasurer's) annual settlements; and that the "fiscal year ending 1887" covered the period from the collector's settlement in 1886 to his settlement in 1887.

In the state's own financial affairs, the fiscal year begins on July 1. (Gen. Stat. 1909, § 8955.) In first-class cities under the old form of government the fiscal year begins on April 1. (Gen. Stat. 1909, § 1038.) In first- and second-class cities under commission government the fiscal year begins on January 1. (Gen. Stat. 1909, §§ 1328, 1500.)

The defendant alleges, and the fact is not denied, that for many years the fiscal year of Leavenworth county has been considered and dealt with by the county authorities as beginning on the second Tuesday in October in each year. Whether this is true of the counties of this state generally may not have to be determined here.

In 1871 a special law was enacted relating to levies, county revenues, and taxation in Leavenworth county. (Laws 1871, ch. 148.) In 1876 another special law was enacted, concerning bond issues, funding indebtedness, issue of warrants, etc. (Laws 1876, ch. 36.) In that year, also, another special act relating to Leavenworth county tax levies was adopted by the legislature. (Laws 1876, ch. 90.)

In 1879 another special law was enacted relating to taxation in Leavenworth county, fixing the fiscal year of that county, limiting the issue of warrants to the sum raised by the levy for each fiscal year and providing penalties for its violation, etc. (Laws 1879, ch. 120.) By this act the fiscal year of Leavenworth county was thus defined:

"SEC. 2. The fiscal year of the county of Leavenworth shall begin with the second Tuesday of October, and the tax levied by virtue of section one of this act, in the year eighteen hundred and seventy-nine, and each year thereafter, shall be applied to the expenses of the fiscal year beginning the second Tuesday of October in each year; and no part of the tax levied in any one year shall be used to pay indebtedness due before the beginning of the fiscal year for which such levy was made."

Other sections of this special act restrict the issue of warrants, forbid the remissions of taxes and penalties, and make elaborate provisions for the discipline and punishment of county officials who violate its terms.

In 1885 a general law relating to county tax levies was enacted (Laws 1885, ch. 110) ; and this was followed by a lawsuit to determine whether the special act of 1879 or the general act of 1885 controlled the legal limit of general tax levies in Leavenworth county. This was the case of *Howard v. Hulbert,* 63 Kan. 793, 66 Pac. 1041. In stating the question, Mr. Justice Cunningham said:

"Did the general law of 1885 repeal, by implication, the special act of 1879? . . . We do not overlook the rule that repeals by implication are not favored, but we are equally well aware of the rule 'that where two statutes are in any respect, in both language and meaning, irreconcilably repugnant, the provisions of the statute last enacted repeal those of the former, with which they conflict.' . . . That the two acts are repugnant we may not doubt. . . . We conclude that the general act of 1885 repealed the special act of 1879 and that the tax levy in Leavenworth county for 1890, being in excess of the amount the commissioners were authorized to levy, the sale of the real estate in question for the delinquent taxes was unauthorized." (pp. 795, 798.)

Of course, the only matter before the court in *Howard v. Hulbert,* supra, was the legality of the tax levy, and this only involved a consideration of section 1 of the special act of 1879, relating to the amount of tax levies and current expenses in Leavenworth county. When the court was impelled to hold that the later general act superseded the earlier Leavenworth special act by implication, the question of the levy was the only one under consideration. It had no concern with the other provisions of the Leavenworth special act, nor with the provision in section 2 of that act defining the Leavenworth county fiscal year. We see no reason for holding that the other sections of the special act of 1879, limiting indebtedness, the issue of warrants, providing punishment for official misconduct and the like, have been repealed by implication.

It does not appear that the decision in *Howard v. Hulbert* was given the operative interpretation of repealing section 2. *Howard v. Hulbert* was decided in December, 1901. For fourteen years thereafter, and until the spring of 1915, the operative interpretation of the law by those officially charged with its administration in Leavenworth county was that section 2 of the act of 1879 defining the fiscal year was still in effect.

The significance to be attached to the operative interpretation of an act is one which this court has heretofore considered. In 1899 a question arose as to whether an act relating to the fees of the clerk of the supreme court had been repealed. It was shown that the clerk had exacted the disputed fees for nearly thirty years and that the legislature had impliedly recognized them as legal by repeated reference to them. The court said:

"In all cases of ambiguity of statutes, the contemporaneous construction of the legislative and executive departments, and of the officials whose duty it is to carry the laws into effect will be allowed great and, oftentimes, determining weight." (*Harrison v. Benefit Society*, 61 Kan. 134, syl. ¶ 2, 59 Pac. 266.)

In the opinion it was said:

"The rule is well settled that 'in all cases of ambiguity the contemporaneous construction not only of the courts but of the departments, and even of the officials whose duty it is to carry the law into effect, is controlling.' (*Shell's Executors v. Fauche*, 138 U. S. 562, 11 Sup. Ct. Rep. 376, 34 L. Ed. 1040.)" (p. 140.)

Following this reasoning a little further, we note that some twelve years after the enactment of the general tax law of 1885 the legislature took cognizance of the Leavenworth special act of 1879. In 1897 two short acts were passed by the legislature amending section 2 of the Leavenworth special act of 1879. They both read as follows:

"SECTION 1. That section 2, of chapter 120, of the laws of 1879, be amended to read as follows: The fiscal year of the county of Leavenworth in the state of Kansas shall begin with the second Tuesday of October in each year." (Laws 1897, chs. 250 and 251.)

One of these acts was a house bill and the other a senate bill. The enactment of duplicates might argue that the legislature did not pay much attention to what it was doing; but on the other hand it might be urged that the legislature intended to be emphatic about it.

At all events, it is clear that the legislature intended, not-withstanding its general act of 1885, that the fiscal year in Leavenworth county should continue, as theretofore, to begin on the second Tuesday in October.

2. Proceeding now to consider whether the general expenditures of the county are limited in any one fiscal year to the

amount of money which may be expected from that year's levy (and the minor items which accrue to the general revenue fund and which need not be considered here), we find that this matter is about as fully covered by the General Statutes as by the Leavenworth special act of 1879.

Section 2311 of the General Statutes of 1909 provides:

"It shall be the duty of the board of county commissioners of each county in this state to levy in each year, in addition to the taxes for other purposes, a county tax sufficient to defray all county charges and expenses incurred during such year, and twenty per centum in addition to make up ·for delinquent taxes of the same year; and it shall be unlawful for any board of county commissioners or county clerk to issue county warrants or orders in any one year to a greater amount than the amount of the county tax levied in the same year to defray county charges and expenses, less the amount levied for delinquencies."

Section 2313 provides:

"Any board of county commissioners, or any county commissioner, or county clerk, who shall violate any of the provisions of this act, or neglect, or refuse to perform any duty herein imposed, shall be deemed guilty of a misdemeanor, and upon conviction thereof in a court of competent jurisdiction shall be subject to a fine of not less than ten dollars nor more than ten thousand dollars, and shall, moreover, be removed from office."

We do not overlook the cases of *Garfield Township v. Dodsworth*, 9 Kan. App. 752, 58 Pac. 565, and *Garfield Township v. Hubbell*, 9 Kan. App. 785, 59 Pac. 600, which have construed the year referred to in section 2311 of the General Statutes of 1909 to mean the calendar year. Of what significance has a calendar year on the fiscal affairs of a county? None whatever. The statutes provide for the year's levies to be made in August to provide revenues for the ensuing fiscal year. (Gen. Stat. 1909, § 9389.) The statutes provide for the county treasurer's quarterly fiscal settlements, the last quarter of the year being in October at the close of each year of his official term. (Gen. Stat. 1909, §§ 2144, 2145.) He takes his office on the second Tuesday in October immediately following the close of his predecessor's official term. (Gen. Stat. 1909, § 2138.) This is simultaneous with the close of the fiscal year for which his outgoing predecessor is required to render his financial account. The taxes levied in August to provide revenues for the ensuing fiscal year are due November 1, shortly and con-

veniently after the new fiscal year begins. (Gen. Stat. 1909, § 9391.) The first of January is designated as the date when the county treasurer's report for the *first quarter* of the fiscal year shall be published (Gen. Stat. 1909, § 2146), which negatives every assumption that it might be deemed the *commencement* of the fiscal year. With all due deference to the late courts of appeals, we can not see how its decisions just cited can be approved. Whether the *year* mentioned in the statute can in any case be said to be the calendar year we need not decide. Read in connection with the Leavenworth special acts of 1897 it must be said that the *year* referred to in section 2311 of the General Statutes of 1909 is the fiscal year.

From this it follows that in the county of Leavenworth the maximum amount of warrants which could lawfully be issued between the second Tuesday in October, 1914, and the second Tuesday in October, 1915, was controlled by the levy made in August, 1914, with such minor incidental items as may inure by law to the general revenue fund during that year and from the collection of such items overdue from preceding years. We are keeping in mind that each year's general revenue includes not only the receipts from the general tax levy but delinquent taxes of other years not needful for prior years' expenses, and also incidental fees, other stale claims collected, proceeds from the sale of property, etc., which properly inure to the general revenue fund.

In other words, it must be held that Leavenworth county can not in any one fiscal year issue more warrants than that year's revenues may reasonably be expected to meet; and it can not anticipate and impair the revenues of future years by an extraordinary issue of warrants in any one fiscal year. This proposition is fortified from two viewpoints; *first,* no power to do so has been granted by the legislature; and *second,* it has been forbidden by positive statutes, whether the inhibitions of the special act of 1879 or those of the general statutes be held to control in Leavenworth county. We need scarcely add the other obvious proposition, that if this were not the correct law of this case nothing would stand between the county and bankruptcy except the discretion of the board of county commissioners. There is probably no government, national, state, provincial or local, which does not in some

manner provide a check upon public expenditures, and if the contentions of plaintiffs were correct, where would be the check upon the power of the board of county commissioners of Leavenworth county?

In *Comm'rs of Osborne Co. v. Blake,* 25 Kan. 356, a case not unlike the present, it was said:

"All the statutes upon the subject seem to contemplate that the county board will not create, nor allow to be created, liabilities against the county faster than the legal and proper taxes will pay them. But suppose the county board should allow liabilities to be thus created, then may all the creditors of the county convert their claims into judgments, and then compel the county board to levy county taxes vastly beyond the limits prescribed by said section 181? We think not." (p. 358.)

3. It needs but a word to dispose of the order of the board of county commissioners changing the fiscal year from October to January. Such action was in derogation of the statute. (Laws 1897, chs. 250 and 251.) It was done in an attempt to evade the statutory limitations upon county expenditures. It was only attempted to be done so far as affected the general fund out of which these warrants were to be paid. It did not pretend to make a change of the fiscal year so far as the other county funds were concerned. The order changing the fiscal year was without any legal effect whatsoever.

From the foregoing it must be apparent that the statutory restrictions and the precedents cited above are too formidable to be waived aside by a writ of mandamus directing the payment of these warrants at this time. This would ordinarily conclude our opinion. But the matter is one of such public interest that we may be permitted to make some suggestions to the end that no injustice be done to the parties who have acquired these warrants in actual if not technical good faith.

It is conceded that the *claims* for which these warrants were issued were valid and that the county got value received therefor. The present holders of the warrants are therefore subrogated to the rights of the original claimants. Although the warrants are void, the claims are valid. (*School District v. Dudley,* 28 Kan. 160, syl. ¶ 2; *Irvine v. Board of Com'rs* [of Kearny Co., Kan.], 75 Fed. 765.) The county must pay its valid debts. It did not pay them by issuing void warrants. The indebtedness is still outstanding. Presumably the indebt-

edness was incurred for salaries of county officials, stationery, lights, fuel and equipment for the county offices, jurors' fees, witness' fees and kindred legitimate county expenses. If the county has the money now to meet these debts—the claims for which the void warrants were issued—new vouchers should be made, new warrants issued and the claims paid. If the funds on hand will not pay all these claims and the levy for this current year will not produce sufficient revenues to pay them, these outstanding debts or claims should be taken into account in making next year's levy and they can all be paid in time. The safeguarding of the rights of the taxpayers, in the last analysis, is the statutory maximum levy for county expenses. (Gen. Stat. 1909, §§ 9394-9424.)

---

OPINION DENYING A REHEARING.
Filed May 13, 1916.

